# EXHIBIT 1

**IMPORTANT NOTICE**

IMPORTANT: You must read the following before continuing. The following applies to the offering memorandum following this page (the "Offering Memorandum"), and you are therefore advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO.

THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE ISSUER HAS NOT REGISTERED AND DOES NOT INTEND TO REGISTER AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). IN ORDER TO BE ELIGIBLE TO READ THE OFFERING MEMORANDUM OR MAKE AN INVESTMENT DECISION WITH RESPECT TO THE SECURITIES DESCRIBED THEREIN, YOU MUST (1) NOT BE A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT (A "U.S. PERSON") OR (2) BE A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB").

THE OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS OFFERING MEMORANDUM IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

THE TERMS AND CONDITIONS OF THE INTERNATIONAL OFFERING WILL BE NOTIFIED TO THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION (*COMISIÓN NACIONAL BANCARIA Y DE VALORES*) AS REQUIRED UNDER APPLICABLE LAW AND FOR INFORMATIONAL PURPOSES ONLY AND SUCH NOTICE DOES NOT CONSTITUTE A CERTIFICATION AS TO THE INVESTMENT QUALITY OF THE SECURITIES OR OF THE ISSUER'S SOLVENCY, LIQUIDITY OR CREDIT QUALITY OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION SET FORTH IN THE OFFERING MEMORANDUM. THE OFFERING MEMORANDUM IS SOLELY OUR RESPONSIBILITY AND HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE MEXICAN NATIONAL BANKING AND SECURITIES COMMISSION. IN MAKING AN INVESTMENT DECISION, ALL INVESTORS, INCLUDING ANY MEXICAN CITIZEN WHO MAY ACQUIRE SECURITIES FROM TIME TO TIME, MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER.

Confirmation of your representation: The Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum, you shall be deemed to have represented that (a) you consent to delivery of the Offering Memorandum by electronic transmission, and (b) you are not a U.S. Person or, if you are a U.S. Person, you are also a QIB.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the lead manager or any affiliate of the lead manager is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the lead manager or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission and consequently none of the initial purchasers, nor any person who controls the initial purchasers nor any director, officer, employee or agent or affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic format herewith and the hard copy version available to you on request from the initial purchasers.

OFFERING MEMORANDUM                                                                                    CONFIDENTIAL

365,000,000 CBFIs

# FIBRA UNO

**(TRUST F/1401)**

*(a trust formed under the laws of the United Mexican States)*



### Real Estate Trust Certificates

We are a Mexican trust formed primarily to acquire, own, develop, lease and operate a broad range of real estate properties in Mexico, including industrial, retail and office properties. We are internally managed by our management subsidiary, F1 Management, S.C., a *sociedad civil* duly formed under the laws of Mexico, or our Management Subsidiary, and externally advised by Fibra Uno Administración, S.C., a *sociedad civil* duly formed under the laws of Mexico, or our Advisor. We have also entered into agreements with unaffiliated property managers for the operation, management and maintenance of certain of our properties, as described herein. We are organized and conduct our operations so as to qualify as a real estate investment trust (*fideicomiso de inversión en bienes raíces*), or FIBRA, for Mexican federal income tax purposes.

We are offering 365,000,000 of our Real Estate Trust Certificates (*Certificados Bursátiles Fiduciarios Inmobiliarios*), or CBFIs, in a combined offering consisting of (i) a public offering in Mexico of 167,765,739 CBFIs by way of a separate Spanish language prospectus and accompanying prospectus supplement and (ii) an international offering of 197,234,261 CBFIs (a) in the United States, to qualified institutional buyers, as defined in Rule 144A, or Rule 144A, under the U.S. Securities Act of 1933, as amended, or the Securities Act, in transactions exempt from registration thereunder pursuant to Rule 144A and (b) in other countries outside of Mexico and the United States, to non-U.S. persons in reliance on Regulation S under the Securities Act, or Regulation S. The combined offering is made pursuant to our delayed offerings program, or our MultiOffering Program, which has been authorized by the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*), or the CNBV. This offering memorandum relates only to the international offering. CBFIs being offered in the combined offering may be reallocated between the Mexican offering and the international offering. See "Plan of Distribution."

All of the CBFIs offered by this offering memorandum are being sold by us. Our CBFIs are listed on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*), under the symbol "FUNO11."

Our trust agreement contains certain restrictions relating to the ownership and transfer of our CBFIs, including a provision that ownership of 10% or more of our outstanding CBFIs requires the prior approval of a majority of the members of our technical committee, including a majority of the independent members of our technical committee. See "Description of Our CBFIs and Certain Provisions of Our Trust Agreement and Mexican Law" beginning on page 155.

Certain of the Relevant Principals of E-Group have purchased an aggregate of 44,500,600 CBFIs offered in the combined offering at the public offering price, net of any sales commissions or discounts.

**Investing in our CBFIs involves risks. See "Risk Factors" beginning on page 24 of this offering memorandum.**

**The offering price for our CBFIs is Ps.30.50 per CBFI.**

We have granted the initial purchasers and the Mexican underwriters the right to purchase up to an additional 54,750,000 CBFIs within 30 days of the date of this offering memorandum solely to cover over-allotments, if any. See "Plan of Distribution."

The CBFIs have not been and will not be registered under the Securities Act or the securities laws of any jurisdiction other than Mexico. Unless they are registered, the CBFIs may be transferred only in transactions that are exempt from registration under the Securities Act and the securities laws of any other relevant jurisdiction. Accordingly, we are offering the CBFIs pursuant to exemptions from registration under the Securities Act (a) in the United States, only to qualified institutional buyers as defined in Rule 144A, and (b) outside of Mexico and the United States, to investors who are not U.S. persons, as defined in and in reliance on Regulation S. For further details about eligible offerees and transfer restrictions, see "Transfer Restrictions."

Our CBFIs will be registered with the Mexican Securities Registry (*Registro Nacional de Valores*), or the RNV, maintained by the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*), or the CNBV. Such registration does not imply a certification as to the investment quality of the securities offered in this offering memorandum, our solvency, or the accuracy or completeness of the information contained in this offering memorandum, and does not validate acts that are contrary to applicable law.

The CBFIs will be ready for delivery on or about October 9, 2017.

**Joint Global Coordinators and Joint Book-Runners**

| | | |
|---|---|---|
| **Santander** | **BofA Merrill Lynch** | **HSBC** |

*Joint Book-Runners*

| | |
|---|---|
| **BTG Pactual** | **Credit Suisse** |
| **Goldman Sachs & Co. LLC** | **UBS Investment Bank** |

**Financial Advisor and Structuring Agent**

**Consultoría XFN, S.C. ("ExeFin")**

The date of this offering memorandum is October 4, 2017.

## TABLE OF CONTENTS

**Page**

NOTICE TO INVESTORS ........................................................................................................ iii

INFORMATION FOR INVESTORS IN CERTAIN COUNTRIES ........................................ iv

FORWARD-LOOKING STATEMENTS .................................................................................. v

AVAILABLE INFORMATION ............................................................................................... vi

PRESENTATION OF FINANCIAL AND CERTAIN OTHER INFORMATION .................... vii

SUMMARY .............................................................................................................................. 1

THE COMBINED OFFERING ............................................................................................... 21

RISK FACTORS ..................................................................................................................... 24

SERVICE OF PROCESS AND ENFORCEMENT OF CIVIL LIABILITIES ........................ 49

EXCHANGE RATES .............................................................................................................. 50

USE OF PROCEEDS .............................................................................................................. 51

DISTRIBUTION POLICY ...................................................................................................... 52

CAPITALIZATION ................................................................................................................ 55

SELECTED FINANCIAL DATA ........................................................................................... 56

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS .................................................................................................................. 59

INDUSTRY OVERVIEW ....................................................................................................... 79

ABOUT FIBRAS ................................................................................................................... 88

BUSINESS AND PROPERTIES ............................................................................................ 91

THE ADVISORY AGREEMENT, THE SERVICES AGREEMENTS AND THE PROPERTY
MANAGEMENT AGREEMENTS ....................................................................................... 121

MANAGEMENT .................................................................................................................. 130

POLICIES WITH RESPECT TO CERTAIN ACTIVITIES ................................................. 144

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS ................................... 149

PRINCIPAL HOLDERS ....................................................................................................... 154

DESCRIPTION OF OUR CBFIs AND CERTAIN PROVISIONS  OF OUR TRUST AGREEMENT AND
MEXICAN LAW .................................................................................................................. 155

THE MEXICAN SECURITIES MARKET ........................................................................... 166

TAXATION .......................................................................................................................... 170

ERISA CONSIDERATIONS ................................................................................................ 179

PLAN OF DISTRIBUTION ................................................................................................. 182

TRANSFER RESTRICTIONS .............................................................................................. 192

LEGAL MATTERS .............................................................................................................. 193

INDEPENDENT AUDITORS .............................................................................................. 193

APPENDIX A ...................................................................................................................... A-1

APPENDIX B ....................................................................................................................... B-1

INDEX TO FINANCIAL STATEMENTS ............................................................................ F-1

You should rely only on the information contained in this offering memorandum. We have not, and the initial purchasers have not, authorized anyone to provide you with information that is different. This offering memorandum may only be used where it is legal to sell these securities. The information in this offering memorandum may only be accurate on the date of this offering memorandum. We are not making an offer of these securities in any jurisdiction where such an offer is not permitted.

THIS OFFERING MEMORANDUM IS SOLELY THE RESPONSIBILITY OF FIBRA UNO AND HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV OR THE U.S. SECURITIES AND EXCHANGE COMMISSION. APPLICATION HAS BEEN MADE TO REGISTER THE CBFIs IN MEXICO WITH THE RNV MAINTAINED BY THE CNBV, WHICH IS A REQUIREMENT UNDER THE MEXICAN SECURITIES MARKET LAW TO PUBLICLY OFFER SUCH CBFIs IN MEXICO. SUCH REGISTRATION IS EXPECTED TO BE OBTAINED ON OR BEFORE THE CLOSING OF THE INTERNATIONAL OFFERING, AND DOES NOT IMPLY ANY CERTIFICATION AS TO THE INVESTMENT QUALITY OF THE CBFIs, OUR SOLVENCY OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM AND SUCH REGISTRATION DOES NOT RATIFY OR VALIDATE ACTS OR OMISSIONS, IF ANY, UNDERTAKEN IN CONTRAVENTION OF APPLICABLE LAW. IN MAKING AN INVESTMENT DECISION, ALL INVESTORS, INCLUDING ANY MEXICAN CITIZEN WHO MAY ACQUIRE CBFIs FROM TIME TO TIME, MUST RELY ON THEIR OWN EXAMINATION OF FIBRA UNO.

**NOTICE TO INVESTORS**

The Mexican offering is being made in the United Mexican States, or Mexico, by means of a prospectus and prospectus supplement dated as of the date hereof, which have been authorized by the CNBV for use in connection with offerings made under our MultiOffering Program.  These Mexican offering documents are available only in Spanish and, taken together, contain substantially similar information as this offering memorandum, except that the Mexican offering documents include other information required by regulation in Mexico and include general information relevant to offerings of securities other than our CBFIs which may also be offered under our MultiOffering Program.  The international offering is being made in the United States and elsewhere outside of Mexico solely on the basis of the information contained herein.

You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers nor the Mexican underwriters have authorized anyone to provide you with information that is different. This offering memorandum may only be used where it is legal to sell these securities. The information in this offering memorandum may only be accurate as of the date of this offering memorandum. Our business, financial condition, results of operations and prospects may change after the date of this offering memorandum.

We are relying upon an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering. By purchasing the CBFIs, you will be deemed to have made the acknowledgements, representations and agreements described under "Transfer Restrictions" in this offering memorandum. We are not, and the initial purchasers are not, making an offer to sell the CBFIs in any jurisdiction except where such an offer or sale is permitted. You should understand that you will be required to bear the financial risks of your investment for an indefinite period of time.

We have submitted this offering memorandum solely to a limited number of qualified institutional buyers in the United States and to investors outside the United States so that they can consider a purchase of the CBFIs. We have not authorized the use of this offering memorandum for any other purpose. This offering memorandum may not be copied or reproduced in whole or in part. This offering memorandum may be distributed and its contents disclosed only to those prospective investors to whom it is provided. By accepting delivery of this offering memorandum, you agree to these restrictions. See "Transfer Restrictions."

This offering memorandum is based on information provided by us and other sources that we believe to be reliable. We and the initial purchasers cannot assure you that such information is accurate or complete. This offering memorandum summarizes certain documents and other information, and we refer you to them for a more complete understanding of what we discuss in this offering memorandum.

We are not making any representation to any purchaser regarding the legality of an investment in the CBFIs by such purchaser under any legal investment or similar laws or regulations. You should not consider any information in this offering memorandum to be legal, business or tax advice. You should consult your own counsel, accountant, business advisor and tax advisor for legal, tax, business and financial advice regarding any investment in the CBFIs.

We reserve the right to withdraw the offering of the CBFIs at any time, and we and the initial purchasers reserve the right to reject any commitment to subscribe for the CBFIs in whole or in part and to allot to any prospective investor less than the full amount of CBFIs sought by that investor. The initial purchasers and certain related entities may acquire for their own account a portion of the CBFIs.

In connection with the combined offering, any of the initial purchasers and the Mexican underwriters may over-allot or effect transactions that stabilize or maintain the market price of the CBFIs at levels above those that might otherwise prevail in the open market. However, there is no assurance that any such party will undertake stabilizing actions.  Such stabilizing, if commenced, may be discontinued at any time. See "Plan of Distribution."

You must comply with all applicable laws and regulations in force in your jurisdiction, and you must obtain any consent, approval or permission required by you for the purchase, offer or sale of the CBFIs, under the laws and

regulations in force in your jurisdiction to which you are subject or in which you make such purchase, offer or sale, and neither we nor the initial purchasers will have any responsibility therefor.

In making an investment decision, you must rely on your own examination of us and the terms of this offering, including the merits and risks involved. Neither the U.S. Securities and Exchange Commission, or the SEC, nor any other securities commission or other regulatory authority has approved or disapproved the CBFIs, or determined if this offering memorandum is truthful, accurate, adequate or complete. Any representation to the contrary is a criminal offense.

Notwithstanding anything in this offering memorandum to the contrary, except as reasonably necessary to comply with applicable securities laws, you (and each of your employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the offering and all materials of any kind (including opinions and other tax analyses) that are provided to you relating to such tax treatment and tax structure. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of this offering.

Any prospective investor subject to the U.S. Employee Retirement Income Security Act of 1974, or ERISA, and/or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended, or the Internal Revenue Code, should consult with its own counsel and other advisors regarding the consequences under ERISA and/or Section 4975 of the Internal Revenue Code of an investment in the CBFIs.

———————————

## INFORMATION FOR INVESTORS IN CERTAIN COUNTRIES

For information for investors in certain countries, see "Plan of Distribution."

## FORWARD-LOOKING STATEMENTS

This offering memorandum contains forward-looking statements. You can identify forward-looking statements by the use of forward-looking terminology such as "believes," "expects," "may," "will," "would," "could," "should," "seeks," "intends," "plans," "projects," "estimates," "anticipates," "predicts," or "potential" or the negative of these words and phrases or similar words or phrases. You can also identify forward-looking statements by discussions of strategy, plans or intentions. Statements regarding the following subjects may be impacted by a number of risks and uncertainties which may cause our actual results, performance or achievements to be materially different from any future results, performances or achievements expressed or implied by the forward-looking statements:

- our use of the net proceeds of this offering;

- our business and investment strategy;

- the competitive environment in which we operate;

- our ability to maintain or increase our rental rates and occupancy rates;

- the performance and economic condition of our tenants;

- our ability to successfully engage in strategic acquisitions of properties;

- our ability to successfully expand into new markets in Mexico;

- our ability to successfully engage in property development;

- our ability to lease or sell any of our properties;

- the timing of our acquisitions of properties;

- economic trends in the industries or the markets in which we operate;

- general market, economic and political conditions, particularly in Mexico;

- the effect of changes in accounting principles, intervention by regulatory authorities, government directives and monetary or fiscal policy in Mexico;

- our ability to obtain financing on favorable terms, or at all;

- changes in interest and currency exchange rates;

- the amount and yield of any additional investments;

- our ability to generate sufficient cash flows to satisfy current and future debt service obligations and to make distributions;

- changes in the laws or government regulations that affect us, or in the interpretations of those laws and regulations, including changes in tax laws and regulations affecting FIBRAs, changes in environmental, real estate and zoning laws and increases in real property tax rates;

- changes in the tax regime applicable to FIBRAs and to holders of FIBRA securities;

- our ability to maintain our qualification as a FIBRA; and

- other subjects referenced in this offering memorandum, including those set forth under the caption "Risk Factors."

The forward-looking statements contained in this offering memorandum reflect our beliefs, assumptions and expectations of our future performance, taking into account all information currently available to us. These beliefs, assumptions and expectations are subject to risks and uncertainties and can change as a result of many possible events or factors, not all of which are known to us. Some of these factors are described in "Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business and Properties." If a change occurs, our business, financial condition, liquidity and results of operations may vary materially from those expressed in our forward-looking statements. Any forward-looking statement speaks only as of the date on which it is made. New risks and uncertainties arise over time, and it is not possible for us to predict those events or how they may affect us. We disclaim any obligation to publicly update or revise any forward-looking statements to reflect changes in underlying assumptions or factors, new information, future events or other changes.

## AVAILABLE INFORMATION

We are not subject to the information reporting requirements of the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act.  To permit compliance with Rule 144A under the Securities Act in connection with resales of CBFIs, upon the request of a holder of CBFIs, we will furnish to such holder and any prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request we are neither a reporting company under Section 13 or Section 15(d) of the Exchange Act, nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.  Any such request may be made to us in writing at our main office located at Antonio Dovalí Jaime #70, Tower B, 11th Floor, Col. Zedec Santa Fe, C.P. 01210, Mexico City.  Our telephone number is +1 (52) 55 4170-7070.  We are required periodically to furnish certain information, including quarterly and annual reports, to the CNBV and to the Mexican Stock Exchange.

Under the terms of our trust agreement, we are required to furnish to CI Banco, S.A., Institución de Banca Múltiple (or any entity appointed as a successor thereto), as the common representative of the holders of our CBFIs, or the Common Representative, all notices of meetings of the holders of our CBFIs and other reports and communications that are generally made available to holders of our CBFIs. At our request, the Common Representative will be required under our trust agreement to mail these notices, reports and communications received by it from us to all record holders of the CBFIs promptly upon receipt.

## PRESENTATION OF FINANCIAL AND CERTAIN OTHER INFORMATION

**Financial Information**

*Historical financial information*

This offering memorandum includes:

(i)      our audited consolidated financial statements and related notes as of and for the years ended December 31, 2016, 2015, and 2014 or, together, the Audited Financial Statements, and

(ii)      our unaudited condensed consolidated financial statements and related notes as of June 30, 2017 and for each of the six-month periods ended June 30, 2017 and 2016, or the Unaudited Financial Statements.

We refer to the Audited Financial Statements and the Unaudited Financial Statements collectively as the Financial Statements. The Audited Financial Statements included in this offering memorandum were prepared in accordance with International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Boards, or IASB.  The Unaudited Financial Statements included in this offering memorandum were prepared in accordance with International Accounting Standard No. 34, Interim Financial Reporting, the IFRS standard for interim reporting.

*Currency Information*

Unless stated otherwise, references herein to "Pesos" or "Ps." are to Mexican Pesos, the legal currency of Mexico; references to "U.S. Dollars" or "US$" are to dollars, the legal currency of the United States.

This offering memorandum contains translations of certain Peso amounts into U.S. Dollars at specified rates solely for the convenience of the reader. These translations should not be construed as representations that the Peso amounts actually represent such U.S. Dollar amounts or could be converted into U.S. Dollars at the rate indicated as of the dates mentioned herein or at any other rate. Unless otherwise indicated, U.S. Dollar amounts in this offering memorandum have been translated from Pesos at an exchange rate of Ps.18.0279 to US$1.00 published by Banco de México in the Official Gazette (*Diario Oficial de la Federación*), or the Official Gazette, on June 30, 2017. See "Exchange Rates" for information regarding the rates of exchange between the Peso and the U.S. Dollar for the periods specified therein.

*Other Information Presented*

When referring to our portfolio as a whole, we classify a property as "office", "retail" or "industrial" based on the predominant use of the property, as measured by the gross leasable area, or GLA, attributable to such use. Properties with multiple uses or operations are accounted for as industrial, office or retail depending on which use has the highest percentage of the property's total GLA.

Some of our properties are mixed-use properties.  For convenience purposes, we use the term "properties" to refer to both properties that have a single use (a single "operating unit") and to properties that have multiple uses (and therefore contain multiple "operating units").

Another metric used in this offering memorandum is annual base rent, or ABR.  As of any date, the ABR of a property is its monthly rent as of such date multiplied by 12.

This offering memorandum includes references to certain portfolios of properties.  These references are to the different portfolios of properties that we have acquired in separate transactions since our inception.  For example, we refer to our "Initial Portfolio" of properties, which we acquired in connection with our formation transaction. For a list of properties included in each portfolio, please refer to "Portfolio Properties" in Appendix A hereto.

References in this offering memorandum to "Trust F/1401," "Fibra Uno," "we," "our" and "us" are to Trust F/1401, a Mexican trust, together with its subsidiaries. Unless the context otherwise requires, all references in this offering memorandum to the "Issuer" are to Trust F/1401 on an individual basis.

References in this offering memorandum to our "Management Subsidiary" or our "F1 Management Subsidiary" are to F1 Management, S.C., a *sociedad civil* duly formed under the laws of Mexico. References in this offering memorandum to "the Trustee" are to Deutsche Bank México, S.A., *Institución de Banca Múltiple, División Fiduciaria*. References in this offering memorandum to our "Advisor" are to Fibra Uno Administración, S.C., a *sociedad civil* duly formed under the laws of Mexico. References in this offering memorandum to our "Leasing Administrator" are to F2-Services, S.C., a *sociedad civil* duly formed under the laws of Mexico.

References in this offering memorandum to "Morado Leasing Administrator" are to Cabi Inver, S.A. de C.V., a *sociedad anónima de capital variable* duly formed under the laws of Mexico. References in this offering memorandum to our "Leasing Administrators" are to our Leasing Administrator and the Morado Leasing Administrator. References in this offering memorandum to "our Property Managers" are to our Management Subsidiary together with Jumbo Administración, S.A.P.I. de C.V., Finsa Holding, S.A. de C.V., and Hines Interests, S.A. de C.V.

References in this offering memorandum to the "Relevant Principals of E-Group" are to Messrs. Moussa "Moisés" El-Mann Arazi, Max El-Mann Arazi, André El-Mann Arazi, Elías Sacal Micha (together, the "El-Mann Family"), Abud "Abude" Attié Dayán, Isidoro Attié Laniado, Isaac Attié Laniado (together, the "Attié Family"), Amín Guindi Hemsani, Alberto Guindi Hemsani, Jaime Kababie Sacal, Rafael Kababie Sacal, Salomón Kababie Sacal and Moisés Kababie Sacal, so long as they hold, through the control trust, individually or together with the other members of their respective families, an aggregate of at least 3% of our outstanding CBFIs.

References herein to a "property" are to each real estate development individually, which may include one or more parcels of real estate or condominium units, located in the same real estate development, or in the case of "Plaza Central" and "Punta Langosta," the rights to collect lease revenue from such properties.

The standard measure of area in the real estate market in Mexico is the square meter ($m^2$), while in the United States the standard measure is the square foot (sq. ft.). Unless otherwise specified, all units of area shown in this offering memorandum are expressed in terms of square meters. One square meter is equal to approximately 10.764 sq. ft.

Certain percentages and totals may not sum due to rounding.

# SUMMARY

*This summary highlights certain information described in greater detail elsewhere in this offering memorandum. It does not include all of the information you should consider before investing in the CBFIs. For a more complete understanding of our business, you should read the following summary together with the more detailed information regarding us and the historical financial information appearing elsewhere in this offering memorandum, including under the caption "Risk Factors" and our Financial Statements and the related notes thereto included elsewhere in this offering memorandum. Unless otherwise indicated, the information contained in this offering memorandum assumes that (i) the initial purchasers' and the Mexican underwriters' over-allotment options are not exercised, and (ii) 365,000,000 CBFIs have been sold in the combined offering at Ps.30.50 per CBFI.*

## Overview

We are a Mexican real estate investment trust, or FIBRA, that acquires, owns, develops, constructs, leases and operates a broad range of real estate properties in Mexico, including industrial, retail and office properties. As of June 30, 2017, we were the largest public real estate company in Mexico in terms of number of properties, GLA, annual revenues and market capitalization, and we believe that our portfolio represents the largest and highest quality portfolio of industrial, retail and office properties in Mexico. Our objective is to generate value for our investors, mainly through the appreciation of our real estate properties and the generation of stable cash flows. We seek to achieve this objective by pursuing strategies focused on maintaining a diversified portfolio, high occupancy levels, competitive rents, high-quality properties at premium locations, and long-term relationships with our tenants.

We are formed as a Mexican trust and conduct our operations so as to qualify as a FIBRA for tax purposes under Articles 187 and 188 of the Mexican Federal Income Tax Law (*Ley del Impuesto Sobre la Renta*), or the Mexican Income Tax Law. In order to qualify as a FIBRA for tax purposes, we must distribute annually at least 95% of our net taxable income and at least 70% of our assets must be invested in real estate held for lease, among other requirements. For a detailed description of FIBRAs, see "About FIBRAs."

For the year ended December 31, 2016, we had total revenues of Ps.13.2 billion (US$735.1 million) and net operating income, or NOI, of Ps.10.7 billion (US$603 million), compared to total revenues of Ps.10.7 billion (US$594.9 million) and NOI of Ps.8.6 billion (US$479.6 million) for the year ended December 31, 2015. For the six months ended June 30, 2017, we had total revenues of Ps.7.1 billion (US$396.3 million) and NOI of Ps.5.8 billion (US$324.8 million), compared to total revenues of Ps.6.4 billion (US$352.9 million) and NOI of Ps.5.1 billion (US$283.7 million) for the same period of 2016. See "—Net Operating Income (NOI)" for an explanation of NOI, and reconciliations of NOI to total revenues computed in accordance with IFRS.

## Properties

Since our initial public offering in March 2011, we have grown our initial portfolio consisting of 17 properties, comprising 0.7 million m² of GLA that we acquired in our formation transaction, or our Initial Portfolio, to a portfolio that included, as of June 30, 2017: (i) 499 stabilized properties, or our Stabilized Portfolio, (ii) seven properties in various stages of development or expansion, or our Development Portfolio, and (iii) one property, or our JV Development Portfolio, comprising almost all of the properties formerly known as the Buffalo Portfolio and the Colorado Portfolio which we contributed in 2016 to a joint venture with Helios, a Mexican real estate development vehicle that we created in 2015. As of June 30, 2017, our Stabilized Portfolio included 521 operating units (325 retail, 106 industrial and 90 office), comprising 7.7 million m² of GLA (3.0 million m² of retail, 3.8 million m² of industrial and 0.9 million m² of office). We expect that, upon completion, our Development Portfolio will add approximately 452,858 m² of GLA to our Stabilized Portfolio.

Our portfolio is diversified by asset type, geography and tenant base, providing investors with exposure to a broad range of properties throughout Mexico. Our portfolio is located in 31 Mexican states (*i.e.,* all states except Zacatecas). The properties in our portfolio are primarily situated in convenient locations, on or near main freeways and primary avenues, in markets that have generally exhibited favorable demographic trends such as strong

population and income growth. As of June 30, 2017, our Stabilized Portfolio had an occupancy rate of approximately 93.7% based on GLA, and included:

- 325 retail operating units with an aggregate of approximately 3.0 million m$^2$ of GLA (38.8% of our Stabilized Portfolio), with an occupancy rate of approximately 93.3% based on GLA.

- 106 industrial operating units with an aggregate of approximately 3.8 million m$^2$ of GLA (49.6% of our Stabilized Portfolio), with an occupancy rate of approximately 95.3% based on GLA.

- 90 office operating units with an aggregate of approximately 0.9 million m$^2$ of GLA (11.6% of our Stabilized Portfolio), with an occupancy rate of approximately 88.3% based on GLA.

Our Development Portfolio is comprised of seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  Our Development Portfolio includes four properties of which portions have already been developed and leased, or are available to be leased, amounting to approximately 89,960 m² of GLA (1.2% of our Stabilized Portfolio).  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As of June 30, 2017, our Development Portfolio included:

- Two retail properties that we expect, upon completion, will comprise approximately 113,806 m$^2$ of GLA;

- One industrial property that we expect, upon completion, will comprise approximately 48,052 m$^2$ of GLA;

- Two office properties that we expect, upon completion, will comprise approximately 114,000 m$^2$ of GLA; and

- Two mixed-use properties that we expect, upon completion, will comprise approximately 177,000 m$^2$ of GLA.

Our JV Development Portfolio consists of a mixed-use development, project Mitikah, located at the southern end of Mexico City that comprises properties formerly known as the Buffalo Portfolio and the Colorado Portfolio (which are properties that we acquired for Ps.4,246 million), both of which (with the only exception of Espacio Churubusco, a commercial mall in Mexico City that we acquired as part of the Buffalo Portfolio and remains in our Stabilized Portfolio) we contributed in 2016 to our joint venture with Helios, a Mexican real estate development vehicle created in 2015 and managed by our wholly-owned F1 Management Subsidiary.  The joint venture project will have an investment of approximately Ps.20 billion and is expected, upon completion, to comprise approximately 113,876 m$^2$ of retail space (including a hotel), 212,213 m$^2$ of office space and 84,890 m$^2$ of residential areas. The office and retail properties are expected to generate an estimated annual NOI of Ps.1,767 million (Ps.651 million for retail and Ps.1,116 million for office, assuming an average rent price per square meter of Ps.574 and Ps.455, respectively).  Mitikah includes a residential area that is being developed exclusively by our partner in the joint venture and in which we will have no participation.  Currently, the joint venture project Mitikah is 37% and 14% pre-leased for the retail and office spaces, respectively.  While Project Mitikah is in construction, we will not receive any rental income from the property that formerly comprised the Colorado Portfolio (an annual revenue loss of approximately Ps.515 million, estimated on the basis of the annual potential rental income *minus* notional interest related to the cost of acquisition of the Colorado Portfolio).

As of June 30, 2017, we had independent lease agreements with approximately 2,800 tenants in a wide range of industries, including the industrial, retail, corporate and government sectors. As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio.  Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio.  However, no other tenant accounted for more than 3.6% of the occupied GLA of our

portfolio or 3.9% of the ABR attributable to our portfolio.  We believe that the size and diversity of our tenant base will help minimize our exposure to economic fluctuations in any one industry or economic sector or with respect to any single tenant.  We believe the properties in our portfolio are also distinguished by the quality of our tenants, which include some of the leading companies in Mexico and in their respective industries, as well as international companies with a presence in Mexico.

As of June 30, 2017, the average remaining term of our leases, by GLA, was approximately 4.4 years, excluding statutory leases (defined below).  On a sector-by-sector basis, the average remaining term of our leases, by GLA, for our retail, industrial and office properties was approximately 5.6, 3.7 and 3.5 years, respectively, in each case excluding statutory leases.

The lease agreements with certain of our tenants have expired and have not been formally renewed. Instead, under the local laws of the Mexican state in which an applicable property is located, generally these tenants are permitted to continue to occupy the property pursuant to the terms of the most recently expired lease agreement, including obligations to pay rent in the same amounts and with the same frequency.  We refer to these arrangements as statutory leases.  The notice period for termination by us of a statutory lease  depends on the laws of the state in Mexico in which the property is located.  As of June 30, 2017, approximately 7.5% of the occupied GLA of our portfolio, or 536,978 m² of GLA, was subject to statutory leases, accounting for approximately 14.0% of our ABR, which provides us with the flexibility to negotiate new leases and to potentially increase rental rates where market conditions permit.

Substantially all our leases contain automatic inflation adjustment provisions with respect to base rent. As of June 30, 2017, 74.1% of our ABR was payable in Mexican Pesos and 25.9% of our ABR was payable in U.S. Dollars.

*Our Portfolio*

The following table sets forth information with respect to our Stabilized Portfolio as of June 30, 2017:

| Type | No. of Properties | No. of Operating Units | GLA (m²) | % of Total GLA | Occupancy Rate (As % of GLA) | ABR as of June 30, 2017 (Ps.in millions) | % of Total ABR | Monthly Rent (Ps.) per square meter of occupied GLA[5] |
|---|---|---|---|---|---|---|---|---|
| Retail[1] .......... | 309 | 325 | 2,970,513 | 38.8% | 93.3% | 6,029.0 | 48.8% | 181.37 |
| Industrial[2] ..... | 105 | 106 | 3,802,881 | 49.6% | 95.3% | 3,259.1 | 26.4% | 74.92 |
| Office[3] ......... | 85 | 90 | 891,902[4] | 11.6% | 88.3% | 3,076.3[4] | 24.9 % | 325.44 |
| **Total** ............. | **499** | **521** | **7,665,296** | **100.0%** | **93.7%** | **12,364.4** | **100.0%** | 143.45 |

[1]   Includes properties leased to operate as a hotel, which represent approximately 2.1% of our total ABR.

[2]   Includes properties leased to operate as a hotel, which represent approximately 0.2% of our total ABR.

[3]   Includes properties leased to operate as a hotel, which represent approximately 1.0% of our total ABR.

[4]   The calculations of GLA and ABR for office include, respectively, 100% of the GLA and 100% of the rents of Torre Mayor, Torre Diana and Torre Reforma Latino.

[5]   To calculate the monthly rent per square meter of occupied GLA, we include 100% of the occupied GLA of Torre Mayor, Torre Diana and Torre Reforma Latino.

The following table sets forth information with respect to the lease expirations of the properties in our Stabilized Portfolio as of June 30, 2017, assuming the tenants do not exercise their renewal option, if any, which may include contractually agreed upon renewal options and, a statutory right to retain possession of a property after the expiration of a lease applicable under the local laws of the Mexican state in which the property is located:

| Year[1] | GLA[2] of Expiring Leases (m²) | % of Total GLA[2] of Expiring Leases | ABR[3] of Leases Expiring within the Year (Ps.in thousands) | % of Total ABR[3] of Leases Expiring within the Year | Monthly rent per square meter of occupied GLA (Ps.)[4] |
|---|---|---|---|---|---|
| 2017 | 486,470 | 6.8% | 938,188 | 7.6% | 160.7 |
| 2018 | 1,055,228 | 14.7% | 1,738,772 | 14.1% | 137.3 |
| 2019 | 883,139 | 12.3% | 1,451,285 | 11.7% | 136.9 |
| 2020 | 851,232 | 11.9% | 1,379,703 | 11.2% | 135.1 |
| 2021 and thereafter | 3,369,864 | 46.9% | 5,127,644 | 41.5% | 126.8 |
| Statutory Leases[5] | 536,978 | 7.5% | 1,728,809 | 14.0% | 268.3 |
| **Total** | **7,182,911** | **100.0%** | **12,364,401** | **100.0%** | **143.4** |

[1]  Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

[2]  Refers to m² of occupied GLA.

[3]  ABR refers to the monthly base rent as of June 30, 2017 multiplied by 12.

[4]  To calculate the monthly rent per square meter of occupied GLA, we include 100% of the occupied GLA of Torre Mayor, Torre Diana and Torre Reforma Latino.

[5]  Lease agreements that have expired but continue to pay rent.

For more detailed information about the properties in our portfolio, see "Business and Properties—Our Portfolio."

## Market Opportunity

We believe we are well positioned to identify and take advantage of opportunities in the Mexican real estate market that we expect to arise as the Mexican economy continues to expand. From a macroeconomic perspective, we believe that Mexico will continue to enjoy stability, which has provided and will continue to provide us with diverse alternatives to fund our growth. We also believe that the projected demographic dynamics that are driving the growth of the economically active segments of the population in Mexico will continue fueling consumer demand in cities and regions where availability of suitable commercial properties is low and where, as the members of our senior management team have done in the past, we will be able to continue investing resources to develop and acquire value-oriented assets.

The competitive advantages that we believe differentiate us from other FIBRAs in Mexico are built not only on the many years of experience of our senior management team, but also from our position as market leaders and innovators. We believe our business platform efficiently responds to real estate market fundamentals, whether they are related to the macroeconomic environment, the dynamics of the global real estate market or local market structures.

| Real Estate Market Fundamentals | | Our Capabilities | |
|---|---|---|---|
| **Economic Stability** ..... | Mexico's fiscal and monetary policies as well as a sound banking and financial system have provided solid stability in the Mexican real estate market and access to long-term financing. | » **Access to Capital** ...... | Our capacity for executing our business plan provides us with access to both equity and debt capital markets and has enabled, and we believe will continue to enable, us to obtain additional financing at a competitive cost. |
| **Demographics** ............ | Mexico's demographic transition towards a more economically active population base is fueling consumer demand. | » **Target Markets** ......... | Part of our investment strategy includes targeting underserved and stabilized markets with growing middle-income populations in Mexico. |
| **Geography** ................. | Mexico continues to be strategically positioned to benefit from global trade, tourism and emerging consumer flows. | » **Locations** ................... | Our well-located property base provides exposure to the most dynamic trends in the retail, industrial and office segments. |
| **Competition** ............... | Significant local knowledge is required to operate effectively in the Mexican real estate market. | » **Expertise/Scale** ......... | Our senior management team's combined experience exceeds 200 years and distinguishes us from our competitors. |
| **Investment Opportunities** ............ | Relatively fragmented markets with limited access to capital may trigger the opportunity to acquire high quality assets. | » **Sourcing Capabilities** ............... | Our senior management team has a proven track record of sourcing and consummating successful acquisitions in various sectors, including the retail, industrial and office segments and across Mexican cities. |
| **Relative Scarcity** ....... | Investors seeking to allocate funds in the Mexican real estate market are limited by the scarcity of investment vehicles and/or products. | » **Internal Growth** ....... | We can generate additional cash flow from our portfolio by stabilizing our development properties and by expanding and maximizing the potential income from our stabilized properties. |
| **Potential for Convergence** ............... | Mexican real estate prices and rent levels are below those prevailing in | » **Financial Differentiation** .......... | We were the first investment vehicle structured as a FIBRA, |

| Real Estate Market Fundamentals | Our Capabilities |
|---|---|
| comparable Latin American countries. | and we are the largest and most liquid FIBRA issuing securities in the public market in Mexico with a large participation of international investors. |

**Our Competitive Strengths**

We believe we have the following competitive strengths:

- *Large-scale, broadly diversified portfolio with high quality tenants*.  We have the largest real estate portfolio in Mexico and Latin America.  Our portfolio is comprised of high-quality properties generally located in exceptional locations.  Properties in our industrial portfolio are located in the main manufacturing and logistics centers of the country, near the main highways, ports or other connecting infrastructure in Mexico.  Properties in our retail portfolio are located in the cities in Mexico with the highest traffic volume of consumers and visitors.  Our office portfolio includes iconic and hard-to-replace buildings located in the corporate centers of Mexico.  With an average age of 6.3 years, we believe ours is a young portfolio that will not require significant remodeling capital investments during the next few years.  Our portfolio is diversified by currency, asset type, geography, tenant base and lease maturity, which enables us to mitigate currency, geographic, tenant and lease maturity concentration risks while allowing for increased cash-flow stability.  We believe that the diversification of our portfolio by both asset type and geography allows us to benefit from broad growth trends in Mexico without dependence on the performance of any specific industry or any given city or regional economy in Mexico.  We believe that our properties are also distinguished by the quality of our tenants, many of which are among the leading companies in Mexico and in their respective industries, which include, among others, the retail, financial, education and entertainment industries, as well as international companies with a presence in Mexico. As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio.  Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio.  However, no other tenant accounted for more than 3.6% of the occupied GLA of our portfolio or 3.9% of the ABR attributable to our portfolio.  We believe the size, diversity and quality of our portfolio enables us to provide tenants with a broad range of real estate solutions to support their business operations, while the diversity of our tenant base protects us against industry-specific market disturbances and our mixture of Peso- and U.S. Dollar-denominated rents affords holders of our CBFIs a measure of protection against foreign exchange fluctuations.  Since our inception, we have maintained high occupancy rates and our solid annual rent increases pursuant to renewal agreements often exceed the inflation-linked increases contemplated by our original lease agreements.  We are uniquely positioned to present existing and prospective tenants with a range of options across property types and geographic locations.  We also believe that the lack of significant lease expirations in any one year will help contribute to the stability of our cash flow.  Our leases have a remaining average life of 4.4 years, which ensures predictability and stability in our cash flows.

- *Proven market consolidator with the ability to execute our growth strategy and generate value to our CBFI holders*.  We believe we have demonstrated the ability to execute our business plan, which includes a growth strategy based on raising and efficiently deploying significant amounts of capital in a variety of real estate assets that have the capacity to generate income and the potential for capital appreciation. Since our formation, we have become the largest publicly-traded real estate company in Mexico in terms of number of properties, revenues and market capitalization.   Since our formation, we have increased the number of our properties from 13 to

499, and our GLA from 514,750 m$^2$ to 7.7 million m$^2$.  Our GLA and number of properties have increased consistently year after year since our creation.

At the same time, we have been able to increase the amount of distributions paid to the holders of our CBFIs from an aggregate of Ps.1.0833 per CBFI for the year ended on December 31, 2011, to Ps.1.9831 for the year 2016.  As a result of our proven ability to execute transactions, develop new projects, create sustainable leasing growth and the relationships of our Advisor's management team, we are capable of generating a substantial flow of business and we have an extensive list of potential property acquisitions.  Because of that, we believe that we have ongoing acquisition opportunities that will result in value generation and income and cash flow growth.

- *Opportunities to continue consolidating the markets in which we are active through attractive acquisitions that deliver further growth*.  We intend to continue to expand our portfolio and generate additional cash flow by capitalizing on both internal and external growth opportunities.  During 2016, we continued our expansion, completing three portfolio acquisitions for approximately Ps.5.0 billion that comprise approximately 95,231 m² of GLA.  As of June 30, 2017, we were developing or expanding seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  Four of these properties include approximately 89,960 m² of GLA that have already been developed and leased, or are available to be leased.  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As our development and expansion projects are completed, we expect to generate additional cash flow from our existing portfolio by leasing the space at market rates.  In addition to organic growth from our existing portfolio, we intend to continue to expand our portfolio through selective acquisitions and developments.  We believe that our reputation as a preferred counterparty, which has been established through our proven ability to execute transactions, has enabled us to generate an extensive pipeline of potential acquisitions and developments from third parties.  In addition, our relationship with our Advisor provides an additional source of attractive potential acquisitions and developments.  We believe that our right of first refusal to acquire future real estate investment opportunities sourced by the Relevant Principals of E-Group and certain properties that are currently majority-owned by the El-Mann Family and the Attié Family, as well as the breadth of relationships our Advisor's senior management team has established throughout the Mexican real estate industry, will continue to generate a steady source of attractive investment opportunities through which we can grow our business. See "—Relationship with E-Group and Certain Related Parties."

- *Solid capital structure*.  We believe that we are well-positioned to grow our business due to our growth-oriented, attractive capital structure.  Since our initial public offering in 2011, we have demonstrated the ability to access multiple sources of financing.  As of June 30, 2017, we had raised an aggregate of Ps.67 billion in equity capital through follow-on offerings of our CBFIs, and Ps.55.9 billion in peso-denominated notes, or Peso Notes, and dollar-denominated notes, or USD Notes.  As of June 30, 2017, we had Ps.6.4 billion in outstanding banking financings, 77.9% of which are mortgage-backed loans and the remaining 22.1% unsecured bank loans.  In addition, as of June 30, 2017, we had Ps.7 billion and US$410 million available under our unsecured revolving dual-currency syndicated committed credit line that expires in 2020, and Ps.500 million (which we have drawn since) under our Ps.1.5 billion unsecured facility with Banco Santander that expires in June 2018.  We have also been able to utilize our CBFIs as acquisition currency to acquire properties in exchange for CBFIs.  As a result of our ability to obtain financing from a broad range of sources, we have been able to grow our business while maintaining what we consider to be a conservative leverage ratio (as measured by total debt to total assets) of 31.6% as of June 30, 2017.  We also believe that our capital structure benefits from debt maturities of up to 30 years.  Our liability management strategy has increased the average maturity of our debt from 3.1 years as of September 30, 2013 to 10.8 years as of June 30, 2017.  As of June 30, 2017, our outstanding indebtedness had an average annual cost of 7.31%,

and approximately 70.1% of our total indebtedness was fixed-rate indebtedness, after giving effect to our financial derivatives, which helps reduce our exposure to changes in interest rates, while, after giving effect to our foreign exchange swaps, 40.8% of our total indebtedness was U.S. Dollar-denominated, which is naturally hedged by lease contracts that are denominated in the same currency.  As we grow our business, we believe that our enhanced access to capital as a public company in Mexico from a variety of different sources and our conservative approach to leverage will continue to provide us with a significant advantage over our competitors in acquiring and developing properties that meet our investment objectives.

- *Experienced management team*.  Our Management Subsidiary's and Advisor's management teams are led by Messrs. André El-Mann Arazi, their Chief Executive Officer and Isidoro Attié Laniado, their Executive Vice President of Strategy and Finance.  Additionally, our Management Subsidiary's management team includes Mr. Gonzalo Pedro Robina Ibarra, its Deputy Chief Executive Officer, and six vice presidents, Gerardo Vargas Ateca, its Vice President of Finance, Javier Elizalde Vélez, its Vice President of Treasury, Ignacio Tortoriello Tortoriello, its Vice President of Administration, Jorge Humberto Pigeon Solórzano, its Vice President of Capital Markets and Investor Relations, Alfonso Arceo Obregón, its Vice President of Commercial Operations and Alejandro Chico Pizarro, its Vice President of Legal Affairs.  See "Management."

**Our Business Objectives and Growth Strategies**

Our primary business objectives are to: (i) continue our growth as the leading owner and operator of industrial, retail and office properties in Mexico; (ii) increase our cash flow from our properties; (iii) maintain our properties in optimal condition to preserve their long-term value; and (iv) generate attractive returns mainly through the potential capital appreciation of our properties.  Our business strategy consists of the following principal elements:

- *Increase our presence in urban markets with high levels of consumption and economic activity*.  We will continue to invest in properties and portfolios located in prime locations within urban markets with high levels of consumption and economic activity.  In pursuing this strategy, we target stable markets with in-place infrastructure, robust population and business growth, and household incomes above the national average.  In particular, we intend to continue to expand and consolidate our presence in metropolitan areas such as Mexico City, Toluca, Monterrey, Guadalajara and Cancún, which are areas that have historically exhibited favorable trends in population and income growth.

- *Target medium-sized metropolitan areas that exhibit high demographic growth where we have the opportunity to provide underserved segments of the population with new entertainment and retail options*.  In addition to continuing to expand our presence in established urban markets, we also intend to pursue opportunities in medium-sized metropolitan areas in Mexico that exhibit high demographic growth where we have the opportunity to provide underserved segments of the population with new entertainment and retail options.  We generally target cities with populations at least between 300,000 and 500,000 inhabitants.  Our Advisor has an established track record of consummating innovative projects in underpenetrated markets in Mexico, and we expect to continue to benefit from its substantial experience and expertise as we execute in these markets.

- *Continue to source and capitalize on opportunities to acquire assets*.  We intend to continue to grow our business by acquiring properties that best meet our acquisition criteria and that will enhance our portfolio.  We will seek to capitalize on the substantial deal flow that our Advisor's senior management team has generated on our behalf.  Many of these opportunities have been and will continue to be sourced from third parties, who we believe have come to view us as a preferred counterparty due to our proven ability to execute transactions.

Accordingly, we believe we will have numerous opportunities to continue to make accretive acquisitions that will further drive growth in revenues and cash flow. We seek to utilize our strong balance sheet and liquidity position, as well as our Advisor's in-depth market knowledge and expertise, to execute transactions and capitalize on opportunities.

- **Capitalize on opportunities to generate additional cash flow from our portfolio**. In addition to growth through the expansion of our portfolio, we also seek to increase the cash flow from the properties we currently own. We seek to capitalize on internal growth opportunities through the following strategies:

  - *Development portfolio*. As our Development Portfolio and JV Development Portfolio are developed, we expect to generate additional revenue by leasing such space at market rates.

  - *Rent increases.* Substantially all of our existing lease agreements contain contractual increases in rent that are tied to inflation. As a result, we expect that our rental revenue will continue to grow at least in line with inflation in Mexico through the realization of these contractual increases in rent.

  - *Potentially increasing rental rates as current leases expire.* We believe that we can grow the rental revenue from our portfolio by increasing rental rates as current lease agreements with below-market rents expire and by renegotiating new lease agreements at current market rates.

  - *Gross leasable area available*. We seek to generate additional rental revenue from our GLA available through the leasing of unoccupied spaces. As of June 30, 2017, we had approximately 482,386 m² of unoccupied GLA available for leasing that we expect will generate additional rental revenue as tenants for these spaces are identified.

- **Maintain relationships with high quality tenants**. We seek to continue our close relationships with internationally, nationally and regionally recognized tenants by making our commitment to superior tenant service one of our highest priorities. We believe internationally, nationally and regionally recognized tenants provide more predictable property-level cash flows as they are typically higher credit quality tenants that generate stable revenues. Our tenants include established multinational and domestic companies and range from brand-name retailers to leading manufacturers to government agencies. We seek to provide our tenants with a broad range of real estate solutions to support their business operations. Due to the size, diversity and quality of our portfolio, we are able to present tenants with a range of options across asset types and geographic locations. We also maintain open lines of communication with our tenants so that we can be responsive to their needs and provide a level of service that we believe is superior to other landlords in our markets. This regular communication also allows us to gain valuable insights with respect to current and future market trends. Prior to expanding into a particular market, we seek to gauge our current tenants' desire to expand into that area with the goal of obtaining lease commitments in connection with our planned developments. We believe our focus on tenant relationships not only helps us retain existing tenants, attract new tenants and replace departing tenants quickly and efficiently, but also facilitates our focused growth.

**Recent Developments**

*Earthquake*

On September 19, 2017, an earthquake in Mexico significantly affected Mexico City, Morelos, Guerrero and Puebla. We have commenced a comprehensive analysis to determine if there were any damages to any of our

properties as a result of the earthquake that may be material. As of the date of this offering memorandum, no material damage to any of the properties in our portfolio has been identified.

**Our Management**

We are internally managed primarily by our wholly-owned management subsidiary, F1 Management S.C., a *sociedad civil* duly formed under the laws of Mexico, through which we conduct the day-to-day management and administration of a significant portion of our business. As of June 30, 2017, our F1 Management Subsidiary was staffed with approximately 645 employees, none of whom was unionized.

We are externally advised by Fibra Uno Administración, S.C., a *sociedad civil* duly formed under the laws of Mexico, or our Advisor. Our Advisor was formed for the sole purpose of advising us and assisting us in formulating and implementing our investment and financial strategies.

In addition, our Leasing Administrators perform certain leasing, billing and collection services on our behalf.

Our Management Subsidiary, our Advisor and our Leasing Administrator are exclusively dedicated to our affairs. See "—The Advisory Agreement, the Services Agreements and the Property Management Agreements" for summaries of our agreements with our Advisor, our Leasing Administrators and the Property Managers.

We believe we benefit from our management team's substantial understanding and strategic knowledge of our industry and the local markets as we execute our business strategy and selectively assemble and operate a diversified portfolio of income-generating properties in Mexico.

**The Advisory Agreement, the Services Agreements and the Property Management Agreements**

We are party to (i) an advisory agreement with our Advisor, (ii) a services agreement with each of our Leasing Administrators, (iii) property management agreements with each of our Property Managers and (iv) a services agreement and property management agreements with third parties as described below. Each of the advisory agreement, the services agreement and the property management agreements is in the Spanish language and is governed by Mexican law.

*Advisory Agreement*

Pursuant to the advisory agreement, our Advisor is responsible for, among other duties, consulting with and advising us and the Property Managers on long-term financial and strategic planning, assisting us in our relationship with investors and assisting us in the implementation of major decisions.

In accordance with the terms of the advisory agreement, our Advisor is entitled to receive an annual fee in an amount equal to 0.50% of the undepreciated book value of our assets less any outstanding indebtedness, plus any applicable value-added taxes. This annual fee is paid in installments on a quarterly basis. In addition, as consideration for advising us and the Property Managers in the contribution and acquisition of properties in accordance with the terms of the advisory agreement, subject to approval by our technical committee, our Advisor is entitled to receive a sourcing and advisory fee in an amount equal to 3% of the value of any property contributed to or acquired by us (which includes any fee payable by our Advisor or us to real estate brokers hired in connection with such contribution or acquisition), paid in cash or with CBFIs, as may be agreed between the Advisor and our technical committee, other than the 17 properties we acquired as part of our formation transactions and other than contributions or acquisitions from a related party, payable (one time, either in cash or in CBFIs determined on a case-by-case basis) at the closing of any such contribution or acquisition. With respect to acquisitions or contributions of properties in which Relevant Principals of E-Group have ownership interests, the sourcing and advisory fee will only apply to the value of the portion of the property that is not owned by any Relevant Principal of E-Group.

After its initial five-year term expired on January 19, 2016, the agreement with our Advisor was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

For a detailed description of the advisory agreement, including the fees payable pursuant thereto and the termination provisions thereof, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Advisory Agreement."

*Services Agreement with our Leasing Administrator*

Pursuant to the services agreement with our Leasing Administrator, our Leasing Administrator is responsible for (i) invoicing leases and maintenance fees, (ii) collecting rents and maintenance fees on our behalf, (iii) supporting our Property Managers in the negotiation and execution of leases, pursuant to our policies and instructions, and (iv) supporting our Property Managers in carrying out all necessary activities to ensure the renewal of our lease agreements. Our Leasing Administrator performs these functions for all properties other than those in the Morado Portfolio.

In accordance with the terms of the services agreement with our Leasing Administrator, our Leasing Administrator is entitled to receive a monthly fee in an amount equal to 2.0% of the lease payments actually received under the leases on our properties, other than those in the Morado Portfolio, for the previous month, plus any applicable value-added taxes.

After its initial five-year term expired on January 19, 2016, the services agreement with our Leasing Administrator was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

For a detailed description of the services agreement with our Leasing Administrator, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Services Agreement with our Leasing Administrator."

*Property Management Agreement with our Management Subsidiary*

Pursuant to the property management agreement with our Management Subsidiary, our Management Subsidiary is responsible for the day-to-day management and administration of our business (other than the Morado Portfolio, Maine Portfolio and Vermont Portfolio). In accordance with the terms of the property management agreement, our Management Subsidiary is entitled to receive a monthly fee in an amount equal to 1% of the lease payments actually received under the leases on our properties included in the property management agreement for the previous month, plus any applicable value-added taxes.

After its initial five-year term expired on January 19, 2016, the property management agreement was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

For a detailed description of the property management agreement with our Management Subsidiary, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Property Management Agreement with F1 Management Subsidiary".

*Services Agreement and Property Management Agreements with Third Parties*

In addition to the advisory agreement, the services agreement and the property management agreements described above, we manage and operate certain of our properties through the following agreements: (i) the services agreement with Morado Leasing Administrator through which Morado Leasing Administrator provides us with all promotion, advertising, consulting and contracting services, as well as the execution of new lease agreements over

the properties in the Morado Portfolio and certain other properties; and (ii) the property management agreements with Jumbo Administración, S.A.P.I. de C.V., Hines Interests, S.A. de C.V., and Finsa Holding, S.A. de C.V. through which these companies provide us with all necessary services related to the management, operation and maintenance of the properties comprising the Morado Portfolio, Maine Portfolio and Vermont Portfolio, respectively.

Under the terms of the services agreement with Morado Leasing Administrator, during the 7.5-year period that began on August 31, 2012, we will pay the Morado Leasing Administrator the equivalent of 5.0% of the rental amount under each new lease agreement (not including renewals or extensions of existing lease agreements) we enter into with tenants of the Morado Portfolio as a result of their involvement.

Under the terms of the property management agreement with Jumbo Administración, S.A.P.I. de C.V., we will pay the sum of (i) 3.0% per month of the revenue collected from the Morado Portfolio; (ii) the total amount of the maintenance fees, advertising fees and services charged to the tenants and users of the properties, in accordance with their respective lease agreement; and (iii) 0.5% per year over the contribution value of the real estate property assets contributed to the Trust, payable quarterly in arrears.

Under the terms of the property management agreement with Hines Interests, S.A. de C.V., we will pay Ps.1.6 million annually, plus any applicable value-added taxes.

Under the terms of the property management agreement with Finsa Holding, S.A. de C.V., we will pay a monthly amount equal to 3.0% of the revenue collected from the Vermont Portfolio.

For a detailed description of the property management agreements, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Property Management Agreement with Jumbo Administración, S.A.P.I de C.V.," "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Property Management Agreement with Hines Interests, S.A. de C.V.," and "The Advisory Agreement, the Services Agreements and the Property Management Agreements—Property Management Agreement with Finsa Holding, S.A. de C.V."

**Relationship with E-Group and Certain Related Parties**

*Background*

E-Group is a group of individuals and entities, including members of the El-Mann and the Attié families, with over 30 years of experience in the Mexican real estate market. E-Group is dedicated to the acquisition, development and operation of various types of commercial and other real estate projects in Mexico, including industrial, retail, office and mixed-use projects. E-Group has developed and operated more than 233 projects in different sectors of the Mexican real estate industry and different geographic areas of Mexico.

Certain members of E-Group participate in our management and operations, and we believe that our relationship with E-Group provides us with significant advantages in sourcing, evaluating, underwriting, acquiring, developing, leasing and managing properties. Our Management Subsidiary, our Advisor and our Leasing Administrator have access to E-Group's deep industry relationships, market intelligence and execution experience. We believe that our relationship with E-Group provides us with access to an extensive pipeline of potential acquisitions.

Because of potential conflicts of interest with E-Group, as part of our establishment, various rights of first refusal and reversion rights were granted that benefit both us and the Relevant Principals of E-Group. In addition, certain other provisions were put in place to mitigate these potential conflicts. For a more detailed description of the rights of first refusal, reversion rights and other provisions, see "Certain Relationships and Related Transactions."

*Rights of First Refusal Benefitting Fibra Uno*

Pursuant to our trust agreement and the contribution agreements relating to the Initial Portfolio, the Relevant Principals of E-Group (comprised of certain members of E-Group, so long as they hold, through the control trust, individually or together with the other members of their respective families, an aggregate of at least 3% of our outstanding CBFIs), have agreed to provide us with a right of first refusal to purchase any future real estate investment opportunity sourced by any of them, to the extent such opportunity involves industrial, office, retail or mixed-use properties and so long as the control trust holds at least 15% of our outstanding CBFIs.  For a list of the Relevant Principals of E-Group, see "Management—E-Group".  As of June 30, 2017, the control trust held 18.5% of our outstanding CBFIs.  In addition, the El-Mann Family and the Attié Family (each as defined herein) have agreed to provide us with a right of first refusal to purchase any industrial, retail, office, hotel or mixed-use property that, as of January 10, 2011, was majority-owned by them, either collectively or separately.

We believe that this access to future real estate investment opportunities sourced by the Relevant Principals of E-Group and certain properties that are currently majority-owned by the El-Mann Family and the Attié Family, will generate an ongoing source of attractive investment opportunities through which we can continue to grow our business.

*Rights of First Refusal Benefitting E-Group*

Pursuant to our trust agreement and the contribution agreements relating to certain properties contributed by the Relevant Principals of E-Group to us in connection with our initial offering and related formation transactions, the Relevant Principals of E-Group will have a right of first refusal with respect to all of our properties so long as the control trust holds at least 15% of our outstanding CBFIs. Pursuant to this right, in the event we decide to sell any of our properties, and, if applicable, the relevant contributors and tenants with rights of first refusal with respect to such property have declined to exercise such rights, these persons, collectively through a common representative, will have a right of first refusal to acquire such property from us.

We and our Advisor have established certain policies and procedures to address potential conflicts of interest. In accordance with our trust agreement, the affirmative vote of a majority of the members of our technical committee as well as the affirmative vote of a majority of the independent members of our technical committee is required prior to us entering into any material contract, transaction or relationship with a related party, including our Advisor, our Leasing Administrator, the person who established us as a trust, or our Settlor, the Relevant Principals of E-Group, the El-Mann Family, the Attié Family, the members of our technical committee or any other person or party who may have a conflict of interest.

*Reversion Rights*

In addition to the rights of first refusal described above, pursuant to our trust agreement and the contribution agreements relating to our portfolios, such as our Initial Portfolio, the Azul Portfolio, the G-30 Portfolio and the Morado Portfolio, for so long as the contributors of such properties hold any CBFIs issued to them in connection with the contributions of such portfolios, they will have reversion rights (equivalent to the right to repurchase the property), solely with respect to the properties contributed by them. Pursuant to these rights, in the event we decide to sell any such property or upon a termination of our trust agreement, the applicable contributors will have the right to re-acquire such contributed property in its entirety from us. If the holders of these rights of first refusal and reversion rights exercise their rights to acquire or re-acquire a property from us, any such transaction will be subject to the prior approval of our technical committee, including the approval of at least a majority of the independent members of our technical committee. In addition, if we choose to sell or are required to sell any of our properties, the reversion right of the applicable contributors and the rights of first refusal granted to the Relevant Principals of E-Group as described above could reduce the value of the property sold. See "Risk Factors—Risks Related to Our Properties and Operations—Our ability to dispose of our properties is restricted, including by rights of first refusal, and these restrictions could reduce the value of any property sold or impair our liquidity or operating flexibility if sales of such properties were necessary to generate capital or otherwise."

*Influence of Control Trust*

Upon completion of our initial offering and our formation transactions, the contributors of our Initial Portfolio placed all of the CBFIs held by them in a control trust. As of June 30, 2017, approximately 18.5% of our outstanding CBFIs were held in the control trust. As a result, the technical committee of the control trust will have the ability to substantially influence us.

The control trust is controlled by its technical committee, which is comprised of members of the El-Mann Family and the Attié Family, each of whom is appointed by Mr. André El-Mann Arazi. Pursuant to the terms of our trust agreement, the contributors, through the control trust and so long as they hold 15% or more of our outstanding CBFIs through the control trust, will be able to appoint a majority of the members of our technical committee and will be able to control certain actions to be taken by us that require the approval of holders of more than 85% of our outstanding CBFIs. See "Risk Factors—Risks Related to Our Relationship with Our Advisor, Our Leasing Administrators and Our Property Managers—There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs."

Certain of the Relevant Principals of E-Group (the "Interested Members") have purchased an aggregate of 44,500,600 CBFIs offered in the combined offering at the public offering price, net of any sales commissions or discounts.

**Our MultiOffering Program**

Under our MultiOffering Program, we will be able to make from time to time offers of CBFIs or debt securities during a five-year period that ends on October 2, 2022.  The maximum amount of CBFIs that can be offered under the MultiOffering Program is 1,500,000,000.  The aggregate principal amount of debt securities that may be issued under the MultiOffering Program is Ps.55 billion.  Debt securities may be issued in Pesos, U.S. Dollars or *Unidades de Inversión*, or UDIs.

Our Management Subsidiary announced on September 25, 2017 that it will recommend to our Technical Committee the adoption of resolutions applicable to any issuances of our CBFIs after the completion of the combined offering and the potential acquisition of the Apollo II, Turbo and Frimax portfolios, pursuant to which:

(a)  We will announce an equity offering of up to 330.25 million CBFIs  to the markets only if the CBFI is trading at that time at a price of 90% of NAV per CBFI or greater;

(b)  We will announce the issuance of up to 750 million CBFIs to the market only if the trading price at that time is 95% of NAV per CBFI or greater; and

(c)  In the event CBFIs are used as payment for investments in real estate, we will not issue CBFIs at a price below NAV per CBFI, regardless of when the acquisitions occur, excluding the announced Apollo II, Turbo or Frimax portfolios.

**Our Organizational Structure**

The following chart shows our organizational structure as of June 30, 2017:



**Summary Selected Financial Data**

The following tables present financial information and other data as of and for the periods indicated. These tables should be read in conjunction with our Financial Statements. See "Presentation of Financial and Certain Other Information."

Our financial information for the years ended December 31, 2016, 2015 and 2014 has been derived from the Audited Financial Statements and notes thereto included elsewhere in this offering memorandum. Our financial information for the six-month periods ended June 30, 2017 and 2016, has been derived from the Unaudited Financial Statements and notes thereto included elsewhere in this offering memorandum.

Our Financial Statements and other financial information included in this offering memorandum, unless otherwise specified, are stated in Pesos.

The Audited Financial Statements included in this offering memorandum have been audited by Galaz, Yamazaki, Ruiz Urquiza, S.C., a member of Deloitte Touche Tohmatsu Limited, our independent auditors.

The CNBV requires certain entities that disclose their financial information to the public through the Mexican Stock Exchange to prepare and disclose, beginning with the year ending December 31, 2012, their financial information in conformity with IFRS. Our consolidated financial statements for the year ended December 31, 2012 were our first set of annual financial statements prepared in accordance with IFRS.

For additional information regarding financial information presented in this offering memorandum, see "Presentation of Financial and Certain Other Information."

**Fibra Uno Consolidated Statements of Financial Position Data**

*(In thousands of Mexican Pesos)*

| | As of June 30, | As of December 31, | | |
|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2014 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and restricted cash | 1,870,940 | 5,554,120 | 5,995,918 | 500,848 |
| Financial investments | 2,122,509 | 1,956,101 | 2,300,596 | 19,528,446 |
| Lease receivables | 1,221,790 | 990,594 | 797,869 | 763,723 |
| Other accounts receivable | 833,632 | 519,700 | — | — |
| Due from related parties | 147,957 | 80,293 | — | — |
| Recoverable taxes, mainly value-added tax | 1,808,089 | 2,141,696 | 4,161,762 | 3,082,513 |
| Prepaid expenses | 972,589 | 430,717 | 459,660 | 171,658 |
| Total current assets | 8,977,506 | 11,673,221 | 13,715,805 | 24,047,188 |
| Non-current assets: | | | | |
| Investment properties | 183,897,093 | 172,739,278 | 151,822,122 | 113,303,350 |
| Advanced payment for the acquisitions of investment property | — | — | — | 1,121,095 |
| Investments in associates | 4,195,509 | 5,178,900 | 3,113,889 | 2,854,011 |
| Derivative financial instruments | 368 | 515,055 | — | — |
| Other assets | 1,809,193 | 1,920,523 | 2,121,525 | 2,289,490 |
| Total non-current assets | 189,902,163 | 180,353,756 | 157,057,536 | 119,567,946 |
| **Total assets** | **198,879,669** | **192,026,977** | **170,773,341** | **143,615,134** |
| | | | | |
| **Liabilities and trustors' capital** | | | | |
| Current liabilities: | | | | |
| Borrowings | 1,631,569 | 633,911 | 10,123,627 | 1,791,924 |
| Trade accounts payable and accrued expenses | 5,311,518 | 3,232,397 | 1,913,159 | 1,928,023 |
| Deferred revenues | 159,889 | 165,362 | 100,010 | 57,023 |
| Due to related parties | 122,287 | 93,266 | 104,488 | — |
| Total current liabilities | 7,225,263 | 4,124,936 | 12,241,284 | 3,776,970 |
| Borrowings/Long-term debt | 60,239,108 | 64,172,642 | 44,209,408 | 34,128,710 |
| Other long-term debt | 107,169 | 125,530 | — | — |
| Derivative financial instruments | 702,515 | — | — | — |
| Deposits from tenants | 837,125 | 825,067 | 702,303 | 474,809 |
| Deferred revenues — Long-term | 166,164 | 135,467 | 261,968 | 159,174 |
| Total liabilities | 69,277,344 | 69,383,642 | 57,414,963 | 38,539,663 |
| Trustors' capital: | | | | |
| Trustors' capital | 94,925,839 | 95,383,575 | 97,742,580 | 93,500,173 |
| Retained earnings | 32,375,413 | 25,524,669 | 15,615,798 | 11,575,298 |
| Other comprehensive income | (133,315) | (103,006) | — | — |
| Total trustors' capital | 127,167,937 | 120,805,238 | 113,358,378 | 105,075,471 |
| Non-controlling participation[1] | 2,434,388 | 1,838,097 | — | — |
| Total shareholders' equity | 129,602,325 | 122,643,335 | 113,358,378 | 105,075,471 |
| **Total liabilities and trustors' capital** | **198,879,669** | **192,026,977** | **170,773,341** | **143,615,134** |
| **Net Asset Value per CBFI** *(Ps.)* [2] | **39.3988** | **37.7445** | **35.4511** | **36.5048** |

---

[1]   Beginning on January 1, 2016, in compliance with IFRS we are required to separately present the minority interest of our partner in Torre Reforma Latino.

[2]   Net Asset Value per CBFI is the value of total assets *minus* the value of total liabilities *divided* by the number of outstanding CBFIs at the end of the period.

## Fibra Uno Consolidated Statements of Operations Data

*(In thousands of Mexican Pesos)*

| | For the Six Months Ended June 30, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2016** | **2015** | **2014** |
| Revenue from: | | | | | |
| Leases.................................... | 6,275,127 | 5,658,034 | 11,756,607 | 9,574,616 | 6,989,751 |
| Maintenance........................... | 647,747 | 590,168 | 1,230,420 | 963,377 | 707,842 |
| Dividend revenues from beneficiary rights ............ | 125,156 | 76,016 | 157,821 | 148,573 | 124,387 |
| Administration fees............... | 95,988 | 37,500 | 108,000 | 38,333 | — |
| | 7,144,018 | 6,361,718 | 13,252,848 | 10,724,899 | 7,821,980 |
| Expenses from: | | | | | |
| Management fees .................. | (362,013) | (335,567) | (678,686) | (612,928) | (490,832) |
| Operating expenses............... | (469,282) | (388,737) | (824,967) | (668,237) | (530,623) |
| Maintenance expenses .......... | (676,538) | (641,461) | (1,293,772) | (1,065,230) | (807,394) |
| Amortization of administrative platform........................... | (97,492) | (97,492) | (194,984) | (194,984) | (194,984) |
| Executive bonus.................... | (89,693) | (240,626) | (169,997) | (587,792) | (530,280) |
| Property tax.......................... | (168,418) | (153,142) | (323,074) | (258,801) | (155,104) |
| Insurance.................. | (75,905) | (63,221) | (143,918) | (87,012) | (84,179) |
| | (1,939,341) | (1,920,246) | (3,629,398) | (3,474,984) | (2,793,396) |
| Interest expense ........................... | (2,356,964) | (1,693,102) | (3,826,836) | (2,681,540) | (2,019,111) |
| Interest income ........................... | 262,220 | 64,467 | 263,833 | 412,083 | 430,494 |
| Foreign exchange gain (loss), net | 3,134,332 | (1,616,750) | (4,752,607) | (3,878,142) | (2,222,097) |
| Amortization of bank fees......... | (64,975) | (60,005) | (133,579) | (81,867) | (166,545) |
| Derivatives ............................. | (49,939) | (193,352) | (46,624) | — | — |
| Other expenses, net ................. | (6,304) | — | — | — | — |
| Fair value adjustments to property investments............ | 2,431,845 | 4,171,992 | 11,266,275 | 4,714,041 | 4,659,760 |
| **Consolidated net income.........** | **8,554,892** | **5,114,722** | **12,393,912** | **5,734,490** | **5,711,085** |
| Controlling participation .......... | 8,535,005 | 4,461,796 | 11,824,632 | 5,734,490 | 5,711,085 |
| Non-controlling participation[1]. | 19,887 | 652,926 | 569,280 | — | — |
| | 8,554,892 | 5,114,722 | 12,393,912 | 5,734,490 | 5,711,085 |
| **Basic net income per CBFI[2]..** | **2.6128** | **1.6192** | **1.9927** | **1.9054** | **2.3264** |
| **Diluted net income per CBFI[2]** | **2.2196** | **1.3546** | **1.9696** | **1.6403** | **1.7517** |
| **Distribution per CBFI[2] [3]** ..... | **1.0269** | **0.9821** | **1.9832** | **1.9957** | **1.8246** |

---

[1]  Beginning on January 1, 2016, in compliance with IFRS we are required to separately present the minority interest of our partner in Torre Reforma Latino.

[2]  In Mexican Pesos.

[3]  Amounts effectively paid to CBFI holders during the period.

### Net Operating Income (NOI)

In this offering memorandum, we present net operating income, or NOI, which is a non-IFRS financial measure. NOI should not be considered as an alternative to net income (determined in accordance with IFRS) as an indication of our performance, and we believe that to understand our performance further, NOI should be compared with our reported net income or loss and considered in addition to cash flows in accordance with IFRS, as presented in our consolidated financial statements.

We consider NOI to be an appropriate supplemental measure to net income because we believe it helps both investors and management to understand the core operations of our properties. We define NOI as total revenues (including lease revenues and maintenance fees) less property-level expenses (which includes operating expenses, maintenance expenses, property taxes and insurance expenses).  Not included in the calculation of NOI are certain other expenses (such as (1) allowances for estimated uncollectable accounts, (2) brokerage commissions and (3)

expenses for the recovery of value-added tax), as well as management fees, amortization of intangible assets, fair value adjustments to investment properties, interest expense, interest income, foreign exchange (loss) gain-net, and other non-operating items.

### NOI Reconciliation Table

*(In thousands of Ps.)*

| | For the Six Months Ended June 30, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2016** | **2015** | **2014** |
| (+) Investment properties revenues.......................... | 6,275,127 | 5,658,034 | 11,756,607 | 9,574,616 | 6,989,751 |
| (+) Maintenance fees.............................................. | 647,747 | 590,168 | 1,230,420 | 963,377 | 707,842 |
| (+) Dividend revenues from beneficiary rights....... | 125,156 | 76,016 | 157,821 | 148,573 | 124,387 |
| (+) Administration fees .......................................... | 95,988 | 37,500 | 108,000 | 38,333 | — |
| (=) Total revenues ................................................. | **7,144,018** | **6,361,718** | **13,252,848** | **10,724,899** | **7,821,980** |
| (-) Operating expenses ........................................... | (469,282) | (388,737) | (824,967) | (668,257) | (530,623) |
| (-) Maintenance expenses........................................ | (676,538) | (641,461) | (1,293,772) | (1,065,230) | (807,394) |
| (-) Property taxes .................................................. | (168,418) | (153,142) | (323,074) | (258,801) | (155,104) |
| (-) Insurance ......................................................... | (75,905) | (63,221) | (143,918) | (87,012) | (84,179) |
| (+/-) Other expenses .............................................. | — | — | — | — | 159,986[1] |
| (=) NOI | **5,753,875** | **5,115,157** | **10,667,117** | **8,645,619** | **6,404,666** |
| **NOI Margin (as a % of investment properties plus dividend revenues)** | **89.90%** | **89.21%** | **89.53%** | **88.92%** | **90.03%** |
| **NOI per CBFI** *(Ps.)* [2] | **1.7647** | **1.5961** | **3.3148** | **2.8535** | **2.7735** |

[1]   Other expenses includes (1) an allowance for estimated uncollectable accounts, (2) brokerage commissions and (3) extraordinary, non-recurring expenses for the recovery of value-added tax.

[2]   NOI divided by the average number of CBFIs in the period.

## Flows From Operations (FFO)

We consider FFO to be an appropriate measure that helps both investors and management to understand the cash flow from our operations and the distributions to our CBFI holders. We calculate FFO by adding to or subtracting from our consolidated net income the non-cash items (items that do not entail a cash outflow or inflow), such as fair value adjustments to investment properties and investment in associates, foreign exchange gain (loss) net, fair value of our derivative financial instruments, and amortization of balance sheet items such as bank fees, administrative platform, and equity compensation plan.

### FLOWS FROM OPERATIONS RECONCILIATION TABLE

*(In thousands of Ps.)*

| | For the Six Months Ended June 30, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2016** | **2015** | **2014** |
| Consolidated net income ......................................... | 8,554,892 | 5,114,722 | 12,393,912 | 5,734,490 | 5,711,085 |
| (+/-) Fair value adjustments to investment properties and investments in associates.................. | (2,431,845) | (4,171,992) | (11,266,275) | (4,714,041) | (4,659,760) |
| (+/-) Foreign exchange gain (loss), net .................. | (3,134,332) | 1,616,750 | 4,752,607 | 3,878,142 | 2,222,097 |
| (+/-) Derivative financial instruments.................... | 49,939 | 193,352 | 46,624 | — | — |

| | | | | | |
|---|---:|---:|---:|---:|---:|
| (+) Amortization of bank fees | 64,975 | 60,005 | 133,579 | 81,867 | 166,545 |
| (+) Equity compensation plan | 89,693 | 240,626 | 169,997 | 587,792 | 530,280 |
| (+) Amortization of administrative platform | 97,492 | 97,492 | 194,984 | 194,984 | 194,984 |
| (+/-) Non-recurrent items | 6,304 | — | — | — | (182,261) |
| (-) Non-controlling interest[1] | (8,549) | (7,902) | (14,103) | — | — |
| **(=) FFO** | **3,288,569** | **3,143,053** | **6,411,325** | **5,763,234** | **3,982,970** |
| **FFO Margin (as a % of investment properties plus dividend revenues)** | **51.38%** | **54.81%** | **53.81%** | **59.27%** | **55.99%** |
| **FFO per CBFI** *(Ps.)*[2] | **1.0087** | **0.9808** | **1.9925** | **1.9028** | **1.6874** |

[1]      Minority interest of our partner in Torre Reforma Latino computed without giving effect to the fair value adjustment attributable to that property.

[2]      FFO divided by the average number of CBFIs in the period.

## THE COMBINED OFFERING

*The following is a brief summary of certain terms of this offering and it is not intended to be complete. For a more complete description of the terms of the CBFIs, see "Description of our CBFIs and Certain Provisions of our Trust Agreement and Mexican Law."*

| | |
|---|---|
| Issuer ...................................................................... | Deutsche Bank México, S.A., Institución de Banca Múltiple, División Fiduciaria, acting solely in its capacity as the *fiduciario* (trustee) of the *fideicomiso* (trust) F/1401. |
| The combined offering ............................................ | 365,000,000 CBFIs |
| The international offering ........................................ | 197,234,261 CBFIs |
| The Mexican offering .............................................. | 167,765,739 CBFIs. |
| Reallocations .......................................................... | The number of CBFIs to be offered pursuant to each offering is subject to reallocation by the initial purchasers and the Mexican underwriters. |
| Over-allotment option.............................................. | We have granted to the initial purchasers and the Mexican underwriters options, exercisable within 30 days from the date of this offering memorandum, to purchase up to an aggregate of 29,585,139 additional CBFIs (in the case of the option granted to the initial purchasers) and an additional 25,164,861 CBFIs (in the case of the option granted to the Mexican underwriters), in each case only to cover over-allotments, if any. |
| Allocation to certain existing holders ...................... | Certain of the Relevant Principals of E-Group (the "Interested Members") have purchased an aggregate of 44,500,600 CBFIs offered in the combined offering at the public offering price, net of any sales commissions or discounts. |
| CBFIs outstanding prior to completion of this combined offering                ................. | 3,326,983,408 CBFIs |
| CBFIs outstanding upon to completion of this combined offering.................................................... | 3,691,983,408 CBFIs or 3,746,733,408 CBFIs if the over-allotment options are exercised in full. |
| Lock-up .................................................................. | We and the members of our Advisor's senior management team, the members of our technical committee and all members of the El-Mann Family and the Attié Family have agreed that, for a period of 90 days from the date of this offering memorandum, we and they will not, without the prior written consent of the representatives of the initial purchasers and the Mexican underwriters, dispose of or hedge any of their CBFIs or any securities convertible into or exchangeable for our CBFIs.  See "Plan of Distribution—No Sale of Similar Securities." |
| Use of Proceeds ...................................................... | Based on an offering price of Ps.30.50 per CBFI, the net proceeds to us from the combined offering will be |

approximately Ps.10.8 billion (US$596.9 million) after deducting initial purchasers' and underwriters' discounts and commissions and estimated offering expenses payable by us of approximately Ps.372 million (US$20.6 million), or approximately Ps.12.4 billion (US$687.8 million) after deducting initial purchasers' and underwriters' discounts and commissions and estimated offering expenses payable by us of approximately Ps. 402 million (US$22.3 million), if the initial purchasers' and Mexican underwriters' over-allotment options are exercised in full. Solely for the convenience of the reader, peso amounts in the preceding sentence have been translated to U.S. Dollars at the exchange rate of Ps.18.0279 to US$1.00, published by the Banco de México in the Official Gazette of June 30, 2017.

We intend to use the net proceeds of the combined offering for general business purposes. See "Use of Proceeds."

As of the date hereof, we do not have any binding agreement for the acquisition of any property or portfolio and therefore, until appropriate investments can be acquired and made in accordance with FIBRA regulations, we intend to maintain the net proceeds of the combined offering in short-term investments, such as *Certificados de la Tesorería de la Federación*, or CETES (Mexico's Peso-denominated treasury bills). These investments are expected to provide a lower net return than we will seek to achieve from acquisitions of additional properties.

Voting rights .............................................................   All holders of our CBFIs will have the same voting rights. However, pursuant to our trust agreement, any holder, or group of holders, has the right to appoint, for each 10% of our outstanding CBFIs held, a main member and his or her respective alternate member to our technical committee. See "Management—Our Technical Committee—Election of Technical Committee."

Each CBFI entitles the holder thereof to vote at any of our meetings of holders of CBFIs, except that our trust agreement provides that any person determined by our technical committee to have acquired our CBFIs in violation of the anti-takeover provisions of our trust agreement will not be able to vote such CBFIs nor exercise any rights derived from them, other than economic rights. See "Description of Our CBFIs and Certain Provisions of Our Trust Agreement and Mexican Law— Ownership Limits."

Ownership and transfer restrictions ........................   Our trust agreement contains certain restrictions relating to the ownership and transfer of our CBFIs, including a provision that ownership of 10% or more of our outstanding CBFIs requires the prior approval of a majority of the members of our technical committee, including a majority of the independent members of our technical committee. We have not registered, nor do we expect to register, the CBFIs under the Securities

Act and, unless so registered, the CBFIs may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. See "Transfer Restrictions."

Settlement procedures................................................. Settlement of the CBFIs will be made through the book-entry system of *S.D. Indeval Institución para el Depósito de Valores, S.A. de C.V.*, or Indeval.

Listing.................................................................... Our CBFIs are listed for trading on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*) under the symbol "FUNO11."

Taxation................................................................. For certain Mexican and U.S. federal income tax consequences with respect to an investment in our CBFIs, see "Taxation."

# RISK FACTORS

Investment in the CBFIs involves risks. You should carefully consider the following risk factors in addition to other information contained in this offering memorandum before purchasing the CBFIs we are offering. The occurrence of any of the following risks might cause you to lose all or part of your investment. Some statements in this offering memorandum, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section entitled "Forward-Looking Statements."

## Risks Related to Our Properties and Operations

***We are dependent on our tenants for substantially all of our income, and our business would be adversely affected if a significant number of our tenants, or any of our major tenants, were unable to meet their lease obligations.***

Substantially all of our income is derived from the rental of our properties. As a result, our performance depends on our ability to collect rent from our tenants and our tenants' ability to make rental payments. Our income and funds available for payment of distributions on our CBFIs or the principal and interest on our debt securities could be negatively affected if a significant number of our tenants, or any of our major tenants, were to delay lease commencements, decline to extend or renew leases upon expiration, fail to make rental payments when due or close their businesses or declare bankruptcy. In addition, we may incur substantial costs or delays, including litigation and related expenses or delays, in protecting our investment and re-leasing our property. Furthermore, we could be subject to additional substantial costs, including legal fees and related expenses, in order to protect our investment and re-lease our property.

As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio. Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio.   Some of our properties are occupied by one tenant, and as a result, their performance will depend on the financial stability of such tenants. If our tenants were to experience a downturn in their businesses, their financial condition could be weakened, which could result in their failure to make timely rental payments or their default under their leases, which could seriously harm our performance.

***We have not entered into definitive agreements to purchase any additional properties using the net proceeds of the combined offering and, therefore, you will be unable to evaluate the economic merits of any additional investments that we may make prior to investing in the combined offering.  If we are unable to use the net proceeds of the combined offering to acquire additional properties in a timely fashion or at all, our results of operations could be adversely affected.***

Our future success depends in large part on our ability to continue to grow our business through the acquisition of additional properties. We have not yet entered into definitive agreements to purchase any specific properties using the net proceeds of the combined offering and, therefore, you will be unable to evaluate the economic merits of our acquisitions before making an investment decision with respect to our CBFIs. As a result, we may use the net proceeds of the combined offering to make investments with which you may not agree. Our failure to apply the net proceeds of the combined offering effectively or to find suitable properties to acquire in a timely manner or on acceptable terms could result in returns that are substantially below expectations or result in losses, which could have a material adverse effect on our business, financial condition and results of operations.

Until appropriate investments can be identified, we intend to maintain the net proceeds of the combined offering in short-term investments, such as CETES (Mexico's Peso-denominated treasury bill). These investments are expected to provide a lower net return than we will seek to achieve from acquisitions of properties. We may be unable to invest the remaining net proceeds of the combined offering on acceptable terms, or at all, which could delay holders of our CBFIs from receiving a return, if any, on their investment. Moreover, because we will not have identified these future investments at the time of the combined offering, we will have broad authority to invest such proceeds in any assets that we may identify in the future.

- 24 -

We cannot assure you that we will be able to identify assets that meet our investment objectives, that we will be successful in consummating any investment opportunities we identify or that one or more investments we may make using the net proceeds from the combined offering will generate revenue, income or cash flow. Our inability to do any of the foregoing could materially and adversely affect our results of operations and cash flow.

***Our debt service obligations could adversely affect our results of operations, may require us to sell properties, may jeopardize our qualification as a FIBRA and could adversely affect our ability to make distributions to holders of the CBFIs and the market price of the CBFIs.***

As of June 30, 2017, we had total indebtedness of Ps.62.3 billion (US$3.5 billion), of which Ps.5.0 billion (US$275.4 million) was secured indebtedness, and our subsidiaries had no outstanding indebtedness. In addition to our existing indebtedness, we may continue to incur debt, including secured debt, in the future. Our indebtedness, coupled with other debt we may continue to incur subjects us to many risks, including the risks that:

- our operating cash flow may be insufficient to make required payments of principal and interest;

- our leverage may increase our vulnerability to adverse economic and industry conditions;

- we may be required to dedicate a substantial portion of our operating cash flow from operations to payments on our debt, thereby reducing cash available for distributions to the holders of our CBFIs, funds available for operations and maintenance capital expenditures, future business opportunities and other purposes;

- the terms of any financing we seek may not be as favorable as the terms of the current debt at such time; and

- the terms of our debt may limit our ability to make distribution payments to holders of our CBFIs and may affect the market price of our CBFIs.

If we violate covenants in our debt agreements, we could be required to repay all or a portion of our indebtedness before maturity.

***We are a Mexican trust and all of our assets and operations are located in Mexico. Therefore, we are subject to political, economic, legal and regulatory risks specific to Mexico and the Mexican real estate industry.***

We are formed in Mexico and all of our assets and operations are located in Mexico. As a result, we are subject to political, economic, legal and regulatory risks specific to Mexico, including the general condition of the Mexican real estate industry and the Mexican economy, the devaluation of the Peso as compared to the U.S. Dollar, Mexican inflation, interest rates, regulation, confiscatory taxation and regulation, expropriation, social instability and political, social and economic developments in Mexico. For a more detailed description of these and other risks relating to Mexico, see "—Risks Related to Mexico."

***The geographic concentration of our properties in states located in central and southeastern Mexico could leave us vulnerable to an economic downturn in those regions, other changes in market conditions or natural disasters in those areas, resulting in a decrease in our revenue or otherwise negatively impacting our results of operations.***

The properties in our portfolio located in the State of Mexico, Mexico City, Jalisco, Nuevo León and Tamaulipas, provided approximately 40.7%, 16.5%, 10.4%, 7.6% and 4.3% of GLA, respectively, and 23.3%, 34.0%, 10.1%, 7.6% and 2.4%, respectively, of our ABR as of June 30, 2017. As a result of the geographic concentration of properties in these states, we are particularly exposed to potential downturns in these local economies, other changes in local real estate market conditions and natural disasters that occur in those areas (such as hurricanes, floods, earthquakes and other events). In the event of adverse economic or other changes in these states, our business, financial condition, results of operations, and cash flow, the trading price of our CBFIs and our ability to make distributions to the holders of our CBFIs may be materially and adversely affected.

***Significant competition may decrease or prevent increases in our properties' occupancy and rental rates and may reduce our investment opportunities.***

We compete with a number of owners, developers, FIBRAs and operators of industrial, retail and office real estate in Mexico, many of which own properties similar to ours in the same markets in which our properties are located. Our competitors may have substantial financial resources and may be able or willing to accept more risk than we can prudently manage. Competition from these entities may reduce the number of suitable investment opportunities offered to us or increase the bargaining power of property owners seeking to sell. Further, those entities may have more flexibility than we do in their ability to offer rental concessions to attract tenants. If our competitors offer space at rental rates below current market rates, or below the rental rates we currently charge our tenants, we may lose existing or potential tenants and we may be pressured to reduce our rental rates to below those which we currently charge or to offer substantial rent abatements, tenant improvements, early termination rights or tenant favorable renewal options in order to retain tenants when our tenants' leases expire. Also, we may be required to pay above market prices for new property acquisitions, or may be unable to acquire targeted properties at all. In the event the risks described herein materialize, our business, financial condition, results of operations, cash flow, the trading price of our CBFIs and our ability to make cash distributions under the CBFIs may be materially and adversely affected.

***If we are unable to renew our leases or lease our vacant space, or we are unable to lease our properties at or above existing rental rates, our rental revenue may be adversely affected.***

The properties in our Stabilized Portfolio had an occupancy rate of approximately 93.7% in terms of GLA as of June 30, 2017, including leases that have been entered into as of such date but not yet delivered to the lessee. As of June 30, 2017, 6.8% of lease agreements by GLA were scheduled to expire in 2017. In addition, leases representing approximately 7.5% of occupied GLA as of June 30, 2017, or 536,978 m², had converted into statutory leases. We cannot assure you that our leases will be renewed or that our properties will be re-leased at rental rates equal to or above our existing rental rates or that substantial rent abatements, tenant improvements, early termination rights or tenant-favorable renewal options will not be offered to attract new tenants or retain existing tenants. There can be no assurance that we will be able to lease any unoccupied spaces or spaces in different stages of development on favorable terms, or at all. In addition, we intend to continue to acquire additional development properties, and may acquire undeveloped land, in the future as part of our growth strategy. To the extent that our properties, or portions of our properties, remain vacant for extended periods of time, we may receive reduced or no revenue from such properties, resulting in less cash available to make distributions to holders of our CBFIs. Moreover, the resale value of a property could be diminished because the market value of a particular property depends principally upon the value of the leases of such property.

***Our operating performance is subject to risks associated with the real estate industry generally.***

Real estate investments are subject to various risks and fluctuations and cycles in value and demand, many of which are beyond our control. Certain events may decrease cash available for the payment of distributions as well as the value of our properties. These events include, but are not limited to:

- adverse changes in local, national or international demographic and economic conditions, such as the recent global economic downturn;

- vacancies or our inability to rent space on favorable terms;

- adverse changes in financial conditions of tenants and buyers of properties;

- inability to collect rent from tenants;

- changes in laws, regulations and governmental policies, including, without limitation, tax, zoning, environmental and safety laws, governmental fiscal policies, and changes in enforcement thereof;

- competition from other real estate investors with significant capital, including other real estate investment companies, FIBRAs and institutional investment funds;

- reductions in the level of demand for commercial space, and changes in the relative popularity of properties;

- increases in the supply of industrial, retail and office space;

- fluctuations in interest rates, which could adversely affect our ability, or the ability of buyers and tenants of properties, to obtain financing on favorable terms, or at all; and

- increases in expenses including, but not limited to, insurance costs, labor costs, energy prices, real estate assessments and other taxes and costs of compliance with laws, regulations and governmental policies, and restrictions on our ability to pass expenses on to our tenants.

In addition, possible periods of economic slowdown or recession, such as the recent global economic downturn, rising interest rates or declining demand for real estate, or the public perception that any of these events may occur, could result in a general decline in rents or an increased incidence of defaults under existing leases. If we cannot operate our properties to meet our financial expectations, our business, financial condition, results of operations, and cash flow, the trading price of our CBFIs and our ability to make distributions to the holders of our CBFIs and to satisfy our debt service obligations could be materially and adversely affected.

***We rely on external sources of capital to fund future capital needs, and if we encounter difficulty in obtaining such funds, we may not be able to make future acquisitions necessary to grow our business, complete development or redevelopment projects, or meet any maturing obligations.***

In order to qualify as a FIBRA under Articles 187 and 188 of the Mexican Income Tax Law, we are required, among other things, to distribute each year to holders of our CBFIs at least 95% of our net taxable income. Because of this distribution requirement, we may not be able to fund, from cash retained from operations, all of our future capital needs, including capital needed to make investments, complete development or redevelopment projects and satisfy or refinance maturing obligations.

Accordingly, we rely on external sources of capital, including debt and equity financing, to fund future capital needs. The availability of financing is limited in Mexico, and the interest rates and general terms and conditions are often not competitive with those of countries such as the United States. In addition, the recent global economic slowdown has resulted in a capital environment characterized by limited availability, increasing costs and significant volatility. If we are unable to obtain needed funds on satisfactory terms, or at all, we may not be able to make the investments needed to expand our business, complete development or redevelopment projects, or meet our obligations and commitments as they mature. Our access to capital depends upon a number of factors over which we have little or no control, including general market conditions, the market's perception of our current and potential future earnings and cash distributions and the market price of our CBFIs. We may not be in a position to take advantage of attractive investment opportunities for growth if we are unable to access the capital markets on a timely basis on favorable terms.

***Our ability to sell equity to raise capital to expand our business depends, in part, on the market price of our CBFIs, and our failure to meet market expectations with respect to our business could negatively affect the market price of our CBFIs and limit our ability to sell equity.***

The availability of equity capital to us depends, in part, on the market price of our CBFIs which, in turn, depends upon various market conditions and other factors that may change from time to time, including:

- the extent of investors' interest;

- our ability to satisfy the distribution requirements applicable to FIBRAs;

- the general reputation of FIBRAs and the attractiveness of their equity securities in comparison to other equity securities, including securities issued by other real-estate based companies;

- our financial performance and that of our tenants;

- analyst reports about us and the Mexican real estate industry;

- general stock and bond market conditions, including changes in interest rates on fixed income securities, which may lead prospective purchasers of our CBFIs to demand a higher annual yield from future distributions;

- a failure to maintain or increase our distributions, which are dependent, to a large part, on our cash flow from operations which, in turn, depends upon increased revenue from additional acquisitions and rental increases; and

- other factors such as governmental regulatory action and changes in tax laws applicable to FIBRAs.

Our failure to meet the market's expectations with regards to future earnings and cash distributions would likely adversely affect the market price of our CBFIs and, as a result, the availability of equity capital to us.

***We may acquire properties that have encumbrances, such as a mortgage, or other forms of debt, and could incur new debts or refinance existing debts when acquiring such properties.***

Pursuant to our trust agreement, we may acquire properties and rights with encumbrances, which limit our ability to make cash distributions. We may also acquire such properties with the intention of repaying the debt on such properties, or we may incur new loans or refinance the debt related to such properties. We may not have the necessary resources to meet such debt obligations and we may be unable to repay the debt on such properties, which may have a material adverse effect on us.

***Our existing financing arrangements contain, and our future financing arrangements will likely contain, restrictive covenants relating to our operations, which may affect our distribution and operating policies and our ability to incur additional debt.***

The indentures governing the USD Notes and the Peso Notes contain covenants that, among other things, limit the incurrence of debt by us, and permit us to consolidate or merge with, or transfer all or substantially all of our assets to, another person only if any such transaction complies with certain requirements. Such indentures (i) permit a maximum 60% total leverage ratio, and a maximum 40% secured debt leverage ratio, (ii) require a minimum debt service ratio of 1.5 to 1.0 on a *pro forma* basis after giving effect to the incurrence of additional debt and the application of net proceeds, and (iii) require that we and our subsidiaries maintain unencumbered total assets of not less than 150% of the aggregate principal amount of all our and our subsidiaries' outstanding unsecured debt. As of June 30, 2017, our total leverage ratio was 31.6%, our secured debt leverage ratio was 2.5%, our debt service ratio was 2.25x and our unencumbered total assets represented 315.1% of the aggregate principal amount of all our outstanding unsecured debt.

In the future, we expect to incur additional debt, which may include debt securities, credit facilities, property-level debt, including mortgages and construction loans, any of which are likely to contain restrictive covenants. Our existing credit facilities, debt agreements and debt securities contain, and our future financing agreements will likely contain, a number of covenants that, among other things, restrict our ability to: (i) acquire or dispose of assets or businesses, (ii) incur additional indebtedness, (iii) make distributions prior to repayment of indebtedness, (iv) make capital expenditures, (v) create liens on assets, (vi) enter into leases, investments or acquisitions, (vii) engage in mergers or consolidations, or (viii) otherwise engage in trust activities (including our ability to acquire additional investments, businesses, properties or assets or engage in certain changes of control and asset sale transactions) without the consent of the creditors. In addition, our existing credit agreements require us to maintain specified financial ratios, including minimum interest coverage ratios, maximum leverage ratios and

minimum net worth. The failure to meet any of these covenants, including financial coverage ratios, could cause an event of default under or accelerate some or all of our indebtedness, which would have a material adverse effect on our results of operations and financial condition.

***If we were to incur uninsured losses, uninsurable losses, or losses in excess of our insurance coverage, we would be required to pay for such losses, which could adversely affect us.***

We believe we carry comprehensive insurance, including property, casualty and business interruption insurance. We do not carry insurance for certain types of losses that may be either uninsurable or not economically insurable, such as losses due to riots or acts of war. There can be no assurance that we will be able to obtain insurance on the uninsured portion of our portfolio. If we were to incur uninsured losses, we would be required to pay for such losses, which could have a material adverse effect on our financial condition and results of operations. Should an uninsured loss occur, we could be adversely affected. If any such loss is insured, we may be required to pay a significant deductible on any claim for recovery of such a loss prior to our insurer being obligated to reimburse us for the loss, or the amount of the loss may exceed our coverage for the loss. In addition, future lenders may require such insurance, and our failure to obtain such insurance could constitute a default under our credit facilities or debt agreements. In addition, we may reduce or discontinue terrorism, earthquake, flood or other insurance on some or all of our properties in the future if the cost of premiums for any of these policies exceeds, in our judgment, the value of the coverage discounted for the risk of loss. In addition, if any one of our insurance carriers were to become insolvent, we would be forced to replace the existing insurance coverage with another suitable carrier at potentially unfavorable rates, and any outstanding claims would be at risk for collection. If we were to incur uninsured or uninsurable losses, or losses in excess of our current coverage, our business, financial condition, results of operations, cash flow, trading price of our CBFIs and our ability to make distributions to holders of our CBFIs may be materially and adversely affected.

***We may be forced to make capital expenses necessary to keep our properties in the condition our tenants or prospective tenants expect, thereby decreasing the cash available for distributions to holders of our CBFIs.***

We may, upon expiration of leases at our properties, be required to make rent or other concessions to tenants, accommodate requests for renovations, build-to-suit remodeling and other improvements or provide additional services to our tenants. As a result, we may have to make significant capital or other expenditures in order to retain tenants whose leases expire and to attract new tenants in sufficient numbers. Additionally, we may need to raise capital to make such expenditures. If we are unable to do so or capital is otherwise unavailable, we may be unable to make the required expenditures. This could result in non-renewals by tenants upon expiration of their leases, which would result in declines in revenue from operations and reduce cash available for payments of distributions to holders of our CBFIs.

***If we are unable to sell, dispose of or refinance one or more of our properties in the future, we may be unable to realize our investment objectives and our business may be adversely affected.***

Real estate investments are relatively illiquid and difficult to sell quickly. Proceeds, if any, will be realized from an investment generally upon disposition or refinancing of the underlying property. We may be unable to realize our investment objectives by sale, other disposition or refinancing at attractive prices within any given period of time, or may otherwise be unable to complete any exit strategy. In particular, these risks could arise from weakness in or even the lack of an established market for a property, changes in the financial condition or prospects of prospective purchasers, changes in local, national or international economic conditions, and changes in laws, regulations or fiscal policies of jurisdictions in which the property is located.

***Our assets may be subject to impairment charges, which would have an adverse effect on our results of operations.***

We periodically evaluate our real estate investments and other assets for impairment indicators. The judgment regarding the existence of impairment indicators is based on factors such as market conditions, tenant performance and legal structure. If we determine that an impairment has occurred, we would be required to make an adjustment to the net carrying value of the asset, which could have a material adverse effect on our results of operations in the period in which the impairment charge is recorded.

- 29 -

***Our operations are subject to extensive environmental and safety laws and regulations and we may incur costs that have a material adverse effect on our results of operations and financial condition as a result of any liabilities under or potential violations of environmental and safety laws and regulations.***

Our operations are subject to general Mexican federal and state laws and regulations relating to the protection of the environment. Under the environmental laws, the Mexican government has implemented a program to protect the environment by promulgating rules concerning areas such as ecological planning, environmental risk and impact assessment, air pollution, natural protected areas, flora and fauna protection, conservation and rational use of natural resources, and soil pollution, among others. Mexican federal and local authorities, such as the Ministry of Environment and Natural Resources (*Secretaría de Medio Ambiente y Recursos Naturales*), the Attorney General's Office for the Protection of the Environment (*Procuraduría Federal de Protección al Ambiente*), the National Water Commission (*Comisión Nacional del Agua*) and Mexican state and municipal governments, have the power to bring civil, administrative and criminal proceedings against companies that breach applicable environmental laws and may halt a non-complying development.

We anticipate that the regulation of our business operations under Mexican federal, state and local environmental laws and regulations will increase and become more stringent over time. We cannot predict the effect, if any, that the adoption of additional or more stringent environmental laws and regulations would have on our results of operations, cash flows, capital expenditure requirements or financial condition.

***Compliance with the laws, regulations and covenants that are applicable to our properties, including permit, license, zoning and environmental requirements, may adversely affect our ability to make future acquisitions, developments or renovations, result in significant costs or delays and adversely affect our growth strategy.***

Our properties are subject to various covenants and local laws and regulatory requirements, including permitting and licensing requirements. Local regulations, including municipal or local ordinances, zoning restrictions and restrictive covenants imposed by community developers, may restrict the use of our properties and may require us to obtain approval from local authorities or private community organizations at any time with respect to our properties, including prior to acquiring or developing a property, or when developing or undertaking renovations of any of our properties. Among other things, these restrictions may relate to fire and safety, seismic, asbestos-cleanup or hazardous material abatement requirements. We cannot assure you that existing regulatory policies will not adversely affect us. Our growth strategy may be materially and adversely affected by our ability to obtain permits, licenses and zoning approvals. Our failure to obtain such permits, licenses and zoning approvals could have a material adverse effect on our business, financial condition and results of operations.

***In accordance with applicable laws, we are subject to a maximum indebtedness limit and to a debt service coverage ratio, which may limit our capacity to obtain financing.***

We are subject to a maximum limit of debt that we may incur in connection with our total assets, which at any time may not be higher than 50% of the accounting value of our total assets, measured at the closing of the last reported quarter, in accordance with Mexican applicable laws. Likewise, we have the obligation to comply with a debt service coverage ratio at the execution of any loan agreement, facility or financing payable with the trust estate. Pursuant to applicable Mexican laws, such coverage ratio may not be lower than 1.0x. In each case, the indebtedness level and the debt service coverage ratio shall be calculated in accordance with applicable Mexican laws.

If we exceed the indebtedness maximum limit or if the debt service coverage ratio is lower than 1.0x, we may not be able to obtain additional loans payable with trust estate funds until we make the necessary adjustments to meet the above-mentioned limit, with the exception of refinancing operations to extend the debt maturity of which our technical committee obtains knowledge. However, the result of such refinancing shall not result in an increase in the indebtedness level or a decrease in the calculation of the debt service coverage ratio calculated before such refinancing operation.

If we exceed the indebtedness maximum level or if the debt service coverage index is lower than 1.0x, our management subsidiary shall have to present to a meeting of the holders of our CBFIs a report detailing the circumstances, as well as a corrective plan that includes the manner, terms and, in each case, the necessary

requirements to comply with the limit. In the event that the circumstances set forth in this risk factor occur, other risk factors, such as the impossibility to continue with our development and growth for lack of resources, may occur, which may adversely affect our ability to make distributions to holders of our CBFIs.

***Leverage restrictions and liquidity requirements applicable to FIBRAs may affect our growth.***

We are subject, in accordance with applicable laws and regulations, to certain leverage restrictions and liquidity requirements, including the following: (i) when the assets of a trust estate are pledged as collateral in connection with the assumption or incurrence of loans or the entering into of other financings, the value of the security interest must be disclosed and cannot exceed 50% of the book value of the assets of the trust estate, and (ii) when incurring or assuming any loans or entering into other financings, a FIBRA shall establish a minimum debt service coverage ratio, which cannot be below 1.0x. While a FIBRA is not in compliance with either requirement, the FIBRA cannot assume additional debt secured by the assets of the trust estate, except to extend the maturity of existing secured debt through refinancing. Such refinancing may not have the effect of increasing the total indebtedness of the trust estate.

In order to comply with the restrictions and requirements described above, we may be required to maintain a high level of liquid assets, which could result in lower yields on our investments, which may adversely affect our financial condition, results of operations and cash flow.

Additionally, if we fail to meet the leverage requirements of the amendments, we would be unable to incur additional indebtedness, which could have an adverse effect on our ability to make additional investments until we are once again in compliance with these requirements.

***We may be subject to confiscation of our assets pursuant to the Mexican Federal Law on Confiscation of Assets.***

Pursuant to article 22 of the Mexican Constitution, certain types of criminal conduct by our tenants in any of our properties may cause the authorities to seek to confiscate our property in accordance with the Mexican Federal Law on Confiscation of Assets.  This risk exists, even if the related criminal proceedings have not finalized and any ultimate criminal liability has not been ascertained, as long as it is determined that the specified criminal conduct in fact occurred.

***We may be unable to detect conduct related to money laundering that may derive from leasing operations.***

We may be unable to detect on time conduct or activities related to money laundering by our tenants related to our lease agreements, which may adversely affect our business, financial condition and results of operations.

***Our failure to maintain information related to our leasing activities could result in penalties under Mexican anti-money laundering laws.***

Pursuant to anti-money laundering legislation in Mexico, we may be required to maintain certain information related to our leasing activities, including the execution of lease agreements, and may be required to file such information with applicable Mexican tax authorities to the extent such activity is characterized as high risk under the statute.  If we were unable to comply with these requirements, we could be subject to penalties that could adversely affect our cash flow and operations.

***As a Mexican trust with securities registered with the RNV, we are subject to financial reporting and other requirements for which our financial and accounting systems, procedures and controls may not be adequately prepared.***

As a Mexican trust with securities registered with the RNV, we incur significant legal, accounting and other expenses, including costs associated with public entity reporting requirements and corporate governance requirements, including requirements under the Mexican Securities Market Law, BMV Internal Rules (*Reglamento Interior de la BMV*) and the General Provisions Applicable to Securities Issuers and other Participants of the Securities Market (*Disposiciones de Carácter General Aplicables a las Emisoras de Valores y a otros*

*Participantes del Mercado de Valores*), including our transition to reporting our financial statements in accordance with IFRS. If we identify significant deficiencies or material weaknesses in our internal control over financial reporting that we cannot remediate in a timely manner, we could become subject to delisting from the Mexican Stock Exchange, an investigation by the CNBV and civil or criminal sanctions. Our management may be required to devote significant time and incur significant expense to remediate any significant deficiencies or material weaknesses that may be discovered and may not be able to remediate any significant deficiency or material weakness in a timely manner. Deficiencies, including any material weaknesses, in our internal control over financial reporting which may occur in the future could result in errors in our financial statements that could require us to restate our financial statements, cause us to fail to meet reporting obligations and cause holders of our CBFIs to lose confidence in our reported financial information, all of which could lead to a decline in the trading price of our CBFIs, or otherwise materially adversely affect our business, reputation, results of operations, financial condition, or liquidity.

***Compliance with new accounting standards applicable to us may adversely affect our ability to make distributions to holders of our CBFIs.***

Application of IFRS 9 (*Financial Instruments*) and IFRS 15 (*Revenue from Contracts with Customers*), both of which will become effective on January 1, 2018, and of IFRS 16 (*Leases*), which will become effective on January 1, 2019, may have an adverse impact on our internal processes, business operations and financial situation, or affect our compliance with contractual covenants.  Although as of the date of this offering memorandum we do not anticipate any significant impact from the application of these financial reporting standards, we continue to evaluate, quantify and assess the final effect of these mandatory norms.   In addition, application of these new financial reporting standards may impair the comparability of our financial results for prior periods.

***We may be unable to complete acquisitions that would grow our business and, even if we complete acquisitions, we may fail to successfully integrate and operate acquired properties.***

Our growth strategy includes the disciplined acquisition of properties as opportunities arise. Our ability to acquire properties on satisfactory terms and successfully integrate and operate them is subject to the following risks:

- we may be unable to acquire desired properties because of competition from other real estate competitors;

- we may acquire properties that are not accretive to our results upon acquisition, and our Property Managers may not successfully manage and lease those properties to meet our expectations;

- competition from other potential acquirers may significantly increase the purchase price of a desired property;

- we may be unable to generate sufficient cash from operations, or obtain the necessary debt or equity financing to consummate an acquisition or, if obtainable, financing may not be on satisfactory terms;

- we may need to spend more than budgeted amounts to develop properties or to make necessary improvements or renovations to acquired properties;

- agreements for the acquisition of properties are typically subject to customary conditions to closing, including satisfactory completion of due diligence investigations, and we may spend significant time and money on potential acquisitions that we do not consummate;

- the process of acquiring or pursuing the acquisition of a new property may divert the attention of the executive officers of our Property Managers from our existing business operations;

- we may be unable to quickly and efficiently integrate new acquisitions into our existing operations;

- market conditions may result in higher than expected vacancy rates and lower than expected rental rates; and

- we may acquire properties without any recourse, or with only limited recourse, for liabilities, whether known or unknown, such as clean-up of environmental contamination, claims by tenants, vendors or other persons against the former owners of the properties and claims for indemnification by general partners, directors, officers and others indemnified by the former owners of the properties.

If we cannot complete property acquisitions on favorable terms, or integrate or operate acquired properties to meet our goals or expectations, our business, financial condition, results of operations and cash flow, the trading price of our CBFIs and our ability to make distributions to holders of our CBFIs and to satisfy our debt service obligations could be materially and adversely affected.

***Delays in our receipt of the reimbursement of value-added taxes paid in connection with our acquisition of properties could have an adverse effect on our cash flow, results of operations and ability to make distributions to holders of our CBFIs.***

We are required to pay value-added taxes in connection with our acquisition of properties. Pursuant to Article 6 of the Mexican Value Added Tax Law (*Ley del Impuesto al Valor Agregado*) and Article 22 of the Mexican Federal Tax Code (*Código Fiscal de la Federación*), such amounts must be reimbursed to us by the applicable tax authorities within 40 business days following the reimbursement request to such tax authorities. To the extent that we experience delays in the receipt of such reimbursements, our cash flow, results of operations and our ability to make distributions to holders of our CBFIs could be materially and adversely affected.

***We may be unable to successfully expand our operations into new markets, which could adversely affect our return on our real estate investments in these markets.***

If the opportunity arises, we may explore acquisitions of properties in new markets within Mexico. Each of the risks applicable to our ability to acquire and successfully integrate and operate properties in our current markets is also applicable to our ability to acquire and successfully integrate and operate properties in new markets. In addition to these risks, we may not possess the same level of familiarity with the dynamics and market conditions of any new markets that we may enter, which could adversely affect our ability to expand into or operate in those markets. We may be unable to achieve a desired return on our investments in new markets. If we are unsuccessful in expanding into new markets, it could adversely affect our business, financial condition, results of operations and cash flow, the trading price of our CBFIs and our ability to make distributions to holders of our CBFIs.

***Our properties are concentrated in the industrial, retail and office real estate sectors in Mexico, and our business could be adversely affected by an economic downturn in any of those sectors.***

As of June 30, 2017, our Stabilized Portfolio was comprised of 499 properties with 521 operating units and a total GLA of 7.7 million $m^2$, 93.7% of which was leased. The 521 operating units included (i) 325 retail operating units with a total GLA of 3.0 million $m^2$ (38.8% of our Stabilized Portfolio), 93.3% of which was leased, (ii) 106 industrial operating units with approximately 3.8 million $m^2$ of GLA (49.6% of Stabilized Portfolio), 95.3% of which was leased, and (iii) 90 office operating units with total GLA of 0.9 million $m^2$ (11.6% of our Stabilized Portfolio), 88.3% of which was leased. This concentration may expose us to the risk of economic downturns in the retail, office and industrial real estate sectors to a greater extent than if our properties were more diversified across other sectors of the real estate industry.

***Our ability to dispose of our properties is restricted, including by rights of first refusal, and these restrictions could reduce the value of any property sold or impair our liquidity or operating flexibility if sales of such properties were necessary to generate capital or otherwise.***

In order to qualify as a FIBRA, we are subject to various requirements, including the requirement that we may not sell any real estate that is developed or acquired by us for a period of at least four years following the completion of the development or acquisition, as applicable, in order to retain the tax benefits attributable to that property. If we were to sell a property during this period, we would be subject to significant adverse tax consequences related to such property, which may make a sale of the property less desirable. In order to maintain the tax benefits available to FIBRAs, we intend to hold any properties developed or acquired by us for at least four years from the completion of development or acquisition. At the time of a sale of a property, we will have to satisfy all requirements mandated by law and by the relevant lease agreements, including, if applicable, any preferential rights of purchase. In addition, pursuant to our trust agreement and certain contribution agreements, for so long as the contributors of such properties hold any CBFIs issued to them in connection with the contributions of the corresponding properties, they will have reversion rights (equivalent to the right to repurchase the property), solely with respect to the properties contributed by them. Pursuant to these rights, in the event we decide to sell any such contributed property or upon a termination of our trust agreement, such contributors will have the right to re-acquire such property in its entirety from us at a price approved by a majority of the independent members of our technical committee. Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group will have a right of first refusal with respect to all of our properties so long as the control trust holds at least 15% of our outstanding CBFIs. Pursuant to this right, in the event we decide to sell any such property, these persons, collectively through a common representative, will have a right of first refusal to acquire such property from us at a price approved by a majority of the independent members of our technical committee. Furthermore, some of our tenants, pursuant to lease agreements or by law, have a right of first refusal to purchase the property from us upon a sale by us of such property in the future, which right will have priority over the right of first refusal of the Relevant Principals of E-Group and may have priority over the contributors' reversion rights. These restrictions and rights could impede our ability to sell properties and to raise cash quickly, or at opportune times. In addition, if we choose to sell or are required to sell any of our properties, the reversion right of the relevant contributors and the rights of first refusal granted to the Relevant Principals of E-Group as described above could reduce the value of the property sold. See "Certain Relationships and Related Transactions."

***We are exposed to risks associated with property development.***

As part of our growth and value generation strategy, we expect to continue being engaged in real estate development and redevelopment activities and, as a consequence, we are subject to certain risks, including, without limitation:

- the availability and timely receipt of zoning and other regulatory approvals;

- the cost and timely completion of construction (including unanticipated risks beyond our control, such as weather or labor conditions, shortages of materials and construction overruns);

- the availability and pricing of financing on satisfactory terms, or at all; and

- the ability to achieve an acceptable level of occupancy upon completion.

These risks could result in delays or substantial unforeseen cost increases and could even prevent the completion of a project to which important resources may have already been dedicated, all of which would have a material adverse effect on our business, financial condition, results of operations and cash flow, the trading price of our CBFIs and our ability to make distributions to holders of our CBFIs.

***The properties we have acquired and may acquire in the future may be subject to unknown liabilities that could affect the value and profitability of these properties.***

In connection with our acquisition of properties from time to time, we may assume existing liabilities, some of which may be unknown, unquantifiable or not disclosed by the seller or the external advisors at the time of the acquisition. Unknown liabilities might include liabilities for cleanup or remediation of environmental conditions, claims of tenants, vendors or other persons dealing with the entities or properties prior to our acquisition of the entities or properties, tax liabilities, employment-related issues, and accrued but unpaid liabilities, whether incurred in the ordinary course of business or otherwise. If the magnitude of such unknown liabilities is high, either singly or in the aggregate, they could adversely affect our business, financial condition, results of operations and cash flow, the trading price of our CBFIs  and our ability to make distributions to holders of our CBFIs.

***We cannot assure you of our ability to make distributions in the future. We may use borrowed funds or funds from other sources to make distributions, which may adversely impact our operations.***

We intend to continue to make distributions to holders of our CBFIs in order to qualify as a FIBRA. The Mexican Income Tax Law requires that a FIBRA distribute annually at least 95% of its net taxable income. To satisfy the requirements to qualify as a FIBRA, we intend to continue to pay distributions equal to at least 95% of our net taxable income to holders of our CBFIs. If our assets are insufficient to make cash distributions, there is no obligation for us to make such distributions or payments.

All distributions are made at the discretion of our technical committee and depend on our earnings, our financial condition, maintenance of our FIBRA qualification and other factors as our technical committee may deem relevant from time to time.  In order for our technical committee to order a distribution of any amounts other than 95% of our net taxable income, the vote of a majority of the independents members is required.  In addition, any distribution of less than 95% of our net taxable income requires approval by the holders of our CBFIs.  We do not have other or different assets or resources other than those that constitute our assets. We may be required to fund distributions from working capital, net proceeds of the combined offering or a sale of assets to the extent distributions exceed earnings or cash flows from operations. Funding distributions from working capital would restrict our operations. Finally, selling assets may require us to dispose of assets at a time or in a manner that is not consistent with our disposition strategy. If we borrow to fund distributions, our leverage ratios and future interest costs would increase, thereby reducing our earnings and cash available for distribution from what they otherwise would have been. We may not be able to make distributions in the future and we cannot assure you that our distribution policy will not change in the future.

***There is no obligation to make distributions with any resources other than those which form part of our assets.***

There is no obligation to make distributions from resources other than those which form part of our assets, as provided in our trust agreement. Our trust agreement does not include any guarantee of delivery of cash distribution to holders of our CBFIs. None of us, our Settlor, contributors of the properties in our portfolio, our Management Subsidiary, our Advisor, our Leasing Administrator, or any of their affiliates or subsidiaries, or the initial purchasers or the Mexican underwriters, will be responsible to make distributions under our CBFIs. In the event our trust assets are insufficient to make all the cash distributions under the CBFIs, there is no obligation of our Settlor, the contributors of the properties in our portfolio, our Management Subsidiary, our Advisor, our Leasing Administrator, Bank of New York Mellon, Institución de Banca Múltiple (or any entity appointed as a successor thereto), as the common representative of the holders of our CBFIs, or the Common Representative, us or any of their affiliates or subsidiaries, or the initial purchasers or the Mexican underwriters, to make such cash distributions under our CBFIs.

***Our property taxes could increase due to property tax rate changes or reassessment, which could adversely impact our cash flows.***

Even if we continue to qualify as a FIBRA for Mexican tax purposes, we will be required to pay state and local taxes on our properties. The real property taxes on our properties may increase as property tax rates change or as our properties are assessed or reassessed by taxing authorities. Therefore, the amount of property taxes we pay in

the future may differ substantially from the property taxes that were paid on our properties in the past. If the property taxes we pay increase, our results of operations, financial condition, cash flows and ability to make distributions to holders of our CBFIs could be materially and adversely affected.

***Joint venture investments that we make could be adversely affected by our lack of sole decision-making authority, our reliance on our joint venture partners' financial condition and disputes between us and our joint venture partners.***

We may co-invest in properties with third parties through partnerships, joint ventures or other entities, acquiring non-controlling interests in or sharing responsibility for managing the affairs of a property, partnership, joint venture or other entity. Investments through partnerships, joint ventures, or other entities may, under certain circumstances, involve risks not present were a third party not involved, including the possibility that joint venture partners might become bankrupt, fail to fund their share of required capital contributions, make poor business decisions or block or delay necessary decisions. Joint venture partners may have economic or other business interests or goals which are inconsistent with our business interests or goals, and may be in a position to take actions contrary to our policies or objectives. Such investments may also have the potential risk of impasses on decisions, such as a sale, because neither we nor our joint venture partners would have full control over the partnership or joint venture. Disputes between us and our joint venture partners may result in litigation or arbitration that would increase our expenses and prevent the members of our management team from focusing its time and effort on our business. Consequently, actions by, or disputes with, our joint venture partners might result in subjecting the facilities owned by the partnership or joint venture to additional risk. In addition, we may in certain circumstances be liable for the actions of our joint venture partners.

***Interest expense on any indebtedness we incur may limit our cash available for distribution to holders of our CBFIs.***

Our existing indebtedness bears interest at a fixed or variable rate and any indebtedness we incur in the future may also bear interest at a fixed or variable rate. Higher interest rates could increase debt service requirements on our variable rate indebtedness and could reduce the amounts available for distribution to holders of our CBFIs, as well as reduce funds available for our operations, future business opportunities, or other purposes.

***In the ordinary course of our business, we may be subject to litigation from time to time.***

In the ordinary course of our business, we may be subject to litigation. We may also be exposed to litigation resulting from the activities of our tenants or their customers, or in connection with our property acquisition, disposition and development activities. The outcome of any such proceedings may materially adversely affect us and may continue without resolution for long periods of time. Any litigation may consume substantial amounts of our Property Managers' and our Advisor's senior management's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation. The acquisition, ownership, development and disposition of real property will expose us to certain litigation risks which could result in losses, some of which may be material. Litigation may be commenced with respect to a property we have acquired in relation to activities that took place prior to our acquisition of such property. The commencement of any such litigation, or an adverse result in any litigation that may be pending, could have a material adverse effect on our business, results of operations and financial condition.

**Risks Related to Our Relationship with Our Advisor, Our Leasing Administrators and Our Property Managers**

***We are dependent on our Management Subsidiary, our Advisor and our Leasing Administrator, and their key personnel, for our success, and we may not find suitable replacements if our agreements with them are terminated, or if key personnel leave their employment or otherwise become unavailable to us.***

Our Management Subsidiary is responsible for the day-to-day management and administration of a significant portion of our business. Our Advisor assists us in the formulation and implementation of our investment and financial strategies and our Leasing Administrator performs certain leasing, billing and collection services on

our behalf. Accordingly, we believe that our success depends to a significant extent upon the efforts, experience, diligence, skill and network of business contacts of the officers and key personnel of our Advisor, our Leasing Administrator and our Management Subsidiary. The departure of any of the officers or key personnel of our Management Subsidiary, our Advisor or our Leasing Administrator could have a material adverse effect on our performance. In addition, we offer no assurance that our Advisor or our Leasing Administrator will remain as our advisor and our leasing administrator, or that we will continue to have access to their officers and professionals. If the advisory agreement or the services agreements are terminated and no suitable replacements are found, we may not be able to execute our business plan. Moreover, certain of the non-independent members of our technical committee are also officers of our Management Subsidiary, our Advisor, our Leasing Administrator or one of their affiliates, and most of them have responsibilities and commitments in addition to their responsibilities to us.

***There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs.***

We are subject to conflicts of interest arising out of our relationship with our Advisor and our Leasing Administrator and their respective affiliates. Specifically, certain of the non-independent members of our technical committee are also officers of, and have ownership interests in, our Advisor and our Leasing Administrator. In addition, our advisory agreement, property management agreement with our Management Subsidiary and services agreement with our Leasing Administrator were negotiated between related parties and their terms, including fees and other amounts payable, may not be as favorable to us as if they had been negotiated on an arm's-length basis with unaffiliated third parties. In addition, certain of our Advisor's and Management Subsidiary's officers have a controlling interest in and are related persons. We pursue a similar strategy to such related persons and may compete with them for investment opportunities. As a result, there may be conflicts in allocating assets that are suitable for such related persons and us.

As a consequence we have established certain policies and procedures to avoid possible conflicts of interest. In accordance with our trust agreement, the majority of votes from the technical committee's members and independent members is needed before formalizing any agreement, transaction or material relationship with a related person, including our Management Subsidiary, our Advisor, our Leasing Administrator, relevant settlors, members of our technical committee or any other person or party that may have a conflict of interest. Furthermore, to face possible conflicts of interest that may arise from an investment opportunity convenient for us and the related persons, in accordance to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group agreed to grant us the right to participate in any future investment opportunity in real estate that complies with the eligibility requirements, as long as such opportunity is adequate for us and the control trust holds at least 15% of our CBFIs.

In addition, the contributors of the properties that comprise our Initial Portfolio and any properties that the Relevant Principals may contribute to us in the future, are subject to certain tax consequences upon our sale of such properties. The taxes on the contribution of such properties are deferred initially, but must ultimately be paid by the respective contributors of such properties in the event one of the following occurs: (i) we dispose of such properties or (ii) the respective contributors dispose of the CBFIs received as consideration for the contribution of such properties. Accordingly, the Relevant Principals of E-Group may have different objectives regarding the appropriate pricing, timing and other material terms of any sale of such properties and could exercise their influence over our affairs by attempting to delay, defer or prevent a transaction that might otherwise be in our best interests.

In addition, pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group have a right of first refusal with respect to all of our properties and, pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the contributors have reversion rights solely with respect to the properties in our Initial Portfolio contributed by them. Pursuant to these rights, in the event we decide to sell a property from our Initial Portfolio or upon a termination of our trust agreement, these persons, collectively through a common representative, will have a right of first refusal to acquire or re-acquire such properties from us, provided that any such transaction will be subject to the prior approval of our technical committee, including the approval of at least a majority of the independent members of our technical

committee. There is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs.

***We may pursue less vigorous enforcement of agreements because of conflicts of interest with certain of the members of our technical committee.***

Messrs. Moisés El-Mann Arazi, André El-Mann Arazi, Isidoro Attié Laniado, Elías Sacal Micha, Max El-Mann Arazi and Abude Attié Dayán, each of whom is a member of our technical committee, had interests in the properties that we acquired in the formation transactions and entered into contribution agreements and purchase and sale agreements with us in connection with such acquisitions pursuant to which they received CBFIs and cash. In addition, certain of these individuals are officers of, and/or have an ownership interest in our Management Subsidiary, our Advisor and our Leasing Administrator. In connection with our initial offering and our formation transaction, we entered into the advisory agreement with our Advisor, the property management agreement with our F1 Management Subsidiary and the services agreement with our Leasing Administrator, pursuant to which we will pay our Advisor, our F1 Management Subsidiary and our Leasing Administrator fees. The terms of the agreements pursuant to which we acquired our Initial Portfolio and the terms of the advisory agreement, the services agreement with our Leasing Administrator and the property management agreement with our Management Subsidiary were not negotiated on an arm's-length basis, and we may choose not to enforce, or to enforce less vigorously, our rights under these agreements because of our desire to maintain our ongoing relationship with our Advisor, its senior management team, our Management Subsidiary, our Leasing Administrator and certain members of our technical committee, given their significant knowledge of our business, relationships with our customers and significant holdings of our CBFIs.

***The advisory agreement with our Advisor, the property management agreement with our Management Subsidiary and the services agreement with our Leasing Administrator were not negotiated on an arm's length basis and their terms may not be as favorable to us as if they had been negotiated with unaffiliated third parties.***

Certain of the non-independent members of our technical committee are also officers of, and/or have ownership interests in, our Management Subsidiary, our Advisor and our Leasing Administrator. The advisory agreement with our Advisor, the property management agreement with our Management Subsidiary and the services agreement with our Leasing Administrator were negotiated between related parties and their terms, including fees payable, may not be as favorable to us as if they had been negotiated with unaffiliated third parties.

**Risks Related to Our Organization and Structure**

***For purposes of Mexican law, we are an issuance trust, not a guarantee trust, and recovery on an investment in our CBFIs is subject to our receipt of sufficient funds resulting from our investments in real estate.***

Our trust agreement is an agreement by which holders of our CBFIs acquire the right to receive cash distributions from the cash flow that is or will be part of our assets. As a consequence of being, for purposes of Mexican law, an issuance trust and not a guarantee trust, recovery on an investment in our CBFIs is subject to our receipt of sufficient funds resulting from the investments in our real estate.

***Tax regulation applicable to FIBRAS has been evolving and it is subject to modification; accordingly, there can be no assurance that the laws and regulations relating to FIBRAs, and any interpretations thereof, will not change in a manner that adversely affects us.***

Tax regulation applicable to FIBRAS has been evolving and it is subject to modification; accordingly, there can be no assurance that the laws and regulations relating to FIBRAs will not be modified in the future, including changes in the criteria issued by the Mexican tax authorities providing more specific or different guidance regarding the requirements to qualify as a FIBRA; some of these changes could adversely affect our operations. To the extent that the Mexican tax authorities provide more specific guidance regarding, or change, the requirements to qualify as a FIBRA, we may be required to adjust our strategy accordingly. Any additional guidance or changes could inhibit our ability to pursue our business strategy. If we are unable to maintain our qualification as a FIBRA, we could, among other things, be required to change the manner in which we conduct

- 38 -

our operations, which could adversely affect our financial condition, results of operations, cash flow and our ability to make payments when due under the CBFIs.

To the extent that the tax regime applicable to FIBRAs changes, such changes may make it impossible for us to both qualify as a FIBRA and a real estate operating company. See "ERISA Considerations."

***Certain contributors of property to our portfolio who have received CBFIs in exchange for their contributions may have an interest in preventing our sale of such property, even if such sale is in our best interest.***

The contributors of the properties that we acquired in exchange for CBFIs and any properties that may be contributed to us in the future are subject to certain tax consequences upon our sale of such properties. The taxes on the contribution of such properties are deferred initially, but must ultimately be paid by the respective contributors of such properties if any of the following events occurs: (i) we dispose of such properties or (ii) the respective contributors dispose of the CBFIs received as consideration for the contribution of such properties. Accordingly, they may have different objectives regarding the appropriate pricing, timing and other material terms of any sale of such properties and could exercise their influence over our affairs by attempting to delay, defer or prevent a transaction that might otherwise be in our best interest or in the interest of our other holders of CBFIs.

***Members of our Advisor's senior management team, each of whom are executive officers of our Management Subsidiary, have outside business interests and investments, which could potentially take their time and attention away from us.***

Members of our Advisor's senior management team, each of whom are executive officers of our Management Subsidiary, have outside business interests, including ownership and, in some cases, management responsibilities related to certain properties and entities that have not been contributed to or acquired by us. The presence of outside business interests may present a conflict in that they could interfere with the ability of the members of our Advisor's senior management team to devote time and attention to our business and affairs and, as a result, our business could be harmed.

***Messrs. Moisés El-Mann Arazi, André El-Mann Arazi, Isidoro Attié Laniado, Abude Attié Dayán and Max El-Mann Arazi have significant influence over our affairs and could exercise such influence in a manner that is not in the best interest of holders of our CBFIs.***

The control trust is controlled by its technical committee, which is comprised of Messrs. Moisés El-Mann Arazi, André El-Mann Arazi, Isidoro Attié Laniado, Abude Attié Dayán and Max El-Mann Arazi. These individuals, through the control trust and as long as they hold 15% or more of our outstanding CBFIs through the control trust, are able to appoint a majority of the members of our technical committee.

***The contributors' ability to sell their ownership stake in us and speculation about such possible sales may adversely affect the market price of our CBFIs.***

The members of our Advisor's senior management team, the members of our technical committee and all members of the El-Mann Family and the Attié Family have from time to time agreed, and may in the future agree, to restrict their ability to dispose of or hedge any of their CBFIs or any securities convertible into or exchangeable for our CBFIs. As long as these persons continue to retain significant ownership in us, the liquidity and market price of our CBFIs may be adversely impacted. In addition, speculation by the press, stock analysts, holders of our CBFIs or others regarding their intention to dispose of their CBFIs could adversely affect the market price of our CBFIs. Accordingly, our CBFIs may be worth less than they would be if these individuals did not have significant ownership in us.

***Our technical committee may change certain of our trust policies without the approval of holders of our CBFIs.***

Within the parameters established in our trust agreement, our distribution policies and our policies with respect to other activities, including growth, capitalization and operations, are determined by our technical committee. In certain circumstances, these policies may be amended or revised at any time and from time to time at

- 39 -

the discretion of our technical committee without a vote of holders of our CBFIs. A change in these policies could have an adverse effect on our business, financial condition, results of operations and cash flow, the trading price of our CBFIs  and our ability to make distributions to holders of our CBFIs.

**Risks Related to the Securities Markets and Ownership of our CBFIs**

***The historical performance of our Advisor's senior management team may not be indicative of our future results or an investment in our CBFIs.***

The past performance of our Advisor's senior management team is not intended to be indicative of, or a guarantee or prediction of, the returns that our Advisor or we may achieve in the future. This is especially true for us because we operate as a FIBRA with our CBFIs registered with the RNV and we are required to comply with certain regulatory requirements relating to trusts with securities registered with the RNV in Mexico, as well as the FIBRA requirements of the Mexican Income Tax Law, which are highly technical and complex. Accordingly, we can offer no assurance that our Advisor's senior management team will replicate their historical performance in their previous endeavors. Our investment returns could be substantially lower than the returns achieved by them in their previous endeavors.

***The number of CBFIs available for future sale, including by the contributors to our portfolio and the sellers of properties that receive CBFIs in payment, could adversely affect the market price of our CBFIs, and future sales by us of our CBFIs may be dilutive to existing holders of our CBFIs.***

Issuances or sales of substantial amounts of our CBFIs in the public market, or the perception that such issuances or sales might occur, could adversely affect the market price of our CBFIs. The exercise of the over-allotment option, the issuance of our CBFIs in connection with property, portfolio or business acquisitions, the issuance of CBFIs as payment of fees to our Advisor and other issuances of our CBFIs could be dilutive and have an adverse effect on the market price of our CBFIs.

***Future issuances of our CBFIs, whether as consideration for future contributions to our portfolio or in payment for services provided to us, may adversely affect the market price of, and dilute the value of, our CBFIs.***

Our Trust Agreement allows our Technical Committee to issue CBFIs as consideration for transfers of properties to our portfolio or in payment for services provided to us, including by our Advisor.  Such issuances may occur from time to time, depending in each case upon the conditions then prevailing.  In addition, in the event of future capital raising issuances of our CBFIs, existing holders of our CBFIs will not have any preemptive rights with respect to the new issuance that would allow them to maintain their ownership percentage in us.  The end result of both types of issuances may be a dilution of the ownership interest of existing holders of our CBFIS with respect to our total CBFIs outstanding, as well as a decrease in the market price of our CBFIs.

***Future offerings of securities ranking senior to our CBFIs may limit our operating and financial flexibility and may adversely affect the market price of, and dilute the value of, our CBFIs.***

If we decide to issue securities in the future ranking senior to our CBFIs or otherwise incur indebtedness, it is possible that these securities or indebtedness will be governed by an indenture or other instrument containing covenants restricting our operating flexibility and limiting our ability to make distributions to holders of our CBFIs. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges, including with respect to distributions, more favorable than those of our CBFIs and may result in dilution to holders of our CBFIs. Because our decision to issue securities in any future offering or otherwise incur indebtedness will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings or financings, any of which could reduce the market price of our CBFIs and dilute the value of our CBFIs.

***Increases in market interest rates may result in a decrease in the value of our CBFIs.***

One of the factors that influence the price of our CBFIs is the distribution paid on our CBFIs (as a percentage of the price of our CBFIs) relative to market interest rates. An increase in market interest rates may lead prospective purchasers of our CBFIs to expect higher distributions and, if we are unable to pay such higher distributions, the market price of our CBFIs could decrease.

***The market price of our CBFIs could be adversely affected by our level of cash distributions.***

The market's perception of our growth potential and our current and potential future cash distributions, whether from operations, sales or refinancings, as well as the real estate market value of the underlying assets, may cause our CBFIs to trade at prices that differ from our net asset value per CBFI. In order to qualify as a FIBRA, the Mexican Income Tax Law requires that we distribute annually at least 95% of our net taxable income. If we retain operating cash flow for investment purposes, working capital reserves or other purposes, these retained funds, while increasing the value of our underlying assets, may not correspondingly increase the market price of our CBFIs. Our failure to meet the market's expectations with regard to future earnings and cash distributions likely would adversely affect the market price of our CBFIs.

***The market price of our CBFIs after this offering may be lower than the offering price, and the price of our CBFIs may be volatile or may decrease regardless of our operating performance. In addition, an active trading market on the Mexican Stock Exchange, which is the only exchange on which our CBFIs are listed, may not be sustained following the combined offering.***

Because our CBFIs have not been registered under the Securities Act or listed on any U.S. securities exchange, these securities are subject to transfer restrictions. We do not intend to provide registration rights to holders of our CBFIs and do not intend to file any registration statement with the SEC in respect of our CBFIs. Our CBFIs are listed on the Mexican Stock Exchange, but we cannot assure you that an active trading market will be sustained or that our CBFIs will be resold at or above the offering price. The Mexican Stock Exchange is one of Latin America's largest exchanges in terms of market capitalization, but it remains relatively small, illiquid and volatile compared to other major world markets. We cannot assure you as to the liquidity of any markets that may develop for our CBFIs or the price at which our CBFIs may be sold. The offering price of our CBFIs will be determined by agreement among us and the initial purchasers, but we cannot assure you that our CBFIs will not trade below the offering price following the completion of the combined offering. See "Plan of Distribution." The market value of our CBFIs could be materially and adversely affected by general market conditions, including the extent to which a secondary market develops for our CBFIs following the completion of the combined offering, the extent of institutional investor interest in us, the general reputation of FIBRAs and the attractiveness of their CBFIs in comparison to other equity securities (including securities issued by other real estate-based companies), our financial performance and general stock and bond market conditions. Some other factors that could negatively affect, or result in fluctuations in, the price of our CBFIs include:

- actual or anticipated variations in our quarterly operating results;

- changes in our earnings estimates or publication of research reports about us or the real estate industry;

- increases in market interest rates, which may lead purchasers of our CBFIs to demand a higher yield;

- adverse market reaction to any increased indebtedness we incur in the future;

- additions or departures of key personnel of our Advisor, our Management Subsidiary or our Leasing Administrator;

- speculation in the press or investment community;

- changes in accounting principles; and

- passage of legislation or other regulatory developments that adversely affect us or our industry.

***If securities analysts do not publish research or reports about our business or if they downgrade our CBFIs or our sector, the price of our CBFIs could decline.***

The trading market for our CBFIs relies in part on the research and reports that industry or financial analysts publish about us or our business. We do not control these analysts. Furthermore, if one or more of the analysts who cover us downgrades our stock or our industry, or the stock of any of our competitors, the price of our CBFIs could decline. If one or more of these analysts ceases coverage of us, we could lose attention in the market, which in turn could cause the price of our CBFIs to decline.

***In order to continue to qualify as a "real estate operating company" under the Plan Assets Regulation, we may have to acquire or dispose of certain investments or pursue various activities under sub-optimal conditions.***

Our decision to manage our assets and activities so as to continue to qualify as a "real estate operating company" (as defined in "ERISA Considerations") may necessitate the acquisition or disposition of particular investments or the pursuit of various activities under sub-optimal conditions. We may forego a favorable investment if it would not qualify under the "real estate operating company" exception under the Plan Assets Regulation (including to the extent the structure of such investment is not consistent with the "real estate operating company" requirements) or we may decide to liquidate an investment at a disadvantageous time based on these requirements, resulting in lower proceeds than might otherwise have been the case without the need for such compliance. See "ERISA Considerations."

***Holders of our CBFIs do not have preemptive rights that entitle them to participate in future offerings.***

Under our trust agreement, if we issue new CBFIs as part of a capital increase, holders of our CBFIs do not have the right to subscribe to a proportional (or any other) number of CBFIs to maintain their existing ownership percentage. Rights to subscribe for CBFIs in these circumstances are known as preemptive rights. As a result, the ownership interest of holders of our CBFIs may be diluted upon future capital increases.

***The protections afforded to minority holders of our CBFIs in Mexico are different from those in the United States.***

Under Mexican law, the protections afforded to minority holders of our CBFIs and the fiduciary duties of officers and members of our technical committee are, in some respects, different from those in the United States and certain other jurisdictions. In particular, the Mexican legal regime concerning fiduciary duties of members of our technical committee is not as developed as in the United States, and the criteria applied in the United States to ascertain the independence of members of our technical committee (as the same recently has been made more restrictive in the wake of well publicized corporate scandals) is different from the criteria applicable under corresponding Mexican laws and regulations. Further, in Mexico, there are no procedures for class actions or shareholder derivative actions and different procedural requirements exist for bringing shareholder lawsuits. As a result, in practice it may be more difficult for minority holders of our CBFIs to enforce their rights against us and members of our technical committee or controlling holders of our CBFIs than it would be for shareholders of a U.S. company. See "Principal Holders" and "Description of Our CBFIs and Certain Provisions of Our Trust Agreement and Mexican Law."

***Our trust agreement restricts the ability of non-Mexican holders of our CBFIs to invoke the protection of their governments with respect to their rights as holders of our CBFIs.***

Non-Mexican holders of our CBFIs shall be treated like Mexican holders with respect to their ownership interests and are deemed to have agreed not to invoke the protection of their governments. Both our trust agreement and our CBFIs provide that any legal action relating to the execution, interpretation or performance of our trust agreement is governed by Mexican law and may be brought only in Mexican courts. As a result, it is not possible

- 42 -

for holders of our CBFIs to enforce their rights as holders under our trust agreement before courts other than Mexican courts.

***Distributions to holders of our CBFIs will be made in Pesos.***

We make distributions to holders of our CBFIs in Pesos. Any significant fluctuations in the exchange rates between Pesos to U.S. Dollars or other currencies could have an adverse impact on the U.S. Dollar or other currency equivalent amounts that holders of our CBFIs receive from the conversion. In addition, the amount paid by us in Pesos may not be readily convertible into U.S. Dollars or other currencies. While the Mexican federal government does not currently restrict the ability of Mexican or foreign persons or entities to convert Pesos into U.S. Dollars or other currencies, the Mexican federal government could institute restrictive exchange control policies in the future. Future fluctuations in exchange rates and the effect of any exchange control measures adopted by the Mexican government on the Mexican economy cannot be predicted.

***Our CBFIs have not been rated by any rating agency.***

Our CBFIs have not been rated by any rating agency, as our CBFIs are not debt instruments and do not require a rating of the issuance from a rating agency.  Prospective investors should carefully consider the information contained in this offering memorandum and consult with qualified investment advisers before making an investment in our CBFIs.

**Risks Related to Mexico**

***Economic, political and social conditions may adversely affect our business.***

We are formed in Mexico and all of our assets and operations are located in Mexico. As a result, we are subject to political, economic, legal and regulatory risks specific to Mexico, including the general condition of the Mexican economy, the devaluation of the Peso as compared to the U.S. Dollar, Mexican inflation, interest rates, regulation, confiscatory taxation and regulation, expropriation, social and political instability and social and economic developments in Mexico. Many countries in Latin America, including Mexico, have suffered significant economic, political and social crises in the past, and these events may occur again in the future. Instability in the region has been caused by many different factors, including:

- significant governmental influence over local economies;

- substantial fluctuations in economic growth;

- high levels of inflation;

- changes in currency values;

- exchange controls or restrictions on expatriation of earnings;

- high domestic interest rates;

- wage and price controls;

- changes in governmental economic or tax policies;

- imposition of trade barriers;

- unexpected changes in regulation; and

- overall political, social and economic instability.

There can be no assurance that future developments in the Mexican economic, political or social environment, over which we have no control, will not have a material adverse effect on our business, results of operations, financial condition or prospects or adversely affect the market price of our CBFIs.

***The Mexican government has exercised, and continues to exercise, significant influence over the Mexican economy. Changes in Mexican governmental policies could adversely affect our business, results of operations and financial condition.***

The Mexican federal government has exercised, and continues to exercise, significant influence over the Mexican economy. Accordingly, Mexican federal governmental actions and policies concerning the economy, state-owned enterprises and state controlled, funded or influenced financial institutions could have a significant impact on private sector entities in general and on us in particular, and on market conditions, prices and returns on Mexican securities. See "Business and Properties—Regulation." The Mexican government has in the past intervened in the local economy and occasionally makes significant changes in policies and regulations, which it could continue to do in the future. Such actions to control inflation and other regulations and policies have involved, among other measures, increases in interest rates, changes in tax policies, price controls, currency devaluations, capital controls, limits on imports and other actions. Our business, financial condition, results of operations and our ability to make distributions to the holder of our CBFIs may be adversely affected by changes in governmental policies or regulations involving or affecting our trust estate, our management, our operations and our tax regime. We cannot assure you that changes in Mexican federal governmental policies will not adversely affect our business, financial condition and results of operations. The tax legislation, in particular, in Mexico is subject to constant change and there can be no assurance as to whether the Mexican government may make changes to it or any of its existing political, social, economic or other policies, which changes may have a material adverse effect on our business, results of operations, financial condition or prospects or adversely affect our ability to make distributions to holders of our CBFIs.

***Adverse economic conditions in Mexico may adversely affect our results of operations and financial condition.***

The results of our operations are dependent on the economic conditions in Mexico, characterized by unstable exchange rates, high inflation, high interest rates, economic contraction, reduction of flow of international capital, reduction of liquidity in the banking sector, high unemployment rates and reduced investor confidence, among others. As a result, our business, financial condition and results of operations may be affected by the general condition of the local economy, price instability, inflation, interest rates, regulations, taxation, social instability and other political, social and economic developments in the country, over which we have no control.

In the past, Mexico has experienced prolonged periods of weak economic conditions. We cannot assure you that such conditions will not return or that such conditions will not have a material and adverse effect on our business, results of operations or financial condition.

Decreases in the growth rate of the local economy where our properties are located, periods of negative growth and/or increases in inflation or interest rates may result in lower demand for our properties. Because a large percentage of our costs and expenses are fixed, we may not be able to reduce costs and expenses upon the occurrence of any of these events, and our profit margins may suffer as a result.

***Fluctuations in the value of the Peso against the U.S. Dollar may have an adverse effect on our results of operations and financial condition.***

Because substantially all of our revenues are and will continue to be denominated in Pesos, and a significant portion of our indebtedness, is denominated in U.S. Dollars, if the value of the Peso decreases against the U.S. Dollar, our cost of financing will increase. Further, the devaluation or depreciation of the Peso could increase in Peso terms the amount of our foreign currency-denominated liabilities, negatively affecting our results of operations. Recently, the value of the Peso relative to the U.S. Dollar has decreased significantly, with the U.S. Dollar reaching its all-time high rate against the Peso during the month of February 2016. Generally, we do not enter into hedging agreements to mitigate our risk for currency fluctuations resulting from our U.S. Dollar denominated indebtedness. The Peso is currently subject to significant fluctuations against the U.S. Dollar and may be subject to such fluctuations in the future.

- 44 -

From time to time, the Banco de México may openly participate in the foreign exchange markets to minimize volatility and support the Mexican Peso.  The Banco de México and the Mexican government have also promoted other mechanisms to stabilize currency exchange rates and provide liquidity, for example, by using foreign currency derivatives and futures contracts publicly traded on the Chicago Mercantile Exchange. Notwithstanding the above, the Peso has recently experienced meaningful fluctuations against the Dollar and may be subject to further fluctuations in the future.

Fluctuations in currency rates may adversely affect our ability to acquire assets denominated in other currencies and may also adversely affect the performance of the investments in such assets. Since assets may be purchased with and income may be payable in Pesos, the value of these assets measured in U.S. Dollars may be affected favorably or unfavorably by changes in currency rates, costs of conversion and exchange control regulations. Therefore, the amount of distributions made by us as well as the U.S. Dollar-denominated value of our investments will be adversely affected by reductions in the value of the Peso relative to the U.S. Dollar.

Severe devaluation or depreciation of the Peso may also result in disruption of the international foreign exchange markets. This may limit our ability to transfer or to convert Pesos into U.S. Dollars and other currencies or to make timely payments of interest and principal on our USD Notes, our other U.S. Dollar denominated debt and any additional U.S. Dollar denominated debt that we may incur in the future. This may also have an adverse effect on our financial position, results of operations and cash flows in future periods by, for example, increasing in Peso terms the amount of our foreign currency denominated liabilities and the rate of default among our borrowers. While the Mexican government does not currently restrict, and for many years has not restricted, the right or ability of Mexican or foreign persons or entities to convert Pesos into U.S. Dollars or to transfer other currencies outside of Mexico, the Mexican government could institute restrictive exchange control policies in the future. The effect of any exchange control measures adopted by the Mexican government on the Mexican economy cannot be predicted.

***We may incur losses due to U.S. Dollar-denominated leases.***

As of June 30, 2017, approximately 74.1% of our lease agreements, in terms of ABR, were denominated in Pesos, and approximately 25.9% of our lease agreements, in terms of ABR, were denominated in U.S. Dollars. We may not be able to receive payments of amounts owed to us by our obligors in U.S. Dollars because, under the Mexican Monetary Law (*Ley Monetaria de los Estados Unidos Mexicanos*), obligations to make payments to any Mexican or foreign companies or individuals in Mexico in a foreign currency, whether by agreement or upon enforcement of a judgment, may be discharged in Pesos at the exchange rate for Pesos prevailing at the time and place of payment as determined by the Banco de México and published in the Official Gazette on the date of the payment. Accordingly, pursuant to the Mexican Monetary Law, we may incur losses as a result of being forced to accept payment in Pesos for U.S. Dollar-denominated obligations.

***Developments in other countries may adversely affect the Mexican economy, the market value of our securities and our results of operations.***

The Mexican economy and the market value of Mexican companies may be, to varying degrees, affected by economic and market conditions in other emerging market countries and in the United States. Although economic conditions in other emerging market countries and in the United States may differ significantly from economic conditions in Mexico, investors' reactions to developments in other countries may have an adverse effect on the market value of securities of Mexican issuers or of Mexican assets.

In addition, economic conditions in Mexico are highly correlated with economic conditions in the United States as a result of the North American Free Trade Agreement, or NAFTA, and increased economic activity between the two countries. We cannot assure you that events in other emerging market countries, in the United States or elsewhere, will not adversely affect our business, results of operations and financial condition.

***Inflation in Mexico, along with government measures to curb inflation, may have an adverse effect on our investments.***

High inflation rates can adversely affect our business, financial condition and results of operations. If Mexico again experiences high inflation in the future, we may not be able to adjust the prices we charge our tenants to offset its negative effects.

Increases in the rental rates for our assets are commonly tied to inflation. For Peso-denominated leases, the increase is usually based on the increases reflected in the official Mexican Consumer Price Index, which is based on the increase of certain predetermined items included in the index, which are limited and mainly refer to articles required to cover the basic necessities of a household, many of them subsidized or controlled by the government. As a result of the foregoing, this index may not accurately reflect actual inflation. Additionally, increases in the rental rates for our assets are annualized and therefore rent adjustments for inflation may not take effect until the following year. Accordingly, adjustments in the rent based on Mexican inflation may be deferred and may not match actual inflation. Increases to rental payments under our U.S. Dollar-denominated leases are usually tied to U.S. inflation, which has traditionally been lower than the Mexican inflation and could therefore be insufficient to cover the actual increase in costs.

***Political conditions in Mexico may have an adverse effect on our business, results of operations or financial condition.***

Political events in Mexico may significantly affect Mexican economic policy and, consequently, our operations. Political disagreements between the executive and the legislative branches could result in deadlock and prevent the timely implementation of political and economic reforms, which in turn could have a material adverse effect on Mexican economic policy and on our business. It is also possible that political uncertainty may adversely affect Mexico's economic situation.

Political events in Mexico could materially affect market conditions, including the Peso's parity to other currencies, the general conditions in the Mexican real estate industry and the Mexican economy, inflation, interest rates, statutes, taxes and confiscatory regulations, expropriation, social and political instability and economic development, all of which may have a direct impact on our business. We cannot assure you that Mexican political events, over which we have no control, will not have an adverse effect on our business, results of operations or financial condition.

***Mexico has experienced a period of increasing criminal activity, and such activities could affect our results of operations and financial condition.***

In the last several years, Mexico has experienced a period of high criminal activity, primarily due to organized crime. These activities, their possible escalation and the violence associated with them may have a negative impact on the business environment in certain locations in which we operate, and therefore on our results of operations and financial condition.

***Mexico's relationship with the United States may have adversely changed following the results of the U.S. presidential election.***

The United States presidential election in November 2016 resulted in the election of Donald J. Trump and victories of the Republican Party both in the White House and in Congress.  U.S. policies and guidelines may not be favorable for, and even adversely affect, Mexico.  Any renegotiation of commercial treaties or other changes in foreign policy by the new administration may affect the macroeconomic variables on which the stability of the Mexican economy depends, including interest rates, exchanges rate of the Peso against the Dollar, and inflation. The new administration may renegotiate the terms of trade treaties between the United States and Mexico, such as NAFTA, and adopt other protectionist policies announced during the election campaign.  In addition, should the new administration institute policy changes, the Mexican government may implement retaliatory actions, such as imposing restrictions on Mexican imports of United States products or on exports from Mexico to the United States.

These actions, whether implemented by the United States or Mexico, or both, could adversely affect our business, financial condition, results of operations and prospects and the trading price of our CBFIs.

***High interest rates in Mexico could increase our financing costs.***

Historically, Mexico has experienced high real and nominal interest rates. Accordingly, if we incur Peso-denominated debt in the future, it could be at higher interest rates.

***We are subject to different disclosure and accounting standards than companies in other countries.***

A principal objective of the securities laws of the United States, Mexico, and other countries is to promote full and fair disclosure of all material corporate information, including accounting information. However, there may be less or different publicly available information about foreign issuers of securities than is regularly published by or about U.S. issuers of listed securities. We are subject to reporting obligations in respect of the CBFIs listed on the Mexican Stock Exchange. The disclosure standards imposed by the Mexican Stock Exchange may be different than those imposed by securities exchanges in other countries or regions such as the United States. As a result, the level of information that is available may not correspond to what non-Mexican investors in our CBFIs are accustomed to. In addition, accounting standards and disclosure requirements in Mexico differ from those of the United States. In particular, in the first quarter of 2012 we began to report our financial statements under IFRS, as required by Mexican regulations. IFRS differs from U.S. GAAP in a number of respects. Items on the financial statements of a company prepared in accordance with IFRS may not reflect its financial position or results of operations in the way they would be reflected had such financial statements been prepared in accordance with U.S. GAAP.

***It may be difficult for us to pursue claims in Mexico and to enforce our rights under certain judgments and/or arbitration awards.***

We may have difficulty in successfully pursuing claims in Mexico, as compared to in the United States. Further, to the extent that we obtain a judgment but are required to seek its enforcement in the Mexican courts, there can be no assurance that such courts will enforce the judgment. There are numerous and detailed requirements to enforce in Mexico final judgments against Mexican or foreign entities or individuals obtained by us outside Mexico, making it difficult to enforce such judgments. Additionally, we may have difficulty enforcing arbitration awards in Mexico because they must be validated in Mexican courts, must comply with certain minimum requirements and are sometimes subject to challenges. Furthermore, litigation in the courts of Mexico is often a lengthy and expensive process due to various defenses and motions particular to the Mexican judicial system.

***It may be difficult to enforce civil liabilities against us, members of our technical committee, our Advisor or its officers.***

We are a trust formed under the laws of Mexico. All of the members of our technical committee and the officers of our Advisor, our Leasing Administrators and our Property Managers reside in Mexico. Furthermore, all of our assets are located in Mexico. As a result, it may be difficult for you to effect service of process within the United States or in any other jurisdiction outside of Mexico upon these persons, or to enforce against them or us, in any jurisdiction outside of Mexico, judgments predicated upon the laws of any such jurisdiction, including any judgment predicated upon the federal and state securities laws of the United States. There is doubt as to the enforceability, in original actions in Mexican courts or in original actions or actions for enforcement of judgments obtained in courts of jurisdictions outside of Mexico, of civil liabilities under the laws of any jurisdiction outside of Mexico, including any judgment predicated solely upon the federal and state securities laws of the United States. See "Service of Process and Enforcement of Civil Liabilities."

**Tax Risks**

*Our real estate acquisitions may be subject to acquisition tax in properties that are contributed to us.*

We may be subject to tax when we acquire properties that are contributed to us.  With respect to the Tax on the Acquisition of Real Estate, depending on the local legislation applicable in the municipality in which the acquired real estate is located, it is possible that local taxing authorities may determine that one or more of our acquisitions constitute a "disposition" and that we are therefore subject to the Tax on the Acquisition of Real Estate or its equivalent.  Therefore, we have sought confirmation from various local authorities about whether properties contributed to us generate the payment of the Tax on Acquisition of Real Estate Properties in the cases in which, pursuant to the applicable contribution agreements, the contributors have reversion rights with respect to the contributed property.

Certain municipalities have not provided such confirmations; however, the relevant tax legislation allows us to conclude that the obligation  to pay the Tax on Acquisition of Real Estate does not arise at the time of contribution of assets to us, but at the time when the respective contributors definitively lose the reversion rights they had retained, which occurs if we sell such assets, or if their contributors sell the CBFIs they received in consideration for the contribution of such properties to us.  In those circumstances, or if the contributors lose their reversion rights for any other reason, we are obligated to determine and pay applicable taxes to the local tax authorities of the jurisdiction in which the property in question is located.  In the event of a partial sale by the contributor of the CBFIs received as consideration, any related reversion rights are extinguished *pro rata*, and the determination of the tax owed is made in the same proportion.

*If we are treated as a PFIC, U.S. holders of our CBFIs could be subject to materially adverse U.S. federal income tax consequences.*

If we were or become treated as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes, U.S. taxable investors who hold our CBFIs could be subject to materially adverse U.S. federal income tax consequences.  In particular, such holders could incur significant additional U.S. federal income taxes with respect to our CBFIs, and would be required to file additional U.S. federal tax information returns.  U.S. investors should consult their tax advisers regarding our PFIC status, the tax considerations relevant to an investment in a PFIC and any U.S. federal income tax elections that may be available if we were treated as a PFIC.  See "Taxation—Certain U.S. Federal Income Tax Considerations—Passive Foreign Investment Companies."

*We may be subject to adverse legislative or regulatory tax changes that could affect us or the CBFIs.*

At any time, the U.S. federal, state or local, Mexican federal or local, or other non-U.S. tax laws or regulations or the judicial or administrative interpretations of those laws or regulations may be changed. We cannot predict when or if any new U.S. federal, state or local, Mexican federal or local, or other non-U.S. tax law, regulation or judicial interpretation, will be adopted, promulgated or may become effective, and any such law, regulation or interpretation may take effect retroactively.  We and holders of the CBFIs could be adversely affected by any such change in, or any new, tax law, regulation or administrative or judicial interpretation.  As a result of recent tax reforms in Mexico, a new requirement was established, pursuant to which we must not obtain more than 5% of our income from variable rents, except where such percentage is based on sales of tenants.  Although we do not expect this tax reform to impact our lease business, we are required to comply with this new law.

## SERVICE OF PROCESS AND ENFORCEMENT OF CIVIL LIABILITIES

We are a trust formed under the laws of Mexico. Our Trustee, all of the members of our technical committee and the officers of our Advisor, our Leasing Administrators and our Property Managers reside, and substantially all of the assets of such persons are located, in Mexico. Furthermore, all of our assets are located in Mexico. As a result, it may be difficult for you to effect service of process within the United States or in any other jurisdiction outside of Mexico upon these persons or to enforce against them or us in any jurisdiction outside of Mexico judgments predicated upon the laws of any such jurisdiction, including any judgment predicated upon the federal and state securities laws of the United States. We have been advised by our Mexican counsel that there is doubt as to the enforceability, in original actions in Mexican courts or in original actions or actions for enforcement of judgments obtained in courts of jurisdictions outside of Mexico, of civil liabilities under the laws of any jurisdiction outside of Mexico, including any judgment predicated solely upon the federal and state securities laws of the United States. See "Risk Factors—Risks Related to Mexico—It may be difficult to enforce civil liabilities against us, members of our technical committee, our Advisor or its officers."

## EXCHANGE RATES

On December 21, 1994, Banco de México, the Mexican central bank, implemented a floating foreign exchange rate regime under which the Peso is allowed to float freely against the U.S. Dollar and other foreign currencies. Banco de México has stated that it will intervene directly in the foreign exchange market only to reduce what it deems to be excessive short-term volatility. Since mid-2003, Banco de México has been conducting auctions of U.S. Dollars in an attempt to reduce the levels of its foreign reserves. Banco de México conducts open market operations on a regular basis to manage the size of Mexico's monetary base. Changes in Mexico's monetary base have an impact on the exchange rate. Banco de México may increase or decrease the reserve of funds that Mexican financial institutions are required to maintain. If the reserve requirement is increased, these financial institutions will be required to allocate more funds to their reserves, which will reduce the amount of funds available for operations. This causes the amount of available funds in the market to decrease and the cost, or interest rate, to obtain funds to increase. The opposite happens if reserve requirements are lowered. This mechanism, known as "*corto*" or "*largo*," as the case may be, or more formally "the daily settlement balance target," represents a device used by Banco de México to adjust the level of interest and net foreign exchange rates. We cannot assure you that Banco de México will maintain its current policies with respect to the Peso or that the Peso will not continue to depreciate significantly in the future.

Banco de México has provided for risk management and hedging mechanisms against fluctuations in the Peso/U.S. Dollar exchange rate. Banco de México allows Mexican banks and brokerage houses to participate in futures markets for the Peso. In April 1995, the Chicago Mercantile Exchange introduced Peso futures contracts and options on Peso futures contracts and started trading these options and futures. On December 18, 1998, trading started at the Mexican Derivatives Exchange, including Peso futures contracts.

In the event of shortages of foreign currency, we cannot assure you that foreign currency would continue to be available to private-sector companies or that foreign currency needed by us to service foreign currency obligations would continue to be available without substantial additional cost.

The following table sets forth, for the periods indicated, the period-end, high and low free market rates published by Banco de México in the Official Gazette, expressed in nominal Pesos per U.S. Dollar. See "Presentation of Financial and Certain Other Information." The rates shown below are in nominal Pesos and have not been restated in constant currency units.

| Year Ended December 31, | Banco de México Exchange Rate[1] | | |
|---|---|---|---|
| | **Period End** | **Low** | **High** |
| 2012 | 12.99 | 12.63 | 14.39 |
| 2013 | 13.07 | 11.98 | 13.44 |
| 2014 | 14.73 | 12.85 | 14.79 |
| 2015 | 17.34 | 14.56 | 17.38 |
| 2016 | | | |
| **Month Ended** | | | |
| January 2017 | 20.76 | 20.62 | 21.91 |
| February 2017 | 19.83 | 19.70 | 20.79 |
| March 2017 | 18.71 | 18.71 | 20.0 |
| April 2017 | 19.07 | 18.49 | 19.11 |
| May 2017 | 18.66 | 18.42 | 19.14 |
| June 2017 | 18.03 | 17.88 | 18.69 |
| July 2017 | 17.74 | 17.49 | 18.36 |
| August 2017 | 17.78 | 17.62 | 17.97 |
| September 2017 | 18.20 | 17.64 | 18.20 |

[1]   Source: Banco de México

## USE OF PROCEEDS

Based on an offering price of Ps.30.50 per CBFI, the net proceeds to us from the combined offering will be approximately Ps.10.8 billion (US$596.9 million) after deducting initial purchasers' and underwriters' discounts and commissions and estimated offering expenses payable by us of approximately Ps.372 million (US$20.6 million), or approximately Ps.12.4 billion (US$687.8 million) after deducting initial purchasers' and underwriters' discounts and commissions and estimated offering expenses payable by us of approximately Ps.402 million (US$22.3 million), if the initial purchasers' and Mexican underwriters' over-allotment options are exercised in full. Solely for the convenience of the reader, peso amounts in the preceding sentence have been translated to U.S. dollars at the exchange rate of Ps.18.0279 to US$1.00, published by the Banco de México in the Official Gazette of June 30, 2017.

We intend to use the net proceeds of the combined offering for general business purposes including, but not limited to, (i) the acquisition from time to time of additional properties as investment opportunities arise, (ii) the completion of our Development Portfolio, and (iii) the payment of maintenance capital expenditures in connection with improvements to the properties in our portfolios.

As of the date hereof, we do not have any binding agreement for the acquisition of any property or portfolio and therefore, until appropriate investments can be acquired and made in accordance with FIBRA regulations, we intend to maintain the net proceeds of the combined offering in short-term investments, such as Certificados de la Tesorería de la Federación, or CETES (Mexico's Peso-denominated treasury bills). These investments are expected to provide a lower net return than we will seek to achieve from acquisitions of additional properties.

## DISTRIBUTION POLICY

We conduct our operations so as to qualify as a FIBRA under Articles 187 and 188 of the Mexican Income Tax Law. The Mexican Income Tax Law requires that a FIBRA distribute annually at least 95% of its net taxable income (*Resultado Fiscal*). Our net taxable income is calculated as the result of subtracting from our total revenues our deductions permitted by law. For more information, see "Taxation—Certain Mexican Federal Income Tax Considerations." In accordance with our trust agreement, we distribute to holders of our CBFIs, *pro rata*, 95% of our net taxable income each fiscal year, as long as certain requirements are met, including the approval of our technical committee of (i) the financial statements on which such distributions will be based, and (ii) the amount of the distribution, with the prior opinion of our audit committee. Distributions of other than 95% of our net taxable income will also require the approval of a majority of the independent members of our technical committee. We made distributions in respect of each fiscal quarter since the year ended December 31, 2011, and we intend to continue to make quarterly distributions provided that there are sufficient funds for that purpose. Our technical committee has the authority to determine our distribution policy and, as the case may be, to modify it. To satisfy the requirements to qualify as a FIBRA, we intend to pay distributions equal to at least 95% of our net taxable income to holders of our CBFIs.

For purposes of determining the amount of mandatory distributions required to retain FIBRA status, our net taxable income is computed in compliance with Mexican tax laws and regulations, and differs from our consolidated net income as presented in our financial statements prepared in compliance with IFRS. The main differences between the two computations arise from (i) the allowance of a depreciation deduction in respect of our investment property equal to 5% of the value of such property (excluding land), and (ii) the computation of interest gain or expense on the basis of the real interest rate only. The following shows the effect of these differences:

| IFRS Computation | Mexican Law Tax Computation | |
| --- | --- | --- |
| Revenues from leases, maintenance, dividends from beneficiary rights and administration fees | Revenues from leases, maintenance, dividends from beneficiary rights and administration fees | |
| (-)   Management fees | (-)   Management fees | |
| (-)   Operating expenses | (-)   Operating expenses | |
| (-)   Maintenance expenses | (-)   Maintenance expenses | |
| (-)   Insurance | (-)   Insurance | |
|  | (-)   Authorized Deductions: Depreciation (5% of investment properties, excluding land) | Cash generation: |
| (-)   Interest expense | (-)   Interest expense (real) | Depreciation (non-cash item) |
| +     Interest income | +    Interest income (real) | |
| (-)   Amortization of bank fees | (-)   Amortization of bank fees | |
| (-)   Executive bonus | (-)   Executive bonus | |
| (+/-) Foreign exchange gain (loss) | (+/-) Foreign exchange gain (loss) | |
| (+/-) Fair value adjustment to property investments | (+/-) Fair value adjustment to property investments | |
| (+/-) Derivatives | (+/-) Derivatives | |
| (+/-) Other income (expense) | (+/-) Other income (expense) | |
| Consolidated Net Income | Net Taxable Income | |

The allowance for tax purposes of a depreciation deduction that does not entail a cash outflow has historically enabled us to retain cash flows from operations that may be used mainly to make principal payments on our indebtedness.

The following table sets forth, for the periods indicated, information regarding distributions made in respect of our CBFIs since our inception, and our Net Asset Value per CBFI as of the end of each quarter:

| | Per CBFI | | Payment Date | Total Distributed | NAV per CBFI[2] |
|---|---|---|---|---|---|
| | *(Ps.)* | *(US$)[1]* | | *(Ps. in thousands)* | |
| **2011** | | | | | |
| First Quarter | 0.0343 | 0.0029 | May 26, 2011 | 14,478 | 17.23 |
| Second Quarter | 0.3022 | 0.0260 | July 7, 2011 | 127,684 | 19.18 |
| Third Quarter | 0.3779 | 0.0286 | October 13, 2011 | 159,711 | 19.26 |
| Fourth Quarter | 0.3689 | 0.0290 | February 14, 2012 | 155,884 | 19.18 |
| **2012** | | | | | |
| First Quarter | 0.1960 | 0.0149 | April 23, 2012 | 156,103 | 22.65 |
| Second Quarter | 0.3000 | 0.0226 | July 17, 2012 | 252,685 | 24.51 |
| Third Quarter | 0.4045 | 0.0317 | December 18, 2012 | 340,677 | 28.70 |
| Fourth Quarter | 0.4216 | 0.0331 | January 31, 2013 | 355,115 | 28.52 |
| **2013** | | | | | |
| First Quarter | 0.3700 | 0.0307 | May 9, 2013 | 581,786 | 28.93 |
| Second Quarter | 0.4100 | 0.0324 | August 9,2013 | 738,256 | 28.74 |
| Third Quarter | 0.4504 | 0.0340 | November 11, 2013 | 814,771 | 28.68 |
| Fourth Quarter | 0.4800 | 0.0361 | February 13, 2014 | 868,327 | 32.18 |
| **2014** | | | | | |
| First Quarter | 0.4366 | 0.0337 | May 9, 2014 | 826,814 | 32.91 |
| Second Quarter | 0.4014 | 0.0303 | August 11, 2014 | 1,154,948 | 34.88 |
| Third Quarter | 0.4976 | 0.0365 | November 7, 2014 | 1,432,474 | 34.77 |
| Fourth Quarter | 0.4890 | 0.0329 | February 16, 2015 | 1,407,521 | 36.50 |
| **2015** | | | | | |
| First Quarter | 0.4921 | 0.0325 | May 11, 2015 | 1,470,962 | 35.15 |
| Second Quarter | 0.4934 | 0.0302 | August 7, 2015 | 1,499,272 | 35.17 |
| Third Quarter | 0.5005 | 0.0297 | November, 9, 2015 | 1,525,891 | 35.04 |
| Fourth Quarter | 0.5097 | 0.0271 | February 11, 2016 | 1,629,778 | 35.45 |
| **2016** | | | | | |
| First Quarter | 0.5020 | 0.0280 | May 9, 2016 | 1,607,651 | 35.85 |
| Second Quarter | 0.4801 | 0.0259 | August 9, 2016 | 1,546,481 | 36.26 |
| Third Quarter | 0.4894 | 0.0264 | November 9, 2016 | 1,586,799 | 36.50 |
| Fourth Quarter | 0.5116 | 0.0250 | February 9, 2017 | 1,662,539 | 37.74 |
| **2017** | | | | | |
| First Quarter | 0.5154 | 0.0270 | May 9, 2017 | 1,684,261 | 39.28 |
| Second Quarter | 0.5115 | 0.0285 | August 9, 2017 | 1,701,892 | 39.40 |

[1] Translated at the Ps./US$ exchange rate published by *Banco de México* in the Official Gazette on the Payment Date.

[2] As of the end of the quarter, computed using the number of CBFIs then outstanding.

The timing, form, frequency and amount of distributions will be authorized by our technical committee based upon a variety of factors, including:

- our actual results of operations;

- our level of retained cash flows;

- the terms and provisions of any financing agreements;

- any debt service requirements;

- maintenance capital expenditure requirements for our properties;

- our net taxable income;

- the annual distribution requirements under the FIBRA provisions of the Mexican Income Tax Law;

- our operating expenses; and

- other factors that our technical committee may deem relevant, including the amount of distributions made by similar companies.

We anticipate that our estimated cash available for distribution will exceed the annual distribution requirements applicable to FIBRAs. However, under some circumstances, we may be required to pay distributions in excess of cash available for distribution in order to meet these distribution requirements and we may need to use the proceeds from future equity and debt offerings, sell assets or borrow funds to make some distributions. We cannot assure you that our distribution policy will not change in the future.

Distributions of net taxable income on our CBFIs, whether paid in cash or other property, will generally be subject to Mexican withholding tax at a current rate of 30%, unless a holder that is not a resident of Mexico and that will not hold CBFIs in connection with the conduct of a trade or business in Mexico, or a Nonresident Holder, is exempt from withholding. See "Taxation—Certain Mexican Federal Income Tax Considerations."

## CAPITALIZATION

The following table presents our capitalization (in thousands of Pesos and U.S. Dollars) as of June 30, 2017:

- on an actual basis; and

- on an as adjusted basis to give effect to the issuance and sale of 365,000,000 CBFIs in the combined offering, after deducting the initial purchasers' and underwriters' discounts and commissions and the estimated expenses of the offering payable by us.

You should read this table in conjunction with "Use of Proceeds," "Selected Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our Unaudited Financial Statements included elsewhere in this offering memorandum.

| | As of June 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | **Actual** | | **As Adjusted** | |
| | *Ps.(in thousands)* | *US$ (in thousands)[2]* | *Ps.(in thousands)[3]* | *US$ (in thousands)[2]* |
| Cash and restricted cash[1] ................................ | 3,993,449 | 221,515 | 14,753,965 | 818,396 |
| Debt | | | | |
| Short-term debt ................................................ | 1,631,569 | 90,502 | 1,631,569 | 90,502 |
| Long-term debt ................................................ | 60,239,108 | 3,341,438 | 60,239,108 | 3,341,438 |
| Total debt[4] ................................................ | 61,870,677 | 3,431,940 | 61,870,677 | 3,431,940 |
| Trustors' capital[5] ............................................ | 129,602,325 | 7,188,986 | 140,362,841 | 7,785,868 |
| **Total capitalization** ........................................ | **191,473,002** | **10,620,927** | **202,233,518** | **11,217,808** |

(1) Cash and restricted cash includes cash, restricted cash and financial investments.

(2) Solely for the convenience of the reader, Peso amounts appearing in this table have been translated to U.S. Dollar amounts at the exchange rate of Ps.18.0279 to US$1.00, published by Banco de México in the Official Gazette on June 30, 2017.

(3) Reflects the purchase of 44,500,600 CBFIs by the Interested Members. The proceeds from the CBFIs purchased by the Interested Members are not included in the calculation of the sales commissions payable to the initial purchasers and Mexican underwriters.

(4) Actual total debt, and the existing total debt component of the "As Adjusted" figure, is presented net of costs related to such debt.

(5) The adjusted information included in this table reflects that 365,000,000 CBFIs were sold in the combined offering at the offering price of Ps.30.50 per CBFI, and assumes that the initial purchasers' and the Mexican underwriters' over-allotment options are not exercised.

## SELECTED FINANCIAL DATA

The following tables present financial information and other data as of and for the periods indicated. These tables should be read in conjunction with our Financial Statements and notes thereto appearing elsewhere in this offering memorandum.  See "Presentation of Financial and Certain Other Information."

Our financial information for the years ended December 31, 2016, 2015, and 2014 has been derived from the Audited Financial Statements and the notes thereto included elsewhere in this offering memorandum. Our financial information for the six-month periods ended June 30, 2017 and 2016, has been derived from the Unaudited Financial Statements and the notes thereto included elsewhere in this offering memorandum.

Our Financial Statements and other financial information included in this offering memorandum, unless otherwise specified, are stated in Pesos.

The Audited Financial Statements included in this offering memorandum have been audited by Galaz, Yamazaki, Ruiz Urquiza, S.C., a member of Deloitte Touche Tohmatsu Limited, our independent auditors.

The CNBV requires certain entities that disclose their financial information to the public through the Mexican Stock Exchange to prepare and disclose, beginning with the year ending December 31, 2012, their financial information in conformity with IFRS. Our consolidated financial statements for the year ended December 31, 2012 were our first set of annual financial statements prepared in accordance with IFRS.

The U.S. Dollar amounts provided below are conversions from the Peso amounts, solely for the convenience of the reader. Unless otherwise indicated, we have translated U.S. Dollar amounts in this offering memorandum at the exchange rate of Ps.18.0279 to US$1.00, published by Banco de México in the Official Gazette (*Diario Oficial de la Federación*), or the Official Gazette, on June 30, 2017. See "Exchange Rates" for information regarding the rates of exchange between the Peso and the U.S. Dollar for the periods specified therein.

These conversions should not be construed as representations that the Peso amounts actually represent such U.S. Dollar amounts or could be converted into U.S. Dollars at the rate indicated or at any other rate.

For additional information regarding financial information presented in this offering memorandum, see "Presentation of Financial and Certain Other Information."

**Fibra Uno Consolidated Statements of Financial Position Data**

*(In thousands of Mexican Pesos)*

| | As of June 30, | As of December 31, | | |
|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2014 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and restricted cash | 1,870,940 | 5,554,120 | 5,995,918 | 500,848 |
| Financial investments | 2,122,509 | 1,956,101 | 2,300,596 | 19,528,446 |
| Lease receivables | 1,221,790 | 990,594 | 797,869 | 763,723 |
| Other accounts receivable | 833,632 | 519,700 | — | — |
| Due from related parties | 147,957 | 80,293 | — | — |
| Recoverable taxes, mainly value-added tax | 1,808,089 | 2,141,696 | 4,161,762 | 3,082,513 |
| Prepaid expenses | 972,589 | 430,717 | 459,660 | 171,658 |
| Total current assets | 8,977,506 | 11,673,221 | 13,715,805 | 24,047,188 |
| Non-current assets: | | | | |
| Investment properties | 183,897,093 | 172,739,278 | 151,822,122 | 113,303,350 |
| Advanced payment for the acquisitions of investment property | — | — | — | 1,121,095 |
| Investments in associates | 4,195,509 | 5,178,900 | 3,113,889 | 2,854,011 |
| Derivative financial instruments | 368 | 515,055 | — | — |
| Other assets | 1,809,193 | 1,920,523 | 2,121,525 | 2,289,490 |
| Total non-current assets | 189,902,163 | 180,353,756 | 157,057,536 | 119,567,946 |
| **Total assets** | **198,879,669** | **192,026,977** | **170,773,341** | **143,615,134** |
| | | | | |
| **Liabilities and trustors' capital** | | | | |
| Current liabilities: | | | | |
| Borrowings | 1,631,569 | 633,911 | 10,123,627 | 1,791,924 |
| Trade accounts payable and accrued expenses | 5,311,518 | 3,232,397 | 1,913,159 | 1,928,023 |
| Deferred revenues | 159,889 | 165,362 | 100,010 | 57,023 |
| Due to related parties | 122,287 | 93,266 | 104,488 | — |
| Total current liabilities | 7,225,263 | 4,124,936 | 12,241,284 | 3,776,970 |
| Borrowings/Long-term debt | 60,239,108 | 64,172,642 | 44,209,408 | 34,128,710 |
| Other long-term debt | 107,169 | 125,530 | — | — |
| Derivative financial instruments | 702,515 | — | — | — |
| Deposits from tenants | 837,125 | 825,067 | 702,303 | 474,809 |
| Deferred revenues — Long-term | 166,164 | 135,467 | 261,968 | 159,174 |
| Total liabilities | 69,277,344 | 69,383,642 | 57,414,963 | 38,539,663 |
| Trustors' capital: | | | | |
| Trustors' capital | 94,925,839 | 95,383,575 | 97,742,580 | 93,500,173 |
| Retained earnings | 32,375,413 | 25,524,669 | 15,615,798 | 11,575,298 |
| Other comprehensive income | (133,315) | (103,006) | — | — |
| Total trustors' capital | 127,167,937 | 120,805,238 | 113,358,378 | 105,075,471 |
| Non-controlling participation[1] | 2,434,388 | 1,838,097 | — | — |
| Total shareholders' equity | 129,602,325 | 122,643,335 | 113,358,378 | 105,075,471 |
| **Total liabilities and trustors' capital** | **198,879,669** | **192,026,977** | **170,773,341** | **143,615,134** |
| **Net Asset Value per CBFI** *(Ps.)*[2] | **39.3988** | **37.7445** | **35.4511** | **36.5048** |

[1] Beginning on January 1, 2016, in compliance with IFRS we are required to separately present the minority interest of our partner in Torre Reforma Latino.

[2] Net Asset Value per CBFI is the value of total assets *minus* the value of total liabilities *divided* by the number of outstanding CBFIs at the end of the period.

**Fibra Uno Consolidated Statements of Operations Data**

*(In thousands of Mexican Pesos)*

| | For the Six Months Ended June 30, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2016** | **2015** | **2014** |
| Revenue from: | | | | | |
| Leases ................................... | 6,275,127 | 5,658,034 | 11,756,607 | 9,574,616 | 6,989,751 |
| Maintenance ........................ | 647,747 | 590,168 | 1,230,420 | 963,377 | 707,842 |
| Dividend revenues from beneficiary rights ................ | 125,156 | 76,016 | 157,821 | 148,573 | 124,387 |
| Administration fees .............. | 95,988 | 37,500 | 108,000 | 38,333 | — |
| | **7,144,018** | **6,361,718** | **13,252,848** | **10,724,899** | **7,821,980** |
| Expenses from: | | | | | |
| Management fees................... | (362,013) | (335,567) | (678,686) | (612,928) | (490,832) |
| Operating expenses............... | (469,282) | (388,737) | (824,967) | (668,237) | (530,623) |
| Maintenance expenses.......... | (676,538) | (641,461) | (1,293,772) | (1,065,230) | (807,394) |
| Amortization of administrative platform............................. | (97,492) | (97,492) | (194,984) | (194,984) | (194,984) |
| Executive bonus.................... | (89,693) | (240,626) | (169,997) | (587,792) | (530,280) |
| Property tax.......................... | (168,418) | (153,142) | (323,074) | (258,801) | (155,104) |
| Insurance……………… | (75,905) | (63,221) | (143,918) | (87,012) | (84,179) |
| | (1,939,341) | (1,920,246) | (3,629,398) | (3,474,984) | (2,793,396) |
| Interest expense......................... | (2,356,964) | (1,693,102) | (3,826,836) | (2,681,540) | (2,019,111) |
| Interest income ......................... | 262,220 | 64,467 | 263,833 | 412,083 | 430,494 |
| Foreign exchange gain (loss), net | 3,134,332 | (1,616,750) | (4,752,607) | (3,878,142) | (2,222,097) |
| Amortization of bank fees......... | (64,975) | (60,005) | (133,579) | (81,867) | (166,545) |
| Derivatives ............................... | (49,939) | (193,352) | (46,624) | — | — |
| Other expenses, net .................. | (6,304) | — | — | — | — |
| Fair value adjustments to property investments ............ | 2,431,845 | 4,171,992 | 11,266,275 | 4,714,041 | 4,659,760 |
| **Consolidated net income ........** | **8,554,892** | **5,114,722** | **12,393,912** | **5,734,490** | **5,711,085** |
| Controlling participation........... | 8,535,005 | 4,461,796 | 11,824,632 | 5,734,490 | 5,711,085 |
| Non-controlling participation[1]. | 19,887 | 652,926 | 569,280 | — | — |
| | **8,554,892** | **5,114,722** | **12,393,912** | **5,734,490** | **5,711,085** |
| **Basic net income per CBFI** [2] | **2.6128** | **1.6192** | **1.9927** | **1.9054** | **2.3264** |
| **Diluted net income per CBFI** [2] | **2.2196** | **1.3546** | **1.9696** | **1.6403** | **1.7517** |
| **Distribution per CBFI** [2][3]. | **1.0269** | **0.9821** | **1.9832** | **1.9957** | **1.8246** |

---

[1] Beginning on January 1, 2016, in compliance with IFRS we are required to separately present the minority interest of our partner in Torre Reforma Latino.

[2] In Mexican Pesos.

[3] Amounts effectively paid to CBFI holders during the period.

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion in conjunction with "Selected Financial Data" and the Financial Statements and notes thereto appearing elsewhere in this offering memorandum.*

### Overview

We are a Mexican FIBRA that acquires, owns, develops, constructs, leases and operates a broad range of real estate properties in Mexico, including industrial, retail and office properties. As of June 30, 2017, we were the largest public real estate company in Mexico in terms of number of properties, GLA, annual revenues and market capitalization, and we believe that our portfolio represents the largest and highest quality portfolio of industrial, retail and office properties in Mexico. Our objective is to generate value for our investors, mainly through the appreciation of our real estate properties and the generation of stable cash flows. We seek to achieve this objective by pursuing strategies focused on maintaining a diversified portfolio, high occupancy levels, competitive rents, high-quality properties at premium locations, and long-term relationships with our tenants.

We are formed as a Mexican trust and conduct our operations so as to qualify as a FIBRA for tax purposes under Articles 187 and 188 of the Mexican Federal Income Tax Law (*Ley del Impuesto Sobre la Renta*), or the Mexican Income Tax Law. In order to qualify as a FIBRA for tax purposes, we must distribute annually at least 95% of our net taxable income and at least 70% of our assets must be invested in real estate held for lease, among other requirements. For a detailed description of FIBRAs, see "About FIBRAs."

### Properties

Since our initial public offering in March 2011, we have grown our initial portfolio consisting of 17 properties, comprising 0.7 million m² of GLA that we acquired in our formation transaction, or our Initial Portfolio, to a portfolio that included, as of June 30, 2017: (i) 499 stabilized properties, or our Stabilized Portfolio, (ii) seven properties in various stages of development or expansion, or our Development Portfolio, and (iii) one property, or our JV Development Portfolio, comprising almost all of the properties formerly known as the Buffalo Portfolio and the Colorado Portfolio which we contributed in 2016 to a joint venture with Helios, a Mexican real estate development vehicle that we created in 2015. As of June 30, 2017, our Stabilized Portfolio included 521 operating units (325 retail, 106 industrial and 90 office), comprising 7.7 million m² of GLA (3.0 million m² of retail, 3.8 million m² of industrial and 0.9 million m² of office). We expect that, upon completion, our Development Portfolio will add approximately 452,858 m² of GLA to our Stabilized Portfolio.

Our portfolio is diversified by asset type, geography and tenant base, providing investors with exposure to a broad range of properties throughout Mexico. Our portfolio is located in 31 Mexican states (*i.e.,* all states except Zacatecas). The properties in our portfolio are primarily situated in convenient locations, on or near main freeways and primary avenues, in markets that have generally exhibited favorable demographic trends such as strong population and income growth. As of June 30, 2017, our Stabilized Portfolio had an occupancy rate of approximately 93.7% based on GLA, and included:

- 325 retail operating units with an aggregate of approximately 3.0 million m² of GLA (38.8% of our Stabilized Portfolio), with an occupancy rate of approximately 93.3% based on GLA.

- 106 industrial operating units with an aggregate of approximately 3.8 million m² of GLA (49.6% of our Stabilized Portfolio), with an occupancy rate of approximately 95.3% based on GLA.

- 90 office operating units with an aggregate of approximately 0.9 million m² of GLA (11.6% of our Stabilized Portfolio), with an occupancy rate of approximately 88.3% based on GLA.

Our Development Portfolio is comprised of seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio. Our Development Portfolio includes four properties

portions of which, amounting to approximately 89,960 m² of GLA (1.2% of our Stabilized Portfolio), have already been developed and leased, or are available to be leased.  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As of June 30, 2017, our Development Portfolio included:

- Two retail properties that we expect, upon completion, will comprise approximately 113,806 m$^2$ of GLA;

- One industrial property that we expect, upon completion, will comprise approximately 48,052 m$^2$ of GLA;

- Two office properties that we expect, upon completion, will comprise approximately 114,000 m$^2$ of GLA; and

- Two mixed-use properties that we expect, upon completion, will comprise approximately 177,000 m$^2$ of GLA.

Our JV Development Portfolio consists of a mixed-use development, project Mitikah, located at the southern end of Mexico City that comprises properties formerly known as the Buffalo Portfolio and the Colorado Portfolio (which are properties that we acquired for Ps.4,246 million), both of which (with the only exception of Espacio Churubusco, a commercial mall in Mexico City that we acquired as part of the Buffalo Portfolio and remains in our Stabilized Portfolio) we contributed in 2016 to our joint venture with Helios, a Mexican real estate development vehicle created in 2015 and managed by our wholly-owned F1 Management Subsidiary.  The joint venture project will have an investment of approximately Ps.20 billion and is expected, upon completion, to comprise approximately 113,876 m$^2$ of retail space (including a hotel), 212,213 m$^2$ of office space and 84,890 m$^2$ of residential areas. The office and retail properties are expected to generate an estimated annual NOI of Ps.1,767 million (Ps.651 million for retail and Ps.1,116 million for office, assuming an average rent price per square meter of Ps.574 and Ps.455, respectively).  Mitikah includes a residential area that is being developed exclusively by our partner in the joint venture and in which we will have no participation.  Currently, the joint venture project Mitikah is 37% and 14% pre-leased for the retail and office spaces, respectively.  While Project Mitikah is in construction, we will not receive any rental income from the property that formerly comprised the Colorado Portfolio (an annual revenue loss of approximately Ps.515 million, estimated on the basis of the annual potential rental income *minus* notional interest related to the cost of acquisition of the Colorado Portfolio).

As of June 30, 2017, we had independent lease agreements with approximately 2,800 tenants in a wide range of industries, including the industrial, retail, corporate and government sectors. As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio.  Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio.  However, no other tenant accounted for more than 3.6% of the occupied GLA of our portfolio or 3.9% of the ABR attributable to our portfolio.  We believe that the size and diversity of our tenant base will help minimize our exposure to economic fluctuations in any one industry or economic sector or with respect to any single tenant.  We believe the properties in our portfolio are also distinguished by the quality of our tenants, which include some of the leading companies in Mexico and in their respective industries, as well as international companies with a presence in Mexico.

As of June 30, 2017, the average remaining term of our leases, by GLA, was approximately 4.4 years, excluding statutory leases (defined below).  On a sector-by-sector basis, the average remaining term of our leases, by GLA, for our retail, industrial and office properties was approximately 5.6, 3.7 and 3.5 years, respectively, in each case excluding statutory leases.

The lease agreements with certain of our tenants have expired and have not been formally renewed.  Instead, under the local laws of the Mexican state in which an applicable property is located, generally these tenants are permitted to continue to occupy the property pursuant to the terms of the most recently expired lease agreement, including obligations to pay rent in the same amounts and with the same frequency.  We refer to these arrangements as statutory leases.  The notice period for termination by us of a statutory lease depends on the laws

of the state in Mexico in which the property is located.  As of June 30, 2017, approximately 7.5% of the occupied GLA of our portfolio, or 536,978 m² of GLA, was subject to statutory leases, accounting for approximately 14.0% of our ABR, which provides us with the flexibility to negotiate new leases and to potentially increase rental rates where market conditions permit.

Substantially all our leases contain automatic inflation adjustment provisions with respect to base rent.  As of June 30, 2017, 74.1% of our ABR was payable in Mexican Pesos and 25.9% of our ABR was payable in U.S. Dollars.

### Factors That May Influence Future Results of Operations

**Rental Revenue.**  Our revenue is derived primarily from the rents we receive from leases with our tenants.  The amount of rental revenue generated by the properties that comprise our portfolio depends principally on our ability to maintain the occupancy rates of currently leased space and to lease currently available space and space that becomes available upon lease terminations or through the expansion and development of properties.  As of June 30, 2017, our portfolio had an occupancy rate of approximately 93.7% in terms of GLA.  The amount of rental revenue we generate will also depend on our ability to collect rents from our tenants pursuant to their leases, as well as our ability to maintain or increase rental rates at our properties.  Positive or negative trends in our tenants' businesses or in our geographic areas could also impact our rental revenue in future periods.  In addition, growth in rental income will also partially depend on our ability to acquire additional properties that meet our investment criteria, as well as our ability to expand the GLA of our properties.  As of June 30, 2017, we were in the process of developing seven properties which comprise our Development Portfolio and one property that constitutes our JV Development Portfolio.   We expect the development of most of these properties to be completed within the next 15 months, with our Development Portfolio increasing our current GLA by approximately 452,858 m² and our JV Development Portfolio increasing our GLA by approximately 326,089 m².

**Lease Expirations.**  Our ability to re-lease space subject to expiring leases will impact our results of operations and is affected by economic and competitive conditions in our markets as well as the desirability of our individual properties.  The leases scheduled to expire during the remainder of 2017 represent 6.8% of our total occupied GLA and 7.6% of our total ABR.

**Market Conditions.**  We seek investment opportunities throughout Mexico.  Positive or negative changes in conditions in these markets will impact our overall performance.  Future economic downturns or regional downturns affecting our target markets or downturns in the commercial real estate industry that impair our ability to renew or re-lease space as well as the ability of our tenants to fulfill their lease commitments, as in the case of tenant defaults or bankruptcies, could adversely affect our ability to maintain or increase rental rates at our properties.  We believe that our target markets are characterized by compelling demographics and positive trends in real estate market fundamentals.

**Competitive Environment.**  We compete with other owners, developers and operators of industrial, retail and office real estate in Mexico, many of which own properties similar to ours in the same markets in which our properties are located.  In the future, competition from others may diminish our opportunities to acquire a desired property on favorable terms, or at all.  In addition, competition may affect the occupancy rates and rents we receive from our properties, and thus our financial results, and we may be pressured to reduce our rental rates to below those which we currently charge or to offer substantial rent abatements, tenant improvements, early termination rights or tenant-favorable renewal options in order to retain tenants when our tenants' leases expire.

**Operating and Administrative Expenses, Property Taxes and Insurance.**  Our operating and administrative expenses generally consist of management fees, maintenance and repairs, real estate taxes, insurance, administrative expenses, electricity and other miscellaneous operating expenses.  The majority of maintenance and repair expenses are normally paid by our tenants through periodic maintenance fees.  We also incur expenses related to corporate governance, public reporting, and compliance with the various provisions of Mexican securities laws.  Increases or decreases in such operating and administrative expenses will impact our overall performance.

- 61 -

*Fair value adjustments to property investments.* We initially record investment property acquisitions and leasehold improvements at cost, including transaction costs. Investment properties acquired in exchange for CBFIs are initially recorded at fair value. Under IFRS, investment properties are valued at fair value determined by independent appraisers when an event or development has occurred that has an impact on the value of the investment property and at least once in each twelve-month period following the acquisition date. Gains and losses in fair value are recorded in the line item "Fair value adjustments to property investments" in our consolidated statement of operations in the period in which they arise. For the year ended December 31, 2016, we recognized a Ps.11.3 billion gain related to the fair value to property investments; for the six-month period ended June 30, 2017, we recognized a Ps.2.4 billion gain related to the fair value to property investments. Changes in the fair value of our investment properties can have a significant impact on our results of operations.

### Critical Accounting Policies

Our discussion and analysis of our financial condition and results of operations are based upon our Audited Financial Statements, which were prepared under IFRS. Preparation of the financial information in conformity with IFRS requires us to make estimates, judgments and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, as well as the disclosure of our contingent assets and liabilities at the date of the preparation of such financial information. We have based these estimates, judgments and assumptions on the historical experience of operating the related properties as well as on various other factors that we believe to be reasonable under the circumstances. We will continue to use historical experience and other pertinent factors in making these estimates, judgments and assumptions as it relates to our future accounting. Actual results may differ from these estimates under different assumptions or conditions. We believe our critical accounting policies are as follows:

### Critical judgments in applying accounting policies

The following are the critical judgments, apart from those involving estimates, that our management has made in the process of applying our accounting policies and that have the most significant effect on the amounts recognized in our Audited Financial Statements.

#### Lease classification

Leases are classified based on the extent to which risks and rewards incidental to ownership of a leased asset accrue to us or our tenant, as determined by the commercial terms and conditions of the transaction rather than the form of the agreement. We have determined, based on an evaluation of the terms and conditions of each arrangement, that we retain all the significant risks and rewards of ownership of these properties and thus account for leases as operating leases.

#### Business combinations and acquisitions of assets and liabilities

We apply judgment when determining whether an acquisition of an investment property or a portfolio of investment properties is a business combination or an asset acquisition. Particularly, we consider the following criteria:

    i)        The number of properties acquired.

    ii)      The extent to which significant processes are acquired and the extent to which ancillary services are provided by the acquiree (including maintenance, cleaning, security, bookkeeping and other property services).

    iii)     Whether the acquiree has allocated its own staff to manage the property and/or to deploy any processes (including all relevant administration such as invoicing, cash collection, provision of management information to the entity's owners and tenant information).

This determination can have a significant impact in the accounting for the initial and subsequent recognition of assets and liabilities acquired.

*Income taxes*

In order to continue to maintain our FIBRA status for Mexican federal income tax purposes, we are required to meet various requirements, including annually distributing at least 95% of our net taxable income. We apply judgment in determining whether we will continue to qualify for FIBRA tax status. No current or deferred income taxes have been accounted for in our consolidated financial statements.

### Key source of estimation uncertainty

Valuation of investment properties is a key source of estimation uncertainty. A revision to our estimates can have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next fiscal year, including our investment properties.

*Valuation of investment properties*

In order to estimate the fair value of our investment properties, management, with the assistance of an independent appraiser, selects the appropriate valuation techniques given the particular circumstances of each property and valuation. Critical assumptions relating to the estimates of the fair value of investment properties include contractual rental payments, expected future market rental payments, renewal rates, maintenance requirements, discount rates that reflect current market uncertainties, capitalization rates and recent investment property prices. If there is any change in these assumptions or regional, national or international economic conditions, the fair value of our property investments may change materially.

### Results of Operations

The results of operations set forth below are derived from the Audited Financial Statements and Unaudited Financial Statements.

The following table sets forth portfolios we acquired during the six months ended June 30, 2017 and the years ended 2016, 2015 and 2014 which have impacted our income and expenses and may have impacted the comparability of our financial information in each of those periods:

| Portfolio | Acquisition date (Execution of public deed) | Acquisition type |
|---|---|---|
| **2017** | | |
| Frimax | June 28, 2017 | Investment properties |
| Saqqara | April 5, 2017 | Investment properties |
| Tuxla Fashion Mall | April 3, 2017 | Investment properties |
| **2016** | | |
| Park Tower Vallarta | September 2, 2016 | Investment property |
| El Salto Jalisco | February 23, 2016 | Investment properties |
| Midtown Jalisto | July 21, 2016 | Development |
| Torre Cuarzo | June 16, 2016 | Development |
| Espacio Tollocan | April 15, 2016 | Development |
| Puerta de Hierro | February 23, 2016 | Investment properties |
| **2015** | | |
| Alaska | December 14, 2015 | Investment properties |
| Indiana (Lamar) | November 19, 2015 | Investment properties |
| Artificios No. 40 | November 4, 2015 | Investment properties |
| CuautiPark II | September 30,2015 | Investment properties |
| Oregon | June 11, 2015 | Investment properties |
| Indiana | June 2, 2015 | Investment properties |
| Kansas | April 30, 2015 | Investment properties |
| Buffalo | April 17, 2015 | JV Development |
| Utah | March 4, 2015 | Investment properties |
| Florida | February 27, 2015 | Investment properties |

| Portfolio | Acquisition date (Execution of public deed) | Acquisition type |
|---|---|---|
| **2014** | | |
| Samara ...................................................... | December 16, 2014 | Investment properties |
| Insurgentes 476 and 1571.............................. | September 24, 2014 | Investment properties |
| Christel House ............................................ | August 24, 2014 | Development |
| La Viga ...................................................... | July 23, 2014 | Investment properties |
| R-15 (Galerías Guadalajara and Península Vallarta).................................................... | July 15, 2014 | Investment properties |
| Hotel Centro Histórico ................................. | July 7, 2014 | Investment properties |
| Corporativo San Mateo ................................. | June 25, 2014 | Investment properties |
| California................................................... | May 5, 2014 | Investment properties |
| Maine ........................................................ | February 19, 2014 | Investment properties |
| Colorado .................................................... | January 30, 2014 | JV Development |

### Comparison of the Six Months Ended June 30, 2017 to the Six Months Ended June 30, 2016

The following table shows our revenues and expenses for the six-month periods ended June 30, 2017 and 2016:

| Consolidated Statements of Operations Data | Six Months Ended June 30, | |
|---|---|---|
| | **2017** | **2016** |
| | *(Ps. in thousands)* | |
| Lease revenues | 6,275,127 | 5,658,034 |
| Maintenance fees revenues | 647,747 | 590,168 |
| Dividend revenues from beneficiary rights | 125,156 | 76,016 |
| Administration fees | 95,988 | 37,500 |
| Management fees | (362,013) | (335,567) |
| Operating expenses | (469,282) | (388,737) |
| Maintenance expense | (676,538) | (641,461) |
| Administrative platform amortization | (97,492) | (97,492) |
| Executive bonus | (89,693) | (240,626) |
| Property tax | (168,418) | (153,142) |
| Insurance | (75,905) | (63,221) |
| Interest expense | (2,356,964) | (1,693,102) |
| Interest income | 262,220 | 64,467 |
| Foreign exchange gain (loss), net | 3,134,332 | (1,616,750) |
| Amortization of bank commissions | (64,975) | (60,005) |
| Other expenses, net | (6,304) | — |
| Derivative financial instruments | (49,939) | (193,352) |
| Fair value adjustments to property investments and investments in trust rights | 2,431,845 | 4,171,992 |
| **Consolidated net income** | **8,554,892** | **5,114,722** |

*Lease Revenues:*  Lease revenues increased by Ps.617.1 million, or 10.9%, to Ps.6,275.1 million for the six-month period ended June 30, 2017, from Ps.5,658.0 million for the six-month period ended June 30, 2016. This increase was primarily due to (i) additional lease revenue due to the acquisition of portfolios and the completion of construction of development properties (ii) an increase in lease revenue from our existing portfolio as a result of above-inflation rent adjustments and (iii) depreciation of the Peso in relation to the U.S. Dollar, since 25.9% of our lease agreements in terms of ABR is denominated in U.S. Dollars.

*Maintenance Fees Revenues:* Maintenance fees revenues increased by Ps.57.6 million, or 9.8%, to Ps.647.7 million for the six-month period ended June 30, 2017, from Ps.590.2 million for the six-month period ended June 30, 2016.  This increase was primarily due to additional maintenance fees revenue due to the acquisition of portfolios and the completion of development properties.

*Dividend Revenues from Beneficiary Rights:* Dividend revenues from beneficiary rights, which include revenues from our 49% interest in the lease revenue from Torre Mayor and, in this semester for the first time, from our 50% interest in Torre Diana, presented an increase of Ps.49.1 million, or 64.6%, to Ps.125.2 million for the six-month period ended June 30, 2017 from Ps.76.0 million for the six-month period ended June 30, 2016. The increase was primarily due to the net income from Torre Mayor, the addition of Torre Diana to our Stabilized Portfolio and the impact of the depreciation of the Peso against the U.S. Dollar since these two properties receive substantially all of their revenues in U.S. Dollars.

*Administration Revenues:* Administration revenues increased by Ps.58.5 million, or 156%, to Ps.96.0 million for the six-month period ended June 30, 2017, from Ps.37.5 million for the six-month period ended June 30, 2016.  The increase was primarily due to the additional fees generated by our coinvestment in project Mitikah.

*Management Fees:* Management fees, which include fees payable to our Advisor, our Property Managers, consultants and other professionals, increased by Ps.26.4 million or 7.9%, to Ps.362.0 million for the six-month period ended June 30, 2017, from Ps.335.6 million for the six-month period ended June 30, 2016. This increase was primarily due to an increase in advisory fees as a result of the growth of the net value of our portfolio resulting from our acquisition of additional properties.

*Operating Expenses:* Operating expenses increased by Ps.80.5 million, or 20.7%, to Ps.469.3 million for the six-month period ended June 30, 2017, from Ps.388.7 million for the six-month period ended June 30, 2016. This increase was primarily due to (i) fees paid to our Leasing Administrator, (ii) professional fees incurred in connection with the recovery of value-added taxes, and (iii) expenses related to the appraisals of a higher number of properties.

*Maintenance Expenses:* Maintenance expenses increased by Ps.35.1 million, or 5.5%, to Ps.676.5 million for the six-month period ended June 30, 2017 from Ps.641.5 million for the six-month period ended June 30, 2016. This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties. The amount of maintenance expenses paid is comparable to the maintenance income received from our tenants.  The majority of maintenance and repair expenses are ordinarily paid by our tenants through periodic maintenance fees.

*Amortization of Administrative Platform:* The administrative platform acquired as part of the Apolo Portfolio acquisition in December 2013 will be amortized over a 20-year period. The acquisition value of the platform was Ps.2.5 billion.

*Executive Compensation Plan:* As of June 30, 2017 the estimated expense relating to the executive compensation plan amounted to Ps.89.7 million, considering the price of our CBFIs as of that date.  We record as an expense based on an estimate of the value of CBFIs that may eventually be awarded allocated evenly through the vesting period.  At the end of the year, Fibra Uno will revise and adjust the estimate of the number and value of CBFIs that it expects will be awarded, based on metrics developed by independent experts.

*Property Taxes:* Expenses related to property tax increased by Ps.15.3 million, or 10.0%, to Ps.168.4 million for the six-month period ended June 30, 2017, from Ps.153.1 million for the six-month period ended June 30, 2016.  This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties.

*Insurance:* Expenses related to insurance policies increased by Ps.12.7 million, or 20.1%, to Ps.75.9 million for the six-month period ended June 30, 2017, from Ps.63.2 million for the six-month period ended June 30, 2016.  This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties and the depreciation of the Peso against the U.S. Dollar as we insure substantially all of our properties in U.S. Dollars.

*Interest Expense:* Interest expense, which includes interest paid and interest provision, increased by Ps.663.9 million, or 39.2% to Ps.2,357.0 million for the six-month period ended June 30, 2017, from Ps.1,693.1 million for the six-month period ended June 30, 2016.  This increase was primarily due to (i) an increase in interest

rates during the first half of 2017, (ii) depreciation of the Peso against the U.S. Dollar, (iii) the issuance in the Mexican market of Peso-denominated notes for Ps.4.5 billion, (iv) the re-opening of two series of U.S. Dollar-denominated notes issued in 2014 and 2015 and the issuance of an additional aggregate US$ 500 million of both series, (v) refinancing of the credit of the Samara property from Ps.929.5 million to Ps.2,897 million, (vi) indebtedness in the amount of Ps.790.4 million assumed in connection with the acquisition of the Frimax portfolio, (vii) the renewal of the Actinver loan facility for Ps.410 million, and (viii) interest in connection with foreign exchange swaps with an aggregate notional amount of US$ 450 million.

*Interest Income:*  Interest income increased by Ps.197.8 million, or 306.8%, to Ps.262.2 million for the six-month period ended June 30, 2017, from Ps.64.5 million for the six-month period ended June 30, 2016, due mainly to the increase in financial investments.

*Foreign Exchange Gain, Net:* Net foreign exchange gain for the six-month period ended June 30, 2017, was Ps.3,134.3 million, as compared to a net loss of Ps.1,616.8 million for the six-month period ended June 30, 2016, due to the appreciation of the Peso against the U.S. Dollar.

*Amortization of Bank Fees:* During the six-month period ended June 30, 2017, a total of Ps.65.0 million in bank fees was amortized. This amount represents an 8.1% increase from the Ps.60.0 million amortized during the six-month period ended June 30, 2016, mainly due to the fees related to (i) the issuance in the Mexican market of Peso-denominated notes for Ps.4.5 billion, and (ii) the re-opening of two series of U.S. Dollar-denominated notes issued in 2014 and 2015 and the issuance of an additional US$500 million of both series.

*Fair Value Adjustments to Investment Properties:*  Under IFRS, we assess fair value of our investment properties at least annually or upon significant fluctuations in market conditions. Fair value adjustments to investment properties represented a gain of Ps.2,431.8 million for the six-month period ended June 30, 2017.  This gain was primarily due to (i) new acquisitions, (ii) progress made in, or completion of the development of properties in our Development Portfolio, and (iii) the positive effect of the valuation of our properties.

*Net Income:* As a result of the foregoing, net income increased by Ps.3,440.2 million, or 67.3%, to Ps.8,554.9 million for the six-month period ended June 30, 2017, from Ps.5,114.7 million for the six-month period ended June 30, 2016.

**Comparison of the Year Ended December 31, 2016 to the Year Ended December 31, 2015.**

The following table shows our revenues and expenses for the fiscal years ended December 31, 2016 and 2015:

| Consolidated Statements of Operations Data | Year Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| | *(Ps. in thousands)* | |
| Lease revenues | 11,756,607 | 9,574,616 |
| Maintenance fees revenues | 1,230,420 | 963,377 |
| Dividend revenues from beneficiary rights | 157,821 | 148,573 |
| Administration fees | 108,000 | 38,333 |
| Management fees | (678,686) | (612,928) |
| Operating expenses | (824,967) | (668,237) |
| Maintenance expense | (1,293,772) | (1,065,230) |
| Administrative platform amortization | (194,984) | (194,984) |
| Executive bonus | (169,997) | (587,792) |
| Property tax | (323,074) | (258,801) |

| Consolidated Statements of Operations Data | Year Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| | *(Ps. in thousands)* | |
| Insurance | (143,918) | (87,012) |
| Interest expense | (3,826,836) | (2,681,540) |
| Interest income | 263,833 | 412,083 |
| Foreign exchange gain (loss), net | (4,752,607) | (3,878,142) |
| Amortization of bank commissions | (133,579) | (81,867) |
| Derivative financial instruments | (46,624) | — |
| Fair value adjustments to property investments and investments in trust rights | 11,266,275 | 4,714,041 |
| **Consolidated net income** | **12,393,912** | **5,734,490** |

*Lease Revenues:* Lease revenues increased by Ps.2,182.0 million, or 22.8%, to Ps.11,756.6 million for the fiscal year ended December 31, 2016, from Ps.9,574.6 million for the fiscal year ended December 31, 2015. This increase was primarily due to (i) additional lease revenue due to the acquisition of portfolios and the completion of construction of development properties (ii) an increase in lease revenue from our existing portfolio as a result of above-inflation rent adjustments and (iii) depreciation of the Peso in relation to the U.S. Dollar, since 32.6% of our lease agreements in terms of ABR are denominated in U.S. Dollars.

*Maintenance Fees Revenues:* Maintenance fees revenues increased by Ps.267.0 million, or 27.7%, to Ps.1,230.4 million for the fiscal year ended December 31, 2016, from Ps.963.4 million for the fiscal year ended December 31, 2015. This increase was primarily due to additional maintenance fees revenue due to the acquisition of portfolios and the completion of development properties.

*Dividend Revenues from Beneficiary Rights:* Dividend revenues from beneficiary rights, which include revenues from our 49% interest in the lease revenue from Torre Mayor, presented an increase of Ps.9.2 million, or 6.2%, to Ps.157.8 million for the fiscal year ended December 31, 2016 from Ps.148.6 million for the fiscal year ended December 31, 2015, primarily due to the net income from Torre Mayor and impact of the depreciation of the Peso against the U.S. Dollar since Torre Mayor receives substantially all of its revenues in U.S. Dollars.

*Administration Revenues:* Revenues under the management agreement between our F1 Management Subsidiary and Helios, our real estate development vehicle created in 2015, increased by Ps.69.7 million, or 182%, to Ps.108.0 million for the year ended December 31, 2016, from Ps.38.3 million for the year ended December 31, 2015. The increase was primarily due to the accrual of management fees during the entire one-year period and the additional fees generated by our coinvestment in project Mitikah.

*Management Fees:* Management fees, which include fees payable to our Advisor, our Property Managers, consultants and other professionals, increased by Ps.65.8 million or 10.7%, to Ps.678.7 million for the fiscal year ended December 31, 2016, from Ps.612.9 million for the fiscal year ended December 31, 2015. This increase was primarily due to an increase in advisory fees as a result of the growth of the net value of our portfolio resulting from our acquisition of additional properties.

*Operating Expenses:* Operating expenses increased by Ps.156.7 million, or 23.5%, to Ps.824.9 million for the fiscal year ended December 31, 2016, from Ps.668.2 million for the fiscal year ended December 31, 2015. This increase was primarily due to (i) fees paid to our Leasing Administrator, (ii) professional fees incurred in connection with the recovery of value-added taxes, and (iii) expenses related to the appraisals of a higher number of properties.

*Maintenance Expenses:* Maintenance expenses increased by Ps.228.5 million, or 21.5%, to Ps.1,293.8 million for the fiscal year ended December 31, 2016 from Ps.1,065.2 million for the fiscal year ended December 31,

2015.  This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties. The amount of maintenance expenses paid is comparable to the maintenance income received from our tenants. The majority of maintenance and repair expenses are ordinarily paid by our tenants through periodic maintenance fees.

*Amortization of Administrative Platform:* The administrative platform acquired as part of the Apolo Portfolio acquisition in December 2013 will be amortized over a 20-year period. The acquisition value of the platform was Ps.2.5 billion.

*Executive Compensation Plan:* As of December 31, 2016 the estimated expense relating to the executive compensation plan amounted to Ps.170.0 million, considering the price of our CBFIs as of December 31, 2016. We record as an expense based on an estimate of the value of CBFIs that may eventually be awarded allocated evenly through the vesting period.  At the end of the year, Fibra Uno will revise and adjust the estimate of the number and value of CBFIs that it expects will be awarded, based on metrics developed by independent experts.

*Property Taxes:* Expenses related to property tax increased by Ps.64.3 million, or 24.8%, to Ps.323.1 million for the fiscal year ended December 31, 2016, from Ps.258.8 million for the fiscal year ended December 31, 2015. This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties.

*Insurance:* Expenses related to insurance policies increased by Ps.56.9 million, or 65.4%, to Ps.143.9 million for the fiscal year ended December 31, 2016, from Ps.87.0 million for the fiscal year ended December 31, 2015.  This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties and the depreciation of the Peso against the U.S. Dollar as we insure substantially all of our properties in U.S. Dollars.

*Interest Expense:* Interest expense, which includes interest paid and interest provision, increased by Ps.1,145.3 million, or 42.7% to Ps.3,826.8 million for the fiscal year ended December 31, 2016, from approximately Ps.2,681.5 million for the fiscal year ended December 31, 2015. This increase was primarily due to (i) an increase of approximately 200 bp in interest rates during 2016, (ii) depreciation of the Peso against the U.S. Dollar (from Ps.17.3398 to Ps.20.6640 per USD), (iii) the issuance in the Mexican market of Peso-denominated notes for Ps.4.5 billion, (iv) the re-opening of two series of U.S. Dollar-denominated notes issued in 2014 and 2015 and the issuance of an additional aggregate US$ 500 million of both series, (v) refinancing of the credit of the Samara property from Ps.929.5 million to Ps.2,897 million, and (vi) interest in connection with foreign exchange swaps with an aggregate notional amount of US$ 300 million.

*Interest Income:* Interest income decreased by Ps.148.3 million, or 36.0%, to Ps.263.8 million for the fiscal year ended December 31, 2016, from Ps.412.1 million for the fiscal year ended December 31, 2015.

*Foreign Exchange Loss, net:* Foreign exchange loss, net was Ps.4,752.6 million for the fiscal year ended December 31, 2016, compared to a loss of Ps.3,878.1 million for the fiscal year ended December 31, 2015.  This increase was primarily due to the effects of the depreciation of the Peso in relation to the U.S. Dollar on our debt denominated in foreign currency.  Between January 2, 2016 and December 31, 2016, the exchange rate between the Peso and the U.S. Dollar increased from Ps.17.3398 to US$1.00 to Ps.20.6640 to US$1.00, a 19.2% increase, compared with a 17.6% increase during the corresponding period in 2015 (from Ps.14.7414 to US$1.00 on January 2, 2015, to Ps.17.3398 on December 31, 2015).

*Amortization of Bank Fees:* During the fiscal year ended December 31, 2016, a total of Ps.133.6 million in bank fees was amortized.  This amount represents a 51.7% decrease from the Ps.81.9 million amortized during the fiscal year ended December 31, 2015, mainly due to lower prepayments of debt resulting in acceleration of fees initially intended to be amortized over the original life of the loan.

*Derivatives:* Losses from transactions in derivatives during the year ended December 31, 2016 amounted to Ps.46.6 million and arose from our foreign-exchange swaps.

*Fair Value Adjustments to Investment Properties:* Under IFRS, we assess fair value of our investment properties at least annually or upon significant fluctuations in market conditions. Fair value adjustments to investment properties represented a gain of Ps.11,266.3 million for the fiscal year ended December 31, 2016. This gain was primarily due to (i) new acquisitions, (ii) progress made in, or completion of the development of properties in our Development Portfolio, and (iii) the positive effect of the valuation of our properties.

*Net Income:* Net income increased by Ps.6,659.4 million, or 116.1%, to Ps.12,393.9 million for the fiscal year ended December 31, 2016, from Ps.5,734.5 million for the year ended December 31, 2015, as a result of the factors described above.

**Comparison of the Year Ended December 31, 2015 to the Year Ended December 31, 2014.**

The following table shows our revenues and expenses for the fiscal years ended December 31, 2015 and 2014:

| Consolidated Statements of Operations Data | Year Ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| | *(Ps.in thousands)* | |
| Lease revenues | 9,574,616 | 6,989,751 |
| Maintenance fees revenues | 963,377 | 707,842 |
| Dividend revenues from beneficiary rights | 148,573 | 124,387 |
| Administration fees | 38,333 | - |
| Management fees | (612,928) | (490,832) |
| Operating expenses | (668,237) | (530,623) |
| Maintenance expenses | (1,065,230) | (807,394) |
| Administrative platform amortization | (194,984) | (194,984) |
| Executive bonus | (587,792) | (530,280) |
| Property tax | (258,801) | (155,104) |
| Insurance | (87,012) | (84,179) |
| Interest expense | (2,681,540) | (2,019,111) |
| Interest income | 412,083 | 430,494 |
| Foreign exchange gain (loss), net | (3,878,142) | (2,222,097) |
| Amortization of bank fees | (81,867) | (166,545) |
| Fair value adjustments to property investments and investments in trust rights | 4,714,041 | 4,659,760 |
| **Consolidated net income** | **5,734,490** | **5,711,085** |

*Lease Revenues:* Lease revenues increased by Ps.2,584.9 million, or 37.0%, to Ps.9,574.6 million for the fiscal year ended December 31, 2015, from Ps.6,989.8 million for the fiscal year ended December 31, 2014. This increase was primarily due to (i) additional lease revenue due to the acquisition of portfolios and the completion of construction of development properties (ii) an increase in lease revenue from our existing portfolio as a result of positive leasing spreads and inflation-based rent adjustments and (iii) depreciation of the Peso in relation to the U.S. Dollar (as of December 31, 2015, 32.1% of our lease agreements in terms of ABR were denominated in U.S. Dollars).

*Maintenance Fees Revenues:* Maintenance fees revenues increased by Ps.255.5 million, or 36.1%, to Ps.963.4 million for the fiscal year ended December 31, 2015, from Ps.707.8 million for the fiscal year ended December 31, 2014. This increase was primarily due to (i) additional maintenance fees revenue due to the

acquisition of portfolios and the completion of development properties and (ii) an increase in maintenance fees revenues in respect of our existing portfolio.

*Dividend Revenues from Beneficiary Rights:* Dividend revenues from beneficiary rights, which include revenues from our 49% interest in the lease revenue from Torre Mayor, presented an increase of Ps.24.2 million, or 19.4%, to Ps.148.6 million for the fiscal year ended December 31, 2015 from Ps.124.4 million for the fiscal year ended December 31, 2014, primarily due to the impact of the depreciation of the Peso against the U.S. Dollar since Torre Mayor receives substantially all of its revenues in U.S. Dollars.

*Administration Fees:* During 2015, we recorded Ps.38.3 million of administration fees revenues in accordance with the terms of the management agreement between our F1 Management Subsidiary and Helios, our real estate development vehicle created during 2015.

*Management Fees:* Management fees, which include fees payable to our Advisor, our Property Managers, consultants and other professionals, increased by Ps.122.1 million or 24.9%, to Ps.612.9 million for the fiscal year ended December 31, 2015, from Ps.490.8 million for the fiscal year ended December 31, 2014. This increase was primarily due to an increase in advisory fees as a result of the growth of the net value of our portfolio resulting from our acquisition of additional properties.

*Operating Expenses:* Operating expenses increased by Ps.137.6 million, or 25.9%, to Ps.668.2 million for the fiscal year ended December 31, 2015, from Ps.530.6 million for the fiscal year ended December 31, 2014. This increase was primarily due to (i) expenses related to the growth of the property portfolio, (ii) expenses incurred in connection with the recovery of value-added taxes, and (iii) expenses related to the appraisals of certain properties.

*Maintenance Expenses:* Maintenance expenses increased by Ps.257.8 million, or 31.9%, to Ps.1,065.2 million for the fiscal year ended December 31, 2015 from Ps.807.4 million for the fiscal year ended December 31, 2014. This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties. The amount of maintenance expenses paid is comparable to the maintenance income received from our tenants. The majority of maintenance and repair expenses are ordinarily paid by our tenants through periodic maintenance fees. The acquisition of the Kansas Portfolio with a lower occupancy rate than the rest of our retail portfolios implies that we have to bear a higher portion of maintenance expenses ourselves.

*Amortization of Administrative Platform:* The administrative platform acquired as part of the Apolo Portfolio acquisition in December 2013 will be amortized over a 20-year period. The acquisition value of the platform was Ps.2.5 billion.

*Executive Compensation Plan:* As of December 31, 2015 the estimated expense relating to the executive compensation plan amounted to Ps.587.8 million, considering the price of our CBFIs as of December 31, 2016. We record as an expense based on an estimate of the value of CBFIs that may eventually be awarded. At the end of the year, Fibra Uno will revise and adjust the estimate of the number and value of CBFIs that it expects will be awarded, based on metrics of the compensation plan approved by the CBFI holders meeting.

*Property Tax:* Expenses related to property tax increased by Ps.103.7 million, or 66.9%, to Ps.258.8 million for the fiscal year ended December 31, 2015, from Ps.155.1 million for the fiscal year ended December 31, 2014. This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties.

*Insurance:* Expenses related to insurance policies increased by Ps.2.8 million, or 3.4%, to Ps.87.0 million for the fiscal year ended December 31, 2015, from Ps.84.2 million for the fiscal year ended December 31, 2014. This increase was primarily due to the growth of our portfolio resulting from our acquisition of additional properties and the depreciation of the Peso against the U.S. Dollar as we insure substantially all of our properties in U.S. Dollars.

*Interest Expense:* Interest expense, which includes interest paid and interest provision, increased by Ps.662.4 million, or 32.8% to Ps.2,681.5 million for the fiscal year ended December 31, 2015, from Ps.2,019.1

million for the fiscal year ended December 31, 2014. This increase was primarily due to the Ps.7.5 billion Peso Notes issued on February 2, 2015 and the 10 year US.300.0 million USD Notes issued on December 3, 2015.

*Interest Income:* Interest income decreased by Ps.18.4 million, or 4.3%, to Ps.412.1 million for the fiscal year ended December 31, 2015, from Ps.430.5 million for the fiscal year ended December 31, 2014. This decrease was primarily due to our investment of the proceeds from our CBFIs issued in February 2015.

*Foreign Exchange Loss, Net:* Foreign exchange loss, net was Ps.3,878.1 million for the fiscal year ended December 31, 2015, compared to a loss of Ps.2,222.1 million for the fiscal year ended December 31, 2014. This increase was primarily due to the effects of the depreciation of the Peso in relation to the U.S. Dollar on our debt denominated in foreign currency. Between January 2, 2015 and December 31, 2015, the exchange rate between the Peso and the U.S. Dollar increased from Ps.14.7414 to US$1.00 to Ps.17.3398 to US$1.00, a 17.6% increase, compared with a 12.6% increase during the corresponding period in 2014 (from Ps.13.0843 to US$1.00 on January 2, 2014, to Ps.14.7348 on December 31, 2014).

*Amortization of Bank Fees:* During the fiscal year ended December 31, 2015, a total of Ps.81.9 million in bank fees was amortized. This amount represents a 50.8% decrease from the Ps.166.5 million amortized during the fiscal year ended December 31, 2014, when prepayments of bank loans resulted in the accelerated amortization of fees originally intended to be amortized over the life of the loans being prepaid.

*Fair Value Adjustments to Investment Properties:* Under IFRS, we assess fair value of our investment properties at least annually or upon significant fluctuations in market conditions. Fair value adjustments to investment properties represented a gain of Ps.4,714.0 million for the fiscal year ended December 31, 2015, 1.2% more than the gain of Ps.4,659.8 million in 2014. This increase was primarily due to (i) the growth of our portfolio and the acquisition of several portfolios by the end of 2014 and during 2015, (ii) the progress and the completion of development properties, and (iii) increases in the fair value of the properties in our portfolio.

*Net Income:* Consolidated net income increased by Ps.23.4 million, or 0.4%, to Ps.5,734.5 million for the fiscal year ended December 31, 2015, from Ps.5,711.1 million for the fiscal year ended December 31, 2014, as a result of the factors described above.

### *Liquidity and Capital Resources*

Our short-term liquidity requirements consist primarily of funds to pay for operating expenses and other expenditures directly associated with our properties, including:

- fees payable under the advisory agreement, services agreements with our Leasing Administrators and the property management agreement with our Management Subsidiary;

- principal payments on outstanding indebtedness;

- interest expense on outstanding indebtedness;

- anticipated and unanticipated capital expenditures, tenant improvements and leasing commissions; and

- cash distributions expected to be paid to holders of our CBFIs.

We intend to satisfy our short-term liquidity requirements through cash provided by our operations. We believe our rental revenue, net of operating expenses, will generally provide cash inflows to meet our debt service obligations, pay general and administrative expenses and fund regular distributions.

We maintain cash accounts in both Pesos and U.S. Dollars. Rent collections are received through several bank accounts that are swept daily into a concentration account. Once in the concentration account, funds are invested in government securities at approximately 2:00 p.m. (local time in Mexico City). Funds received after this

deadline remain in the concentration account until the next business day.  U.S. Dollar-denominated funds are maintained in our checking accounts.

Our long-term liquidity requirements consist primarily of funds to pay for property acquisitions and any associated value-added taxes, construction projects, renovations, expansions and other non-recurring capital expenditures that need to be made periodically.  We intend to satisfy our long-term liquidity requirements through various sources of capital, including existing working capital, cash provided from operations, borrowings and issuances of CBFIs.  See "—Financing" for a more detailed discussion of our borrowings.

We intend to maintain our indebtedness so that we will be capable of operating in an efficient and flexible manner that will allow us to compete effectively and implement our growth and business plan over time.  We plan on financing acquisitions with the most advantageous sources of capital available at the time of acquisition, which may include borrowings under credit lines, the assumption of existing indebtedness on acquired properties, the proceeds from issuances of equity and debt, and the issuance of CBFIs to sellers that may prefer CBFIs as payment.

As of June 30, 2017, our working capital was positive Ps.1,752.2 million, due to a higher cash balance than our short-term debt maturities and accounts payable related to our property acquisitions.

Our properties will require periodic capital expenditures and renovations to remain competitive.  In addition, we will incur development costs relating to the construction and development of our Development Portfolio.  See "—Properties Under Development" for a more detailed description of the properties under development.  In addition, acquisitions, redevelopments, remodeling or expansions of properties will require significant capital outlays.  We may not be able to fund such capital improvements solely from net cash provided by operations because we must distribute annually at least 95% of our net taxable income to qualify as a FIBRA.  As a result, our ability to fund capital expenditures, acquisitions, remodeling, expansions or property redevelopment through retained earnings is very limited. Consequently, we expect to rely heavily upon the availability of debt or equity capital for these purposes.  If we are unable to obtain the necessary capital on favorable terms, or at all, our financial condition, liquidity, results of operations and prospects could be materially and adversely affected.

### Financing

As of June 30, 2017, we had total consolidated indebtedness of Ps.62.3 billion (US$3.5 billion), of which Ps.5.0 billion (US$275.4 million) was secured indebtedness, and our subsidiaries had no outstanding indebtedness. As of June 30, 2017, 45.8% of our indebtedness was denominated in Pesos and 54.2% was denominated in U.S. Dollars.  As a result of foreign exchange swaps in effect on June 30, 2017, as of that date 59.2% of our indebtedness was denominated in Pesos and 40.8% was denominated in U.S. Dollars.

We believe that we are well positioned to obtain and utilize additional debt financing to grow our business. We intend to finance future acquisitions and developments using the remaining amounts available under our credit lines and a combination of the issuance of equity and debt securities in the capital markets, mortgage indebtedness and construction loans from local or international banks.

Our trust agreement provides that we will have a maximum leverage ratio of 50.0% of the appraised value of our properties and that we will maintain a debt service coverage ratio of at least 1.20x.  Each ratio is measured prior to the incurrence of any additional debt or the assumption of any debt in connection with a property acquisition. As of June 30, 2017, our leverage ratio (as measured by total debt to total assets) was 31.6%.  Our secured leverage ratio (as measured by total secured debt to total assets) as of June 30, 2017, was 2.5%.

As of June 30, 2017, our ratio of unencumbered assets to unsecured indebtedness was 315.1%. Additionally as of June 30, 2017, our debt service coverage ratio was 2.25x, and our interest coverage ratio was 2.35x.

The table below sets forth the details of our outstanding debt as of June 30, 2017 and as of December 31, 2016, 2015 and 2014:

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2017 | December 31, | | |
| Total Debt[1] | | 2016 | 2015 | 2014 |
| | | *(Ps.in million)* | | |
| Blackstone (Morado) | - | - | 6,579.8 | 6,864.1 |
| Blackstone (G-30) | - | - | 1,366.8 | 1,677.5 |
| Banamex (G-30) | - | - | 217.3 | 358.1 |
| Metlife (G-30) | - | - | - | 393.4 |
| Bancomext (Vermont) | 1,278.0 | 1,515.3 | 1,335.0 | 1,190.6 |
| Blackstone (Vermont) | - | - | 919.9 | 812.6 |
| Metlife (Hotel Centro Histórico) | - | - | - | 454.9 |
| HSBC MXN (Samara) | 2,897.1 | 2,965.7 | 948.9 | 995.3 |
| HSBC USD (Samara) | - | - | 265.3 | 236.9 |
| Inbursa Loan | - | - | 2,000.0 | - |
| Actinver Loan | 410.0 | 410.0 | - | - |
| Santander Loan | 1,000.0 | - | - | - |
| Metlife (Frimax) | 256.8 | - | - | - |
| Metlife (Frimax) | 533.6 | - | - | - |
| Peso Notes (FUNO 13) | 6,850.1 | 6,850.1 | 6,850.1 | 4,350.1 |
| Peso Notes (FUNO 13-2) | 3,120.9 | 3,120.9 | 2,000.0 | 2,000.0 |
| Peso Notes (FUNO 13-U) | 2,448.4 | 2,368.1 | 2,290.8 | 2,243.6 |
| Peso Notes (FUNO 15) | 7,500.0 | 7,500.0 | 7,500.0 | - |
| Peso Notes (FUNO 16) | 883.7 | 883.7 | - | - |
| Peso Notes (FUNO 16-U) | 2,633.4 | 2,547.1 | - | - |
| USD Notes (due 2024, 2026 and 2044) | 32,450.2 | 37,195.2 | 22,541.7 | 14,734.8 |
| **Total Debt** | **62,262.3** | **65,356.1** | **54,815.5** | **36,311.3** |
| Less - transaction costs | (550.6) | (581.6) | (482.5) | (390.7) |
| Less - current debt (includes current portion of long term debt) | (1,631.6) | (633.9) | (10,123.6) | (1,791.9) |
| Fair value | 159.0 | 32.0 | - | - |
| **Total Long-Term Borrowings** | **60,239.1** | **64,172.6** | **44,209.4** | **34,128.7** |

[1]   As of June 30, 2017, all bank debt (with exception of the Actinver and Santander Loans) was secured by 17 properties, which are valued at approximately Ps.16.3 billion. The Peso Notes and the USD Notes are unsecured.

*Credit Lines and Other Indebtedness*

*Actinver Loan*

On November 29, 2013, we entered into a loan agreement with Banco Actinver S.A. Institución de Banca Múltiple, Grupo Financiero Actinver, or the Actinver Loan.  Initially an unsecured, twelve-month facility for up to Ps.300 million, the Actinver Loan has been renewed and the maximum amount available thereunder has been increased.  Currently the facility carries interest at 28-day TIIE plus 180 basis points.  As of June 30, 2017, (i) the outstanding amount under the Actinver Loan was Ps.410 million, due on June 12, 2018, and (ii) the current cost for the loan was 9.17% *per annum*.

*Santander Loan*

On December 15, 2016, we entered into a loan agreement with Banco Santander (Mexico), S.A. Institución de Banca Múltiple, Grupo Financiero Santander Mexico, or the Santander Loan.  Under this facility, we have available on an unsecured basis up to Ps.1.5 billion for an 18-month term.  As of June 30, 2017, the outstanding amount under the Santander Loan was Ps.1 billion, due on December 20, 2017, and accruing interest at 28-day TIIE plus 125 basis points.  After June 30, 2017, the remaining Ps.500 million of this facility was drawn at an interest rate of 28-day TIIE plus 150 basis points and a due date of January 23, 2018. As of June 30, 2017, the current cost for the loan was 8.62% *per annum*.

*Vermont Portfolio Acquisition Loan Assumptions*

In connection with the acquisition of the Vermont Portfolio, we assumed loans from GEREM and Bancomext. As of June 30, 2017, (i) the outstanding balance of the Bancomext credit was US$70.9 million, due on November 3, 2020, and (ii) the current cost of the loans was 4.89% *per annum*. The GEREM portion of the financing was repaid in 2016.

*Samara Acquisition Loan Assumptions*

In connection with the acquisition of the Samara Portfolio, we assumed one U.S. Dollar-denominated and one Peso-denominated loan from HSBC. As of June 30, 2017, only the Peso-denominated loan remained outstanding with a balance of Ps.2.9 billion. The loan accrues interest at 28-day TIIE plus 200 basis points, and is due on September 15, 2023. As of June 30, 2017, the current cost for the loan was 9.37% *per annum*.

*Frimax Acquisition Loan Assumptions*

In connection with the acquisition of the Frimax portfolio, we assumed two loans from Metlife Mexico, S.A. As of June 30, 2017, the loans had an outstanding balance of Ps.533.6 million and Ps.256.8 million for an aggregate of Ps.790.4 million. These loans accrue interest at 7.92% *per annum* and are due on December 1, 2023.

*Syndicated Loan*

On July 29, 2015 we entered into a committed, dual-currency, unsecured revolving loan facility with a five year term. Banco Santander (México), S.A., is the administrative agent and BBVA Bancomer, S.A., HSBC México, S.A., Bank of America, Credit Suisse AG, Goldman Sachs Bank USA, Itaú Unibanco, S.A., are syndicate banks. The loan facility is for an amount of up to Ps.7 billion and US$360 million, with an interest rate of 28-day TIIE plus a margin in between 125 and 150 basis points for the Peso tranche and LIBOR plus a margin in between 125 and 150 basis points for the U.S. Dollar tranche.

On October 16, 2015, an amendment to the loan agreement was executed to include Deutsche Bank AG, New York Branch, as lender for an additional amount of US$50 million. With this new lender, the loan facility amount is for up to Ps.7 billion and US$410 million.

As of the date of this offering memorandum, there has been no drawing under these facilities.

*USD Notes*

On January 30, 2014, we sold in the international market US$1.0 billion of senior unsecured notes. The USD Notes were issued in two tranches: US$600 million of senior unsecured 5.250% notes due December 15, 2024 and US$400 million of senior unsecured 6.950% notes due January 30, 2044. On December 3, 2015, we issued US$300 million senior unsecured notes 5.250% notes due 2026. On June 13, 2016, we re-opened the 2014 issuance of notes due 2044 and sold an additional US$300 million of such notes, and the 2015 issuance of notes due 2026, and sold an additional US$200 million of such notes.

As of June 30, 2017, the outstanding balance under our USD Notes was US$1.8 billion, or Ps.32.4 billion.

The indentures governing the USD Notes contain covenants that, among other things, limit the incurrence of debt by us, and permit us to consolidate or merge with, or transfer all or substantially all of our assets to, another person only if any such transaction complies with certain requirements. The indentures permit a maximum 60% total leverage ratio, and a 40% secured debt leverage ratio. In addition, the indentures require a minimum debt service ratio of 1.5 to 1.0 on a pro forma basis after giving effect to the incurrence of additional debt. The indentures governing the USD Notes contain customary events of default for this type of security.

*Peso Notes*

On December 16, 2013, we issued and sold in the Mexican market Ps.4.4 billion of senior unsecured 28-day TIIE plus 80 basis points notes due June 10, 2019 (FUNO 13) (with a current cost as of June 30, 2017 of 8.17% *per annum*), Ps.2.0 billion of senior unsecured 8.40% notes due December 4, 2023 (FUNO 13-2), and 425,700,000 senior unsecured inflation-protected 5.09% notes due November 27, 2028 (FUNO 13U).

On February 2, 2015, we issued and sold Ps.7.5 billion of senior unsecured 6.99% notes due July 23, 2025 (FUNO 15), and reopened the issuance FUNO 13 to sell an additional Ps.2.5 billion.

On April 14, 2016, we issued and sold in the Mexican market Ps.2.5 billion of senior unsecured inflation-protected 4.60% notes, due April 1, 2027 (FUNO 16U), Ps.884 million of senior unsecured 28-day TIIE plus 65 basis points notes due April 11, 2019 (FUNO 16) (with a current cost as of June 30, 2017 of 8.02% *per annum*), and reopened the issuance of FUNO 13-2 to sell an additional Ps.1.1 billion.

We refer to the notes issued on December 16, 2013, on February 2, 2015 and on April 14, 2016, collectively, as the Peso Notes. As of June 30, 2017 the total outstanding balance of the Peso Notes was Ps.23.4 billion (US$1.3 billion).

The indenture for the Peso Notes contains customary events of default for this type of security and covenants substantially similar to those contained in the indentures for the USD Notes.

Over the past few years, we have been focused on our liability management in order to improve our capital structure and our debt profile. An increase in NOI allows us the ability to absorb a higher cost of debt without substantially impacting our FFO:

| | Interest Expense (Ps. in thousands) | Total Debt (Ps. in thousands) | Fixed-Rate Debt (% of Total Debt) | Floating-Rate Debt (% of Total Debt) | US$ Debt (% of Total Debt) | Peso Debt (% of Total Debt) | DSCR | NOI per CBFI[1] | Interest per CBFI[1] | FFO per CBFI[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | | | |
| First Quarter | 510,788 | 37,886,549 | 68% | 32% | 45% | 55% | 0.96x | 0.75 | 0.28 | 0.42 |
| Second Quarter | 563,197 | 36,206,404 | 71% | 29% | 42% | 58% | 1.08x | 0.85 | 0.28 | 0.46 |
| Third Quarter | 488,230 | 34,554,585 | 76% | 24% | 38% | 62% | 1.24x | 0.58 | 0.17 | 0.36 |
| Fourth Quarter | 456,896 | 35,920,634 | 76% | 24% | 37% | 63% | 2.53x | 0.59 | 0.16 | 0.44 |
| **2015** | | | | | | | | | | |
| First Quarter | 595,358 | 46,517,178 | 76% | 24% | 50% | 50% | 1.32x | 0.61 | 0.20 | 0.43 |
| Second Quarter | 671,331 | 46,543,616 | 76% | 24% | 49% | 51% | 1.34x | 0.68 | 0.22 | 0.45 |
| Third Quarter | 685,108 | 47,319,855 | 79% | 21% | 49% | 51% | 1.29x | 0.76 | 0.23 | 0.50 |
| Fourth Quarter | 729,743 | 54,333,035 | 78% | 22% | 45% | 55% | 2.18x | 0.80 | 0.23 | 0.53 |
| **2016** | | | | | | | | | | |
| First Quarter | 812,843 | 54,455,550 | 78% | 22% | 46% | 54% | 2.17x | 0.80 | 0.25 | 0.50 |
| Second Quarter | 880,259 | 61,483,876 | 78% | 22% | 50% | 50% | 2.20x | 0.80 | 0.27 | 0.48 |
| Third Quarter | 1,050,463 | 62,520,708 | 69% | 24% | 51% | 49% | 2.41x | 0.84 | 0.33 | 0.49 |
| Fourth Quarter | 1,083,271 | 64,806,553 | 77% | 23% | 50% | 50% | 2.42x | 0.88 | 0.33 | 0.52 |
| **2017** | | | | | | | | | | |
| First Quarter | 1,121,902 | 61,133,289 | 71% | 29% | 57% | 43% | 2.19x | 0.89 | 0.35 | 0.52 |
| Second Quarter | 1,235,062 | 61,870,677 | 70% | 30% | 59% | 41% | 2.25x | 0.88 | 0.38 | 0.49 |

[1] Calculated using the average number of CBFIs in the period.

We have undrawn committed credit lines totaling US$826 million.

*Properties Under Development*

Our Development Portfolio is comprised of seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  Our Development Portfolio includes four properties portions of which, amounting to approximately 89,960 m² of GLA (1.2% of our Stabilized Portfolio), have already been developed and leased, or are available to be leased.  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As of June 30, 2017, our Development Portfolio included:

- Two retail properties that we expect, upon completion, will comprise approximately 113,806 m² of GLA;

- One industrial property that we expect, upon completion, will comprise approximately 48,052 m² of GLA;

- Two office properties that we expect, upon completion, will comprise approximately 114,000 m² of GLA; and

- Two mixed-use properties that we expect, upon completion, will comprise approximately 177,000 m² of GLA.

Below is a table summarizing the properties under development in our Development Portfolio and JV Development Portfolio:

| Portfolio | Property | Property Type | Final GLA (m²) | Amount Invested as of June 30, 2017 (Ps.in millions)[1] | Estimated Investment Amount Pending (Ps.in millions) | Estimated Expected Annual Potential Additional Revenue (Ps.in millions)[2] |
|---|---|---|---|---|---|---|
| La Viga | La Viga ........................ | Office | 102,000 | 1,440.9 | 132.1 | 171.3 |
| G-30 | Berol............................ | Industrial | 48,052 | 1,321.5 | 0 | 128.8 |
| Individual | Torre Cuarzo................ | Retail/Offices | 72,000 | 3,157.3 | 214.7 | 362.0 |
| Apolo | Tlalpan ........................ | Retail | 95,967 | 1,165.3 | 163.7 | 114.0 |
| Turbo | Espacio Tollocan ......... | Retail | 17,839 | 426.6 | 41.4 | 53.0 |
| Individual | Midtown Jalisco............ | Retail/Offices | 105,000 | 1,556.8 | 2,811.2 | 579.4 |
| G-30 | Mariano Escobedo ....... | Office | 12,000 | 359.5 | 40.5 | 61.0 |
| **Total** | | | **452,858** | **9,427.8** | **3,403.6** | **1,469.5** |
| JV Development | Mitikah[3]..................... | Mixed | 326,089 | 1,700.0 | 7,127.3 | 1,644.0 |

[1]  Excluding acquisition / land costs.
[2]  For illustrative purposes only.  Figures assume no change in circumstances prior to completion and are subject to contingencies.
[3]  Includes Colorado and Buffalo portfolios (excluding land value). This project is being developed under our joint venture with Helios.

We expect total development costs of the seven properties in our Development Portfolio to be approximately Ps.12.8 billion (US$712 million), of which approximately Ps.9.4 billion had been expensed as of June 30, 2017.  These figures represent estimated fixed costs under the construction and development agreements we entered into to complete the construction and development of such properties.

During the remainder of 2017 we will continue developing project Mitikah, a mixed-use development located at the southern end of Mexico City that comprises properties formerly known as the Buffalo Portfolio and the Colorado Portfolio, both of which (with the only exception of Espacio Churubusco, a commercial mall in Mexico City that we acquired as part of the Buffalo Portfolio and remains in our Stabilized Portfolio) we contributed in 2016 to our joint venture with Helios, a Mexican real estate development vehicle created in 2015 and managed by our wholly-owned F1 Management Subsidiary.  The joint venture project will have an investment of approximately Ps.20 billion and is expected, upon completion, to comprise approximately 113,876 m² of retail space (including a hotel), 212,213 m² of office space and 84,890 m² of residential areas. The office and retail properties are expected to generate an estimated annual NOI of Ps.1,767 million (Ps.651 million for retail and

Ps.1,116 million for office, assuming an average rent price per square meter of Ps.574 and Ps.455, respectively). Mitikah includes a residential area that is being developed exclusively by our partner in the joint venture and in which we will have no participation.  Currently, the joint venture project Mitikah is 37% and 14% pre-leased for the retail and office spaces, respectively.  While Project Mitikah is in construction, we will not receive any rental income from the property that formerly comprised the Colorado Portfolio (an annual revenue loss of approximately Ps.515 million, estimated on the basis of the annual potential rental income *minus* notional interest related to the cost of acquisition of the Colorado Portfolio).

### Distribution Policy

We conduct our operations so as to qualify as a FIBRA under Articles 187 and 188 of the Mexican Income Tax Law. The Mexican Income Tax Law requires that a FIBRA distribute annually at least 95% of its net taxable income. For more information, see "Taxation Certain Mexican Federal Income Tax Considerations." To satisfy the requirements to qualify as a FIBRA, we intend to pay distributions equal to at least 95% of our net taxable income to holders of our CBFIs.

For the year ended December 31, 2014, we paid cash distributions in the aggregate amount of Ps.4.8 billion in respect of the year ended December 31, 2014. Of this amount, Ps.2.0 billion was classified for income tax purposes as an ordinary dividend and Ps.2.8 billion as a return of capital.

For the year ended December 31, 2015, we paid cash distributions in the aggregate amount of Ps.6.1 billion in respect of the year ended December 31, 2015. Of this amount, Ps.1.7 billion was classified for income tax purposes as an ordinary dividend and Ps.4.4 billion as a return of capital.

For the year ended December 31, 2016, we paid cash distributions in the aggregate amount of Ps.6.4 billion in respect of the year ended December 31, 2016. Of this amount, Ps.1.9 billion was classified for income tax purposes as an ordinary dividend and Ps.4.5 billion as a return of capital.

For the six months ended June 30, 2017, we paid cash distributions in the aggregate amount of Ps.3.4 billion. The total amount was classified for income tax purposes as an advance on the distribution of net taxable income.

### Inflation

Substantially all of our leases contain provisions designed to mitigate the adverse impact of inflation. These provisions generally increase rental rates during the terms of the leases either at fixed rates or indexed escalations (based on the Mexican Consumer Price Index or other measures). We may be adversely impacted by inflation with respect to the leases that do not contain indexed escalation provisions. In addition, most of our leases require the tenant to pay an allocable share of operating expenses, including common area maintenance costs. This may reduce our exposure to increases in costs and operating expenses resulting from inflation, assuming our properties remain leased and tenants fulfill their obligations to reimburse us for such expenses.

### Seasonality

We do not consider our business to be subject to material seasonal fluctuations.

### Quantitative and Qualitative Disclosures About Market Risk

Our future income, cash flows and fair values relevant to financial instruments depend upon prevailing market interest rates. Market risk is the exposure to loss resulting from changes in interest rates, foreign currency exchange rates, commodity prices and equity prices. The primary market risks to which we believe we could be exposed are interest rate risk and foreign currency exchange rate risk. Many factors, including governmental monetary and tax policies, domestic and international economic and political considerations and other factors that are beyond our control contribute to interest rate risk and exchange rate risk. We may in the future engage in hedging.

As of June 30, 2017, we had Ps.62.3 billion of indebtedness outstanding, of which 30%, is subject to fixed interest rates and 70%, is variable rate debt.

If interest rates on our variable debt were to decrease/increase by 200 basis points, and all other variables were to hold constant, our interest expense on our variable rate debt for the fiscal year ended December 31, 2016 would decrease/increase approximately Ps.129.3 million.   Interest rate risk amounts were determined by considering the impact of hypothetical interest rates on our financial instruments.  These analyses do not consider the effect of any change in overall economic activity that could occur in that environment.  Further, in the event of a change of that magnitude, we may take actions to further mitigate our exposure to the change.  However, due to the uncertainty of the specific actions that would be taken and their possible effects, these analyses assume no changes in our financial structure.

We conduct transactions denominated in U.S. Dollars. Additionally, we have outstanding debt in U.S. Dollars incurred in connection with the issuance of the USD Notes and assumed in connection with certain acquisitions.   Therefore, we are exposed to changes in exchange rates between the Mexican Peso and the U.S. Dollar. We believe foreign currency risk is naturally hedged by U.S. Dollar-denominated revenues.

If exchange rates had been two Mexican Pesos per U.S. Dollar higher or lower and all other variables were held constant, our net income for the year ended December 31, 2016 would have decreased or increased by Ps.3.7 billion, in each case partially offset by US$592 million as a result of our foreign exchange hedges.

***Contractual Obligations***

*Borrowings*

As of June 30, 2017 and December 31, 2016, 2015 and 2014, interest amounts payable in future periods, based on the terms of our outstanding loan agreements, totaled approximately Ps.44.9 billion, Ps.50.8 billion, Ps.30.5 billion and Ps.21.0 billion, respectively.

*Capital lease agreements*

We own the leasing rights to Plaza Central pursuant to an agreement with *Fideicomiso para la Construcción y Operación de la Central de Abasto de la Ciudad de México*, or FICEDA, a trust created for the construction and operation of a wholesale distribution center in Mexico City, to use, develop and lease the property, and to receive all of the lease revenue in respect of the leases for the property, until December 2055. In accordance with the terms of the agreement, we are required to distribute 10% of the gross revenues accruing from our commercial use of the property to FICEDA.

We own the right to operate and collect lease revenues from the Punto Langosta shopping center located in a maritime terminal and port until October 6, 2023. In accordance with the terms of the agreement, we are required to distribute 2.5% of the gross revenues arising from our commercial use of the property to the *Administración Portuaria Integral de Quintana Roo*, the port authority.

**INDUSTRY OVERVIEW**

Information contained in this section has been included with the authorization of Colliers International and Jones Lang LaSalle.

**Retail Real Estate Market**

During 2016, total sales floor in shopping centers with more than 10,000 $m^2$ of GLA increased by more than 770,000 $m^2$, 15% (120,000 $m^2$) of which were expansions on existing malls. The Metropolitan Area showed the largest number of new shopping centers. Consolidated occupancy rate was 94% for this market. The retail segment continued to strengthen, and demand for new spaces has been mainly driven by the restaurant, fashion and health sectors.

In addition, as of December 31, 2016, there were approximately 2.5 million $m^2$ of retail property under construction in 58 projects, and more than 1.2 million $m^2$ in 81 buildings were in the project stage. It is expected that inventory under construction will become operational within the next three years.





Source: Colliers International

As of December 31, 2016, shopping center inventory in Mexico totaled 638 properties, with a leasable area over 20.2 million $m^2$ within the 7 areas of the country: Center, Metropolitan, North, Northeast, Northwest, Southeast and Southwest. The Metropolitan area included 6.2 million $m^2$, which represented 31% of the total leasable area, followed by the Central area with 5.9 million $m^2$, which represented 29% of the total leasable area. Power Centers and Fashion Malls comprised the largest inventory share with 38% and 33%, respectively (7.7 million $m^2$ and 6.6 million $m^2$), of the total leasable area.

The State of Mexico reported the largest leasable area, which is indicative of the large population concentrated in the state: 15 million people. The growth rate of shopping centers has decreased across the country, mainly due to the lack of land in the main cities.



Inventory of Shopping Centers per Area.

Source: Colliers International

During the second semester of 2016, nine shopping centers with a leasable area of over 10,000 $m^2$ became operational, totaling 299,000 $m^2$ of new space. Two properties also increased their leasable area by 88,000 $m^2$, totaling 387,000 $m^2$ of new space during such semester.



Source: Colliers International

As of December 31, 2016, new shopping centers were focusing on mixed-use real estate in which visitors have access to a broad selection of products and entertainment options. As a result, we believe that shopping centers featuring self-service stores as anchors (Power Centers, Community Centers and Neighborhood Centers) are reaching a saturation point, and developers are turning their attention to Fashion Malls with self-service and entertainment components, a trend that is being seen in the main cities of the country.

The increase in density in cities has contributed in a large scale to real estate under development focusing on mixed-use, mega-projects, which combine shopping centers with corporate, housing or lodging.

As of December 31, 2016, vertical developments were becoming an attractive resource for developers that build in high density areas such as Mexico City, Guadalajara and Monterrey, driven by high land prices, for which project densities are being increased.

Existing consolidated shopping centers have found an organic way to continue attracting visitors through expansions and renovations. Mundo E and Parque Delta are clear examples of this. Paseo Interlomas and Plaza Satélite are currently in process of expanding and renovating.

As of December 31, 2016, the market showed an occupancy rate of 94%, which was driven by demand that has been increasing in recent years. Outlet Centers had the highest occupancy rate with 98%, followed by Fashion Malls and Power Centers, with a 96% and 95% occupancy rate, respectively. The retail market has maintained an average occupancy of around 93% over the last 3 years.





Source: Colliers International

As of December 31, 2016, average rent prices in shopping centers varied as follows (data in Pesos per square meter per month): rent prices in: (i) Power Center increased from Ps.200 to Ps.400; (ii) Fashion Malls increased from Ps.600 to Ps.1,300; (iii) Community Centers increased from Ps.200 to Ps.400; (iv) Neighborhood Centers increased from Ps.260 to Ps.400; (v) Entertainment Centers increased from Ps.270 to Ps.600; (vi) Lifestyle Centers increased from Ps.280 to Ps.420; and (vii) Outlet Centers increased from Ps.350 to Ps.550.





Source: Colliers International

*Trends*

There has also been an increase in the number of mega-projects with mixed-use properties that combine retail, corporate, services and entertainment options in one area.

There has also been an increase in hybrid projects that combine a self-service store with a Fashion Mall.

The Mexican market presents a great opportunity for new brands, both local and foreign, seeking to establish themselves in Mexico.

Modal Transfer Centers (CETRAMs) contribute to the advancement of road management, transportation, security and aesthetics. Established CETRAMs have been successful by placing different types of services and entertainment, which is attractive for public transportation users and other visitors.

Another type of project that is gaining traction is under-bridges. Under-bridges are underutilized spaces that are considered to be high risk. The purpose of these projects is to optimize the public spaces and to complement them by offering retail and service options, which are currently being promoted by Mexico City's government as consumer and recreation centers.



Source: Colliers International

**Office Real Estate Market**

The bulk of the office market in Mexico is located in Mexico City and Monterrey.  Currently, Mexico City represents 83% of the Class A+, A, and B office inventory, whereas Monterrey represents approximately 14% of such office inventory.  The rest of the inventory is divided among several other cities, including Guadalajara.

At the end of 2016, Class A+, A, and B office inventory in Mexico City totaled 8.6 million square meters with an occupancy rate of 88.9% and was divided among 10 strips.  Such inventory showed a growth of 6.7%, compared to 2015, and a net absorption rate of 450,000 m$^2$.

At the end of 2016, Monterrey had an inventory of 1.3 million square meters of Class A+, A, and B office space with an occupancy rate of 86%, which represented an increase of 400 bps, compared to 2015, which was 82%.  The office market in Monterrey is divided in 8 strips.



Source: Colliers International

In Mexico City, the vacancy rate has remained stable, an indication that the market was capable of absorbing the real estate that came into the market during 2016. As of December 31, 2016, the strips with the most vacancy are North, Polanco, and Reforma, with 289,000 m$^2$, 137,000 m$^2$, and 130,000 m$^2$ of vacant space, respectively.

With respect to buildings under construction, as of December 31, 2016, there were 88 properties in Mexico City, which represents 1.6 million square meters that will become operational between 2017 and 2019. Moreover, in Monterrey there are 5 buildings with 66,000 m$^2$ that will commence operations in 2017.

In 2016, demand in Mexico City totaled 950,000 m$^2$ of sale and leasing in all categories over the 10 strips, which represents an increase of 6.1% compared to 2015.  The greatest amount of activity was in the Reforma, Periférico Sur and Insurgentes strips, with 186,000 m$^2$, 167,000 m$^2$, and 119,000 m$^2$, respectively.



Source: Colliers International

The amount of square meters sold at the end of 2016 was 458,000 m$^2$, an increase of 33% from 2015.

In Mexico City, weighted average monthly rent prices per square meter for Class A+, A, and B office space were US$25, US$24, and US$17, respectively.  In the Reforma, Polanco and Lomas-Palmas strips, prices ranged from US$30 to US$34, US$27 to US$29, and US$19 to US$29, respectively.  Prices in the Bosques, Interlomas, Insurgentes, Santa Fe, Periférico Sur, Lomas Altas and Norte strips ranged from US$20 to US$30 for Class A+, US$15 to US$29 for Class A, and US$9 to US$21 for Class B.

In Monterrey, monthly rent prices per square meter for Class A+, A, and B office space ranged from Ps.290 to Ps.590, Ps.221 to Ps.400, and US$150 to Ps.350, respectively.

In general, good absorption rates have been observed in both cities.

**Industrial Real Estate Market**

The industrial real estate market grew substantially in 2016.  Class A industrial space inventory totaled 68.3 million square meters nationwide at the end of the year, which represents an increase of 8%, compared to 2015.  The sub-markets that showed the greatest growth were Queretaro, San Luis Potosi, Puebla, Saltillo, Mexico City and Chihuahua.  Net sales for the year in Mexico City alone totaled over 957,000 m$^2$, while the net sales for the country totaled 5.5 million square meters, which represents twice the annual sale average from 2007 to 2014. The national occupancy rate remained at 94.5%.  The largest sub-markets were Monterrey, Mexico City and Ciudad Juarez, with approximately a 34% of total inventory.

According to a research report from Jones Lang La Salle, the current perception in the market is that demand continues to be aggressive and that real estate developers are not able to keep up with demand.  For example, occupancy in Mexico City increased from 94.2% to 97.2% in 2016, which suggests that there is a scarcity of land to continue to develop additional industrial spaces.

As depicted below, the industrial market in Mexico as of December 31, 2016, is divided into three regions: Bajio, Central and North, which are further sub-divided into 18 sub-markets.

| Sub-Market | Inventory (m$^2$) | Vacancy (m$^2$) | Net Annual Absorption (m$^2$) | Occupancy | Price per m$^2$ per month (US$) | Growth | New Deliveries (m$^2$) |
|---|---|---|---|---|---|---|---|
| Aguascalientes | 2,094,514 | 37,210 | 150,297 | 98.2% | $3.55 | 4.3% | 138,482 |
| Guadalajara | 3,841,910 | 248,751 | 593,812 | 93.5% | $4.09 | 0.0% | 87,429 |
| Guanajuato | 5,155,927 | 284,093 | 504,541 | 94.5% | $4.20 | 5.8% | 335,579 |
| Queretaro | 5,050,580 | 375,260 | 749,471 | 92.6% | $4.09 | 27.9% | 1,487,321 |
| San Luis Potosi | 3,035,453 | 160,632 | 398,883 | 94.7% | $4.09 | 18.9% | 807,053 |
| **Bajio Region** | **19,178,384** | **1,105,946** | **2,397,004** | **94.2%** | **$4.00** | **14.9%** | **2,855,864** |
| Mexico City | 7,351,712 | 205,763 | 957,115 | 97.2% | $4.95 | 2.6% | 450,228 |
| Puebla | 2,544,409 | 117,519 | 253,275 | 95.4% | $4.09 | 3.5% | 847,571 |
| Toluca | 3,143,515 | 86,365 | 103,440 | 97.3% | $4.38 | 0.0% | 0 |
| **Central Region** | **13,039,636** | **409,647** | **1,313,830** | **96.9%** | **$4.47** | **10.0%** | **1,297,799** |
| Chihuahua | 2,159,678 | 56,718 | 53,325 | 97.4% | $3.88 | 16.2% | 350,918 |
| Ciudad Juarez | 6,035,754 | 459,182 | 201,831 | 92.4% | $4.09 | 1.3% | 83,624 |
| Matamoros | 1,670,122 | 160,611 | 15,206 | 90.4% | $4.49 | 0.1% | 931 |
| Mexicali | 2,243,608 | 128,776 | 101,621 | 94.3% | $4.20 | 1.5% | 37,161 |
| Monterrey | 9,773,811 | 701,984 | 678,035 | 92.8% | $4.30 | 1.6% | 208,497 |
| Nogales | 1,112,108 | 65,775 | 54,347 | 94.1% | $3.66 | 7.1% | 78,967 |
| Nuevo Laredo | 888,211 | 65,735 | 73,955 | 92.6% | $3.50 | 4.8% | 42,296 |
| Reynosa | 3,021,053 | 247,798 | 199,132 | 91.8% | $4.00 | 1.1% | 34,286 |
| Saltillo/Ramos Arizpe | 3,447,309 | 170,642 | 122,534 | 95.0% | $4.10 | 7.1% | 589,061 |
| Tijuana | 5,793,433 | 156,666 | 255,354 | 97.3% | $4.74 | 2.1% | 124,161 |

| Sub-Market | Inventory (m²) | Vacancy (m²) | Net Annual Absorption (m²) | Occupancy | Price per m² per month (US$) | Growth | New Deliveries (m²) |
|---|---|---|---|---|---|---|---|
| North Region | 36,145,087 | 2,213,887 | 1,755,340 | 93.9% | $4.23 | 4.9% | 1,549,902 |
| National Total | 68,363,107 | 3,729,480 | 5,466,174 | 94.5% | $4.19 | 8.3% | 5,703,565 |



Source: Jones Lang LaSalle

# ABOUT FIBRAS

**General**

A "FIBRA" is an investment vehicle dedicated to the acquisition and development of real estate in Mexico intended for leasing (and possible subsequent sale) or the acquisition of the right to receive lease revenue from real estate or to provide financing for such purposes using real estate as collateral. A FIBRA has similarities to a real estate investment trust, or REIT, in the United States, as described below. In accordance with Mexican law, a FIBRA must be established by contract as a trust and is the vehicle for issuing the CBFIs.

The introduction of FIBRAs in Mexico, and the establishment of the tax regime applicable to FIBRAs in 2004, as an investment vehicle (through the securities it issues) represents a new kind of security available to investors (both individuals and entities). The legal structure of a FIBRA is due to certain reforms enacted over the past several years to (i) various provisions of the Mexican tax laws and regulations, (ii) operating, trading and other Mexican regulations, (iii) the investment regime of the Mexican pension fund administrators (*Administradoras de Fondos para el Retiro*, or *AFORES*) permitting the investment in FIBRAs by Mexican pension funds, and (iv) annual tax regulations issued by the Ministry of Tax (*misceláneas fiscales*).

## Comparison of Certain Aspects of FIBRAs and REITs

The rules and regulations governing FIBRAs under Mexican law have similar, as well as certain analogous, but nonetheless different, characteristics with the rules and regulations governing REITs under U.S. federal income tax law. The table below highlights some of these principal differences:

|  | **Mexican FIBRAS** | **U.S. REITs** |
|---|---|---|
| **Distributions**.................................... | • Must distribute at least 95% of net taxable income to investors annually. | • Must distribute at least 90% of net taxable income, with certain adjustments, to investors annually. |
| **Investment Focus**........................... | • Must invest at least 70% of total assets in real estate or rights derived from it. | • Must invest at least 75% of total assets in real estate assets (including equity and debt), government securities and cash. |
|  | • Real estate must be leased or held for lease, unless it is in process of being developed. | • Must derive at least 75% of gross income from certain real estate related sources, and must derive at least 95% of gross income from such real estate related sources, and other sources of passive income. |
|  |  | • Subject to 100% penalty tax on sales of property "primarily held for sale to customers in the ordinary course of business." |
| **Other Considerations**................... | • Properties must be held by the FIBRA and not be sold for at least four years after completion of development or acquisition (if fully developed) in order to retain tax benefits regarding that | • Not more than 25% of assets may consist of stock in taxable REIT subsidiaries, or TRSs. |

| **Mexican FIBRAs** | **U.S. REITs** |
| --- | --- |
| property. | |
| • Mexican resident individuals without business activity are exempt from income tax on the sale of FIBRA-related CBFIs or shares insofar as the corresponding sale is made through the Mexican Stock Exchange or a recognized market, as defined by the Mexican Income Tax Law. | • Non-U.S. holders of REIT shares are generally subject to U.S. federal withholding tax on dividends from a REIT at a 30% rate, subject to reduction under an applicable income tax treaty. |
| • Non-Mexican holders of CBFIs are generally subject to Mexican withholding tax on distributions in respect of a FIBRA's net taxable income at a rate of 30%, subject to reduction or exemption for certain classes of investors. | • Non-U.S. holders of publicly traded REIT shares generally are not subject to U.S. federal income and withholding tax on sales of such shares. |
| • Non-Mexican holders of CBFIs are generally not subject to Mexican income or withholding tax on sales of CBFIs, provided such sales are through the Mexican Stock Exchange or a recognized market, as defined in the Mexican Income Tax Law. | |

**Main Benefits of an Investment in a FIBRA Relative to Certain Other Investments**

The main benefits of an investment in a FIBRA (relative to other investments) are:

- the potential for a high return on investment (on a cash basis) relative to other investments due to the requirement for distribution of 95% of net taxable income, and the potential for capital appreciation of CBFIs commensurate with increases in the value of the real properties held by the FIBRA;

- access to the Mexican real estate market as an investment option through a security that can be traded easily and has readily identifiable market price;

- broader diversification with respect to geographic exposure, property types and number of tenants for investors seeking to invest in the Mexican real estate market or generally for an investor's investment portfolio;

- FIBRAs may serve as a vehicle to attract foreign investment into Mexico; and

- applicable tax benefits.

FIBRAs encourage the development of the Mexican real estate market by providing a vehicle through which institutional and retail investors can access this market, by serving as a source of liquidity for developers and investors, and by contributing to the diversification of real estate risks for investors.

We believe that a FIBRA that is traded on the Mexican Stock Exchange has several benefits under Mexican tax law, such as not being subject to income tax for some investors, and exempting its investors who qualify as exempted investors under Mexican tax laws (such as individuals who reside in Mexico, tax-exempt entities or non-Mexican persons) from being subject to taxes with respect to secondary market transactions involving CBFIs.  For more detailed information, see "Taxation—Certain Mexican Federal Income Tax Considerations."

## BUSINESS AND PROPERTIES

**Overview**

We are a Mexican FIBRA that acquires, owns, develops, constructs, leases and operates a broad range of real estate properties in Mexico, including industrial, retail and office properties. As of June 30, 2017, we were the largest public real estate company in Mexico in terms of number of properties, GLA, annual revenues and market capitalization, and we believe that our portfolio represents the largest and highest quality portfolio of industrial, retail and office properties in Mexico. Our objective is to generate value for our investors, mainly through the appreciation of our real estate properties and the generation of stable cash flows.  We seek to achieve this objective by pursuing strategies focused on maintaining a diversified portfolio, high occupancy levels, competitive rents, high-quality properties at premium locations, and long-term relationships with our tenants.

We are formed as a Mexican trust and conduct our operations so as to qualify as a FIBRA for tax purposes under Articles 187 and 188 of the Mexican Federal Income Tax Law (*Ley del Impuesto Sobre la Renta*), or the Mexican Income Tax Law. In order to qualify as a FIBRA for tax purposes, we must distribute annually at least 95% of our net taxable income and at least 70% of our assets must be invested in real estate held for lease, among other requirements. For a detailed description of FIBRAs, see "About FIBRAs."

**Properties**

Since our initial public offering in March 2011, we have grown our initial portfolio consisting of 17 properties, comprising 0.7 million m² of GLA that we acquired in our formation transaction, or our Initial Portfolio, to a portfolio that included, as of June 30, 2017: (i) 499 stabilized properties, or our Stabilized Portfolio, (ii) seven properties in various stages of development or expansion, or our Development Portfolio, and (iii) one property, or our JV Development Portfolio, comprising almost all of the properties formerly known as the Buffalo Portfolio and the Colorado Portfolio which we contributed in 2016 to a joint venture with Helios, a Mexican real estate development vehicle that we created in 2015.  As of June 30, 2017, our Stabilized Portfolio included 521 operating units (325 retail, 106 industrial and 90 office), comprising 7.7 million m² of GLA (3.0 million m² of retail, 3.8 million m² of industrial and 0.9 million m² of office). We expect that, upon completion, our Development Portfolio will add approximately 452,858 m² of GLA to our Stabilized Portfolio.

Our portfolio is diversified by asset type, geography and tenant base, providing investors with exposure to a broad range of properties throughout Mexico. Our portfolio is located in 31 Mexican states (*i.e.,* all states except Zacatecas). The properties in our portfolio are primarily situated in convenient locations, on or near main freeways and primary avenues, in markets that have generally exhibited favorable demographic trends such as strong population and income growth. As of June 30, 2017, our Stabilized Portfolio had an occupancy rate of approximately 93.7% based on GLA, and included:

- 325 retail operating units with an aggregate of approximately 3.0 million m$^2$ of GLA (38.8% of our Stabilized Portfolio), with an occupancy rate of approximately 93.3% based on GLA.

- 106 industrial operating units with an aggregate of approximately 3.8 million m$^2$ of GLA (49.6% of our Stabilized Portfolio), with an occupancy rate of approximately 95.3% based on GLA.

- 90 office operating units with an aggregate of approximately 0.9 million m$^2$ of GLA (11.6% of our Stabilized Portfolio), with an occupancy rate of approximately 88.3% based on GLA.

Our Development Portfolio is comprised of seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  Our Development Portfolio includes four properties portions of which, amounting to approximately 89,960 m² of GLA (1.2% of our Stabilized Portfolio), have already been developed and leased, or are available to be leased.  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As of June 30, 2017, our Development Portfolio included:

- Two retail properties that we expect, upon completion, will comprise approximately 113,806 m$^2$ of GLA;

- One industrial property that we expect, upon completion, will comprise approximately 48,052 m$^2$ of GLA;

- Two office properties that we expect, upon completion, will comprise approximately 114,000 m$^2$ of GLA; and

- Two mixed-use properties that we expect, upon completion, will comprise approximately 177,000 m$^2$ of GLA.

Our JV Development Portfolio consists of a mixed-use development, project Mitikah, located at the southern end of Mexico City that comprises properties formerly known as the Buffalo Portfolio and the Colorado Portfolio (which are properties that we acquired for Ps.4,246 million), both of which (with the only exception of Espacio Churubusco, a commercial mall in Mexico City that we acquired as part of the Buffalo Portfolio and remains in our Stabilized Portfolio) we contributed in 2016 to our joint venture with Helios, a Mexican real estate development vehicle created in 2015 and managed by our wholly-owned F1 Management Subsidiary. The joint venture project will have an investment of approximately Ps.20 billion and is expected, upon completion, to comprise approximately 113,876 m$^2$ of retail space (including a hotel), 212,213 m$^2$ of office space and 84,890 m$^2$ of residential areas. The office and retail properties are expected to generate an estimated annual NOI of Ps.1,767 million (Ps.651 million for retail and Ps.1,116 million for office, assuming an average rent price per square meter of Ps.574 and Ps.455, respectively). Mitikah includes a residential area that is being developed exclusively by our partner in the joint venture and in which we will have no participation. Currently, the joint venture project Mitikah is 37% and 14% pre-leased for the retail and office spaces, respectively. While Project Mitikah is in construction, we will not receive any rental income from the property that formerly comprised the Colorado Portfolio (an annual revenue loss of approximately Ps.515 million, estimated on the basis of the annual potential rental income *minus* notional interest related to the cost of acquisition of the Colorado Portfolio).

As of June 30, 2017, we had independent lease agreements with approximately 2,800 tenants in a wide range of industries, including the industrial, retail, corporate and government sectors. As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio. Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio. However, no other tenant accounted for more than 3.6% of the occupied GLA of our portfolio or 3.9% of the ABR attributable to our portfolio. We believe that the size and diversity of our tenant base will help minimize our exposure to economic fluctuations in any one industry or economic sector or with respect to any single tenant. We believe the properties in our portfolio are also distinguished by the quality of our tenants, which include some of the leading companies in Mexico and in their respective industries, as well as international companies with a presence in Mexico.

As of June 30, 2017, the average remaining term of our leases, by GLA, was approximately 4.4 years, excluding statutory leases (defined below). On a sector-by-sector basis, the average remaining term of our leases, by GLA, for our retail, industrial and office properties was approximately 5.6, 3.7 and 3.5 years, respectively, in each case excluding statutory leases.

The lease agreements with certain of our tenants have expired and have not been formally renewed. Instead, under the local laws of the Mexican state in which an applicable property is located, generally these tenants are permitted to continue to occupy the property pursuant to the terms of the most recently expired lease agreement, including obligations to pay rent in the same amounts and with the same frequency. We refer to these arrangements as statutory leases. The notice period for termination by us of a statutory lease depends on the laws of the state in Mexico in which the property is located. As of June 30, 2017, approximately 7.5% of the occupied GLA of our portfolio, or 536,978 m² of GLA, was subject to statutory leases, accounting for approximately 14.0% of our ABR, which provides us with the flexibility to negotiate new leases and to potentially increase rental rates where market conditions permit.

Substantially all our leases contain automatic inflation adjustment provisions with respect to base rent. As of June 30, 2017, 74.1% of our ABR was payable in Mexican Pesos and 25.9% of our ABR was payable in U.S. Dollars.

*Our Stabilized Portfolio*

The following table sets forth information with respect to our Stabilized Portfolio as of June 30, 2017, 2016 and 2015 and as of December 31, 2016, 2015 and 2014:

| | June 30, | | | December 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2016 | 2015 | 2014 |
| **Retail:** [1] | | | | | | |
| Number of properties | 309 | 307 | 302 | 309 | 306 | 272 |
| Number of operating units | 325 | 323 | 312 | 325 | 321 | 277 |
| GLA (*m²*) | 2,970,513 | 2,939,856 | 2,749,358 | 2,954,328 | 2,856,981 | 2,164,835 |
| Percentage of total GLA (*m²*) | 38.8% | 40.9% | 41.2% | 40.1% | 40.4% | 36.4% |
| Occupancy rate as percentage of total GLA | 93.3% | 93.6% | 93.0% | 93.6% | 93.2% | 94.9% |
| ABR (*Ps.in million*) | 6,029.0 | 5,728.4 | 5,157.1 | 5,993.5 | 5,429.8 | 3,871.6 |
| Percentage of total ABR | 48.8% | 51.4% | 52.3% | 48.7% | 49.6% | 48.2% |
| Monthly rent per m² of occupied GLA (*Ps.*) | 181.37 | 173.49 | 168.14 | 180.7 | 169.9 | 157.2 |
| **Industrial:** [2] | | | | | | |
| Number of properties | 105 | 103 | 99 | 104 | 101 | 100 |
| Number of operating units | 106 | 104 | 101 | 105 | 102 | 102 |
| GLA (*m²*) | 3,802,881 | 3,458,662 | 3,217,207 | 3,570,278 | 3,400,690 | 3,136,000 |
| Percentage of total GLA (*m²*) | 49.6% | 48.1% | 48.2% | 48.4% | 48.0% | 52.7% |
| Occupancy rate as percentage of total GL | 95.3% | 94.7% | 96.2% | 96.5% | 96.9% | 96.4% |
| ABR (*Ps. in million*) | 3,259.1 | 2,896.4 | 2,553.7 | 3,199.4 | 2,810.3 | 2,382.7 |
| Percentage of total ABR | 26.4% | 26.0% | 25.9% | 26.0% | 25.7% | 29.6% |
| Monthly rent per m² of occupied GLA (*Ps.*) | 74.92 | 73.67 | 68.73 | 77.36 | 71.1 | 65.7 |
| **Office:** [3] [4] | | | | | | |
| Number of properties | 85 | 83 | 74 | 84 | 81 | 72 |
| Number of operating units | 90 | 88 | 80 | 89 | 86 | 76 |
| GLA (*m²*) | 891,902 | 792,896 | 703,373 | 845,330 | 821,604 | 650,406 |
| Percentage of total GLA (*m²*) | 11.6% | 11.0% | 10.5% | 11.5% | 11.6% | 10.9% |
| Occupancy rate as percentage of total GL | 88.3% | 90.2% | 91.0% | 88.2% | 92.9% | 91.3% |
| ABR (*Ps. in million*) | 3,076.3 | 2,519.6 | 2,154.6 | 3,101.4 | 2,702.4 | 1,789.0 |
| Percentage of total ABR | 24.9% | 22.6% | 21.8% | 25.2% | 24.7% | 22.2% |
| Monthly rent per m² of occupied GLA (*Ps.*) | 325.44 | 293.67 | 280.51 | 342.64 | 294.9 | 283.5 |
| **Total:** | | | | | | |
| Number of properties | 499 | 493 | 475 | 497 | 488 | 444 |
| Number of operating units | 521 | 515 | 493 | 519 | 509 | 455 |
| GLA (*m²*) | 7,665,296 | 7,191,414 | 6,669,938 | 7,369,935 | 7,079,274 | 5,951,240 |
| Occupancy rate as percentage of total GL | 93.7% | 93.8% | 94.3% | 94.4% | 95.0% | 95.3% |
| ABR (*Ps. in million*) | 12,364.4 | 11,144.3 | 9,865.4 | 12,294.3 | 10,942.5 | 8,046.3 |
| Monthly rent per m² of occupied GLA (*Ps.*) | 143.45 | 137.73 | 130.65 | 147.29 | 135.7 | 121.7 |

[1]   Includes properties leased to operate as hotels, which as of June 30, 2017, 2016 and 2015 represented, respectively, 2.1%, 2.0% and 1.46% of our total ABR, and as of December 31, 2016, 2015 and 2014 represented, respectively, 2.7%, 2.7% and 5.5% of our total ABR.

[2]   Includes properties leased to operate as hotels, which as of June 30, 2017, 2016 and 2015 represented, respectively, 0.2%, 0.3% and 0.07% of our total ABR, and as of December 31, 2016, 2015 and 2014 represented, respectively, 0.2%, 0.3% and 0.3% of our total ABR.

[3]   Includes properties leased to operate as hotels, which as of June 30, 2017, 2016 and 2015 represented, respectively, 1.0%, 1.2% and 0.33% of our total ABR, and as of December 31, 2016, 2015 and 2014 represented, respectively, 0.9%, 1.2% and 3.6% of our total ABR.

(4)   Office GLA includes 100% of the leasable areas of Torre Mayor and, for December 31, 2016 and June 30, 2017, of Torre Diana and Torre Reforma Latino.  In the computation of office ABR as of December 31, 2014 and 2015, and as of June 30, 2015 and 2016, only 49% of the rents of Torre Mayor were included.

The following table sets forth information with respect to the lease expirations of the properties in our Stabilized Portfolio as of December 31, 2016 and June 30, 2017, assuming the tenants do not exercise their renewal option, if any, which may include contractually agreed upon renewal options and, a statutory right to retain possession of a property after the expiration of a lease applicable under the local laws of the Mexican state in which the property is located:

| Year[1] | GLA[2] of Expiring Leases ($m^2$) | | % of Total GLA[2] of Expiring Leases | | ABR[3] of Leases Expiring within the Year (Ps.in millions) | | % of Total ABR of Leases Expiring within the Year | | Monthly rent (Ps.) per square meter of occupied GLA[4] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 |
| 2017 ........................... | 879,270 | 486,470 | 12.6 | 6.8 | 1,658.9 | 938.2 | 13.5 | 7.6 | 157.2 | 160.7 |
| 2018 ........................... | 1,036,440 | 1,055,228 | 14.9 | 14.7 | 1,677.7 | 1,738.8 | 13.6 | 14.1 | 134.9 | 137.3 |
| 2019 ........................... | 813,092 | 883,139 | 11.7 | 12.3 | 1,305.8 | 1,451.3 | 10.6 | 11.7 | 133.8 | 136.9 |
| 2020 ........................... | 673,566 | 851,232 | 9.7 | 11.9 | 1,203.6 | 1,379.7 | 9.8 | 11.2 | 148.9 | 135.1 |
| 2021 and thereafter ..... | 2,907,726 | 3,369,864 | 41.8 | 46.9 | 4,503.8 | 5,127.6 | 36.6 | 41.5 | 129.1 | 126.8 |
| Statutory Leases[5]........ | 645,903 | 536,978 | 9.3 | 7.5 | 1,944.4 | 1,728.8 | 15.8 | 14.0 | 250.9 | 268.3 |
| **Total** ........................... | **6,955,997** | **7,182,911** | **100.0** | **100.0** | **12,294.3** | **12,364.4** | **100.0%** | **100.0%** | **147.3** | **143.4** |

(1)   Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

(2)   Refers to m² of occupied GLA.

(3)   ABR refers to the monthly base rent as of December 31, 2016 and June 30, 2017, respectively, multiplied by 12.

(4)   To calculate the monthly rent per square meter of occupied GLA, we include 100% of the occupied GLA of Torre Mayor, Torre Diana and Torre Reforma Latino.

(5)   Lease agreements that have expired but continue to pay rent.

*Announced Potential Acquisitions*

On September 8, 2016 and on November 16, 2016 we announced the potential acquisitions of the portfolios "Turbo" and "Apolo II" through the press releases attached hereto as Appendix B. We currently do not have binding agreements in connection with the acquisition of the "Turbo" and "Apolo II" Portfolios. As a result, there is no certainty as to whether these acquisitions will take place and whether the proceeds of the global offering will be utilized for such purpose.

## Market Opportunity

We believe we are well positioned to identify and take advantage of opportunities in the Mexican real estate market that we expect to arise as the Mexican economy continues to expand. From a macroeconomic perspective, we believe that Mexico will continue to enjoy stability, which has provided and will continue to provide us with diverse alternatives to fund our growth. We also believe that the projected demographic dynamics that are driving the growth of the economically active segments of the population in Mexico will continue fueling consumer demand in cities and regions where availability of suitable commercial properties is low and where, as the members of our senior management team have done in the past, we will be able to continue investing resources to develop and acquire value-oriented assets.

The competitive advantages that we believe differentiate us from other FIBRAs in Mexico are built not only on the many years of experience of our senior management team, but also from our position as market leaders and innovators. We believe our business platform efficiently responds to real estate market fundamentals, whether

they are related to the macroeconomic environment, the dynamics of the global real estate market or local market structures.

| **Real Estate Market Fundamentals** | | | **Our Capabilities** | |
|---|---|---|---|---|
| **Economic Stability** ..... | Mexico's fiscal and monetary policies as well as a sound banking and financial system have provided solid stability in the Mexican real estate market and access to long-term financing. | » | **Access to Capital** ...... | Our capacity for executing our business plan provides us with access to both equity and debt capital markets and has enabled, and we believe will continue to enable, us to obtain additional financing at a competitive cost. |
| **Demographics** ............ | Mexico's demographic transition towards a more economically active population base is fueling consumer demand. | » | **Target Markets** ......... | Part of our investment strategy includes targeting underserved and stabilized markets with growing middle-income populations in Mexico. |
| **Geography** .................. | Mexico continues to be strategically positioned to benefit from global trade, tourism and emerging consumer flows. | » | **Locations** ................... | Our well-located property base provides exposure to the most dynamic trends in the retail, industrial and office segments. |
| **Competition** ................ | Significant local knowledge is required to operate effectively in the Mexican real estate market. | » | **Expertise/Scale** ......... | Our senior management team's combined experience exceeds 200 years and distinguishes us from our competitors. |
| **Investment Opportunities** ............ | Relatively fragmented markets with limited access to capital may trigger the opportunity to acquire high quality assets | » | **Sourcing Capabilities** ............... | Our senior management team has a proven track record of sourcing and consummating successful acquisitions in various sectors, including the retail, industrial and office segments and across Mexican cities. |
| **Relative Scarcity** ........ | Investors seeking to allocate funds in the Mexican real estate market are limited by the scarcity of investment vehicles and/or products. | » | **Internal Growth** ....... | We can generate additional cash flow from our portfolio by stabilizing our development properties and by expanding and maximizing the potential income from our stabilized properties. |
| **Potential for Convergence** ............... | Mexican real estate prices and rent levels are below those prevailing in comparable Latin American countries. | » | **Financial Differentiation** ......... | We were the first investment vehicle structured as a FIBRA, and we are the largest and most liquid FIBRA issuing securities in the public market in Mexico |

| Real Estate Market Fundamentals | Our Capabilities |
|---|---|
| | with a large participation of international investors. |

**Our Competitive Strengths**

We believe we have the following competitive strengths:

- ***Large-scale, broadly diversified portfolio with high quality tenants***.  We have the largest real estate portfolio in Mexico and Latin America.  Our portfolio is comprised of high-quality properties generally located in exceptional locations.  Properties in our industrial portfolio are located in the main manufacturing and logistics centers of the country, near the main highways, ports or other connecting infrastructure in Mexico.  Properties in our retail portfolio are located in the cities in Mexico with the highest traffic volume of consumers and visitors.  Our office portfolio includes iconic and hard-to-replace buildings located in the corporate centers of Mexico.  With an average age of 6.3 years, we believe ours is a young portfolio that will not require significant remodeling capital investments during the next few years.  Our portfolio is diversified by currency, asset type, geography, tenant base and lease maturity, which enables us to mitigate currency, geographic, tenant and lease maturity concentration risks while allowing for increased cash-flow stability.  We believe that the diversification of our portfolio by both asset type and geography allows us to benefit from broad growth trends in Mexico without dependence on the performance of any specific industry or any given city or regional economy in Mexico.  We believe that our properties are also distinguished by the quality of our tenants, many of which are among the leading companies in Mexico and in their respective industries, which include, among others, the retail, financial, education and entertainment industries, as well as international companies with a presence in Mexico.  As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio, and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio.  Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio.  However, no other tenant accounted for more than 3.6% of the occupied GLA of our portfolio or 3.9% of the ABR attributable to our portfolio.  We believe the size, diversity and quality of our portfolio enables us to provide tenants with a broad range of real estate solutions to support their business operations, while the diversity of our tenant base protects us against industry-specific market disturbances and our mixture of Peso- and U.S. Dollar-denominated rents affords holders of our CBFIs a measure of protection against foreign exchange fluctuations.  Since our inception, we have maintained high occupancy rates and our solid annual rent increases pursuant to renewal agreements often exceed the inflation-linked increases contemplated by our original lease agreements.  We are uniquely positioned to present existing and prospective tenants with a range of options across property types and geographic locations.  We also believe that the lack of significant lease expirations in any one year will help contribute to the stability of our cash flow.  Our leases have a remaining average life of 4.4 years, which ensures predictability and stability in our cash flows.

- ***Proven market consolidator with the ability to execute our growth strategy and generate value to our CBFI holders***.  We believe we have demonstrated the ability to execute our business plan, which includes a growth strategy based on raising and efficiently deploying significant amounts of capital in a variety of real estate assets that have the capacity to generate income and the potential for capital appreciation. Since our formation, we have become the largest publicly-traded real estate company in Mexico in terms of number of properties, revenues and market capitalization.  Since our formation, we have increased the number of our properties from 13 to 499, and our GLA from 514,750 $m^2$ to 7.7 million square meters.  Our GLA and number of properties have increased consistently year after year since our creation.

At the same time, we have been able to increase the amount of distributions paid to the holders of our CBFIs from an aggregate of Ps.1.0833 per CBFI for the year ended on December 31, 2011, to Ps.1.9831 for the year 2016.  As a result of our proven ability to execute transactions, develop

new projects, create sustainable leasing growth and the relationships of our Advisor's management team, we are capable of generating a substantial flow of business and we have an extensive list of potential property acquisitions.  Because of that, we believe that we have ongoing acquisition opportunities that will result in value generation and income and cash flow growth.

- *Opportunities to continue consolidating the markets in which we are active through attractive acquisitions that deliver further growth*. We intend to continue to expand our portfolio and generate additional cash flow by capitalizing on both internal and external growth opportunities. During 2016, we continued our expansion, completing three portfolio acquisitions for approximately Ps.5.0 billion that comprise approximately 95,231 m² of GLA.  As of June 30, 2017, we were developing or expanding seven properties that we expect, upon completion, will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  Four of these properties include approximately 89,960 m² of GLA that have already been developed and leased, or are available to be leased.  We include these portions of our Development Portfolio in our Stabilized Portfolio.  As our development and expansion projects are completed, we expect to generate additional cash flow from our existing portfolio by leasing the space at market rates.  In addition to organic growth from our existing portfolio, we intend to continue to expand our portfolio through selective acquisitions and developments.  We believe that our reputation as a preferred counterparty, which has been established through our proven ability to execute transactions, has enabled us to generate an extensive pipeline of potential acquisitions and developments from third parties.  In addition, our relationship with our Advisor provides an additional source of attractive potential acquisitions and developments.   We believe that our right of first refusal to acquire future real estate investment opportunities sourced by the Relevant Principals of E-Group and certain properties that are currently majority-owned by the El-Mann Family and the Attié Family, as well as the breadth of relationships our Advisor's senior management team has established throughout the Mexican real estate industry, will continue to generate a steady source of attractive investment opportunities through which we can grow our business. See "—Relationship with E-Group and Certain Related Parties."

- *Solid capital structure*. We believe that we are well-positioned to grow our business due to our growth-oriented, attractive capital structure. Since our initial public offering in 2011, we have demonstrated the ability to access multiple sources of financing. As of June 30, 2017, we had raised an aggregate of Ps.67 billion in equity capital through follow-on offerings of our CBFIs, and Ps.55.9 billion in peso-denominated notes, or Peso Notes, and dollar-denominated notes, or USD Notes.  As of June 30, 2017, we had Ps.6.4 billion in outstanding banking financings, 77.9% of which are mortgage-backed loans and the remaining 22.1% unsecured bank loans.  In addition, as of June 30, 2017, we had Ps.7 billion and US$410 million available under our unsecured revolving dual-currency syndicated committed credit line that expires in 2020, and Ps.500 million (which we have drawn since) under our Ps.1.5 billion unsecured facility with Banco Santander that expires in June 2018.  We have also been able to utilize our CBFIs as acquisition currency to acquire properties in exchange for CBFIs.  As a result of our ability to obtain financing from a broad range of sources, we have been able to grow our business while maintaining what we consider to be a conservative leverage ratio (as measured by total debt to total assets) of 31.6% as of June 30, 2017.  We also believe that our capital structure benefits from debt maturities of up to 30 years. Our liability management strategy has increased the average maturity of our debt from 3.1 years as of September 30, 2013 to 10.8 years as of June 30, 2017. As of June 30, 2017 our outstanding Peso-denominated indebtedness had an average annual cost of 7.43% and our outstanding U.S. Dollar-denominated indebtedness had an average annual cost of 5.87%. As of June 30, 2017, our outstanding indebtedness had an average annual cost of 7.31%, and approximately 70.1% of our total indebtedness was fixed-rate indebtedness, after giving effect to our financial derivatives, which helps reduce our exposure to changes in interest rates, while, after giving effect to our foreign exchange swaps, 40.8% of our total indebtedness was U.S. Dollar-denominated, which is naturally hedged by lease contracts that are denominated in the same currency.  As we grow our business, we believe that our enhanced

access to capital as a public company in Mexico from a variety of different sources and our conservative approach to leverage will continue to provide us with a significant advantage over our competitors in acquiring and developing properties that meet our investment objectives.

- ***Experienced management team***. Our Management Subsidiary's and Advisor's management teams are led by Messrs. André El-Mann Arazi, their Chief Executive Officer and Isidoro Attié Laniado, their Executive Vice President of Strategy and Finance.  Additionally, our Management Subsidiary's management team includes Mr. Gonzalo Pedro Robina Ibarra, its Deputy Chief Executive Officer, and six vice presidents, Gerardo Vargas Ateca, its Vice President of Finance, Javier Elizalde Vélez, its Vice President of Treasury, Ignacio Tortoriello Tortoriello, its Vice President of Administration, Jorge Humberto Pigeon Solórzano, its Vice President of Capital Markets and Investor Relations, Alfonso Arceo Obregón, its Vice President of Commercial Operations and Alejandro Chico Pizarro, its Vice President of Legal Affairs.  See "Management."

## Our Business Objectives and Growth Strategies

Our primary business objectives are to: (i) continue our growth as the leading owner and operator of industrial, retail and office properties in Mexico; (ii) increase our cash flow from our properties; (iii) maintain our properties in optimal condition to preserve their long-term value; and (iv) generate attractive returns mainly through the potential capital appreciation of our properties.  Our business strategy consists of the following principal elements:

- ***Increase our presence in urban markets with high levels of consumption and economic activity***. We will continue to invest in properties and portfolios located in prime locations within urban markets with high levels of consumption and economic activity.  In pursuing this strategy, we target stable markets with in-place infrastructure, robust population and business growth, and household incomes above the national average.  In particular, we intend to continue to expand and consolidate our presence in metropolitan areas such as Mexico City, Toluca, Monterrey, Guadalajara and Cancún, which are areas that have historically exhibited favorable trends in population and income growth.

- ***Target medium-sized metropolitan areas that exhibit high demographic growth where we have the opportunity to provide underserved segments of the population with new entertainment and retail options***.  In addition to continuing to expand our presence in established urban markets, we also intend to pursue opportunities in medium-sized metropolitan areas in Mexico that exhibit high demographic growth where we have the opportunity to provide underserved segments of the population with new entertainment and retail options.  We generally target cities with populations at least between 300,000 and 500,000 inhabitants.  Our Advisor has an established track record of consummating innovative projects in underpenetrated markets in Mexico, and we expect to continue to benefit from its substantial experience and expertise as we execute in these markets.

- ***Continue to source and capitalize on opportunities to acquire assets***. We intend to continue to grow our business by acquiring properties that best meet our acquisition criteria and that will enhance our portfolio.  We will seek to capitalize on the substantial deal flow that our Advisor's senior management team has generated on our behalf.  Many of these opportunities have been and will continue to be sourced from third parties, who we believe have come to view us as a preferred counterparty due to our proven ability to execute transactions.

  Accordingly, we believe we will have numerous opportunities to continue to make accretive acquisitions that will further drive growth in revenues and cash flow.  We seek to utilize our strong balance sheet and liquidity position, as well as our Advisor's in-depth market knowledge and expertise, to execute transactions and capitalize on opportunities.

- ***Capitalize on opportunities to generate additional cash flow from our portfolio***.  In addition to growth through the expansion of our portfolio, we also seek to increase the cash flow from the

properties we currently own.  We seek to capitalize on internal growth opportunities through the following strategies:

- *Development portfolio*.  As our Development Portfolio and JV Development Portfolio are developed, we expect to generate additional revenue by leasing such space at market rates.

- *Rent increases.* Substantially all of our existing lease agreements contain contractual increases in rent that are tied to inflation. As a result, we expect that our rental revenue will continue to grow at least in line with inflation in Mexico through the realization of these contractual increases in rent.

- *Potentially increasing rental rates as current leases expire.* We believe that we can grow the rental revenue from our portfolio by increasing rental rates as current lease agreements with below-market rents expire and by renegotiating new lease agreements at current market rates.

- *Gross leasable area available*. We seek to generate additional rental revenue from our GLA available through the leasing of unoccupied spaces.  As of June 30, 2017, we had approximately 482,386 m² of unoccupied GLA available for leasing that we expect will generate additional rental revenue as tenants for these spaces are identified.

*Maintain relationships with high quality tenants*.  We seek to continue our close relationships with internationally, nationally and regionally recognized tenants by making our commitment to superior tenant service one of our highest priorities.  We believe internationally, nationally and regionally recognized tenants provide more predictable property-level cash flows as they are typically higher credit quality tenants that generate stable revenues. Our tenants include established multinational and domestic companies and range from brand-name retailers to leading manufacturers to government agencies.  We seek to provide our tenants with a broad range of real estate solutions to support their business operations.  Due to the size, diversity and quality of our portfolio, we are able to present tenants with a range of options across asset types and geographic locations.  We also maintain open lines of communication with our tenants so that we can be responsive to their needs and provide a level of service that we believe is superior to other landlords in our markets.  This regular communication also allows us to gain valuable insights with respect to current and future market trends.  Prior to expanding into a particular market, we seek to gauge our current tenants' desire to expand into that area with the goal of obtaining lease commitments in connection with our planned developments.  We believe our focus on tenant relationships not only helps us retain existing tenants, attract new tenants and replace departing tenants quickly and efficiently, but also facilitates our focused growth.

## Our Portfolio

The table below sets forth relevant information with respect to the portfolios in our Stabilized Portfolio as of June 30, 2017, 2016 and 2015:

| | June 30, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2017** | | | **2016** | | | **2015** | | |
| **Portfolio** | **No. Of Properties** | **GLA** *(m²)* | **Occupancy Rate**[(1)] | **No. Of Properties** | **GLA** *(m²)* | **Occupancy Rate**[(1)] | **No. Of Properties** | **GLA** *(m²)* | **Occupancy Rate**[(1)] |
| Initial | 17 | 719,097 | 96% | 17 | 710,278 | 96% | 17 | 705,242 | 95% |
| Azul | 23 | 125,181 | 96% | 23 | 125,681 | 99% | 23 | 125,681 | 98% |
| Rojo | 219 | 173,884 | 97% | 219 | 173,884 | 100% | 219 | 173,884 | 100% |
| Morado | 16 | 537,584 | 91% | 16 | 541,290 | 88% | 16 | 543,451 | 88% |
| Gris | 1 | 77,393 | 100% | 1 | 77,351 | 99% | 1 | 64,335 | 100% |
| Blanco | 1 | | 79% | 1 | | 99% | 1 | 44,641 | 100% |

|  | June 30, | | | | | | | | |
|  | 2017 | | | 2016 | | | 2015 | | |
| Portfolio | No. Of Properties | GLA (m²) | Occupancy Rate[1] | No. Of Properties | GLA (m²) | Occupancy Rate[1] | No. Of Properties | GLA (m²) | Occupancy Rate[1] |
|  |  | 44,871 |  |  | 44,871 |  |  |  |  |
| Villahermosa | 1 | 21,853 | 86% | 1 | 22,450 | 83% | 1 | 22,341 | 87% |
| Verde | 1 | 117,786 | 100% | 1 | 117,786 | 100% | 1 | 118,658 | 100% |
| TM | 1 | 83,971 | 100% | 1 | 83,971 | 100% | 1 | 83,971 | 100% |
| Pace | 2 | 43,593 | 100% | 2 | 43,593 | 100% | 2 | 43,593 | 100% |
| G-30 | 32 | 1,904,130 | 93% | 30 | 1,701,791 | 96% | 27 | 1,548,597 | 97% |
| UAG | 1 | 163,000 | 100% | 1 | 163,000 | 100% | 1 | 163,000 | 100% |
| Vermont | 34 | 524,297 | 92% | 34 | 521,099 | 92% | 34 | 524,586 | 98% |
| Apolo | 46 | 895,953 | 95% | 45 | 879,080 | 95% | 45 | 881,323 | 94% |
| P12 | 10 | 91,868 | 84% | 10 | 91,118 | 83% | 10 | 91,907 | 94% |
| Parque Empresarial Cancún | 1 | 18,000 | 100% | 1 | 18,000 | 100% | 1 | 18,000 | 100% |
| Reforma 155 | 1 | 5,038 | 100% | 1 | 4,835 | 61% | 1 | 4,815 | 0% |
| Maine | 6 | 152,926 | 93% | 6 | 152,637 | 88% | 6 | 152,841 | 99% |
| California | 29 | 349,307 | 91% | 29 | 348,394 | 87% | 29 | 345,475 | 85% |
| La Viga | 1 | 31,323 | 100% | 1 | 22,538 | 73% | 1 | 22,538 | 73% |
| R15 | 3 | 176,215 | 92% | 3 | 174,955 | 93% | 2 | 79,414 | 85% |
| Corporativo San Mateo | 1 | 5,440 | 100% | 1 | 5,440 | 100% | 1 | 5,440 | 100% |
| Hotel Centro Histórico | 1 | 40,000 | 100% | 1 | 40,000 | 100% | 1 | 40,000 | 100% |
| Samara | 1 | 133,772 | 99% | 1 | 133,620 | 97% | 1 | 133,564 | 96% |
| Adana Aguascalientes | 1 | 22,510 | 89% | 1 | 22,506 | 80% | 1 | 23,908 | 66% |
| Kansas | 12 | 362,641 | 81% | 12 | 351,905 | 82% | 12 | 349,835 | 81% |
| Indiana | 17 | 256,161 | 100% | 17 | 256,161 | 100% | 13 | 179,899 | 100% |
| Oregon | 3 | 34,118 | 98% | 3 | 34,087 | 96% | 3 | 34,103 | 100% |
| Utah | 1 | 16,348 | 100% | 1 | 16,347 | 61% | 1 | 16,347 | 100% |
| Florida | 1 | 21,755 | 97% | 1 | 21,755 | 98% | 1 | 21,755 | 100% |
| Alaska | 6 | 124,489 | 96% | 6 | 124,363 | 99% |  |  |  |
| Artificios 40 | 1 | 2,603 | 100% | 1 | 2,603 | 100% |  |  |  |
| Turbo | 1 | 46,813 | 100% | 1 | 46,234 | 100% |  |  |  |
| El Salto | 1 | 24,000 | 100% | 1 | 24,051 | 100% |  |  |  |
| Puerta de hierro | 1 | 24,946 | 100% | 1 | 24,946 | 100% |  |  |  |
| Torre Diana | 1 | 64,000 | 94% | 1 | 64,000 | 86% |  |  |  |
| Frimax | 2 | 212,401 | 98% |  |  |  |  |  |  |
| Saqqara | 1 |  | 70% |  |  |  |  |  |  |

| | | June 30, | | | | | | | |
| | 2017 | | | 2016 | | | 2015 | | |
| Portfolio | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] |
|---|---|---|---|---|---|---|---|---|---|
| | | 11,236 | | | | | | | |
| Espacio Churubusco | 1 | 4,793 | 87% | | | | | | |
| Buffalo[2] | | | | 1 | 4,793 | 97% | 1 | 4,793 | 100% |
| Colorado[3] | | | | | | | 1 | 102,000 | 100% |
| **Total** | **499** | **7,665,296** | **93.7%** | **493** | **7,191,414** | **93.8%** | **475** | **6,669,938** | **94.3%** |

[1] Calculated as a percentage of the total GLA.
[2] As of June 30, 2017, the undeveloped part of this portfolio was no longer part of our Stabilized Portfolio, since it was contributed to the joint venture with Helios to develop Project Mitikah, our JV Development Portfolio.  The stabilized portion of the Buffalo portfolio is now referred to as Espacio Churubusco and remains in our Stabilized Portfolio.
[3] As of June 30, 2017, this portfolio was no longer part of our Stabilized Portfolio since it was contributed to Project Mitikah, our JV Development Portfolio.

The table below sets forth relevant information with respect to the portfolios in our Stabilized Portfolio as of December 31, 2016, 2015 and 2014:

| | | December 31, | | | | | | | |
| | 2016 | | | 2015 | | | 2014 | | |
| Portfolio | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] | No. Of Properties | GLA ($m^2$) | Occupancy Rate[1] |
|---|---|---|---|---|---|---|---|---|---|
| Initial | 17 | 713,690 | 95% | 17 | 709,678 | 96% | 17 | 701,028 | 96% |
| Azul | 23 | 125,681 | 98% | 23 | 125,681 | 99% | 23 | 125,683 | 100% |
| Rojo | 219 | 173,884 | 97% | 219 | 173,884 | 100% | 219 | 173,884 | 100% |
| Morado | 16 | 536,610 | 90% | 16 | 541,742 | 90% | 16 | 550,002 | 89% |
| Gris | 1 | 77,351 | 99% | 1 | 77,351 | 99% | 1 | 64,335 | 100% |
| Blanco | 1 | 44,871 | 79% | 1 | 44,641 | 100% | 1 | 44,711 | 100% |
| Villahermosa | 1 | 21,775 | 86% | 1 | 22,341 | 86% | 1 | 22,714 | 86% |
| Verde | 1 | 117,786 | 100% | 1 | 118,658 | 99% | 1 | 117,192 | 100% |
| TM | 1 | 83,971 | 100% | 1 | 83,971 | 100% | 1 | 83,971 | 100% |
| Pace | 2 | 43,593 | 100% | 2 | 43,593 | 100% | 2 | 43,593 | 100% |
| G-30 | 32 | 1,855,606 | 96% | 28 | 1,646,091 | 98% | 27 | 1,460,903 | 98% |
| UAG | 1 | 163,000 | 100% | 1 | 163,000 | 100% | 1 | 163,000 | 100% |
| Vermont | 34 | 521,099 | 92% | 34 | 521,099 | 96% | 34 | 524,588 | 95% |
| Apolo | 46 | 893,008 | 95% | 45 | 880,635 | 95% | 45 | 882,849 | 94% |
| P12 | 10 | 91,628 | 80% | 10 | 91,132 | 87% | 10 | 91,959 | 99% |
| Parque Empresarial Cancún | 1 | 18,000 | 100% | 1 | 18,000 | 100% | 1 | 18,000 | 100% |
| Reforma 155 | 1 | 4,835 | 61% | 1 | 4,835 | 61% | 1 | 4,815 | 100% |
| Maine | 6 | | 91% | 6 | | 99% | 7 | | 99% |

| | December 31, | | | | | | | | |
| | 2016 | | | 2015 | | | 2014 | | |
| Portfolio | No. Of Properties | GLA (m²) | Occupancy Rate[1] | No. Of Properties | GLA (m²) | Occupancy Rate[1] | No. Of Properties | GLA (m²) | Occupancy Rate[1] |
|---|---|---|---|---|---|---|---|---|---|
| | | 152,926 | | | 152,841 | | | 146,115 | |
| California | 29 | 349,307 | 91% | 29 | 348,394 | 87% | 29 | 345,469 | 86% |
| La Viga | 1 | 29,645 | 100% | 1 | 22,538 | 73% | 1 | 22,538 | 73% |
| R15 | 3 | 175,780 | 94% | 3 | 174,719 | 87% | 2 | 82,981 | 83% |
| Corporativo San Mateo | 1 | 5,440 | 100% | 1 | 5,440 | 100% | 1 | 5,440 | 100% |
| Hotel Centro Histórico | 1 | 40,000 | 100% | 1 | 40,000 | 100% | 1 | 40,000 | 100% |
| Samara | 1 | 133,723 | 97% | 1 | 134,304 | 96% | 1 | 133,471 | 97% |
| Adana Aguascalientes | 1 | 22,564 | 88% | 1 | 22,495 | 77% | | | |
| Kansas | 12 | 354,225 | 83% | 12 | 349,809 | 80% | | | |
| Indiana | 17 | 256,161 | 100% | 17 | 256,161 | 100% | | | |
| Oregon | 3 | 34,118 | 97% | 3 | 34,339 | 96% | | | |
| Utah | 1 | 16,347 | 100% | 1 | 16,347 | 100% | | | |
| Florida | 1 | 21,755 | 98% | 1 | 21,755 | 100% | | | |
| Alaska | 6 | 124,383 | 96% | 6 | 124,404 | 99% | | | |
| Artificios 40 | 1 | 2,603 | 100% | 1 | 2,603 | 100% | | | |
| Turbo | 2 | 46,777 | 100% | | | | | | |
| El Salto | 1 | 24,051 | 100% | | | | | | |
| Puerta de hierro | 1 | 24,946 | 100% | | | | | | |
| Torre Diana | 1 | 64,000 | 94% | | | | | | |
| Buffalo | 1 | 4,793.4 | 88.2% | 1 | 4,793.4 | 99.1% | | | |
| Colorado[2] | | | | 1 | 102,000.0 | 100.0% | 1 | 102,000 | 100% |
| **Total** | **497** | **7,369,935** | **94.5%** | **488** | **7,079,274.0** | **94.9%** | **444** | **5,951,241** | **95.3%** |

[1]   Calculated as a percentage of the total GLA.

[2]   As of December 31, 2016, this portfolio was no longer part of our Stabilized Portfolio since it was contributed to Project Mitikah, our JV Development Portfolio.

We believe that the size and diversity of our tenant base will help minimize our exposure to economic fluctuations in any one industry or economic sector or with respect to any single tenant. We believe that our properties are also distinguished by the quality of our tenants, many of which are among the leading companies in Mexico and in their respective industries, as well as international companies with a presence in Mexico.

*Geographic Diversification*

The properties in our portfolio are located in 31 Mexican states (every Mexican state except Zacatecas). Five of these states (State of Mexico, Jalisco, Nuevo León, Tamaulipas and Quintana Roo), together with Mexico City, account for 83.0% of our total GLA and 84.6% of our ABR as of June 30, 2017. We believe that the

geographic diversification within Mexico of our portfolio will help ensure that we will not depend excessively on any given area or regional economy. The following table presents a summary of our portfolio by state as of June 30, 2017:

| State | GLA (thousand m²) | Occupied Area (thousand m²) | Occupancy Rate | Annualized Base Rent (Ps.in millions) | No. Of Properties |
|---|---|---|---|---|---|
| Aguascalientes | 62.6 | 60.3 | 96% | 87.5 | 6 |
| Baja California | 13.1 | 13.1 | 100% | 19.1 | 16 |
| Baja California South | 35.7 | 22.6 | 63% | 53.1 | 4 |
| Campeche | 1.0 | 1.0 | 100% | 1.5 | 2 |
| Chiapas | 31.4 | 31.3 | 99% | 67.5 | 3 |
| Chihuahua | 194.2 | 185.9 | 96% | 257.2 | 21 |
| Coahuila | 182.2 | 163.0 | 89% | 243.3 | 20 |
| Colima | 14.8 | 13.9 | 94% | 20.3 | 4 |
| Durango | 24.3 | 24.3 | 100% | 31.2 | 3 |
| Guanajuato | 48.5 | 48.2 | 99% | 91.7 | 6 |
| Guerrero | 76.4 | 60.6 | 79% | 118.7 | 10 |
| Hidalgo | 61.7 | 59.8 | 97% | 117.9 | 3 |
| Jalisco | 799.9 | 779.5 | 97% | 1,244.3 | 34 |
| Mexico City | 1,265.3 | 1,196.4 | 95% | 4,204.7 | 109 |
| Mexico State | 3,120.7 | 2,944.4 | 94% | 2,875.2 | 66 |
| Michoacán | 1.1 | 1.1 | 100% | 1.7 | 2 |
| Morelos | 27.8 | 27.8 | 100% | 25.1 | 3 |
| Nayarit | 44.7 | 43.0 | 96% | 89.7 | 2 |
| Nuevo León | 585.5 | 545.1 | 93% | 933.8 | 65 |
| Oaxaca | 34.3 | 33.6 | 98% | 31.6 | 3 |
| Puebla | 47.2 | 47.2 | 100% | 52.0 | 7 |
| Querétaro | 21.3 | 20.7 | 97% | 79.1 | 5 |
| Quintana Roo | 269.7 | 253.6 | 94% | 893.9 | 11 |
| San Luis Potosí | 42.5 | 30.5 | 72% | 26.6 | 7 |
| Sinaloa | 13.7 | 13.5 | 99% | 16.9 | 7 |
| Sonora | 97.4 | 89.1 | 91% | 127.2 | 16 |
| Tabasco | 22.2 | 19.2 | 87% | 48.2 | 2 |
| Tamaulipas | 329.2 | 274.8 | 83% | 295.7 | 34 |
| Tlaxcala | 35.9 | 35.5 | 99% | 60.8 | 1 |
| Veracruz | 106.6 | 96.3 | 90% | 156.0 | 20 |
| Yucatán | 54.5 | 47.8 | 88% | 93.1 | 7 |
| **Total** | **7,665.3** | **7,182.9** | **93%** | **12,364.4** | **499** |

*Tenant Diversification*

Our tenants included national, regional and local companies that represent a variety of industries, including the industrial, retail, corporate and government sectors, among others. As of June 30, 2017, we had approximately 6,800 lease contracts with approximately 2,800 tenants, our ten largest tenants by GLA occupied approximately 27.5% of the occupied GLA of our Stabilized Portfolio (approximately 1.7 million m²), and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio. Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our

portfolio. However, no other tenant accounted for more than 3.6% of the occupied GLA of our portfolio or 3.9% of the ABR attributable to our portfolio. We believe that our tenant diversification will help us to minimize our exposure to market fluctuations in specific industry or economic sectors or with respect to a particular tenant. We believe that our properties are different from others because of the quality of our tenants, many of which are located within the largest companies in Mexico as well as international companies with presence in Mexico.

The following tables set forth information regarding the distribution of our top ten tenants by GLA and ABR as of June 30, 2017, and as of December 31, 2016, 2015 and 2014:

### June 30, 2017

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Walmart (Retail)[1] | 748,540 | 10.4% | Walmart (Retail)[1] | 1,039,790 | 8.4% |
| Icel (Education) | 256,161 | 3.6% | Icel (Education) | 477,213 | 3.9% |
| Santander (Financial Institution) | 189,290 | 2.6% | Santander (Financial Institution) | 397,726 | 3.2% |
| UAG (Education) | 163,000 | 2.3% | Cinepolis (Entertainment) | 222,669 | 1.8% |
| Cinepolis (Entertainment) | 123,912 | 1.7% | Alsea (Restaurants) | 171,794 | 1.4% |
| Alsea (Restaurants) | 121,907 | 1.7% | Copemsa (Parking Operator) | 161,527 | 1.3% |
| Zimag (Logistics) | 115,983 | 1.6% | Fiesta Inn (Hotel) | 134,058 | 1.1% |
| Vitro (Industrial) | 87,660 | 1.2% | Banamex (Financial Institution) | 109,334 | 0.9% |
| Liverpool (Retail) | 83,026 | 1.2% | Zimag (Logistics) | 102,677 | 0.8% |
| Unilever (Consumer Goods) | 82,039 | 1.1% | SAT (Government) | 95,593 | 0.8% |
| **Total 10 Clients** | **1,971,518** | **27.5%** | **Total 10 Clients** | **2,912,381** | **23.6%** |

[1]   These retail companies are subsidiaries of Walmart Group and operate under various brands (*e.g.*, Walmart Supercenter, Sam's Club, Superama).

### December 31, 2016

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Retail | 745,157 | 10.7% | Retail | 1,018,478 | 8.3% |
| Education | 256,161 | 3.7% | Education | 477,205 | 3.9% |
| Financial Institution | 181,007 | 2.6% | Financial Institution | 339,790 | 2.8% |
| Entertainment | 163,000 | 2.3% | Education | 210,868 | 1.7% |
| Restaurants | 124,000 | 1.8% | Restaurants | 190,624 | 1.6% |

**December 31, 2016**

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Entertainment | 123,912 | 1.8% | Parking Operator | 149,458 | 1.2% |
| Logistics | 115,983 | 1.7% | Hotel | 135,072 | 1.1% |
| Retail | 100,076 | 1.4% | Hotel | 133,879 | 1.1% |
| Consumer Goods | 83,026 | 1.2% | Logistics | 100,018 | 0.8% |
| Bakery | 82,222 | 1.2% | Government | 95,591 | 0.8% |
| **Total 10 Clients** | **1,974,545** | **28.4%** | **Total 10 Clients** | **2,850,981** | **23.2%** |

**December 31, 2015**

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Retail | 755,547 | 11.2% | Retail | 980,216 | 9.0% |
| Education | 256,161 | 3.8% | Financial Institution | 794,880 | 7.3% |
| Financial Institution | 186,598 | 2.8% | Education | 477,213 | 4.4% |
| Education | 163,000 | 2.4% | Financial Institution | 333,352 | 3.0% |
| Financial Institution | 129,238 | 1.9% | Entertainment | 197,618 | 1.8% |
| Entertainment | 123,912 | 1.8% | Restaurants | 139,251 | 1.3% |
| Logistics | 115,983 | 1.7% | Hotel | 131,780 | 1.2% |
| Retail | 105,689 | 1.6% | Logistics | 111,540 | 1.0% |
| Consumer Goods | 82,677 | 1.2% | Government | 109,993 | 1.0% |
| Bakery | 82,222 | 1.2% | Logistics | 96,688 | 0.9% |
| **Total 10 Clients** | **2,001,027** | **29.8%** | **Total 10 Clients** | **3,372,531** | **30.8%** |

**December 31, 2014**

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Retail | 660,481 | 11.1% | Retail | 839,068 | 10.4% |
| Financial Institution | 185,242 | 3.1% | Financial Institution | 501,524 | 6.2% |
| Education | 163,000 | 2.7% | Financial Institution | 313,356 | 3.9% |
| Bakery | 123,312 | 2.1% | Entertainment | 231,818 | 2.9% |
| Logistics | 115,983 | 1.9% | Hotel | 175,312 | 2.2% |
| Financial Institution | 114,344 | 1.9% | Restaurants | 111,291 | 1.4% |

**December 31, 2014**

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Retail | 105,689 | 1.8% | Logistics | 96,060 | 1.2% |
| Entertainment | 103,388 | 1.7% | Logistics | 95,410 | 1.2% |
| Consumer Goods | 82,054 | 1.4% | Bakery | 82,028 | 1.0% |
| Education | 77,176 | 1.3% | Education | 73,932 | 0.9% |
| **Total 10 Clients** | **1,730,670** | **29.1%** | **Total 10 Clients** | **2,519,798** | **31.3%** |

*Lease Expirations*

We take a proactive approach with respect to leasing, maintaining regular contact with tenants and frequently visiting each property. We are in ongoing dialogue with tenants regarding their intentions with respect to the space at existing properties, as well as any plans to expand. We also leverage the market intelligence of our Leasing Administrators as well as our senior management team, building relationships with potential local, regional and national tenants that would complement our current customer base as space becomes available.

We also receive key money revenue from the sale of "lease rights" (the right to lease spaces). A key money payment is a one-time non-reimbursable payment made to us by some entering tenants in our retail properties. The following table sets forth information with respect to the lease expirations of the properties in our Stabilized Portfolio as of December 31, 2016 and June 30, 2017, assuming the tenants do not exercise their renewal option, if any:

| Year[1] | GLA[2] of Expiring Leases (m²) | | % of Total GLA[2] of Expiring Leases | | ABR[3] of Leases Expiring within the Year (Ps.in millions) | | % of Total ABR of Leases Expiring within the Year | | Monthly rent (Ps.) per square meter of occupied GLA[4] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 | 12/31/16 | 6/30/17 |
| 2017 ........................... | 879,270 | 486,470 | 12.6 | 6.8 | 1,658.9 | 938.2 | 13.5 | 7.6 | 157.2 | 160.7 |
| 2018 ........................... | 1,036,440 | 1,055,228 | 14.9 | 14.7 | 1,677.7 | 1,738.8 | 13.6 | 14.1 | 134.9 | 137.3 |
| 2019 ........................... | 813,092 | 883,139 | 11.7 | 12.3 | 1,305.8 | 1,451.3 | 10.6 | 11.7 | 133.8 | 136.9 |
| 2020 ........................... | 673,566 | 851,232 | 9.7 | 11.9 | 1,203.6 | 1,379.7 | 9.8 | 11.2 | 148.9 | 135.1 |
| 2021 and thereafter ..... | 2,907,726 | 3,369,864 | 41.8 | 46.9 | 4,503.8 | 5,127.6 | 36.6 | 41.5 | 129.1 | 126.8 |
| Statutory Leases[5]....... | 645,903 | 536,978 | 9.3 | 7.5 | 1,944.4 | 1,728.8 | 15.8 | 14.0 | 250.9 | 268.3 |
| **Total** | **6,955,997** | **7,182,911** | **100.0** | **100.0** | **12,294.3** | **12,364.4** | **100.0%** | **100.0%** | **147.3** | **143.4** |

[1]   Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

[2]   Refers to m² of occupied GLA.

[3]   ABR refers to the monthly base rent as of December 31, 2016 and June 30, 2017, respectively, multiplied by 12.

[4]   To calculate the monthly rent per square meter of occupied GLA, we include 100% of the occupied GLA of Torre Mayor, Torre Diana and Torre Reforma Latino.

[5]   Lease agreements that have expired but continue to pay rent.

In addition to well-staggered lease expirations, we believe the structure of our leases, which primarily provide for fixed rental payments and are primarily payable in Pesos, further contributes to the stability of the cash flows provided by our portfolio.

*Asset Types*

*Retail*

The following table presents the distribution of the retail operating units in our portfolio by state as of June 30, 2017 (together with, for comparison purposes, national figures as of the end of each of the last three fiscal years):

| State | GLA (thousand m²) | Occupied Area (thousand m²) | Occupancy Rate | Annualized Base Rent (Ps.in millions) | No. Of Properties |
|---|---|---|---|---|---|
| Aguascalientes | 30.5 | 28.2 | 92% | 58.2 | 4 |
| Baja California | 9.0 | 9.0 | 100% | 13.1 | 13 |
| Baja California South | 35.7 | 22.6 | 63% | 53.1 | 4 |
| Campeche | 1.0 | 1.0 | 100% | 1.5 | 2 |
| Chiapas | 31.4 | 31.3 | 99% | 67.5 | 3 |
| Chihuahua | 112.1 | 103.8 | 93% | 189.3 | 15 |
| Mexico City | 533.7 | 501.5 | 94% | 1397.6 | 62 |
| Coahuila | 44.3 | 43.7 | 99% | 94.1 | 14 |
| Colima | 14.4 | 13.5 | 94% | 18.8 | 3 |
| Durango | 1.2 | 1.2 | 100% | 0.9 | 2 |
| Mexico State | 496.2 | 460.0 | 93% | 704.5 | 31 |
| Guanajuato | 27.8 | 27.5 | 99% | 67.0 | 5 |
| Guerrero | 76.4 | 60.6 | 79% | 118.7 | 10 |
| Hidalgo | 61.7 | 59.8 | 97% | 117.9 | 3 |
| Jalisco | 564.1 | 553.1 | 98% | 1019.3 | 26 |
| Michoacán | 1.1 | 1.1 | 100% | 1.7 | 2 |
| Morelos | 23.2 | 23.2 | 100% | 21.1 | 2 |
| Nayarit | 44.7 | 43.0 | 96% | 89.7 | 2 |
| Nuevo León | 227.6 | 206.2 | 91% | 514.0 | 26 |
| Oaxaca | 34.3 | 33.6 | 98% | 31.6 | 3 |
| Puebla | 1.0 | 1.0 | 100% | 2.4 | 2 |
| Querétaro | 21.3 | 20.7 | 97% | 79.1 | 5 |
| Quintana Roo | 234.8 | 220.2 | 94% | 832.4 | 10 |
| San Luis Potosí | 10.2 | 9.3 | 91% | 10.6 | 5 |
| Sinaloa | 12.9 | 12.7 | 99% | 15.0 | 6 |
| Sonora | 75.7 | 67.5 | 89% | 120.9 | 13 |
| Tabasco | 22.2 | 19.2 | 87% | 48.2 | 2 |
| Tamaulipas | 34.0 | 25.1 | 74% | 48.1 | 11 |
| Tlaxcala | 35.9 | 35.5 | 99% | 60.8 | 1 |
| Veracruz | 101.6 | 91.3 | 90% | 148.1 | 17 |
| Yucatán | 50.6 | 43.8 | 87% | 83.6 | 5 |
| **6/30/17 Total** | **2,970.5** | **2,770.1** | **93%** | **6,029.0** | **309** |
| 12/31/16 Total | 2,954.3 | 2,763.9 | 94% | 5,993.5 | 309 |
| 12/31/15 Total | 2,857.0 | 2,663.7 | 93% | 5,429.8 | 306 |
| 12/31/14 Total | 2,164.8 | 2,054.4 | 95% | 3,871.6 | 272 |

The following table sets forth information with respect to the lease expirations of our retail properties as of June 30, 2017, assuming that tenants do not exercise any renewal or early termination rights:

| Year[1] | GLA[2] of Expiring Leases (m²) | % of Total GLA[2] of Expiring Leases | ABR[3] of Leases Expiring within the Year (Ps.in thousands) | % of Total ABR[3] of Leases Expiring within the Year | Monthly rent per square meter of occupied GLA (Ps.) |
|---|---|---|---|---|---|
| 2017 | 266,579 | 9.6% | 608,833 | 10.1% | 190.3 |
| 2018 | 228,459 | 8.2% | 843,500 | 14.0% | 307.7 |
| 2019 | 180,223 | 6.5% | 654,259 | 10.9% | 302.5 |
| 2020 | 156,041 | 5.6% | 391,324 | 6.5% | 209.0 |
| 2021 and thereafter | 1,715,079 | 61.9% | 2,801,222 | 46.5% | 136.1 |
| Statutory Leases[5] | 223,710 | 8.1% | 729,829 | 12.1% | 271.9 |
| **Total** | **2,770,090** | **100.0%** | **6,028,966** | **100.0%** | **181.4** |

[1] Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

[2] Refers to m² of occupied GLA.

[3] ABR refers to the monthly base rent as of June 30, 2017 multiplied by 12.

[4] Lease agreements that have expired but continue to pay rent.

*Industrial*

The following table presents the distribution of the industrial operating units in our portfolio by state as of June 30, 2017 (together with, for comparison purposes, national figures as of the end of each of the last three fiscal years):

| State | GLA (thousand m²) | Occupied Area (thousand m²) | Occupancy Rate | Annualized Base Rent (Ps.in millions) | No. Of Properties |
|---|---|---|---|---|---|
| Aguascalientes | 30.8 | 30.8 | 100% | 28.2 | 1 |
| Baja California | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Baja California South | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Campeche | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Chiapas | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Chihuahua | 82.1 | 82.1 | 100% | 67.9 | 6 |
| Coahuila | 138.0 | 119.3 | 86% | 149.2 | 6 |
| Colima | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Durango | 23.2 | 23.2 | 100% | 30.2 | 1 |
| Guanajuato | 20.7 | 20.7 | 100% | 24.7 | 1 |
| Guerrero | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Hidalgo | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Jalisco | 212.4 | 212.4 | 100% | 185.6 | 4 |
| Mexico City | 44.9 | 44.9 | 100% | 42.7 | 1 |
| Mexico State | 2,526.4 | 2,432.0 | 96% | 2,056.0 | 31 |
| Michoacán | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Morelos | 4.6 | 4.6 | 100% | 4.0 | 1 |
| Nayarit | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Nuevo León | 314.3 | 306.2 | 97% | 345.5 | 23 |
| Oaxaca | 0.0 | 0.0 | 0% | 0.0 | 0 |

| State | GLA *(thousand m²)* | Occupied Area *(thousand m²)* | Occupancy Rate | Annualized Base Rent *(Ps.in millions)* | No. Of Properties |
|---|---|---|---|---|---|
| Puebla | 45.5 | 45.5 | 100% | 46.7 | 4 |
| Querétaro | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Quintana Roo | 18.0 | 18.0 | 100% | 14.6 | 1 |
| San Luis Potosí | 32.3 | 21.2 | 66% | 16.1 | 2 |
| Sinaloa | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Sonora | 16.0 | 16.0 | 100% | 1.0 | 1 |
| Tabasco | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Tamaulipas | 293.7 | 248.3 | 85% | 246.7 | 22 |
| Tlaxcala | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Veracruz | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Yucatán | 0.0 | 0.0 | 0% | 0.0 | 0 |
| **6/30/17 Total** | **3,802.9** | **3,625.1** | **95%** | **3,259.1** | **105** |
| 12/31/16 Total | 3,570.3 | 3,446.5 | 97% | 3,199.4 | 104 |
| 12/31/15 Total | 3,400.70 | 3,294.60 | 97% | 2,810.29 | 101 |
| 12/31/14 Total | 3,136.0 | 3,023.1 | 96% | 2,382.71 | 100 |

The following table sets forth information with respect to the lease expirations of our industrial properties as of June 30, 2017, assuming that tenants do not exercise any renewal or early termination rights:

| Year[1] | GLA[2] of Expiring Leases *(m²)* | % of Total GLA[2] of Expiring Leases | ABR[3] of Leases Expiring within the Year *(Ps.in thousands)* | % of Total ABR[3] of Leases Expiring within the Year | Monthly rent per square meter of occupied GLA *(Ps.)* |
|---|---|---|---|---|---|
| 2017 | 131,821 | 3.6% | 109,238 | 3.4% | 69.1 |
| 2018 | 740,702 | 20.4% | 601,268 | 18.4% | 67.6 |
| 2019 | 626,628 | 17.3% | 540,322 | 16.6% | 71.9 |
| 2020 | 595,724 | 16.4% | 528,839 | 16.2% | 74.0 |
| 2021 and thereafter | 1,391,606 | 38.4% | 1,370,982 | 42.1% | 82.1 |
| Statutory Leases[5] | 138,603 | 3.8% | 108,477 | 3.3% | 65.2 |
| **Total** | **3,625,083** | **100.0%** | **3,259,126** | **100.0%** | **74.9** |

[1]  Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

[2]  Refers to m² of occupied GLA.

[3]  ABR refers to the monthly base rent as of June 30, 2017 multiplied by 12.

[4]  Lease agreements that have expired but continue to pay rent.

*Office*

The following table presents the distribution of the office properties in our portfolio by state as of June 30, 2017 (together with, for comparison purposes, national figures as of the end of each of the last three fiscal years):

| State | GLA *(thousand m²)* | Occupied Area *(thousand m²)* | Occupancy Rate | Annualized Base Rent *(Ps.in millions)* | No. Of Properties |
|---|---|---|---|---|---|
| Aguascalientes | 1.2 | 1.2 | 100% | 1.1 | 1 |
| Baja California | 4.1 | 4.1 | 100% | 6.0 | 3 |

- 109 -

| State | GLA (thousand m²) | Occupied Area (thousand m²) | Occupancy Rate | Annualized Base Rent (Ps.in millions) | No. Of Properties |
|---|---|---|---|---|---|
| Baja California South | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Campeche | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Chiapas | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Chihuahua | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Coahuila | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Colima | 0.4 | 0.4 | 100% | 1.5 | 1 |
| Durango | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Guanajuato | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Guerrero | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Hidalgo | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Jalisco | 23.3 | 13.9 | 60% | 39.3 | 4 |
| Mexico City | 686.7 | 650.0 | 95% | 2764.5 | 46 |
| Mexico State | 98.1 | 52.4 | 53% | 114.7 | 4 |
| Michoacán | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Morelos | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Nayarit | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Nuevo León | 43.6 | 32.8 | 75% | 74.3 | 16 |
| Oaxaca | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Puebla | 0.7 | 0.7 | 100% | 2.8 | 1 |
| Querétaro | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Quintana Roo | 16.9 | 15.4 | 91% | 46.8 | 0[1] |
| San Luis Potosí | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Sinaloa | 0.8 | 0.8 | 100% | 1.9 | 1 |
| Sonora | 5.7 | 5.7 | 100% | 5.3 | 2 |
| Tabasco | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Tamaulipas | 1.4 | 1.4 | 100% | 0.9 | 1 |
| Tlaxcala | 0.0 | 0.0 | 0% | 0.0 | 0 |
| Veracruz | 5.0 | 5.0 | 100% | 7.9 | 3 |
| Yucatán | 4.0 | 4.0 | 100% | 9.4 | 2 |
| **6/30/17 Total** | **891.9** | **787.7** | **91%** | **3076.3** | **85** |
| 12/31/16 Total | 845.3 | 745.6 | 88% | 3,101.4 | 84 |
| 12/31/15 Total | 821.6 | 763.6 | 93% | 2,702.36 | 81 |
| 12/31/14 Total | 650.4 | 593.8 | 91% | 1,788.96 | 72 |

[1]    Quintana Roo includes a mixed-use property that is reflected in the table presenting the distribution of the retail operating units in our portfolio by state because Retail GLA is higher than Office GLA for this property. As a result, for purposes of this table, Quintana Roo is not considered to have any office properties.

The following table sets forth information with respect to the lease expirations of our office properties as of June 30, 2017, assuming that tenants do not exercise any renewal or early termination rights:

| Year[1] | GLA[2] of Expiring Leases (m²) | % of Total GLA[2] of Expiring Leases | ABR[3] of Leases Expiring within the Year (Ps.in thousands) | % of Total ABR[3] of Leases Expiring within the Year | Monthly rent per square meter of occupied GLA (Ps.)[4] |
|---|---|---|---|---|---|
| 2017 .................................. | 88,070 | 11.2% | 220,117 | 7.2% | 208.3 |
| 2018 .................................. | 86,067 | 10.9% | 294,004 | 9.6% | 284.7 |
| 2019 .................................. | 76,288 | 9.7% | 256,704 | 8.3% | 280.4 |
| 2020 .................................. | 99,468 | 12.6% | 459,540 | 14.9% | 385.0 |
| 2021 and thereafter ........... | 263,179 | 33.4% | 955,440 | 31.1% | 302.5 |
| Statutory Leases[5] ............. | 174,666 | 22.2% | 890,503 | 28.9% | 424.9 |
| **Total ..................................** | **787,738** | **100.0%** | **3,076,309** | **100.0%** | **325.4** |

(1) Data presented in this table is based on the signing date of each lease agreement. However, certain lease agreements commence once the property is delivered, rather than the date on which the lease agreement is signed. As a result, lease agreements for properties that were not delivered on the lease execution date may expire at a later date than indicated in this table.

(2) Refers to m² of occupied GLA.

(3) ABR refers to the monthly base rent as of June 30, 2017 multiplied by 12.

(4) To calculate the monthly rent per square meter of occupied GLA, we include 100% of the occupied GLA of the TM Portfolio.

(5) Lease agreements that have expired but continue to pay rent.

## *Portfolio Acquisitions*

During 2016, we completed six strategic property acquisitions and developments for an amount higher than Ps.6.0 billion, which represented an increase of 4.1% of our GLA and 2.0% in the number of operating units as compared to 2015, to obtain a portfolio with approximately 7.4 million m² of GLA and 497 properties with 519 operations.

| Stabilized Portfolio | Acquisition Date | GLA (m²) | Acquisition value without VAT (in thousands) | Payment (in thousands) | No. Of Properties |
|---|---|---|---|---|---|
| El Salto | February 23 | 24,000 | Ps.180,000 | CBFIs: Ps.180,000 | 1 |
| Puerta de Hierro | February 23 | 24,946 | Ps.700,000 | Cash: Ps.700,000 | 1 |
| Espacio Tollocan | April 15 | 17,839 | Ps.229,300 | Cash: Ps.229,300 | 1 |
| Torre Cuarzo | June 16 | 72,000 | Ps.2,898,100 | Cash: Ps.1,240,300 CBFIs:Ps.1,657,800 | 1 |
| Midtown Jalisto | July 21 | 105,000 | Ps.440,000 | Cash: Ps.440,000 | 1 |
| Park Tower Vallarta | August 19 | 46,234 | Ps.1,477,100 | Cash: Ps.513,242 CBFIs: Ps.963,858 | 1 |

*Recent Acquisitions*

As of June 30, 2017, we announced the acquisition of properties and developments for more than Ps.5 billion as follows:

| Stabilized Portfolio | Acquisition Date | GLA *(m²)* | Acquisition value without VAT *(in thousands)* | Payment *(in thousands)* | No. Of Properties |
|---|---|---|---|---|---|
| Doña Rosa (Frimax) [1] | June 28 | 212,000 | Ps.2,108,000 | CBFIs: Ps.2,108,000 | 1 |
| Saqqara | April 5 | 11,236 | Ps.702,000 | Cash:  Ps.702,000 | 1 |
| Fashion Mall Tuxla | April 3 | 52,899 | Ps.2,690.0 | Cash: Ps.1,200 CBFIs: Ps.1,490 [2] | 1 |

[1]   During the second quarter of 2017, the Issuer acquired Escatto (Frimax), a parcel of land located in Mexico State for Ps.80 million paid in cash.

[2]   As of June 30, 2017 the balance for the acquisition price is outstanding and is included in accounts payable for the acquisition in our financial statements.

*The Development Portfolio*

We expect total development costs of the seven properties in our Development Portfolio to be approximately Ps.12.8 billion (US$ 712 million), of which approximately Ps.9.4 billion had been expensed as of June 30, 2017.  These figures represent estimated fixed costs under the construction and development agreements we entered into to complete the construction and development of such properties.

The following table sets forth a summary of our Development Portfolio and JV Development Portfolio as of June 30, 2017:

| Portfolio | Property | Property Type | Final GLA *(m²)* | Amount Invested as of June 30, 2017 *(Ps.in millions)*[1] | Estimated Investment Amount Pending *(Ps.in millions)* | Estimated Expected Annual Potential Additional Revenue *(Ps.in millions)*[2] |
|---|---|---|---|---|---|---|
| La Viga | La Viga | Office | 102,000 | 1,440.9 | 132.1 | 171.3 |
| G-30 | Berol | Industrial | 48,052 | 1,321.5 | 0 | 128.8 |
| Individual | Torre Cuarzo | Retail/Offices | 72,000 | 3,157.3 | 214.7 | 362.0 |
| Apolo | Tlalpan | Retail | 95,967 | 1,165.3 | 163.7 | 114.0 |
| Turbo | Espacio Tollocan | Retail | 17,839 | 426.6 | 41.4 | 53.0 |
| Individual | Midtown Jalisco | Retail/Offices | 105,000 | 1,556.8 | 2,811.2 | 579.4 |
| G-30 | Mariano Escobedo | Office | 12,000 | 359.5 | 40.5 | 61.0 |
| **Total** | | | **452,858** | **9,427.8** | **3,403.6** | **1,469.5** |
| JV Development | Mitikah[3] | Mixed | 326,089 | 1,700.0 | 7,127.3 | 1,644.0 |

[1]   Excluding acquisition / land costs.

[2]   For illustrative purposes only. Figures assume no change in circumstances prior to completion and are subject to contingencies.

[3]   Includes Colorado and Buffalo portfolios (excluding land value). This project is being developed under our joint venture with Helios.

## Investment Process

We and our Advisor have developed a comprehensive process for identifying and analyzing acquisition and development opportunities and expect to continue to expand our portfolio through the acquisition of developed properties and through the development of new properties. The investment process may consider a broad range of

real estate properties in Mexico, including, but not limited to, industrial, retail, office and hotel properties, consistent with maintaining our qualification as a FIBRA. We believe we are well-positioned to take advantage of potential opportunities and will benefit from our Advisor's expertise as we identify, underwrite, develop and acquire properties.

Our investment objectives and growth strategy focuses on the following areas:

*Value-enhancing acquisitions*

- We seek to acquire attractively located industrial, retail and office properties, which are value-enhancing to our portfolio. The properties we will seek to acquire will generally be located in communities that demonstrate strong demographics, population growth and well-established traffic patterns. As part of our growth strategy, we intend to focus on medium-sized metropolitan areas where we have the opportunity to provide underserved segments of the population with new entertainment and retail options.

- We also intend to target properties in prime locations in stable, urban markets with in-place infrastructure, robust populations and economic growth. In particular, we intend to continue to establish our presence in the Mexico City, Cancún, Guadalajara, Monterrey, Toluca and other cities in the State of Mexico.

- Our relationship with the Relevant Principals of E-Group, the El-Mann Family and the Attié Family provide us with access to an ongoing pipeline of attractive acquisition opportunities, which may not be available to our competitors.

*Opportunistic, value-enhancing development and redevelopment projects*

We intend to opportunistically increase the value of existing and future properties through development and redevelopment projects in order to generate long-term recurring cash flow growth and favorable investment returns.

*Proactive property management*

We seek to leverage our long-standing tenant relationships and the leasing expertise of our Leasing Administrators to induce lease renewals from existing tenants or to execute leases with new tenants, in both circumstances, seeking rent levels which are equal to or higher than the rents we now receive. Through intensive property management, we seek to reduce operating costs in the management of our properties.

In evaluating a particular investment, we may consider a variety of factors, including:

*Market and property analysis.* Prior to our consummation of an acquisition, we and our Advisor conduct a thorough analysis of the characteristics of the market in which the property is located, and the property itself, including:

- Population density and growth potential;

- Economic dynamics and the tax and regulatory environment of the area;

- Population income trends;

- Regional, market and property specific supply/demand dynamics;

- Existing and potential competition from other property owners and operators;

- Market rents and potential for rent growth;

- Barriers to entry and other property specific sources of sustainable competitive advantage;

- Location, visibility and accessibility of the property;

- Credit quality of in-place tenants and the potential for future rent increases;

- Quality of construction, design, and current physical condition of the asset; and

- Opportunity to increase the property's operating performance and value through better management, focused leasing efforts and/or capital improvements.

***Underwriting and due diligence process.*** Our underwriting process includes an analysis of all available material information about a potential acquisition. Our obligation to close an acquisition generally will be conditioned upon the delivery and verification of certain documents from the seller, as applicable, including:

- Plans and specifications;

- Environmental, geological and soil reports;

- Evidence of marketable title, evidence of existing liens, customary insurance policies (if any), archaeological information and other documents;

- Financial and credit information relating to the property and its tenants; and

- Existing leases, tenant rent collections, operating expenses, real estate taxes, leasing and renewal activity.

***Investment approval.*** Our technical committee will approve any acquisition of real estate (other than those made with a related person or that represents a conflict of interest) that represents up to 19.99% of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the most recently completed fiscal quarter. Any acquisition of real estate that represents (i) 20% or greater of our assets or (ii) 10% or greater of our assets made with related persons or that represent a conflict of interest, in either case in a single transaction or a series of related transactions that may be deemed to be one transaction, based on our financial statements for the most recently completed fiscal quarter, must be approved by holders representing a majority of our outstanding CBFIs. In accordance with our conflicts of interest policies, acquisitions of properties from related parties, including the contributors of our Initial Portfolio, the Relevant Principals of E-Group, the El-Mann Family and the Attié Family, also require the affirmative vote of a majority of the members of our technical committee, including a majority of the independent members of our technical committee. Investments that cannot or do not meet the eligibility requirements may be approved by our technical committee, including a majority of the independent members. See "Policies With Respect to Certain Activities—Investment Policies."

## Development

We believe that our ability to develop and redevelop properties sets us apart from many of our competitors who often depend on a third party to develop properties or focus solely on acquiring already-developed properties. Our Property Managers' senior management teams have experience in all aspects of the development process, including site selection and analysis, property design and construction management, and we expect to benefit from this expertise. Our Advisor assists us in strategically selecting new sites and implementing cost-effective, architecturally appealing space in desirable areas based on specific data, including visibility and convenience of location, competitive occupancy and rental rates, market saturation, traffic count, barriers to entry and future economic, demographic and migration trends. Our Advisor has expertise in all stages of the development cycle, including sourcing development opportunities; identifying the optimal use of the land or property; internal capabilities with respect to design and engineering as well as relationships with leading firms that provide such

services; working with state and local governments on matters such as land use, licenses and permits; access to a construction company, "Parks Desarrolladora," that is partially owned and controlled by members of the El-Mann family and works mainly for E-Group and its affiliates, and may work for us; and leasing properties.

Our Property Managers' senior management teams have developed a reputation as a trusted provider of innovative solutions with the ability to execute on a timely and cost-effective basis. Our Property Managers routinely work with existing tenants to develop new properties to meet their expansion plans, or to redevelop existing properties to better serve their business needs. Our Property Managers' senior management teams are also commonly presented with opportunities to purchase properties from land owners that do not have the financial resources or the development expertise to develop properties.

*Real Estate Development Vehicle*

On March 12, 2015, we announced the creation of Helios, a Mexican real estate development vehicle designed to maximize our development capabilities while minimizing equity dilution and maintaining prudent leverage levels.  On June 26, 2015, Helios announced the conclusion of its capital raising effort with the placement of Ps.6.0 billion CBFIs of the capital-call variety, and the initial capital call thereunder for Ps.1.2 billion.  Pursuant to the corresponding trust agreement and a co-investment agreement, we will co-invest in each project undertaken by Helios with at least a 30% ownership interest.  Helios is managed by our wholly owned F1 Management Subsidiary pursuant to a management agreement with a five to eight year term (depending upon the extension of Helios's investment period). As a result of this joint venture, we contributed the Buffalo Portfolio (with the exception of Espacio Churubusco, a commercial mall in Mexico City that we acquired as part of the Buffalo Portfolio and remains in our Stabilized Portfolio) and the Colorado Portfolio to our joint venture with Helios to develop Project Mitikah.

**Funding Sources**

We intend to finance future acquisitions and developments using our existing sources of financing which consist of a combination of the issuance of equity and debt securities in the local and international capital markets, credit facilities, mortgage indebtedness and construction loans from local or international banks. For more information relating to our funding sources and obligations, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Financing."

**Disposition of Assets**

In order to qualify as a FIBRA, we are subject to various requirements, including the requirement that we may not sell any real estate that is constructed or acquired by us for a period of at least four years following the completion of the construction or acquisition, as applicable, in order to retain the tax benefits attributable to that property. If we were to sell a property during this period, we would be subject to significant adverse tax consequences related to such property, which may make a sale of the property less desirable. See, "Risk Factors— Risks Related to Our Properties and Operations—There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs." In addition, with respect to the properties in our Initial Portfolio, a sale of a property may also trigger payment of municipal taxes, as discussed above under "Risk Factors—Tax Risks—Our real estate acquisitions may be subject to acquisition tax." While we generally acquire assets with an expectation of holding them for an extended period, we may opportunistically dispose of properties in certain circumstances, such as when:

- we will recognize diversification benefits associated with selling the asset and rebalancing our portfolio;

- returns appear to have been maximized for the asset; and

- redeploying capital into acquisition, development and redevelopment opportunities might offer higher return prospects.

The determination of whether a particular asset should be sold or otherwise disposed of will be made after consideration of relevant factors, including prevailing economic conditions, with a view toward maximizing returns for holders of our CBFIs. See "Policies With Respect to Certain Activities—Disposition Policies."

**Property Management and Leasing Strategy**

We believe that focused property management, leasing and customer retention are essential to maximizing operating cash flow and value of our properties. Our Property Managers manage our properties with a view toward creating an environment that fully supports our tenants' businesses.

Our Property Managers conduct substantially all of our operating and administrative functions, including leasing, acquisitions, development, data processing, finance and accounting. On-site functions such as maintenance, landscaping, sweeping, plumbing and electrical may be performed by our Property Managers or subcontracted to third parties.

We take a proactive approach to property management, maintaining regular contact with tenants and frequently visiting each property. As part of our ongoing property management, our Property Managers closely monitor the financial and overall performance of each property and its tenants as well as changes in local or regional markets. Each property is subject to a planning and budgeting process, which takes into account local market, economic and industry conditions.

Pursuant to the services agreements with our Leasing Administrators, our Leasing Administrators are responsible for (i) invoicing leases and maintenance fees, (ii) collecting rents and maintenance fees on our behalf, (iii) supporting our Property Managers in the negotiation and execution of leases, and (iv) supporting our Property Managers in carrying out all necessary activities to ensure the renewal of our lease agreements. Our Property Managers seek to leverage the market intelligence of our Leasing Administrators and our Advisor, having become familiar with current tenants as well as potential local, regional and national tenants that would complement our current customer base.

Our Property Managers seek to maximize the cash flows at our properties by leasing vacant space, increasing rents as current leases with below market rents expire, and negotiating new leases to reflect increases in rental rates.

**Regulation**

*General*

Our properties are subject to various laws, ordinances and regulations. We believe that we have the necessary permits and approvals to operate each of our properties.

*Environmental Matters*

Our operations are subject to the General Law of Ecological Equilibrium and Environmental Protection (*Ley General del Equilibrio Ecológico y la Protección al Ambiente*), or LGEEPA, which establishes the legal framework which regulates the preservation, restoration and protection of the environment in Mexico. Regulations issued pursuant to LGEEPA encompass areas such as ecological planning, environmental risk and impact assessment, air pollution, natural protected areas, flora and fauna protection, conservation and rational use of natural resources, and soil pollution, among others.

In addition, our operations are also subject to the National Waters Law (*Ley de Aguas Nacionales*), the General Waste Prevention and Management Law (*Ley General para la Prevención y Gestión Integral de los Residuos*), the General Sustainable Forest Development Law (*Ley General de Desarrollo Forestal Sustentable*) and

- 116 -

the General Wildlife Law (*Ley General de Vida Silvestre*), and numerous standards known as Official Mexican Standards (*Normas Oficiales Mexicanas*) which complement the environmental regulations.

The Ministry of Environment and Natural Resources (*Secretaría de Medio Ambiente y Recursos Naturales*) and the Attorney General's Office for the Protection of the Environment (*Procuraduría Federal de Protección al Ambiente*) are the federal authorities responsible for overseeing, enforcing, formulating and implementing environmental policies in Mexico, including environmental impact authorizations to engage in certain activities. The National Water Commission (*Comisión Nacional del Agua*) is responsible for administering water supply and wastewater discharges within the federal jurisdiction. In addition, the Mexican state governments may issue specific environmental laws and regulations on those matters falling under their respective jurisdictions which are not expressly reserved for the federal jurisdiction. Local ordinances may also be imposed and applied at a municipal level. These federal and local authorities have the power to bring civil, administrative and criminal proceedings against companies that breach the applicable environmental laws and may halt a non-complying development.

Mexico is a party to many international conventions and agreements on environmental protection. These international conventions, upon ratification by the senate, become a part of Mexican law. Under the North America Agreement on Environmental Cooperation, or NAAEC, a side agreement to NAFTA, each NAFTA country, including Mexico, must ensure that its environmental laws and regulations are duly enforced. NAAEC does not empower any of the environmental agencies of the three NAFTA partners to enforce the environmental laws of another party, if a NAFTA partner fails to enforce its domestic environmental laws, it may be subject to the dispute mechanism created within the NAAEC, which may lead to monetary penalties, and in some cases, to the suspension of NAFTA benefits. Certain terms of NAFTA are currently being renegotiated, which could potentially result in additional regulations becoming applicable to us.

There are currently no material legal or administrative proceedings pending against us with respect to any environmental matter. We believe that our operations comply in all material respects with all applicable environmental laws and regulations.

Although we don't currently have in effect a specific set of environmental management principles, we are in the process of articulating and implementing such principles, which we expect will reflect the following:

1.  *Environmental Policies.*  These policies are described in our Code of Ethics and are mandatory for our employees, service providers, affiliates and joint ventures.  Our Code of Ethics requires Fibra Uno to protect the environment and to that effect:

    -   Employees are responsible for the implementation of strict control measures for the protection of the environment;

    -   We acknowledge our public commitment to the protection of the environment and compliance with all environmental laws and regulations;

    -   We take all necessary actions to ensure that in our operations and in our relationship with our tenants:

        i.    Effective procedures of response to potential emergencies are implemented so as to minimize the impact of unforeseeable events;

        ii.   Significant changes to our properties are evaluated to prevent the occurrence of adverse changes to the environment;

        iii.  Sewage and waste management do not cause adverse changes to the environment;

        iv.   Efficient sources of energy are utilized, and their performance continuously monitored; and

       v.        All precautionary measures are taken to avoid environmental accidents.

2.   *Centralization of information.* We have put in place internal procedures to centralize information regarding our sustainability results (not only environmental, but also social and regarding safety and health).

3.   *Monitoring and Reporting.* We have prepared internal reports of the results of our sustainability assessments that include environmental matters as well as energy, water, emissions, refuse and bio-diversity. We expect to continue this assessment on an annual basis and making public their results on our web page.

4.   *Setting objectives.* Although not formally in effect yet, our operating areas establish objectives regarding the reduction of energy and water consumption on an annual basis.

Since its inception, Fibra Uno has pioneered in Mexico innovative and sustainable real estate solutions. Buildings that we developed or acquired under development are certified or pre-certified LEED by the US Green Building Council. This voluntary certification program is based on widely acknowledged criteria that seek high performance and sustainability with respect to nine factors:

      i.        Integration process;

      ii.        Location and transportation;

      iii.        Sustainable sites;

      iv.        Water efficiency;

      v.        Energy and atmosphere;

      vi.        Materials and resources;

      vii.        Indoor environmental quality;

      viii.        Innovation; and

      ix.        Regional priorities.

Fibra Uno owns or has interests in the following LEED-certified or pre-certified projects:

| Project | GLA (m²) | Total built area (m²) | Certification | Year |
|---|---|---|---|---|
| Torre Mayor | 83,971 | 157,000.0 | LEED Gold | 2015 |
| Torre Diana | 64,000 | 138,634.0 | LEED Silver | 2017 |
| Torre Reforma Latino | 45,746 | 88,513.0 | LEED Gold | 2017 |
| Centrum Park o Berol[1] | 99,000 | 180,000.0 | Pre certificado LEED Gold | 2015 |
| Cartera Buffalo[2] | 67,178 | 67,178.0 | Pre certificado LEED Silver | 2016 |
| Midtown Jalisco[1] | 105,000 | 279,600.0 | Pre certificado LEED Gold | 2016 |
| Saqqara | 11,236 | 27,000.0 | Pre certificado LEED Silver | 2009 |

[1]    Part of our Development Portfolio
[2]    Contributed to the joint venture with Helios to develop Project Mitikah, our JV Development Portfolio.

**Insurance**

We carry comprehensive insurance, including property, casualty and business interruption insurance. We do not carry insurance for certain types of losses that may be either uninsurable or not economically insurable, such as losses due to earthquakes, riots or acts of war. According to our internal analysis, as of June 30, 2017, 80% of the appraised value of the properties in our portfolio was insured (excluding the land value of the properties in our portfolio). There can be no assurance that we will be able to obtain insurance on the uninsured portion of our portfolio. If we were to incur uninsured losses, we would be required to pay for such losses, which could have a material adverse effect on our financial condition and results of operations. See "Risk Factors Risks Related to Our Properties and Operations If we were to incur uninsured or uninsurable losses, or losses in excess of our insurance coverage, we would be required to pay for such losses, which could adversely affect our results of operations, financial condition and our cash flow."

**Capital Expenditure Requirements**

We cover (i) development capital expenditure requirements, as such are required from time to time in order to construct the properties in our Development Portfolio, and (ii) maintenance capital expenditure requirements, as such are required from time to time in order to make improvements to the properties in our portfolios as determined by our management.

The budget allocated to maintenance capital expenditures over the next five years totals approximately Ps.654 million, which will be applied as required by each of our properties.

**Competition**

We compete with numerous acquirers, owners, developers and operators of commercial real estate, many of which own or may seek to acquire properties similar to ours in the same markets in which our properties are located. The principal means of competition are rent charged, location, services provided and the nature and condition of the facility to be leased. If our competitors offer space at rental rates below current market rates, below the rental rates we currently charge our tenants, in better locations within our markets or in higher quality facilities, we may lose potential tenants and we may be pressured to reduce our rental rates to below those which we currently charge in order to retain tenants when our tenants' leases expire.

**Patents, Licenses, Trademarks and Other Agreements**

As of the date of this offering memorandum, no patents, licenses, trademarks or other related agreements property of Fibra Uno exist.

**Principal Clients**

Our tenants include national, regional and local companies that represent a variety of industries, including the industrial, retail, corporate and government sectors, among others. As of June 30, 2017, our ten largest tenants by GLA occupied approximately 27.4% of the occupied GLA of our Stabilized Portfolio (approximately 1.7 million m²), and our ten largest tenants by ABR represented approximately 23.6% of the ABR attributable to our portfolio. Walmart, a leading multi-national retailer, accounted for 10.4% of the occupied GLA of our portfolio and 8.4% of the ABR attributable to our portfolio. However, no other tenant accounted for more than 3.8% of the occupied GLA of our portfolio or 4.5% of the ABR attributable to our portfolio. We believe that our tenant diversification will help us to minimize our exposure to market fluctuations in specific industry or economic sectors or with respect to a particular tenant. We believe that our properties are different from others because of the quality of our tenants, many of which are among the largest companies in Mexico as well as international companies with presence in Mexico.

The following tables set forth information regarding the distribution of our top tenants by GLA and ABR as of June 30, 2017:

**June 30, 2017**

| Sector | Amount of GLA Rented (m²) | % of Total GLA | Sector | ABR (Ps. in thousands) | % of Total ABR |
|---|---|---|---|---|---|
| Walmart (Retail)[1] | 748,540 | 10.4% | Walmart (Retail)[1] | 1,039,790 | 8.4% |
| Icel (Education) | 256,161 | 3.6% | Icel (Education) | 477,213 | 3.9% |
| Santander (Financial Institution) | 189,290 | 2.6% | Santander (Financial Institution) | 397,726 | 3.2% |
| UAG (Education) | 163,000 | 2.3% | Cinepolis (Entertainment) | 222,669 | 1.8% |
| Cinepolis (Entertainment) | 123,912 | 1.7% | Alsea (Restaurants) | 171,794 | 1.4% |
| Alsea (Restaurants) | 121,907 | 1.7% | Copemsa (Parking Operator) | 161,527 | 1.3% |
| Zimag (Logistics) | 115,983 | 1.6% | Fiesta Inn (Hotel) | 134,058 | 1.1% |
| Vitro (Industrial) | 87,660 | 1.2% | Banamex (Financial Institution) | 109,334 | 0.9% |
| Liverpool (Retail) | 83,026 | 1.2% | Zimag (Logistics) | 102,677 | 0.8% |
| Unilever (Consumer Goods) | 82,039 | 1.1% | SAT (Government) | 95,593 | 0.8% |
| **Total 10 Clients** | **1,971,518** | **27.5%** | **Total 10 Clients** | **2,912,381** | **23.6%** |

[1] These retail companies are subsidiaries of Walmart Group and operate under various brands (*e.g.*, Walmart Supercenter, Sam's Club, Superama).

[2] Refers to portion of GLA occupied.

## Employees

The day-to-day management and administration of a significant portion of our business is conducted by our F1 Management Subsidiary, which was staffed with approximately 645 employees as of June 30, 2017, none of whom was unionized.

## Offices

Our principal office is located at Antonio Dovalí Jaime # 70, Tower B, 11th Floor, Col. Zedec Santa Fe, C.P. 01210, México City. Our telephone number is +1 (52) 55 4170-7070.

## Legal Proceedings

We, our Advisor, our Property Managers and our Leasing Administrators may from time to time be involved in routine litigation arising in the ordinary course of business.

## THE ADVISORY AGREEMENT, THE SERVICES AGREEMENTS AND THE PROPERTY MANAGEMENT AGREEMENTS

**General**

We manage and operate our portfolio through the following agreements:

*Advisory Agreement*

On January 20, 2011, we entered into an advisory agreement with our Advisor through which our Advisor assists us in formulating and implementing our investment and financial strategies.

References in this offering memorandum to "our Advisor" refer to Fibra Uno Administración, S.C., a *sociedad civil* duly formed under the laws of Mexico, which was formed for the sole purpose of advising us and assisting us in formulating and implementing our investment and financial strategies.

*Services Agreements*

**(a)    Services Agreement with our Leasing Administrator**

On January 20, 2011, we entered into a services agreement with our Leasing Administrator, to provide us with certain leasing, billing and collection services, subject to our oversight and supervision, in connection with our properties, except for properties comprising the Morado Portfolio.

References in this offering memorandum to "our Leasing Administrator" refer to F2-Services, S.C., a *sociedad civil* duly formed under the laws of Mexico.

**(b)    Services Agreement with Morado Leasing Administrator**

On August 31, 2012, we entered into a services agreement with the Morado Leasing Administrator, to provide us with all promotion, advertising, consulting and contracting services, as well as the execution of new lease agreements over the properties in the Morado Portfolio and certain other properties.

References in this offering memorandum to "Morado Leasing Administrator" refer to Cabi Inver, S.A. de C.V., a *sociedad anónima de capital variable* duly formed under the laws of Mexico, and, together with our Leasing Administrator, "our Leasing Administrators."

*Property Management Agreements*

**(a)    Property Management Agreement with our F1 Management Subsidiary**

On January 20, 2011, we entered into a property management agreement with our F1 Management Subsidiary for the day-to-day management and administration of a significant portion of our business. With regard to the management, operation and maintenance of the Vermont Portfolio, Maine Portfolio, Morado Portfolio and Apolo Portfolio our F1 Management Subsidiary is supported by the entities described below.

References in this offering memorandum to "our F1 Management Subsidiary" refer to F1 Management S.C., a *sociedad civil* duly formed under the laws of Mexico.

**(b)    Property Management Agreement with Jumbo Administración, S.A.P.I. de C.V.**

On August 31, 2012, we entered into a property management agreement with Jumbo Administración, S.A.P.I de C.V., a *sociedad anónima promotora de inversión de capital variable* duly formed under the laws of Mexico to provide all necessary services related to the management, operation and maintenance of the properties comprising the Morado Portfolio.

(c)      **Property Management Agreement with Finsa Holding, S.A. de C.V.**

On August 15, 2013, we entered into a property management agreement with Finsa Holding, S.A. de C.V., a *sociedad anónima de capital variable* duly formed under the laws of Mexico to provide all necessary services related to the management, operation and maintenance of the properties comprising the Vermont Portfolio.

(d)      **Property Management Agreement with Hines Interests, S.A. de C.V.**

On February 18, 2014, we entered into a property management agreement with Hines Interests, S.A. de C.V., a *sociedad anónima de capital variable* duly formed under the laws of Mexico to provide all necessary services related to the management, operation and maintenance of the properties comprising the Maine Portfolio.

References in this offering memorandum to "our Property Managers" refer to our Management Subsidiary together with Jumbo Administración, S.A.P.I de C.V., Finsa Holding, S.A. de C.V., and Hines Interests, S.A. de C.V.

***Officers of our Advisor and Management Subsidiary***

Our Management Subsidiary's and Advisor's management teams are led by Messrs. André El-Mann Arazi, their Chief Executive Officer and Isidoro Attié Laniado, their Executive Vice President of Strategy and Finance. Additionally, our Management Subsidiary's management team includes Mr. Gonzalo Robina Ibarra, its Deputy Chief Executive Officer, and six vice presidents, Gerardo Vargas Ateca, its Vice President of Finance, Javier Elizalde Vélez, its Vice President of Treasury, Jorge Humberto Pigeon Solórzano, its Vice President of Markets and Investor Relations, Ignacio Tortoriello, its Vice President of Administration and IT, Alfonso Arceo, its Vice President of Properties Management and Alejandro Chico P., its Vice President of Legal Affairs.

Certain members of our technical committee and officers of our Management Subsidiary, including Messrs. André El-Mann Arazi, Isidoro Attié Laniado, Moisés El-Mann Arazi, Max El-Mann Arazi and Abude Attié Dayán, have an ownership interest in our Advisor and/or our Leasing Administrator. Our Management Subsidiary, our Advisor and our Leasing Administrator are exclusively dedicated to our affairs. For a detailed description of our Advisor's senior management team, see "Management—Our Advisor."

**Advisory Agreement**

Under the advisory agreement, our Advisor is responsible for, among other duties, consulting with and advising us and our Property Managers on long-term financial and strategic planning, assisting us in our relationship with investors and strategy and assisting us in the implementation of major decisions including, without limitation, the following:

(i)      providing advice and recommendations to us with respect to acquisitions of real estate consistent with our investment objectives and policies;

(ii)      consulting with us regarding the composition of our portfolio;

(iii)      advising us with respect to our capital structure and capital raising;

(iv)      assisting our Management Subsidiary in the identification, underwriting, selection and acquisition of our properties;

(v)      consulting with our Management Subsidiary with respect to development and redevelopment projects, including advising our Property Managers on site selection and analysis, property design and construction management;

(vi)      assisting our Management Subsidiary in sourcing potential acquisition and development opportunities and otherwise making its network of industry relationships available to us;

(vii)    assisting our technical committee in developing criteria for debt and equity financing that are specifically tailored to our investment objectives;

(viii)    assisting in the preparation of reports and statistical and economic data;

(ix)    recommending and advising on how to define, or whether to request a change of, plans, projects, budget, calendars, policies, that it believes are necessary and convenient for better management, operation, supervision and profitability of our projects;

(x)    recommending and advising our technical committee regarding individuals who could potentially fulfill the functions of supervising, auditing and controlling the acts of the Trustee, service providers, legal advisors and other entities related to us;

(xi)    recommending and advising on how best to present reports on activities regarding internal control and supervision;

(xii)    recommending and advising our technical committee, our Property Managers and our Leasing Administrators on the development of their activities and the fulfillment of their obligations towards the Trustee;

(xiii)    recommending to our Property Managers how best to organize and prepare the inventory of our projects, including the characteristics of each property or acquisition;

(xiv)    recommending, advising and presenting the necessary plans under which the following acts will be implemented: (i) control and supervision of our fiscal obligations; and (ii) ensuring compliance with our obligations, especially with regards to CBFI-related obligations and those derived from the Mexican Securities Market Law and any related dispositions;

(xv)    advising regarding the activities related to supervising the internal and external auditors, as well as the legal advisors, and other technical and service providers to the Trustee;

(xvi)    recommending all of the policies and guidelines required to process licenses, permits, and other necessary authorizations for the projects;

(xvii)    providing advice regarding (i) management, operations, promotion, organization, planning, direction, supervision, representation, control, directing, commercialization, import, export and (ii) judicial, accounting, fiscal, administrative, financial, economic, technical, architectural, engineering and construction, regarding any projects and us; and

(xviii)    otherwise performing all tasks necessary to perform its services provided to us under the advisory agreement.

### *Reports*

The advisory agreement requires our Advisor to furnish the Trustee and our technical committee with monthly reports, as well as any information that the Trustee or our technical committee may reasonably request.

### *Advisory Fee*

In accordance with the terms of the advisory agreement, our Advisor is entitled to receive an annual fee in an amount equal to 0.50% of the undepreciated book value of our assets less any outstanding indebtedness, plus any applicable value-added taxes. The first three installments, payable in respect of the quarters ended March 31, June 30 and September 30 of each year, will be provisional payments calculated as described above (but expressed quarterly) based on the financial statements for such quarter. The fourth installment will be a definitive, final payment in respect of the fiscal year calculated based on the audited financial statements for such year. The amount

payable as the fourth installment will represent the annual fee calculated as described above, less the installment payments previously made in respect of the first three quarters of the year. To the extent that the sum of the installment payments made in respect of the first three quarters of the year exceeds the amount payable as the fourth installment, our Advisor will be required to repay the difference in cash to us.

In addition, as consideration for advising us and the Property Managers in the contribution and acquisition of properties in accordance with the terms of the advisory agreement, subject to approval by our technical committee, our Advisor is entitled to receive a sourcing and advisory fee in an amount equal to 3% of the value of any property contributed to or acquired by us (which includes any fee payable by us or our Advisor to real estate brokers hired in connection with such contribution or acquisition), paid in cash or with CBFIs, as may be agreed between the Advisor and the technical committee, other than the 17 properties we acquired as part of our formation transactions and other than contributions or acquisitions from a related party, payable (one time, either in cash or in CBFIs determined on a case-by-case basis) at the closing of any such contribution or acquisition. With respect to acquisitions or contributions of properties in which Relevant Principals of E Group have ownership interests, the sourcing and advisory fee will only apply to the value of the portion of the property that is not owned by any Relevant Principal of E Group. In addition, the contribution or acquisition from Relevant Principals of E Group will be subject to the prior approval of our technical committee, including a majority of the independent members of our technical committee. The sourcing and advisory fee may be increased by our technical committee, with the affirmative vote of a majority of the independent members.

### Term

After its initial five-year term expired on January 19, 2016, the agreement with our Advisor was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

### Removal of Advisor; Termination

The advisory agreement may be terminated by us or by our Advisor upon 90 days' prior written notice. The advisory agreement will also terminate upon the termination of the property management agreement with our F1 Management Subsidiary or the services agreement with our Leasing Administrator.

Upon completion of our initial offering and our formation transactions, the contributors of our Initial Portfolio placed all of the CBFIs held by them in a control trust.  Upon the completion of the offering, the control trust is expected to continue being our controlling shareholder.  Four of the members of our technical committee, including Messrs. Moisés El-Mann Arazi, André El-Mann Arazi, Isidoro Attié Laniado and Max El-Mann Arazi, have an ownership interest in our Advisor and, so long as the control trust holds 15% or more of our outstanding CBFIs, they will be able to cause the control trust to prevent the removal of our Advisor other than for "cause."

### Liability and Indemnification

The advisory agreement provides that our Advisor will not assume any responsibility other than to render the services called for thereunder, and will not be liable for any errors of judgment made in good faith unless such errors constitute a breach of its obligations thereunder in a manner that lacks diligence, honesty and good faith.

### Governing Law; Submission to Jurisdiction

The advisory agreement is in the Spanish language and is governed by Mexican law. The advisory agreement provides that the parties thereto have submitted to the jurisdiction of the courts of Mexico City in connection with any controversy arising from the interpretation of or non-compliance with the advisory agreement.

### Services Agreement with our Leasing Administrator

Pursuant to the services agreement with our Leasing Administrator, our Leasing Administrator will be responsible for, among other duties:

(i)        invoicing leases and maintenance fees;

(ii)       collecting rents and maintenance fees on our behalf;

(iii)      supporting our Property Managers in the negotiation and execution of leases, pursuant to our policies and instructions;

(iv)      supporting our Property Managers in carrying out all necessary activities to ensure the renewal of our lease agreements; and

(v)       otherwise performing all tasks necessary to perform its services provided to us under the services agreement with our Leasing Administrator.

Our Leasing Administrator performs these functions for all properties other than those in the Morado Portfolio.

### Reports

The services agreement requires our Leasing Administrator to furnish the Trustee, our technical committee and our F1 Management Subsidiary with monthly reports, as well as any information that the Trustee or our technical committee may reasonably request.

### Services Fee

In accordance with the terms of the services agreement with our Leasing Administrator, our Leasing Administrator is entitled to receive a monthly fee in an amount equal to 2.0% of the lease payments actually received under the leases on our properties, other than those in the Morado Portfolio, for the previous month, plus any applicable value-added taxes.

### Term

After its initial five-year term expired on January 19, 2016, the services agreement was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

### Removal of Leasing Administrator; Termination

The services agreement may also be terminated by us or by our Leasing Administrator upon 90 days' prior written notice, and will also terminate upon a termination of the advisory agreement or the property management agreement with our Management Subsidiary.

### Liability and Indemnification

The services agreement provides that our Leasing Administrator will not assume any responsibility other than to render the services called for thereunder, and will not be liable for any errors of judgment made in good faith unless such errors constitute a breach of its obligations thereunder in a manner that lacks diligence, honesty and good faith.

### Governing Law; Submission to Jurisdiction

The services agreement with our Leasing Administrator is in the Spanish language and is governed by Mexican law. The services agreement with our Leasing Administrator provides that the parties thereto have submitted to the jurisdiction of the courts of Mexico City in connection with any controversy arising from the interpretation of or non-compliance with this services agreement.

**Services Agreement with Morado Leasing Administrator**

On August 31, 2012, we entered into a services agreement with Morado Leasing Administrator, to provide us with all promotion, advertising, consulting and contracting services, as well as the execution of new lease agreements over the properties in the Morado Portfolio and certain other properties. These services include, but are not limited to: (i) rendering all the marketing activities necessary to promote and maintain the properties leased; (ii) carrying out all the advertising campaigns related to the properties; (iii) negotiating, hiring and supervising the activities of the independent holders or brokers that promote the lease of the properties; (iv) negotiating and executing new lease agreements; and (v) as applicable, extending the existing lease agreements, each in accordance with the policies, terms, periods and conditions authorized by our technical committee.

Under the terms of the services agreement, we will pay Morado Leasing Administrator the equivalent of 5.0% of the rental amount under each new lease agreement (not including renewals or extensions of existing lease agreements) we enter into with tenants of the Morado Portfolio as a result of their involvement, for a period of up to five years starting on the effective date of the lease agreement.

The services agreement has a mandatory term of 7.5 years for each party to the agreement, effective as of August 31, 2012.

**Property Management Agreement with F1 Management Subsidiary**

Under the property management agreement with F1 Management Subsidiary, our F1 Management Subsidiary is responsible for the day-to-day management and administration of a significant portion of our business (other than the Morado Portfolio, Maine Portfolio and Vermont Portfolio). With regard to the management, operation and maintenance of the Vermont Portfolio, Maine Portfolio and Morado Portfolio our F1 Management Subsidiary is supported by the entities described below. Our F1 Management Subsidiary is responsible for, among other duties, the following matters:

(i)      reviewing revenues and expenses;

(ii)     cash management and treasury functions;

(iii)    preparing financial statements and reviewing tax filings and in-house audit and tax compliance functions;

(iv)     supervising our external auditors and legal counsel;

(v)      human resources activities;

(vi)     overseeing compliance with applicable securities and securities exchange requirements;

(vii)    investor relations activities;

(viii)   sourcing and conducting due diligence on property acquisition and development opportunities and consulting with our Advisor with respect thereto;

(ix)     negotiating for the acquisition, financing, refinancing and development of our properties (including matters relating to governmental approvals and zoning requirements), with the assistance of our Advisor and pursuant to the instructions of our technical committee;

(x)      negotiating for and coordinating the disposition of our properties;

(xi)     submitting property acquisition and disposition proposals to our technical committee and holders of our CBFIs;

(xii)   determining when to renovate, alter, develop or redevelop our properties and coordinating any such renovations, alterations, developments and redevelopments, including selecting, contracting with and overseeing architects, engineers, contractors and materials providers;

(xiii)  initiating and coordinating property maintenance, including painting and carpeting, and designing and overseeing tenant improvements;

(xiv)   overseeing utilities services;

(xv)    negotiating insurance coverage for our properties and handling insurance claims;

(xvi)   performing advertising and marketing functions, including retaining and overseeing independent real estate brokers for our properties;

(xvii)  preparing maintenance programs (i.e., any studies, plans, reports, projects, licenses, budgets and calendars relating to the renovation and maintenance of our properties so as to ensure they are properly operating and functioning) and their respective budgets and having our technical committee revise and approve them;

(xviii) informing tenants of any increase in maintenance fees, according to the budgets approved by our technical committee;

(xix)   supervising, monitoring, maintaining and when applicable, improving the security systems of our properties;

(xx)    establishing rules for the use, lease, improvement and maintenance of our properties;

(xxi)   setting general terms and conditions for our Leasing Administrators' negotiations for leases of our properties, and reviewing and approving all leases prior to execution by our Leasing Administrators on our behalf;

(xxii)  directing and supervising litigation, evictions and other legal matters arising from our properties;

(xxiii) supervising our Leasing Administrators in their billings and collections, including compiling our Leasing Administrators' financial work into our tax and financial records; and

(xxiv)  otherwise performing all tasks necessary to perform its services provided to us under the property management agreements.

***Fees***

In accordance with the terms of the property management agreement with F1 Management Subsidiary, our F1 Management Subsidiary is entitled to receive a monthly fee in an amount equal to 1% of the lease payments actually received under the leases on our properties included in the property management agreement for the previous month, plus any applicable value-added taxes. Our F1 Management Subsidiary is entitled to receive all maintenance fees, plus any applicable value-added taxes collected from tenants, which shall be used solely for the payment of maintenance expenses of the properties. We expect any surplus income generated by our F1 Management Subsidiary to be periodically distributed to us, as sole owner of our F1 Management Subsidiary.

***Term***

After its initial five-year term expired on January 19, 2016, the property management agreement was automatically extended for two one-year terms and will be subject to subsequent one-year automatic extensions unless previously terminated.

*Termination*

The property management agreement with F1 Management Subsidiary may be terminated by us or by our F1 Management Subsidiary upon 90 days' prior written notice. The property management agreement with our F1 Management Subsidiary will also terminate upon the termination of the advisory agreement or the services agreement with our Leasing Administrator. Termination of the property management agreement with our F1 Management Subsidiary will result in the termination of the services agreement with our Leasing Administrator and the advisory agreement.

*Liability and Indemnification*

The property management agreement provides that our F1 Management Subsidiary will not assume any responsibility other than to render the services called for thereunder, and will not be liable for any errors of judgment made in good faith unless such errors constitute a breach of its obligations thereunder in a manner that lacks diligence.

*Governing Law; Submission to Jurisdiction*

The property management agreement with F1 Management Subsidiary is in the Spanish language and is governed by Mexican law. This property management agreement provides that the parties thereto have submitted to the jurisdiction of the courts of Mexico City in connection with any controversy arising from the interpretation of or non-compliance with this property management agreement.

## Property Management Agreement with Jumbo Administración, S.A.P.I. de C.V.

On August 31, 2012, we entered into a property management agreement with Jumbo Administración, S.A.P.I de C.V., a subsidiary of the contributors of the Morado Portfolio, to provide all necessary services related to the management, operation and maintenance of the properties comprising the Morado Portfolio. These services include, but are not limited to: (i) invoicing and collecting rent, maintenance fees and other benefits in accordance with the lease agreements; (ii) negotiating and executing lease agreements and, as applicable, extensions to the lease agreements, in accordance with the policies, terms and conditions established by our technical committee; (iii) carrying out all actions necessary to comply with all the obligations and to exercise all of the rights arising from the lease agreements; (iv) selecting and contracting for personnel services for the maintenance and oversight of the real estate property assets; (v) managing and protecting our real estate property assets as strategic assets; (vi) overseeing the real estate property assets; (vii) carrying out the advertising campaigns for the real estate property assets; and (viii) carrying out all actions necessary to maintain the real estate property assets in compliance with all obligations under and to exercise all the rights arising from the ownership or holding thereof.

Under the terms of the property management agreement, we will pay Jumbo Administración, S.A.P.I. de C.V. an amount equal to the sum of (i) 3.0% per month of the revenue collected from the Morado Portfolio; (ii) the total amount of the maintenance fees, advertising fees and services charged to the tenants and users of the properties, in accordance with their respective lease agreement; and (iii) 0.5% per year over the contribution value of the real estate property assets contributed to the Trust, payable per quarter in arrears.

The agreements that we have executed for the management of the Morado Portfolio have a mandatory term of 7.5 years for each party thereto, effective as of August 31, 2012.

In addition, for the management of the Morado Portfolio, we will continue receiving services from our Advisor, our Leasing Administrator and our F1 Management Subsidiary.

## Property Management Agreement with Hines Interests, S.A. de C.V.

On February 18, 2014, we entered into a property management agreement with Hines Interests, S.A. de C.V. to provide all necessary services related to the management, operation and maintenance of the properties comprising the Maine Portfolio. These services include, but are not limited to: (i) invoicing and collecting rent,

maintenance fees and other benefits in accordance with the lease agreements; (ii) monitoring the managing and operation of the real estate property assets comprising the Maine Portfolio; (iii) rendering services to tenants in accordance with the terms set forth in the lease agreements; (iv) maintaining records and files of the lease agreements; (v) handling complaints and requests from tenants; (vi) conducting and supervising the operation and managing activities of the real estate property assets, including but not limited to, security services, preventive maintenance programs and preservation of the real estate property assets; (vii) supervising the performance of improvements that are necessary in the real estate property assets and to carry out any and all acts in order to comply with all its obligations and to exercise all rights arising from the lease agreements; (viii) selecting and contracting personnel services for the maintenance and oversight of the real estate property assets; (ix) carrying out the management and reporting of financial activities related to the properties; (x) carrying out the advertising campaigns for the real estate property assets; and (xi) carrying out all actions necessary to maintain the real estate property assets in compliance with all obligations under and to exercise all the rights arising from the ownership or holding thereof.

Under the terms of the property management agreement, we will pay Hines Interests, S.A. de C.V. Ps.1.6 million annually, plus any applicable value-added taxes.

After an initial term of two years, the agreement is subject to automatic one-year extensions; however, the agreement may be terminated by us upon 60 days' prior written notice or by Hines Interests, S.A. de C.V. upon 90 days' prior written notice.

In addition, for the management of the Maine Portfolio, we will continue receiving services from our Advisor, our Leasing Administrator and our F1 Management Subsidiary.

**Property Management Agreement with Finsa Holding, S.A. de C.V.**

On August 15, 2013, we entered into a property management agreement with Finsa Holding, S.A. de C.V. to provide all necessary services related to the management, operation and maintenance of the properties comprising the Vermont Portfolio. These services include, but are not limited to: (i) invoicing and collecting rent, maintenance fees and other benefits in accordance with the lease agreements; (ii) monitoring the management and operation of the real estate property assets comprising the Vermont Portfolio; (iii) maintaining records and files of the lease agreements; (iv) conducting annual reviews of insurance policies regarding the real estate property assets; (v) conducting and supervising the operation and managing activities of the real estate property assets, including but not limited to, security services, preventive maintenance program and preservation of the real estate property assets; (vi) conducting surveillance operations and preparing reports on the performance of the real estate property assets; (vii) rendering services to tenants in accordance with the terms set forth in the lease agreements; (viii) handling relations and communication with tenants; (ix) supervising the performance of improvements that are necessary in the real estate property assets and to carry out any and all acts in order to comply with all its obligations and to exercise all rights under the lease agreements; (x) selecting and contracting for personnel services for the maintenance and oversight of the real estate property assets; (xi) carrying out the management and reporting of financial activities related to the real estate property assets; (xii) overseeing the real estate property assets; and (xiii) carrying out all actions necessary to maintain the real estate property assets in compliance with all obligations under and to exercise all the rights arising from the ownership or holding thereof.

Under the terms of the property management agreement, we will pay Finsa Holding, S.A. de C.V. an amount equal to 3.0% of the revenue collected from the Vermont Portfolio.

The agreement had an original mandatory term of two years and provides for two automatic two-year extensions; however, the agreement may be terminated by us or by Finsa Holding, S.A. de C.V. upon 60 days' prior written notice.

In addition, for the management of the Vermont Portfolio, we will continue receiving services from our Advisor, our Leasing Administrator and our F1 Management Subsidiary.

# MANAGEMENT

## Members of Our Technical Committee

Our technical committee consists of 12 main members (five of whom are independent members) and their respective alternate members.  The name and age of the persons who serve as main members of our technical committee, who are appointed pursuant to our trust agreement, are set forth below:

| Main members | Age |
| --- | --- |
| Moisés El-Mann Arazi | 64 |
| André El-Mann Arazi | 53 |
| Isidoro Attié Laniado | 48 |
| Elías Sacal Micha | 67 |
| Max El-Mann Arazi | 58 |
| Abude Attié Dayán | 75 |
| Jaime Kababie Sacal | 68 |
| Ignacio Trigueros Legarreta* | 65 |
| Antonio Franck Cabrera* | 63 |
| Rubén Goldberg Javkin* | 67 |
| Herminio Blanco Mendoza* | 65 |
| Alberto Felipe Mulás Alonso* | 56 |

\*    Independent member

In April 2016, Alejandro Chico Pizarro, our Vice President of Legal Affairs, was nominated by both the technical committee and the nominations committee, as secretary of the technical committee. Such nomination was approved by our CBFI Holders' Assembly on April 28, 2016.

## Biographical information

The following sets forth biographical information for the main members of our technical committee. For biographical information on Messrs. André El-Mann Arazi and Isidoro Attié Laniado, see "—Our Advisor."

*Moisés El-Mann Arazi* is the Chairman of our technical committee. Mr. El-Mann Arazi has more than 40 years of experience in the real estate business.  He was one of the founding members of E-Group, one of the most important real estate groups in Mexico. He has led E-Group, which currently has vertically integrated real estate operations in Mexico, in connection with each project the group has been involved with.  Mr. El-Mann Arazi has developed more than 170 real estate projects in key locations in Mexico and has had an important role in capital raising transactions to fund projects in Mexico and abroad.  He has been involved in several social projects.  Over almost 40 years, he has built a network of customers with whom he maintains excellent relations and for whom he is an important source of real estate solutions.

*Elías Sacal Micha* has been involved in E-Group since it was founded. Mr. Sacal Micha has more than 40 years of experience in real estate.  He has been responsible for the development and operation of several projects, mainly in the retail segment.  He has had a critical role in the development, promotion, operation and marketing of large real estate projects, especially in the retail segment.  Mr. Sacal Micha has a profound knowledge of the commercial segment and has successfully developed an extensive network of customers that have been critical contributors to the growth of E-Group and Fibra Uno.

*Max El-Mann Arazi* has been involved in E-Group since it was founded and has more than 40 years of experience in real estate.  During his time in E-Group, he has focused on the management of industrial real estate, the acquisition of properties in all stages of development, and the management of real estate projects in the industrial, commercial, office and residential segments. He also has considerable experience in the retail sector, and has had a fundamental role in serving the needs of customers in the commercial and industrial segments.

*Abude Attié Dayán* is a distinguished businessman and philanthropist with more than 50 years of experience in the retail, real estate, financial and energy sectors.  He is the founder of Tiendas Melody, a leading Mexican business specialized in women's apparel, which was sold in the 1970s to a private equity firm.  Mr. Attié

Dayán has been involved in the real estate business since the 1970s, investing in and developing a series of projects in the retail, housing, office and industry sectors.  Mr. Attié Dayán has been a promoter of different business in various sectors and has been a shareholder in companies such as SARE, The TechnoWise Group, Insignia Life, Presencia and Medios, etc.  In addition, he has been involved in various charitable projects.

***Jaime Kababie Sacal*** has been a partner in the E-Group for more than 20 years.  In addition to his experience in the real estate business, Mr. Kababie has been involved in the industrial sector and has more than 40 years of experience in the production of polyethylene products, including packages and wrappers.

***Ignacio Trigueros Legarreta*** is an independent member of our technical committee and has had a long and illustrious academic career.  He is a director of the Centro de Análisis e Investigación Económica del Instituto Tecnológico Autónomo de México, or ITAM and a full-time professor in the same institution.  He is a member of the board of directors of Evercore Casa de Bolsa and an Advisor of the Investment Committee of Afore XXI.  He is a renowned economist and researcher.  He has also served as an advisor to various governmental units and has received several awards.  Mr. Trigueros received a degree in economics from ITAM and a Master's degree and a PhD in economics from the University of Chicago.

***Antonio Franck*** is an independent member of our technical committee.  Mr. Franck has over 40 years of experience in corporate, banking and securities law, and has advised companies in Mexico and abroad in connection with merger and acquisition transactions and strategic alliances.  He has been actively involved in the creation of several banks and financial groups in Mexico and was legal advisor to the banks that advised the Mexican government in its debt restructuring from 1982 to 1992.  He is currently a partner in Jones Day México.  He is an expert on matters of corporate governance and has advised the boards of directors of Coppel, BanCoppel, Farmacias del Ahorro, Landsteiner, Globo Cambio, Grupo Aeroportuario del Pacífico, Mexicana de Cananea, Sears Roebuck de México, y Grupo Financiero IXE.  He is the President of the Comité Legislativo y de Análisis del Consejo Coordinador Empresarial and a member of the Comisión de Honor y Justicia de la Barra Mexicana de Abogados.  Moreover, he has taught at Escuela Libre de Derecho and the Universidad Iberoamericana.  He received his law degree from Universidad Iberoamericana and attended post-graduate programs at University of Houston and Harvard University.

***Rubén Goldberg Javkin*** is an independent member of our technical committee.  He is a Senior Director and Partner of Goldberg, Alerhand y Asociados, S.C., an investment bank, and the President of the Investment Committee of Galileo Total Return Fund.  He has extensive experience in financing and corporate and investment banking.  He was responsible for corporate banking at Bank of America México, a principal for México of Wells Fargo Bank and General Director of investment banking at HSBC.  He was the President of N.M. Rothschild & Sons (México) and a member of the board of directors of Grupo Collado.  Mr. Goldberg received a public accountant degree from the Universidad Nacional Autónoma de México and an MBA from The Wharton School at the University of Pennsylvania.

***Herminio Blanco Mendoza*** is an independent member of our technical committee. He is the President and General Director of Soluciones Estratégicas Consultoría, a business specializing in international commercial consulting.  He has extensive experience in the public sector and international trade.  Mr. Blanco is the President of the board of directors of IQOM Inteligencia Comercial, the only provider of daily trade analysis in Latin America and Mexico.  Mr. Blanco served as Secretary of Trade and Industry of Mexico during the Zedillo administration and as Mexico's Chief Negotiator of NAFTA during the Salinas administration.   He has had key positions in committees and boards of companies such as CYDSA, Grupo Financiero Banorte, Bancomex and Foreign Trade Bank of Latin America. He was previously an assistant professor at Rice University in the United States and at the Colegio de México.  Mr. Blanco received a degree in economics from the Instituto Tecnológico y de Estudios Superiores de Monterrey and a PhD in economics from the University of Chicago.

***Alberto Mulás Alonso*** is an independent member of our technical committee.  He has 30 years of experience in investment banking, strategic and financial consulting and mergers and acquisitions as well as with the public sector.  Mr. Mulás Alonso is the managing partner of CReSCE Consultores, a specialized, strategic and corporate governance consulting firm.  He is also an independent member of the boards of directors or committees of OMA, Cinépolis, Farmacias del Ahorro, and Grupo Estafeta, among others.  From 2014 to 2016 Mr. Mulás

Alonso was Chief Executive Officer of Itaú-Unibanco, where he was responsible for developing the bank's presence in Mexico.  In the public sector, during the Fox administration, Mr. Mulás Alonso was Undersecretary of Urban Development and Housing and created the Commission and the National Housing Council, in both of which he was the first Commissioner and General Secretary, respectively, and from which he promoted the transformation of the *Fondo de Operación y Financiamiento Bancario a la Vivienda,* FOVI, into the Federal Mortgage Institution and other structural changes in Infonavit, Fovisste and Fonhapo.  Mr. Mulás Alonso started his career as an associate at Bankers Trust Company, and subsequently held different positions at JP Morgan, Lehman Brothers and Donaldson, Lufkin & Jenrette.    He has been actively involved in projects of institutions such as the World Bank, the International Monetary Fund, the International Finance Corporation and the Inter-American Development Bank.  He has been member of the board of directors of private and publicly held companies such as Grupo Modelo, Grupo Financiero Santander, Empresas ICA, Acciones y Valores, Grupo Comex, Cydsa, Aeroméxico y Mexicana de Aviación, Grupo Porres, Bancomext and Sociedad Hipotecaria Federal.  Mr. Mulás Alonso holds a BS in Chemical Engineering from Universidad Iberoamericana and earned his MBA from The Wharton School of the University of Pennsylvania.

**Executive Officers of Our Management Subsidiary**

The day-to-day management and administration of a significant portion of our business is conducted by our Management Subsidiary. The following table sets forth the names, ages and positions of the executive officers of our Management Subsidiary:

| Name | Age | Position |
| --- | --- | --- |
| André El-Mann Arazi | 53 | Chief Executive Officer |
| Isidoro Attié Laniado | 48 | Executive Vice President of Strategy and Finance |
| Gonzalo Robina Ibarra | 56 | Deputy Chief Executive Officer |
| Gerardo Vargas Ateca | 59 | Vice President of Finance |
| Javier Elizalde Vélez | 45 | Vice President of Treasury |
| Jorge Pigeon Solórzano | 48 | Vice President of Capital Markets and Investor Relations |
| Ignacio Tortoriello Tortoriello | 60 | Vice President of Administration and Information Technology |
| Alfonso Arceo Oregón | 46 | Vice President of Property Management |
| Alejandro Chico Pizarro | 42 | Vice President of Legal Affairs |

For biographical information on Messrs. André El-Mann Arazi and Isidoro Attié Laniado, please see "Our Advisor."

*Gonzalo Robina Ibarra* is our Management Subsidiary's Deputy Chief Executive Officer. He has more than 35 years of experience in real estate.  Mr. Robina currently serves as the first Chairman of AMEFI (Mexican Real Estate FIBRAs Association).  Previously, he was President of Fenix Capital Group, a Deutsche Bank subsidiary with more than 7,000 properties and 14,000 real assets under management. Mr. Robina was Chief Commercial Officer of GICSA and founder of MexFund, a real estate fund created in 2007, where he served as Chairman and Chief Executive Officer, which was acquired by us in 2011.  Mr. Robina was founder of the Missionary Family movement and was its director for 15 years.  He has a Bachelors' Degree in Business Administration from Universidad Iberoamericana and earned his Masters' Degree in Finance from Instituto Tecnológico Autónomo de México (ITAM).

*Gerardo Vargas Ateca* is our Management Subsidiary's Vice President of Finance.  He has a lengthy and successful career of more than 35 years in banking and finance. He has held key positions in several government agencies such as PEMEX, Banco de Mexico and FOBAPROA. Mr. Vargas was Chief Financial Officer of GRUMA. In addition, he has served in high-profile positions in financial institutions such as Banamex, Serfin, Santander and BBVA.  At Serfin he served as deputy Chief Executive Officer of Treasury and Wealth Management, and Chief Executive Officer of Operadora de Bolsa Serfin.  He was also deputy Chief Executive Officer of Corporate and Investment Banking of Santander and Chief Executive Officer of Markets and Promotion for Mexico and LatAm at BBVA.  He also served as the Chief Executive Officer of Investment Banking for BBVA in Madrid. Prior joining us,

Mr. Vargas was Chief Executive Officer of Products and Treasury of Grupo Monex. Gerardo holds a Bachelors' Degree in Economics from Instituto Tecnológico Autónomo de México (ITAM) and earned his Masters' Degree in Economics from the University of Chicago.

*Javier Elizalde Vélez* is our Management Subsidiary's Vice President of Treasury. Mr. Elizalde Vélez has more than 15 years of experience in corporate banking. Previously, he was Director of Corporate Banking at BBVA Bancomer since 2002, and held several key positions within Bancomer's corporate division, where he actively participated in the funding structures of more than 100 real estate projects. Mr. Elizalde has been in charge of our treasury since our creation and served as our Chief Financial Officer until 2014. He holds a BA in Business Administration from Instituto Tecnológico de Estudios Superiores de Monterrey (ITESM) in Mexico City.

*Jorge Humberto Pigeon Solórzano* is our Management Subsidiary's Vice President of Capital Markets and Investor Relations. Mr. Pigeon has 25 years of experience in investment banking and capital markets. He has worked for James Capel, Violy, Byorum & Partners, and BBVA Securities in New York. He was also director of equity capital markets at BBVA Bancomer. Prior to joining us, he was Executive Director, Head of Equity Capital Markets with Santander, where he was in charge of our initial public offering and two of our follow-on offerings. Mr. Pigeon has participated in several equity, debt and M&A deals in the United States, Mexico, Latin America and Europe, totaling more than 25 billion U.S. Dollars of aggregated transactions value. He holds a BS in Civil Engineering from Universidad Iberoamericana and has completed several courses focused to corporate finance, valuation and investment banking.

*Ignacio Tortoriello* is our Management Subsidiary's Vice President of Administration and Information Technology. He has more than 35 years of experience and has held key roles in structuring strategies and controls, and in creating efficient and committed teams, and has been a consultant focused in business processes and information technologies. Has successfully implemented complex processes and administrative platforms in several corporations and has advised many other corporations on corporate planning and administrative issues. He held key positions in companies such as CEMEX and Comex, and has advised companies such as Chocolates Turin, Honeywell Automotive Mexico, Almex and SuKarne. Mr. Tortoriello has been member of the board of Chocolates Turin, Opcion Proa, and Cables y Plasticos. He holds a Bachelor's Degree in Economics from Instituto Tecnológico Autónomo de México (ITAM), and earned his MBA from Instituto Panamericano de Alta Dirección de Empresas (IPADE), and has completed several training courses on supply chain, logistics and planning at IPADE and GeorgiaTech, among others.

*Alfonso Arceo* is our Management Subsidiary's Vice President of Property Management. Mr. Arceo has more than 20 years of experience in operations management and business development, and has held several top management positions. Prior to joining us, Mr. Arceo was Vice President of Operations with Mexico Retail Properties, where he developed and implemented a series of manuals and processes to achieve institutional management in more than 50 shopping centers. Formerly he was Director of New Businesses with Blockbuster Mexico, where he developed the first "Blockbuster Cinema" concept in the world. He was also Chief Executive Officer of Multimax, the fourth largest chain of movie theaters at the time. Mr. Arteo began his professional career in corporate banking with BBVA Bancomer. He holds a BA of Business Administration from Universidad Anahuac in Mexico City and earned his MBA from Instituto de Empresa in Madrid.

*Alejandro Chico P.* is our Management Subsidiary's Vice President of Legal Affairs. Mr. Chico has more than 20 years of experience with domestic and international law firms as a lawyer specialized in financial, banking and capital markets law. His practice has been focused on both equity and debt transactions in local and foreign markets. He has also advised clients on restructurings, highly-complex real estate operations, and mergers and acquisitions. Mr. Chico was actively involved in the structuring and implementation of our initial public offering. Prior to joining us, he was Partner of the law firm Jones Day in Mexico City. He has international experience in law firms such as Cleary, Gottlieb, Steen & Hamilton and Latham & Watkins. He holds a law degree from Universidad Anahuac and earned his Master of Laws degree from University of Miami.

The chart below details our experienced management team:



## E-Group

Prior to our initial public offering in 2011, our properties were owned and managed by E-Group, certain members of which comprise our senior management team. With over 30 years of experience in the Mexican real estate market, E-Group is a group of Mexican individuals and entities, including trusts created by individuals and companies, that is vertically integrated and dedicated to the acquisition, development and operation of various types of commercial and other real estate projects in Mexico, including industrial, retail, office and mixed-use projects. The origin of E-Group dates back to the 1970s, when members of the El-Mann family commenced operations as the franchisee of a Mexican brand of paints and related products. As the franchise expanded, E-Group faced a shortage of well-located commercial properties that met its quality standards and offered reasonable rents. As a result, E-Group began acquiring and developing land and properties which, on occasion, were larger than the space needed for its stores and could be leased to other businesses. Recognizing the opportunity in the Mexican commercial real estate market, E-Group transitioned its business to focus on real estate, expanding its portfolio of properties throughout the 1980s and, in the early 1990s, developed its first industrial facility. Today, E-Group provides full service real estate operations, having developed and operated more than 233 projects in different sectors of the Mexican real estate industry and different geographic areas of Mexico.

Certain members of E-Group participate in our management and operations, and we believe that our relationship with E-Group provides us with significant advantages in sourcing, evaluating, underwriting, acquiring, developing, leasing and managing properties. Our Management Subsidiary, our Advisor and our Leasing Administrator have access to E-Group's deep industry relationships, market intelligence and execution experience. We believe that our relationship with E-Group provides us with access to an extensive pipeline of potential acquisitions.

Pursuant to our trust agreement and the contribution agreements relating to the Initial Portfolio, Messrs. Moussa "Moisés" El-Mann Arazi, Max El-Mann Arazi, André El-Mann Arazi, Elías Sacal Micha, Abud "Abude" Attié Dayán, Isidoro Attié Laniado, Isaac Attié Laniado, Amín Guindi Hemsani, Alberto Guindi Hemsani, Jaime Kababie Sacal, Rafael Kababie Sacal, Salomón Kababie Sacal and Moisés Kababie Sacal, whom, so long as they hold, through the control trust, individually or together with the other members of their respective families, an aggregate of at least 3% of our outstanding CBFIs, we refer to as the Relevant Principals of E-Group, have agreed to provide us with a right of first refusal to purchase any future real estate investment opportunity sourced by any of

them, to the extent such opportunity involves industrial, office, retail or mixed-use properties and so long as the control trust holds at least 15% of our outstanding CBFIs. In addition, the El-Mann Family and the Attié Family (each as defined herein) have agreed to provide us with a right of first refusal to purchase any industrial, retail, office, hotel or mixed-use property that, as of January 10, 2011, was majority-owned by them, either collectively or separately. For a more detailed description of the rights of first refusal, see "Certain Relationships and Related Transactions." We believe that this access to future real estate investment opportunities sourced by the Relevant Principals of E-Group and certain properties that are currently majority-owned by the El-Mann Family and the Attié Family will generate an ongoing source of attractive investment opportunities through which we can grow our business.

## Our Technical Committee

Currently, our technical committee is comprised of 12 members (five of whom are independent) and their respective alternate members. Pursuant to the terms of our trust agreement, the management of our business is vested in our technical committee, which may have up to 21 main members. Our trust agreement allows for an alternate member to serve in place of each elected main member if such main member is unable to attend a meeting of our technical committee. As explained in more detail below, our technical committee is elected or ratified each year at the annual meeting of holders of our CBFIs.

Under Mexican law at least 25% of the main members of our technical committee and their respective alternates are required to be independent members as construed under Mexican legal requirements. As of June 30, 2017, five of the 12 main members were independent members, representing 41.6% of the main membership of our technical committee. The independent members of our technical committee were appointed for their expertise, capacity and professional prestige, and are required to be able to carry out their functions free of conflicts of interest and without regard to personal, patrimonial or economic interests.

The determination of whether a member of our technical committee is independent takes into account, among other things, his or her relationship with the relevant contributors or related parties to such contributors. Notwithstanding the foregoing, a person may not be an independent member if such person is:

(i)      a director or employee of us, our Advisor, our Leasing Administrator, our Settlor or any Specified Contributor, or any entity that forms part of their respective business groups, including their examiners, including any person or entity that has held such position during the preceding 12 months;

(ii)     any person who has significant influence or mandatory power over us, our Advisor, our Leasing Administrator, our Settlor or any Specified Contributor;

(iii)    a shareholder that forms a part of a group of persons that have control over us, our Advisor, our Leasing Administrator, our Settlor or any Specified Contributor;

(iv)    a client, servicer, supplier, debtor, lender, partner, counselor or employee of an entity that is also a client, servicer, supplier, debtor or lender of us, our Advisor, our Leasing Administrator, our Settlor or any Specified Contributor, if: (A) in the case of a client, servicer or supplier, the total sales of such client, servicer or supplier that are derived from us, our Advisor, our Leasing Administrator, our Settlor or any Specified Contributor represent more than 10% of the total sales during the preceding 12 months of such client, servicer or supplier, (B) in the case of a debtor, the amount of credit owed by such debtor to our Settlor, our Advisor or our Leasing Administrator represents greater than 15% of the assets of our Settlor, our Advisor or our Leasing Administrator, or of that debtor, or (C) in the case of a lender, the amount of credit extended by such lender to our Settlor, our Advisor or our Leasing Administrator represents greater than 15% of the assets of our Settlor, our Advisor or our Leasing Administrator, or of that lender;

(vi)     a director or employee of any lessee of any of our properties that represents 10% or more of our ABR, who has held such position during the preceding 12 months;

(vii)    any external auditors of us or our Advisor or our Leasing Administrator, that has held such position during the preceding 12 months (in accordance with Article 24 of the Mexican Securities Market Law); and

(viii)   any person who has a family relationship, of blood, affinity or civil up to fourth grade or by affinity up to fourth grade, and also spouses or domestic partners recognized under Mexican law (*la concubina o el concubinario*), of any of person referred to in the foregoing subclauses (i) through (vi).

### Election of Technical Committee

Pursuant to our trust agreement, at each meeting of holders of our CBFIs for the election of our technical committee, any holder, or group of holders, with 10% of our outstanding CBFIs has the right to appoint a main member (and his or her respective alternate member) to our technical committee. As long as the contributors of the properties constituting our portfolio hold 15% or more of the outstanding CBFIs through the control trust, they will have the right to appoint a number of the members of our technical committee (and their respective alternates) equal to at least half of the total number of members of our technical committee at such time, plus one additional member (effectively ensuring that, during such time, the contributors are able to appoint a majority of the members of our technical committee). The contributors of the properties constituting our portfolio also have the ability, in their discretion, to exclusively appoint members of our technical committee not considered to be independent members. Holders of our CBFIs that meet such ownership thresholds will be required to submit to Deutsche Bank México, S.A., *Institución de Banca Múltiple, División Fiduciaria* (or any entity appointed as a successor thereto), or the Trustee, evidence of such ownership prior to a meeting of holders of our CBFIs.

The initial contributors, through a control trust, appointed the chairman of our technical committee, who is a member of our technical committee. The secretary (who may not be a member of our technical committee) was appointed by the technical committee in accordance with our trust agreement. CI Banco, S.A., *Institución de Banca Múltiple* (or any entity appointed as a successor thereto), as provided in our trust agreement, acts as the common representative of the holders of our CBFIs, or the Common Representative. The Common Representative may attend (but not participate in) meetings of our technical committee.

### Removal of Members

The appointment of the main members of our technical committee and their respective alternates may generally only be revoked by the holders of our CBFIs that originally appointed them. Such holders may at any time revoke such appointment by notifying the Trustee in accordance with the procedures described above under "Election of Technical Committee." The appointment of the main members of our technical committee and their respective alternates may be revoked by holders of our CBFIs other than the holders that originally appointed such members only in a meeting of holders of our CBFIs at which the appointment of all members of our technical committee is revoked, in which case, the substituted persons could be appointed during the following 12 months from their revocation.

The death, incapacity or resignation of a member of our technical committee will result in the automatic and immediate revocation of such person's membership on our technical committee, and the holders of our CBFIs that originally appointed such member will appoint a new member within the following five days or will be considered to have waived their right to appoint a new member to our technical committee until such appointment has been made.

### Meetings

Our technical committee meets in regular meetings in accordance with the calendar approved in the first meeting of our technical committee of each year, and in extraordinary meetings when necessary for its functions,

upon request of one of its main members to the other main members of our technical committee. Any of the members of our technical committee may request that the secretary of our technical committee call a meeting of our technical committee, with at least five days' prior notice. Such request must briefly indicate the matters to be resolved in such meeting. Extraordinary meetings of our technical committee may be called by the secretary of our technical committee, including upon request of a member of our technical committee, as described above, with at least three days' prior notice. Such notice shall be given to all the members of our technical committee, our Advisor and the Trustee in writing indicating the agenda for, and the place, date and time of the meeting. Such notice will not be necessary when all the main members of our technical committee are gathered.

Meetings of our technical committee may be held by conference telephone call or any other means that allows communication among participants in the meeting in real time and which may be recorded. The secretary of our technical committee will confirm in writing the presence of the members participating by conference telephone call or such other means for purposes of constituting a quorum.

The quorum for a meeting of our technical committee is a majority of the main members or their respective alternates, as applicable. Each member of our technical committee has one vote. Resolutions of our technical committee may be adopted by a majority vote of the members present, except for instances where our trust agreement also requires the affirmative vote of the majority of the independent members of our technical committee. Our technical committee may act without a meeting by adopting resolutions with the unanimous written consent of all the main members or their respective substitutes. In addition, the members of our technical committee can enter into agreements regarding their voting rights. In the event that the opinion of a majority of the independent members differs from that of the majority of the members of our technical committee, such difference of opinion must be disclosed via EMISNET (*Sistema Electrónico de Comunicación con Emisoras de Valores*), which is an electronic communication platform established by the Mexican Stock Exchange.

### Authority of Our Technical Committee

Our technical committee is authorized to instruct our Trustee to take any action in connection with our operations not expressly reserved to holders of our CBFIs. Our technical committee has certain duties which may not be delegated, which include, among other things: authorizing issuances of our CBFIs, whether public or private and whether within or outside of Mexico; advising and instructing the Trustee on the sale or cancelation of CBFIs, with the prior opinion of our Management Subsidiary; appointing legal, tax and accounting advisors, and instructing the Trustee to hire such advisors; establishing and amending the policies pursuant to which our assets will be invested, subject to and in accordance with our trust agreement (including the eligibility requirements described in "Policies with Respect to Certain Activities—Investment Policies"); analyzing and, where applicable, approving, together with the affirmative vote of a majority of the independent members, possible investments that could not or do not meet the eligibility requirements; approving any transaction (other than those made with a related person or that represent a conflict of interest) representing up to 19.99% of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the preceding quarter; approving our policies with respect to related parties, as well as authorizing transactions with related parties, including our Advisor, our Leasing Administrator, our Settlor, any of the Relevant Principals of E-Group, the El-Mann Family, the Attié Family, the members of our technical committee or any other related party, for which the affirmative vote of the majority of the independent members will also be required; appointing a substitute advisor for us, with the opinion of our practices committee, in the event our Advisor's appointment is revoked or our Advisor is unable to carry out its duties; appointing a substitute for our Property Managers, with notice to the Trustee, in the event our property management agreements are terminated or if our Property Managers are unable to carry out their duties; establishing our accounting policies, with the prior opinion of our audit committee; approving our internal controls and internal audit rules, with the prior opinion of our audit committee; approving, with the prior opinion of our audit committee, our financial statements for a consideration at a meeting of holders of our CBFIs; approving, together with the vote of a majority of the independent members, amendments to the eligibility requirements; establishing our leverage policies described under "Policies with Respect to Certain Activities—Leverage Policies"; establishing disposition policies with respect to our assets, subject to and in accordance with the provisions of our trust agreement, which disposition policies are described under "Policies with Respect to Certain Activities—Disposition Policies"; approving our distribution policies, and any particular distributions exceeding 95% of our net taxable net income; establishing our audit committee and practices committee, each of which will be

exclusively comprised of independent members; appointing and removing, with our audit committee's recommendation, our external auditor; instructing the Trustee to disclose certain statutory events referenced in the Mexican Securities Market Law, including all agreements whose purpose is contrary to an opinion of our audit committee or practices committee; and reviewing the compliance by our Management Subsidiary of its obligations under our trust agreement under the property management agreements with the Management Subsidiary.

### Compensation

While members of our technical committee do not have a right to compensation for acting in such capacity, the independent members are permitted to receive payment in cash or in kind if agreed to by the holders of our CBFIs at a meeting of such holders.

## Committees of Our Technical Committee

### Audit Committee

Our technical committee is responsible for appointing the chairman and the members of our audit committee. As required by applicable law, each of the three members of our audit committee must be an independent member. Each of the three members of our audit committee was appointed upon completion of our initial offering.

Our audit committee is responsible, among other things, for (i) evaluating our external auditors and analyzing their reports, (ii) analyzing our financial statements and discussing them with appropriate personnel, and based thereon assessing whether to recommend their approval to our technical committee, (iii) informing our technical committee of its view as to our internal controls and internal audit system including any irregularities that may be detected, (iv) requesting and obtaining independent expert opinions, (v) investigating non-compliance with operating and accounting guidelines and policies or with our internal controls or internal audit system, (vi) informing our technical committee of any important irregularities it may encounter and proposing remedial measures, (vii) calling meetings of holders of our CBFIs and requesting matters to be added to the agenda as it considers necessary, (viii) verifying compliance by our Advisor and the Trustee with resolutions of holders of our CBFIs and technical committee, (ix) verifying the implementation of internal control mechanisms and their compliance with applicable law, (x) requiring our Property Managers, our Leasing Administrators, the Trustee or their respective officers or employees involved in their management and operation, to prepare reports describing the preparation of financial statements, and (xi) holding periodic meetings with relevant directors of our Property Managers, our Advisor, our Leasing Administrators, the Common Representative and the Trustee.

### Practices Committee

Our technical committee is responsible for appointing the chairman and the members of our practices committee. Our practices committee adopts its resolutions by majority vote. As required by applicable law, each of the three members of our practices committee is an independent member. Each of the three members of our practices committee was appointed upon completion of our initial offering.

Our practices committee is responsible, among other things, for (i) providing opinions to our technical committee with regard to transactions that our practices committee is involved in with related parties and Relevant Principals of the E-Group, (ii) providing opinions to our technical committee with regard to the value of the transactions that our technical committee is involved with in carrying out its duties, (iii) providing recommendations to our technical committee as to what reports it should request from our Advisor or the Trustee to carry out its duties, (iv) advising our technical committee in carrying out its duties under our trust agreement, (v) presenting to our technical committee market studies relating to sectors to which our properties and assets belong, and providing recommendations as appropriate, and (vi) requesting and obtaining independent expert opinions.

*Nominations and Compensation Committee*

Our CBFI holders voted at our 2014 annual CBFI holders' assembly meeting to create a compensation committee to administer the 2014 Plan and to perform certain other functions. For a description of the 2014 Plan see "Management—Our Advisor—2014 Equity Incentive Compensation Plan." The 2014 annual CBFI holder's assembly meeting granted the technical committee the power to create a compensation committee. Our technical committee members voted at our March 2015 technical committee meeting to delegate the authority and powers planned for the compensation committee to the nomination committee, in particular the powers regarding to the Equity Incentive Compensation Plan, and also approved the change of the name of the nomination committee to the nomination and compensation committee and ratified the appointment of the existing nomination committee members. Our CBFI holders voted at our 2015 annual CBFI holders' assembly meeting to ratify the nominations and compensation committee members' appointment.

Our nominations and compensation committee is responsible for, among other things: (i) searching, analyzing and evaluating candidates for election or appointment as independent members of our technical committee; (ii) proposing to the assembly of holders of CBFIs individuals who, in the committee's opinion and based on their satisfaction of the independence requirements under the Mexican Securities Market Law, may join our technical committee as independent members, or when applicable, as substitute members to such independent members; (iii) monitoring and reviewing all matters relating to the independence of the independent members of our technical committee, including any issues involving potential conflicts of interest; (iv) proposing to the assembly of holders of CBFIs or our technical committee, as appropriate, the remuneration, if any, paid to members of the technical committee; (v) considering our audit committee's opinion on the removal of members of our technical committee, when it submits such opinion to the assembly of holders of CBFIs; (vi) with respect to the authority and powers in relation to the Equity Incentive Compensation Plan (1) reviewing and approving the corporate goals and objectives relevant to the compensation of our senior management team in accordance with the 2014 Plan, (2) evaluating the performance of our senior management team in light of such goals and objectives and approving compensation of such persons based on such evaluation, (3) reviewing and approving grants and awards under any future incentive-based compensation plans and equity-based plans; and (vii) any other duties assigned to it by the assembly of holders of CBFIs or our technical committee. Our nominations and compensation committee will support its nominations of independent members to our technical committee by certifying, to the satisfaction of the assembly of holders of CBFIs, the independence, experience and professional prestige of the candidates, and also taking into account that these individuals are able to perform their duties free from conflicts of interest, and without being subject to personal, property-based or economic interests that may pose conflicts with our interests.

The assembly of holders of CBFIs is responsible for appointing the members of our nominations and compensation committee, which is comprised of five members. A majority of the members of our nominations committee are independent members of our technical committee. Members of our nominations and compensation committee hold office until the later to occur of (i) one year from the date of their appointment and (ii) such time as their replacement has been appointed and is prepared to serve as a member of our nominations and compensation committee. Our nominations and compensation committee shall meet at any time upon notice from the chairman or secretary of our technical committee or any two members of our technical committee. The quorum for a meeting of our nominations and compensation committee is a majority of its members, and resolutions of our nominations and compensation committee are valid when adopted by the affirmative vote of at least a majority of the members present. The assembly of holders of CBFIs may, in its discretion, accept or reject the recommendations of our nominations and compensation committee, and any dispute regarding the effect of the recommendations made by our nominations and compensation committee shall be resolved at an extraordinary meeting of holders of CBFIs.

In relation to the committee's powers regarding the Equity Incentive Compensation Plan, our senior management will propose to the nomination and compensation committee annual compensation for our senior management team and employees of our Management Subsidiary. After due consideration, the nomination and compensation committee will make recommendations to our technical committee regarding the level of compensation for our senior management team and employees of our Management Subsidiary. Our technical committee will review the compensation recommendation and will provide final approval to any compensation under the 2014 Plan.

**Duty of Care and Duty of Loyalty of Members of our Technical Committee**

Our trust agreement imposes a duty of care and a duty of loyalty on members of our technical committee by reference to Mexican Securities Market Law and its provisions applicable to board members of Mexican publicly-traded companies (*Sociedades Anónimas Bursátiles*), as there is not a specific set of rules applicable to the members of a technical committee of a FIBRA.

According to Mexican Securities Market Law, the duty of care consists of acting in good faith and in our best interests. For such purpose, members of our technical committee are required to obtain the necessary information from our Advisor, the external auditors or any other person in order to be prepared to act in our best interests. The duty of care is discharged, principally, by attending our committee meetings and disclosing material information obtained by the relevant member of our technical committee at such meetings. Failure to act with care by members of our technical committee makes them jointly liable for damages and losses caused to us and our subsidiaries.

The duty of loyalty consists primarily of maintaining the confidentiality of information received in connection with the performance of duties and abstaining from discussing or voting on matters where a member of our technical committee has a conflict of interest. In addition, the duty of loyalty is violated if a holder, or group of holders, of our CBFIs is knowingly favored or if, without the express approval of our technical committee, a director takes advantage of a corporate opportunity. The duty of loyalty is also violated by (i) failing to disclose to the audit committee and the external auditors any irregularities that a member of our technical committee may encounter in the performance of his or her duties and (ii) disclosing information that is false or misleading or omitting to register any transaction in our records that could affect our financial statements. The violation of the duty of loyalty would make the relevant members of our technical committee jointly liable for damages and losses caused to us and our subsidiaries; this liability would also arise if damages and losses are caused as a result of benefits obtained by the member or members or third parties, as a result of actions of such members of our technical committee.

Liability actions for damages and losses resulting from the violation of the duty of care or the duty of loyalty may be exercised solely for our benefit and may be brought by us or by holders representing 5% or more of our CBFIs and if applicable criminal actions may only be brought by the Mexican Ministry of Finance, after consulting with the CNBV.

As a safe harbor for members of our technical committee, the liabilities specified above (including criminal liability) will not be applicable if the member, acting in good faith, (i) complied with applicable law, (ii) made the decision based upon information provided by our Advisor or third-party experts, the capacity and credibility of which could not be subject to reasonable doubt and (iii) selected the most adequate alternative in good faith or if the negative effects of such decision could not have been foreseeable.

**Our Advisor**

Our technical committee is responsible for ensuring that we have an advisor at all times, and has appointed our Advisor in accordance with our trust agreement. In consideration for its services to us, our Advisor will be entitled to advisory fees under the advisory agreement. See "The Advisory Agreement, the Services Agreements and the Property Management Agreements."

The following table sets forth the names, ages and positions of our Advisor's executive officers:

| Name | Age | Position |
|---|---|---|
| André El-Mann Arazi .................................. | 53 | Chief Executive Officer |
| Isidoro Attié Laniado.................................. | 48 | Executive Vice President of Strategy and Finance |

*André El-Mann Arazi* is a member of our technical committee and the Chief Executive Officer of our Advisor and our Management Subsidiary.  He has more than 35 years of experience in the real estate sector. He is co-founder of E-Group, one of the largest and most important real estate groups in Mexico. Has extensive expertise

in operating in all real estate segments, in raising capital to fund large-scale projects, and in acquiring real estate projects and properties. He is currently member of the board of each of the companies that integrate E-Group. Mr. El-Mann has been a member of the Metropolitan Council of BBVA Bancomer, is a member of the board of directors of The TechnoWise Group, and is an independent member of the board of Grupo Financiero Actinver.

*Isidoro Attié Laniado* is a member of our technical committee and the Executive Vice President of Strategy and Finance of our Advisor and our Management Subsidiary. He is a renowned businessman with broad experience of more than 30 years in the retail rector and more than 20 years in real estate. Mr. Attié was Chief Financial Officer and Chief Executive Officer of Grupo Melody, a women's apparel retail business founded by his father in the 60s and that was sold to a private equity firm in 2007. Since Mr. Attié joined E-Group, he has been actively involved in the development and acquisition of real estate projects in Mexico. Since then, Mr. Attié has been key to the growth and success of the E-Group, and has played a significant role during the process and promotion of our initial public offering in March of 2011.

*2014 Equity Incentive Compensation Plan*

We have implemented an employee compensation plan, or the 2014 Plan, which was approved at our CBFI holders' assembly meeting on April 4, 2014. We believe the 2014 Plan better aligns the interests of our senior management and the employees of our Management Subsidiary with those of the holders of our CBFIs. This plan replaces the performance bonus plan approved by our technical committee on April 23, 2013 (which had not been implemented). To assist us in the implementation of the 2014 Plan, we hired Pablo Persson Errejon of Persson Human Resources Strategists, an independent consultant with experience in designing employee compensation plans.

The compensation plan has the following characteristics:

**Size of the 2014 Plan**. The plan is limited to 5% of the CBFIs outstanding after giving effect to the capital increases proposed for the year ended December 31, 2014 (162,950,664 CBFIs).

**Objectives of the 2014 Plan**: The plan is structured to (i) reward performance, (ii) retain talent and (iii) align the interests of our CBFIs holders with those of our senior management and employees of our Management Subsidiary.

**Term of the 2014 Plan**: The term of the plan is 10 years, commencing April 4, 2014.

**Governance of the Plan**. Our senior management will propose to the compensation committee annual compensation for our senior management team and employees of our Management Subsidiary. After due consideration, the compensation committee will make recommendations to our technical committee regarding the level of compensation for our senior management team and employees of our Management Subsidiary. Our technical committee will review the compensation recommendation and will provide final approval to any compensation under the 2014 Plan. Our compensation committee is responsible for, among other things, (1) reviewing and approving the corporate goals and objectives relevant to the compensation of our senior management team in accordance with the 2014 Plan, (2) evaluating the performance of our senior management team in light of such goals and objectives and approving compensation of such persons based on such evaluation, (3) reviewing and approving grants and awards under any future incentive-based compensation plans and equity-based plans and (4) performing other functions or duties deemed appropriate by our technical committee. Sixty percent of the compensation committee is comprised of independent members of our technical committee. As set forth in the 2017 annual CBFI holders' assembly meeting, the current members of the compensation committee are Herminio Blanco, Rubén Goldberg, Antonio Franck, André El-Mann, Isodoro Attié and Ignacio Trigueros. The compensation committee enables us to maintain an objective evaluation of the level of compensation for our senior management team and the senior management team of our Advisor.

**Key characteristics of the compensation plan**: The recommendations made by both our senior management and the compensation committee will be made on the following basis:

(a) *Certain Definitions*

    a.  "Fully Diluted FFO/CBFI" means the funds generated from operations without considering the expense attributable to the CBFIs issued pursuant to the 2014 Plan divided by the number of outstanding CBFIs (including the CBFIs to be issued pursuant to the 2014 Plan during the year of calculation of this ratio).

    b.  **"Fully Diluted Dividend per CBFI"** means the dividends or distributions (for taxable income and capital return, as the case may be) divided by the number of outstanding CBFIs (including the CBFIs to be issued pursuant to the 2014 Plan during the year of calculation of this ratio).

    c.  "Yield of the CBFIs vs. IPC" means, the yield of the CBFIs, without considering dividends, measured against the Mexican Stock Exchange's, or BMV, Index of Prices and Quotations, or IPC yield, without considering dividends for a period from January 1st to December 31st of the year in which the measurement is performed.

(b) Up to 10% of the CBFIs available under the 2014 Plan may be granted each year (except that more than 10% of such CBFIs may be granted as set forth below).

(c) If options are granted pursuant to the 2014 Plan, these options may not be offered at an exercise price below market price at the time the grant is made.

(d) 20% of the CBFIs available to be issued under the 2014 Plan in each year are to be used as retaining bonuses.

(e) The remaining 80% of the CBFIs available to be issued under the 2014 Plan in each year are to be granted in accordance with the following:

    a.  Fully Diluted FFO/CBFI shall have a weight of 40% of the applicable rate set forth below.

    b.  Fully Diluted Dividend per CBFI shall have a weight of 30% of the applicable rate set forth below.

    c.  Yield of the CBFIs vs. IPC shall have a weight of 30% of the applicable rate set forth below.

(f) If in any year CBFIs available to be issued under the 2014 Plan in that year are not granted, these CBFIs may be used in subsequent years, but no more than 20% of the total CBFIs allocated for distribution under the 2014 Plan may be delivered in any one year.

(g) The weights described above will be applied to the applicable rates set forth below:

**Fully Diluted FFO/CBFI**

| Growth above inflation in basis points | Applicable Rate |
|---|---|
| Up to 100 | 20% |
| Up to 200 | 40% |
| Up to 300 | 60% |
| Up to 400 | 80% |
| Up to 500 | 100% |

**Fully Diluted Dividend per CBFI**

| Growth above inflation in basis points | Applicable Rate |
|---|---|
| 0 | 20% |
| 50 | 40% |
| 100 | 60% |
| 150 | 80% |
| 200 | 100% |

**Yield of the CBFIs vs. IPC**

| Yield Spread | Applicable Rate |
|---|---|
| 0 | 20% |
| 200 | 40% |
| 300 | 60% |
| 400 | 80% |
| 500 | 100% |

The number of CBFIs to be granted will be determined by the sum of the products of the above weights and applicable rates.

On May 12, 2016, we announced that 18,261,112 treasury shares were issued in connection with our employee compensation plan, or ECP, which was approved in 2014.  As a result of this issuance, as of May 12, 2016, the total number of CBFIs outstanding was 3,220,900,751.  On June 8, 2017, 4,301,897 CBFIs were issued under the ECP.  Following that issuance, the total number of CBFIs outstanding was 3,282,127,156.

## POLICIES WITH RESPECT TO CERTAIN ACTIVITIES

The following is a discussion of certain of our investment, disposition, financing and other policies. These policies have been determined by our technical committee and, in general, may be amended or revised from time to time by our technical committee without a vote of holders of our CBFIs.

### Investment Policies

#### *Investment in Real Estate or Interests in Real Estate*

Our investment objective is to provide attractive risk-adjusted returns to holders of our CBFIs over the long-term through stable distributions of our net taxable income (*Resultado Fiscal*), as determined by our technical committee, and capital appreciation. We intend to achieve this objective by selectively assembling a diversified portfolio of high quality, income-producing commercial properties in Mexico. As of June 30, 2017, our portfolio was comprised of: (i) 499 stabilized properties, or our Stabilized Portfolio, (ii) seven properties in various stages of development or expansion, or our Development Portfolio, and (iii) one property, or our JV Development Portfolio, comprising almost all of the properties formerly known as the Buffalo Portfolio and the Colorado Portfolio which we contributed in 2016 to a joint venture with Helios, a Mexican real estate development vehicle that we created in 2015.  As of June 30, 2017, our Stabilized Portfolio included 521 operating units (325 retail, 106 industrial and 90 office), comprising 7.7 million m² of GLA (3.0 million m² of retail, 3.8 million m² of industrial and 0.9 million m² of office). We expect that, upon completion, our Development Portfolio will add approximately 452,858 m² of GLA to our Stabilized Portfolio.  For a discussion of our properties and our strategic objectives, see "Business and Properties."

We intend to expand our portfolio and grow our business over time by acquiring properties with a focus on attractive current cash flow, or the potential for attractive cash flow through development and redevelopment activities, and the potential for long-term capital appreciation. In accordance with our trust agreement, any property that we may acquire must satisfy certain eligibility requirements as follows:

- the property must be intended for leasing;

- the property must be located in Mexico;

- the property must pertain, among others, to the sub-sectors of office, retail, industrial, hotels and tourist centers;

- a favorable due diligence opinion on the property must be prepared by attorneys, accountants, architects and other specialists, depending on the characteristics of the property;

- a report of the business reasons for the acquisition must be prepared by our Management Subsidiary; and

- a pricing report that supports the proposed price of the acquisition must be prepared by an independent third party; the property must have valid insurance in accordance with industry standards at the time of acquisition; and if the property is owned by a related party, a majority of the members of our technical committee and a majority of the independent members of our technical committee must approve the acquisition. For a description of our policies with respect to related party transactions, see "Conflicts of Interest."

These eligibility requirements may be amended or waived from time to time by our technical committee upon the affirmative vote of a majority of the independent members of our technical committee.

Subject to the eligibility requirements described above, as we grow our business we may diversify in terms of property locations, size and market, and we do not have any limit on the amount or percentage of our assets that may be invested in any one property or any one geographic area within Mexico. We intend to acquire and hold

- 144 -

properties for long-term investment. We may also develop, redevelop, expand and improve properties, including the properties in our portfolio. We intend to operate our business, including engaging in future investment, development and redevelopment activities, in a manner that is consistent with the maintenance of our status as a FIBRA for Mexican federal income tax purposes. We intend to obtain appraisals for our properties on an annual basis.

Our technical committee will approve any acquisition of real estate (other than those made with a related person or that represents a conflict of interest) that represents up to 19.99% of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the most recently completed fiscal quarter. Any acquisition of real estate that represents 20% or more of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the most recently completed fiscal quarter, must be approved by holders representing a majority of our outstanding CBFIs. In accordance with our conflicts of interest policies, acquisitions from or co-investments with related parties, including the contributors, the Relevant Principals of E-Group, the El-Mann Family and the Attié Family will also require the affirmative vote of a majority of the independent members of our technical committee and the affirmative vote of a majority of the members of our technical committee. Investments that cannot or do not meet the eligibility requirements may be approved by our technical committee, including a majority of the independent members.

Subject to our conflicts of interest policies described below, we may acquire properties from, or sell properties to, related parties, including members of our technical committee, officers of our Advisor, the Relevant Principals of E-Group, the El-Mann Family and the Attié Family. As we grow our business, we believe that our relationship with E-Group will provide us with access to an extensive pipeline of potential acquisitions. Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, so long as the control trust holds at least 15% of our outstanding CBFIs, the Relevant Principals of E-Group have agreed to provide us with a right of first refusal to purchase any future real estate investment opportunity sourced by any of them, to the extent such opportunity involves industrial, office, retail or mixed-use properties.

In addition, pursuant to our trust agreement, the El-Mann Family and the Attié Family have agreed to provide us with a right of first refusal to purchase any industrial, retail, office, hotel or mixed-use property that as of January 10, 2011 was majority-owned by them, either collectively or separately. The process for exercising this right is the same as the process for exercising our right of first refusal with respect to future real estate investment opportunities sourced by the Relevant Principals of E-Group, as described below; provided, that, if our technical committee declines to exercise our right of first refusal, and the El-Mann Family and the Attié Family negotiate with any third party, price and terms that are more favorable to such party than those that were previously offered to our technical committee, the El-Mann Family and the Attié Family must notify our technical committee of such revised terms, and the technical committee will then have the opportunity to acquire the relevant property from the El-Mann Family and the Attié Family on such revised terms as described above, subject to the approval of a majority of the independent members of our technical committee. For a more detailed description of the rights of first refusal and the reversion rights, see "Certain Relationships and Related Transactions."

We also may participate with third parties in property ownership, through joint ventures, partnerships or other types of co-ownership. These types of investments may permit us to own interests in larger assets without unduly restricting our diversification and, therefore, providing us with flexibility in structuring our portfolio. We may co-invest with the Relevant Principals of E-Group in any property, as long as our ownership interest in such property is at least 50%. Any such co-investment will be made with the approval of our technical committee, including a majority of the independent members of our technical committee, which if approved will determine the terms and conditions of such co-investment (including termination and dispute-resolution provisions). Except for our investment in the TM Portfolio, we do not currently anticipate that we will enter into a joint venture, partnership or other co-ownership arrangement where we do not own a controlling interest.

We may acquire properties that are subject to existing mortgage financing and other indebtedness, and we may incur new indebtedness or refinance indebtedness when we acquire properties, subject to compliance with our leverage policies as described below under "Leverage Policies." Debt service on such financing or indebtedness will have a priority over any distributions with respect to our CBFIs.

**Disposition Policies**

We do not currently intend to dispose of any of the properties in our portfolio, although we reserve the right to do so if our technical committee determines that such action would be in the best interests of holders of our CBFIs.

In accordance with our trust agreement, our technical committee is responsible for establishing disposition policies with respect to our assets. Our disposition policies are as follows: the Trustee may implement the disposition of any asset: (i) that has suffered or is suffering a negative impact on its value or in the generation of income that negatively and significantly impacts the value of our assets, (ii) that ceases to be compatible with our strategic objectives, (iii) whose best use is other than leasing, (iv) whose value will be maximized by such disposition, and (v) other important reasons established by our technical committee; for any sale of any real estate representing up to 19.99% of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the preceding quarter, the Trustee may perform such sale but only with the prior approval of our technical committee and, for any sale of any real estate representing greater than 5% but less than 20% of our assets, including the majority vote of the independent members of our technical committee; for any sale of real estate representing 20% or greater of our assets (in a single transaction or a series of related transactions that may be deemed to be one transaction), based on our financial statements for the preceding quarter, approval of holders representing a majority of our outstanding CBFIs is required; and for any sale of properties proposed to occur prior to a four-year statutory period under Article 187 of the Mexican Income Tax Law, the following conditions must be met: (i) our Advisor must submit a request to our technical committee to effect such sale, (ii) compliance with the disposition policy applicable to our properties, (iii) the majority vote of the members of our technical committee must be obtained, and (iv) the majority vote of the independent members of our technical committee must be obtained. Once these conditions are met, our technical committee will determine the price and conditions of the sale, will notify the Trustee, the Relevant Principals of E-Group and, if the property was contributed to us, the relevant contributors, of such price and conditions for purposes of such contributors' reversion right, which must be exercised within ten business days of notice; see "Certain Relationships and Related Transactions."

Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group will have a right of first refusal with respect to all of our properties so long as the control trust holds at least 15% of our outstanding CBFIs. Pursuant to this right, in the event we decide to sell any of our properties, and, if applicable, the relevant contributors and tenants with rights of first refusal with respect to such property have declined to exercise such rights, these persons, collectively through a common representative, will have a right of first refusal to acquire such property from us. In addition, pursuant to our trust agreement and the contribution agreements relating to our portfolios, such as our Initial Portfolio, the Azul Portfolio, the Morado Portfolio and the G-30 Portfolio, for so long as the contributors of such properties hold any CBFIs issued to them in connection with the contributions of such portfolios, they will have reversion rights (equivalent to the right to repurchase the property), solely with respect to the properties contributed by them. Pursuant to these reversion rights, in the event we decide to sell a contributed property or upon a termination of our trust agreement, the applicable contributors have the right to re-acquire such contributed property in its entirety from us. If the holders of these rights of first refusal and reversion rights exercise their rights to acquire or re-acquire a property from us, any such transaction will be subject to the prior approval of our technical committee, including the approval of at least a majority of the independent members of our technical committee. In addition, if we choose to sell or are required to sell any of our properties, the reversion right of the applicable contributors and the rights of first refusal granted to the Relevant Principals of E-Group as described above could reduce the value of the property sold. See "Risk Factors Risks Related to Our Properties and Operations—Our ability to dispose of our properties is restricted, including by rights of first refusal, and these restrictions could reduce the value of any property sold or impair our liquidity or operating flexibility if sales of such properties were necessary to generate capital or otherwise." For a more detailed description of the rights of first refusal and the reversion rights, see "Certain Relationships and Related Transactions."

The contributors of the properties in the G-30 Portfolio, Azul Portfolio, Morado Portfolio, Tepotzotlán Portfolio and our Initial Portfolio, including certain members of our technical committee and officers of our Management Subsidiary and our Advisor, may be influenced as to the desirability of a proposed disposition by the tax consequences to them under Mexican law resulting from the disposition of a certain property. See "Risk Factors

Risk Related to Our Relationship with Our Advisor, Our Leasing Administrators and Our Property Managers—There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs."

**Leverage Policies**

Under our trust agreement, our technical committee is responsible for establishing our leverage policies. Currently, our leverage policies, as determined by our technical committee, with respect to any of our assets or a proposed investment in real estate, are as follows:

(i)     our borrowings may not be in an amount that would cause us to exceed the lower of (A) a 50% Loan to Value (as defined below) ratio with respect to all our properties (including any proposed investment), or (B) a Debt Service Coverage Ratio (as defined below) equal to 1.20x for the 12 months following such investment;

(ii)    for purposes of issuing debt instruments in the securities markets, privately or publicly, we will obtain proposals of terms and conditions therefor by at least two banking or financial institutions, and our technical committee will decide by majority vote the proposal it deems more favorable to us;

(iii)   the leverage limits set forth in subclause (i) above may not be amended other than by the majority of the members of our technical committee, including a majority of the independent members; and

(iv)    for properties acquired with existing debt, our Advisor is required to ensure that the outstanding debt related to such property is adjusted to levels established in our policies within 12 months, absent which our technical committee, with the prior opinion of our practices committee, will seek a resolution.

As used above, "Loan to Value" ratio means, with respect to a property, the amount (expressed as a percentage) that the outstanding debt secured by such property bears in relation to the estimated value of such property, and "Debt Service Coverage Ratio" means the net operating income of the trust for the prior fiscal year, divided by the sum of principal and interest payments due on our outstanding borrowings for such period. As of June 30, 2017, our leverage ratio (as measured by total debt to total assets) was 31.6% of our assets and our debt service coverage ratio was 2.25x.

Subject to the leverage policies described above, we intend, when appropriate, to employ prudent amounts of leverage as a means of providing additional funds for the acquisition, development, redevelopment, improvement and expansion of properties. The amount of leverage we will deploy for particular investments will depend upon our Advisor's and our technical committee's assessment of a variety of factors, which may include the anticipated liquidity and price volatility of the assets in our portfolio, the potential for losses, the availability and cost of financing the assets, our opinion of the creditworthiness of our financing counterparties, the health of the Mexican economy and credit markets and our outlook for the level, slope and volatility of interest rates. We believe that our leverage policies are appropriate for an entity whose assets are primarily real estate.

Our technical committee must approve the incurrence of any indebtedness that would cause our leverage to exceed 80% of the leverage limits established by our technical committee. Our technical committee shall have the authority to approve the financing of any acquisition or series of related acquisitions that represent up to 19.99% of our assets, and the holders representing a majority of our outstanding CBFIs shall have the authority to approve the financing of any acquisition or series of related acquisitions that represent 20% or more of our assets, in each case based on our financial statements for the most recently completed fiscal quarter. Our leverage policies may be modified from time to time in light of then-current economic conditions, relative costs of debt and equity capital, market values of our properties, general conditions in the market for debt and equity securities, fluctuations in the market price of our CBFIs, growth and acquisition opportunities and other factors. Accordingly, we may in the future increase or decrease our ratio of indebtedness beyond the limits described above. If these policies were

changed, we could become more highly leveraged, resulting in an increased risk of default on our obligations and a related increase in debt service requirements that could adversely affect our financial condition and results of operations and our ability to make distributions to holders of our CBFIs. See "Management's Discussion and Analysis of Financial Condition and Results of Operations Liquidity and Capital Resources."

**Conflicts of Interest Policies**

Under our trust agreement, our technical committee is responsible for approving our policies with respect to related parties. In accordance with our trust agreement, the affirmative vote of a majority of the members of our technical committee as well as a majority of the independent members of our technical committee is required prior to us entering into any material contract, transaction or relationship with a related party, including our Advisor, our Leasing Administrator, our Settlor, the Relevant Principals of E-Group, the El-Mann Family, the Attié Family, the members of our technical committee or any other person or party who may have a conflict of interest. We are subject to conflicts of interest arising out of our relationship with our Advisor and our Leasing Administrator and their respective affiliates, including E-Group, and we will enter into transactions with related parties. See "Certain Relationships and Related Transactions." We cannot assure you that our policies will succeed in eliminating the influence of such conflicts. If they are not successful, decisions could be made that might fail to reflect fully the interests of all holders of our CBFIs. See "Risk Factors Risks Related to Our Relationship with Our Management Subsidiary, Our Advisor and Our Leasing Administrator—There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs."

**Policies with Respect to Other Activities**

Subject to certain formalities required under Mexican law, including obtaining any necessary governmental authorizations, we have authority to offer new CBFIs in exchange for property and to repurchase or otherwise acquire our CBFIs in the open market or otherwise, and we may engage in such activities in the future. Our trust agreement does not contemplate the issuance of preferred CBFIs by us. See "Description of Our CBFIs and Certain Provisions of Our Trust Agreement and Mexican Law."

We have not engaged in trading, underwriting or agency distribution or sale of securities of other issuers and do not intend to do so. At all times, we make investments in such a manner as to qualify as a FIBRA for Mexican federal income tax purposes, unless, due to circumstances or changes in Mexican tax rules and regulations, our technical committee determines that it is no longer in our best interest to qualify as a FIBRA. We have not made any loans to third parties, although we may in the future, in terms of Mexican law, make loans to third parties limited to business purposes.

We make available to holders of our CBFIs audited annual financial statements and annual reports. See "Available Information."

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

### *Advisory Agreement, Services Agreement and Property Management Agreements*

We entered into (i) an advisory agreement with our Advisor, (ii) a services agreement with our Leasing Administrator, and (iii) a property management agreement with our Management Subsidiary. For a detailed description of these agreements, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements."

On November 12, 2012, an independent member of our technical committee proposed to the technical committee that it should consider authorizing a bonus to the staff members of our Advisor, and also consider the circumstances under which such a bonus would be issued. Should our technical committee decide to issue bonuses to staff members of our Advisor, it would require the approval of the technical committee, including the vote of the majority of the independent members of the technical committee.

In addition, we have entered into a portfolio management agreement with Jumbo Administración, S.A.P.I. de C.V., a subsidiary of the contributors of the Morado Portfolio, on August 31, 2012, to provide all necessary services related to the management, operation and maintenance of the properties comprising the Morado Portfolio. For a detailed description of this agreement, see "The Advisory Agreement, the Services Agreements and the Property Management Agreements—General—Property Management Agreements—Property Management Agreement with Jumbo Administration, S.A.P.I. de C.V."

Certain members of our technical committee are also officers of, and have an ownership interest in, our Advisor and our Leasing Administrator. As a result, the advisory agreement between us and our Advisor, and the services agreement between us and our Leasing Administrator were negotiated between related parties, and their terms, including fees and other amounts payable, may not be as favorable to us as if they had been negotiated with unaffiliated third parties. See "Conflicts of Interest" and "Risk Factors—Risks Related to Our Relationship with Our Advisor, Our Leasing Administrators and Our Property Managers—The advisory agreement with our Advisor, the property management agreement with our Management Subsidiary and the services agreement with our Leasing Administrator were not negotiated on an arm's length basis and their terms may not be as favorable to us as if they had been negotiated with unaffiliated third parties."

### *Rights of First Refusal*

Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, so long as the control trust holds at least 15% of our outstanding CBFIs, the Relevant Principals of E-Group have agreed to provide us with a right of first refusal to purchase any future real estate investment opportunity sourced by any of them, to the extent such opportunity involves industrial, office or retail properties, and are required to notify our technical committee of their intention to acquire any property that complies with substantially all of the eligibility requirements for investment by us contained in our trust agreement, within ten business days of their determination of such intention. The Relevant Principals of E-Group must include in such notification certain specified information, provided the information is available, including the material terms of the potential acquisition, the intended use of the property and the price of the property. After receiving such notification from the Relevant Principals of E-Group, our technical committee will have ten business days to notify the Relevant Principals of E-Group in writing of its affirmative decision for us to acquire the property in question, and we will have 30 days following the delivery of the notice to consummate the acquisition. If our technical committee fails to notify the Relevant Principals of E-Group of our intent to exercise our right of first refusal or acquire the property within the time allotted, we will be deemed to have declined our right to exercise the right of first refusal, in which case the Relevant Principals of E-Group may acquire such property. The decision to exercise our right to acquire such property will be made upon the affirmative vote of a majority of the members of our technical committee, including a majority of the independent members of our technical committee.

In addition, pursuant to our trust agreement, the El-Mann Family and the Attié Family have agreed to provide us with a right of first refusal to purchase any industrial, retail, mixed-use or office property that, as of January 10, 2011, was majority-owned by them, either collectively or separately. The process for exercising this

right is the same as the process for exercising our right of first refusal with respect to future real estate investment opportunities sourced by the Relevant Principals of E-Group, as described above; provided, that, if our technical committee declines to exercise our right of first refusal, and the El-Mann Family and the Attié Family negotiate with any third party, price and terms that are more favorable to such party than those that were previously offered to our technical committee, the El-Mann Family and the Attié Family must notify our technical committee of such revised terms, and the technical committee will then have the opportunity to acquire the relevant property from the El-Mann Family and the Attié Family on such revised terms as described above, subject to the approval of a majority of the independent members of our technical committee.

### Reversion Rights

Pursuant to our trust agreement and the contribution agreements relating our portfolios, such as our Initial Portfolio, the Azul Portfolio, the G-30 Portfolio and the Morado Portfolio, for so long as the contributors of such properties hold any CBFIs issued to them in connection with the contributions of such portfolios, they will have reversion rights (equivalent to the right to repurchase the property), solely with respect to the properties contributed by them. Pursuant to these reversion rights, in the event we decide to sell a contributed property or upon a termination of our trust agreement, the relevant contributors will have the right to re-acquire such property in its entirety from us.

In the event that we decide to sell a property in our Initial Portfolio, a majority of the independent members of our technical committee will be required to approve the sale, the price and the conditions of the sale. Once the price and conditions of the sale of the property have been determined, our technical committee will notify such terms and conditions to the Trustee and the relevant contributors. The relevant contributors will have ten business days to notify us in writing of their intent to exercise the right of first refusal and acquire the property from us, and we will have 30 days following the delivery of the notice to consummate the acquisition. If any contributors decline to exercise their reversion rights with respect to a property, the reversion rights with respect to such property in its entirety may be exercised by the remaining relevant contributors. If the relevant contributors fail to notify us of their intent to exercise their right to acquire the property within the time allotted, such relevant contributors will be deemed to have declined their right to exercise the reversion rights, in which case our technical committee will notify the Relevant Principals of E-Group of such offer and its terms and conditions to allow the Relevant Principals of E-Group the opportunity to exercise their rights of first refusal with respect to such property. To the extent that we negotiate price, terms and conditions with any third party that are more favorable to such party than those that were previously offered to the relevant contributors, we must notify the relevant contributors of such revised terms and they will have the opportunity to acquire the relevant property from us on such revised terms as described above, subject to the approval of a majority of the independent members of our technical committee.

In addition, pursuant to the documentation relating to the acquisition of the G-30 Portfolio, the contributors of such portfolio have reversion rights solely with respect to the properties that comprise the G30 Portfolio. Pursuant to these rights, in the event we decide to sell a property in the G-30 Portfolio, contributors of such portfolio will have the right to re-acquire such property in its entirety from us. If the contributors of the G-30 portfolio exercise their rights to re-acquire a property from us, any such transaction will be subject to the prior approval of our technical committee. In addition, if we choose to sell any of the properties in the G-30 Portfolio, the reversion right of the contributors of the G-30 Portfolio as described above could reduce the value of the property sold.

### Rights of First Refusal of the Relevant Principals of E-Group with Respect to Our Properties

Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group will have a right of first refusal with respect to all of our properties so long as the control trust holds at least 15% of our outstanding CBFIs. In the event that we decide to sell a property and, if applicable, the relevant contributors and tenants with rights of first refusal with respect to such property have declined to exercise such rights, the technical committee will notify the Trustee and the Relevant Principals of E-Group of the sale, the price and the conditions of the sale, as approved by a majority of the independent members of our technical committee. The process for exercising this right of first refusal is the same as the process for exercising the reversion rights with respect to the properties in our Initial Portfolio, as described above. In the case of the properties in our Initial Portfolio, this right of first refusal will be subordinated to the reversion right described above.

In addition, if we choose to sell or are required to sell any of our properties, the reversion right of the relevant contributors and the rights of first refusal granted to the Relevant Principals of E-Group as described above could reduce the value of the property sold. See "Risk Factors-Risks Related to Our Properties and Operations-Our ability to dispose of our properties is restricted, including by rights of first refusal, and these restrictions could reduce the value of any property sold or impair our liquidity or operating flexibility if sales of such properties were necessary to generate capital or otherwise."

### Tenant Rights of First Refusal with Respect to Our Properties

Some of our tenants, pursuant to lease agreements or by law, have a right of first refusal to purchase the property from us upon a sale by us of such property in the future, which right will have priority over the right of first refusal of the Relevant Principals of E-Group and may have priority over the contributors' reversion rights.

### Conflicts of Interest

We are subject to conflicts of interest arising out of our relationship with our Advisor and our Leasing Administrator and their respective affiliates, including E-Group. Specifically, certain of the non-independent members of our technical committee are also officers of, and have ownership interests in, our Advisor and our Leasing Administrator. Our advisory agreement, property management agreements and services agreement were negotiated between related parties and their terms, including fees and other amounts payable, may not be as favorable to us as if they had been negotiated on an arm's-length basis with unaffiliated third parties. In addition, certain of our Advisor's officers have a controlling interest in and are Relevant Principals of E-Group. We pursue a similar strategy to E-Group and may compete with E-Group for investment opportunities. As a result, there may be conflicts in allocating assets that are suitable for us and E-Group. We and our Advisor have established certain policies and procedures to address potential conflicts of interest.

In accordance with our trust agreement, the affirmative vote of a majority of the members of our technical committee as well as the affirmative vote of a majority of the independent members of our technical committee is required prior to us entering into any material contract, transaction or relationship with a related party, including our Advisor, our Leasing Administrator, our Settlor, the Relevant Principals of E-Group, the El-Mann Family, the Attié Family, the members of our technical committee or any other person or party who may have a conflict of interest.

In addition, to address the potential conflicts of interest that may arise when an investment opportunity is suitable for both us and E-Group, pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, so long as the control trust holds at least 15% of our outstanding CBFIs, the Relevant Principals of E-Group have agreed to provide us with a right of first refusal to purchase any future real estate investment opportunity sourced by any of them, to the extent such opportunity involves industrial, office, retail or mixed-use properties. In addition, pursuant to our trust agreement, the El-Mann Family and the Attié Family have agreed to provide us with a right of first refusal to purchase any industrial, retail, office, hotel or mixed-use property that, as of January 10, 2011, was majority-owned by them, either collectively or separately. In accordance with our trust agreement, so long as the control trust holds at least 15% of our outstanding CBFIs, the Relevant Principals of E-Group are required to notify our technical committee of their intention to acquire any property that complies with substantially all of the eligibility requirements for investment by us contained in our trust agreement, within ten business days of their determination of such intention. The Relevant Principals of E-Group must include in such notification certain specified information, provided the information is available, including the material terms of the potential acquisition, the intended use of the property and the price of the property. After receiving such notification from the Relevant Principals of E-Group, our technical committee will have ten business days to notify the Relevant Principals of E-Group in writing of its affirmative decision for us to acquire the property in question, and we will have 30 days following the delivery of the notice to consummate the acquisition. If our technical committee fails to notify the Relevant Principals of E-Group of our intent to exercise our right of first refusal to acquire the property within the time allotted, we will be deemed to have declined our right to exercise the right of first refusal, in which case, the Relevant Principals of E-Group may acquire such property. If we elect to exercise our right to acquire such property, such acquisition will be upon the affirmative vote of a majority of the members of our technical committee, including a majority of the independent members of our technical committee. For a more detailed description of the

rights of first refusal, including the right of first refusal provided to us by the El-Mann Family and the Attié Family, see "Certain Relationships and Related Transactions."

Pursuant to our trust agreement and the contribution agreements relating to our Initial Portfolio, the Relevant Principals of E-Group will have a right of first refusal with respect to all of our properties so long as the control trust holds at least 15% of our outstanding CBFIs. Pursuant to this right, in the event we decide to sell any of our properties, and, if applicable, the relevant contributors and tenants with rights of first refusal with respect to such property have declined to exercise such rights, these persons, collectively through a common representative, will have a right of first refusal to acquire such property from us. In addition, pursuant to our trust agreement and the contribution agreements relating to our portfolios, such as our Initial Portfolio, the Azul Portfolio, the G-30 Portfolio and the Morado Portfolio, for so long as the contributors of such properties hold any CBFIs issued to them in connection with the contributions of such portfolios, they will have reversion rights (equivalent to the right to repurchase the property), solely with respect to the properties contributed by them. In addition, pursuant to these rights, in the event we decide to sell any such property or upon a termination of our trust agreement, the applicable contributors will have the right to re-acquire such contributed property in its entirety from us. If the holders of these rights of first refusal and reversion rights exercise their rights to acquire or re-acquire a property from us, any such transaction will be subject to the prior approval of our technical committee, including the approval of at least a majority of the independent members of our technical committee. In addition, if we choose to sell or are required to sell any of our properties, the reversion right of the applicable contributors and the rights of first refusal granted to the Relevant Principals of E-Group as described above could reduce the value of the property sold. For a more detailed description of the rights of first refusal and the reversion rights, see "Certain Relationships and Related Transactions."

As of June 30, 2017, the contributors of the Initial Portfolio collectively owned approximately 18.5% of our outstanding CBFIs and have the ability to substantially influence us. Upon completion of our initial offering and our formation transactions, the contributors placed all of the CBFIs held by them in a control trust. The control trust is controlled by its technical committee, which is comprised of Messrs. Moisés El-Mann Arazi, André El-Mann Arazi, Isidoro Attié Laniado, Abude Attié Dayán, and Max El-Mann Arazi, each of whom is appointed by Mr. André El-Mann Arazi. Pursuant to the terms of our trust agreement, the contributors, through the control trust and so long as they hold 15% or more of our outstanding CBFIs through the control trust, will be able to appoint a majority of the members of our technical committee and will be able to control certain actions to be taken by us that require the approval of holders of more than 85% of our outstanding CBFIs.

We cannot assure you that any of our policies will succeed in eliminating the influence of such conflicts. If they are not successful, decisions could be made that might fail to reflect fully the interests of holders of our CBFIs. See "Risk Factors Risks Related to Our Relationship with Our Advisor, Our Leasing Administrators and Our Property Managers—There are conflicts of interest in our relationship with our Advisor and our Leasing Administrator and their affiliates, and there is no assurance that our policies and procedures will be adequate to address all of the conflicts that may arise, which could result in adverse consequences to us and the holders of the CBFIs."

Certain members of our technical committee and the officers of our Advisor, our Leasing Administrator and our Management Subsidiary sold or contributed the properties in our portfolio. Because of our desire to maintain our relationships with the members of our technical committee and the officers of our Advisor, our Leasing Administrator and our Management Subsidiary with whom we have entered into the contribution agreements and purchase and sale agreements in connection with our formation transactions, we may choose not to enforce, or may enforce less vigorously, our rights under these agreements. See "Risk Factors Risks Related to Our Organization and Structure—We may pursue less vigorous enforcement of the agreements pursuant to which we acquired our Initial Portfolio and the advisory agreement, the property management agreements, the services agreement and other agreements because of conflicts of interest with certain of our members of our technical committee."

***The Control Trust***

Pursuant to the control trust agreement, (i) the contributors and the sellers of Chetumal who receive CBFIs transferred, and the Trustee of the control trust acquired, the ownership of, and title to, the CBFIs issued according

to the control trust agreement and to all agreements related to the control trust, (ii) the Trustee manages and administers the brokerage account according to the instructions provided by the technical committee of the control trust, (iii) the Trustee exercises its economic and corporate rights that correspond to it as holder of the CBFIs, also according to the instructions provided by the technical committee of the control trust, and (iv) when applicable, the Trustee will transfer the corresponding CBFIs to the contributors, by depositing them into the brokerage account.

The Trustee will not implement any instruction provided by the technical committee of the control trust that contravenes any of the aforementioned obligations.

# PRINCIPAL HOLDERS

The following table sets forth certain information with respect to those persons and entities that have an economic interest in our outstanding CBFIs as of June 30, 2017.

| Owner[1] | Number of CBFIs Owned | Percentage of All CBFIs | Percentage of All CBFIs after the Combined Offering[2] |
|---|---|---|---|
| Control Trust ........................................................... | 609,726,726 | 18.5% | 17.56% |

[1] The members of our technical committee and officers of our Advisor and our Management Subsidiary own their CBFIs indirectly through the control trust. The control trust is controlled by a technical committee consisting of four members comprised of Messrs Moisés El-Mann Arazi, André El-Mann Arazi, Max El-Mann Arazi, Abude Attié Dayán and Isidoro Attié Laniado. As of June 30, 2017, a total of 3,289,543,506 CBFIs were outstanding. As of September 25, 2017, a total of 3,326,983,408 CBFIs were outstanding.  See "Summary—Relationship with E-Group and Certain Related Parties."

[2] Reflects the sale of 365,000,000 CBFIs in the combined offering, but excludes up to 54,750,000 CBFIs issuable upon exercise of the over-allotment option, and reflects the purchase by the Interested Members of 44,500,600 CBFIs.

## DESCRIPTION OF OUR CBFIs AND CERTAIN PROVISIONS
## OF OUR TRUST AGREEMENT AND MEXICAN LAW

Set forth below is certain information concerning our CBFIs and a brief summary of certain provisions of our trust agreement and Mexican law. The description does not purport to be complete and is qualified in its entirety by reference to our trust agreement and Mexican law. Unless otherwise indicated, this description gives effect to our capitalization after the combined offering.

### General

We were formed as a trust on January 12, 2011, under the laws of Mexico. Our principal office is located at Antonio Dovalí Jaime # 70, Tower B, 11th Floor, Col. Zedec Santa Fe, C.P. 01210, Mexico City. Our telephone number is +(5255) 4170 7070. A copy of our trust agreement has been filed with the CNBV and with the Mexican Stock Exchange and is available for review at the Mexican Stock Exchange.

Our trust agreement provides that our main business purposes are the acquisition and development of real estate for leasing, the acquisition of real estate lease rights, and granting loans for such purposes which may be secured or guaranteed by such assets. We intend to continue to selectively acquire a portfolio of high quality, income-producing commercial properties in Mexico.

Pursuant to our trust agreement, in order to fulfill our purposes, the Trustee will have certain powers, at the direction of our technical committee, which include, among other things: (i) conducting offerings of our CBFIs, (ii) opening and maintaining necessary accounts as provided by our trust agreement for the conduct of our business, (iii) effectuating investments in properties on our behalf, and administering and maintaining such investments, (iv) delivering distributions to holders of our CBFIs, (v) collecting, receiving and managing rents on our properties, (vi) execute the advisory agreement with our Advisor, the services agreement with our Leasing Administrators and the property management agreements with our Property Managers, any subsequent amendments thereto, and, upon instruction of our technical committee and/or our Management Subsidiary, any other agreements in accordance with the purposes of our trust, (vii) hiring and removing legal counsel, accountants, and other experts as provided in our trust agreement, (viii) preparing and making all tax filings on our behalf, and liaising with tax authorities and agencies as necessary, (ix) take necessary actions, subject to the instruction of our technical committee or the assembly of holders of our CBFIs, as applicable, to ensure that we are not treated as a PFIC for U.S. federal income tax purposes, (x) granting general and special powers of attorney as required for the realization of our business purposes, in accordance with our trust agreement, (xi) applying for and obtaining any loans in connection with our acquisition or development of properties, (xii) carrying on the liquidation process of us in the event our trust agreement is terminated, (xiii) giving access to our Advisor, our Management Subsidiary, our Leasing Administrator and the Common Representative to any information relating to us or our trust agreement, and (xiv) in general, perform its obligations diligently and in a timely manner, in accordance with our trust agreement and other applicable legal provisions.

### CBFIs

Our trust agreement provides that the Trustee may issue CBFIs from time to time pursuant to and in accordance with our trust agreement and applicable Mexican legal requirements. Our CBFIs are listed on the Mexican Stock Exchange under the symbol "FUNO11." Our CBFIs have no nominal value, and may be issued to, paid for and held by either Mexican or non-Mexican investors. Our CBFIs do not grant holders rights over the real estate properties that form part of our assets.

As of June 30, 2017, 3,859,822,623 CBFIs have been issued, 3,289,543,506 of these were outstanding, 13,193,287 of these had been cancelled and 557,085,830 were in treasury.

Subject to the provisions of our trust agreement regarding the restrictions on ownership and transfer of our CBFIs, holders of our CBFIs are entitled (i) to receive cash distributions from such CBFIs, as and when authorized by our technical committee, and (ii) to ratably receive proceeds from the sale of our assets legally available for distribution to holders of our CBFIs in the event of our liquidation, dissolution or winding up after payment of or

adequate provision for all our known debts and liabilities, all in accordance with Mexican legal requirements. Holders of our CBFIs are not entitled to directly use our properties.

Our CBFIs do not represent any interest in or obligation of our Advisor, our Leasing Administrator, E-Group, the Trustee, the Common Representative or any of their affiliates. Further, our CBFIs are not a deposit or other obligation of any bank, are not an insurance policy of any insurance company and are not insured or guaranteed by the U.S. Federal Deposit Insurance Corporation, any other (U.S. or Mexican) governmental agency or any insurance company. Our CBFIs will not benefit from any insurance guaranty association coverage or any similar protection.

On the date hereof, the CNBV authorized our MultiOffering Program which allows us, from time to time within five years from the approval date, to carry out in Mexico public offerings of debt or equity securities without having to submit to the CNBV or the Mexican Stock Exchange for prior review or approval of any nature the corresponding offering prospectus and related materials. Terms and conditions of each offering will be determined at the time of such offering depending on the market conditions then prevailing. We expect that the use for each such offering of previously negotiated and approved documentation (the forms of prospectus, prospectus supplements, legal opinions and underwriting agreements were agreed to and approved in advance of the CNBV approval), together with the lack or prior review referred to above, will allow us efficiently and expeditiously to take advantage of market opportunities as they arise. The aggregate maximum amount of securities that we are authorized to issue under our MultiOffering Program is 1,500,000,000 CBFIs and up to Ps.55 billion aggregate principal amount of debt securities (which may be denominated in Ps., U.S. Dollars of UDIs).

## Market Information

The following tables provide certain information regarding the price of our CBFIs on the Mexican Stock Exchange:

| Year | Ending Price (Ps.) | High (Ps.) | Low (Ps.) | Return[1] | Average Daily Volume |
|------|---------|------|-----|---------|---------|
| March 17, 2011 | 19.50 | N/A | N/A | N/A` | N/A |
| 2011 | 23.80 | 25.00 | 19.40 | 22.1% | 133,959 |
| 2012 | 39.00 | 39.00 | 23.89 | 63.9% | 1,284,665 |
| 2013 | 41.82 | 47.79 | 34.20 | 7.2% | 6,750,567 |
| 2014 | 43.48 | 47.89 | 39.31 | 4.0% | 7,734,557 |
| 2015 | 37.99 | 46.09 | 34.31 | -12.6% | 5,803,956 |
| 2016 | 31.22 | 40.47 | 29.20 | -17.8% | 6,941,874 |

[1] Computed with respect to the ending price for the prior year (or the closing price on March 17, 2011, in the case of 2011)

| Quarter | Ending Price (Ps.) | High (Ps.) | Low (Ps.) | Return[1] | Average Daily Volume |
|---------|---------|------|-----|---------|---------|
| **2012** | | | | | |
| First | 25.19 | 26.10 | 23.89 | 5.8% | 730,659 |
| Second | 27.46 | 28.20 | 24.90 | 9.0% | 1,182,687 |
| Third | 29.11 | 29.78 | 27.20 | 6.0% | 1,038,099 |
| Fourth | 39.00 | 39.00 | 28.86 | 34.0% | 2,199,146 |
| **2013** | | | | | |
| First | 40.75 | 42.36 | 36.52 | 4.5% | 5,700,647 |
| Second | 43.29 | 47.79 | 39.65 | 6.2% | 11,688,745 |
| Third | 36.26 | 43.19 | 35.99 | -16.2% | 4,535,359 |
| Fourth | 42.30 | 42.70 | 34.20 | 16.7% | 5,002,796 |

| Quarter | Ending Price (Ps.) | High (Ps.) | Low (Ps.) | Return[1] | Average Daily Volume |
|---|---|---|---|---|---|
| **2014** | | | | | |
| First | 42.23 | 45.14 | 40.94 | -0.2% | 5,503,452 |
| Second | 45.27 | 45.36 | 39.31 | 7.2% | 10,829,334 |
| Third | 44.21 | 47.85 | 44.08 | -2.3% | 7,719,168 |
| Fourth | 43.48 | 47.89 | 40.67 | -1.7% | 6,764,141 |
| **2015** | | | | | |
| First | 40.41 | 46.09 | 39.82 | -7.1% | 6,316,780 |
| Second | 37.31 | 41.35 | 36.39 | -7.8% | 7,230,802 |
| Third | 34.91 | 38.96 | 34.31 | -6.4% | 5,528,208 |
| Fourth | 37.99 | 38.67 | 34.45 | 8.8% | 4,177,195 |
| **2016** | | | | | |
| First | 40.16 | 40.16 | 34.73 | 6.2% | 6,982,055 |
| Second | 37.37 | 40.47 | 36.89 | -2.8% | 6,131,756 |
| Third | 34.43 | 37.75 | 34.35 | -2.6% | 6,725,440 |
| Fourth | 31.22 | 35.71 | 29.20 | -0.03% | 7,975,969 |
| **2017** | | | | | |
| First | 32.08 | 32.14 | 27.76 | 2.8% | 10,476,490 |
| Second | 34.42 | 34.93 | 31.49 | 7.3% | 6,337,775 |

[1] Computed with respect to the ending price for the prior quarter.

| Month | Ending Price (Ps.) | High (Ps.) | Low (Ps.) | Return[1] | Average Daily Volume |
|---|---|---|---|---|---|
| **2015** | | | | | |
| January | 45.20 | 45.44 | 41.50 | 4.0% | 3,935,914 |
| February | 41.93 | 46.09 | 41.93 | -7.2% | 4,651,285 |
| March | 40.41 | 42.61 | 39.82 | -3.6% | 10,211,732 |
| April | 38.28 | 41.35 | 38.28 | -5.3% | 5,865,832 |
| May | 39.28 | 40.03 | 38.28 | 2.6% | 7,189,662 |
| June | 37.31 | 38.96 | 36.39 | -5.0% | 8,635,041 |
| July | 38.70 | 38.96 | 37.64 | 3.7% | 5,165,448 |
| August | 35.89 | 38.66 | 34.31 | -7.3% | 5,703,252 |
| September | 34.91 | 36.84 | 34.56 | -2.7% | 5,740,368 |
| October | 36.28 | 37.22 | 34.45 | 3.9% | 3,809,641 |
| November | 38.51 | 38.67 | 34.70 | 6.1% | 4,886,343 |
| December | 37.99 | 38.10 | 36.39 | -1.4% | 3,881,287 |
| **2016** | | | | | |
| January | 36.36 | 38.80 | 34.73 | -4.3% | 5,956,043 |
| February | 37.83 | 37.83 | 34.88 | 4.0% | 6,224,490 |
| March | 40.16 | 40.16 | 37.09 | 6.2% | 8,610,539 |
| April | 39.32 | 40.47 | 37.54 | -2.1% | 4,707,948 |
| May | 38.43 | 39.13 | 37.28 | -2.3% | 9,319,741 |
| June | 37.37 | 38.74 | 36.89 | -2.8% | 4,302,864 |

| Month | Ending Price *(Ps.)* | High *(Ps.)* | Low *(Ps.)* | Return[(1)] | Average Daily Volume |
|-------|------------|------------|-----------|-----------|-----------------|
| July | 36.78 | 37.70 | 36.73 | -1.6% | 6,499,738 |
| August | 35.35 | 37.75 | 35.35 | -3.9% | 6,716,335 |
| September | 34.43 | 35.79 | 34.35 | -2.6% | 6,961,114 |
| October | 35.06 | 35.47 | 34.26 | 1.8% | 5,148,686 |
| November | 31.23 | 35.71 | 29.20 | -10.9% | 8,935,150 |
| December | 31.22 | 32.76 | 30.73 | -0.031% | 9,889,748 |
| **2017** | | | | | |
| January | 29.31 | 31.68 | 27.76 | -6.1% | 5,865,764 |
| February | 29.06 | 30.20 | 28.74 | -0.9% | 15,936,263 |
| March | 32.08 | 32.14 | 29.22 | 10.4% | 10,371,958 |
| April | 32.88 | 32.88 | 31.49 | 2.5% | 8,194,756 |
| May | 33.05 | 34.54 | 32.46 | 0.5% | 6,037,970 |
| June | 34.42 | 34.93 | 33.92 | 4.1% | 5,118,231 |

_____
[(1)]   Computed with respect to the ending price for the prior month.

## Changes in CBFIs, Other Securities, Pre-emptive Rights, Redemption and Lock-ups

We may issue our CBFIs from time to time, in accordance with the Mexican Securities Market Law and our trust agreement, as instructed by our technical committee, pursuant to which, in accordance with applicable Mexican law, our CBFIs will be issued. We will also be required to satisfy as certain formalities required under Mexican law, including obtaining any necessary governmental authorizations. Our trust agreement does not impose a limit on the number of CBFIs we are authorized to issue.

Pursuant to our trust agreement, we may issue CBFIs with different rights, other types of securities, including those set forth in the Mexican Securities Market Law, such as debt securities, subject to compliance with the provisions of our trust agreement and Mexican law.

Holders of our CBFIs do not have pre-emptive or preferential rights for the acquisition of additional CBFIs that we may issue. Our CBFIs are not subject to redemption by us.

As part of our regular acquisitions, the sellers or assignors of the properties we acquire that receive our CBFIs as consideration agree to certain lock-ups to either (i) guarantee obligations under the contribution or purchase agreements, as applicable, or (ii) to avoid excessive public float as a consequence of the sale of our CBFIs in the market. With respect to the Oregon Portfolio, the contributors agreed not to sell more than 160,000 CBFIs per day for a period of 60 days and no more than 70,000 CBFIs per day after such period. With respect to the Samara Property, some members of the control trust, as contributors, agreed not to dispose of part of their CBFIs for a period of up to 540 days and the other contributors, that are not members of the control trust, agreed not to dispose of part of their CBFIs for a period of up to 270 days.

## The Common Representative

Our trust agreement appoints CI Banco, S.A., *Institución de Banca Múltiple* (or any entity appointed as a successor thereto) as the common representative, or the Common Representative, of the holders of our CBFIs collectively (and not individually). In addition to the obligations provided in our CBFIs, our trust agreement and the other documents of the combined offering, the Common Representative will act in accordance with the instructions provided by the majority of the holders of our CBFIs.

Our trust agreement provides that the Common Representative's obligations will include, among other things, the following (in addition to any rights and obligations it may have under applicable Mexican law): (i)

executing the CBFIs after verifying they comply with all applicable legal requirements, (ii) verifying the execution of our trust agreement, (iii) verifying the existence of our trust assets and that they are duly insured, (iv) verifying our compliance with the use of proceeds from the offering, (v) verifying the compliance of the Trustee, our Advisor, our Property Managers and our Leasing Administrators with their obligations under our trust agreement and of any other person in accordance with agreements executed to accomplish the purposes of our trust agreement, (vi) notifying the CNBV, the Mexican Stock Exchange and Indeval with respect to any delay by the Trustee in complying with its obligations, (vii) calling and presiding over a meeting of the holders of our CBFIs as required under our trust agreement or applicable law, or when it considers it necessary or advisable to receive ratification of its actions, (viii) verifying the subscription, in representation of the holders of our CBFIs, of all the documents and agreements executed with the Trustee in connection with our trust agreement and our CBFIs, (ix) taking all actions needed to preserve the rights of holders of our CBFIs jointly (including actions relating to payments holders are entitled to receive), (x) acting as intermediary between the Trustee and holders of our CBFIs for purposes of delivering to such holders any amounts due to them under our trust agreement and for any other required matter, (xi) exercising its rights and complying with its obligations established in our CBFIs, our trust agreement and other documents to which it is a party, (xii) requesting from the Trustee, our Advisor, our Property Managers and our Leasing Administrators all information and documentation (including information relating to our financial condition) it needs to carry out its duties as the Common Representative set forth in our trust agreement (in the understanding that the Trustee and our Advisor will provide all reasonably requested information and documentation), (xiii) furnishing to holders of our CBFIs copies of reports delivered to the Common Representative by the Trustee and our Advisor, (xiv) publishing notices of delivery of cash distributions to the holders and inform Indeval and the Mexican Stock Exchange, at least six business days in advance, about such cash distributions, as well as inform Indeval and the Mexican Stock Exchange, at least ten business days in advance, of the quantity and the date of the distribution, (xv) performing all necessary acts to maintain the eligibility and validity of our trust, (xvi) abstaining from engaging in activities that are contrary to any of the provisions of our trust agreement or applicable law as well as perform all activities necessary to enable parties related to us to exercise their rights, and (xvii) performing all necessary acts to preserve our rights.

In addition, the Common Representative will not be required to make any out-of-pocket payment in order to satisfy any legal or financial requirements applicable to the CBFIs. If, for any given reason, the Trustee, underwriter or any third party, or any conflict that involves these parties, prevents the making of any necessary payment of the CBFIs, the Common Representative will inform holders of our CBFIs of the situation, and in conformity with any resolutions passed by holders of our CBFIs, the Common Representative will be allowed to grant rights or confer powers to any given individual or group of individuals so that they can effectuate the necessary payments. The Common Representative will not be responsible for the authenticity of the documents or information provided to it by the Trustee, our Property Managers, our external auditor, our Advisor or our Leasing Administrators, such as financial reports, property evaluations, debt/loan documents, portfolio information or any other document related to any issuance that the Common Representative may require and that it itself did not prepare.

Our trust agreement provides that all actions taken by the Common Representative on behalf of holders of our CBFIs under our trust agreement, our CBFIs, or under applicable law, will be binding upon and be deemed to be accepted by holders of our CBFIs.

The Common Representative may be removed by holders of our CBFIs at an extraordinary meeting called for that purpose (as long as a quorum equal to at least 75% of the outstanding CBFIs is obtained), but such removal will not be effective until a new Common Representative has been appointed and accepted such appointment. The Common Representative may resign from its role only under circumstances qualified by a judge, as provided by Mexican law.

**Our Assets**

Our trust agreement provides that our assets will be comprised of, among other things: (i) our portfolio, (ii) our rights to the leases on the properties in our portfolio, and (iii) the net proceeds of any offerings.

**The Trustee**

The Trustee's obligations include, among other things: (i) providing our external auditor with information needed to conduct its annual audit of our financial statements, (ii) delivering a monthly report setting forth information required by our trust agreement to the Common Representative, our external auditor, our Advisor, our technical committee, our practices committee and our audit committee, (iii) verifying compliance by our external auditors with the terms of their engagement, (iv) consulting with our technical committee with respect to any matters not provided for in our trust agreement, by notifying our technical committee in a manner that enables them to reach a decision within a reasonable time and (v) complying, on behalf of the holders of our CBFIs, with all tax-related laws, including the Mexican Income Tax Law and the Mexican Flat Tax Law, considering the information provided to it by our tax and accounting advisor. Our technical committee may call a meeting of holders of our CBFIs to reach such a decision. For those matters requiring prompt attention and with respect to which a meeting of holders of our CBFIs is therefore not called, our technical committee is required to resolve such matters promptly, in consultation with our practices committee and our audit committee (as needed).

Our trust agreement provides that the Trustee and our Management Subsidiary will only be liable with respect to the accounts opened under our trust agreement in instances of negligence, fraud or bad faith (as construed under Mexican legal standards).

The Trustee may be removed by our technical committee following a request from our Advisor or the Common Representative, but such removal will not be effective until a new trustee has been appointed.

Our Advisor has the right to request our technical committee to substitute the Trustee in the event it has shown the existence of an event constituting cause for removal, as set forth our trust agreement.

The Trustee may resign, but only for an "important cause," as defined by Mexican law. In such case, the Trustee must inform our technical committee and the Common Representative, and our technical committee must, within ten days of such notice, inform the Trustee of the identity of the institution that will replace it. The outgoing Trustee's resignation will not be effective until a new trustee has accepted its appointment.

In the event the Trustee is removed or resigns, the new trustee shall be a financial institution of recognized solvency, prestige and with experience in managing similar trusts, as determined by our technical committee and complying with our policy on conflict of interest.

**Restrictions on Ownership of Our CBFIs**

Pursuant to our trust agreement, no person may individually, or together with other persons, acquire ownership or beneficial ownership, directly or indirectly, of 10% or more of our outstanding CBFIs (whether executed in one or more transactions that result in such persons holding individually, or together with such other persons, such percentage), without the prior approval of a majority of the members of our technical committee, including a majority of the independent members of our technical committee. This authorization shall be made in writing and prior to the acquisition, and will be required regardless of whether the acquisition of CBFIs is through a private or public offering, directly or indirectly, in or outside of the securities market or through any other means, in Mexico or abroad.

The foregoing ownership limitation applies to our CBFIs, as well as any security or instrument we may issue whose underlying assets are CBFIs, and any other document that relates to rights of our CBFIs. In addition, the foregoing ownership limitation applies to (i) the purchase or sale of any rights that correspond to our CBFIs, (ii) any agreement that limits or results in the transfer of any of rights of holders of our CBFIs, other than those set forth in our trust agreement, (iii) any CBFIs held by one or more persons acting together as a group and (iv) acquisitions that one or more interested parties purport to make, acting as a group, association of persons or consortium.

Furthermore, our trust agreement provides that any purchase or sale of our CBFIs that is not in compliance with the foregoing limitations will be null and void, and that any person determined by our technical committee to

have acquired our CBFIs in violation of the anti-takeover provisions of our trust agreement will not be able to vote such CBFIs nor exercise any rights derived from them, other than economic rights.

**Meetings of Holders of our CBFIs and Voting Rights**

The Common Representative is obligated to summon a general ordinary meeting at least once a year (no later than March) in order to, among other things, approve our financial statements for the prior fiscal year and appoint members of our technical committee and determine their compensation (if any). Meetings of holders of our CBFIs may also be called by our technical committee and our audit committee through the Common Representative. The Common Representative is required to preside over a meeting of holders of our CBFIs.

In addition, any holder, or group of holders, representing at least 10% of our outstanding CBFIs has the right to request the Common Representative to call a meeting of holders of our CBFIs to discuss the matters indicated in the request. If the Common Representative fails to call a meeting within 15 calendar days following receipt of the request, such holder(s) may request that the call be made by a competent court (in the Trustee's domicile, in the first instance).

Meetings of holders of our CBFIs may also be called by the Trustee through the Mexican Stock Exchange. The call for such meeting must be made at least ten calendar days prior to the date of the meeting.

Calls for meetings of holders of our CBFIs by the Common Representative must be published in the Official Gazette and in a newspaper of general circulation in the Trustee's domicile, at least ten calendar days prior to the date of the meeting. Calls for meetings of holders of our CBFIs must set forth the place, date and time of the meeting, and the relevant agenda. To attend a meeting, holders must deposit the deposit receipts issued by Indeval, as well as the list of holders issued by the relevant securities market.

Any holder, or group of holders, representing 10% or more of the outstanding CBFIs has the right, which may only be exercised once in respect of a meeting, to postpone the meeting for three days with respect to a vote on any matter to which such holder(s) do not consider themselves sufficiently informed.

Minutes of meetings of holders of our CBFIs will be issued by the president and secretary of the meeting, will be added to the attendance list and are required to be signed by the holders present at the meeting.

***Voting***

Subject to the provisions of our trust agreement regarding the restrictions on ownership and transfer of our stock, each outstanding CBFI entitles the holder to one vote on all matters submitted to a vote of holders, including the election of members of our technical committee. Pursuant to our trust agreement, any holder, or group of holders, has the right to appoint a main member for each 10% of our outstanding CBFIs held and his or her respective alternate member to our technical committee. The contributors of the properties in our Initial Portfolio, through a control trust and as long as the control trust holds 15% or more of the outstanding CBFIs, will have the right to appoint the majority of the members of our technical committee. See "Management Our Technical Committee Election of Technical Committee." In order to attend a meeting of holders of our CBFIs, holders must be registered in our stock registry, or submit appropriate evidence of the title to their CBFIs.

Holders of our CBFIs may enter into voting agreements for purposes of voting at a meeting of holders of our CBFIs. However, such voting agreements must be notified to the Trustee by its constituent holders within five business days, and any such voting agreements involving 10% or more of our CBFIs require the prior approval of our technical committee. Voting agreements are permitted to contain agreements to refrain from appointing a particular member of our technical committee.

Except for those meetings described below as extraordinary meetings of holders of our CBFIs, all other meetings will be ordinary meetings.

The quorum for an ordinary meeting of holders of our CBFIs in response to a first call therefor is at least 50% of the outstanding CBFIs, and resolutions may be taken by holders of a majority of our CBFIs present. If a quorum is not met in response to a first call for a meeting, a subsequent meeting may be called at which resolutions may be taken by the holders of a majority of our CBFIs present, regardless of the percentage of outstanding CBFIs represented at such meeting. The quorum for an extraordinary meeting of holders of our CBFIs whose purpose is to (i) remove the Common Representative, (ii) appoint a new Common Representative, or (iii) convey or grant an extension to the Trustee or to propose an amendment to the public deed, or the Mexican Issuance Deed, will be more than 85% of the outstanding CBFIs.

Resolutions may be adopted by holders of our CBFIs by majority vote, except that the required votes will be more than 85% of the outstanding CBFIs for extraordinary meetings of holders of our CBFIs whose purpose is to (i) amend certain provisions of our trust agreement, (ii) terminate our trust agreement (and our existence as a trust), (iii) liquidate our assets, or (iv) delist our CBFIs from the National Securities Registry of the Mexican Stock Exchange.

Holders of our CBFIs may be represented at a meeting by an attorney in fact as their proxy.

**Registration and Transfer**

Our CBFIs are registered with the National Securities Registry of the Mexican Stock Exchange, as required under the Mexican Securities Market Law and regulations issued by the Mexican Stock Exchange. Our CBFIs are evidenced by global certificates. Holders will hold their CBFIs indirectly, in book entry form through brokers, banks, other financial entities or other entities approved by the Mexican Stock Exchange that maintain accounts with Indeval, or Indeval Participants.

Indeval is the holder of record in respect of all CBFIs held in book-entry form. Indeval will issue certifications to any Indeval Participant who may request them. Only those persons holding CBFIs as registered holders through any relevant Indeval Participants will be recognized as holders of our CBFIs, subject to our trust agreement and Mexican law.

The transfer of CBFIs must be registered in our stock registry. Transfers of CBFIs deposited with Indeval will be registered in book entry form pursuant to the Mexican Securities Market Law.

**Distributions**

In accordance with our trust agreement, we intend to distribute to holders of our CBFIs, *pro rata*, 95% of our net taxable income each fiscal year, as long as certain requirements are met, including the approval of our technical committee of (i) the financial statements on which such distributions will be based, and (ii) the amount of the distribution, with the prior opinion of our audit committee. Distributions of other than 95% of our net taxable income will also require the approval of a majority of the independent members of our technical committee. Currently, distributions have been made quarterly and this practice will continue as long as there are funds sufficient for that purpose. Our technical committee has the power to determine our distribution policy and, if needed, modify it. We intend to pay regular quarterly distributions equal to at least 95% of our net taxable income to holders of our CBFIs.

**Term and Termination**

Our trust agreement provides that we, as a trust, will have the necessary term for compliance of our purposes and we, as a trust, may be terminated in the event such compliance becomes impossible. In particular, our trust agreement (and we as a trust) will be terminated (i) by judicial order, decree or other legal decision in the event the competent authorities or laws determine that it (and we as a trust) should be terminated, (ii) upon our expiration as a trust, which according to Article 394 of the Mexican General Law on Negotiable Instruments and Credit Operations, will occur after 50 years but may be renewed after this period by request, and (iii) at a meeting of holders of our CBFIs upon the affirmative vote of more than 85% of the outstanding CBFIs.

## Liquidation

Upon our dissolution, one or more liquidators must be appointed by an extraordinary meeting of holders of our CBFIs to wind up our affairs. All fully paid and outstanding CBFIs will be entitled to participate equally in any distribution upon liquidation.

Upon termination of our trust agreement (and us, as a trust), the liquidation process with respect to our assets will proceed as follows: (i) our technical committee will appoint a liquidator within 15 business days of the occurrence of one of the events that would cause such termination (as described under "Term and Termination"), and will grant such liquidator certain powers and obligations, including all powers and obligations of our Advisor (and our Advisor will cease to have such powers and obligations), (ii) the liquidator will be required to perform all necessary and/or convenient acts to protect the rights of holders of our CBFIs and maintain our assets, as well as cancelling the registration of our CBFIs in the National Securities Registry of the Mexican Stock Exchange and any other registry within or outside of Mexico, and (iii) the liquidator will be required to pay our outstanding obligations and distribute any remaining amounts of our assets to the holders of our CBFIs *pro rata*.

In connection with the liquidation of our assets, the liquidator is required to observe certain procedures described in, and perform such liquidation in accordance with, our trust agreement.

## Minority Protections Under Our Trust Agreement

Our trust agreement contains a number of minority protections. These minority protections include provisions that permit:

- any holder, or group of holders, representing 10% of our outstanding CBFIs has the right to appoint a main member of our technical committee, together with his or her respective alternate member, provided that they have not waived the right to make such appointments; any technical committee member so appointed may be discharged by the remaining holders of our CBFIs only if all members of our technical committee are so discharged;

- any holder, or group of holders, representing 10% of our outstanding CBFIs to request Common Representative call a meeting of holders of our CBFIs;

- any holder, or group of holders, representing 10% of our outstanding CBFIs that are represented at a meeting of holders of our CBFIs to postpone the meeting for three days with respect to a vote on any matter to which such holder(s) do not consider themselves sufficiently informed;

- any holder or group of holders, representing at least 20% of our outstanding CBFIs to contest any holders' resolution, subject to certain requirements under Mexican law; and

- any holder or group of holders, representing at least 15% of our outstanding CBFIs to institute judicial proceedings (*acciones de responsabilidad*) against the Management Subsidiary for a breach of its obligations.

In addition, our trust agreement provides for certain corporate governance requirements, including the requirement to elect independent (as construed under Mexican legal requirements) members, and to maintain an audit committee and practices committee to oversee our management.

## Anti-Takeover Provisions

Subject to certain exceptions, our trust agreement provides that any person who individually, or together with other persons, wishes to acquire beneficial ownership of our CBFIs, directly or indirectly, in one or more transactions that result in such persons holding individually, or together with such other persons, CBFIs representing 10% or more of our outstanding CBFIs, must obtain the prior approval of a majority of the members of our technical

committee, including a majority of the independent members of our technical committee, before undertaking the transaction.

The foregoing ownership limitation applies to our CBFIs, as well as any security or instrument we may issue whose underlying assets are CBFIs, and any other document that relates to rights of our CBFIs. In addition, the foregoing ownership limitation applies to (i) the purchase or sale of any rights that correspond to our CBFIs, (ii) any agreement that limits or results in the transfer of any of the rights of holders of our CBFIs, other than those set forth in our trust agreement, and (iii) any CBFIs held by one or more persons acting together as a group.

Furthermore, our trust agreement provides that any purchase or sale of our CBFIs that is not in compliance with the foregoing limitations will be null and void, and that any person determined by our technical committee to have acquired our CBFIs in violation of the anti-takeover provisions of our trust agreement will not be able to vote such CBFIs nor exercise any rights derived from them, other than economic rights.

A potential acquirer must obtain the prior approval of our technical committee before undertaking any of the transactions described above. To obtain such approval, the potential acquirer must deliver to our Management Subsidiary, with a copy to our technical committee and the Trustee, a written authorization request that contains certain details about the transaction. After receiving this request, our technical committee may submit the potential acquirer's request to holders of our CBFIs at an extraordinary meeting of holders of our CBFIs. Such request must include, among other things: (i) the number of CBFIs proposed to be acquired, (ii) the identity and nationality of the acquirer and of its owners, (iii) the characteristics of the potential acquirer, such as whether it is a competitor of ours, as well as its financial solvency and reputation, (iv) the origin of the funds to be used for the acquisition, and (v) whether or not such acquirer intends to seek to acquire ownership or control of 30% or more of our outstanding CBFIs (whether through acquisition, voting agreements or otherwise).

## Other Provisions

### Governing Law; Submission to Jurisdiction

Our trust agreement is in the Spanish language and is governed by Mexican law. Our trust agreement provides that the parties thereto have submitted to the jurisdiction of the courts of Mexico City in connection with any controversy arising from the interpretation of or non-compliance with our trust agreement.

### Amendments to Our Trust Agreement

Our trust agreement may only be amended pursuant to an agreement between the contributors and the Common Representative, and will require the consent of the holders of the majorities of our CBFIs specified in our trust agreement as well as the presence of the Trustee, except that amendments of certain provisions of our trust agreement (relating to the parties to our trust agreement, our assets, our purposes, issuance of our CBFIs, obligations of the Common Representative, meetings of holders of our CBFIs, our technical committee, our audit committee, our practices committee, our Management Subsidiary, investment in real estate, distributions, reversion rights, liquidation of assets and transfer of CBFIs) require the vote of more than 85% of our outstanding CBFIs.

Our trust agreement provides that if at any time our Advisor has been removed or the contributors collectively cease to have control over at least 15% of our outstanding CBFIs, the Common Representative is required to call a meeting of holders of our CBFIs no later than the month following the occurrence of one of such events for the purpose of amending our trust agreement as recommended by our practices committee. Resolutions adopted at such a meeting will be valid if they receive the affirmative vote of holders of a majority of our outstanding CBFIs.

### External Auditor

Our external auditor is Galaz, Yamazaki, Ruiz Urquiza, S.C., a member of Deloitte Touche Tohmatsu Limited. However, our technical committee may appoint a different external auditor at any time.

Our external auditor's obligations will include, among other things: (i) delivering an annual audit report to the Trustee, our Advisor, our audit committee and the Common Representative, during the first 20 business days of each year, and (ii) verifying the information in the Trustee's monthly report against the amounts received in the accounts, and notifying the Trustee, the Common Representative and our audit committee of any discrepancies.

The external auditor may be removed by our technical committee upon the recommendation of our audit committee, but such removal will not be effective until a new external auditor has been appointed.

**Tax Advisor**

Our tax advisor is DLA Piper México.

## THE MEXICAN SECURITIES MARKET

We have prepared the information concerning the Mexican securities market set forth below based on materials obtained from public sources, including the CNBV, the Mexican Stock Exchange, Banco de México and publications by market participants.

Our CBFIs are listed on the Mexican Stock Exchange under the symbol "FUNO11."

We cannot predict the continued liquidity of the Mexican Stock Exchange. If the trading volume of the CBFIs in such market falls below certain levels, the CBFIs could be delisted or deregistered in that market. In addition, the price of our CBFIs may be volatile or may decline regardless of our operating performance.

### Trading on the Mexican Stock Market

#### *Overview*

The Mexican Stock Exchange, located in Mexico City, is the only stock exchange in Mexico. Operating continuously since 1907, the Mexican Stock Exchange is organized as a corporation (*sociedad anónima bursátil de capital variable*). Securities trading on the Mexican Stock Exchange occurs each business day from 8:30 a.m. to 3:00 p.m., Mexico City time.

Since January 1999, all trading on the Mexican Stock Exchange has been effected electronically. The Mexican Stock Exchange may impose a number of measures to promote an orderly and transparent trading price of securities, including the operation of a system of automatic suspension of trading in securities of a particular issuer when price fluctuation exceeds certain limits.

Settlement on the Mexican Stock Exchange is effected three business days after a share transaction. At the request of the relevant broker or issuer, and whenever it is duly justified, the settlement term may be modified by the Mexican Stock Exchange by notifying such modification to the CNBV. Most securities traded on the Mexican Stock Exchange are on deposit with the Indeval, a privately owned securities depositary that acts as a clearinghouse, depositary, and custodian, as well as a settlement, transfer, and registration agent for Mexican Stock Exchange transactions, eliminating the need for physical transfer of securities.

Although the Mexican Securities Market Law provides for the existence of an over-the-counter market, no such market for securities in Mexico has developed.

### Market Regulation

In 1925, the Mexican National Banking Commission (*Comisión Nacional Bancaria*) was established to regulate banking activity and in 1946, the Mexican Securities Commission was established to regulate stock market activity. In 1995, these two entities were merged to form the CNBV. In 1975, the first Securities Market Law was enacted, introducing important structural changes to the Mexican financial system, including the organization of brokerage firms as corporations (*sociedades anónimas*). The CNBV regulates and supervises the Mexican securities market, the Mexican Stock Exchange, Indeval and brokerage firms through a board of governors composed of 13 members.

On December 30, 2005, a new Mexican Securities Market Law was enacted and published in the Official Gazette. The new Mexican Securities Market Law became effective on June 28, 2006, however, in some cases an additional period of 180 days (until late December 2006) was available for issuers to incorporate the new corporate governance and other requirements derived from the new law into their bylaws. The Mexican Securities Market Law sets standards for authorizing companies to operate as brokerage firms, which authorization is granted at the discretion of the CNBV. In addition to setting standards for brokerage firms, the Mexican Securities Market Law authorizes the CNBV, among other things, to regulate the public offering and trading of securities, corporate governance, disclosure and reporting standards and to impose sanctions for the illegal use of insider information and other violations of the Mexican Securities Market Law.

The new Mexican Securities Market Law changed the Mexican securities regulation in various material respects. The reforms were intended to update the Mexican regulatory framework applicable to the securities market and publicly-traded companies in accordance with international standards.

In particular, the new Mexican Securities Market Law (i) establishes that public entities and the entities controlled by them will be considered a single economic unit, (ii) clarifies the rules for tender offers, dividing them into voluntary and mandatory categories, (iii) clarifies standards for disclosure of holdings of shareholders of public companies, (iv) expands and strengthens the role of the board of directors of public companies, (v) defines the standards applicable to the board of directors and the duties of the board, each director, its secretary, the general director and executive officers (introducing concepts such as the duty of care, duty of loyalty and safe harbors), (vi) replaces the statutory auditor (*comisario*) and its duties with an audit committee, a corporate practices committee and external auditors, (vii) clearly defines the roles and responsibilities of executive officers, (viii) improves the rights of minority shareholders relating to legal remedies and access to company information, (ix) introduces concepts such as consortiums, groups of related persons or entities, control, related parties and decision-making power, (x) sets out three new types of companies different to the ones which are set out by the Mexican Companies Law, the (A) *sociedad anónima promotora de inversión*, by which the investment of national and foreigner investors shall be promoted, (B) *sociedad anónima promotora de inversión bursátil* and (C) *sociedad anónima bursátil*, and (xi) expands the definition of applicable sanctions for violations of the Mexican Securities Market Law, including the punitive damages and criminal penalties.

In March 2003, the CNBV issued certain general regulations applicable to issuers and other securities market participants. The general regulations, which repealed several previously enacted CNBV regulations (*circulares*), now provide a single set of rules governing issuers and issuer activity, among other things. In September 2006, these general regulations were amended to give effect to the provisions of the new Mexican Securities Market Law.

In addition, in September 2004, the CNBV issued general rules applicable to brokerage firms, the CNBV Rules for Brokerage Firms (*circulares aplicables a casas de bolsa*). These rules now provide a single set of rules governing participation of Mexican initial purchasers in public offerings, among other things. These rules have been amended several times, the last amendment was published in the Official Gazette on November 30, 2006.

***Issuance, registration and continued listing standards***

To offer securities to the public in Mexico, an issuer must meet specific qualitative and quantitative requirements. In addition, only securities that have been registered with the RNV as authorized by CNBV approval may be listed on the Mexican Stock Exchange. The authorization of the CNBV with respect to the registration does not imply any kind of certification or assurance related to the investment quality of the securities, the solvency of the issuer, or the accuracy or completeness of any information delivered to the CNBV. The general regulations state that the Mexican Stock Exchange must adopt minimum requirements for issuers to list their securities in Mexico and to maintain such listing. These requirements relate to matters such as operating history, financial condition, minimum public float, minimum number of holders and corporate governance, among others. The Mexican Stock Exchange may waive some of these requirements in certain circumstances. In addition, some of the requirements are applicable to each series of securities of the relevant issuer.

The Mexican Stock Exchange will review compliance with the foregoing requirements and other requirements on an annual, semi-annual and quarterly basis, and may also do it at any other time. The Mexican Stock Exchange must inform the CNBV of the results of its review and this information must, in turn, be disclosed to investors. If an issuer fails to comply with any of the foregoing requirements, the Mexican Stock Exchange will request that the issuer propose a plan to cure the violation. If the issuer fails to propose a plan, if the plan is not satisfactory to the Mexican Stock Exchange or if an issuer does not make substantial progress with respect to the corrective measures, trading of the relevant series of shares on the Mexican Stock Exchange will be temporarily suspended.

*Reporting obligations*

Issuers of listed securities are required to file unaudited quarterly financial statements and audited annual financial statements as well as various periodic reports with the CNBV and the Mexican Stock Exchange.  Mexican issuers must file the following reports with the CNBV:

- an annual report prepared in accordance with the CNBV general regulations by no later than June 30 of each year;

- quarterly reports, within 20 business days following the end of each of the first three quarters and 40 days following the end of the fourth quarter; and

- reports disclosing material events promptly upon their occurrence.

The CNBV's general regulations and the rules of the Mexican Stock Exchange require issuers of listed securities to file information through SEDI that relates to any act, event or circumstance that could influence issuers' share price. If listed securities experience unusual price volatility, the Mexican Stock Exchange must immediately request that an issuer inform the public as to the causes of the volatility or, if the issuer is unaware of the causes, that an issuer make a statement to that effect. In addition, the Mexican Stock Exchange must immediately request that issuers disclose any information relating to relevant material events, when it deems the information currently disclosed to be insufficient, as well as instruct issuers to clarify the information when necessary. The Mexican Stock Exchange may request that issuers confirm or deny any material events that have been disclosed to the public by third parties when it deems that the material event may affect or influence the securities being traded. The Mexican Stock Exchange must immediately inform the CNBV of any such requests.

An issuer may defer the disclosure of material events under some circumstances, as long as:

- the issuer implements adequate confidentiality measures (including maintaining records of persons or entities in possession of confidential information);

- the information is related to incomplete transactions;

- there is no misleading public information relating to the material event; and

- no unusual price or volume fluctuation occurs.

Similarly, if an issuer's securities are traded on both the Mexican Stock Exchange and a foreign securities exchange, the issuer must simultaneously file the information that it is required to file pursuant to the laws and regulations of the foreign jurisdiction with the CNBV and the Mexican Stock Exchange.

*Suspension of trading*

Under its internal regulations, the Mexican Stock Exchange may suspend trading in the securities of a particular issuer as a result of:

- the disclosure of material events;

- unusual price or volume fluctuations;

- failure by the issuer to timely or adequately comply with its reporting obligations, including the obligation to disclose material events; or

- significant exceptions or comments contained in the auditors' opinion of the issuer's financial statements, or determinations that such financial statements were not prepared in accordance with the applicable accounting procedures and policies.

- 168 -

In cases where an issuer's securities are traded simultaneously on other stock exchanges outside of Mexico, the Mexican Stock Exchange may consider the measures adopted by such other stock exchanges in order to suspend and/or resume trading in the issuer's shares.

In addition, pursuant to the Mexican Securities Market Law and the CNBV's general rules, trading may be suspended to avoid or remedy disorder conditions or operations that do not conform to sound market practices or when listing requirements are not complied with.

The Mexican Stock Exchange must immediately inform the CNBV and the general public of any such suspension. The Mexican Stock Exchange may reinstate trading in suspended shares when it deems the causes triggering the suspension to have been resolved.

### *Insider trading, trading restrictions and tender offers*

The Mexican Securities Market Law contains specific regulations regarding insider trading, including, the requirement that persons in possession of information deemed privileged abstain (i) from trading in the relevant issuer's securities, (ii) from providing insider information to third parties and (iii) from making recommendations to third parties to trade in such securities.

# TAXATION

## Certain Mexican Federal Income Tax Considerations

The following discussion is a summary of certain Mexican federal income tax consequences of the acquisition, ownership and disposition of our CBFIs by a holder that is not a resident of Mexico and that will not hold CBFIs in connection with the conduct of a trade or business in Mexico, or a "Non-resident Holder." The definition of residence for Mexican tax purposes is both highly technical and based on the relevant facts and circumstances. Therefore, any determination of residence should take into account the particular situation of each holder. This discussion does not purport to be a comprehensive description of all of the tax considerations that may be relevant to a decision to acquire, own and dispose of our CBFIs, and does not address the Mexican federal income tax consequences that may apply to holders subject to special tax rules. In addition, this summary does not describe any tax consequences arising under the laws of any state, locality, municipality or other taxing jurisdiction other than the federal income tax laws of Mexico.

The existing Mexican tax regime applicable to FIBRAs has been subject to several amendments since it was first enacted in 2003. In addition, there has been a lack of legal, judicial or regulatory guidance regarding FIBRAs, and there can be no assurance that future changes in the laws and regulations governing FIBRAs will not adversely affect us and holders of our CBFIs. If we are unable to maintain our qualification as a FIBRA, we could be required to change the manner in which we conduct our operations, which could adversely affect our financial condition, results of operations and cash flow, the trading price of our CBFIs and our ability to make distributions to holders of our CBFIs. See "Risk Factors—Risks Related to Our Organization and Structure—The existing tax regime applicable to FIBRAs has been evolving and was recently amended. There can be no assurance that the laws and regulations relating to FIBRAs, and any interpretations thereof, will not further change in a manner that adversely affects us."

### FIBRA Status

*Qualification.* We conduct our operations so as to qualify as a real estate trust (*fideicomiso de inversión en bienes raíces*), or FIBRA, for Mexican federal income tax purposes commencing with our taxable year ending December 31, 2011. We are formed as a Mexican trust and, under Articles 187 and 188 of the Mexican Income Tax Law, in order to qualify as a FIBRA, we must: (i) lease our real estate (other than our real estate under construction), (ii) hold our real estate for at least four years, (iii) distribute annually at least 95% of our net taxable income (*Resultado Fiscal*), and (iv) maintain at least 70% of our assets in the form of in real estate, among other requirements. We intend to comply with the requirements for qualification as a FIBRA for each of our taxable years.

*Our Pass-Through Status.* As a Mexican trust with FIBRA status, we are generally treated as a pass-through entity for Mexican federal income tax purposes. Therefore, all income from the conduct of our business is attributed to the holders of our CBFIs and we are disregarded as a taxable entity in Mexico, in each case, to the extent of our distributions to holders of our CBFIs. As a consequence, holders of our CBFIs are subject to Mexican federal income tax on their respective portions of our net taxable income that is paid to them as distributions on our CBFIs. However, such Mexican federal income tax liability will be satisfied by the custodians through their withholding obligations, such that no further Mexican tax payments or Mexican tax return filing obligations will be required by Non-resident Holders.

Moreover, for Mexican Value Added Tax (*Impuesto al Valor Agregado*), or VAT, the Trustee will elect to remit such tax on behalf of the holders of our CBFIs. Therefore, Non-resident Holders of our CBFIs are subject only to Mexican federal income tax, and such tax will be satisfied by the custodians through their withholding tax obligations.

*Our Taxes.* As a trust, we are subject to VAT, and the Trustee will remit such tax on our behalf. Generally, VAT will be added to the rents collected from our tenants at a rate of 16% and, as described above. Therefore, we expect no effect on Non-resident Holders of our CBFIs due to such tax. Notwithstanding our general pass-through tax treatment, we will have to pay Mexican federal income tax on our undistributed net taxable income and on any gain recognized from the sale of property held for less than four years, in each case, at a rate of 30%. Currently, we

do not expect to retain any net taxable income or sell any property held for less than four years. As a trust, we are exempt from monthly estimated Mexican federal income tax payments. Therefore, we expect to pay Mexican federal income tax once each fiscal year on our undistributed net taxable income (if any).

We are also subject to local real estate and acquisition taxes at regular rates. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for a description of the financial impact of local taxes on our operations.

*Our Taxable Income*. Our taxable income is calculated as the result of subtracting from our total revenues our deductions permitted by law. Such deductions include our ordinary expenses, including interest and depreciation on our properties (not including amounts attributable to land) at a rate of 5% per year. At the end of the tax year, we may subtract from our net taxable income distributions previously paid to holders of our CBFIs, provided that we distribute at least 95% of our net taxable income each year and maintain our qualification as a FIBRA.

### Taxation of No-resident Holders

*Distributions on Our CBFIs*. Distributions of net taxable income on our CBFIs made to Non-resident Holders, whether paid in cash or other property, will generally be subject to Mexican withholding tax at a current rate of 30%, unless a Non-resident Holder is exempt from withholding (as described below). Such rate generally is not reduced under applicable tax treaties, including the Mexico / United States income tax treaty.

Pension fund Non-resident Holders are generally exempt from Mexican withholding tax on our distributions, provided that they are exempt from taxation in their place of residence. In order to avoid Mexican withholding tax, the pension fund must notify the Trustee of its exempt status and meet certain other requirements. Pension funds are urged to consult their tax advisors with regard to their ability to claim an exemption from Mexican withholding taxes on distributions on our CBFIs.

*Dispositions of Our CBFIs*. Under current Mexican federal income tax law and regulations, gain from the sale or other disposition of our CBFIs that are registered with the Mexican Stock Exchange by a Non-resident Holder generally will not be subject to Mexican federal income tax, provided (i) the transaction is carried out through (a) the Mexican Stock Exchange, (b) other securities exchanges or markets approved by the Mexican Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*), or (c) other securities exchanges or markets with ample securities trading that are located in countries with which Mexico has entered into an income tax treaty, and (ii) certain other requirements are met, including that the transaction is effected pursuant to a non-restricted open market offer.

Sales or other dispositions of our CBFIs carried out in other circumstances generally are subject to Mexican federal income tax, at a rate of 10% (40% in the case of residents of certain tax havens, as defined by the Mexican Income Tax Law) of the gross proceeds (which tax must be withheld by the purchaser), except to the extent that a Non-resident Holder is eligible for benefits under an income tax treaty to which Mexico is a party or otherwise exempt from Mexican federal income taxation. In this regard, Non-resident Holders that are residents of the United States generally may not claim an exemption on a taxable disposition of our CBFIs under the Mexico / United States income tax treaty, as our assets will be comprised substantially of real estate. Non-U.S. Non-resident Holders are urged to consult their tax advisors as to their ability to claim an exemption from Mexican federal income tax on an otherwise taxable disposition of our CBFIs under an applicable tax treaty between their jurisdiction of residence and Mexico.

### Other Mexican Taxes

In the event we are subject to Mexican tax on our undistributed net taxable income or on gain from the sale of property held less than four years (as described above), subsequent distributions in respect of such income will not be subject to Mexican withholding taxes. Also, in such case, pension trusts will not be entitled to claim any refund or reduction in Mexican tax in respect of Mexican tax previously paid by us on their share of such income.

Under certain circumstances, a Non-resident Holder will not be liable for Mexican estate, inheritance or similar taxes with respect to its holdings of CBFIs; provided, however, that gratuitous transfers of CBFIs may in certain circumstances result in imposition of Mexican tax upon the recipient.

There are no Mexican stamp, issue registration or similar taxes payable by a Non-resident Holder with respect to CBFIs.

## Certain U.S. Federal Income Tax Considerations

The following discussion is a summary of certain U.S. federal income tax consequences of the acquisition, ownership and disposition of our CBFIs. Except as otherwise indicated, this discussion applies only to beneficial owners of CBFIs who are "U.S. Holders" (as defined below) who hold such CBFIs as capital assets for U.S. federal income tax purposes (generally, property held for investment). This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing final, temporary and proposed U.S. Treasury Regulations, administrative pronouncements of the IRS and judicial decisions, all as are currently in effect and all of which are subject to change (possibly on a retroactive basis) and to differing interpretations.

This discussion does not purport to address all U.S. federal income tax consequences that may be relevant to a particular holder. In addition, this discussion does not address tax consequences that may be relevant to U.S. Holders subject to special U.S. federal income tax treatment including:

- insurance companies;

- tax-exempt organizations;

- broker-dealers;

- traders in securities that elect to mark-to-market;

- banks or other financial institutions;

- partnerships or other pass through entities;

- real estate investment trusts and regulated investment companies;

- persons whose functional currency is not the U.S. Dollar;

- U.S. expatriates;

- persons who hold our CBFIs as part of a hedge, straddle or conversion transaction; or

- persons who own, directly, indirectly or by attribution, 10% or more of the total combined voting power or value of our CBFIs.

This discussion does not address any U.S. federal alternative minimum tax consequences, any U.S. federal estate or gift tax consequences, any state or local tax consequences, or any non-U.S. tax consequences of the acquisition, ownership or disposition of our CBFIs. You should consult your tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences to you of the acquisition, ownership and disposition of our CBFIs based on your particular circumstances.

You are a "U.S. Holder" if you are a beneficial owner of our CBFIs and for U.S. federal income tax purposes, you are:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of the trust or (ii) the trust has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person.

A non-U.S. Holder is a beneficial owner of our CBFIs that is not a U.S. Holder or a partnership for U.S. federal income tax purposes.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) holds our CBFIs, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Partners or partnerships considering an investment in our CBFIs should consult their tax advisors as to the U.S. federal, state, local and non-U.S. tax consequences to them of the acquisition, ownership and disposition of our CBFIs.

### Our U.S. Federal Income Tax Classification

We have elected to be treated as a corporation for U.S. federal income tax purposes, effective as of our date of formation.

### Taxation of Dividends

Subject to the discussion below under "—Passive Foreign Investment Companies," the gross amount of any distributions of cash or property on our CBFIs generally will be treated as dividend income for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of our current and accumulated earnings and profits will be treated first as a tax-free return of capital to the extent of your tax basis in our CBFIs and thereafter will be treated as capital gain from the sale or exchange of the CBFIs. Due to the U.S. federal income tax treatment of the formation transactions and the fact that our properties depreciate faster for Mexican tax purposes than for U.S. federal income tax purposes, a higher percentage of our distributions may be treated as dividends for U.S. federal income tax purposes than for Mexican federal tax purposes in earlier years, while distributions in later years may be treated as dividends for Mexican federal tax purposes but as return of capital distributions for U.S. federal income tax purposes. We expect to announce the percentage of our distributions that are treated as dividends for U.S. federal income tax purposes on an annual basis. Dividends paid by us generally will not be eligible for the dividends received deduction available under the Internal Revenue Code for certain corporate U.S. Holders.

Dividends generally will be eligible for preferential U.S. federal income tax rates when received by individuals and other non-corporate U.S. Holders.

If you are a U.S. Holder, the amount of any cash dividend paid in Pesos will be included in your gross income for U.S. federal income tax purposes in an amount equal to the U.S. Dollar value of the gross amount of the Pesos received (*i.e.,* before deduction of any Mexican withholding tax), calculated by reference to the exchange rate in effect on the date the dividend is actually or constructively received by you, regardless of whether the Pesos are in fact converted into U.S. Dollars at that time. If the Pesos received as a dividend are converted into U.S. Dollars on the date of receipt, you generally should not recognize foreign currency gain or loss with respect to such dividend. If the Pesos received as a dividend are not converted into U.S. Dollars on the date of receipt, you will have a tax basis in the Pesos equal to their U.S. Dollar value on the date of receipt. Any foreign currency gain or loss recognized on a subsequent conversion or other disposition of the Pesos will be treated as U.S. source ordinary income or loss. U.S. Holders should consult their tax advisors regarding whether any disposition of Pesos giving rise to foreign currency loss constitutes a reportable transaction for U.S. federal income tax purposes.

A U.S. Holder will be entitled, subject to a number of complex limitations and conditions, to claim a U.S. foreign tax credit in respect of Mexican withholding taxes imposed on dividends on our CBFIs. U.S. Holders who do not elect to claim a credit for any foreign taxes paid during the taxable year may instead claim a deduction in respect of such Mexican withholding taxes, provided that the U.S. Holder elects to deduct all foreign taxes paid or accrued for the taxable year. Dividends received with respect to our CBFIs will be treated as foreign source income. For purposes of the U.S. foreign tax credit limitation, foreign source income is separated into different "baskets," and the credit for foreign taxes on income in any basket is limited to the U.S. federal income tax allocable to such income. Thus, for example, if a U.S. Holder's federal income tax rate on dividends paid by us is less than the Mexican withholding taxes imposed on such dividends, the U.S. Holder would not be able to use any excess Mexican withholding taxes as a credit against its U.S. federal income tax liability unless the holder is able to use such credits to offset U.S. federal income taxes payable on other foreign source income of the same basket. For these purposes, dividends paid on our CBFIs generally will constitute "passive category income." Further, in certain circumstances, if you:

• have held our CBFIs for less than a specified period during which you are not protected from risk of loss, or

• are obligated to make payments related to the dividends,

you may not be allowed a foreign tax credit for foreign taxes imposed on dividends paid on our CBFIs. The rules governing the application of the U.S. foreign tax credit are complex, and you are urged to consult your tax advisor regarding the availability of the foreign tax credit to you based on your particular circumstances.

### *Sale, Exchange or Other Taxable Disposition of CBFIs*

Subject to the discussion below under "—Passive Foreign Investment Companies," a U.S. Holder generally will recognize U.S. source capital gain or loss upon a sale, exchange or other taxable disposition of our CBFIs measured by the difference between the amount realized on the sale, exchange or other taxable disposition of our CBFIs and the U.S. Holder's adjusted tax basis in our CBFIs. Any gain or loss will be long-term capital gain or loss if our CBFIs have been held for more than one year. Non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital loss is subject to limitations under the Internal Revenue Code.

If you are a U.S. Holder of our CBFIs, the initial tax basis of your CBFIs will be the U.S. Dollar value of the Peso-denominated purchase price established on the date of purchase. If our CBFIs are treated as traded on an "established securities market," a cash basis U.S. Holder, or, if it elects, an accrual basis U.S. Holder, will determine the U.S. Dollar value of the cost of such CBFIs by translating the amount paid at the spot rate of exchange on the settlement date of the purchase. If this rule applies to you and you convert U.S. Dollars to Pesos and immediately use such currency to purchase our CBFIs, such conversion generally will not result in foreign currency gain or loss to you.

The amount realized on a sale, exchange or other taxable disposition of our CBFIs by a U.S. Holder generally will be the U.S. Dollar value of the payment received on (i) the date of receipt of payment in the case of a cash basis U.S. Holder and (ii) the date of disposition in the case of an accrual basis U.S. Holder. If our CBFIs are treated as traded on an "established securities market," a cash basis taxpayer, or, if it elects, an accrual basis taxpayer, will determine the U.S. Dollar value of the amount realized by translating the amount received at the spot rate of exchange on the settlement date of the sale.

If Mexican tax is withheld on a sale, exchange or other taxable disposition of our CBFIs, the amount realized by a U.S. Holder will include the gross proceeds of the sale, exchange or other taxable disposition (i.e., before deduction of the Mexican tax). Capital gain or loss recognized by a U.S. Holder on the sale, exchange or other taxable disposition of our CBFIs generally will be treated as U.S. source gain or loss for U.S. foreign tax credit purposes. Consequently, in the case of a gain from the disposition of a CBFIs that is subject to Mexican tax, the U.S. Holder may not be able to claim as a foreign tax credit any Mexican tax paid, unless the U.S. Holder can apply the credit against U.S. federal income tax payable on other foreign source income of the same basket (as discussed

above in "—Taxation of Dividends"). Alternatively, the U.S. Holder may take a deduction in respect of the Mexican tax, provided that the U.S. Holder elects to deduct all foreign taxes paid or accrued for the taxable year

***Passive Foreign Investment Companies***

Special adverse U.S. federal income tax rules apply to U.S. persons owning shares of a passive foreign investment company, or PFIC. A non-U.S. entity treated as a corporation for U.S. federal income tax purposes generally will be classified as a PFIC for U.S. federal income tax purposes in any taxable year in which, after applying relevant look-through rules with respect to certain subsidiaries, either:

- at least 75% of its gross income is "passive income," or

- at least 50% of the value of its assets, based on their quarterly average, is attributable to assets that produce or are held for the production of passive income.

For this purpose, passive income generally includes, among other things, dividends, interest, certain rents and royalties, gains from the disposition of assets that produce passive income and gains from commodities transactions. Notwithstanding the foregoing, rents from real property generally will not be treated as passive income (and real property producing such rents generally will not be treated as passive assets) if they are derived in the active conduct of a trade or business.

One way that rental income can be treated as derived in the active conduct of a trade or business, is for the lessor, through its own officers or employees, to regularly perform active and substantial management and operational functions while the property is leased. Because of the significant management and operations functions carried out with respect to a majority (by value) of our properties by our employees (including employees of our Management Subsidiaries, which are considered to be our employees because our Management Subsidiaries are disregarded as separate entities from us for U.S. federal income tax purposes), we treat the lease income derived from such properties as active income for purposes of the PFIC test and we treat such properties as active assets for purposes of the PFIC test. As a result, we do not expect that we have been or will be treated as a PFIC. However, some of the relevant management activities with respect to such properties are carried out by third parties and some by persons who we expect would be treated as our employees for U.S. federal income tax purposes although they are not formally employed by us. Furthermore, the necessary services related to the management, operation and maintenance of certain other properties that we own are provided by third parties. As a result, it is possible that the IRS could take the position, and that a court might agree, that some or all of the rental income that we treat as active income for purposes of the PFIC test is not derived in the active conduct of a trade or business, and therefore is treated as passive income for purposes of the PFIC tests.

Furthermore, the determination of whether we are or will be characterized as a PFIC depends on the results of our operations, the relative values of our assets, the assets that we acquire in the future and the timing of such acquisitions. In particular, any cash we hold, including the cash raised in this offering, is generally treated as held for the production of passive income for the purpose of the PFIC test, and any income generated from cash or other liquid assets is generally treated as passive income for such purpose. As a result, our ability to avoid being characterized as a PFIC will depend in significant part on our ability to deploy proceeds from this or future offerings within limited periods of time following such offering to acquire properties managed by our Management Subsidiaries.

In addition, although we expect that the value of properties that we do not treat as active assets, together with other assets that we do not treat as active assets, have represented less than a majority of the gross value of our aggregate assets, based on the quarterly averages of our assets, and have generated less than 75% of our gross income, there is no assurance that these properties will not increase in value disproportionately to our other properties or that the income they produce will not increase disproportionately to our active income. If any of these events were to occur, or if our assets or income that are treated as passive for purposes of the PFIC rules otherwise represent a greater percentage of our aggregate assets or income than expected, we could be treated as a PFIC.

Many of these factors are not entirely in our control, the relevant information may not be available until the close of the taxable year and our actual PFIC status for any taxable year will not be determined until after the end of such year.  Furthermore, the application of certain of the PFIC rules to our business is not entirely clear. In particular, there is a lack of directly applicable authority regarding the meaning of providing active and substantial management and operational functions through a company's own officers and employees in connection with a business similar to ours in the context of the PFIC rules. As a result, no assurance can be provided that we will not be classified as a PFIC for any particular taxable year.

In the event we are or become a PFIC for U.S. federal income tax purposes for any taxable year (or portion thereof) that is included in the holding period of a U.S. Holder, absent a U.S. Holder validly making the election discussed below, a U.S. Holder will be subject to special adverse tax rules with respect to (i) "excess distributions" received on our CBFIs and (ii) any gain recognized upon a sale or other disposition (including a pledge) of our CBFIs. Excess distributions are distributions, including distributions that may not be dividends for U.S. federal income tax purposes, received in a taxable year that are greater than 125% of the average annual distributions received during the shorter of the three preceding taxable years or the U.S. Holder's holding period for its CBFIs. Under these special tax rules, (a) the excess distribution or gain will be allocated ratably over the U.S. Holder's holding period for its CBFIs, (b) the amount allocated to the current taxable year and any year prior to our becoming a PFIC will be treated as ordinary income, and (c) the amount allocated to each other taxable year will be subject to tax at the highest tax rate in effect for that year and an interest charge (at the rate generally applicable to underpayments of tax due in such year) will be imposed on the resulting tax attributable to each such year.

*Mark-to-Market Election.*  Provided our CBFIs are "marketable stock" for purposes of the PFIC rules, in the event that we are or become a PFIC, a U.S. Holder may make an election to include gain or loss on its CBFIs in its U.S. federal taxable income under a mark-to-market method of accounting. To be marketable stock, our CBFIs must be regularly traded on a qualifying exchange (i) in the United States that is registered with the SEC or a national market system established pursuant to the Exchange Act or (ii) outside the United States that is properly regulated and meets certain trading, listing, financial disclosure and other requirements. To be readily traded, our CBFIs must be traded on a qualifying exchange in more than *de minimis* quantities on at least 15 days during each calendar quarter for any calendar year during whichever CBFIs are traded. Our CBFIs are listed on the Mexican Stock Exchange. While we believe that our CBFIs should be treated as marketable stock for purposes of the PFIC rules, the IRS has not provided a list of the exchanges that meet the foregoing requirements and thus no assurance can be provided that our CBFIs will be (or will remain) treated as marketable stock for purposes of the PFIC rules. If we are treated as a PFIC and an effective mark-to-market election is made after the initial PFIC taxable year in which a U.S. Holder owns its CBFIs, distributions as well as any mark-to-market gain during the first year for which the election is in effect will be subject to the PFIC excess distribution rules described above.

Except as provided in the previous sentence, a U.S. Holder that makes an effective mark-to-market election will include as ordinary income each year the excess of the fair market value of its CBFIs at the end of the year over its adjusted tax basis in its CBFIs. Similarly, any gain realized on the sale, exchange or other disposition of the CBFIs will be treated as ordinary income. A U.S. Holder that makes a mark-to-market election will be entitled to deduct as an ordinary loss each year the excess of its adjusted tax basis in its CBFIs over their fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. A U.S. Holder that makes a mark-to-market election will increase its adjusted tax basis in its CBFIs by the amount of any income inclusions and decrease its adjusted tax basis in its CBFIs by the amount of any deductions under the mark-to-market rules. If a U.S. Holder makes a mark-to-market election, it will be effective for the taxable year for which the election is made and all subsequent taxable years unless we are no longer classified as a PFIC, the CBFIs are no longer regularly traded on a qualified exchange or the IRS consents to the revocation of the election.

A mark-to-market election is made by filing IRS Form 8621 (which form is also used to report a U.S. Holder's income resulting from a mark-to-market election). If a U.S. Holder does not make a mark-to-market election, the U.S. Holder is still required to file IRS Form 8621 upon (i) receiving an excess distribution from a PFIC or (ii) recognizing gain from the sale or exchange (including a pledge) of an interest in a PFIC. In addition, U.S. Holders that own an interest in a PFIC are required to file additional U.S. federal information tax returns.

Failure to make a required filing will extend the statute of limitations until such required information is furnished to the IRS.

If we are a PFIC and we have any direct, and in certain circumstances, indirect subsidiaries that are PFICs (each a "Subsidiary PFIC"), a U.S. Holder will be treated as owning its pro rata share of the stock of each such Subsidiary PFIC and will be subject to the PFIC rules with respect to each such Subsidiary PFIC. A U.S. Holder may not make a mark-to-market election with respect to the shares of any Subsidiary PFIC. Thus, the mark-to-market election is not available to mitigate the adverse tax consequences attributable to any Subsidiary PFIC.

The rules dealing with PFICs and with the mark-to-market election are complex and are affected by various factors in addition to those described above. U.S. Holders are urged to consult their tax advisors regarding the PFIC rules in connection with their acquisition, ownership and disposition of our CBFIs-

*QEF Election*. A U.S. Holder may mitigate any adverse tax consequences of the PFIC rules by filing an election to treat the PFIC as a qualified electing fund ("QEF") if the PFIC complies with certain reporting requirements. In the event that we are or become a PFIC, we do not intend to comply with such reporting requirements necessary to permit U.S. Holders to elect to treat us as a QEF.

### *Foreign Asset Reporting*

Individuals and certain domestic entities that are U.S. Holders will be required, subject to certain exceptions, to report information with respect to their investments in "specified foreign financial assets" on IRS Form 8938, which would include an investment in our CBFIs not held through a custodial account with a U.S. financial institution. Investors who fail to report required information could become subject to substantial penalties. Prospective investors are encouraged to consult their tax advisors regarding the foreign financial asset reporting obligations and their application to our CBFIs.

### *Tax on Net Investment Income*

A 3.8% Medicare contribution tax will generally apply to all or some portion of the net investment income of a U.S. Holder who is an individual with adjusted gross income that exceeds a threshold amount.  In the case of individuals, a 3.8% tax is imposed for each taxable year on the lesser of (a) net investment income for the year or (b) the modified adjusted gross income for such year in excess of a threshold amount (between US$125,000 and US$250,000, depending on the U.S. Holder's circumstances).  For these purposes, dividends received with respect to our CBFIs, and gains or losses realized from the taxable disposition of our CBFIs, will generally be taken into account in computing your net investment income.

### *Tax Consequences for Non-U.S. Holders*

Except as described in "Information Reporting and Backup Withholding" below, a non-U.S. Holder will not be subject to U.S. federal income or withholding tax on the payment of distributions on our CBFIs or gain from the disposition of our CBFIs unless:

- such income is effectively connected with the conduct by the non-U.S. Holder of a trade or business in the United States and. in the case of a resident of a country that has a tax treaty with the United States, such income is attributable to a permanent establishment or, in the case of an individual, a fixed place of business, in the United States; or

- in the case of gain from the disposition of our CBFIs, the non-U.S. Holder is an individual who holds our CBFIs as a capital asset and is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such income in the same manner as a U.S. Holder unless otherwise provided in an applicable tax treaty. In such a case, a non-U.S. Holder that is a corporation for U.S. federal income tax purposes also may be subject to a

branch profits tax on the after-tax amount of such income at a rate of 30% (or at a reduced rate under an applicable tax treaty). If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate under an applicable tax treaty) on the amount by which such non-U.S. Holder's U.S. source capital gains exceed its U.S. source capital losses during the taxable year of disposition of the CBFIs.

### *Information Reporting and Backup Withholding*

Information returns may be filed with the IRS in connection with dividends in respect of our CBFIs and proceeds from the sale or other disposition of our CBFIs unless an exemption applies. U.S. Holders that fail to establish an exemption from information reporting may also be subject to backup withholding if they fail to provide a U.S. taxpayer identification number (or certification of other exempt status) or if they fail to report in full their dividend and interest income. The amount of any backup withholding will be allowed as a credit against a holder's U.S. federal income tax liability and may entitle a holder to a refund to the extent the withheld tax exceeds such U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

## ERISA CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended, or ERISA, imposes certain requirements on employee benefit plans (as defined in Section 3(3) of ERISA) subject to the provisions of Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans, or collectively, ERISA Plans, and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification. In addition, ERISA requires the fiduciary of an ERISA Plan to maintain the indicia of ownership of the ERISA Plan's assets within the jurisdiction of the U.S. district courts.

The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors." For example, a fiduciary should consider whether an investment in CBFIs may be too illiquid or too speculative for a particular ERISA Plan, and whether the assets of the ERISA Plan would be sufficiently diversified after any such investment. Any fiduciary of an ERISA Plan that proposes to cause such ERISA Plan to purchase CBFIs should consult with its own legal and tax advisors with respect to the potential application of ERISA and the Internal Revenue Code to such investment and the consequences of such investment under ERISA and the Internal Revenue Code. Moreover, each fiduciary of an ERISA Plan should determine whether, under the general fiduciary standards of ERISA, an investment in CBFIs is appropriate for the ERISA Plan, taking into account the overall investment policy of the ERISA Plan and the overall composition of the ERISA Plan's investment portfolio.

Section 406 of ERISA and Section 4975 of the Internal Revenue Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Internal Revenue Code, such as individual retirement accounts, or, together with ERISA Plans, Plans, and certain persons (referred to as "parties in interest" under ERISA or "disqualified persons" under the Internal Revenue Code) having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person who engages in a non-exempt prohibited transaction may be subject to non-deductible excise taxes and other penalties and liabilities under ERISA and the Internal Revenue Code, and the transaction might have to be rescinded. In addition, a fiduciary who causes an ERISA Plan to engage in a non-exempt prohibited transaction may be personally liable for any resultant loss incurred by the ERISA Plan and may be subject to other potential remedies. Accordingly, each original or subsequent purchaser or transferee of a CBFI that is or may become a Plan is responsible for determining that its purchase and holding of such CBFI will not constitute a non-exempt prohibited transaction.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Internal Revenue Code, may nevertheless be subject to local, state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Internal Revenue Code. Fiduciaries of any such plans should consult with their legal and tax advisors before purchasing CBFIs.

**The Plan Assets Regulation**

The U.S. Department of Labor has issued a regulation, 29 CFR Section 2510.3-101, which has been modified by Section 3(42) of ERISA (together, the "Plan Assets Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Internal Revenue Code. Under the Plan Assets Regulation, subject to certain exceptions, if a Plan invests in an "equity interest" of an entity (which is defined as an interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features) that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company' (as described below) or that participation in the entity by "benefit plan investors" is not "significant." We would expect that the CBFIs would constitute an "equity interest" in us for purposes of the Plan Assets Regulation, and we would not expect the CBFIs to constitute "publicly offered securities" for purposes of the Plan Assets Regulation. In addition, we will not be registered under the Investment Company Act and will be unable

to adequately monitor participation in us by "benefit plan investors" such that participation by "benefit plan investors" may prove to be "significant" at any given time.

## Operating Companies

Under the Plan Assets Regulation, an entity is an "operating company" if it is primarily engaged, directly or through a majority-owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. In addition, the Plan Assets Regulation provides that the term "operating company" includes an entity qualifying as a real estate operating company, or REOC. An entity is a REOC if (i) on its "initial valuation date" and on at least one day within each "annual valuation period," at least 50% of the entity's assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors) are invested in real estate that is managed or developed and with respect to which such entity has the right to substantially participate directly in management or development activities; and (ii) such entity in the ordinary course of its business is engaged directly in the management and development of real estate during specified periods. The "initial valuation date" is the date on which an entity first makes an investment that is not a short-term investment of funds pending long-term commitment. An entity's "annual valuation period" is a pre-established period not exceeding 90 days in duration, which begins no later than the anniversary of the entity's initial valuation date.

We will use reasonable efforts to ensure that the terms and conditions of our investments, and the contractual rights obtained and exercised with respect to such investments, will enable us to qualify as a REOC within the meaning of the Plan Assets Regulation from and after the date we make our first investment. However, no assurance can be given that this will be the case.

If our assets are deemed to constitute ERISA "plan assets" (*i.e.,* if we fail to qualify as a REOC as of our initial valuation date, or during any subsequent annual valuation period, and we do not otherwise qualify as an operating company, and the participation in us by "benefit plan investors" is "significant"), certain transactions that we might enter into, or might have entered into, in the ordinary course of our business might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Internal Revenue Code and might have to be rescinded and might give rise to prohibited transaction excise taxes and fiduciary liability, as described above. In addition, if our assets are deemed to be "plan assets" of a Plan, our management, as well as various providers of fiduciary or other services to us, and any other parties with authority or control with respect to us, might be considered fiduciaries under ERISA and Section 4975 of the Internal Revenue Code, or otherwise parties in interest or disqualified persons by virtue of their provision of such services (and there could be an improper delegation of authority to such providers). Moreover, if our underlying assets were deemed to be assets constituting "plan assets," there are several other provisions of ERISA that could be implicated for an ERISA Plan if it were to acquire and hold CBFIs either directly or by investing in an entity whose underlying assets are deemed to be assets of the ERISA Plan.

Any insurance company proposing to use assets of its general account to purchase CBFIs should consider the implications of the United States Supreme Court's decision in John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank, 510 U.S. 86 (1993), which in certain circumstances treats such general account assets as assets of a Plan that owns a policy or other contract with such insurance company, as well as the effect of Section 401(c) of ERISA as interpreted by regulations issued by the United States Department of Labor.

By its purchase and holding of any CBFIs, the purchaser (including a transferee) thereof will be deemed to have represented and agreed that the decision to invest assets of the Plan in CBFIs was made by an "independent fiduciary with financial expertise" within the meaning of 29 CFR Section 2510.3-21(c)(1), and the other requirements of that section are satisfied.

The sale of CBFIs to a Plan is in no respect a representation by us or any other person associated with the offering of CBFIs that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

The preceding discussion is only a summary of certain ERISA implications of an investment in the securities and does not purport to be complete. Prospective investors should consult with their own legal, tax,

- 180 -

financial and other advisors prior to investing to review these implications.in light of such investor's particular circumstances.

# PLAN OF DISTRIBUTION

Santander Investment Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and HSBC Securities (USA) Inc. are acting as joint global coordinators and joint book-runners of the international offering and as representatives of each of the initial purchasers named below. Subject to the terms and conditions set forth in the international purchase agreement among us and the initial purchasers dated the date of this offering memorandum, or the International Purchase Agreement, we have agreed to sell to the initial purchasers, and each of the initial purchasers has agreed, severally and not jointly, to purchase from us, the number of CBFIs set forth opposite its name below.

| Initial Purchasers | Number of CBFIs |
|---|---|
| Santander Investment Securities Inc. ................................................................. | 55,225,593 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated ........................................... | 43,391,537 |
| HSBC Securities (USA) Inc. ................................................................................ | 19,723,426 |
| Banco BTG Pactual S.A. – Cayman Branch ........................................................ | 19,723,426 |
| Credit Suisse Securities (USA) LLC .................................................................... | 19,723,426 |
| Goldman Sachs & Co. LLC .................................................................................. | 19,723,426 |
| UBS Securities LLC............................................................................................. | 19,723,426 |
| Total .................................................................................................................... | 197,234,261 |

Banco BTG Pactual S.A. – Cayman Branch is not a broker-dealer registered with the SEC, and therefore may not sell CBFIs in the United States or to U.S. persons except in compliance with applicable U.S. laws and regulations. To the extent that Banco BTG Pactual S.A. – Cayman Branch intends to sell the CBFIs in the United States, it will do so only through BTG Pactual US Capital, LLC or one or more U.S. registered broker-dealers, or as otherwise permitted by applicable U.S. law.

With respect to the Mexican offering, subject to the terms and conditions stated in the Mexican underwriting agreement among us and the Mexican underwriters dated the date of this offering memorandum, or the Mexican Underwriting Agreement, we have agreed to sell to the Mexican underwriters, and each of the Mexican underwriters has agreed, severally and not jointly, to purchase from us, the principal amount of CBFIs set forth opposite its name below.

| Mexican Underwriters | Number of CBFIs |
|---|---|
| Casa de Bolsa Santander, S.A. de C.V. Grupo Financiero Santander Mexico ...... | 98,800,522 |
| Merrill Lynch Mexico, S.A. de C.V., Casa de Bolsa ............................................ | 30,000,000 |
| HSBC Casa de Bolsa, S.A. de C.V., Grupo Financiero HSBC .............................. | 24,239,130 |
| Casa de Bolsa BBVA Bancomer, S.A. de C.V., Grupo Financiero Bancomer ..... | 7,239,130 |
| Actinver Casa de Bolsa, S.A. de C.V., Grupo Financiero Actinver...................... | 7,486,957 |
| Total .................................................................................................................... | 167,765,739 |

A prospectus and prospectus supplement in Spanish pursuant to Mexican law and practice has been prepared and will be used in connection with the Mexican offering in accordance with applicable law.

We have granted the initial purchasers and the Mexican underwriters the right to purchase up to an additional 15% of the CBFIs sold in this offering (54,750,000 CBFIs) within 30 days of the date of this offering memorandum solely to cover over-allotments, if any. The initial purchasers and the Mexican underwriters have the right to exercise such option to cover over-allotments, if any, in the sale of the CBFIs.  The options in the international offering and the Mexican offering may be exercised independently.  It is expected that the additional CBFIs will be delivered at the same time as the firm CBFIs and paid for in cash or exchange of CBFIs as exercised within 30 days after the date of this offering memorandum.

Subject to the terms and conditions set forth in the International Purchase Agreement and the Mexican Underwriting Agreement, the initial purchasers and the Mexican underwriters have agreed, severally and not jointly,

to purchase all of the CBFIs sold under the International Purchase Agreement and the Mexican Underwriting Agreement if any of these CBFIs are purchased.  If an initial purchaser defaults, the International Purchase Agreement provides that the purchase commitments of the non-defaulting initial purchasers may be increased or the International Purchase Agreement may be terminated.

Certain of the Relevant Principals of E-Group (the "Interested Members") have purchased an aggregate of 44,500,600 CBFIs offered in the combined offering at the public offering price, net of any sales commissions or discounts.

We have agreed to indemnify the several initial purchasers against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the initial purchasers may be required to make in respect of those liabilities.

## Commissions and Discounts

The representatives and the Mexican underwriters have advised us that the initial purchasers and the Mexican underwriters propose initially to offer the CBFIs in this offering at the offering price set forth on the cover page of this offering memorandum.  After this offering, the offering price or any other term of the offering may be changed.

## CBFIs Are Not Being Registered

The CBFIs have not been registered under the Securities Act or any U.S. state securities laws.  The initial purchasers propose to offer the CBFIs for resale in transactions not requiring registration under the Securities Act or applicable U.S. state securities laws, including sales pursuant to Rule 144A and Regulation S.  The initial purchasers will not offer or sell the CBFIs except to persons they reasonably believe to be qualified institutional buyers or pursuant to offers and sales to non-U.S. persons that occur outside of the United States within the meaning of Regulation S.  In addition, until 40 days following the commencement of this offering, an offer or sale of CBFIs within the United States by a dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act unless the dealer makes the offer or sale in compliance with Rule 144A or another exemption from registration under the Securities Act.  Each purchaser of the CBFIs will be deemed to have made acknowledgments, representations and agreements as described under "Transfer Restrictions."

## Additional Issue of CBFIs

The offering price in this combined offering was determined through negotiations between us, the initial purchasers and the Mexican underwriters.  In addition to prevailing market conditions, the factors we considered in determining this offering price were:

- the valuation multiples of third parties that we, the initial purchasers and the Mexican underwriters believe to be comparable to us,

- our financial information and history,

- the history of, and the prospects for, the industry in which we operate,

- an assessment of our management and its present operations, and the prospects for, and timing of, our future revenues,

- the present state of our development,

- the historical trading value of our CBFIs previously listed on the Mexican Stock Exchange, and

- the above factors in relation to market values and various valuation measures of third parties engaged in activities similar to ours.

The offering price of our CBFIs in this offering does not necessarily bear any relationship to the book value of our assets, our financial condition or any other established criteria of value and may not be indicative of the market price for our CBFIs after the combined offering.

The CBFIs are listed on the Mexican Stock Exchange under the symbol "FUNO11."  If the CBFIs issued in this offering are traded, they may trade at a price below the offering price, depending on prevailing market conditions, the market for similar securities, our operating performance and financial condition, general economic conditions and other factors.  We cannot assure the liquidity of the trading market for the CBFIs.  If an active trading market for the CBFIs does not develop, the market price and liquidity of the CBFIs may be adversely affected.

## Settlement

The international offering and the Mexican offering are conditioned on the closing of each other.

The initial purchasers and the Mexican underwriters may enter into an international intersyndicate agreement, or the Intersyndicate Agreement, pursuant to which sales may be made between the initial purchasers and the Mexican underwriters of such number of CBFIs as may be determined by the joint global coordinators and joint book-runners.  Except as otherwise may be agreed, the price of any CBFIs so sold shall be the offering price applicable thereto less an amount not greater than the selling concession applicable to such CBFIs, as the case may be.  To the extent that there are sales between the initial purchasers and the Mexican underwriters pursuant to the Intersyndicate Agreement, the number of CBFIs initially available for sale by the initial purchasers may be more or less than the number appearing on the cover page of this offering memorandum.  Under the Intersyndicate Agreement, the Mexican underwriters and any dealer to whom they sell CBFIs will not offer to sell or sell CBFIs to persons who are non-Mexican persons or to persons they believe intend to resell to persons who are non-Mexican persons, except in the case of transactions under the Intersyndicate Agreement.  Similarly, the initial purchasers and any dealer to whom they sell CBFIs will not offer to sell or sell CBFIs to Mexican persons or to persons they believe intend to resell to Mexican persons, except in the case of transactions under the Intersyndicate Agreement.

## Short Positions

Until the distribution of the CBFIs is completed, SEC rules may limit underwriters and selling group members from bidding for and purchasing our CBFIs.  However, the stabilization agent may engage in transactions that stabilize the price of the CBFIs, such as bids or purchases to peg, fix or maintain that price.

In connection with the combined offering, the initial purchasers may purchase and sell the CBFIs in the open market.  These transactions may include syndicate covering transactions and stabilizing transactions.  These transactions may also include over-allotment and stabilizing in the Mexican market in accordance with Mexican law and regulations.  Over-allotment involves sales of CBFIs in excess of the aggregate number of CBFIs shown on the cover of this offering memorandum, which creates a short position.  Covering transactions involve purchases of CBFIs in the open market after the distribution has been completed in order to cover short positions or exercising an over-allotment option granted by us.  Stabilizing transactions consist of certain bids or purchases of CBFIs made for the purpose of preventing or retarding a decline in the market price of the CBFIs while the combined offering is in progress.  Any of these activities may have the effect of raising or maintaining the market price of the CBFIs or preventing or retarding a decline in the market price of the CBFIs.  As a result, the price of the CBFIs may be higher than the price that might otherwise exist in the open market.

Neither we nor any of the initial purchasers make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the CBFIs.  In addition, neither we nor any of the initial purchasers make any representation that the initial purchasers will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.  Reports of stabilization activity, if any, are required to be furnished to the CNBV.

The Initial Purchasers may also impose a penalty bid. This occurs when a particular Initial Purchaser repays to the Initial Purchasers a portion of the underwriting discount received by it because such Initial Purchaser or its affiliates have repurchased notes sold by or for the account of such Initial Purchaser in stabilizing or short covering transactions.

**No Sales of Similar Securities**

We and the members of our Advisor's senior management team, the members of our technical committee and all members of the El-Mann Family and the Attié Family have agreed that, for a period of 90 days from the date of this offering memorandum, we and they will not, without the prior written consent of the representatives of the initial purchasers and the Mexican underwriters, dispose of or hedge any of their CBFIs or any securities convertible into or exchangeable for our CBFIs.  Specifically, we and these other persons have agreed, with certain limited exceptions, not to directly or indirectly:

- offer, issue, pledge, sell or contract to sell any CBFIs,
- offer, issue or sell any option or contract to purchase any CBFIs,
- purchase any option or contract to sell any CBFIs,
- grant any option, right or warrant for the sale of any CBFIs,
- lend or otherwise dispose of or transfer any CBFIs,
- request or demand that we file a registration statement related to the CBFIs, and
- enter into any swap, hedge or other agreement that transfers, in whole or in part, the economic consequence of ownership of any CBFIs whether any such swap or transaction is to be settled by delivery of CBFIs or other securities, in cash or otherwise.

We cannot assure you that the initial purchasers will not waive any of the foregoing lock-up obligations, in which case these CBFIs would become eligible for sale earlier.

We cannot predict the effect, if any, that future sales of our CBFIs, or the availability of such securities for future sale, will have on the market price of the CBFIs prevailing from time to time or on our ability to raise capital in the future.  Sales of substantial amounts of our securities in the public market, or the perception that such sales could occur, could adversely affect the prevailing market price of our CBFIs and our ability to sell securities in the future at a time and at a price that the issuer deems to be appropriate.

**Selling Restrictions**

Other than with respect to the public offering of the CBFIs listed on the BMV, no action has been or will be taken in the United States, the United Kingdom or any country or jurisdiction by us, our shareholders, the initial purchasers or the Mexican underwriters that would permit a public offering of the CBFIs, or possession or distribution of any offering material in relation thereto, in any country or jurisdiction where action for that purpose is required.  Accordingly, the CBFIs may not be offered or sold, directly or indirectly, and neither this offering memorandum nor any other offering material or advertisements in connection with the CBFIs may be distributed, published, in or from any country or jurisdiction, except in compliance with any applicable rules and regulations of any such country or jurisdiction.  This offering memorandum does not constitute an offer to sell or a solicitation of an offer to purchase in any jurisdiction where such offer or solicitation would be unlawful.  Persons into whose possession this offering memorandum comes are advised to inform themselves about and to observe any restrictions relating to the offering of the CBFIs, the distribution of this offering memorandum and resale of the CBFIs.  See "Transfer Restrictions."

**Notice to Prospective Investors in Canada**

This offering memorandum constitutes an "exempt offering document" as defined in and for the purposes of applicable Canadian securities laws. No prospectus has been filed with any securities commission or similar regulatory authority in Canada in connection with the offer and sale of the CBFIs. No securities commission or similar regulatory authority in Canada has reviewed or in any way passed upon this offering memorandum or on the merits of the CBFIs and any representation to the contrary is an offense.

**Canadian investors are advised that this offering memorandum has been prepared in reliance on section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* ("NI 33-105"). Pursuant to section 3A.3 of NI 33-105, this offering memorandum is exempt from the requirement that Fibra Uno and the initial purchasers provide Canadian investors with certain conflicts of interest disclosure pertaining to "connected issuer"**

**and/or "related issuer" relationships that may exist between Fibra Uno and the initial purchasers as would otherwise be required pursuant to subsection 2.1(1) of NI 33-105.**

The offer and sale of the CBFIs in Canada is being made on a private placement basis only and is exempt from the requirement that Fibra Uno prepare and file a prospectus under applicable Canadian securities laws. Any resale of CBFIs acquired by a Canadian investor in this offering must be made in accordance with applicable Canadian securities laws, which may vary depending on the relevant jurisdiction, and which may require resales to be made in accordance with Canadian prospectus requirements, pursuant to a statutory exemption from the prospectus requirements, in a transaction exempt from the prospectus requirements or otherwise under a discretionary exemption from the prospectus requirements granted by the applicable local Canadian securities regulatory authority. These resale restrictions may under certain circumstances apply to resales of the CBFIs outside of Canada.

Each Canadian investor who purchases CBFIs will be deemed to have represented to Fibra Uno, the initial purchasers and to each dealer from whom a purchase confirmation is received, as applicable, that the investor is (i) purchasing as principal, or is deemed to be purchasing as principal in accordance with applicable Canadian securities laws, for investment only and not with a view to resale or redistribution; (ii) an "accredited investor" as such term is defined in section 1.1 of National Instrument 45-106 *Prospectus Exemptions* or, in Ontario, as such term is defined in section 73.3(1) of the *Securities Act* (Ontario); and (iii) is a "permitted client" as such term is defined in section 1.1 of National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*.

Any discussion of taxation and related matters contained in this offering memorandum does not purport to be a comprehensive description of all of the tax considerations that may be relevant to a Canadian investor when deciding to purchase the CBFIs and, in particular, does not address any Canadian tax considerations. No representation or warranty is hereby made as to the tax consequences to a resident, or deemed resident, of Canada of an investment in the CBFIs or with respect to the eligibility of the CBFIs for investment by such investor under relevant Canadian federal and provincial legislation and regulations.

Securities legislation in certain of the Canadian jurisdictions provides certain purchasers of securities pursuant to an offering memorandum (such as this offering memorandum), including where the distribution involves an "eligible foreign security" as such term is defined in Ontario Securities Commission Rule 45-501 *Ontario Prospectus and Registration Exemptions* and in Multilateral Instrument 45-107 *Listing Representation and Statutory Rights of Action Disclosure Exemptions*, as applicable, with a remedy for damages or rescission, or both, in addition to any other rights they may have at law, where the offering memorandum, or other offering document that constitutes an offering memorandum, and any amendment thereto, contains a "misrepresentation" as defined under applicable Canadian securities laws. These remedies, or notice with respect to these remedies, must be exercised or delivered, as the case may be, by the purchaser within the time limits prescribed under, and are subject to limitations and defenses under, applicable Canadian securities legislation. In addition, these remedies are in addition to and without derogation from any other right or remedy available at law to the investor.

Upon receipt of this document, each Canadian investor hereby confirms that it has expressly requested that all documents evidencing or relating in any way to the sale of the securities described herein (including for greater certainty any purchase confirmation or any notice) be drawn up in the English language only. *Par la réception de ce document, chaque investisseur canadien confirme par les présentes qu'il a expressément exigé que tous les documents faisant foi ou se rapportant de quelque manière que ce soit à la vente des valeurs mobilières décrites aux présentes (incluant, pour plus de certitude, toute confirmation d'achat ou tout avis) soient rédigés en anglais seulement.*

**Notice to Prospective Investors in the EEA**

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State") with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date"), an offer to the public of any CBFIs which are the subject of the offering contemplated by this offering memorandum may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any of such CBFIs may be made at any time with effect from and including the Relevant Implementation Date under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

(a)  to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)  to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the Initial Purchasers; or

(c)  in any other circumstances falling within Article 3(2) of the Prospectus Directive;

provided that no such offer of CBFIs shall require us or the Initial Purchasers to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to the CBFIs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the CBFIs to be offered so as to enable an investor to decide to purchase or subscribe the CBFIs, as the same may be varied in that member state by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.  The EEA selling restriction is in addition to any other selling restrictions set out in this offering memorandum.

Each person in a Relevant Member State who receives any communication in respect of, or who acquires any CBFIs under, the offer of CBFIs contemplated by this offering memorandum will be deemed to have represented, warranted and agreed to and with us and the Initial Purchasers that:

(1)  it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive; and

(2)  in the case of any CBFIs acquired by it as a financial intermediary, as that term is used in Article 3(2) of the Prospectus Directive, (a) the CBFIs acquired by it in the offering have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Relevant Member State other than "qualified investors" (as defined in the Prospectus Directive), or in circumstances in which the prior consent of the representatives has been given to the offer or resale; or (b) where CBFIs have been acquired by it on behalf of persons in any Relevant Member State other than qualified investors, the offer of those CBFIs to it is not treated under the Prospectus Directive as having been made to such persons.

## Notice to Prospective Investors in the United Kingdom

This communication is only being distributed to and is only directed at (1) persons who are outside the United Kingdom or (2) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (3) high net worth companies, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons").  The CBFIs are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such CBFIs will be engaged in only with, relevant persons.  Any person who is not a relevant person should not act or rely on this document or any of its contents.

## Notice to Prospective Investors in Switzerland

The CBFIs may not and will not be publicly offered, distributed or re-distributed on a professional basis in or from Switzerland and neither this offering memorandum nor any other solicitation for investments in the CBFIs may be communicated or distributed in Switzerland in any way that could constitute a public offering within the meaning of Article 1156 or 652a of the Swiss Code of Obligations or of Article 2 of the Federal Act on Investment Funds of March 18, 1994.

This offering memorandum may not be copied, reproduced, distributed or passed on to others without the Initial Purchasers' prior written consent.   This offering memorandum is not a prospectus within the meaning of Articles 1156 and 652a of the Swiss Code of Obligations or a listing prospectus according to Article 32 of the Listing Rules of the Swiss exchange and may not comply with the information standards required thereunder.   We will not apply for a listing of our CBFIs on any Swiss stock exchange or other Swiss regulated market and this offering memorandum may not comply with the information required under the relevant listing rules.   The CBFIs have not and will not be registered with the Swiss Federal Banking Commission and have not and will not be authorized under the Federal Act on Investment Funds of March 18, 1994.   The investor protection afforded to acquirers of investment fund certificates by the Federal Act on Investment Funds of March 18, 1994, does not extend to acquirers of the CBFIs.

**Notice to Prospective Investors in Hong Kong**

This offering memorandum has not been approved by or registered with the Securities and Futures Commission of Hong Kong or the Registrar of Companies of Hong Kong.   The CBFIs may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the CBFIs may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to CBFIs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Japan**

The CBFIs offered in this offering memorandum have not been registered under the Securities and Exchange Law of Japan.   The CBFIs have not been offered or sold and will not be offered or sold, directly or indirectly, in Japan or to or for the account of any resident of Japan, except (i) pursuant to an exemption from the registration requirements of the Securities and Exchange Law and (ii) in compliance with any other applicable requirements of Japanese law.

**Notice to Prospective Investors in Singapore**

This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the CBFIs may not be circulated or distributed, nor may the CBFIs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore, or the SFA, (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the CBFIs are subscribed or purchased under Section 275 by a relevant person which is:

(a)   a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)   a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the CBFIs pursuant to an offer made under Section 275 except:

(1)  to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(2)  where no consideration is or will be given for the transfer;

(3)  where the transfer is by operation of law; or

(4)  as specified in Section 276(7) of the SFA.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This offering memorandum relates to an exempt offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority.  This document is intended for distribution only to persons of a type specified in those rules.  It must not be delivered to, or relied on by, any other person.  The Dubai Financial Services Authority has no responsibility for reviewing or verifying any documents in connection with exempt offers.  The Dubai Financial Services Authority has not approved this document nor taken steps to verify the information set out in it, and has no responsibility for it.  The CBFIs to which this offering memorandum relates may be illiquid and/or subject to restrictions on their resale.  Prospective purchasers of the CBFIs should conduct their own due diligence on the CBFIs.  If you do not understand the contents of this offering memorandum you should consult an authorized financial advisor.  For the avoidance of doubt, the CBFIs are not interests in a "fund" or "collective investment scheme" within the meaning of either the Collective Investment Law (DIFC Law No. 1 of 2006) or the Collective Investment Rules Module of the Dubai Financial Services Authority Rulebook.

**Notice to Prospective Investors in Argentina**

We have not made, and will not make, any application to obtain an authorization from the National Securities Exchange Commission (Comisión Nacional de Valores or the "CNV") for the public offering of the CBFIs in Argentina.  The CNV has not approved the CBFIs, the Offering nor any document relating to the offering of the CBFIs.  The CBFIs will not be offered or sold in Argentina, except in transactions that will not constitute a public offering of securities within the meaning of Section 16 of the Argentine Public Offering Law N° 17,811, as amended.  Argentine insurance companies may not purchase the CBFIs.

**Notice to Prospective Investors in Brazil**

The offer of CBFIs described in this offering memorandum will not be carried out by any means that would constitute a public offering in Brazil under Law No. 6,385, of December 7, 1976, as amended, and under CVM Rule (Instrução) No. 400, of December 29, 2003, as amended.  The offer and sale of the CBFIs have not been and will not be registered with the Comissão de Valores Mobiliários in Brazil.  Any representation to the contrary is untruthful and unlawful.  Any public offering or distribution, as defined under Brazilian laws and regulations, of the interests in Brazil is not legal without such prior registration.  Documents relating to the offering of the CBFIs, as well as information contained therein, may not be supplied to the public in Brazil, as the offering of the CBFIs is not a public offering of securities in Brazil, nor may they be used in connection with any offer for sale of the CBFIs to the public in Brazil.  This offering memorandum is addressed to you personally, upon your request and for your sole benefit, and is not to be transmitted to anyone else, to be relied upon by anyone else or for any other purpose either quoted or referred to in any other public or private document or to be filed with anyone without our prior, express and written consent.

**Notice to Prospective Investors in Chile**

The offer of the CBFIs is subject to General Rule No. 336, dated June 27, 2012, of the Superintendencia de Valores y Seguros de Chile (Chilean Superintendency of Securities and Insurance, or "SVS").

The offer relates to securities not registered with the Registro de Valores (Securities Registry) or the Registro de Valores Extranjeros (Registry of Foreign Securities) of the SVS; therefore, the securities are not subject to the supervision and oversight of the SVS. Because the securities are unregistered securities in Chile, we are not required to disclose public information about the securities in Chile. The securities may not be publicly offered in Chile unless they are registered with the relevant securities registry.

*La oferta de los valores está acogida a la NCG N° 336, de fecha 27 de junio de 2012 de la Superintendencia de Valores y Seguros de Chile (SVS).*

*La oferta versa sobre valores no inscritos en el Registro de Valores o en el Registro de Valores Extranjeros que lleva la SVS, por lo que tales valores no están sujetos a la fiscalización de dicho organismo. Por tratarse de valores no inscritos, no existe obligación por parte del emisor de entregar en Chile información pública respecto de los valores. Estos valores no pueden ser objeto de oferta pública, mientras no sean inscritos en el registro de valores correspondiente.*

**Notice to Prospective Investors in Colombia**

The CBFIs have not been and will not be registered in the Colombian National Registry of Securities and Issuers (Registro Nacional de Valores y Emisores) maintained by the Colombian Superintendency of Finance (Superintendencia Financiera de Colombia) and may not be offered, sold or negotiated or otherwise be subject to brokerage activities in Colombia, except under circumstances which do not constitute a public offering of securities under applicable Colombian securities laws and regulations. Furthermore, foreign financial entities must abide by the terms of Part 4 of Decree 2555 of 2010 to privately market and offer the CBFIs to their Colombian clients.

**Notice to Prospective Investors in Peru**

Neither the CBFIs nor this offering memorandum have or will be registered with or approved by the Peruvian Capital Markets Superintendency (Superintendencia de Mercado de Valores). Accordingly, the CBFIs cannot be offered or sold in Peru, except if such offering is considered a private offering under the securities laws and regulations of Peru. The Peruvian securities market law establishes, among others, that any particular offer may qualify as private if it is directed exclusively to institutional investors.

**Notice to Prospective Investors in Australia**

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission ("ASIC"), in relation to the offering. This offering memorandum does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

Any offer in Australia of the CBFIs may only be made to persons (the "Exempt Investors") who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the CBFIs without disclosure to investors under Chapter 6D of the Corporations Act.

The CBFIs applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring CBFIs must observe such Australian on-sale restrictions.

This offering memorandum contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider

whether the information in this offering memorandum is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

**Other Relationships**

Some of the initial purchasers and their affiliates have engaged in, and may in the future engage in, investment banking, financings and other commercial dealings in the ordinary course of business with us or our affiliates.  They have received, or may in the future receive, customary fees, payments and commissions for these transactions.

In addition, in the ordinary course of their business activities, the initial purchasers and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial investments (including bank loans) for their own account and for the accounts of their customers.  Such investments and securities activities may involve securities and/or investments of ours or our affiliates.  The initial purchasers and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial investments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and investments.

The initial purchasers and/or their affiliates may enter into derivative transactions in connection with the CBFIs, acting at the order and for the account of their clients. The initial purchasers and/or their affiliates may also purchase some of the CBFIs in this offering as a hedge for such transactions. Such derivative transactions and associated hedging activity could constitute a material portion, and may have an effect on demand, price or other terms, of the global offering.

## TRANSFER RESTRICTIONS

The international offering is being made in accordance with Rule 144A and Regulation S under the Securities Act. The CBFIs have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction except Mexico and, accordingly, may not be offered, sold, pledged or otherwise transferred or delivered (i) within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S), except to qualified institutional buyers, or QIBs, in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A, or (ii) outside the United States, to non-U.S. persons in accordance with Regulation S.

### Rule 144A

Each purchaser of CBFIs offered to U.S. persons, and therefore in reliance on Rule 144A, will be deemed to have represented and agreed that it understands that:

- such CBFIs have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction except Mexico; and

- such CBFIs may not be offered, sold, pledged or otherwise transferred except (A) to a person who the seller and any person acting on its behalf reasonably believe is a QIB in a transaction meeting the requirements of Rule 144A, (B) in accordance with Regulation S under the Securities Act, or (C) in accordance with Rule 144 under the Securities Act (if available), in each case in accordance with any applicable securities laws of any state of the United States.

### Regulation S

Each purchaser of CBFIs offered to non-U.S. persons outside the United States, and therefore in reliance on Regulation S, will be deemed to have represented and agreed that it understands that:

- such CBFIs have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction except Mexico; and

- such securities may not be offered, sold, pledged or otherwise transferred in a transaction deemed to occur within the United States of America, except (A) in accordance with Rule 144A under the Securities Act or (B) pursuant to another exemption from the registration requirements of the Securities Act, in either case in accordance with any applicable securities laws of any state of the United States.

## LEGAL MATTERS

The validity of the CBFIs will be passed upon by Holland & Knight México, S.C., our special Mexican counsel, and Mijares Angoitia Cortés y Fuentes, special Mexican counsel to the initial purchasers.  Certain legal matters in connection with the international offering will be passed upon for us by Hogan Lovells US LLP, our special U.S. counsel, and for the initial purchasers by Paul Hastings LLP, special U.S. counsel to the initial purchasers.  With respect to certain matters governed by Mexican law, Hogan Lovells US LLP may rely on the opinion of Holland & Knight México, S.C. and Paul Hastings LLP may rely on the opinion of Mijares Angoitia Cortés y Fuentes.

## INDEPENDENT AUDITORS

The audited consolidated financial statements of Fibra Uno and its subsidiaries as of and for the years ended December 31, 2016, 2015 and 2014, were audited by Galaz, Yamazaki, Ruiz Urquiza, S.C., a member of Deloitte Touche Tohmatsu Limited. Galaz, Yamazaki, Ruiz Urquiza, S.C. is a member of the Association of Public Accountants of Mexico (*Colegio de Contadores Públicos de México, A.C.*).

**APPENDIX A**

| | Page |
|---|---|
| Portfolio Properties.................................................................................................................................. | **A-2** |

**PORTFOLIO PROPERTIES**

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy *(as a % of GLA)* |
|---|---|---|---|---|---|
| Initial | Retail | Via Morelos 300 | 7,763 | 0.1% | 83.3% |
| | | Vallejo 2000 | 10,298 | 0.1% | 93.2% |
| | | Rentimex | 2,141 | 0.0% | 66.2% |
| | | Parque Celaya | 20,401 | 0.3% | 98.7% |
| | | Americas Chetumal | 35,436 | 0.5% | 99.5% |
| | | Americas Tuxtla | 16,541 | 0.2% | 99.0% |
| | | Plaza Central | 60,266 | 0.8% | 85.3% |
| | | Parque Taxco | 16,642 | 0.2% | 67.7% |
| | | Malecon | 71,117 | 0.9% | 89.4% |
| | | Tuxtla Ii | 14,386 | 0.2% | 100.0% |
| | | Toluca Wm | 15,023 | 0.2% | 100.0% |
| | Industrial | Via Morelos 300 | 46,204 | 0.6% | 96.2% |
| | | Polaris | 72,297 | 0.9% | 95.7% |
| | | La Joya I | 59,320 | 0.8% | 100.0% |
| | | Diamante | 23,805 | 0.3% | 100.0% |
| | | Maravillas I | 70,782 | 0.9% | 100.0% |
| | | Tlaquepark | 137,938 | 1.8% | 100.0% |
| | Office | Reforma 99 | 16,616 | 0.2% | 100.0% |
| | | Rentimex | 5,197 | 0.1% | 100.0% |
| | | Malecon | 16,924 | 0.2% | 90.7% |
| Gris | Retail | Rio De Los Remedios | 32,426 | 0.4% | 99.4% |
| | Industrial | Rio De Los Remedios | 44,967 | 0.6% | 100.0% |
| Blanco | Retail | Cuemanco | 44,871 | 0.6% | 79.1% |
| Azul | Retail | Avenida Central 243 | 1,202 | 0.0% | 100.0% |
| | | Aguascalientes 102 | 3,103 | 0.0% | 100.0% |
| | | Zapopan Uvm | 74,070 | 1.0% | 100.0% |
| | | Monterrey Dp | 284 | 0.0% | 100.0% |
| | | Acapulco Bk | 2,088 | 0.0% | 100.0% |
| | | Leones | 619 | 0.0% | 100.0% |
| | | Edison Insurgentes | 211 | 0.0% | 100.0% |
| | | Arboledas | 350 | 0.0% | 100.0% |
| | | Naucalpan Juarez 2 | 1,341 | 0.0% | 100.0% |
| | | Alameda Juarez 30 | 1,207 | 0.0% | 64.7% |
| | | Pitic City Center | 7,375 | 0.1% | 92.4% |
| | | Mexicali Dp | 600 | 0.0% | 100.0% |
| | | Miguel Angel De Quevedo | 462 | 0.0% | 100.0% |
| | | Olivar De Los Padres | 854 | 0.0% | 100.0% |
| | | Tijuana Starbucks | 813 | 0.0% | 100.0% |
| | | Terraza Pedregal | 3,765 | 0.0% | 100.0% |
| | | Del Valle Dp | 101 | 0.0% | 100.0% |
| | | Tlahuac Dp | 215 | 0.0% | 100.0% |
| | | Santa Fe Chillis | 369 | 0.0% | 100.0% |
| | Industrial | Hermosillo Dia | 15,959 | 0.2% | 100.0% |
| | Office | Leones | 1,174 | 0.0% | 100.0% |
| | | Cofre De Perote | 270 | 0.0% | 100.0% |
| | | Alameda Juarez 30 | 725 | 0.0% | 100.0% |
| | | Reforma 222 | 3,505 | 0.0% | 0.0% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Yucatan 23 | 4,520 | 0.1% | 100.0% |
| Rojo | Retail | Paseo De La Reforma | 511 | 0.0% | 100.0% |
| | | Montecito | 298 | 0.0% | 100.0% |
| | | Av Jose Maria Castorena | 274 | 0.0% | 100.0% |
| | | Ctral De Abastos C 4 2 Local 98 | 213 | 0.0% | 100.0% |
| | | Ctral De Abastos C 4 2 Local 204 | 255 | 0.0% | 100.0% |
| | | Calzada De Tlalpan 398 | 613 | 0.0% | 100.0% |
| | | Av Rio Churubusco | 252 | 0.0% | 100.0% |
| | | Paseo De Las Lilas | 217 | 0.0% | 100.0% |
| | | Ricardo Flores Magon | 358 | 0.0% | 100.0% |
| | | Av Instituto Politecnico Nacional | 352 | 0.0% | 100.0% |
| | | Copernico | 521 | 0.0% | 100.0% |
| | | Calzada Ignacio Zaragoza | 380 | 0.0% | 100.0% |
| | | Av Mariano Escobedo | 417 | 0.0% | 100.0% |
| | | Calzada De Tlalpan 1 198 | 315 | 0.0% | 100.0% |
| | | Av Cuauhtemoc | 240 | 0.0% | 100.0% |
| | | Gral Pedro A De Los Santos | 569 | 0.0% | 100.0% |
| | | Calzada De Tlalpan 495 | 335 | 0.0% | 100.0% |
| | | Calz De Tlalpan | 280 | 0.0% | 100.0% |
| | | Jardin Centenario | 437 | 0.0% | 100.0% |
| | | Jose Ma Castorena 4 Locs | 279 | 0.0% | 100.0% |
| | | Av Canal De Miramontes | 470 | 0.0% | 100.0% |
| | | Diagonal De San Antonio | 534 | 0.0% | 100.0% |
| | | Cinematografistas Esq. A | 295 | 0.0% | 100.0% |
| | | P De La Ref Esq R De La Plata 2 | 331 | 0.0% | 100.0% |
| | | Av M Ocampo Esq Marina Nal | 313 | 0.0% | 100.0% |
| | | Francisco I Madero | 666 | 0.0% | 100.0% |
| | | Norte 45 | 350 | 0.0% | 100.0% |
| | | Niza | 479 | 0.0% | 100.0% |
| | | Calz San Juan De Aragon | 498 | 0.0% | 100.0% |
| | | Av De Las Palmas | 471 | 0.0% | 100.0% |
| | | Av Canal De Miramontes | 776 | 0.0% | 100.0% |
| | | Monte Elbruz Y Blvd A Camacho | 695 | 0.0% | 100.0% |
| | | Calz De Guadalupe | 745 | 0.0% | 100.0% |
| | | Venustiano Carranza | 444 | 0.0% | 100.0% |
| | | Prolongacion 5 De Mayo | 255 | 0.0% | 100.0% |
| | | Allende Esq Agustin De Iturbide | 348 | 0.0% | 100.0% |
| | | Gpe Victoria Y Leona Vicario | 602 | 0.0% | 100.0% |
| | | Yucatan Ote | 364 | 0.0% | 100.0% |
| | | Av De Los Bosques | 432 | 0.0% | 100.0% |
| | | Blvd Interlomas Lote 5 Mza I | 755 | 0.0% | 100.0% |
| | | Av Lomas Verdes | 1,695 | 0.0% | 100.0% |

A-3

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy *(as a % of GLA)* |
|---|---|---|---|---|---|
| | | Av Morelos | 905 | 0.0% | 100.0% |
| | | Republica De Puerto Rico | 478 | 0.0% | 100.0% |
| | | Av Juarez | 528 | 0.0% | 100.0% |
| | | Calz Insurgentes Esq Calle 7A Y 8 | 247 | 0.0% | 100.0% |
| | | Calzada Justo Sierra | 424 | 0.0% | 100.0% |
| | | Av De Los Heroes Esq A Lopez Mateos | 469 | 0.0% | 100.0% |
| | | Mexicali Sn Luis Rio Colorado | 589 | 0.0% | 100.0% |
| | | Morelos 134 | 2,297 | 0.0% | 100.0% |
| | | Paseo De Los Heroes | 275 | 0.0% | 100.0% |
| | | Blvd Agua Caliente Esq Rio Grijalva | 843 | 0.0% | 100.0% |
| | | Av Venustiano Carranza 17 124 | 749 | 0.0% | 100.0% |
| | | Blvd Diaz Ordaz Esq Av B C | 716 | 0.0% | 100.0% |
| | | Av Cabo San Lucasy Lazaro Cardenas | 346 | 0.0% | 100.0% |
| | | Blvd Agustin Olachea Y H Galeana | 427 | 0.0% | 100.0% |
| | | Av Ruiz Cortinez | 500 | 0.0% | 100.0% |
| | | Calle 28 Esq Calle 31 | 451 | 0.0% | 100.0% |
| | | 17 Calle Ote Y 11 Av Norte | 508 | 0.0% | 100.0% |
| | | Allende Esq Agustin Melgar | 826 | 0.0% | 100.0% |
| | | Av Americas Y Simon Bolivar | 1,734 | 0.0% | 100.0% |
| | | 16 De Septiembre Y Rep De Peru | 1,019 | 0.0% | 100.0% |
| | | Av Juarez Norte | 1,672 | 0.0% | 100.0% |
| | | Mares Carr Panan Km 2 5 Estac | 215 | 0.0% | 100.0% |
| | | Av Tecnologico Soriana | 540 | 0.0% | 100.0% |
| | | Mares Carr Panan Km 2 5 Carr A Avalos | 215 | 0.0% | 100.0% |
| | | Av Universidad Y Calle Leyes | 788 | 0.0% | 100.0% |
| | | Av Constitucion Esq 5 De Mayo | 511 | 0.0% | 100.0% |
| | | C Coronado Esq Con Alejandria | 698 | 0.0% | 100.0% |
| | | Av Benito Juarez | 424 | 0.0% | 100.0% |
| | | Av Juarez Y Guerrero | 394 | 0.0% | 100.0% |
| | | Benito Juarez | 360 | 0.0% | 100.0% |
| | | Matamoros | 483 | 0.0% | 100.0% |
| | | Calle Escobedo | 290 | 0.0% | 100.0% |
| | | Av Prog Esq Cuauhtemoc | 389 | 0.0% | 100.0% |
| | | Blvd Harold R Pape Y Bravo | 1,312 | 0.0% | 100.0% |

A-4

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Blvd A Lopez M Esq Reforma | 364 | 0.0% | 100.0% |
| | | Av L Cardenas Esq Alejo Glez | 420 | 0.0% | 100.0% |
| | | Zaragoza  401 | 891 | 0.0% | 100.0% |
| | | Calz.Francisco I.Madero | 422 | 0.0% | 100.0% |
| | | Allende Esq Lerdo De Tejada | 629 | 0.0% | 100.0% |
| | | Calle Juarez 71 | 564 | 0.0% | 100.0% |
| | | Calle Juarez 48 A | 536 | 0.0% | 100.0% |
| | | Hidalgo Sur | 373 | 0.0% | 100.0% |
| | | Medellin E Independencia | 355 | 0.0% | 100.0% |
| | | Calle Constitucion | 923 | 0.0% | 100.0% |
| | | Av Ninos H De Chapultepec | 240 | 0.0% | 100.0% |
| | | Juarez | 298 | 0.0% | 100.0% |
| | | Aquiles Serdan Y Cuauhtemoc | 420 | 0.0% | 100.0% |
| | | Morelos 109 111 | 608 | 0.0% | 100.0% |
| | | Blvd J Lopez Portillo Esq Vicente Gro | 319 | 0.0% | 100.0% |
| | | Av Costera Miguel Aleman 51 | 670 | 0.0% | 100.0% |
| | | Av Costera Miguel Aleman 2083 | 1,096 | 0.0% | 100.0% |
| | | Benito Juarez Y Mangos | 665 | 0.0% | 100.0% |
| | | Av Hidalgo | 451 | 0.0% | 100.0% |
| | | Lopez Cotilla P B Y Mezzanine | 857 | 0.0% | 100.0% |
| | | Av Mexico | 380 | 0.0% | 100.0% |
| | | Tepeyac Esq Las Rosas | 253 | 0.0% | 100.0% |
| | | Calle Ferrocaril | 1,404 | 0.0% | 100.0% |
| | | Av Lazaro Cardenas | 351 | 0.0% | 100.0% |
| | | Av Vallarta | 791 | 0.0% | 100.0% |
| | | Matamoros Sur Antes M Arana 148 | 281 | 0.0% | 100.0% |
| | | Av Lazaro Cardenas | 337 | 0.0% | 100.0% |
| | | Av Francisco I Madero Ote | 724 | 0.0% | 100.0% |
| | | Jardin Juarez | 529 | 0.0% | 100.0% |
| | | Insurgentes Pte Esq H Colegio M | 320 | 0.0% | 100.0% |
| | | Av Benito Juarez Pte | 259 | 0.0% | 100.0% |
| | | Prol Av Fco I Madero Ote Miguel Aleman | 1,501 | 0.0% | 100.0% |
| | | Zaragoza 511 | 393 | 0.0% | 100.0% |
| | | Av Universidad | 890 | 0.0% | 100.0% |
| | | Av Revolucion | 1,150 | 0.0% | 100.0% |
| | | Av San Jeronimo | 624 | 0.0% | 100.0% |
| | | Zaragoza Esq Espinosa | 630 | 0.0% | 100.0% |
| | | Av R Cortines Esq Alfonso Reyes | 890 | 0.0% | 100.0% |

A-5

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Enrique L Y Gonzalitos Dr Eleuterio Glez | 524 | 0.0% | 100.0% |
| | | Av Felix U Gomez | 488 | 0.0% | 100.0% |
| | | P Mier Ote Planta Excavada | 533 | 0.0% | 100.0% |
| | | Av Universidad Nte Alfonso Reyes | 1,031 | 0.0% | 100.0% |
| | | L Cardenas Y Blvd Acapulco | 895 | 0.0% | 100.0% |
| | | Rio Mississipi Ote | 1,194 | 0.0% | 100.0% |
| | | C Doblado Esq Vasconcelos | 1,255 | 0.0% | 100.0% |
| | | Aldama Frente Secundario | 1,381 | 0.0% | 100.0% |
| | | Manuel Barragan Y Topo Chico | 425 | 0.0% | 100.0% |
| | | Felix Galvan Lopez Carr M Aleman | 726 | 0.0% | 100.0% |
| | | Guaymas Esq 5 De Mayo | 469 | 0.0% | 100.0% |
| | | Independencia Esq Gmo Prieto | 321 | 0.0% | 100.0% |
| | | Blvd Valsequillo Y Av 51 Pte | 729 | 0.0% | 100.0% |
| | | Av Prol Corregidora | 424 | 0.0% | 100.0% |
| | | 16 De Septiembre | 633 | 0.0% | 100.0% |
| | | Av 5 De Febrero | 762 | 0.0% | 100.0% |
| | | Av Juarez | 425 | 0.0% | 100.0% |
| | | Av Tulum Lotes 13 Y 14 | 404 | 0.0% | 100.0% |
| | | Alvaro Obregon | 613 | 0.0% | 100.0% |
| | | Av Hidalgo Esq J De Los Reyes | 602 | 0.0% | 100.0% |
| | | Av Venustiano Carranza 1925 | 657 | 0.0% | 100.0% |
| | | Av Industrias Esq Eje 114 | 274 | 0.0% | 100.0% |
| | | Calle 3A Norte Lote 8 Mzna 17 | 604 | 0.0% | 100.0% |
| | | Carr A Costa Rica | 592 | 0.0% | 100.0% |
| | | Javier Mina | 445 | 0.0% | 100.0% |
| | | Av Vicente Guerrero | 342 | 0.0% | 100.0% |
| | | Carr Internacional | 617 | 0.0% | 100.0% |
| | | Av Panamericana Esq Calle 2A | 624 | 0.0% | 100.0% |
| | | Vicente Guerrero Esq Av Sonora | 1,678 | 0.0% | 100.0% |
| | | Morelos Esq Miguel Aleman | 776 | 0.0% | 100.0% |
| | | Aquiles Serdan Esq Yanez | 1,924 | 0.0% | 100.0% |
| | | Av B Juarez Entre Av Jal Y L Encinas | 3,348 | 0.0% | 100.0% |
| | | Aguascalientes Y B Juarez | 450 | 0.0% | 100.0% |
| | | Av Alvaro Obregon | 300 | 0.0% | 100.0% |
| | | Miguel Aleman Esq Garcia Morales | 262 | 0.0% | 100.0% |
| | | Av B Juarez Esq Calle 2A | 825 | 0.0% | 100.0% |
| | | Av Leandro Adriano | 300 | 0.0% | 100.0% |

A-6

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Blvd Lopez Mateos Y Calle 14 | 1,000 | 0.0% | 100.0% |
| | | Gral Manuel Glez Esq Sexta | 505 | 0.0% | 100.0% |
| | | Calle Sexta Y Luis Caballero | 228 | 0.0% | 100.0% |
| | | Reforma Esq Paseo Colon | 520 | 0.0% | 100.0% |
| | | Av Hidalgo | 293 | 0.0% | 100.0% |
| | | Blvd Jose Ma Morelos Esq R Chile | 811 | 0.0% | 100.0% |
| | | Portes Gil Esq Avila Camacho | 1,860 | 0.0% | 100.0% |
| | | Porfirio Diaz | 605 | 0.0% | 100.0% |
| | | Av Fco I Madero Esq S L P | 363 | 0.0% | 100.0% |
| | | Fray Andres Olmos Esq E Carranza | 476 | 0.0% | 100.0% |
| | | Ruiz Cortines Y Av Las Americas | 382 | 0.0% | 100.0% |
| | | Hidalgo | 629 | 0.0% | 100.0% |
| | | Jose Ma Morelos Esq I Zaragoza | 513 | 0.0% | 100.0% |
| | | Jose Ma Mor Esq A R Cortines | 1,192 | 0.0% | 100.0% |
| | | Av Circunvalacion O Lazaro Cardenas | 405 | 0.0% | 100.0% |
| | | Av Gral Manuel Avila Camacho | 411 | 0.0% | 100.0% |
| | | J De La Luz Enriquez | 1,462 | 0.0% | 100.0% |
| | | Calle Hidalgo | 769 | 0.0% | 100.0% |
| | | H Colegio Militar Esq Calle 4 | 979 | 0.0% | 100.0% |
| | | Salvador Diaz Miron | 480 | 0.0% | 100.0% |
| | | Calle 86 B 639 Manz 55 | 497 | 0.0% | 100.0% |
| | | Calle 6 X 400 C C Pza Fiesta Carr Motul | 295 | 0.0% | 100.0% |
| | | Calle 86 B 639 4 | 309 | 0.0% | 100.0% |
| | | Jaime Balmes Plaza Polanco 1 | 655 | 0.0% | 100.0% |
| | | Blvd Lazaro C Esq B Juarez 1 | 475 | 0.0% | 100.0% |
| | | Av Independencia Norte 1 | 606 | 0.0% | 100.0% |
| | | Av Juarez Esq Fco I Madero 1 | 809 | 0.0% | 100.0% |
| | | Av Independencia 1 | 757 | 0.0% | 100.0% |
| | | Avenida 3 Y Calle 5 1 | 969 | 0.0% | 100.0% |
| | Office | Anillo Periferico | 5,812 | 0.1% | 100.0% |
| | | Rio Amazonas | 508 | 0.0% | 100.0% |
| | | Rio Lerma | 513 | 0.0% | 100.0% |
| | | Rio Nazas Y Rio Amazonas | 1,554 | 0.0% | 100.0% |
| | | Insurgentes Y Monasterios | 1,173 | 0.0% | 100.0% |
| | | Insurgentes Sur | 1,222 | 0.0% | 100.0% |
| | | Blvd Adolfo Ruiz Cortines | 1,257 | 0.0% | 100.0% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Presidente Mazarik Y A France | 863 | 0.0% | 100.0% |
| | | Av Americas 1702 | 1,248 | 0.0% | 100.0% |
| | | Av Libertad Y Cda De Los Heroes C Civico | 818 | 0.0% | 100.0% |
| | | Calle B Juarez Y Lazaro C | 1,256 | 0.0% | 100.0% |
| | | Erasmo Castellanos | 1,980 | 0.0% | 100.0% |
| | | Av Francisco I Madero | 381 | 0.0% | 100.0% |
| | | Av Americas | 480 | 0.0% | 100.0% |
| | | Av Americas | 296 | 0.0% | 100.0% |
| | | Americas | 9,215 | 0.1% | 100.0% |
| | | Dr Mier Norte | 425 | 0.0% | 100.0% |
| | | P. Mier Ote.  Torre P. M | 2,600 | 0.0% | 0.0% |
| | | Padre Mier Ote 17 Caj Estac | 239 | 0.0% | 100.0% |
| | | P Mier Ote Torre P Mier Y Mor | 1,454 | 0.0% | 100.0% |
| | | P. Mier Ote., Torre P Mi | 857 | 0.0% | 0.0% |
| | | P. Mier Ote., Torre P Mi | 856 | 0.0% | 100.0% |
| | | P. Mier Ote., Torre P Mi | 853 | 0.0% | 0.0% |
| | | P. Mier Ote., Torre More | 765 | 0.0% | 0.0% |
| | | P Mier Ote Torre Morelos 134 8 Piso | 763 | 0.0% | 100.0% |
| | | P Mier Ote Torre Morelos 134 7 Piso | 732 | 0.0% | 100.0% |
| | | P Mier Ote Torre P Mier 134 5 P 6 Locs | 234 | 0.0% | 100.0% |
| | | Padre Mier Ote. (Ofnas A | 1,874 | 0.0% | 100.0% |
| | | Jose Vasconcelos | 1,723 | 0.0% | 100.0% |
| | | Av Bosques Del Valle | 3,153 | 0.0% | 100.0% |
| | | Av Reforma | 655 | 0.0% | 100.0% |
| | | 5 De Mayo Esq Angel Flores | 820 | 0.0% | 100.0% |
| | | 5 De Febrero | 2,474 | 0.0% | 100.0% |
| | | Blvd L Encinas J Esq Calle B Juarez | 3,237 | 0.0% | 100.0% |
| | | Morelos Y Calle 12 | 1,437 | 0.0% | 100.0% |
| | | Av I Zaragoza Esq Roman Marin | 1,878 | 0.0% | 100.0% |
| | | Av Independencia | 1,951 | 0.0% | 100.0% |
| | | Mario Molina Esq J J Herrera | 1,185 | 0.0% | 100.0% |
| | | Paseo Montejo Calle 56 A | 2,461 | 0.0% | 100.0% |
| | | Calle 56 | 1,512 | 0.0% | 100.0% |
| Sendero Villahermosa | Retail | Sendero Villahermosa | 21,853 | 0.3% | 86.4% |
| Verde | Industrial | Lerma Park I | 117,786 | 1.5% | 100.0% |
| Morado | Retail | La Isla Cancun | 40,360 | 0.5% | 96.9% |
| | | Forum By The Sea | 11,968 | 0.2% | 88.2% |
| | | Punta Langosta | 8,928 | 0.1% | 85.4% |
| | | Centro Maya | 16,462 | 0.2% | 97.4% |
| | | Outlet Cancun | 21,871 | 0.3% | 96.4% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Outlet Guadalajara | 32,209 | 0.4% | 91.3% |
| | | Outlet Monterrey | 38,063 | 0.5% | 75.9% |
| | | Forum Tepic | 44,399 | 0.6% | 96.0% |
| | | Corporativo Tlalnepantla | 60 | 0.0% | 99.9% |
| | Industrial | Corporativo Tlalnepantla | 18,226 | 0.2% | 55.5% |
| | | Tultitlan I | 136,827 | 1.8% | 95.7% |
| | | Tultitlan Ii | 62,073 | 0.8% | 92.0% |
| | Office | Corporativo Blas Pascal | 5,334 | 0.1% | 94.5% |
| | | Corporativo Insurgentes | 6,087 | 0.1% | 80.9% |
| | | Corporativo Interlomas | 5,980 | 0.1% | 52.8% |
| | | Corporativo Constitucion | 15,837 | 0.2% | 90.0% |
| | | Corporativo Santa Fe | 40,188 | 0.5% | 87.2% |
| | | Corporativo Tlalnepantla | 32,714 | 0.4% | 97.3% |
| Torre Mayor | Office | Torre Mayor | 83,971 | 1.1% | 100.0% |
| Pace | Industrial | Saltillo | 23,368 | 0.3% | 100.0% |
| | | Chihuahua | 20,226 | 0.3% | 100.0% |
| Naranja | Office | Torre Adalid 21 | 3,906 | 0.1% | 9.9% |
| | | Baja California 200 | 4,934 | 0.1% | 100.0% |
| | | Plaza Polanco | 2,530 | 0.0% | 100.0% |
| G30 | Retail | Iztapalapa 547 | 7,182 | 0.1% | 93.4% |
| | | Forum Lago | 60,842 | 0.8% | 90.8% |
| | | Palomas | 17,913 | 0.2% | 98.5% |
| | | Americas Playa | 27,605 | 0.4% | 94.1% |
| | | Salina Cruz | 33,035 | 0.4% | 97.9% |
| | | Torre Reforma Latino | 483 | 0.0% | 7.3% |
| | | Xochimilco I | 30,430 | 0.4% | 80.8% |
| | Industrial | La Mexiquense | 177,663 | 2.3% | 75.7% |
| | | Iztapalapa 547 | 44,934 | 0.6% | 100.0% |
| | | Lago Ii | 150,173 | 2.0% | 95.7% |
| | | Tepotzotlan I | 67,948 | 0.9% | 92.7% |
| | | Ceylan | 18,380 | 0.2% | 100.0% |
| | | Gustavo Baz 180 | 33,044 | 0.4% | 100.0% |
| | | La Joya Iii | 26,037 | 0.3% | 100.0% |
| | | La Joya Iv | 21,798 | 0.3% | 100.0% |
| | | La Palma | 26,081 | 0.3% | 100.0% |
| | | Maravillas Ii | 25,000 | 0.3% | 100.0% |
| | | James Watt | 78,276 | 1.0% | 100.0% |
| | | Puente Grande Ii | 28,443 | 0.4% | 100.0% |
| | | Puente Grande I | 17,942 | 0.2% | 100.0% |
| | | Tultipark | 188,389 | 2.5% | 99.4% |
| | | Lago I | 89,394 | 1.2% | 100.0% |
| | | Purisima | 206,833 | 2.7% | 100.0% |
| | | San Martin Obispo I | 163,253 | 2.1% | 95.7% |
| | | San Martin Obispo Ii | 85,957 | 1.1% | 100.0% |
| | | Tlalnepark Iv | 71,778 | 0.9% | 100.0% |
| | | Lago Iii | 81,580 | 1.1% | 100.0% |
| | Office | Torre Platinum | 7,019 | 0.1% | 85.2% |
| | | Gustavo Baz 180 | 2,029 | 0.0% | 100.0% |
| | | Mariano Escobedo 595 | 6,110 | 0.1% | 100.0% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy *(as a % of GLA)* |
|---|---|---|---|---|---|
| | | Centrumpark | 51,948 | 0.7% | 19.1% |
| | | Torre Reforma Latino | 45,263 | 0.6% | 91.6% |
| Individuales Industriale | Industrial | Parque Empresarial Cancun | 18,000 | 0.2% | 100.0% |
| | | El Salto | 24,000 | 0.3% | 100.0% |
| Universidad Autónoma De Individuales | Retail | Universidad Autonoma De Guadalajara | 163,000 | 2.1% | 100.0% |
| | Retail | Torre Diamante Insurgentes | 1,471 | 0.0% | 100.0% |
| | | Puerta De Hierro | 24,946 | 0.3% | 100.0% |
| | | Churubusco | 4,793 | 0.1% | 86.9% |
| | Office | Reforma 155 | 5,038 | 0.1% | 100.0% |
| | | Montes Urales | 16,348 | 0.2% | 100.0% |
| | | Torre Diamante Insurgentes | 20,285 | 0.3% | 97.2% |
| | | Artificios 40 | 2,603 | 0.0% | 100.0% |
| | | Saqqara | 11,236 | 0.1% | 70.4% |
| | | Torre Diana | 64,000 | 0.8% | 93.6% |
| Vermont | Industrial | Matamoros Norte I | 6,968 | 0.1% | 0.0% |
| | | Oriente I | 9,811 | 0.1% | 100.0% |
| | | Ciudad Industrial | 15,615 | 0.2% | 100.0% |
| | | Oriente Ii | 20,720 | 0.3% | 100.0% |
| | | Oriente Iii | 18,089 | 0.2% | 100.0% |
| | | Matamoros Norte Ii | 19,622 | 0.3% | 100.0% |
| | | Oriente Iv | 15,329 | 0.2% | 100.0% |
| | | Oriente V | 11,745 | 0.2% | 100.0% |
| | | Oriente Vi | 6,968 | 0.1% | 100.0% |
| | | Nuevo Laredo | 23,480 | 0.3% | 100.0% |
| | | Reynosa | 18,184 | 0.2% | 0.0% |
| | | Villa Florida I | 10,655 | 0.1% | 100.0% |
| | | Parque Monterrey | 12,589 | 0.2% | 100.0% |
| | | Milenium I | 19,412 | 0.3% | 100.0% |
| | | Milenium Ii | 12,248 | 0.2% | 100.0% |
| | | Milenium Iii | 11,797 | 0.2% | 100.0% |
| | | Nexxus | 37,107 | 0.5% | 100.0% |
| | | Puebla I | 12,483 | 0.2% | 100.0% |
| | | Puebla Ii | 17,975 | 0.2% | 100.0% |
| | | Cuidad Victoria | 23,185 | 0.3% | 100.0% |
| | | Ciudad Juarez | 21,066 | 0.3% | 100.0% |
| | | Monclova | 18,722 | 0.2% | 0.0% |
| | | Saltillo | 19,375 | 0.3% | 100.0% |
| | | Morelos | 4,627 | 0.1% | 100.0% |
| | | Durango | 23,185 | 0.3% | 100.0% |
| | | Oriente Vii | 15,097 | 0.2% | 100.0% |
| | | Cuautitlan Izcalli | 7,624 | 0.1% | 100.0% |
| | | Reynosa Villa Florida Ii | 22,297 | 0.3% | 100.0% |
| | | Guadalupe I | 15,794 | 0.2% | 100.0% |
| | | Puebla Iii | 7,525 | 0.1% | 100.0% |
| | | Puebla Iv | 7,525 | 0.1% | 100.0% |
| | | Ramos Arizpe I | 19,646 | 0.3% | 100.0% |
| | | Ramos Arizpe Ii | 6,530 | 0.1% | 100.0% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy *(as a % of GLA)* |
|---|---|---|---|---|---|
| | | Guadalupe Ii | 11,301 | 0.1% | 100.0% |
| Apolo | Retail | Aguascalientes | 4,448 | 0.1% | 100.0% |
| | | Chihuahua Fashion Mall | 52,419 | 0.7% | 90.3% |
| | | Claveria | 8,665 | 0.1% | 97.3% |
| | | Culiacan | 3,592 | 0.0% | 100.0% |
| | | Revolucion | 11,313 | 0.1% | 98.6% |
| | | Santa Anita | 6,100 | 0.1% | 100.0% |
| | | Universidad | 23,259 | 0.3% | 99.8% |
| | | Zaragoza | 33,229 | 0.4% | 96.3% |
| | | Pachuca | 42,915 | 0.6% | 99.5% |
| | | Parques Polanco | 16,173 | 0.2% | 91.4% |
| | | Chimalhuacan | 8,306 | 0.1% | 100.0% |
| | | Cuautitlan | 16,685 | 0.2% | 97.6% |
| | | Culiacan C De A | 7,309 | 0.1% | 97.6% |
| | | Ecatepec | 27,099 | 0.4% | 97.7% |
| | | Gomez Morin | 24,521 | 0.3% | 100.0% |
| | | Guaymas | 19,485 | 0.3% | 91.4% |
| | | Iguala | 6,457 | 0.1% | 100.0% |
| | | La Cima | 11,382 | 0.1% | 99.6% |
| | | Obregon | 11,301 | 0.1% | 92.9% |
| | | Patria | 29,240 | 0.4% | 100.0% |
| | | Rio Blanco | 6,077 | 0.1% | 100.0% |
| | | Salamanca | 6,076 | 0.1% | 100.0% |
| | | Santa Fe | 67,410 | 0.9% | 98.3% |
| | | Tejeria | 7,785 | 0.1% | 100.0% |
| | | Texcoco | 46,284 | 0.6% | 98.4% |
| | | Tlaxcala | 35,869 | 0.5% | 98.8% |
| | | Tuxpan | 15,839 | 0.2% | 97.8% |
| | | Ciudad Valles | 8,073 | 0.1% | 88.5% |
| | | Xalapa | 11,373 | 0.1% | 99.6% |
| | | Huehuetoca | 21,619 | 0.3% | 98.6% |
| | | Los Cabos | 12,910 | 0.2% | 68.0% |
| | | Panamericana | 17,394 | 0.2% | 88.5% |
| | | Coatzacoalcos | 17,253 | 0.2% | 62.1% |
| | | Poza Rica | 35,070 | 0.5% | 90.3% |
| | | Tepeji Del Rio | 8,260 | 0.1% | 96.3% |
| | | Acapulco Diana | 16,979 | 0.2% | 99.1% |
| | | Tulancingo | 10,497 | 0.1% | 86.9% |
| | | Centrika | 42,610 | 0.6% | 92.6% |
| | | Ixtapaluca | 58,567 | 0.8% | 94.7% |
| | | Ayotla | 22,215 | 0.3% | 80.1% |
| | | Manzanillo I | 6,967 | 0.1% | 87.2% |
| | | Manzanillo Ii | 7,115 | 0.1% | 100.0% |
| | | Las Pintas | 6,951 | 0.1% | 88.6% |
| | | Mariano Otero | 6,061 | 0.1% | 100.0% |
| | | Chilpancingo | 6,175 | 0.1% | 100.0% |
| | | Jesus Del Monte | 22,472 | 0.3% | 100.0% |
| | Office | Santa Fe | 8,152 | 0.1% | 100.0% |
| P12 | Retail | Insurgentes Sur 553 | 34 | 0.0% | 0.1% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | Insurgentes Sur 1787 | 240 | 0.0% | 100.0% |
| | | Insurgentes Sur 1571 | 398 | 0.0% | 100.0% |
| | Office | Americas 833 | 6,471 | 0.1% | 0.0% |
| | | Concepcion Beistegui 13 | 2,071 | 0.0% | 85.5% |
| | | Insurgentes Sur 552 | 8,890 | 0.1% | 100.0% |
| | | Insurgentes Sur 553 | 27,065 | 0.4% | 100.0% |
| | | Insurgentes Sur 1787 | 4,987 | 0.1% | 100.0% |
| | | Insurgentes Sur 1811 | 5,818 | 0.1% | 72.6% |
| | | Juarez 101 | 12,228 | 0.2% | 100.0% |
| | | Revolucion 1877 | 12,163 | 0.2% | 89.6% |
| | | Insurgentes Sur 476 | 10,102 | 0.1% | 47.4% |
| | | Insurgentes Sur 1571 | 1,400 | 0.0% | 100.0% |
| Maine | Retail | Maine Merida | 26,878 | 0.4% | 93.3% |
| | Industrial | Maine Aguascalientes | 30,843 | 0.4% | 100.0% |
| | | Maine Guadalajara | 15,691 | 0.2% | 100.0% |
| | | Maine Guanajuato | 20,664 | 0.3% | 100.0% |
| | | Maine San Luis Potosi | 24,075 | 0.3% | 64.6% |
| | | Maine Tlaquepaque I | 34,776 | 0.5% | 100.0% |
| California | Industrial | California Ecocentro | 2,993 | 0.0% | 100.0% |
| | | California Guadalupe | 12,087 | 0.2% | 100.0% |
| | | California Kronos | 34,457 | 0.4% | 100.0% |
| | | California Linares | 5,015 | 0.1% | 100.0% |
| | | California Logistik I | 8,175 | 0.1% | 68.8% |
| | | California Maquilpark 1 | 8,578 | 0.1% | 100.0% |
| | | California Maquilpark 3 | 10,920 | 0.1% | 100.0% |
| | | California Maquilpark 4 | 4,500 | 0.1% | 0.0% |
| | | California Maquilpark 5 | 13,257 | 0.2% | 20.3% |
| | | California Maquilpark 6 | 5,199 | 0.1% | 0.0% |
| | | California Maquilpark 8 | 8,783 | 0.1% | 100.0% |
| | | California Mbp I | 7,153 | 0.1% | 95.6% |
| | | California Mbp Ii | 7,730 | 0.1% | 15.8% |
| | | California Mbp Iii | 13,373 | 0.2% | 100.0% |
| | | California Apodaca I | 22,624 | 0.3% | 100.0% |
| | | California Apodaca Ii | 9,101 | 0.1% | 85.5% |
| | | California Parque Santa Maria | 50,349 | 0.7% | 100.0% |
| | | California Parque Monterrey I | 4,024 | 0.1% | 100.0% |
| | | California Parque Monterrey Ii | 13,739 | 0.2% | 100.0% |
| | | California Planta La Perla | 4,459 | 0.1% | 100.0% |
| | | California Planta North Gate | 5,564 | 0.1% | 100.0% |
| | | California Planta Panamericano | 13,536 | 0.2% | 100.0% |
| | | California Planta Parque Juarez I | 17,234 | 0.2% | 100.0% |
| | | California Tecnocentro I | 9,811 | 0.1% | 100.0% |
| | | California Tecnocentro Ii | 18,587 | 0.2% | 100.0% |
| | | California Tecnocentro Iii | 3,484 | 0.0% | 100.0% |

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy (as a % of GLA) |
|---|---|---|---|---|---|
| | | California Tecnocentro Iv | 6,703 | 0.1% | 100.0% |
| | | California Villa Florida I | 13,935 | 0.2% | 100.0% |
| | | California Villa Florida Ii | 13,935 | 0.2% | 100.0% |
| Espacio Aguascalientes. | Retail | Espacio Aguascalientes | 22,510 | 0.3% | 89.4% |
| La Viga | Office | La Viga | 31,323 | 0.4% | 100.0% |
| R15 | Retail | Galerias Guadalajara | 62,453 | 0.8% | 97.7% |
| | | Peninsula Vallarta | 10,770 | 0.1% | 45.3% |
| | Industrial | Cuautipark Ii | 96,148 | 1.3% | 96.3% |
| | Office | Galerias Guadalajara | 6,845 | 0.1% | 57.7% |
| San Mateo | Office | Corporativo San Mateo | 5,440 | 0.1% | 100.0% |
| Hotel Centro Historico | Retail | Hotel Centro Historico | 40,000 | 0.5% | 100.0% |
| Samara | Retail | Samara | 53,584 | 0.7% | 98.8% |
| | Office | Samara | 80,188 | 1.0% | 99.2% |
| Kansas | Retail | Acapulco | 25,287 | 0.3% | 59.4% |
| | | Chalco | 50,247 | 0.7% | 78.2% |
| | | Cumbres | 57,234 | 0.7% | 95.0% |
| | | Ecatepec | 24,932 | 0.3% | 67.1% |
| | | Galerias Valle Oriente | 31,025 | 0.4% | 85.1% |
| | | Hermosillo | 27,392 | 0.4% | 80.9% |
| | | Lincoln | 18,291 | 0.2% | 91.2% |
| | | Los Cabos | 21,974 | 0.3% | 59.5% |
| | | Matamoros | 27,368 | 0.4% | 67.4% |
| | | Merida | 22,590 | 0.3% | 78.1% |
| | | Queretaro | 19,081 | 0.2% | 96.7% |
| | | Saltillo | 37,222 | 0.5% | 98.5% |
| Indiana | Retail | Acueducto | 9,886 | 0.1% | 100.0% |
| | | Coacalco | 13,066 | 0.2% | 100.0% |
| | | Cuautitlan Izcalli | 7,100 | 0.1% | 100.0% |
| | | La Villa | 17,053 | 0.2% | 100.0% |
| | | Cuernavaca | 22,692 | 0.3% | 100.0% |
| | | Ecatepec | 11,421 | 0.1% | 100.0% |
| | | Guadalajara | 9,093 | 0.1% | 100.0% |
| | | Lomas Verdes | 8,492 | 0.1% | 100.0% |
| | | Lopez Portillo | 14,362 | 0.2% | 100.0% |
| | | Tlalpan | 44,828 | 0.6% | 100.0% |
| | | Zaragoza | 10,189 | 0.1% | 100.0% |
| | | Zona Rosa I | 4,676 | 0.1% | 100.0% |
| | | Zona Rosa Ii | 7,041 | 0.1% | 100.0% |
| | | El Palomar | 17,430 | 0.2% | 100.0% |
| | | Vallarta | 49,909 | 0.7% | 100.0% |
| | | Hidalgo I | 4,733 | 0.1% | 100.0% |
| | | Hidalgo Ii | 4,190 | 0.1% | 100.0% |
| Oregon | Retail | Cuauhtemoc | 18,732 | 0.2% | 97.2% |
| | | Misterios | 7,971 | 0.1% | 98.6% |
| | | Plaza La Viga | 7,415 | 0.1% | 98.1% |
| Alaska | Retail | Torre Caballito | 120 | 0.0% | 100.0% |
| | | Torre Mexicana | 214 | 0.0% | 78.0% |

A-13

| Portfolio | Segment | Property | GLA | % of Total GLA | Occupancy *(as a % of GLA)* |
|-----------|---------|----------|-----|----------------|------------------------------|
| | | Torre Suma | 261 | 0.0% | 7.7% |
| | | Torre Santa Fe | 138 | 0.0% | 100.0% |
| | Office | Torre Caballito | 39,084 | 0.5% | 100.0% |
| | | Torre Duraznos 127 | 10,146 | 0.1% | 89.8% |
| | | Torre Mexicana | 29,614 | 0.4% | 98.9% |
| | | Torre Suma | 12,440 | 0.2% | 75.0% |
| | | Torre Santa Fe | 21,172 | 0.3% | 100.0% |
| | | Corporativo Cuspide | 11,300 | 0.1% | 100.0% |
| Turbo | Retail | Park Tower Vallarta | 46,234 | 0.6% | 100.0% |
| | | Toluca | 579 | 0.0% | 100.0% |
| Frimax | Industrial | Doña Rosa | 212,401 | 2.8% | 98.0% |
| | | **TOTAL** | 7,665,296 | 100.0% | |

A-14

**APPENDIX B**

Page

**Announced Potential Acquisitions**
Turbo Portfolio Press Release ................................................................................................................................. **B-2**
Apolo II Portfolio Press Release............................................................................................................................. **B-5**



**FIBRA UNO ANNOUNCES THE ACQUISITION OF THE TURBO PORTFOLIO**

**Mexico City, Mexico September 8, 2016. -** *Fibra Uno* (BMV: FUNO11) ("FUNO" or "Fideicomiso F/1401"), the first and largest Real Estate Investment Trust in Mexico announces today that it has agreed to the acquisition of the Turbo portfolio, which includes 18 properties.

FUNO announces today that it has agreed to acquire the Turbo Portfolio, a group of 18 properties on prime locations across 6 states of Mexico. With this acquisition FUNO strengthens its footprint significantly in the Bajío area and expands its presence in other key dynamic cities in the country.

Amongst the many features of the portfolio is that it includes the largest and most renowned regional fashion mall in the Bajío area, one of the fastest-growing areas in the country and hub of the aerospace industry. The portfolio also includes 5 industrial buildings in the Querétaro industrial market, which is located on the NAFTA highway, in one of the most attractive areas for both logistics and manufacturing sectors in Mexico. Furthermore, there are also two techno-parks in Querétaro that currently house approx. 2,000 aeronautical engineers in the heart of Mexico´s aerospace hub.

Moreover, the portfolio features 750 hotel rooms, including FUNO's first brand-new, resort-class, all-inclusive hotel in Puerto Vallarta, one of Mexico's most popular tourist destinations. This property is being acquired under a very convenient and innovative structure of a base-plus-variable rent, which allows FUNO to enjoy a healthy return, plus a variable portion added by the success of the hotel. In addition to this acquisition, the portfolio also includes two business-class hotels in the city of Mérida, one the fastest-growing cities with very favorable demographic and economic dynamics.

This portfolio also includes 4 projects to be developed, one of which is Patio Tollocan, a power center to be built in the best location of the city of Toluca and anchored by one of the largest retailers in Mexico.

The acquisition price-investment agreed for this portfolio is Ps. 14.3 billion; which will be paid with a combination of cash, CBFIs, and property-level, secured debt. The portion paid in cash will be around 20%, the CBFIs portion amounts to approximately 70%, and we expect to assume property-level debt for an additional 10%. FUNO estimates that this portfolio will generate an annual net operating income of Ps. 1.33 billion once fully stabilized. Currently, this portfolio generates approximately Ps. 650 million of net operating income, with final stabilization expected within the next 36 months. The CBFI-portion will be paid in stages as properties stabilize and start generating rental revenue.

The portfolio has approximately 506 thousand sqm of gross leasable area, of which 22% are under development. There are 6 fully stabilized properties, 8 properties under



stabilization process and 4 green-fields under development. The portfolio's final gross leasable area is diversified in three main segments: retail (50%), industrial (44%), and offices (6%). Current occupancy of the stabilized portion of the portfolio is near 90%. Nevertheless, a portion of the portfolio's gross leasable area comes from related parties. The transaction is pending from approval by both FUNO's Practices Committee as well as the anti-trust authority in Mexico. We expect to close the acquisition on a property-by-property basis during the next few months, and we will provide precise information of every closing on a timely manner.

The first acquisition of this portfolio is the recently opened Grand Fiesta Americana Puerto Vallarta, which has been concluded. As we mentioned above, this hotel is FUNO's first brand-new, resort-class, all-inclusive hotel in Puerto Vallarta, one of Mexico's most popular destinations, leased under a based-plus-variable rent structure. The hotel has 46,234 sqm of GLA and 444 rooms and operates under the Grand Fiesta Americana high-end brand. The hotel has a series of amenities and facilities of a world-class resort, as well as a portion of land for future expansion included. The acquisition price of this property is Ps. 1,477 million to be paid with a combination of cash and CBFIs. FUNO expects this property to generate approx. Ps. 150 million of annual net operating income. Furthermore, FUNO has the right to receive rents derived from this property starting January 1, 2016, keeping as guarantee 6.16 million CBFIs in escrow which will be reduced every year for a 3 year period. The property was acquired from related parties and has no debt.

*"We are extremely pleased with this acquisition. We are expanding FUNO's footprint in the Bajio area, which is currently one of the most dynamic regions in terms of economic and industrial activity; and in other key cities with excellent real estate prospects.*

*FUNO´s growth strategy is proven; with these acquisitions we are delivering our commitments announced to our investors in our FUNO day in New York in November last year.*

*While we were silent, we were working hard, scouting, identifying and closing in the right conditions, to agree with our sellers. Now we are in a good position, having reached the right terms to execute and start delivering.*

*Today we start closing; this portfolio that has an enormous potential of value creation given its prime locations and local demand prospects. With this acquisition, FUNO strengthens even more its leadership within Mexico's real estate sector.*

*As we´ve talked in the past, FUNO has the ability to create this type of portfolios which we will continue to create in order to add value to our portfolio and to our CBFI holders."*

 - Commented André El-Mann, FUNO's Chief Executive Officer.

****



**About Fibra Uno**

Fibra Uno (Mexbol: FUNO11; Bloomberg: FUNO11:MM) is the first and largest FIBRA (REIT) in the Mexican market. It operates and develops a wide range of real estate assets for leasing mainly in the industrial, retail and office segments. As of June 30, 2016 Fibra Uno had a portfolio of 515 properties that totaled approximately 7.2 million sqm (approx. 77.4 million sqm) with footprint on 31 states of Mexico. Fibra Uno's strategy focuses in having the best locations with high-quality assets and geographic, segment and tenant diversification. Furthermore, Fibra Uno's management team has more than three decades of expertise in development and operation of all segments of the real estate industry.

<u>Investor Contact</u>

| **In Mexico** | **In New York** | **Media Contact** |
|---|---|---|
| Jorge Pigeon | Lucia Domville | Francisco Galindo |
| Antonio Tejedo | | |
| Tel: +52 (55) 4170-7070 | Tel: +1 (646) 284 9400 | Tel: +52 (55) 5062 8250 |
| investor@fibrauno.mx | fibrauno@grayling.com | fgalindo@zimat.com.mx |
| 🐦 @fibraunomx | | |



## FIBRA UNO ANNOUNCES THE SIGNING OF A LETTER OF INTENT TO ACQUIRE THE APOLLO II PORTFOLIO

**Mexico City, Mexico November 10, 2016. –** *Fibra Uno* (BMV: FUNO11) ("FUNO" or "Fideicomiso F/1401"), the first and largest Real Estate Investment Trust in Mexico announces today that it has executed a letter of intent to acquire the Apollo II portfolio, integrated by 18 retail properties on premium locations across 11 states of Mexico.

This transaction is still subject to: (i) negotiation and execution of the final contracts; (ii) the approval of the governing bodies of both parties; and (iii) the approval of the Mexican Anti-Trust Commission.

The Apollo II portfolio is integrated by 11 stabilized shopping centers, 5 shopping centers in the process of stabilization that represent 60% of the portfolio's total cash flow, and two plots of land for future developments, considering a total investment of between Ps. 10,000 and 11,000 million. FUNO expects that these shopping centers, once stabilized, will generate an annual net operating income of Ps. 1,012 million. The two plots of land for imminent development are in two prime locations of Mexico City, on areas with high purchasing power, whose minimum gross leasable area is estimated to be of 120,000 sqm. It is estimated that the acquisition and closing processes will finalize at the beginning of 2017.

****

**About Fibra Uno**

Fibra Uno (Mexbol: FUNO11; Bloomberg: FUNO11:MM) is the first and largest FIBRA (REIT) in the Mexican market. It operates and develops a wide range of real estate assets for leasing mainly in the industrial, retail and office segments. As of September 30, 2016 Fibra Uno had a portfolio of 516 properties that totaled approximately 7.3 million sqm (approx. 79 million sqm) with footprint on 31 states of Mexico. Fibra Uno's strategy focuses in having the best locations with high-quality assets and geographic, segment and tenant diversification. Furthermore, Fibra Uno's management team has more than three decades of expertise in development and operation of all segments of the real estate industry.

**<u>Investor Contact</u>**

| **In Mexico** | **In New York** | **Media Contact** |
|---|---|---|
| Jorge Pigeon | Lucia Domville | Francisco Galindo |
| Antonio Tejedo | | |
| Tel: +52(55) 4170-7070 | Tel: +1(646) 284 9400 | Tel: +52(55) 5062 8250 |
| investor@fibrauno.mx | fibrauno@grayling.com | fgalindo@zimat.com.mx |
| 🐦 @fibraunomx | | |

## INDEX TO FINANCIAL STATEMENTS

**Page**

**Audited Financial Statements of Fibra Uno**
Audited Annual Consolidated Financial Statements for the Years Ended December 31, 2016, 2015 and 2014 ................................................................................................................................. **F-2**

**Unaudited Financial Statements of Fibra Uno**
Unaudited Condensed Consolidated Interim Financial Statements as of June  30, 2017 and for the six-month Periods ended June 30, 2017 and 2016 ............................................................................ **F-57**

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

Consolidated Financial Statements for the Years Ended December 31, 2016, 2015 and 2014, and Independent Auditors' Report Dated April 5, 2017

**Fideicomiso Irrevocable No. F/1401**
**(Deutsche Bank México, S. A. Institución de Banca Múltiple,**
**División Fiduciaria) and Subsidiaries**

# Independent Auditors' Report and Consolidated Financial Statements for 2016, 2015 and 2014

**Table of contents**         **Page**

Independent Auditors' Report      1

Consolidated Statements of Financial Position      6

Consolidated Statements of Operations      8

Consolidated Statements of Changes in Trustors' Capital      9

Consolidated Statements of Cash Flows      10

Notes to Consolidated Financial Statements      12

# Deloitte.

Galaz, Yamazaki,
Ruiz Urquiza, S.C.
Paseo de la Reforma 505
Colonia Cuauhtémoc
06500 Ciudad de México
México

Tel: +52 (55) 5080 6000
www.deloitte.com/mx

# Independent Auditors' Report to the Technical Committee and Trustors of Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries

### Opinion

We have audited the accompanying consolidated financial statements of Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and subsidiaries ("Fibra UNO"), which comprise the consolidated statements of financial position as of December 31, 2016, 2015 and 2014, and the consolidated statements of operations, the consolidated statements of changes in trustors' capital and the consolidated statements of cash flows for the years then ended, and notes to consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of Fibra UNO as of December 31, 2016, 2015 and 2014, and its financial performance and its cash flows, for the years then ended in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board.

### Basis for Opinion

We conducted our audit in accordance with International Standards on Auditing ("ISAs"). Our responsibilities under those standards are further described in the *Independent Auditor's Responsibilities for the Audit of Consolidated Financial Statements* section of our report. We are independent of Fibra UNO in accordance with the International Ethics Standards Board for Accountants' *Code of Ethics for Professionals Accountants (IESBA Code)* and with the Ethics Code issued by the Mexican Institute of Public Accountants (*IMCP Code*), and we have fulfilled our other ethical responsibilities in accordance with the IESBA Code and IMCP Code.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Key Audit Matters

The Key Audit Matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period and which were selected from the matters reported to the Fibra UNO´s Management and the Audit Committee, but do not represent all matters discussed with them. These matters have been addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not express a separate opinion on these matters. We have determined that the matters described below are the Key Audit Matters to be communicated in our report.

i)    *Rental Revenue Recognition, see Notes 4q and 21*

Fibra UNO has a significant number of tenants with varying contractual terms, such as: lease inception date, lease term, currency of payment, variable rentals, advanced rental payments, grace periods, etc. There may be a risk that the recognition of rental revenue does not conform to the commercial terms of the contracts and that the revenue is not recognized in the appropriate manner, considering the rights and obligations transferred to tenants.

(Continued)

Deloitte se refiere a Deloitte Touche Tohmatsu Limited, sociedad privada de responsabilidad limitada en el Reino Unido, y a su red de firmas miembro, cada una de ellas como una entidad legal única e independiente. Conozca en www.deloitte.com/mx/conozcanos la descripción detallada de la estructura legal de Deloitte Touche Tohmatsu Limited y sus firmas miembro.

**Deloitte.**

Fibra UNO maintains databases of its rental contracts ("Rent Roll") which are supported by the related contracts in which the significant varying contractual terms are documented. This database is the basis for monthly billing. Subsequently, management performs an analysis of the items invoiced to determine the correct recording of revenues accrued in the consolidated statement of operations.
*How our audit addressed the Key Audit Matter:*

Our audit procedures included, among others: 1) the review of commercial terms in rental contracts to determine the timing of when all risks and benefits are transferred to tenants depending on such conditions (i.e. contract signature, property ownership, etc.); 2) we verified, on a test basis, that these contracts were properly included in the Rent Roll of the year; 3) we reviewed the completeness of the information included in the Rent Roll with the assistance of information technology specialists in to confirm that the database was not improperly manipulated; 4) from the selection of rental contracts, we identified performance obligations and verified that invoicing was properly computed and the revenue was recognized only when all the risks had been transferred and once performance obligations had been satisfied; 5) we queried and corroborated with management the types of commercial terms that have been signed with tenants in order to determine the timing as to when all rights and obligations have been transferred.

Based on our procedures, no material issues that could result in adjustments to rental revenue were identified in the accompanying consolidated financial statements.

ii)   *Valuation of Investment Properties, see Notes 4h and 9*

In order to estimate the fair value of investment properties, Management, with the assistance of independent appraisers, select the valuation techniques considered most appropriate given the particular circumstances of each investment property. Assumptions relating to estimates of the fair values of investment properties include obtaining, among others, contractual rents, expectation of future lease payments, renewal rates, maintenance requirements, discount rates reflecting uncertainties of the current market, capitalization rates and recent transaction prices.

The independent appraisers selected by Fibra UNO for all investment property portfolios are CBRE and Colliers International. They are well-known firms with considerable experience in the real estate market. Given the number of variables to determine the fair value of investment properties, there may be a risk that the assumptions and judgments established by the independent appraisers and accepted by Fibra UNO, respectively may be inappropriate.

*How our audit addressed the Key Audit Matter:*

a)   We assessed the capabilities and competences of the appraisal firms, while assessing their independence; discussed the scope of their work; verified that the selected valuation methodologies were in accordance with IFRS; obtained valuation certificates (fair value) of all investment properties, and; we held meetings with them to validate the key assumptions of their appraisals. Based on this work, we are satisfied that the firms remain independent and competent and the scope of their work was appropriate.

b)   From a random sample of properties, we tested the information contained in the appraisal of the investment properties, including rental revenues, acquisitions and capital expenditures, by agreeing them to the underlying property records held by Fibra UNO. The underlying property records were themselves tested back to signed and approved lease contracts and approved third party invoices, as applicable. For the properties currently under development, we traced the costs incurred to date included within development appraisals to quantity surveyor reports and confirmed that they were comparable to costs incurred on similar completed projects. We also agreed a sample of costs included in the quantity surveyor reports to supporting documentation.

(Continued)

**2**

**Deloitte.**

We met with the independent appraisers and obtained the appraisal reports for all properties. We read the appraisal reports for a sample of properties, and confirmed that the valuation approach for each was in accordance with IAS 40 "Investment Property" and suitable for use in determining the carrying value for the purpose of the consolidated financial statements. We involved our internal valuation specialists to compare the valuations of each property to our independently formed market expectations and to discuss and challenge the valuation methodology and assumptions considered by the independent appraiser. We used evidence of comparable market transactions and focused, in particular, on properties where the growth in capital values was higher or lower than our expectations based on market indices.

We concluded that the methodology and professional judgment of Fibra UNO´s Management for the valuation of investment properties, using the aforementioned assumptions, are reasonable. Based on this work, no material issues that could result in adjustments to rental revenue were identified in the accompanying consolidated financial statements.

iii)   *Tax Compliance to Maintain FIBRA Status in Accordance with the Mexican Income Tax Law, see Notes 1 and 20*

In order to maintain FIBRA status, the tax authority (Servicio de Administracion Tributaria Mexicano, "SAT") has established in Articles 187 and 188 of the Mexican Income Tax Law, that Fibra UNO must annually distribute at least 95% of its taxable income to the holders of its Real Estate Trust Certificates (CBFIs), in addition to other requirements. There may be a risk that in the event of non-compliance, Fibra UNO will not be qualified as a FIBRA.

*How our audit addressed the Key Audit Matter:*

The compliance test with these articles was significant for our audit because it is the main basis of Fibra UNO's conclusions regarding its ability to continue as a Going Concern. Our auditing procedures included, among others, the review of the annual tax result and the review of the internal tax specialists to assess compliance of the main requirements established by current legislation as of December 31, 2016.

Based on this work, we did not identify exceptions to the Mexican Income Tax Law, which could have a material effect on the accompanying consolidated financial statements

### Other Matter

The accompanying consolidated financial statements have been translated into English for the convenience of readers.

### Other Information

Management is responsible for the other information. The other information comprises the information included in the annual report which Fibra UNO is obligated to prepare in accordance with the Article 33, Section I, Subsection b) of the fourth title, First Chapter of the General Rules Applicable to Securities Issuers and Other Participants of the Mexican Stock Market and the accompanying Manual of those legal provisions (the Legal provisions). The annual report is expected to be made available to us after the date of this auditor's report.

Our opinion on the consolidated financial statements does not cover the other information and we will not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information identified above when it becomes available and, doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. When we read the Annual Report we will issue the statement about its reading, required in Article 33, Section I, Subsection b), and number 1.2. of the Legal Provisions.

(Continued)

**3**

**Deloitte.**

***Responsibilities of Management and Fibra UNO´s Audit Committee for the Consolidated Financial Statements***

Management is responsible for the preparation and fair presentation of the accompanying consolidated financial statements in accordance with IFRS, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, Management is responsible for assessing the Fibra UNO's ability to continue as a Going Concern, disclosing, as applicable, matters, related to going concern and using the Going Concern basis of accounting unless management either intends to liquidate Fibra UNO or to cease operations, or has no realistic alternative but to do so.

Fibra UNO´s Audit Committee is responsible for the supervision of the procedures and controls needed to ensure Fibra UNO´s financial information is reliable, useful and accurate; with the internal audit´s support.

***Auditors' Responsibilities for the Audit of the Consolidated Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

– Identify and asses the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or override of internal control.

– Obtain and understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Fibra UNO's internal control.

– Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by Management.

– Conclude on the appropriateness of Management's use of the Going Concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Fibra UNO's ability to continue as a Going Concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause Fibra UNO to cease to continue as a Going Concern.

– Evaluate the overall presentation, structure and content of the financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

– We obtained sufficient and appropriate audit evidence regarding the financial information of the entities and business activities within Fibra UNO to express an opinion on the consolidated financial statements. We are responsible for the direction, oversight and execution of the audit. We remain solely responsible for our audit opinion.

(Continued)

**4**

# Deloitte.

We communicate to Fibra UNO´s Management and its Audit Committee regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during the audit.

We also provide to Fibra UNO´s Management and its Audit Committee with a statement that we have complied with the applicable ethics requirements in relation to independence and have communicated to them all relationships and other matters that, may reasonably be expected affect our independence, and where appropriate, the corresponding safeguards.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the Key Audit Matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

Galaz, Yamazaki, Ruiz Urquiza, S. C.
Member of Deloitte Touche Tohmatsu Limited

C. P. C. Carlos M. Pantoja Flores
Mexico City, Mexico
April 5, 2017

*(Concluded)*

5

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.**
**Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Consolidated Statements of Financial Position
**As of December 31, 2016, 2015 and 2014**
**(In thousands of Mexican pesos)**

| Assets | Notes | 2016 | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|---|
| Current assets: | | | | | | | |
| Cash and restricted cash | 6. | $ | 5,554,120 | $ | 5,995,918 | $ | 500,848 |
| Financial investments | 7. | | 1,956,101 | | 2,300,596 | | 19,528,446 |
| Lease receivables and others | 8. | | 1,510,294 | | 797,869 | | 763,723 |
| Due from related parties | 17. | | 80,293 | | - | | - |
| Recoverable taxes, mainly value-added tax | | | 2,141,696 | | 4,161,762 | | 3,082,513 |
| Prepaid expenses | | | 430,717 | | 459,660 | | 171,658 |
| Total current assets | | | 11,673,221 | | 13,715,805 | | 24,047,188 |
| | | | | | | | |
| Non-current assets: | | | | | | | |
| Investment properties | 9. | | 172,739,278 | | 151,822,122 | | 113,303,350 |
| Advanced payment for the acquisition of investment property | 10. | | - | | - | | 1,121,095 |
| Investments in associates | 11. | | 5,178,900 | | 3,113,889 | | 2,854,011 |
| Derivative financial instruments | 13. | | 515,055 | | - | | - |
| Other assets | 12. | | 1,920,523 | | 2,121,525 | | 2,289,490 |
| Total non-current assets | | | 180,353,756 | | 157,057,536 | | 119,567,946 |
| | | | | | | | |
| Total assets | | $ | 192,026,977 | $ | 170,773,341 | $ | 143,615,134 |

**Liabilities and Trustors' Capital**

| | Notes | 2016 | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|---|
| Current liabilities: | | | | | | | |
| Borrowings | 14. | $ | 633,911 | $ | 10,123,627 | $ | 1,791,924 |
| Trade accounts payable and accrued expenses | 15. | | 3,232,397 | | 1,913,159 | | 1,928,023 |
| Deferred revenues | | | 165,362 | | 100,010 | | 57,023 |
| Due to related parties | 17. | | 93,266 | | 104,488 | | - |
| Total current liabilities | | | 4,124,936 | | 12,241,284 | | 3,776,970 |
| | | | | | | | |
| Borrowings | 14. | | 64,172,642 | | 44,209,408 | | 34,128,710 |
| Other accounts payable - Long term | | | 125,530 | | - | | - |
| Deposit from tenants | | | 825,067 | | 702,303 | | 474,809 |
| Deferred revenues - Long term | 16. | | 135,467 | | 261,968 | | 159,174 |
| Total liabilities | | | 69,383,642 | | 57,414,963 | | 38,539,663 |

(Continued)

6

| Liabilities and Trustors' Capital | Notes | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|---|
| Trustors' capital: | | | | | | | |
| Trustors' capital | 19. | $ | 95,383,575 | $ | 97,742,580 | $ | 93,500,173 |
| Retained earnings | | | 25,524,669 | | 15,615,798 | | 11,575,298 |
| Valuation of derivative financial instruments | 13. | | (103,006) | | - | | - |
| Controlling interest | | | 120,805,238 | | 113,358,378 | | 105,075,471 |
| Non-controlling interest | | | 1,838,097 | | - | | - |
| Total trustors' capital | | | 122,643,335 | | 113,358,378 | | 105,075,471 |
| Total liabilities and trustors' capital | | $ | 192,026,977 | $ | 170,773,341 | $ | 143,615,134 |

(Concluded)

See accompanying notes to consolidated financial statements.

**7**

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.
Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Consolidated Statements of Operations

**For the years ended December 31, 2016, 2015 and 2014
(In thousands of Mexican pesos, except net income per CBFI)**

| | Notes | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Revenue from: | | | | |
| Leases | 22. | $ 11,756,607 | $ 9,574,616 | $ 6,989,751 |
| Maintenance | | 1,230,420 | 963,377 | 707,842 |
| Dividend revenues from beneficiary rights | | 157,821 | 148,573 | 124,387 |
| Administration fee | 17. | 108,000 | 38,333 | - |
| | | 13,252,848 | 10,724,899 | 7,821,980 |
| | | | | |
| Expenses from: | | | | |
| Management fees | | (678,686) | (612,928) | (490,832) |
| Operating expenses | | (824,967) | (668,237) | (530,623) |
| Maintenance expenses | | (1,293,772) | (1,065,230) | (807,394) |
| Amortization of administrative platform | | (194,984) | (194,984) | (194,984) |
| Executive bonus | 18. | (169,997) | (587,792) | (530,280) |
| Property tax | | (323,074) | (258,801) | (155,104) |
| Insurance | | (143,918) | (87,012) | (84,179) |
| | | (3,629,398) | (3,474,984) | (2,793,396) |
| | | | | |
| Interest expense | | (3,826,836) | (2,681,540) | (2,019,111) |
| Interest income | | 263,833 | 412,083 | 430,494 |
| Foreign exchange loss, Net | | (4,752,607) | (3,878,142) | (2,222,097) |
| Amortization of bank fees | | (133,579) | (81,867) | (166,545) |
| Derivative financial instruments | 13. | (46,624) | - | - |
| Fair value adjustments to investment properties and investments in associates | 9. | 11,266,275 | 4,714,041 | 4,659,760 |
| | | | | |
| Consolidated net income for the year | | $ 12,393,912 | $ 5,734,490 | $ 5,711,085 |
| | | | | |
| Controlling interest | | $ 11,824,632 | $ 5,734,490 | $ 5,711,085 |
| Non-controlling interest | | 569,280 | - | - |
| | | | | |
| Consolidated net income | | $ 12,393,912 | $ 5,734,490 | $ 5,711,085 |
| | | | | |
| Basic net income per CBFI (real estate trust certificates) (in Mexican pesos) | | $ 1.9927 | $ 1.9054 | $ 2.3264 |
| | | | | |
| Diluted net income per CBFI (in Mexican pesos) | | $ 1.9696 | $ 1.6403 | $ 1.7517 |

See accompanying notes to consolidated financial statements.

**8**

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A., Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Consolidated Statements of Changes in Trustors' Capital

**For the years ended December 31, 2016, 2015 y 2014**
**(In thousands of Mexican pesos)**

| | Number of CBFIs | Trustors' capital | Retained earnings | Valuation of financial derivative financial instruments | Controlling interest | Non-controlling interest | Total |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2014 | 1,809,013,266 | $ 49,914,979 | $ 8,299,234 | $ - | $ 58,214,213 | $ - | $ 58,214,213 |
| Equity contribution | 1,069,373,660 | 45,432,735 | - | - | 45,432,735 | - | 45,432,735 |
| Distributions to trustors | - | (1,847,541) | (2,435,021) | - | (4,282,562) | - | (4,282,562) |
| Consolidated net income for the year | - | - | 5,711,085 | - | 5,711,085 | - | 5,711,085 |
| Balance as of December 31, 2014 | 2,878,386,926 | 93,500,173 | 11,575,298 | - | 105,075,471 | - | 105,075,471 |
| Equity contribution | 319,192,212 | 8,452,064 | - | - | 8,452,064 | - | 8,452,064 |
| Distributions to trustors | - | (4,209,656) | (1,693,991) | - | (5,903,647) | - | (5,903,647) |
| Consolidated net income for the year | - | - | 5,734,490 | - | 5,734,490 | - | 5,734,490 |
| Balance as of December 31, 2015 | 3,197,579,138 | 97,742,581 | 15,615,797 | - | 113,358,378 | - | 113,358,378 |
| Equity contribution | 51,726,612 | 2,095,942 | - | - | 2,095,942 | 1,268,817 | 3,364,759 |
| Distributions to trustors | - | (4,454,948) | (1,915,760) | - | (6,370,708) | - | (6,370,708) |
| Consolidated net income for the year | - | - | 11,824,632 | - | 11,824,632 | 569,280 | 12,393,912 |
| Effect of valuation of derivative financial instruments | - | - | - | (103,006) | (103,006) | - | (103,006) |
| Balance as of December 31, 2016 | 3,249,305,750 | $ 95,383,575 | $ 25,524,669 | $ (103,006) | $ 120,805,238 | $ 1,838,097 | $ 122,643,335 |

See accompanying notes to consolidated financial statements.

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.
Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Consolidated Statements of Cash Flows

**For the years ended December 31, 2016, 2015 and 2014
(In thousands of Mexican pesos)**

| | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Operating activities: | | | | | | |
| Net consolidated income for the year | $ | 12,393,912 | $ | 5,734,490 | $ | 5,711,085 |
| Adjustments for non-cash items: | | | | | | |
| Adjustment to fair value of investment properties and investments in associates | | (11,266,275) | | (4,714,041) | | (4,659,760) |
| Unrealized exchange loss (gain) | | 4,276,168 | | 4,022,379 | | 2,030,618 |
| Amortization of bank fees | | 133,579 | | 81,867 | | 166,545 |
| Amortization of administrative platform | | 194,984 | | 194,984 | | 194,984 |
| Executive bonus | | 169,997 | | 587,792 | | 530,280 |
| Interest income | | (263,833) | | (412,083) | | (430,494) |
| Interest expense | | 3,826,836 | | 2,681,540 | | 2,019,111 |
| Effect of valuation of derivative financial instruments | | 46,624 | | - | | - |
| Total | | 9,511,992 | | 8,176,928 | | 5,562,369 |
| | | | | | | |
| Changes in working capital: | | | | | | |
| (Increase) decrease in: | | | | | | |
| Lease receivable and others | | (712,425) | | (34,146) | | (31,275) |
| Due to related parties | | (80,293) | | - | | 125,609 |
| Recoverable taxes, mainly value-added tax | | 2,020,066 | | (1,079,249) | | 653,489 |
| Prepaid expenses and other assets | | 28,943 | | (315,021) | | (153,973) |
| Increase (decrease) in: | | | | | | |
| Trade accounts payable and accrued expenses | | 1,358,051 | | (340,660) | | (607,019) |
| Deferred revenues | | (61,149) | | 145,781 | | 40,667 |
| Other accounts payable - Long term | | 86,717 | | - | | - |
| Deposit from tenants | | 122,764 | | 227,494 | | 85,231 |
| Due from related parties | | (11,222) | | 104,488 | | (60,767) |
| Net cash flows provided by operating activities | | 12,263,444 | | 6,885,615 | | 5,614,331 |
| | | | | | | |
| Investing activities: | | | | | | |
| Investment in development projects and acquisition expenses | | (5,878,590) | | (8,122,203) | | (3,573,709) |
| Advanced payments for acquisitions of investment properties | | - | | - | | (1,121,095) |
| Acquisition of investment properties | | (2,529,171) | | (16,818,476) | | (6,067,057) |
| Acquisition of a business | | - | | - | | - |
| Financial investments | | 344,495 | | 17,227,850 | | (18,804,470) |
| Investments in trust rights | | - | | (138,564) | | (248,970) |
| Interest received | | 171,698 | | 412,083 | | 430,494 |
| Net cash flows used in investing activities | | (7,891,568) | | (7,439,310) | | (29,384,807) |

(Continued)

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Financing activities: | | | |
| Payments of borrowings | (13,403,201) | (2,612,737) | (15,320,277) |
| Proceeds from borrowings | 17,561,558 | 16,920,892 | 13,101,441 |
| Cash received on sale of non-controlling interest | 1,100,000 | - | - |
| Distributions to trustors | (6,370,708) | (5,903,646) | (4,282,562) |
| Interest paid | (3,701,323) | (2,355,744) | (1,824,540) |
| Capital contribution | - | - | 31,232,804 |
| Net cash flows (used in) provided by financing activities | (4,813,674) | 6,048,765 | 22,906,866 |
| | | | |
| Cash and restricted cash | | | |
| Net (decrease) increase in cash and restricted cash | (441,798) | 5,495,070 | (863,610) |
| Cash and restricted cash at the beginning of the period | 5,995,918 | 500,848 | 1,364,458 |
| | | | |
| Cash and restricted cash at the end of the period | $    5,554,120 | $    5,995,918 | $    500,848 |

(Concluded)

See accompanying notes to these consolidated financial statements.

**11**

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.**
**Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Notes to Consolidated Financial Statements

**For the year ended December 31, 2016, 2015 and 2014**
**(In thousands of Mexican pesos)**

1.   **General information, acquisitions and relevant events**

    a.   ***General information and activities***

Fideicomiso F/1401 of Deutsche Bank Mexico, S. A. Institución de Banca Múltiple, División Fiduciaria ("Fibra UNO") was established as a real estate trust on January 12, 2011 by Fibra Uno Administración, S. A. de C. V. (the "trustor") and Deutsche Bank México, S. A., Institución de Banca Múltiple, División Fiduciaria (the "trustee"). Fibra UNO started operations on March 2011 and was established mainly to acquire and own a variety of real estate properties for the purpose of leasing and developing commercial, industrial and mixed-use properties as well as office buildings and land in the Mexican market.

Fibra UNO, as a real estate investment trust ("FIBRA" for its initials in Spanish), qualifies to be treated as a pass-through entity for Mexican federal income tax purposes. Therefore, all revenue from conducting Fibra UNO's operations is attributed to the holders of its real estate trust certificates ("CBFIs" for their acronym in Spanish) and Fibra UNO itself is not considered a taxable entity in Mexico according to Mexican Tax Laws and Regulations. In order to maintain FIBRA status, the articles 187 and 188 of the Mexican Income Tax Law have established that FIBRAs must distribute annually at least 95% of its taxable income to the holders of its CBFIs.

Fibra UNO has entered into the following relevant agreements:

    i.    An advisory services agreement with Fibra Uno Administración, S. A. de C. V. ("Fibra Uno Administración" or the "Advisor", related party) for the Advisor to assist Fibra UNO in establishing and implementing its investment and financial strategies.

    ii.    A property management agreement with FI Management, S. C. ("F1 Management") , Operadora CVC, A. C. ("Operadora CVC") and F1 Controladora de Activos, S. C. ("F1 Controladora de Activos") (subsidiary entities) to conduct the day-to-day management of the operations of Fibra UNO.

    iii.    A services agreement with F2 Services, S. C. ("F2 Services", related party) to perform certain leasing, billing and collection services on behalf of Fibra UNO, subject to its oversight and supervision.

    iv.    An agreement for advisory and property management services, related to certain properties, signed with Jumbo Administración, S. A. P. I. de C. V. ("Jumbo Administración", related party) under similar conditions as the aforementioned agreements.

    v.    A property management agreement signed with Finsa Holding, S. A. de C. V. to manage the day-to-day operations of the portfolio "Vermont".

    vi.    A property management agreement signed with Hines Interest, S. A. de C. V. to manage the day-to-day operations of the portfolio "Maine".

    vii.    A property management agreement signed with Consultora Centro Historico, S. A. de C. V. to manage the day-to-day operations of the portfolio "Hotel Centro Histórico".

    viii.    A property management agreement signed with Operadora Galgua, S. A. de C. V. to manage the day-to-day operations of the portfolio "Galerías Guadalajara"

**12**

ix.    A services agreement with F1 Administración, S. C. ("F1 Administración") (subsidiary entity) and Banco Invex, S. A. Institución de Banca Múltiple, Invex Grupo Financiero in its capacity as Fideicomiso F/2353 ("Fideicomiso F/2353"),to conduct the day-to-day management of the operations of Fideicomiso F/2353; and

x.     A construction services and management agreement with MTK Developers, S. C. (indirect subsidiary) for the construction of Mitikah project.

The address of Fibra UNO is Quintana Roo No. 3 Despacho 303, Col. Roma Sur, Mexico City.

b.   *Acquisitions*

| Portfolio | Acquisition date | Acquisition type |
|---|---|---|
| Midtown Jalisco (i) | July 21, 2016 | Development |
| Tower Vallarta (ii) | August 19, 2016 | Investment properties |
| Torre Cuarzo (iii) | June 27, 2016 | Development |
| Espacio Tollocan (iv) | June 1, 2016 | Development |
| Puerta de Hierro (v) | February 29, 2016 | Investment properties |
| El Salto Jalisco (vi) | February 23, 2016 | Investment properties |
| Alaska Portfolio (vii) | December 14, 2015 | Investment properties |
| Lamar Portfolio (viii) | November 19, 2015 | Investment properties |
| Artificios No. 40 (ix) | November 4, 2015 | Investment properties |
| Cuautipark II (x) | September 30, 2015 | Investment properties |
| Oregon Portfolio (xi) | June 11, 2015 | Investment properties |
| Indiana Portfolio (xii) | June 2, 2015 | Investment properties |
| Kansas Portfolio (xiii) | April 30, 2015 | Investment properties |
| Buffalo Portfolio (xiv) | April 17, 2015 | Development |
| Utah Portfolio (xv) | March 4, 2015 | Investment properties |
| Florida Portfolio (xvi) | February 27, 2015 | Investment properties |
| Samara (xvii) | December 16, 2014 | Investment properties |
| Insurgentes 476 (xviii) | September 24, 2014 | Investment properties |
| Insurgentes 1571 (xix) | September 24, 2014 | Investment properties |
| Christel House (xx) | August 24, 2014 | Development |
| La Viga (xxi) | July 23, 2014 | Investment properties |
| Península Vallarta (xxii) | July 15, 2014 | Investment properties |
| Galerías Guadalajara (xxiii) | July 15, 2014 | Investment properties |
| Hotel Centro Histórico (xxiv) | July 7, 2014 | Investment properties |
| Corporativo San Mateo (xxv) | June 25, 2014 | Investment properties |
| California Portfolio (xxvi) | May 5, 2014 | Investment properties |
| Maine Portfolio (xxvii) | February 19, 2014 | Investment properties |

i.     During the third quarter of 2016, Fibra UNO acquired the "Midtown Jalisco" property located in Guadalajara, Jalisco. The total acquisition price was $440 million. This property has a piece of land of 58,740.63 m2 approximately reserved for a mixed-use development that will generate 105,000 m2 of gross leasable area plus 225 hotel rooms.

ii.    On August 19 2016, Fibra UNO acquired the "Tower Vallarta" property, which is part of the "Turbo" portfolio, being the first type of all-inclusive hotel resort included in Fibra UNO portfolio, located in Puerto Vallarta. The total acquisition price was $1,477.1 million, of which was paid with a combination of cash and CBFIs.

iii.   On June 27, 2016, Fibra UNO acquired "Torre Cuarzo" property located in Mexico City. The property will have approximately 72,000 m2 of gross leasable area. As to date, the property is in the final stage of development and is expected to be delivered for the second quarter of 2017. The total acquisition price was $2,898.1 million.

**13**

iv.    On June 1, 2016, Fibra UNO entered into an asset acquisition agreement with Fideicomiso 2500, in which Tiendas de Discount Monterrey, S. A. de C. V. ("Soriana") acts as "Trustor A", Fibra UNO as "Trustor B" and Banco Actinver, S. A. Institución de Banca Múltiple, Grupo Financiero ("Actinver") as "Trustee". The trust agreement agreed the construction of "Espacio Tollocan" which includes a Soriana store and a shopping center, and through which Soriana provided a piece of land of 55,378 m2, whereby Fibra UNO made a payment of $229.3 million. Soriana will pay Fibra UNO to build the store for a total amount of $110 million. Once the project is completed both parts will create a condominium regime so Soriana owns its store and Fibra UNO the shopping mall.

v.     On February 29, 2016, Fibra UNO acquired the "Puerta de Hierro" property located in Guadalajara, Jalisco. The property has approximately 24,946 m2 of gross leasable area. The transaction consisted of a sale and lease back, as part of this acquisition Fibra UNO signed a lease agreement for a triple net lease with a duration of 10 years, allowing for a renewal of an additional 10 years. The total acquisition price was $700 million paid in cash.

vi.    On February 23, 2016, Fibra UNO acquired the "El Salto Jalisco" property, an industrial warehouse, located in Guadalajara, Jalisco. Fibra UNO paid 5,060,501 CBFI's equivalent to $180,000. One of the terms for the acquisition of El Salto Jalisco is that once the construction and equipment of a second industrial warehouse is completed of 21,388 m2 approximately, Fibra UNO will make a payment of $180,000 with CBFI's.

vii.   On December 14, 2015, Fibra UNO acquired the "Alaska" portfolio, in exchange for 148,327,000 CBFIs totaling $5,246,766; 5% of these CBFIs will remain in an escrow account for one year, subject to any contingency that could occur with respect to the property. These shares will not have any voting or economic rights during this period. The portfolio is comprised of six office buildings.

viii.  On November 19, 2015, Fibra UNO acquired the "Lamar" portfolio for cash consideration of $2,295,000. The portfolio is comprised of 4 university buildings located in Guadalajara belonging to Grupo ICEL. The transaction consisted of a sale and leaseback, as part of this acquisition Fibra UNO signed a lease agreement with Grupo ICEL, for a triple net lease with a duration of 10 years, allowing for a renewal of an additional 10 years.

ix.    On November 4, 2015, FIbra UNO acquired an office building located in Mexico City, for cash consideration of $52,950.

x.     On September 30, 2015, Fibra UNO acquired the "CuauttiPark II" industrial park. The total acquisition price was 19,806,720 CBFIs equivalent to $783,500 of which $700,741 were paid in CBFIs equivalent to 19,806,720 and $82,759 were paid in cash. The Property is located in the México-Queretaro highway km 39, Estado de México.

xi.    On June 11, 2015, Fibra UNO acquired the "Oregon" portfolio. The total acquisition price was 41,390,686 CBFIs equivalent to $1,626,000. The Oregon Portfolio consists of three malls located in Mexico City.

xii.   On June 2, 2015, Fibra UNO acquired the "Indiana" portfolio. The total acquisition price was $3,190,000. The Indiana portfolio consists of 13 "Grupo ICEL" campuses. The operation is a sale-and-lease-back under a triple-net lease contract with the option of a 10-year extension.

xiii.  On April 30, 2015, Fibra UNO acquired the "Kansas" portfolio. The total acquisition price was $10,452,127. The Kansas portfolio consists of 10 malls, five adjacent land plots for future expansions, two malls in stabilization process, and seven land plots for future expansion.

xiv.   On April 17, 2015, Fibra UNO acquired the "Buffalo" portfolio, which is a mixed-use development. The total acquisition price was US$185 million, equivalent to $2,820,418. The Buffalo portfolio includes the prestigious project known as "Mitikah", and is located in Southern Mexico City. The project will have various uses and components such as offices, a shopping center, a hotel and apartment tower.

**14**

xv.  On March 4, 2015, Fibra UNO acquired the "Utah" property, a corporate office building which is located in Mexico City on the Reforma-Lomas corridor. The total acquisition price was US $67.9 million, equivalent to $1,010,664.

xvi.  On February 27, 2015, Fibra UNO acquired the "Florida" corporate offices building. It is located in Mexico City on Insurgentes Sur Avenue, at the intersection with Barranca del Muerto Street. The total acquisition price was $640,098.

xvii.  On December 16, 2014, Fibra UNO acquired the corporate office and a shopping mall called Samara, located in Mexico City. The property has a gross leasable area of approximately 144,000 m2. The total acquisition price was $5,586 million, assuming debt for $1,232 million and a payment in CBFIs equivalent to $4,165 million.

xviii.  On September 24, 2014, Fibra UNO recorded the acquisition of the property called Insurgentes 476 as part of the portfolio P4 located in Mexico City. The property has a gross leasable area of approximately 9,691 m2. The total amount of acquisition was $216 million.

xix.  On September 24, 2014, Fibra UNO recorded the acquisition of the property called Insurgentes 1571 as part of the portfolio P4 located in Mexico City. The property has a gross leasable area of approximately 1,803 m². The total acquisition price was $64.3 million.

xx.  On August 24, 2014, Fibra UNO recorded the acquisition of a piece of land called "Christel House" located in Mexico City, for the development of educational facilities. The total acquisition price was $34.2 million.

xxi.  On July 23, 2014, Fibra UNO acquired Corporativo la Viga, located in Calzada de la Viga in Mexico City. The property has 22,538 m² approximately. The total acquisition price was $414.9 million.

xxii.  On July 15, 2014, Fibra UNO recorded the acquisition of the shopping mall Peninsula Vallarta as part of the portfolio R-15. It is located in Puerto Vallarta, Jalisco. The property has a gross leasable area of approximately 11,874 m2. The total acquisition price was $260 million of which $57.2 million were paid in cash and $202.8 million were paid with CBFIs.

xxiii.  On July 15, 2014, Fibra UNO recorded the acquisitions of the shopping mall Galerías Guadalajara, as part of the portfolio R-15, located in Guadalajara, in Jalisco. The property has approximately 72,492 m². The total acquisition price was $3,575 million, of which $739 million were paid in cash and $2,720 were paid with CBFIs.

xxiv.  On July 7, 2014, Fibra UNO recorded the acquisition of a hotel operated by the hotel chain Hilton and other tenants. It is located in the Centro Histórico, in downtown Mexico City. The total acquisition price was US $90 million, of which US $59 million were paid with CBFIs, plus debt assumed as part of the acquisition for US $31 million. The hotel has 458 rooms in approximately 40,000 m² of construction.

xxv.  On June 25, 2014, Fibra UNO recorded the acquisition of a property called Corporativo San Mateo located in Estado de México. The total acquisition price was $121 million. The property has a gross leasable area of approximately 5,440 m².

xxvi.  On May 5, 2014, Fibra UNO recorded the acquisition of portfolio California, the total acquisition price was US $274.8 million. To date Fibra UNO has paid US $92.6 million in cash and US $176.2 million with CBFIs. Fibra UNO will have to pay additional US 6 million if in the next 6 months the occupation increase to 15,550 m² approximately.

The portfolio consists of 29 properties located in Chihuahua, Coahuila, Nuevo León, San Luis Potosí and Tamaulipas with a gross leasable area of 345,469 m2 approximately. Additionally, the portfolio has a piece of land of 274,035 m2 approximately reserved for future expansions that will generate approximately 137,800 m2 of gross leasable area for industrial use in Monterrey and San Luis Potosí.

**15**

xxvii.  On February 19, 2014, Fibra UNO closed the acquisition of 5 industrial properties and a retail property to Hines Mexico (also called Maine). The total amount of the acquisition was U.S. $86.5 million and $472.4 million of Mexican pesos, respectively.

c.  ***Relevant events***

i.  On June 27, 2016, Trust agreement "Fideicomiso No. 2584" was executed, between Fibra UNO as "Trustor A" and Fideicomiso Irrevocable No. F/2353 (Banco INVEX, S. A., Multiple Banking Institution, INVEX Grupo Financiero ("Helios"), as "Trustor B" and Banco Actinver, S.A. Institución de Banca Múltiple, Grupo Financiero ("Actinver") as Trustee. The purpose of this Trust is to develop the mixed-use project named "Mitikah", through the commitment of Fibra UNO to contribute to the assets of Fideicomiso 2584, the "Buffalo" and "Colorado" portfolios, and the commitment of Helios to contribute in cash the necessary resources for the completion of the project.

The proceeds of this co-investment, whether as income derived from net income, reimbursement, partial or total divestment of the assets, may be distributed by the Trustee according to the times fixed by the Administrator.

On December 22, 2016, Fibra UNO contributed to the "Buffalo" portfolio with the assets of Fideicomiso 2584 of $3,660 million, for the development of the "Mitikah" project.

Fibra UNO maintains control over Fideicomiso 2584, so it consolidates the figures of this trust to its own; for therefore the contribution of the Buffalo portfolio to Fideicomiso 2584 is presented as of December 31, 2016 in the investment property section in the accompanying consolidated financial statements.

At December 31, 2016, Fibra UNO owns 76.89% of the assets of Fideicomiso 2584, while Fideicomiso 2353 owns 23.11%.

ii.  On October 4, 2016, Fibra UNO recovered $476.1 million in cash for the concept of Value Added Tax.

iii.  On September 30, 2016, Fibra UNO paid a loan assumed for the purchase of the Vermont Portfolio with "Blackstone" (formerly GE Real Estate) of $1,336.3 million, corresponding to the credit line that accrued interest at a fixed rate of 7.75%.

iv.  On September 23, 2016, Fibra UNO had a mortgage loan with HSBC Mexico, S. A., Multiple Banking Institution, Grupo Financiero HSBC ("HSBC") of $3,000 million at a rate TIIE plus 2%, maturing on September 15, 2023.

v.  On September 15, 2016, Fibra UNO prepaid the mortgage loan contracted with HSBC for $914 million, which accrued interest at a TIIE rate plus 2% and US 14.8 million, which accrued interest at a Libor rate plus 2% and had maturity on September 15, 2021.

vi.  On September 1, 2016 and August 31, 2016, Fibra UNO prepaid assumed credits for the purchase of the G-30 Portfolio with Banamex, as follows: US $3.31 million corresponding to interest-bearing credit at a Libor rate plus 1.90% and $152.1 million, corresponding to interest-bearing loans at the TIIE rate plus 1.90%, respectively

vii.  On August 31, 2016, Fibra UNO delivered a serious deposit for the purchase of the "FRIMAX" portfolio, for $366 million, which is shown in other accounts receivable.

viii.  On August 1, 2016, Fibra UNO prepaid a loan assumed for the purchase of the Portfolio Vermont with "Blackstone", for US $51.8 million that accrued interest at a Libor rate plus 3.45%.

ix.  During July 2016, as part of Fibra UNO's plan to limit the exchange rate risk arising from the bond issued in US dollars maturing in 2026, a currency Swap of US $40 million was contracted covering principal and interest.

**16**

x.      On July 11, 2016, Fibra UNO recovered $510.7 million in cash for value added tax.

xi.     On July 1, 2016, Fibra UNO entered into a reciprocal transaction to purchase and sell rates (COLLAR) for hedging purposes of $1,889.5 million, with a floor of 4.5% and a ceiling of 8.75% with maturity date on July 2, 2018.

xii.    During June 2016, Fibra UNO contracted foreign currency swaps for US $260 million, with the purpose of limiting the exchange rate risk arising from the bond issued in US dollars, due in 2016, of which US $100 million The principal and US $160 million cover principal and interest.

xiii.   On June 29, 2016, Fibra UNO had an unsecured credit line contracted with Banco Actinver, S.A. Institución de Banca Múltiple, Grupo Financiero ("Actinver"), for an amount of $410 million at a TIIE rate plus 1.80%, maturing on July 27, 2017.

xiv.    On June 28, 2016, Fibra UNO paid assumed credits for the purchase of the Morado Portfolio with Blackstone as follows: $236.3 million, corresponding to the interest-bearing credit at the rate of 3.40%; US $33.9 million corresponding to the interest-bearing credit at a Libor rate plus 2.70%, $825.7 million corresponding to the line of credit that accrued interest at the rate of 6.46% and $858.5 million pesos corresponding to interest-bearing credit at the rate of 6.46%.

xv.     On June 8, 2016, Fibra UNO issued a US $500 million unsecured debt issuance in the international markets. The bond issuance was a reopening, of which the first reopening of the bond matures in 2026 with a rate of 5.25% of US $200 million, and the second reopening of the bond matures in 2044 with a rate of 6.95% of US $300 million.

xvi.    On April 30, 2016, GP Servicios Industriales, S. A. de C. V. ceased providing management services to the California portfolio according with the signed contract.

xvii.   On April 12, 2016, Fibra UNO issued unsecured debt in the local market of $4.5 billion in three tranches; first tranche of 457,878,300 UDIS equivalent to $2,500 million at a rate of 4.6% maturating on April 1, 2027 and a slate key of FUNO 16U; second tranche of $800 million with a TIIE rate plus 65 basis points maturing on April 11, 2019 and a slate key FUNO 16; last tranche was a bond reopening at a rate of 8.4% of $1.2 billion maturing on December 4, 2023, with a slate key FUNO 13-2.

xviii.  On April 8, 2016, Fibra UNO made the prepayment of the unsecured credit line that had contracted with Inbursa, S.A. Institución de Banca Múltiple, Grupo Financiero Inbursa for Ps. 2,000 million pesos. The loan accrued interest at a TIIE rate plus 2%.

xix.    On February 26, 2016, Fibra UNO made a formal deposit of $100 million for the acquisition of the Torre Quarzo property located in Paseo de la Reforma, Mexico City. At the closing date of the transaction, the formal deposit was used for construction of Torre Quarzo.

xx.     On February 18, 2016, Fibra UNO recovered $1.026 million of value-added tax in cash.

xxi.    On February 8, 2016, Fibra UNO entered into a credit line with Actinver for an amount of $400 million accruing interest at TIIE + 1.80%, which has a maturity of July 17, 2016. Principal and interest were paid in full on April 18, 2016.

As of January 1, 2016 and derived from the second amendment agreement to Fideicomiso 1127/2010 (Torre Latino), in which Ecocinemas, S. A. de C. V. (Ecocinemas) as "Trustor A" and Fibra UNO as "Trustor B", will have the right to receive 22.53% and 77.47%, respectively, of the net proceeds of lease income and the eventual proceeds of the sale of Torre Latino; Fibra UNO recorded in its consolidated financial statements the non-controlling interest corresponding to 22.53% which represents the stake that Ecocinemas has over Torre Latino's equity. The effect of recognizing such non-controlling interest in the consolidated figures of Fibra UNO is shown in the accompanying consolidated financial statements.

xxii.   On December 15, 2015, Fibra UNO prepaid the loan with Metlife for $384,074. The loan accrued interest at a fixed rate of 10.11%.

xxiii.  On December 3, 2015, Fibra UNO carried out a bond issuance in the international markets, issuing an unsecured bonds for US $300 million (2026 Senior Notes) with a maturity of 10 years. These bonds mature on January 30, 2026 and accrue interest at a fixed rate coupon of 5.25%.

xxiv.   On November 26, 2015, Fibra UNO entered into an unsecured loan with Inbursa, SA, Institution of Banca Multiple, Grupo Financiero Inbursa (Inbursa) for $2,000,000 which accrues interest at a rate TIIE plus 2%. The loan has a maturity of November 26, 2016.

xxv.    On November 10, 2015, Fibra UNO signed the Terms and Conditions for the purchase of the "Torre Cuarzo" property located on Reforma, Mexico City in the amount of $1,323,400 and 46,484,779 CBFIs.

xxvi.   On July 29, 2015, Fibra UNO executed a dual - currency unsecured committed revolving credit facility for 5 years. Banco Santander (México), S. A. (Santander), is the administrator agent and BBVA Bancomer, S. A., HSBC México, S. A., Bank of America, Credit Suisse AG, Goldman Sachs Bank USA and Itaú Unibanco, S. A are the lenders. The total aggregate funding committed under the revolving credit facility is $7,000 million and US 410 million. The agreement was amended to include Deutsche Bank. The interest rate, with respect to the peso tranche, is the Mexican Interbank Equilibrium Rate (TIIE) plus a margin between 1.25 and 1.5 points; and with respect to the U.S. dollar tranche is the London Interbank Offered Rate (LIBOR) plus a margin between 1.25 and 1.5 points. As of December 31, 2016 and 2015 Fibra UNO has not drawn against the credit line.

xxvii.  On June 26, 2015, Fibra UNO concluded the process of increasing capital of a real estate development vehicle ("Helios") through the issuance of CBFIs in the form of capital calls not subject to the taxation of a FIBRA. The total amount of committed capital is $6,000,000 with an initial capital call of $1,200,000 equivalent to 20% of the total amount. Fibra UNO will be a co-investor in all projects of this vehicle with at least a 30% ownerships stake. F1 Management S. C., a subsidiary of Fibra UNO will act as Trustor and Administrator of the vehicle. As of December 31, 2016, UNO has made a contribution to the vehicle of $3,660,000.

xxviii. On June 17, 2015, Fibra UNO signed a current credit line with Banco Actinver, S. A, Institution of Banca Multiple ("Actinver") Actinver Financial Group, for up to $400 million a TIIE + 1.80 rate, which has a maturity at 17 July 2016. On February 8, 2016, Fibra UNO disposed of $400,000 which were liquidated on April 18, 2016. On June 29, 2016, Fibra UNO disposed of $410,000. The maturity date of this debt is July 17, 2017.

xxix.   On April 1, 2015, Fibra UNO made a prepayment on the U.S. dollar-denominated loan entered into with Metlife, in connection with Fibra UNO's acquisition of the Hilton Historic Center for $30.4 million. The loan accrued interest at a fixed rate of 7.5%.

xxx.    On February 4, 2015 Fibra UNO issued bonds in two tranches in the Mexican market for a total amount of $25,000 million. The first one for an amount of $7,500 million, named FUNO 15, accrues interest at a fixed rate of 6.99% and has a maturity of 10.5 years. The second one was the reopening of the FUNO 13 issuance for an amount of $2,500 million with a maturity date on June 10, 2019; this tranche accrues interest at the rate of TIIE plus 0.80%. The total amount of this tranche totals $6,850 million.

xxxi.   On December 18, 2014, a purchase-sale agreement was signed between Fibra UNO and Opción Volcan S. A. de C. V. to acquire the Portafolio called ("Utah"). The total amount of acquisition was US $67 million. As of December 31, 2014, the transaction has not been concluded. The transaction was concluded on April 4, 2015.

**18**

xxxii. On August 26, 2014, a memo of understanding between Fibra UNO and PREI Administradora, A. C. for the acquisition of the Portfolio called ("Kansas"), the total acquisition price was $10.5 million. As of December 31, 2014, the transaction has not been concluded. The transaction was concluded on April 30, 2015.

xxxiii. On June 10, 2014, Fibra Uno made its fourth offering of CBFIs in the amount of 800,400,000 CBFIs at a price of $41.00 pesos each, equivalent to $32,816.4 million including over-allocation option and especial offering. The total amount of the certificates are presented net of issuance costs in the consolidated statements of changes in trustors' capital.

With the resources from this offering Fibra UNO prepaid loans for $4,214 million.

xxxiv. On December 16, 2014, Fibra UNO recorded the acquisition of a piece of land located in Cancun, Quintana Roo, for the development of a shopping mall. The total acquisition price was $407.9 million.

xxxv. On January 23, 2014, Fibra UNO issued stock certificates in a global offering in two tranches, under the "Senior Notes" program; the first for an amount of US $600 million for 10-year term, bearing interest at a fixed rate of 5.25%, and the second tranche for an amount of US $400 million, for a 30-year term, bearing interest at a fixed rate of 6.95%. The principal for both issuances will be paid at maturity.

xxxvi. With the resources from the issuances mentioned above, during January and February 2014 Fibra UNO made the full payment of the following credit lines:

(1)    On February 5, 2014, a payment was made related to the loan agreement with Banamex in Mexican pesos, which accrued interest at TIIE rate plus a margin of 1.5 % with maturity on March 21, 2014 for principal and interest of $349,755 and $770, respectively.

(2)    On February 4, 2014, the current loan with Actinver for principal and interest of $300,000 and $1,722, respectively, were paid in full.

(3)    On February 4, 2014, an advanced payment was made related to the loan agreement (credit line), pledged by a mortgage guarantee with Inbursa for principal and interest of $807,269 and $5,799, respectively.

(4)    On January 31, 2014, and advance payment was made related to the loan with Banorte in Mexican pesos, which accrued interest at the TIIE rate plus a margin ranging from 1.7 % to 1.85 % with maturity on June 25, 2020 for principal and interest of $3,339,846 and $18,355, respectively.

(5)    On January 31, 2014, an advanced payment was made related to the loan with Santander which accrued interest on unpaid balances at the 28-day TIIE rate plus a margin of 1.90% for principal and interest of $650,000 and $3,185, respectively.

(6)    On January 30, 2014, Fibra UNO made a payment under the loan with Deutsche Bank AG London Branch for principal and interest of US $250 million and US $795, respectively.

(7)    On January 28, 2014, a payment was made a payment under the loan with BBVA Bancomer, which in Mexican pesos accrued interest at a TIIE rate plus a margin ranging from 1 to 1.3 % with maturity on April 28, 2020 for principal and interest of $521,942 and $2,122, respectively.

**19**

**2.    Basis of presentation**

a.    ***Reclassifications*** - Certain amounts in the consolidated financial statements as of and for the year ended December 31, 2015 and 2014 have been reclassified to conform to the presentation in 2016.

**3.    Application of new and revised International Financial Reporting Standards**

a.    ***Application of new and revised International Financing Reporting Standards ("IFRS" or "IAS") and interpretations that are mandatorily effective for the current year***

In the current year, Fibra UNO has applied a number of amendments to IFRSs and new Interpretation issued by the International Accounting Standards Board ("IASB") that are mandatorily effective for an accounting period that begins on or after January 1, 2016.

| | |
|---|---|
| Amendments to IAS 1 | Disclosure Initiative |
| Amendments to IAS 16 and IAS 38 | Clarification of Acceptable Methods of Depreciation and Amortization |
| Amendments to IFRS 10 and IAS 28 | Sale or Contribution of Assets between an Investor and its Associate or Joint Venture |
| Amendments to IFRS 2012-2014 Cycle | 2012-2014 Cycle |

b.    ***New and revised IFRS in issue but not yet effective***

Fibra UNO has not applied the following new and revised IFRS that have been issued but are not yet effective:

| | |
|---|---|
| IFRS 9 | Financial Instruments[2] |
| IFRS 15 | Revenue from Contracts with Customers[2] |
| IFRS 16 | Leases[3] |
| Amendments to IAS 12 | Income taxes[1] |
| Amendments to IAS 7 | Statements of Cash Flows[1] |
| Amendments to IFRS 2 | Classification and measurement of share-based payments[2] |

[1] Effective for annual periods beginning on or after 1 January 2017, with earlier application permitted.
[2] Effective for annual periods beginning on or after 1 January 2018, with earlier application permitted.
[3] Effective for annual periods beginning on or after 1 January 2019, with earlier application permitted.

**IFRS 9 *Financial Instruments***

IFRS 9 issued in November 2009 introduced new requirements for the classification and measurement of financial assets. IFRS 9 was subsequently amended in October 2010 to include requirements for the classification and measurement of financial liabilities and for derecognition and in November 2014 to include the new requirements for general hedge accounting. Another revised version of IFRS 9 was issued in July 2014 mainly to include a) impairment requirements for financial assets and b) limited amendments to the classification and measurement requirements by introducing a 'fair value through other comprehensive income' (FVTOCI) measurement category for certain simple debt instruments.

Key requirements of IFRS 9:

- All recognized financial assets that are within the scope of IAS 39 *Financial Instruments: Recognition and Measurement* are required to be subsequently measured at amortized cost or fair value. Specifically, debt investments that are held within a business model whose objective is to collect the contractual cash flows, and that have contractual cash flows that are solely payments of principal and interest on the principal outstanding are generally measured at amortized cost at the end of subsequent accounting periods. Debt instruments that are held within a business model whose objective is achieved both by collecting contractual cash flows and selling financial assets, and that have contractual terms that give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding, are generally measured at FVTOCI. All other debt investments and equity investments are measured at their fair value at the end of subsequent accounting periods. In addition, under IFRS 9, entities may make an irrevocable election to present subsequent changes in the fair value of an equity investment (that is not held for trading) in other comprehensive income, with only dividend income generally recognized in net income (loss).

**20**

- With regard to the measurement of financial liabilities designated as of fair value through profit or loss, IFRS 9 requires that the amount of change in the fair value of the financial liability that is attributable to changes in the credit risk of that liability is presented in other comprehensive income, unless the recognition of the effects of changes in the liability's credit risk in other comprehensive income would create or enlarge an accounting mismatch in profit or loss. Changes in fair value attributable to a financial liability's credit risk are not subsequently reclassified to profit or loss. Under IAS 39, the entire amount of the change in the fair value of the financial liability designated as fair value through profit or loss is presented in profit or loss.

- In relation to the impairment of financial assets, IFRS 9 requires an expected credit loss model, as opposed to an incurred credit loss model under IAS 39. The expected credit loss model requires an entity to account for expected credit losses and changes in those expected credit losses at each reporting date to reflect changes in credit risk since initial recognition. In other words, it is no longer necessary for a credit event to have occurred before credit losses are recognized.

- The new general hedge accounting requirements retain the three types of hedge accounting mechanisms currently available in IAS 39. Under IFRS 9, greater flexibility has been introduced to the types of transactions eligible for hedge accounting, specifically broadening the types of instruments that qualify for hedging instruments and the types of risk components of non-financial items that are eligible for hedge accounting. In addition, the effectiveness test has been overhauled and replaced with the principle of an 'economic relationship'. Retrospective assessment of hedge effectiveness is also no longer required. Enhanced disclosure requirements about an entity's risk management activities have also been introduced.

The management of the Entity anticipates that the application of IFRS 9 in the future may have a material impact on amounts reported in respect of the Entity's financial assets and financial liabilities. However, it is not practicable to provide a reasonable estimate of the effect of IFRS 9 until the Entity undertakes a detailed review.

**4.  Significant accounting policies**

a.  ***Statement of compliance***

The consolidated financial statements of Fibra UNO have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board.

b.  ***Basis of measurement***

The consolidated financial statements have been prepared on the historical cost basis, except for investment properties and investment in trust rights which are valued at their fair value, as explained in greater detail in the accounting policies below.

i.  Historical Cost

The historical cost is usually based on the fair value of the consideration given in exchange for assets.

ii.  Fair Value

Fair value is defined as the price that an entity would receive for selling an asset or that would be paid to transfer a liability in an orderly transaction among market participants in the market at the date of valuation.

c.  ***Cash and cash equivalents***

Cash and cash equivalents consist mainly of bank deposits in checking accounts. Cash equivalents are short-term investments, highly liquid and easily convertible into cash, maturing within three months as of their acquisition date, which are subject to immaterial value change risks. Cash is stated at nominal value and cash equivalents are measured at fair value.

**21**

d.   *Recognition of the inflation effects*

Cumulative inflation for the three prior fiscal years to December 31, 2016, 2015 and 2014 is 5.56%, 12.08% and 11.80%, respectively; therefore, the economic environment qualifies as non-inflationary in both years and consequently, the effects of inflation in the accompanying consolidated financial statements are not recognized. The inflation percentages for the years ended as of December 31, 2016, 2015 and 2014 were 3.36%, 2.13% and 4.08%, respectively.

e.   *Basis of consolidation*

The consolidated financial statements incorporate the financial statements of Fibra UNO and its subsidiaries controlled by it. Control is achieved when Fibra UNO has power over the investee, is exposed, or has rights, to variable returns from its involvement with the investee, and has the ability to use its power to affect its returns. The participation in the capital of the subsidiaries is as follows:

| Entity | Participation | | | Activity |
|---|---|---|---|---|
| | 2016 | 2015 | 2014 | |
| F1 Management | 99.99% | 99.99% | 99.99% | Management services and necessary functions to operate Fibra UNO's business. |
| F1 Controladora de Activos | 99.99% | 99.99% | 99.99% | Administration, coordination and supervision and collection services to Fibra UNO. |
| Trust F/00181 "Los Cabos, Baja California Sur" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00186 "Culiacán, Sinaloa" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00220 "Ayutla, Estado de Mexico" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00221"Parques Polanco, Distrito Federal" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00236 "Tepeji del Río, Hidalgo" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00246 "Ixtapaluca, Estado de México" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00257 "Juárez I Panamericana, Chihuahua" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00263 "Coatzacoalcos, Veracruz" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00276 "Pachuca, Hidalgo" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00277 "Poza Rica, Veracruz" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00312 "Juárez II Zaragoza, Chihuahua" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00468 " Galerías Diana, Acapulco Guerrero" | 100% | 100% | 100% | Real estate leasing |
| Trust F/231274 "Tulancingo, Hidalgo" | 100% | 100% | 100% | Real estate leasing |
| Trust F/233218 "Centrika, Monterrey, Nuevo León" | 100% | 100% | 100% | Real estate leasing |

**22**

| Entity | Participation | | | Activity |
|---|---|---|---|---|
| | **2016** | **2015** | **2014** | |
| Trust F/00493 "Fashion Mall, Chihuahua" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00478 "Texcoco, Estado de México" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00561 "Aguascalientes, Aguascalientes" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00738 "Huehuetoca, Estado de Mexico" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00761 "Santa Fe, Mexico City" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00781 "Plaza del Lago, Cuautitlán, Estado de Mexico" | 100% | 100% | 100% | Real estate leasing |
| Trust F/00740 "Centro Bancomer" | 100% | 100% | 100% | Office real estate leasing |
| Trust 435/2004 | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 547/2005 | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 631/2005 | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 635/2004 | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 700/2006 "San José Segunda Etapa" | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 721/2006 "Ecatepec" | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 722/2006 | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 1480/2013 "Parques Cuautitlán" | 100% | 100% | 100% | Real estate leasing |
| Trust 1487/2013 "Querétaro" | 100% | 100% | 100% | Industrial real estate leasing |
| Trust 1527/2014 | 100% | 100% | 100% | Industrial real estate leasing |
| Operadora CVC | 100% | 100% | 100% | Administrative services for the administration of domestic real estate |
| F1 Administración | 100% | 100% | - | Administrative services for the administration of F/2353 |
| MKT Developers, S.A. de C.V. | 99.99% | - | - | Services for the construction of investment properties |
| Trust 2584 "Centro Comercial Mitikah" | 76.89% | - | - | Development of the Mitikah project along with Helios |
| Trust 1127 "Torre Latino" | 77.47% | - | - | Office real estate leasing |
| Trust 2500 "Espacio Tollocan" | 100% | - | - | Shopping center development |

All intercompany balances and transactions have been eliminated.

The significant accounting polices follow by Fibra UNO are:

f.  ***Business combinations***

Acquisitions of businesses are accounted for using the acquisition method. The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition-date fair values of the assets transferred by the Trust, liabilities incurred by the Trust to the former owners of the acquiree and the equity interests issued by the Trust in exchange for control of the acquiree. Acquisition-related costs are generally recognized in statements of comprehensive income as incurred.

**23**

At the acquisition date, all the identifiable assets acquired and all the liabilities assumed are recognized at their fair value.

g. ***Financial instruments***

Financial assets and financial liabilities are recognized when the Entity becomes a party to the contractual provisions of the instrument.

Financial assets and financial liabilities are recognized initially at fair value. Transaction costs that are directly attributable to the acquisition or issue of a financial asset or liability (other than financial assets and liabilities that are recognized at fair value through profit or loss) are added to or deducted from the fair value of the financial asset or financial liabilities, as appropriate, on initial recognition. Transaction costs directly attributable to the acquisition of financial assets or financial liabilities at fair value through profit or loss are recognized immediately in income.

Subsequent measurement of financial instruments depends on the accounting category in which they are classified. Detail of the categories of financial instruments can be found in Note 13.

Cash

Cash consists mainly of bank deposits in checking accounts. Cash is stated at nominal value.

Restricted cash

Restricted cash consists of cash in the custody in various trusts. Its use is restricted to the payment of the current debt service and interest under the loan agreement with Banco Nacional de México, S. A. Institución de Banca Múltiple, Grupo Financiero Banamex ("Banamex") and Blackstone (formerly "GE Real Estate México"). Once payments are settled, funds remaining in these accounts will be released and may be used for the operation of Fibra UNO.

Financial assets at FVTP (Fair Value through Profit or Loss)

Financial assets are classified into the following specified categories: financial assets 'at fair value through profit or loss' ("FVTPL"), 'held-to-maturity' investments, 'available-for-sale' (AFS) financial assets and 'loans and receivables'. The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition. All regular way purchases or sales of financial assets are recognized and derecognized on a trade date basis. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame established by regulation or convention in the marketplace.

Financial assets are classified as of FVTPL when the financial asset is (i) contingent consideration that may be paid by an acquirer as part of a business combination to which IFRS 3 applies, (ii) held for trading, or (iii) it is designated as of FVTPL.

A financial asset is classified as held for trading if:

- It has been acquired principally for the purpose of selling it in the near term; or
- On initial recognition it is part of a portfolio of identified financial instruments that Fibra UNO manages together and has a recent actual pattern of short-term profit-taking; or
- It is a derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as of FVTPL upon initial recognition if:

- Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
- The financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Group's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or
- It forms part of a contract containing one or more embedded derivatives, and IAS 39 permits the entire combined contract to be designated as of FVTPL.

**24**

Financial assets at FVTPL are stated at fair value, with any gains or losses arising on remeasurement recognized in profit or loss. The net gain or loss recognized in profit or loss incorporates any dividend or interest earned on the financial asset and is included in the other income (expense), net, line item. Fair value is determined in the manner described in Note 13.

Loans and receivables

Accounts receivable, loans and other receivables that have fixed or determinable payments that are not quoted in an active market are classified as loans and receivables. Loans and receivables are recognized at amortized cost using the effective interest method and are subject to impairment tests.

Interest income is recognized by applying the effective interest rate, except for short-term receivables when the recognition of interest would be immaterial.

Impairment of financial assets

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at the end of each reporting period. Financial assets are considered to be impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been affected.

For AFS equity investments, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment.

For all other financial assets, objective evidence of impairment could include:

- Significant financial difficulty of the issuer or counterparty; or
- Breach of contract, such as a default or delinquency in interest or principal payments; or
- It becoming probable that the borrower will enter bankruptcy or financial re-organization; or
- The disappearance of an active market for that financial asset because of financial difficulties.

For certain categories of financial assets, such as trade receivables, assets are assessed for impairment on a collective basis even if they were assessed not to be impaired individually. Objective evidence of impairment for a portfolio of receivables could include the Entity's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period of 120 days, as well as observable changes in national or local economic conditions that correlate with default on receivables.

For financial assets carried at amortized cost, the amount of the impairment loss recognized is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate.

For financial assets that are carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in profit or loss.

When an AFS financial asset is considered to be impaired, cumulative gains or losses previously recognized in other comprehensive income are reclassified to profit or loss in the period.

**25**

For financial assets measured at amortized cost, if, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the previously recognized impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortized cost would have been had the impairment not been recognized.

In respect of AFS equity securities, impairment losses previously recognized in profit or loss are not reversed through profit or loss. Any increase in fair value subsequent to an impairment loss is recognized in other comprehensive income and accumulated under the heading of investments revaluation reserve. In respect of AFS debt securities, impairment losses are subsequently reversed through profit or loss if an increase in the fair value of the investment can be objectively related to an event occurring after the recognition of the impairment loss.

Derecognition of financial assets

Fibra UNO derecognizes a financial asset when the contractual rights to the cash flows from the asset expire, or when it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another party. If Fibra UNO neither transfers nor retains substantially all the risks and rewards of ownership and continues to control the transferred asset, Fibra UNO recognizes its retained interest in the asset and an associated liability for amounts it may have to pay. If Fibra UNO retains substantially all the risks and rewards of ownership of a transferred financial asset, Fibra UNO continues to recognize the financial asset and also recognizes a collateralize borrowing for the proceeds received.

On derecognition of a financial asset in its entirety, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognized in other comprehensive income and accumulated in equity is recognized in profit or loss.

On derecognition of a financial asset other than in its entirety (e.g. when Fibra UNO retains an option to repurchase part of a transferred asset), Fibra UNO allocates the previous carrying amount of the financial asset between the part it continues to recognize under continuing involvement, and the part it no longer recognizes on the basis of the relative fair values of those parts on the date of the transfer. The difference between the carrying amount allocated to the part that is no longer recognized and the sum of the consideration received for the part no longer recognized and any cumulative gain or loss allocated to it that had been recognized in other comprehensive income is recognized in profit or loss. A cumulative gain or loss that had been recognized in other comprehensive income is allocated between the part that continues to be recognized and the part that is no longer recognized on the basis of the relative fair values of those parts.

Fibra UNO derecognizes a financial asset, only when the contractual rights to the cash flows from the asset expire, or when substantially all the risks and rewards of ownership of the asset are transferred to another entity.

Classification as debt or equity

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangements.

The key feature in determining whether a financial instrument is a liability is the existence of a contractual obligation of Fibra UNO to deliver cash or another financial asset to the holder, or to exchange financial assets or liabilities under conditions that are potentially unfavorable. In contrast, in the case of an equity instrument the right to receive cash in the form of dividends or other distributions is at the Fibra UNO's discretion and, therefore, there is no obligation to deliver cash or another financial asset to the holder of the instrument.

Equity instruments

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Trust are recognized at the proceeds received, net of direct issue costs.

**26**

When Fibra UNO receives contributions or acquires properties which do not constitute a business, in return for its equity instruments, the transaction is recorded as a payment to third parties (other than employees) payable with share-based equity instruments, which are valued at the fair value of the assets received, except where the value cannot be estimated reliably. The effects on the financial position are recorded in the statement of changes in trustors' capital as "equity contributions" and do not impact current earnings. The fair value of the properties is estimated as described in Note 9.

Financial liabilities

Financial liabilities are classified as either financial liabilities at "FVTPL" or "other financial liabilities". Fibra UNO does not hold any financial liabilities at FVTPL.

Other financial liabilities (including long-term debt) are initially measured at fair value, net of transaction costs.

Other financial liabilities are valued subsequently at amortized cost using the effective interest method which is a method of allocating interest expense over the relevant period using the effective interest rate.

Derecognition of financial liabilities

Fibra UNO derecognizes a financial liability when its obligations are discharged, canceled or expire.

Financial equity instruments

Financial instruments issued by Fibra UNO, including over-allotment options, comply with the definition of equity instruments and are presented as such.

Embedded derivatives

Derivatives embedded in non-derivative host contracts are treated as separate derivatives when their risks and characteristics are not closely related to those of the host contracts and the host contracts are not measured at FVTPL. Fibra UNO has determined that it does not hold any embedded derivatives that require bifurcation.

Derivatives financial instruments

The Entity underwrites a variety of financial instruments to manage its exposure to the risks of volatility in interest rates and exchange rates, including foreign currency *forward* contracts, interest rate *swaps* and combined interest rate and foreign exchange swaps (*cross currency swaps*). Note 13 includes a more detailed explanation of derivative financial instruments. Derivatives are initially recognized at fair value at the date the derivative contract is entered into and are subsequently remeasured at fair value at the end of each reporting period. The resulting gain or loss from remeasurement to fair value is recognized in profit or loss unless the derivative is designated and effective as a hedging instrument, in which event the timing of the recognition in profit or loss depends on the nature of the hedge relationship.

*Hedge accounting*

The Entity designates certain derivative instruments as hedging with respect to foreign currency risk, either as fair value hedges, cash flow hedges, or hedges of the net investment in a foreign operation At the inception of the hedge relationship, the Entity documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Entity documents whether the hedging instrument is highly effective in offsetting changes in fair values or cash flows of the hedged item. Note 13 include details of the fair values of derivative instruments used for hedging purposes.

**27**

– *Fair value hedges*

The change in the fair value of the hedging instruments and the change in the hedged item attributable to the hedged risk are recognized in the line item in the statement of income and other comprehensive (loss) income relating to the hedged item. The change in the fair value of the hedging instrument and the change in the hedged item attributable to the hedged risk are recognized in the statement of operations item related to the hedged item.
The hedge accounting is discontinued when the Entity reverses the hedging relationship, when the hedging instrument expires or is sold, terminates, is exercised, or when it no longer meets the criteria for hedge accounting. The fair value adjustment of the carrying amount of the hedged item arising from the hedged risk is amortized against results as of that date.

– *Cash flow hedges*

The effective portion of changes in fair value of derivatives that are designated and qualify as cash flow hedges is recognized in other comprehensive income in the valuation of derivative instruments in cash flow hedge. The gains and losses relating to the non-effective portion of the hedging instrument are recognized immediately in profit or loss and included in the "Derivative financial instruments" item.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to results in the periods when the hedged item is recognized in results, in the same line item in the statement of income and other comprehensive income where the hedged item is recognized. However, when a forecasted transaction that is hedged gives rise to the recognition of a non-financial asset or a non-financial liability, the gains and losses previously accumulated in equity are transferred from equity and are included in the initial measurement of the cost of the non-financial asset or non-financial liability.

The hedge accounting is discontinued when the Entity reverses the hedging relationship, when the hedging instrument expires or is sold, terminates, is exercised, or when it no longer meets the criteria for hedge accounting. Any accumulated gain or loss on the hedging instrument that has been recognized in equity will continue in equity until the forecasted transaction is finally recognized in profit or loss. When the forecasted transaction is no longer expected to occur, the cumulative gain or loss on capital will be recognized immediately to results.

– *Hedges of net investments in foreign operations*

Hedges of net investments in foreign operations are accounted for similarly to cash flow hedges. Any gain or loss on the hedging instrument relating to the effective portion of the hedge is recognized in other comprehensive income and accumulated under the heading of foreign currency translation reserve. The gain or loss relating to the ineffective portion is recognized immediately in profit or loss, and is included in interest expense or income.

Gains and losses on the hedging instrument relating to the effective portion of the hedge accumulated in the foreign currency translation reserve are reclassified to profit or loss on the disposal of the foreign operation.

h.   **Investment properties**

Land and buildings held for use in the production or supply of goods and services, or for administrative purposes, are presented in the consolidated statement of financial position at their revalued amounts, calculating the fair value at the revaluation date, less any accumulated depreciation or accumulated impairment losses. Revaluations are made with sufficient frequency, so that the carrying amount does not differ materially from what would have been calculated using the fair values at the end of the reporting period.

**28**

Any increase in the revaluation of said land and buildings is recognized in other comprehensive income and accumulated in capital, except if it reverses a decrease in the revaluation of the same asset previously recognized in income, in which case the increase is credited to income in the measure In which it reduces the expenditure by the reduction previously effected. A decrease in the carrying amount that arose from the revaluation of said land and buildings is recorded in income to the extent that it exceeds the balance, if any, of the property revaluation reserve related to a previous revaluation of that asset.

Properties that are under construction for production, delivery or management purposes are recorded at cost less any recognized impairment losses. The cost includes professional fees and, in the case of qualifying assets, the costs for loans capitalized in accordance with Fibra UNO's accounting policy. Such properties are classified to appropriate categories of property, plant and equipment when they are complete for their intended use. The depreciation of these assets, as in other properties, begins when the assets are ready for their intended use.

Assets held under finance leases are depreciated based on their estimated useful life as well as their own assets. However, where there is no reasonable certainty that ownership is obtained at the end of the lease term, the assets are amortized over the shorter period between the life of the lease and its useful life.

An item of property, plant and equipment is derecognised when it is sold or when no future economic benefits are expected to result from continued use of the asset. The profit or loss arising from the sale or withdrawal of an item of property, plant and equipment is calculated as the difference between the proceeds received from the sale and the carrying amount of the asset and is recognized in profit or loss.

Fibra UNO´s Management uses its judgment to determine whether the acquisition of an investment property or an investment property portfolio constitutes a business combination or acquisition of an asset. In particular, the following criteria are used:

(i)     The number of land and building properties purchased.
(ii)    The extent to which relevant processes have been acquired and, in particular, the scope of complementary services provided by the acquired entity (including strategic management of processes, operational processes and resource management processes, including, but not limited to , Activities such as financial management in relation to ownership, significant management of capital investments associated with buildings, management of the type of contracts entered into and composition of tenants, acquisition of new leases).
(iii)   The extent to which the acquired entity has incorporated its own personnel to manage the properties and / or to implement processes (including any administrative system as in the case of billing, collection, generation of information for the owners in relation to the administration or respect to tenants).

i.     ***Investments in associates***

An associate is an entity over which the Trust has significant influence. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or joint control over those policies. Given the nature of certain of its investments in associates, Fibra UNO has designated those as under the equity method.

j.     ***Intangible assets***

1.     <u>Intangible assets acquired in a business combination</u>

Intangible assets acquired in a business combination and recognized separately from goodwill are initially recognized at their fair value at the acquisition date (which is regarded as their cost).

**29**

Subsequent to initial recognition, intangible assets acquired in a business combination are reported at cost less accumulated amortization and accumulated impairment losses, on the same basis as intangible assets that are acquired separately. The administrative platform, the Trust's most significant intangible asset acquired in a business combination, is amortized on a straight-line basis over a period of 20 years.

2.   Derecognition of intangible assets

An intangible asset is derecognized on disposal, or when no future economic benefits are expected from use or disposal. Gains or losses arising from derecognition of an intangible asset, measured as the difference between the net disposal proceeds and the carrying amount of the asset, and are recognized in profit or loss when the asset is derecognized.

k.   ***Impairment of tangible and intangible assets other than goodwill***

At the end of each reporting period, the Fibra UNO reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). When it is not possible to estimate the recoverable amount of an individual asset, the Fibra UNO estimates the recoverable amount of the cash-generating unit to which the asset belongs. When a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

l.   ***Borrowing costs***

Fibra UNO applies the scope exception with respect to capitalization of borrowing costs to investment properties, which are measured at fair value.

m.   ***CBFIs based payment***

1.   Share-based payment transactions of Fibra UNO

Equity-settled share-based payments to employees and others providing similar services to Fibra UNO are measured at the fair value of the equity instruments at the grant date. Details regarding the determination of the fair value of equity-settled CBFIs based transactions are set out in Note 18.

The fair value determined at the grant date of the equity-settled CBFIS-based payments is expensed on a straight line basis over the vesting period, based on Fibra UNO's estimate of equity instruments that will eventually vest, with a corresponding increase in equity. At the end of each reporting period, Fibra UNO revises its estimate of the number of equity instruments expected to vest. The impact of the revision of the original estimates, if any, is recognized in profit or loss such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to the equity settled employee benefits reserve.

Equity-settled CBFIs-based payment transactions with parties other than employees are measured at the fair value of the goods or services received, except where that fair value cannot be estimated reliably, in which case they are measured at the fair value of the equity instruments granted, measured at the date Fibra UNO obtains the goods or the counterparty renders the service.

**30**

For cash-settled CBFIs-based payments, a liability is recognized for the goods or services acquired, measured initially at the fair value of the liability. At the end of each reporting period until the liability is settled, and at the date of settlement, the fair value of the liability is remeasured, with any changes in fair value recognized in profit or loss for the year.

n.   ***Employee benefits***

<u>Retirement benefits costs from termination benefits</u>

Payments to defined contribution retirement benefit plans are recognized as an expense when employees have rendered service entitling them to the contributions.

For defined benefit retirement benefit plans, the cost of providing benefits is determined using the projected unit credit method, with actuarial valuations being carried out at the end of each annual reporting period. Remeasurement, comprising actuarial gains and losses, the effect of the changes to the asset ceiling (if applicable) and the return on plan assets (excluding interest), is reflected immediately in the statement of financial position with a charge or credit recognized in other comprehensive income in the period in which they occur. Remeasurement recognized in other comprehensive income is reflected immediately in retained earnings and will not be reclassified to profit or loss. Past service cost is recognized in profit or loss in the period of a plan amendment. Net interest is calculated by applying the discount rate at the beginning of the period to the net defined benefit liability or asset. Defined benefit costs are categorized as follows:

•   Service cost (including current service cost, past service cost, as well as gains and losses on curtailments and settlements).
•   Net interest expense or income, and
•   Remeasurement.

The retirement benefit obligation recognized in the consolidated statement of financial position represents the actual deficit or surplus in the Entity's defined benefit plans. Any surplus resulting from this calculation is limited to the present value of any economic benefits available in the form of refunds from the plans or reductions in future contributions to the plans.

A liability for a termination benefit is recognized at the earlier of when the entity can no longer withdraw the offer of the termination benefit and when the entity recognizes any related restructuring costs.

<u>Short-term employee benefits</u>

A liability is recognized for benefits accruing to employees in respect of wages and salaries, annual leave and sick leave in the period the related service is rendered at the undiscounted amount of the benefits expected to be paid in exchange for that service.

Liabilities recognized in respect of short-term employee benefits are measured at the undiscounted amount of the benefits expected to be paid in exchange for the related service.

<u>Statutory employee profit sharing</u>

As result of the PTU is recorded in the results of the year in which it is incurred and is presented in operating expenses line item in the consolidated statement of operations.

As result of the 2014 Income Tax Law, as of December 31, 2016 and 2015, PTU is determined based on taxable income, according to Section I of Article 9 of the that Law.

o.   ***Provisions***

Provisions are recognized when Fibra UNO has a present obligation (legal or constructive) as a result of a past event, it is probable that Fibra UNO will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

**31**

p.    *Deposits from tenants*

Fibra UNO obtains refundable deposits from tenants, mainly denominated in pesos, as security for the lease payments for a certain period. These deposits are accounted for as a financial liability (see financial instruments accounting policy above) and are initially recognized at fair value. If a relevant difference from the fair value and the cost at which the liability was initially recorded arises, it would be considered as an initial rent payment and consequently, it would be amortized over the lease term. The deposit would subsequently be measured at amortized cost.

q.    *Rental revenue*

Leases are classified as finance leases when the terms of the lease transfer substantially all the risks and benefits incidental to ownership. All other leases are classified as operating leases. Properties operated under operating leases are included under investment property in the accompanying consolidated statements of financial position.

Operating lease income, which is similar to the contractual lease payments except for the consideration of incentives granted, such as grace periods, are recognized on a straight line basis over the lease term, except for contingent rents (such as inflation), which are recognized when they earned. The lease term is the non-cancellable period of the contract, including additional terms for which the lessee has the option to extend, when at lease inception, management has a reasonable certainty that the lessee will exercise the option.

Revenues also include reimbursements of operating expenses, maintenance and publicity, and others, which are recognized in the period in which services are rendered.

r.    *Income taxes*

As further explained in Note 1, the Trust qualifies as a FIBRA under the Mexican Income Tax Law and, accordingly, no provision for income taxes is recognized. The current and deferred tax consequences of a change in tax status are included in profit or loss for the period, unless they relate to transactions are recognized directly in equity or in other comprehensive income.

s.    *Foreign currency*

Foreign currency transactions are recognized at the rates of exchange prevailing at the dates of the transactions. Monetary items denominated in foreign currencies are retranslated at the rates prevailing at that date. Exchange differences are recognized in profit or loss.

t.    *Statement of cash flows*

Fibra UNO presents its consolidated statements of cash flows using the indirect method. Interest received is classified as investing cash flow, while interest paid is classified as financing cash flow.

u.    *Derivative financial instruments*

The Entity enters into a variety of derivative financial instruments to manage its exposure to interest rate and foreign exchange rate risks, including foreign exchange forward contracts, interest rate swaps and cross currency swaps. Further details of derivative financial instruments are disclosed in Note 13.

Derivatives are initially recognized at fair value at the date the derivative contracts are entered into and are subsequently remeasured to their fair value at the end of each reporting period. The resulting gain or loss is recognized in profit or loss immediately unless the derivative is designated and effective as a hedging instrument, in which event the timing of the recognition in profit or loss depends on the nature of the hedge relationship.

**32**

Embedded derivatives

Derivatives embedded in non-derivative host contracts are treated as separate derivatives when they meet the definition of a derivative, their risks and characteristics are not closely related to those of the host contracts and the contracts are not measured at FVTPL.

**5.    Critical accounting judgments and key sources of estimation uncertainty**

In the application of Fibra UNO's accounting policies, which are described in Note 4, management is required to make judgments, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and associated assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognized in the period in which the estimate is revised if the revision affects only that period, or in the period of the revision and future periods if the revision affects both current and future periods.

a.    ***Critical judgments in applying accounting policies***

The following are the critical judgments, apart from those involving estimates (see below), that management has made in the process of applying the Fibra UNO's accounting policies and that have the most significant effect on the amounts recognized in the consolidated financial statements.

Lease classification

As explained in Note 4, leases are classified based on the extent to which risks and rewards incidental to ownership of a leased asset lie with Fibra UNO or the tenant, depending on the substance of the transaction rather than the form of the contracts. Fibra UNO has determined, based on an evaluation of the terms and conditions of the arrangements, that it retains all the significant risks and rewards of ownership of these property and thus accounts for leases as operating leases.

Business combinations

Management of the Trust applies its judgment when determining whether an acquisition of an investment property or a portfolio of investment properties is a business combination or an asset acquisition. Particularly, the following criteria are considered:

i.    The number of properties of land and buildings acquired.

ii.    The extent to which significant processes are acquired and in particular the extent of ancillary services provided by the acquiree (e.g., maintenance, cleaning, security, bookkeeping, other property services, etc.).

iii.    Whether the acquiree has allocated its own staff to manage the property and/or to deploy any processes (including all relevant administration such as invoicing, cash collection, provision of management information to the entity's owners and tenant information).

This determination can have significant impact in the accounting for the initial and subsequent recognition of assets and liabilities acquired. The transactions which occurred during the periods presented in the accompanying consolidated financial statements were accounted for as asset acquisitions.

b.    ***Key sources of estimation uncertainty***

The following are the key assumptions concerning key sources of estimation uncertainty at the end of the reporting period and that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

**33**

Valuation of investment properties

In order to estimate the fair value of the investment properties, management, with the assistance of an independent appraiser, selects the appropriate valuation techniques given the particular circumstances of each property and valuation. Critical assumptions relating to the estimates of fair values of investment properties include the receipt of contractual rents, expected future market rents, renewal rates, and maintenance requirements, discount rates that reflect current market uncertainties, capitalization rates and recent investment property prices. If there is any change in these assumptions or regional, national or international economic conditions, the fair value of property investments may change materially.

There have been no changes to valuation techniques during 2016, 2015 and 2014. The management of Fibra UNO considers that valuation techniques and critical assumptions used are appropriate to determine the fair values of its investment properties.

**6.   Cash and restricted cash**

|  | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Cash | $ | 5,543,788 | $ | 5,777,368 | $ | 181,675 |
| Restricted cash: | | | | | | |
| Financial reserve for bank loans | | 10,332 | | 218,550 | | 319,173 |
| Total cash and restricted cash | $ | 5,554,120 | $ | 5,995,918 | $ | 500,848 |

**7.   Financial investments**

|  | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Trading investments - Government securities | $ | 1,956,101 | $ | 2,300,596 | $ | 19,528,446 |

**8.   Lease receivables and others**

|  | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Lease receivables | $ | 1,084,690 | $ | 856,497 | $ | 722,986 |
| Allowance for doubtful accounts | | (94,096) | | (105,151) | | (59,483) |
| | | 990,594 | | 751,346 | | 663,503 |
| Other receivables | | 519,700 | | 46,523 | | 100,220 |
| | $ | 1,510,294 | $ | 797,869 | $ | 763,723 |

a.   Lease receivables and credit risk management

At the inception of lease contracts, Fibra UNO requests a refundable deposit from its customers to guarantee timely payment of rents on the commercial property leases, generally denominated in Mexican pesos, consisting, in most of the cases, of two months of rent, which is presented under the caption Deposit from tenants in the accompanying consolidated statements of financial position. In addition, depending of the characteristics of the commercial property, Fibra UNO may request a non-refundable deposit. Alternatively, Fibra UNO requests bonds and other guarantees from its customers. For anchor customers and other high credit quality customers the above guarantees may be waived.

**34**

On a combined basis, and considering only the figures during 2016, 2015 and 2014, Wal Mart and Santander tenants represents 10.4%, 13% and 7% of lease revenue, respectively.

Additionally, individual properties comprising the combined properties, may be individually subject to concentrations of credit risk.

Fibra UNO estimates an allowance for doubtful accounts to provide for unrecoverable amounts receivable. The estimation consist of 100% of past due accounts in legal procedure, 20% of past due accounts under extrajudicial processes and 20% of impairments approved by the Collection Committee. The allowance is reviewed on a periodic basis.

b.  Aging of receivables that are past due but not impaired

Currently, Fibra UNO holds monthly collection levels equal to its monthly billing period; business practices and negotiation allow Fibra UNO to maintain its accounts receivable with maturities of no greater than 26 days as of December 31, 2016.

**9.   Investment properties**

| Fair Value | 2016 | 2015 | 2014 |
|---|---|---|---|
| Investment property for leasing | $ 158,645,638 | $ 137,302,515 | $ 102,361,648 |
| Investment property under development | 11,634,209 | 12,115,917 | 8,538,012 |
| Property interests held under operating leases | 2,459,431 | 2,403,690 | 2,403,690 |
| | $ 172,739,278 | $ 151,822,122 | $ 113,303,350 |

| | Type | Number of properties | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Balance at the beginning of the period | | | $ 152,349,934 | $ 113,831,162 | $ 88,905,718 |
| Acquisitions: | | | | | |
| Midtown Jalisco | Development | 1 | 440,000 | - | - |
| Tower Vallarta | Retail | 1 | 1,477,096 | - | - |
| Torre Cuarzo | Development | 1 | 2,898,091 | - | - |
| Espacio Tollocan | Development | 1 | 229,295 | - | - |
| Puerta de Hierro | Retail | 1 | 700,000 | - | - |
| El Salto Jalisco | Industrial | 1 | 180,000 | - | - |
| Kansas Portfolio | Offices | 12 | - | 10,452,127 | - |
| Alaska Portfolio | Offices | 6 | - | 5,246,766 | - |
| Indiana Portfolio | Retail | 13 | - | 3,190,000 | - |
| Buffalo Portfolio | Development | 1 | - | 2,820,418 | - |
| Lamar Portfolio | Retail | 4 | - | 2,295,000 | - |
| Oregon Portfolio | Retail | 3 | - | 1,626,000 | - |
| Utah Portfolio | Offices | 1 | - | 1,010,664 | - |
| Cuatipark II | Industrial | 1 | - | 783,500 | - |
| Florida | Offices | 1 | - | 640,098 | - |
| Artificios No. 40 | Offices | 1 | - | 52,950 | - |
| Samara | Mixed | 1 | - | - | 5,586,000 |
| R-15 Portfolio | Retail | 2 | - | - | 3,835,434 |
| California Portfolio | Industrial | 29 | - | - | 3,638,928 |
| Maine Portfolio | Mixed | 6 | - | - | 1,673,636 |
| Centro Histórico Hotel | Retail | 1 | - | - | 1,173,506 |
| La Viga | Offices | 1 | - | - | 414,870 |
| P4 | Offices | 2 | - | - | 280,300 |

**35**

| | Type | Number of properties | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Corporativo San Mateo | Offices | 1 | - | - | 120,979 |
| Apolo Portfolio | Retail | 49 | - | - | - |
| G30 Portfolio | Mixed | 30 | - | - | - |
| Vermont Portfolio | Industrial | 34 | - | - | - |
| P8 Portfolio | Offices | 8 | - | - | - |
| Centro Bancomer | Offices | 1 | - | - | - |
| Universidad Autónoma de Guadalajara | Retail | 1 | - | - | - |
| Delaware Portfolio | Mixed | 1 | - | - | - |
| Pace Industries | Industrial | 1 | - | - | - |
| Edificio Corporativo Posadas | Offices | 1 | - | - | - |
| Parque Empresarial Cancún | Industrial | 1 | - | - | - |
| Tanara Aguascalientes | Retail | 1 | - | - | - |
| Morado Portfolio | Mixed | 16 | - | - | - |
| Villa Hermosa | Retail | 1 | - | - | - |
| Construction in progress | | | 5,350,778 | 5,808,522 | 3,805,582 |
| Fair value adjustments to investment properties (1) | | | 9,114,084 | 4,592,727 | 4,396,209 |
| Balance at the end of the period | | | $ 172,739,278 | $ 152,349,934 | $ 113,831,162 |

Significant assumptions utilized in determining fair value are as follows:

a.  CAP rate - This is a rate of profitability of a real estate investment property based on the expected income that the property will generate. The capitalization rate has been used to estimate the potential investor return on its investment, and is obtained by dividing the income generated from the properties, after fixed costs and variable expenses, by the total property value. CAP rates used in the Trust's discounted cash flows range from 8.00% in retail properties, from 8.00% in industrial properties, 8.50% in offices and 8.75% in hotels.

The CAP rate is determined by property, considering the geographic location, occupancy and/or vacancy percentage, remaining lease term, use and type of real estate, quality of the tenants, open and competitive market prices for in similar real estate properties in terms of use and type, income in dollars or pesos (both cases), country risk, inflation, and rental periods or terms.

As of December 31, 2016, change of +25 basis points in the CAP rate used for the valuation of the properties would result in a decrease in the fair value of investment properties and investment in associates of approximately $66,199,157 in retail properties, $23,997,401 in industrial properties, $15,688,453 in offices and $2,878,563 in hotels.

b.  Value per square meter in average leases (GLA) - This is obtained based on the use and construction classification of the property, bearing in mind its useful rentable area. Value in Mexican Pesos per square meter for average rentals used in the Trust's discounted cash flows range of Fibra UNO as of December 31, 2016 is from $9,519 in retail properties, from $1,239 in industrial properties and from $1,727 in offices. An increase in value per square meter for average rentals would result in an increase in the fair value of investment properties, while a decrease would have the opposite effect.

**36**

c.  Discount rate – Is obtained from considering the geographic location, occupancy and/or vacancy percentage, remaining lease term, use and type of real estate, quality of the tenants, open and competitive market prices for in similar real estate properties in terms of use and type, income in dollars or pesos (both cases), country risk, inflation, and rental periods or terms. Discount rates used in the Trust's discounted cash flows range from 9.50% in retail properties, from 9.00% in industrial properties, from 10.00% in offices and from 10.50% in hotels. An increase in the discount rate would result in a lower fair value of the Trust's investment properties, while a decrease would have the opposite effect.

The fluctuation of the fair value on investment properties of the period is recognized in the consolidated statements of operations under the heading adjustments to the fair value of investment properties.

All the investment properties of Fibra UNO are held under absolute control.

Fibra UNO obtains valuations by independent appraisers that hold recognized and relevant professional qualifications and have experience in the location and category of its investment properties.

## 10.  Advanced payment for the acquisition of investment property

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Fideicomiso F/249688 | $    - | $    - | 506,736 |
| PREI Administradora, S. C. | - | - | 400,000 |
| Opción Volcán, S. de R. L. de C. V. | - | - | 188,755 |
| Portafolio Florida | - | - | 25,604 |
|  | $    - | $    - | 1,121,095 |

## 11.  Investments in associates

|  | Participation % | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Torre Mayor | 49% | $   2,999,348 | $   2,416,838 | $   2,295,524 |
| Torre Diana | 50% | 2,179,552 | 697,051 | 558,487 |
|  |  | $   5,178,900 | $   3,113,889 | $   2,854,011 |

(1)  The Trust accounts for this investment under equity method, as required by IFRS, given the nature of the investment.

## 12.  Other assets

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Administrative platform (1) | $   2,043,674 | $   2,043,674 | $   2,043,674 |
| Implementation fees | 440,800 | 440,800 | 440,800 |
| Accumulated amortization | (593,951) | (392,949) | (194,984) |
| Others | 30,000 | 30,000 | - |
|  | $   1,920,523 | $   2,121,525 | $   2,289,490 |

(1)  The acquired administrative platform includes staff, technology and processes.

**37**

13.    **Financial instruments**

Categories of financial instruments

|  | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| ***Financial assets:*** | | | | | | |
| Cash and restricted cash | $ | 5,554,120 | $ | 5,995,918 | $ | 500,848 |
| Investment in government securities | | 1,956,101 | | 2,300,596 | | 19,528,446 |
| Lease receivables and other | | | | | | |
| recoverable accounts | | 1,510,294 | | 797,869 | | 763,723 |
| Due from related parties | | 80,293 | | - | | - |
| Advance payments | | 430,717 | | 459,660 | | 171,658 |
| Trading derivative instruments | | 4,578 | | - | | - |
| Derivative financial instruments | | | | | | |
| designated as hedges | | 510,477 | | - | | - |
| | | | | | | |
| ***Financial liabilities:*** | | | | | | |
| At amortized cost - | | | | | | |
| Trade accounts payable | $ | 3,063,563 | $ | 1,439,933 | $ | 931,104 |
| Due to related parties | | 93,266 | | 104,488 | | - |
| Borrowings | | 65,356,147 | | 54,815,515 | | 36,311,306 |
| Deposit from tenants | | 950,597 | | 702,303 | | 474,809 |

Capital management

Fibra UNO manages its capital to ensure that it will be able to continue as a going concern while maximizing the return to partners through the optimization of the debt and equity balances.

Fibra UNO's capital consists of debt and trustors' capital. Fibra UNO's objectives in managing capital are to ensure adequate operating funds are available to maintain consistent and sustainable CBFI distributions, to fund leasing costs and capital expenditure requirements, and to provide for resources needed to acquire new properties.

Management uses certain financial ratios related to debt, equity and earnings distributions to ensure capital adequacy and monitor capital requirements. The primary ratios used for assessing capital management are the Loans to Value ("LTV") and the Debt Service Coverage ratios ("DSCR"). These indicators assist Fibra UNO in assessing that the debt level maintained is sufficient to provide adequate cash flows for unit holder distributions and capital expenditures, and for evaluating the need to raise funds for further expansion.

Fibra UNO's Trust Agreement limits its borrowings to the minimum amount between an LTV ratio of 50% and a DSCR ratio of 1.2. For the year ended December 31, 2016, 2015 and 2014; Fibra UNO's LTV and DSCR were 34%, 32% and 25%, and of 2.4, 2 and 4.4 times, respectively.

Financial risk management objective

The objective of financial risk management is to meet financial expectations, results of operations and cash flows that will maximize the return to investors in CBFIs, to ensure the ability to make distributions to holders of CBFIs and to satisfy any future debt service obligations.

Fibra UNO's Technical Committee function provides services to the business, coordinates access to domestic financial markets and monitors and manages the financial risks relating to the operations of Fibra UNO through internal risk reports which analyze exposures by degree and magnitude of risks. These risks include market risk (including currency risk and interest rate risk), credit risk and liquidity risk.

Fibra UNO seeks to minimize the effects of these risks using derivative financial instruments to hedge risk exposures. The use of financial derivatives is governed by the Fibra UNO's policies approved by the Technical Committee and Trustors, which provide written principles on exchange rate risk, interest rate risk, credit risk, the use of derivative financial instruments and not Derivatives and the investment of excess liquidity. Internal auditors periodically review compliance with policies and exposure limits. The Entity does not subscribe or negotiate financial instruments, including derivative financial instruments, for speculative purposes.

**38**

The Corporate Treasury function reports quarterly to the Entity's risk management committee, which is an independent body that oversees the risks and policies implemented to mitigate risk exposures

Market risk management

The activities of Fibra UNO expose it primarily to interest rate risk and foreign currency exchange rate risk. The Trust obtains financing with different conditions, either from third or related parties, usually at variable interest rates exposing it to changes in market rates. Financing negotiated in U.S. dollars expose Fibra UNO to fluctuations in the exchange rate between such currency and its functional currency, the Mexican peso. Nevertheless, Fibra UNO has a natural hedge for financing denominated in U.S. dollars coming from the lease contracts that are denominated in the same currency, since cash flows provided by those leases are used to settle the aforementioned debts.

Fibra UNO subscribes derivative financial instruments to manage its exposure to exchange rate risk and interest rates, including:

-   Foreign currency swap contracts to cover exchange rate risk arising from the issuance of foreign currency debt, US dollars.

Market risk exposures are evaluated through sensitivity analysis. There have been no changes in Fibra UNO's exposure to market risks or the way these risks are managed and valued

Interest rate risk management

Fibra UNO enters into financing at variable rates, mainly, the 28-day Mexican Interbank Equilibrium Offered Rate ("TIIE") and London Inter Bank Offered Rate ("LIBOR"). The decision to acquire debt at variable rates is based upon market conditions when contracted. The Trust prepares sensitivity analyses of projected future cash flows to establish the maximum finance charge to maintain profitable projects.

Interest rate sensitivity analysis

The sensitivity analyses below have been determined based on the exposure to interest rates at the end of the reporting period. For floating rate liabilities, the analysis is prepared assuming the amount of the liability outstanding at the end of the reporting period was outstanding for the whole year. A 100 basis point increase or decrease is used when reporting interest rate risk internally to key management personnel and represents management's assessment of the reasonably possible change in interest rates.

If interest rates had been 200 basis points higher/lower and all other variables were held constant, Fibra UNO's net income and trustors' capital for the year ended December 31, 2016, would have (decreased) increased by approximately $(129.3) million and $129.3 million, respectively.

If interest rates had been 200 basis points higher/lower and all other variables were held constant, the net income and Other Comprehensive Income (ORI) of Fibra UNO for the period ended December 31, 2016, would have had an increase (decrease) of approximately $283 and $(332) million in the statement of operations and in the ORI line of $105 and $(124) million for foreign currency swap contracts.

Foreign currency risk management

Fibra UNO conducts transactions denominated in US dollars; therefore it is exposed to changes in exchange rates between the Mexican peso and the US dollar.

**39**

a)   The foreign currency monetary position is as follows:

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| US dollars (thousands): | | | |
| Monetary assets | 548,777 | 341,769 | 66,473 |
| Monetary liabilities | (1,944,434) | (1,760,346) | (1,712,729) |
| Net monetary liability position | (1,395,657) | (1,418,577) | (1,646,256) |
| Equivalent in Mexican pesos | $    (28,839,856) | $    (24,597,841) | $    (24,257,253) |

b)   The exchange rates, in pesos, in effect as of the date of the consolidated statements of financial position and the date of issue of the accompanying financial statements are as follows:

|  | December 31, 2016 | December 31, 2015 | December 31, 2014 | April 5, 2017 |
|---|---|---|---|---|
| US dollars | $    20.6640 | $    17.3398 | $    14.7348 | $    18.8334 |

Foreign currency sensitivity analysis

As of December 31, 2015, in the opinion of the management, the current exchange rate risk as a function of US dollar-denominated debt service is not significant, given a natural hedge provided by revenues also denominated in that currency. As of December 31, 2016, Fibra UNO obtained three borrowings in US dollars from different financial institutions. As of December 31, 2015, Fibra UNO obtained one borrowings in US dollars. As of December 31, 2014, Fibra UNO obtained three borrowings in US dollars from different financial institutions.

If exchange rates had been two Mexican pesos per US dollar higher/lower and all other variables were held constant, the Trust's net income and trustors' capital for the year ended December 31, 2016 would have (decreased) increased to its monetary liabilities approximately of $(3,746) and $3,746 million respectively. This amount would be offset by an increase (decrease) in foreign currency swap contracts that have been designated as hedges of $592 and $592 million, respectively.

Foreign currency sensitivity analysis

It is the policy of Fibra UNO to enter into foreign currency swap contracts to cover specific payments in foreign currency between 15% and 20% of the exposure generated.

During the current year, the Bank designated certain foreign currency swap contracts as coverage of its debt issue, whose functional currency is the US dollar. Six foreign currency swaps were contracted, four of which cover principal and interest being designated as fair value hedge and the remaining two foreign currency swaps cover only principal being designated as cash flow.

The following table details the foreign currency swap contracts in force at the end of the reporting period:

| Núm. | Counterpart | Notional USD (thousands) | Notional MXN (thousands) | Maturity | Active rate | Passive rate | Fair value with risk coverage | Type of coverage |
|---|---|---|---|---|---|---|---|---|
| 1 | Santander | $    50,000 | $    958,000 | 30-jan-2026 | 5.25% | TIIE 28 +3.34% | $    89,111 | VR |
| 2 | Santander | 50,000 | 958,000 | 30-jan-2026 | 0.00% | TIIE 28 −2.60% | 17,267 | FE |
| 3 | Bancomer | 60,000 | 944,750 | 30-jan-2026 | 5.25% | TIIE 28 +3.34% | 151,548 | VR |
| 4 | Bancomer | 50,000 | 944,750 | 30-jan-2026 | 5.25% | TIIE 28 +3.34% | 114,703 | VR |
| 5 | Bancomer | 40,000 | 739,000 | 30-jan-2026 | 5.25% | TIIE 28 +3.59% | 99,999 | VR |
| 6 | Bancomer | 50,000 | 944,750 | 30-jan-2026 | 0.00% | TIIE 28 - 2.77% | 37,849 | FE |
| | | $    300,000 | $5,489,250 | | | | $    510,477 | |

**40**

During the period, hedges, both cash flow and fair value, were highly effective in hedging exposure to the exchange rate. As a result of this hedge, the carrying amount of the US dollar credit was adjusted for $30,449, which was recognized in the income statement together with the fair value of the designated fair value hedge. For cash flow hedging, the changes associated with the exchange rate were reclassified from the ORI line to operating results.

Fibra UNO carried out a reciprocal transaction of purchase and sale of interest rate options (COLLAR) for negotiation purposes for a reference amount of $ 1,889.5 million. Fibra UNO would pay the counterpart if the TIIE rate is lower than 4.5% and the counterparty would pay Fibra UNO if the TIIE is higher than 8.5%. As of December 31, 2016, the fair value of this derivative amounted to $4,578 million, affecting the effect of valuation in financial instruments and is shown in the consolidated statement of operations.

Credit risk management

Credit risk refers to the risk that counterparty will default on its contractual obligations resulting in financial loss to Fibra UNO. Substantially all Fibra UNO income is derived from rental income from commercial property. As a result, its performance depends on its ability to collect rent from its tenants and its tenants' ability to make rental payments. Income and funds available for distribution would be negatively affected if a significant number of tenants, or any major tenants fail to make rental payments when due or close their businesses or declare bankruptcy.

As of December 31, 2016, 2015 and 2014, 10 largest tenants occupied approximately 24%, 27.1% and 25% of the total leasable area, respectively, and represented approximately 25%, 26.6% and 22% of revenues attributable to the Trust's investment property portfolio for the years then ended, respectively. In addition, as of December 31, 2016, one tenant occupied 696,865 of 7,369,935 $m^2$ of the total leasable area of Fibra UNO, which represents approximately 9.46% of the total leasable area and approximately 7.9% of the rental revenues for the year the ended. As of December 31, 2015, one tenant occupied 708,114 of 6,637,904 square meters of the total leasable area of Fibra UNO, which represents approximately 8.6% of the total leasable area and approximately 9.5% of the rental revenues for the year the ended. As of December 31, 2014, one tenant occupied 715,389 of 5,951,200 square meters of the total leasable area of Fibra UNO, which represents approximately 12% of the total leasable area and approximately 11% of the rental revenues for the year the ended.

Fibra UNO has adopted a policy of only dealing with creditworthy counterparties and obtaining sufficient collateral, where appropriate, as a means of mitigating the risk of financial loss from defaults.

Credit risk arises from balances of cash and cash equivalents, accounts receivable, and amounts due from related parties and financial investments. The maximum exposure to credit risk is the balance of each of those accounts as shown in the statement of financial position.

In relation with derivative financial instruments as of December 31, 2016, an adjustment for credit risk (CVA) was determined for the counterparties with which these instruments of $51 million have been contracted, which were recognized in the result of the year for Fibra UNO for the period ended December 31, 2016.

Liquidity risk management

Liquidity risk represents the risk that Fibra UNO will encounter difficulty in meeting its obligations associated with financial liabilities that are settled by delivering cash or another financial asset. Ultimate responsibility for liquidity risk management rests within Fibra UNO's Technical Committee, which has established an appropriate liquidity risk management framework for the management of Fibra UNO's short-, medium- and long-term funding and liquidity management requirements. Fibra UNO manages liquidity risk by maintaining adequate reserves, by continuously monitoring forecast and actual cash flows, and by matching the maturity profiles of forecasted rental cash flows and liabilities. The Treasury department monitors the maturity of liabilities to program payments.

**41**

The following tables detail Fibra UNO's remaining contractual maturity for its non-derivative financial liabilities with agreed repayment periods. The tables have been prepared based on the undiscounted cash flows of financial liabilities based on the earliest date on which Fibra UNO may be required to pay such obligations. The tables include cash flows related to both interest and principal. To the extent that interest is based on a variable rate, the undiscounted amount is derived from the spot interest rates at the end of the reporting period.

| December 31, 2016 | Up to 1 year | 1 to 5 years | More than 5 years | Total |
|---|---|---|---|---|
| Trade accounts payable | $   3,232,397 | $            - | $            - | $   3,232,397 |
| Due to related parties | 93,266 | - | - | 93,266 |
| Borrowings in pesos | 2,017,456 | 10,455,433 | 15,874,547 | 28,347,436 |
| Deposit from tenants | - | 825,067 | - | 825,067 |
| In thousands of Mexican pesos | $   5,343,119 | $  11,280,500 | $  15,874,547 | $  32,498,166 |
| Borrowings in dollars | $ 114,139,450 | $ 503,160,687 | $3,107,250,000 | $3,724,550,137 |
| Borrowings in UDIS | $  43,263,822 | $ 172,821,262 | $1,154,191,244 | $1,370,276,328 |

| December 31, 2015 | Up to 1 year | 1 to 5 years | More than 5 years | Total |
|---|---|---|---|---|
| Trade accounts payable | $   1,517,559 | $            - | $            - | $   1,517,559 |
| Due to related parties | 104,488 | - | - | 104,488 |
| Borrowings | 13,039,925 | 22,132,729 | 50,215,965 | 85,388,619 |
| Deposit from tenants | - | 512,680 | 189,623 | 702,303 |
|  | $  14,661,972 | $  22,645,409 | $  50,405,588 | $  87,712,969 |

| December 31, 2014 | Up to 1 year | 1 to 5 years | More than 5 years | Total |
|---|---|---|---|---|
| Trade accounts payable and accrued expenses | $   1,458,916 | $            - | $            - | $   1,458,916 |
| Borrowings | 3,737,182 | 21,852,532 | 31,789,727 | 57,379,441 |
| Deposit from tenants | - | 275,389 | 199,420 | 474,809 |
|  | $   5,196,098 | $  22,127,921 | $  31,989,147 | $  59,313,166 |

On December 31, 2016, 2015 and 2014, the interest payable in future periods, based on the terms of the outstanding loan contracts, amounts to slightly over $50,837 million pesos, $30,573 million pesos and $21,068 million pesos, respectively and should be considered in addition to the amounts indicated in the table of maturities.

**42**

<u>Fair value of financial instruments</u>

Fair value of financial instruments valued at FVTPL on a recurring basis:

| Financial assets/financial liabilities | Fair value as of | | Fair value hierarchy | Valuation technique(s) and key input(s) |
|---|---|---|---|---|
| | 31/12/16 | 31/12/15 | | |
| 1) Investments in Government securities (see Note 7) | $    1,956,101 | $    2,300,596 | Level 2 | Market value. The fair value of these investments is measured with quoted prices (unadjusted) in active markets for identical instruments. |
| 2) Foreign currency swaps (see Note 13) | $ 510,477 (assigned as hedging) | $    - | Level 2 | Discounted cash flow. Future cash flows are estimated on the basis of forward interest rates (based on performance curves observable at the end of the reporting period) and contractual interest rates discounted at a rate reflecting credit risk of several counterparts. |
| 3) Collar option | $4,578 (assigned as trading) | $    - | Level 2 | Black-Scholes model for interest rate options, using forward rates based on observable yield curves at the end of the reporting period and area of implied rate volatility. |

Fair value of financial instruments carried at amortized cost

The carrying amounts of accounts receivable, accounts payable and other financial assets and liabilities (including due to/from related parties) are of a short-term nature and, in some cases, bear interest at rates tied to market indicators. Accordingly, Fibra UNO believes that their carrying amounts approximate their fair value. Further, deposits from tenants approximate their fair value since the discount rate used to estimate their fair value upon initial recognition has not changed significantly.

The following table presents the carrying amounts and fair values of borrowings:

| | December 31, 2016 | | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|---|---|
| | Amortized cost | Fair value | Amortized cost | Fair value | Amortized cost | Fair value |
| Senior notes | $    37,195,200 | $    41,871,691 | $    22,541,740 | $    22,529,533 | $    14,734,800 | $    15,721,231 |
| Long-term CBFIs | 23,269,942 | 20,517,158 | 18,640,824 | 18,125,493 | 8,593,654 | 8,826,091 |
| Blackstone (formerly GE Real Estate México) | - | - | 8,866,400 | 9,062,159 | 9,354,298 | 8,584,888 |
| Inbursa | - | - | 2,000,000 | 2,029,817 | - | - |
| Bancomext | 1,515,291 | 1,665,149 | 1,335,043 | 1,419,785 | 1,190,423 | 1,209,384 |
| HSBC | 2,965,714 | 3,082,009 | 1,214,184 | 1,303,375 | 1,231,663 | 1,354,829 |
| MetLife | - | - | - | - | 848,294 | 949,074 |
| Banamex | - | - | 217,324 | 229,533 | 358,174 | 349,763 |
| Deutsche Bank | - | - | - | - | - | - |
| Banco Mercantil del Norte | - | - | - | - | - | - |
| BBVA Bancomer | - | - | - | - | - | - |
| Banco Inbursa | - | - | - | - | - | - |
| Actinver | 410,000 | 416,359 | - | - | - | - |
| Santander | - | - | - | - | - | - |
| | $    65,356,147 | $    67,552,366 | $    54,815,515 | $    54,699,695 | $    36,311,306 | $    36,995,260 |

On December 31, 2016, 2015 and 2014, the amounts of the costs of transaction were $580,043, $482,480, $390,672 and $139,594, respectively, (see Note 14).

43

F-46

*Valuation techniques and assumptions applied for the purpose of measuring fair value*

- The fair values of financial assets and financial liabilities with standard terms and conditions and traded on active liquid markets are determined with reference to quoted market prices (includes listed redeemable notes, bills of exchange, debentures and perpetual notes), which are considered Level 2.
- The fair values of other financial assets and financial liabilities (excluding those described above) are determined in accordance with generally accepted pricing models based on discounted cash flow analysis using actual transaction prices from observable markets and quotes for similar instruments. In particular, the fair value of long-term debt, which is considered a Level 2 measurement as per below, was determined using a discounted cash flow model using estimates of current market rates based on observable future curves for TIIE and a credit spread estimated from observable credit spreads for similar entities adjusted as needed.

Financial instruments that are measured subsequent to initial recognition at fair value are grouped into Levels 1 to 3 based on the degree to which the fair value is observable:

- Level 1 fair value measurements are those derived from quoted prices (unadjusted) in active markets for identical assets or liabilities;
- Level 2 fair value measurements are those derived from inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices), and
- Level 3 fair value measurements are those derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data (unobservable inputs).

**14.  Borrowings**

| | | | | | Summary of borrowings as of December 31, 2016 | |
|---|---|---|---|---|---|---|
| Type | Institution | Currency | Rate | Maturity | MXN Balance | USD Balance |
| Mortgage | Finsa Bancomext | USD | 4.89% | October, 2020 | $        - | 73,330 |
| Mortgage | HSBC Samara | MXN | TIIE + 2.0% | September, 2023 | 2,965,714 | - |
| Quirographer | Actinver | MXN | TIIE + 1.8% | July, 2017 | 410,000 | - |
| Debt bonds | National (FUNO 13-2) | MXN | 8.40% | December, 2023 | 3,120,900 | - |
| Debt bonds | National (FUNO 13) | MXN | TIIE + 0.80% | June, 2019 | 6,850,059 | - |
| Debt bonds | National (FUNO 15) | MXN | 6.99% | July, 2025 | 7,500,000 | - |
| Debt bonds | National (FUNO 13U) | UDIS | 5.09% | December, 2028 | 2,368,119 | - |
| Debt bonds | National (FUNO 16U) | UDIS | 4.60% | April, 2027 | 2,547,123 | - |
| Debt bonds | National (FUNO 16) | MXN | TIIE + 0.65% | April, 2019 | 883,750 | - |
| Debt bonds | International | USD | 5.25% | December, 2024 | - | 600,000 |
| Debt bonds | International | USD | 6.95% | January, 2044 | - | 700,000 |
| Debt bonds | International | USD | 5.25% | January, 2026 | - | 500,000 |
| | | | | December 31, 2016 | $   26,645,665 | 1,873,330 |
| | | | | Exchange rate as of December 31, 2016 (pesos per dolar) | | $       20.6640 |
| | | | | | | $   38,710,482 |
| | | | | Balance as of December 31, 2016, in thousands of Mexican pesos | | $   65,356,147 |
| | | | | Current | | (633,911) |
| | | | | Non-current | | 64,722,236 |
| | | | | Cost of transaction | | (580,043) |
| | | | | Fair value adjustment | | 30,449 |
| | | | | | | $   64,172,642 |

44

**Summary of borrowings as of December 31, 2015**

| Type | Institution | Currency | Rate | Maturity | MXN Balance | USD Balance |
|------|-------------|----------|------|----------|-------------|-------------|
| Mortgage | G-30 Banamex (Izt Ps.) 173.8 million FID 547 | MXN | TIIE + 1.90% | February, 2021 | $ 157,223 | - |
| Mortgage | G-30 Banamex (Izt Us.) US 4 million FID 547 | USD | Libor + 1.90% | February, 2021 | - | 3,466 |
| Mortgage | G-30 - Blackstone (formerly GE) Fid. 721/722 $1,480 million | MXN | 7.75% | October, 2016 | 1,366,756 | - |
| Mortgage | Morado - Blackstone (formerly GE) US 254.2 million | USD | 3.10% | July, 2016 | - | 238,943 |
| Mortgage | Morado - Blackstone (formerly GE) US 179 million | USD | Libor + 2.5875% | July, 2016 | - | 42,703 |
| Mortgage | Morado - Blackstone (formerly GE) $864.8 million | MXN | 6.16% | July, 2016 | 831,632 | - |
| Mortgage | Morado - Blackstone (formerly GE) $898 million | MXN | 6.16% | July, 2016 | 864,468 | - |
| Mortgage | Finsa Bancomext US 84.7 million | USD | 4.89% | October, 2020 | - | 76,993 |
| Mortgage | Finsa - Blackstone (formerly GE) US 58.7 | USD | Libor + 3.45% | July, 2018 | - | 53,049 |
| Mortgage | HSBC Samara | USD | Libor + 2.0% | September, 2021 | - | 15,301 |
| Mortgage | HSBC Samara | MXN | TIIE + 2.0% | September, 2021 | 948,868 | - |
| Mortgage | Inbursa | MXN | TIIE + 2.0% | November, 2016 | 2,000,000 | - |
| Debt bonds | National (FUNO 13-2) | MXN | 8.40% | December, 2023 | 2,000,000 | - |
| Debt bonds | National (FUNO 13) | MXN | TIIE + 0.80% | June, 2019 | 6,850,058 | - |
| Debt bonds | National (FUNO 15) | MXN | 6.99% | July, 2025 | 7,500,000 | - |
| Debt bonds | National (FUNO 13U) | UDIS | 5.09% | December, 2028 | 2,290,766 | - |
| Debt bonds | International | USD | 5.25% | December, 2024 | - | 600,000 |
| Debt bonds | International | USD | 6.95% | January, 2044 | - | 400,000 |
| Debt bonds | International | USD | 5.25% | January, 2026 | - | 300,000 |

| | | |
|---|---|---|
| December 31, 2015 | $ 24,809,771 | 1,730,455 |
| Exchange rate | $ 17.3398 | |
| | $ 30,005,744 | |
| Total equivalent in Mexican pesos | 54,815,515 | |
| Current | (10,123,627) | |
| Non-current | 44,691,888 | |
| Cost of transaction | (482,480) | |
| | $ 44,209,408 | |

**Summary of borrowings as of December 31, 2014**

| Type | Institution | Currency | Rate | Maturity | MXN Balance | USD Balance |
|------|-------------|----------|------|----------|-------------|-------------|
| Mortgage | Banamex $173.8 millio (G-30 FID 547 Izt) | MXN | TIIE + 1.90% | February, 2021 | $ 163,617 | - |
| Mortgage | Banamex USD 4 million (G-30 FID 547 Izt) | USD | Libor + 1.90% | February, 2021 | - | 3,671 |
| Mortgage | Banamex USD 10 million (G-30 FID 909 Tranche Tultipark) | USD | Libor + 1.80% | July, 2015 | - | 9,531 |
| Mortgage | MetLife $450 million (G-30 FID 435) | MXN | 10.11% | February, 2016 | 393,368 | - |
| Mortgage | GE Capital Real Estate USD 19.5 million (G-30 Tultipark) | USD | Libor + 1.80% | July, 2015 | - | 18,501 |
| Mortgage | GE Capital Real Estate $1,480 million (G-30 Fid. 721/722) | MXN | 7.75% | October, 2016 | 1,404,873 | - |
| Mortgage | GE Capital Real Estate USD 254.2 million (Morado) | USD | 3.10% | July, 2016 | - | 243,940 |
| Mortgage | GE Capital Real Estate USD 179 million (Morado) | USD | Libor + 2.5875% | July, 2016 | - | 105,260 |
| Mortgage | GE Capital Real Estate $864.8 million (Morado) | MXN | 6.16% | July, 2016 | 842,818 | - |
| Mortgage | GE Capital Real Estate $898 million (Morado) | MXN | 6.16% | July, 2016 | 875,858 | - |
| Mortgage | Bancomext USD 84.7 million (Finsa) | USD | 4.89% | November, 2020 | - | 80,801 |
| Mortgage | GE Capital Real Estate USD 58.7 (Finsa) | USD | Libor + 3.45% | July, 2018 | - | 55,148 |
| Mortgage | MetLife USD 31.1 million (Hotel Centro Histórico) | USD | 7.50% | July, 2015 | - | 30,874 |
| Mortgage | HSBC USD 16. 1 million (Samara) | USD | Libor + 2.0% | September, 2021 | - | 16,043 |
| Mortgage | HSBC $997.7 million (Samara) | MXN | TIIE + 2.0% | September, 2021 | 995,278 | - |

45

F-48

**Summary of borrowings as of December 31, 2014**

| Type | Institution | Currency | Rate | Maturity | MXN Balance | USD Balance |
|------|------------|----------|------|----------|-------------|-------------|
| Debt bonds | National (FUNO 13-2) | MXN | 8.40% | December, 2023 | 2,000,000 | - |
| Debt bonds | National (FUNO 13) | MXN | TIIE + 0.80% | June, 2019 | 4,350,058 | - |
| Debt bonds | National (FUNO 13U) | UDIS | 5.09% | December, 2028 | 2,243,613 | - |
| Debt bonds | International | USD | 5.25% | December, 2024 | - | 600,000 |
| Debt bonds | International | USD | 6.95% | January, 2044 | - | 400,000 |
| | | | | December 31, 2014 | $ 13,269,483 | 1,563,769 |
| | | | | Exchange rate (pesos per dollar) | $ | 14.7348 |
| | | | | | $ | 23,041,823 |
| | | | | Total equivalent in thousands of Mexican pesos | | 36,311,306 |
| | | | | Current | | (1,791,924) |
| | | | | Non-current | | 34,519,382 |
| | | | | Cost of transaction | | (390,672) |
| | | | | | $ | 34,128,710 |

The Trust's loan agreements contain various affirmative and negative covenants, for which Fibra UNO was in compliance as of the date of issuance of the accompanying consolidated financial statements. The most significant covenants are described below:

- Fibra UNO is required to pay, on or before the due date, all property and other related taxes due with respect to its operations.

- Maintain in good standing all properties and assets necessary for the proper operation of the Trust's business, outside of normal use, wear and tear of the properties.

- Maintain insurance on assets, with reputable agents, for amounts to cover risks associated with and sufficient to replace or repair damage to the properties.

- Maintain a debt service ratio (Net Operating Income (NOI) divided by and Debt Service, as those terms are defined in the indenture) of less than 1.20 to 1.

The maturities of long-term portion of long-term debt at December 31, 2016 are:

| | | |
|------|---|------------|
| 2018 | $ | 236,030 |
| 2019 | | 7,966,502 |
| 2020 | | 1,371,218 |
| 2021 | | 137,143 |
| 2022 | | 137,143 |
| 2023 and thereafter | | 54,874,200 |
| | $ | 64,722,236 |

**15.  Trade accounts payable and accrued expenses**

| | 2016 | 2015 | 2014 |
|------|------|------|------|
| Accounts payable for acquisition of investment property | $ 1,947,373 | $ 846,087 | $ 555,322 |
| Trade accounts payable | 985,461 | 86,945 | 112,277 |
| Accrued expenses | 168,834 | 434,413 | 996,919 |
| Interest payable | 130,729 | 545,714 | 263,505 |
| | $ 3,232,397 | $ 1,913,159 | $ 1,928,023 |

46

16.   **Deferred revenues**

The amounts of long-term deferred revenues at December 31, 2016, 2015 and 2014 are a $135,467, $261,968 and $159,174, respectively.

17.   **Transactions and balances with related parties**

Balances and transaction between Fibra UNO and its subsidiaries, which are related parties of Fibra UNO, have been eliminated of the consolidation and are not disclosed within this note.

a.   *Transactions with related parties were as follows:*

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Income: | | | |
| F1 Administración: | | | |
| Administration fees 1.25% (1) | $ 108,000 | $ 38,333 | $ - |
| Expenses: | | | |
| Fibra Uno Administración: | | | |
| Capitalized acquisition fees 3% (2) | $ 385,340 | $ 828,116 | $ 949,263 |
| Management fees 0.5% (2) | $ 577,235 | $ 533,224 | $ 370,869 |
| Parks Desarrolladora, S. A. de C. V.: | | | |
| Capitalized received services (5) | $ 1,493,093 | $ 1,801,200 | $ 880,810 |
| Coordinadora de Inmuebles Industriales, S. A. de C. V.: | | | |
| Capitalized received services | $ 367,065 | $ 855,943 | $ 689,000 |
| G-30 La Madre, S. A. P. I. de C. V.: | | | |
| Capitalized received services | $ 108,133 | $ 433,513 | $ 352,480 |
| Jumbo Administración: | | | |
| Real Estate management services (4) | $ 379,958 | $ 395,400 | $ 305,114 |
| F2 Services: | | | |
| Administrative services (3) | $ 257,834 | $ 207,607 | $ 134,357 |
| E- Administración y Construcción, S. A. de C. V. | | | |
| Capitalized received services | $ 15,901 | $ 89,657 | $ 44,837 |
| Luxe Administración y Control Inmobiliario, S. A. P. I. de C. V. | | | |
| Services received (6) | $ 223 | $ 2,375 | $ 3,038 |
| Cabi Inver, S. A. de C. V. | | | |
| Services received (6) | $ - | $ - | $ 742 |
| Fundación FUNO: | | | |
| Services (7) | $ 108,000 | $ 38,333 | $ - |

**47**

(1) Fibra UNO pays an administration fee in an amount equal to 1.25% of the maximum amount of investment.

(2) Fibra UNO pays an annual fee in an amount equal to 0.5% of the trustors' capital and a 3 % of the total value of acquired properties or contributed by other third parties, plus any applicable value-added taxes in exchange for advisory services.

(3) Fibra UNO pays a monthly fee in an amount equal to 2% of the lease payments received, plus any applicable value-added taxes in exchange for administrative services.

(4) Fibra UNO pays for real estate management services at an amount equivalent to 3% of monthly revenues collected related to rent, uses of spaces (kiosks or islands), management and maintenance fees, advertising and income from parking from the Morado portfolio.

(5) Fibra UNO executed a real state oversight services agreement. Fee is payable based on the construction progress.

(6) Fibra UNO pays to Cabi Inver, S. A. de C. V. and to Luxe Administración y Control Inmobiliario, S. A. P. I. de C. V. the equivalent of 5% of the rental amount under each new lease agreement (not including renewals or extensions of existing lease agreements) that it enters into as a result of their involvement, for a period of five years, beginning on the effective date of the lease agreement.

(7) Fibra UNO paid $80,293 in 2016 for the creation of the FUNO Foundation, approved by the Technical Committee.

The contracts with the aforementioned parties have terms of five years, renewable for additional periods.

b. **_Balances with related parties are as follows:_**

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Due from related parties: |  |  |  |
| Fundación FUNO, A. C. | $ 80,293 | $ - | $ - |
|  |  |  |  |
| Due to related parties: |  |  |  |
| F1 Administración | $ 72,900 | $ 88,951 | $ - |
| Jumbo Administración | 20,366 | 14,555 | - |
| Parks Mantenimiento, S. C. |  | 982 | - |
|  | $ 93,266 | $ 104,488 | $ - |

In addition to the aforementioned balance due to related parties, an additional amount is due to related parties for the acquisition of certain properties, which is also shown in the accompanying consolidated statements of financial position. Payment is expected to be made within one year, which depends on the completion of construction and the ultimate rental of the related retail space.

## 18.   CBFIs-based payments

At the annual Trustee Committee Meeting held on April 4, 2014, the trustee approved a long term executive compensation plan payable through a grant of 162,950,664 CBFIs payable in 10 years and granting no more than the 10% per year, except in the case that in previous years has not been granted the 10%, then it will be able to grant up to 20% per year. Fibra UNO records as expense on a straight-line basis during the vesting period, an estimate of the CBFIs that eventually will be vested. At the end of the year Fibra UNO will revise and adjust the estimate of the number and amount of CBFIs that expects will be awarded, by the support of valuations made by independent qualified experts. The effect of the revision of original estimates could differ significantly. For the years ended December 31, 2016, 2015 and 2014, compensation cost totaled por $169,997 $587,792 and $530,280; respectively. During 2016 and 2015, 18,261,112 and 8,734,156 CBFIs were issued as part of this plan.

**48**

### 19.  Trustors' capital

*Contributions*

a.  Fibra UNO was established by an initial contribution from the trustors of one thousands pesos plus the resources obtained from issuance of CBFIs.

b.  As of December 31, 2016, 2015 and 2014 there are the following outstanding CBFIs:

| Number of CBFIs | 2016 | 2015 | 2014 |
|---|---|---|---|
| In circulation | 3,249,305,750 | 3,197,579,138 | 2,878,386,926 |
| In treasury | 597,323,586 | 486,099,534 | 805,291,746 |

*Distributions*

Fibra UNO's Technical Committee has approved and paid distributions out of tax revenue accounts to CBFI holders as follows:

| Distribution date | Distributions |
|---|---|
| November 9, 2016 | $    1,586,799 |
| August 9, 2016 | 1,546,480 |
| May 9, 2016 | 1,607,651 |
| February 11, 2016 | 1,629,778 |
| Total as of December 31, 2016 | $    6,370,708 |
| November 9, 2015 | $    1,525,891 |
| August 7, 2015 | 1,499,273 |
| May 11, 2015 | 1,470,961 |
| February 16, 2015 | 1,407,521 |
| Total as of December 31, 2015 | $    5,903,646 |
| November 7, 2014 | $    1,432,474 |
| August 11, 2014 | 1,154,948 |
| May 9, 2014 | 826,813 |
| February 13, 2014 | 868,327 |
| Total as of December 31, 2014 | $    4,282,562 |

Net income per basic CBFI was calculated by dividing the net income for the period between the weighted average number of CBFIs with economic rights outstanding amounting to 3,699,543,494 CBFIs, 2,454,936,157 and 1,567,549,974 CBFIs for 2016, 2015 and 2014, respectively. Diluted net income per CBFI considered dilutive shares, as if the shares have been outstanding as of the date they were issued. Weighted average CBFIs considering dilutive CBFIs amounts to 3,829,348,363 CBFIs, 3,495,989,347 CBFIs and 3,260,227,903 CBFIs, respectively.

**49**

CBFIs issued as of December 31, 2016, 2015 and 2014 for the acquisition of investment properties:

| Acquired properties | CBFIs issued |
|---|---|
| Tower Vallarta | 27,016,726 |
| Torre Cuarzo | 31,519,509 |
| El Salto Jalisco | 5,060,501 |
| As of December 31, 2016 | 63,596,736 |
| Alaska | 148,327,000 |
| Oregon | 41,390,686 |
| CuautiPark II | 19,806,720 |
| As of December 31, 2015 | 209,524,406 |
| San Mateo | 2,950,000 |
| Hilton Centro Histórico | 21,875,000 |
| Galerías Guadalajara | 71,576,244 |
| Península Vallarta | 5,019,802 |
| Samara | 109,605,263 |
| As of December 31, 2014 | 211,026,309 |

## 20. Income taxes

In order to maintain FIBRA status, the tax authority "SAT" has established, per articles 187 and 188 of the Mexican Income Tax Law, that Fibra UNO must annually distribute at least 95% of its taxable income to the holders of its CBFIs. There are permanent and temporary differences between the comprehensive income displayed in the accompanying financial statements, and the fiscal result that serves as base to make distributions to the holders of the CBFIs. Accordingly, the administration made reconciliation between the two bases to determine the amount to be distributed. Most relevant differences are: (i) the fair value adjustment to properties investment, (ii) the inflationary adjustment, and (iii) the tax depreciation.

As of December 31, 2016, 2015 and 2014 the Trust has distributed $6,370,708, $5,903646 and $4,282,562; respectively, as an advance from its taxable income accounts and reimbursement of trustor's capital and management has expressed their intention of making the supplemental payments needed to comply with the aforementioned percentage and the related tax obligations.

## 21. Future minimum lease payments

The aggregate annual future minimum lease payments to be received under existing operating leases are as follows:

| Period | Retail | Industrial | Offices | Total |
|---|---|---|---|---|
| Up to 1 year | $ 5,466,685 | $ 2,803,849 | $ 2,030,876 | $ 10,301,410 |
| 1 to 5 years | 16,758,859 | 6,963,320 | 4,893,662 | 28,615,841 |
| More than 5 years | 8,641,876 | 1,748,029 | 1,680,755 | 12,070,660 |
| | $ 30,867,420 | $ 11,515,198 | $ 8,605,293 | $ 50,987,911 |

The lease contracts have remaining terms ranging from one to twenty years.

## 22. Revenues

The following information presents the Trust's revenues based on geographical area, industry and significant tenants.

**50**

a.   *Revenues by geographical region*

Revenues by geographical region are as follows:

| Estado | 2016 | Revenues 2015 | 2014 |
|---|---|---|---|
| Mexico City | $ 3,502,429 | $ 3,235,767 | $ 1,877,328 |
| State of Mexico | 2,618,778 | 2,016,062 | 1,977,598 |
| Jalisco | 1,332,913 | 809,825 | 530,272 |
| Nuevo León | 978,167 | 744,238 | 381,564 |
| Quintana Roo | 918,348 | 697,447 | 700,933 |
| Chihuahua | 276,402 | 295,784 | 210,469 |
| Tamaulipas | 322,888 | 289,805 | 181,836 |
| Coahuila | 253,631 | 201,726 | 53,651 |
| Guerrero | 123,720 | 154,938 | 82,322 |
| Veracruz | 192,080 | 145,385 | 176,124 |
| Sonora | 128,683 | 115,139 | 79,739 |
| Hidalgo | 126,844 | 99,036 | 89,367 |
| Yucatán | 96,127 | 88,051 | 45,989 |
| Nayarit | 97,256 | 77,322 | 91,230 |
| Baja California Sur | 55,593 | 73,974 | 1,720 |
| Aguascalientes | 76,199 | 70,426 | 33,738 |
| Guanajuato | 93,951 | 68,069 | 83,724 |
| Querétaro | 79,095 | 62,547 | 2,564 |
| Tabasco | 50,817 | 53,340 | 52,635 |
| Chiapas | 148,319 | 52,397 | 68,371 |
| Tlaxcala | 68,486 | 48,270 | 51,435 |
| Puebla | 47,301 | 35,023 | 38,162 |
| San Luis Potosí | 24,223 | 27,426 | 29,213 |
| Oaxaca | 33,271 | 26,355 | 27,873 |
| Durango | 31,480 | 22,871 | 26,282 |
| Morelos | 25,047 | 19,130 | 6,747 |
| Colima | 19,520 | 15,769 | 22,611 |
| Baja California | 16,522 | 13,577 | 45,654 |
| Sinaloa | 15,842 | 12,617 | 17,114 |
| Michoacán | 1,433 | 1,231 | 2,184 |
| Campeche | 1,242 | 1,069 | 1,302 |
| | $ 11,756,607 | $ 9,574,616 | $ 6,989,751 |

b.   *Revenues by industry*

*Retail*

The portfolio is composed of 325 investment properties with a stabilized client base; as of December 31, 2016 the gross leasable area is approximately 2,954,300 $m^2$.

*Industrial*

The portfolio is composed of 105 investment properties with a client base stabilized, as of December 31, 2016 the gross leasable area is approximately 3,570,300 $m^2$.

*Office*

The portfolio is composed of 86 investment properties with a client base stabilized, as of December 31, 2016 the gross leasable area is approximately 845,300 m2.

**51**

| Use of property | 2016 Value of investment properties | Gross Leasable Area (GLA) | Revenue |
|---|---|---|---|
| Retail | $ 40,974,380 | 2,954,300 | $ 7,569,877 |
| Industrial | 88,465,128 | 3,570,300 | 2,813,474 |
| Office | 43,299,770 | 845,300 | 1,373,256 |
| | $ 172,739,278 | | $ 11,756,607 |

| Use of property | 2015 Value of investment properties | Gross Leasable Area (GLA) | Revenue |
|---|---|---|---|
| Retail | $ 34,217,357 | 2,857,000 | $ 5,463,229 |
| Industrial | 80,670,009 | 3,401,000 | 2,542,576 |
| Office | 25,346,651 | 822,000 | 1,568,811 |
| | $ 140,234,017 | | $ 9,574,616 |

| Use of property | 2014 Value of investment properties | Gross Leasable Area (GLA) | Revenue |
|---|---|---|---|
| Retail | $ 31,058,106 | 2,164,835 | $ 3,355,080 |
| Industrial | 59,341,055 | 3,136,000 | 2,096,925 |
| Office | 14,893,989 | 650,406 | 1,537,746 |
| | $ 105,293,150 | | $ 6,989,751 |

**23.   Commitments and contingencies**

a.   Except as noted otherwise, neither the Trust nor its assets are subject to any type of legal action, other than those stemming from its routine operations and activity.

b.   On February 2, 2017 the Fibra UNO Technical Committee approved (under previous authorization of the majority of the independent members) distributions of the net tax result accounts up to $1,662.5 million. This distribution will be paid no later than February 9, 2017.

c.   As part of the agreement for the acquisition of the "G-30" Portfolio, Fibra UNO is obliged to pay the needed costs for the conclusion of certain works currently in process, of $5,700,000 approximately, of which $5,057,500 has been utilized.

d.   As part of the agreement for the acquisition of the "El Salto Jalisco" property and once the contributor concludes the construction and equipment of a second industrial warehouse of 21,388 m2 approximately, which is part of this project, Fibra UNO is forced to make a payment of $180 million with CBFIs.

e.   As part of the Trust Agreement 2500 in which it was agreed to build "Espacio Tollocan" which includes the construction of a Soriana store whom will pay an amount of $110 million to Fibra UNO to build its store.

**24.   Transactions that did not affect cash flows**

Investment properties in 2016 increased by $963,854 with respect to the acquisition of the Tower Vallarta property, $1,124,156 with respect to the acquisition of the Torre Cuarzo property and $180,000 with respect to the acquisition of the El Salto Jalisco property, which were financed through the issuance of CBFIs. Investment properties in 2015 increased by $5,246,766 with respect to the acquisition of the Alaska Portfolio, $1,626,000 in relation with Oregon Portfolio and $700,741 with respect to the acquisition of the Cuautipark II Portfolio, which were financed through the issuance of CBFIs. Additionally, investment properties increased by $1,121,095 as a result of advanced payments made in 2014 that were applied to investment properties in 2015.

**52**

**25.    Subsequent events**

During January 2017, as part of Fibra UNO's plan to limit exchange rate risk arising from the bond issued in US dollars maturing in 2026, Fibra UNO contracted two currency swaps, one for US $75 million and the second one for US $25 million, covering principal and interest.

**26.    Approval of consolidated financial statements**

The accompanying condensed consolidated financial statements were authorized for issuance on April 5, 2017 by Lic. Gerardo Vargas Ateca, Finance vice president of Fibra UNO, in accordance with the Committee approval; consequently do not reflect events occurring after that date. These consolidated financial statements are subject to the approval at the trustors' meeting, where they may be modified. Consequently, these financial statements do not reflect events after this date.

\* \* \* \* \* \*

**53**

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

Unaudited Condensed Consolidated Interim Financial Statements as of June 30, 2017, and for the Three and Six Months Ended June 30, 2017 and 2016, and Independent Auditors´ Report Dated August 25, 2017



**Fideicomiso Irrevocable No. F/1401
(Deutsche Bank México, S. A. Institución de Banca Múltiple,
División Fiduciaria) and Subsidiaries**

# Independent Auditors´ Report and Unaudited Condensed Consolidated Interim Financial Statements for the Three and Six Months Ended June 30, 2017 and 2016

**Table of contents** | **Page**
--- | ---
Independent Auditors´ Report | 1
Unaudited Condensed Consolidated Interim Statements of Financial Position | 3
Unaudited Condensed Consolidated Interim Statements of Operations | 5
Unaudited Condensed Consolidated Interim Statements of Changes in Trustors' Capital | 6
Unaudited Condensed Consolidated Interim Statements of Cash Flows | 7
Notes to Unaudited Condensed Consolidated Interim Financial Statements | 9



# Deloitte.

Galaz, Yamazaki,
Ruiz Urquiza, S.C.
Paseo de la Reforma 505
Colonia Cuauhtémoc
06500 Ciudad de México
México

Tel: +52 (55) 5080 6000
www.deloitte.com/mx

# Limited review report from Independent Auditors to the Technical Committee and Trustors of Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries

### Introduction

We have conducted a limited review of the unaudited condensed consolidated interim statements of financial position of Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and subsidiaries ("Fibra UNO") ended June 30, 2017 and unaudited condensed consolidated interim statements of operations for the three and six months ended June 30, 2017 and 2016, and unaudited condensed consolidated interim statements of changes in Trustors´ capital and unaudited condensed consolidated interim statements of cash flows for the six months period then ended, and notes to consolidated financial statements, including a summary of significant accounting policies ("Unaudited Condensed Consolidated Interim Financial Statements"). Management is responsible for the preparation and fair presentation of the accompanying condensed consolidated financial statements in accordance with International Accounting Standards (IAS 34) "Interim Financial Reporting". Our responsibility is to express a conclusion on these condensed consolidated interim financial statements based on our review.

### Scope of the review

Our review was conducted in accordance with International Standard on Review Engagements 2410, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity". An interim financial information review consists of conducting inquiries, primarily with staff responsible for financial and accounting matters, as well as analytical procedures and other review procedures. A review is substantially less in scope than an audit in accordance with International Standards on Auditing, therefore, there is no assurance to acknowledge all the significant matters that could be identified with an audit. Consequently, we do not express an audit opinion on the condensed consolidated interim financial information.

*(Continued)*

Deloitte se refiere a Deloitte Touche Tohmatsu Limited, sociedad privada de responsabilidad limitada en el Reino Unido, y a su red de firmas miembro, cada una de ellas como una entidad legal única e independiente. Conozca en www.deloitte.com/mx/conozcanos la descripción detallada de la estructura legal de Deloitte Touche Tohmatsu Limited y sus firmas miembro.

# Deloitte.

### *Conclusion*

Based on our review, we were not aware of any situation that would call our attention to consider that the accompanying unaudited condensed consolidated interim financial information does not present fairly, in all material respects, the condensed consolidated financial position of Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and subsidiaries as of June 30, 2017, and its condensed consolidated statements of operations for the three and six month periods ended June 30, 2017 and 2016, and consolidated changes in Trustors´ capital and condensed consolidated cash flows for the six month period then ended, in accordance with IAS 34, "Interim Financial Reporting".

Galaz, Yamazaki, Ruiz Urquiza, S. C.
Member of Deloitte Touche Tohmatsu Limited

C. P. C. Carlos M. Pantoja Flores
Mexico City, Mexico
August 25, 2017

*(Concluded)*



**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Unaudited Condensed Consolidated Interim Statements of Financial Position

As of June 30, 2017 (Unaudited) and December 31, 2016 (Audited)
(In thousands of Mexican pesos)

## Assets

| | Notes | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|---|
| Current assets: | | | |
| Cash and restricted cash | 4. | $ 1,870,940 | $ 5,554,120 |
| Financial investments | 5. | 2,122,509 | 1,956,101 |
| Lease receivables | 6. | 1,221,790 | 990,594 |
| Other accounts receivable | 7. | 833,632 | 519,700 |
| Due from related parties | 14. | 147,957 | 80,293 |
| Recoverable taxes, mainly value-added tax | | 1,808,089 | 2,141,696 |
| Prepaid expenses | | 972,589 | 430,717 |
| Total current assets | | 8,977,506 | 11,673,221 |
| Non-current assets: | | | |
| Investment properties | 8. | 183,897,093 | 172,739,278 |
| Investments in associates | 9. | 4,195,509 | 5,178,900 |
| Derivative financial instruments | 12. | 368 | 515,055 |
| Other assets | 10. | 1,809,193 | 1,920,523 |
| Total non-current assets | | 189,902,163 | 180,353,756 |
| Total assets | | $ 198,879,669 | $ 192,026,977 |

## Liabilities and Trustors' capital

| | Notes | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|---|
| Current liabilities: | | | |
| Borrowings | 11. | $ 1,631,569 | $ 633,911 |
| Trade accounts payable and accrued expenses | 13. | 1,260,296 | 1,285,024 |
| Accounts payable for acquisition of investment properties | | 4,051,222 | 1,947,373 |
| Deferred revenues | | 159,889 | 165,362 |
| Due to related parties | 14. | 122,287 | 93,266 |
| Total current liabilities | | 7,225,263 | 4,124,936 |
| Non-current liabilities: | | | |
| Borrowings | 11. | 60,239,108 | 64,172,642 |
| Other accounts payable - Long term | | 107,169 | 125,530 |
| Deposit from tenants | | 837,125 | 825,067 |
| Derivative financial instruments | 12. | 702,515 | - |
| Accruals and deferred income classified as non-current | | 166,164 | 135,467 |
| Total non-current liabilities | | 62,052,081 | 65,258,706 |
| Total liabilities | | 69,277,344 | 69,383,642 |

*(Continued)*



3

| Liabilities and Trustors' capital | Notes | June 30, 2017 (Unaudited) | | December 31, 2016 (Audited) | |
|---|---|---|---|---|---|
| Trustors' capital: | | | | | |
| Trustors' capital | 15. | $ | 94,925,839 | $ | 95,383,575 |
| Retained earnings | | | 32,375,413 | | 25,524,669 |
| Valuation of derivative financial instruments | | | (133,315) | | (103,006) |
| Controlling interest | | | 127,167,937 | | 120,805,238 |
| Non-controlling interest | | | 2,434,388 | | 1,838,097 |
| Total Trustors' capital | | | 129,602,325 | | 122,643,335 |
| Total liabilities and Trustors' capital | | $ | 198,879,669 | $ | 192,026,977 |

*(Concluded)*

See accompanying notes to unaudited condensed consolidated interim financial statements.



4

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.
Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

## Unaudited Condensed Consolidated Interim Statements of Comprehensive Income
For the six and three months ended June 30, 2017 and 2016
(In thousands of Mexican pesos, except net income per CBFI)

| | Six months ended as of June, 30 | | Three months ended as of June 30, | |
| --- | --- | --- | --- | --- |
| | 2017 (Unaudited) | 2016 (Unaudited) | 2017 (Unaudited) | 2016 (Unaudited) |
| Revenue from: | | | | |
| Leases | $ 6,275,127 | $ 5,658,034 | $ 3,136,113 | $ 2,830,737 |
| Maintenance | 647,747 | 590,168 | 335,099 | 299,738 |
| Dividend revenues from beneficiary rights | 125,156 | 76,016 | 61,606 | 38,332 |
| Administration fee | 95,988 | 37,500 | 47,238 | 18,750 |
| | 7,144,018 | 6,361,718 | 3,580,056 | 3,187,557 |
| Expenses from: | | | | |
| Management fees | (362,013) | (335,567) | (183,285) | (169,556) |
| Operating expenses | (469,282) | (388,737) | (234,040) | (193,848) |
| Maintenance expenses | (676,538) | (641,461) | (347,709) | (321,576) |
| Amortization of administrative platform | (97,492) | (97,492) | (48,746) | (48,746) |
| Executive bonus | (89,693) | (240,626) | (39,693) | (116,288) |
| Property tax | (168,418) | (153,142) | (83,278) | (76,626) |
| Insurance | (75,905) | (63,221) | (38,358) | (32,080) |
| | (1,939,341) | (1,920,246) | (975,109) | (958,720) |
| Interest expense | (2,356,964) | (1,693,102) | (1,235,062) | (880,259) |
| Interest income | 262,220 | 64,467 | 143,567 | 26,320 |
| Foreign exchange gain (loss), Net | 3,134,332 | (1,616,750) | 653,151 | (1,694,071) |
| Other expenses | (6,304) | - | - | - |
| Amortization of bank fees | (64,975) | (60,005) | (32,517) | (39,357) |
| Derivative financial instruments | (49,939) | (193,352) | 95,984 | (193,352) |
| Fair value adjustments to investment properties and investments in associates | 2,431,845 | 4,171,992 | 1,287,638 | 2,897,147 |
| Consolidated net income for the year | $ 8,554,892 | $ 5,114,722 | $ 3,517,708 | $ 2,345,265 |
| Controlling interest | $ 8,535,005 | $ 4,461,796 | $ 3,508,787 | $ 1,723,789 |
| Non-controlling interest | 19,887 | 652,926 | 8,921 | 621,476 |
| Consolidated net income | $ 8,554,892 | $ 5,114,722 | $ 3,517,708 | $ 2,345,265 |
| Basic net income per CBFI (real estate trust certificates) (in Mexican pesos) | 2.6128 | 1.6192 | 1.1092 | 0.7424 |
| Diluted net income per CBFI (in Mexican pesos) | 2.2196 | 1.3546 | 0.9426 | 0.6211 |

See accompanying notes to unaudited condensed consolidated interim financial statements.



5

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A., Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

## Unaudited Condensed Consolidated Interim Statements of Changes in Trustors' Capital

For the six months ended June 30, 2017 and 2016
(In thousands of Mexican pesos)

| | Number of CBFIs | Trustors' capital | Retained earnings | Valuation of financial derivative financial instruments | Controlling interest | Non-controlling interest | Total |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2016 (audited) | 3,197,579,138 | $ 97,742,581 | $ 15,615,798 | $ - | $ 113,358,378 | $ - | $ 113,358,378 |
| Equity contribution | 23,321,613 | 1,381,267 | - | - | 1,381,267 | 163,515 | 1,544,782 |
| Distributions to trustors | - | (1,860,909) | (1,376,520) | - | (3,237,429) | - | (3,237,429) |
| Consolidated net income | - | - | 4,461,796 | - | 4,461,796 | 652,926 | 5,114,722 |
| Balance as of June 30, 2016 (unaudited) | 3,220,900,751 | $ 97,262,939 | $ 18,701,074 | $ - | $ 115,964,012 | $ 816,441 | $ 116,780,453 |
| Balance as of January 1, 2017 (audited) | 3,249,305,750 | $ 95,383,575 | $ 25,524,669 | $ (103,006) | $ 120,805,238 | $ 1,838,097 | $ 122,643,335 |
| Equity contribution | 40,237,756 | 1,204,803 | - | - | 1,204,803 | 576,404 | 1,781,207 |
| Distributions to trustors | - | (1,662,539) | (1,684,261) | - | (3,346,800) | - | (3,346,800) |
| Effect of valuation of derivative financial instruments. | - | - | - | (30,309) | (30,309) | - | (30,309) |
| Consolidated net income | - | - | 8,535,005 | - | 8,535,005 | 19,887 | 8,554,892 |
| Balance as of June 30, 2017 (unaudited) | 3,289,543,506 | $ 94,925,839 | $ 32,375,413 | $ (133,315) | $ 127,167,937 | $ 2,434,388 | $ 129,602,325 |

See accompanying notes to unaudited condensed consolidated interim financial statements.



6

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.**
**Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Unaudited Condensed Consolidated Interim Statements of Cash Flows

**For the six months ended June 30, 2017 and 2016**
**(In thousands of Mexican pesos)**

| | Six months ended June 30 | |
|---|---|---|
| | 2017 (Unaudited) | 2016 (Unaudited) |
| **Operating activities:** | | |
| Net consolidated income for the year | $ 8,554,892 | $ 5,114,722 |
| Adjustments for non-cash items: | | |
| Adjustment to fair value of investment properties and investments in associates | (2,431,845) | (4,171,992) |
| Foreign Exchange gain (loss) - net | (3,669,962) | 1,253,829 |
| Amortization of bank fees | 64,975 | 123,226 |
| Amortization of administrative platform | 97,492 | 97,492 |
| Executive bonus | 89,693 | 240,626 |
| Interest income | (262,220) | (64,467) |
| Interest expense | 2,356,964 | 1,693,102 |
| Effect of valuation of derivative financial instruments | 49,939 | 193,352 |
| Total | 4,849,928 | 4,479,890 |
| | | |
| **Changes in working capital:** | | |
| (Increase) decrease in: | | |
| Lease receivable | (231,196) | (251,690) |
| Other accounts receivable | (313,932) | 3,925 |
| Due to related parties | (67,664) | - |
| Recoverable taxes, mainly value-added tax | 333,607 | 1,145,774 |
| Prepaid expenses and other assets | (541,872) | (38,319) |
| Increase (decrease) in: | | |
| Trade accounts payable and accrued expenses | (24,728) | 1,613,875 |
| Due from related parties | 29,021 | 49,711 |
| Other accounts payable - Long term | (18,361) | 114,141 |
| Deferred revenues | 25,224 | (2,658) |
| Deposit from tenants | 12,058 | 47,342 |
| Net cash flows provided by operating activities | 4,052,085 | 7,161,991 |
| | | |
| **Investing activities:** | | |
| Investment in development projects and acquisition expenses | (2,589,460) | (2,986,547) |
| Acquisition of investment properties | (913,758) | (1,964,359) |
| Financial investments | (166,408) | (2,054,382) |
| Interest received | 148,743 | 64,467 |
| Net cash flows used in investing activities | (3,520,883) | (6,940,821) |

*(Continued)*



7

| | Six months ended June 30 | |
| | 2017 (Unaudited) | 2016 (Unaudited) |
| --- | --- | --- |
| Financing activities: | | |
| Payments of borrowings | (525,818) | (9,583,976) |
| Proceeds from borrowings | 1,410,000 | 14,561,558 |
| Capital contribution | 600,000 | - |
| Distributions to trustors | (3,346,800) | (3,237,429) |
| Interest paid | (2,351,764) | (1,545,571) |
| Net cash flows (used in) provided by financing activities | (4,214,382) | 194,582 |
| | | |
| Cash and restricted cash: | | |
| Net (decrease) increase in cash and restricted cash | (3,683,180) | 415,752 |
| Cash and restricted cash at the beginning of the period | 5,554,120 | 5,995,918 |
| | | |
| Cash and restricted cash at the end of the period | $ 1,870,940 | $ 6,411,670 |

*(Concluded)*

See accompanying notes to unaudited condensed these consolidated interim financial statements



8

**Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A.
Institución de Banca Múltiple, División Fiduciaria) and Subsidiaries**

# Notes to Unaudited Condensed Consolidated Interim Financial Statements

**For the six and three months ended June 30, 2017 and December 31, 2017
(In thousands of Mexican pesos)**

1.  **General information, acquisitions and relevant events**

    a.  *General information and activities*

    Fideicomiso Irrevocable No. F/1401 (Deutsche Bank México, S. A. Institución de Banca Múltiple, División Fiduciaria) ("Fibra UNO") was established as a real estate trust on January 12, 2011 by Fibra Uno Administración, S. A. de C. V. (the "Trustor") and Deutsche Bank México, S. A., Institución de Banca Múltiple, División Fiduciaria (the "Trustee"). Fibra UNO started operations on March 2011 and was established mainly to acquire and own a variety of real estate properties for the purpose of leasing and developing commercial, industrial and mixed-use properties as well as office buildings and land in the Mexican market.

    Fibra UNO, as a real estate investment trust ("FIBRA" for its initials in Spanish), qualifies to be treated as a pass-through entity for Mexican federal income tax purposes. Therefore, all revenue from conducting Fibra UNO's operations is attributed to the holders of its real estate trust certificates ("CBFIs" for their acronym in Spanish) and Fibra UNO itself is not considered a taxable entity in Mexico according to Mexican Tax Laws and Regulations. In order to maintain FIBRA status, the articles 187 and 188 of the Mexican Income Tax Law have established that FIBRAs must distribute annually at least 95% of its taxable income to the holders of its CBFIs.

    Fibra UNO has entered into the following relevant agreements:

    i.    An advisory services agreement with Fibra Uno Administración, S. A. de C. V. ("Fibra Uno Administración" or the "Advisor", related party) for the advisor to assist Fibra UNO in establishing and implementing its investment and financial strategies.
    ii.   A property management agreement with FI Management, S. C. ("FI Management") , Operadora CVC, A. C. ("Operadora CVC") and F1 Controladora de Activos, S. C. ("F1 Controladora de Activos") (subsidiary entities) to conduct the day-to-day management of the operations of Fibra UNO.
    iii.  A services agreement with F2 Services, S. C. ("F2 Services", related party) to perform certain leasing, billing and collection services on behalf of Fibra UNO, subject to its oversight and supervision.
    iv.   An agreement for advisory and property management services, related to certain properties, signed with Jumbo Administración, S. A. P. I. de C. V. ("Jumbo Administración", related party) under similar conditions as the aforementioned agreements.
    v.    A property management agreement signed with Finsa Holding, S. A. de C. V. to manage the day-to-day operations of the portfolio "Vermont".
    vi.   A property management agreement signed with Hines Interest, S. A. de C. V. to manage the day-to-day operations of the portfolio "Maine".
    vii.  A property management agreement signed with Consultora Centro Histórico, S. A. de C. V. to manage the day-to-day operations of the building "Hotel Centro Histórico".
    viii. A property management agreement signed with Operadora Galgua, S. A. de C. V. to manage the day-to-day operations of the portfolio "Galerías Guadalajara"



**9**

ix.  A services agreement with F1 Administración, S. C. ("F1 Administración") (subsidiary entity) and Banco Invex, S. A. Institución de Banca Múltiple, Invex Grupo Financiero in its capacity as Fideicomiso F/2353 ("Fideicomiso F/2353"),to conduct the day-to-day management of the operations of Fideicomiso F/2353; and

x.  A construction services and management agreement with MTK Developers, S. C. (indirect subsidiary) for the construction of Mitikah project.

The address of Fibra UNO is Quintana Roo No. 3 Despacho 303, Col. Roma Sur, Mexico City.

b.  *Acquisitions of 2017*

| Portfolio | Acquisition date | Acquisition type |
|---|---|---|
| Doña Rosa (i) | March 2017 | Investment properties |
| Saqqara (ii) | April 2017 | Investment properties |
| Escatto (iii) | June 2017 | Investment properties |
| Fashion Mall Tuxtla (iv) | June 2017 | Investment properties |

i.  During the first quarter of 2017, Fibra UNO, acquired "Doña Rosa" property, which is part of the FRIMAX portfolio. The total acquisition price was $2,108 million paid with CBFIs.

ii.  During the second quarter of 2017, Fibra UNO acquired "Saqqara" property. The total acquisition price was $702 million was paid in cash.

iii.  During the second quarter of 2017, Fibra UNO acquired "Escatto" property. The acquisition price of this development was $80 million paid in cash.

iv.  During the second quarter of 2017, Fibra UNO acquired "Fashion Mall Tuxtla" property. The total acquisition price of this property in development was $2,690 million. As of June 30, 2017, the balance is outstanding and is included in the condensed consolidated statement of financial position in accounts payable for the acquisition of investment property.

c.  *Relevant events*

a.  On June 23, 2017, Fibra UNO had an unsecured credit line contracted with Banco Santander for $1,000 million at a TIIE rate plus 1.25%, due on December 20, 2017.

b.  On June 16, 2017, Fibra UNO paid US $14.250 million as a serious deposit for the purchase of "La Teja" property included consolidated statements of financial position in other accounts receivables.

c.  On June 12, 2017, Fibra UNO paid the unsecured credit contracted with Actinver for an amount of. $410 million, which accrued interest at a TIIE rate plus 1.80%. On the same date, Fibra UNO, had a credit line with the same conditions of the previous credit and maturing on June 12, 2018.

d.  On April 25, 2017, the Technical Committee of Fibra UNO approved, prior authorization of the majority of its independent members, distributions for capital reimbursement for $1,684,261. This distribution was paid by Fibra UNO on May 9, 2017.

e.  On February 2, 2017, the Technical Committee of Fibra UNO approved, prior authorization of the majority of its independent members, distributions for capital reimbursement for $1,662,539. This distribution was paid by Fibra UNO on February 9, 2017.



**10**

f.   During February 2017, as part of the Fibra UNO´s plan to limit the risk of interest rates due to mortgage loan contracted with HSBC, Fibra UNO contracted two SWAPs of interest rates known as "Interest Rate SWAP", for a total of $2,942 million.

g.   During January 2017, as part of Fibra UNO's plan to limit exchange rate risk stemming from the bond issued in US dollars maturing in 2026, Fibra UNO contracted three currency swaps, one for US $75 million, one for US $50 million and one for $25 million of US dollars covering principal and interest.

## 2.   Basis of presentation

a.   *Basis of presentation*

The accompanying condensed consolidated interim financial statements of the Trust have been prepared in accordance with International Accounting Standards (IAS) 34, Interim Financial Reporting. Fibra UNO applied the same accounting policies in the interim information and in its last annual financial statements, except for what is explained in subsection c.
The accompanying condensed consolidated interim financial statements as of June 30, 2017 and 2016, and for the three and six months then ended, have not been audited. In the opinion of the Trust's management, all adjustments (consisting mainly of ordinary, recurring adjustments) necessary for a fair presentation of the accompanying condensed consolidated interim financial statements are included.

Certain information and note disclosures normally included in annual financial statements prepared in accordance with International Financial Reporting Standards ("IFRS") has been condensed or omitted, in accordance with the standards of interim financial reporting. These unaudited condensed consolidated interim financial statements should be read in conjunction with the audited consolidated financial statements of Fibra UNO and their respective notes as of and for the year ended December 31, 2016 and 2015, prepared in accordance with IFRS. The results of the periods are not necessarily indicative of the results for the full year.

b.   *Seasonality*
Management of the Trust does not consider its business to be subject to material seasonal fluctuations.

c.   *Valuation of investment properties at intermediate dates*
At the close of each year, Fibra UNO contracts independent experts to value the investment properties according to the technique of discounted flows. On condensed consolidated interim information, Management applies global factors to the value of the prior year's closing, referring primarily to inflation and the peso's exchange rate against the US dollar. In consequence, there is no detailed valuation in the attached interim information.

## 3.   Application of new and revised International Financial Reporting Standards

a.   *New IFRS*

| | |
|---|---|
| Amendments to IAS 12 | Income taxes[1] |
| Amendments to IAS 7 | Statements of Cash Flows[1] |
| Amendments to IFRS 2 | Classification and measurement of share-based payments [1] |

[1] Effective for annual periods beginning on or after 1 January 2017, with earlier application permitted.



**Amendments to IAS 12 Income Tax:** *Recognition of Deferred Tax Assets for Unrealized Losses*, clarify how to account for deferred tax assets related to debt instruments measured at fair value.

IAS 12 provides requirements on the recognition and measurement of current or deferred tax liabilities or assets. The amendments clarify the requirements on recognition of deferred tax assets for unrealized losses, to address diversity in practice.

Entities are required to apply the amendments for annual periods beginning on or after 1 January 2017. Earlier application is permitted.

**Amendments to IAS 7 Statements of Cash Flows: Provide disclosures**

The amendments in disclosure initiative (Amendments to IAS 7) come with the objective that entities shall provide disclosures that enable users of financial statements to evaluate changes in liabilities arising from financing activities.

To achieve this objective, the IASB requires that the following changes in liabilities arising from financing activities are disclosed (to the extent necessary): (i) changes from financing cash flows; (ii) changes arising from obtaining or losing control of subsidiaries or other businesses; (iii) the effect of changes in foreign exchange rates; (iv) changes in fair values; and (v) other changes.

Entities are required to apply the amendments for annual periods beginning on or after 1 January 2017. Earlier application is permitted.

The management of Fibra UNO expects that there may be some impacts as a result of these modifications

b.   *New and revised IFRS in issue but not yet effective*

Fibra UNO has not applied the following new and revised IFRS that have been issued but are not yet effective:

| | |
|---|---|
| IFRS 9 | Financial Instruments[2] |
| IFRS 15 | Revenue from Contracts with Customers[2] |
| IFRS 16 | Leases[3] |

[2]Effective for annual periods beginning on or after 1 January 2018, with earlier application permitted.
[3] Effective for annual periods beginning on or after 1 January 2019, with earlier application permitted.

Fibra UNO´s Management is not expecting a significant impact as of result of these changes.

**4.   Cash and restricted cash**

| | | June 30, 2017 (Unaudited) | | December 31, 2016 (Audited) |
|---|---|---|---|---|
| Cash | $ | 1,861,926 | $ | 5,543,788 |
| Restricted cash: | | | | |
| Financial reserve for bank loans | | 9,014 | | 10,332 |
| Total cash and restricted cash | $ | 1,870,940 | $ | 5,554,120 |



12

5.  **Financial investments**

| | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| Trading investments – Government securities | $    2,122,509 | $    1,956,101 |

6.  **Lease receivables and others**

| | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| Lease receivables | $    1,371,109 | $    1,084,690 |
| Allowance for doubtful accounts | (149,319) | (94,096) |
| | $    1,221,790 | $    990,594 |

7.  **Other accounts receivable**

| | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| Serious deposit | $    622,898 | $    366,000 |
| Management fee | 150,833 | 113,333 |
| Other receivables | 59,901 | 40,367 |
| | $    833,632 | $    519,700 |

8.  **Investment properties**

| | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| Investment property for leasing | $    160,191,499 | $    158,645,638 |
| Investment property under development | 19,827,829 | 11,634,209 |
| Territorial reserve | 1,350,763 | - |
| Property interests held under operating leases | 2,527,002 | 2,459,431 |
| | $    183,897,093 | $    172,739,278 |



13

| | Type | Number of properties | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|---|---|
| Balance at the beginning of the period | | | $ 172,739,278 | $ 152,349,934 |
| Acquisitions: | | | | |
| Fashion Mall Tuxtla | Retail | 1 | 2,690,000 | - |
| Escatto | Industrial | 1 | 80,000 | - |
| Saqqara | Offices | 1 | 702,240 | - |
| Doña Rosa Portfolio | Industrial | 1 | 2,108,033 | - |
| Midtown Jalisco | Development | 1 | - | 440,000 |
| Tower Vallarta | Retail | 1 | - | 1,477,096 |
| Torre Cuarzo | Development | 1 | - | 2,898,091 |
| El Salto Jalisco | Industrial | 1 | - | 180,000 |
| Espacio Tollocan | Development | 1 | - | 229,295 |
| Puerta de Hierro | Retail | 1 | - | 700,000 |
| Construction in progress | | | 2,589,460 | 5,350,778 |
| Fair value adjustments to investment properties | | | 2,988,082 | 9,114,084 |
| Balance at the end of the period | | | $ 183,897,093 | $ 172,739,278 |

9.  **Investments in associates**

| | Participation % | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|---|
| Torre Mayor | 49% | $ 2,714,409 | $ 2,999,348 |
| Torre Diana | 50% | 1,481,100 | 2,179,552 |
| | | $ 4,195,509 | $ 5,178,900 |

10.  **Other assets**

| | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| Administrative Platform (1) | $ 2,043,674 | $ 2,043,674 |
| Implementation fees | 440,800 | 440,800 |
| Accumulated amortization | (705,281) | (593,951) |
| Others | 30,000 | 30,000 |
| | $ 1,809,193 | $ 1,920,523 |

(1)   Administrative platform acquired includes staff, technology and processes.



**14**

F-72

## 11.   Borrowings

| Type | Institution | Summary of borrowings as of June 30, 2017 (Unaudited) | | | | |
|------|-------------|----------|------|----------|-------------|-------------|
| | | Currency | Rate | Maturity | MXN Balance | USD Balance |
| Mortgage | Finsa Bancomext US 84.7 million | USD | 4.89% | November, 2020 | $          - | $      70,890 |
| Mortgage | HSBC Samara | MXN | TIIE + 2% | September, 2023 | 2,897,143 | - |
| Unsecured | Actinver | MXN | TIIE + 1.8% | June, 2018 | 410,000 | - |
| Unsecured | Santander | MXN | TIIE + 1.25% | December, 2017 | 1,000,000 | - |
| Mortgage | Metlife, Mexico | MXN | 7.92 % | December, 2023 | 256,778 | - |
| Mortgage | Metlife, Mexico | MXN | 7.92 % | December, 2023 | 533,586 | - |
| Debt bonds | National (FUNO 13-2) | MXN | 8.40 % | December, 2023 | 3,120,900 | - |
| Debt bonds | National (FUNO 13) | MXN | TIIE + 0.80% | June, 2019 | 6,850,059 | - |
| Debt bonds | National (FUNO 15) | MXN | 6.99 % | July, 2025 | 7,500,000 | - |
| Debt bonds | National (FUNO 13U) | UDIS | 5.09% | November, 2028 | 2,448,377 | - |
| Debt bonds | National (FUNO 16U) | UDIS | 4.60% | April, 2027 | 2,633,448 | - |
| Debt bonds | National (FUNO 16) | MXN | TIIE + 0.65% | April, 2019 | 883,750 | - |
| Debt bonds | International | USD | 5.25 % | December, 2024 | - | 600,000 |
| Debt bonds | International | USD | 6.95 % | January, 2044 | - | 700,000 |
| Debt bonds | International | USD | 5.25 % | January, 2026 | - | 500,000 |

June 30, 2017                                                                     $    28,534,041           1,870,890

Exchange rate as of June 30, 2017 (pesos per dollar)                    $         18.0279

                                                                                     $         33,728,217

Balance as of June 30, 2017, in thousands of Mexican pesos        $      62,262,258
Current                                                                                        (1,631,569)
Non-current                                                                                 60,630,689
Cost of transaction                                                                          (550,619)
Fair value adjustment                                                                        159,038

                                                                                     $         60,239,108



15

| Type | Institution | Currency | Rate | Maturity | MXN Balance | USD Balance |
|------|-------------|----------|------|----------|-------------|-------------|
| | | | | **Summary of borrowings as of December 31, 2016** | | |
| Mortgage | Finsa Bancomext | USD | 4.89% | November, 2020 | $ - | 73,330 |
| Mortgage | HSBC Samara | MXN | TIIE + 2.0% | September, 2023 | 2,965,714 | - |
| Unsecured | Actinver | MXN | TIIE + 1.8% | July, 2017 | 410,000 | - |
| Debt bonds | National (FUNO 13-2) | MXN | 8.40% | December, 2023 | 3,120,900 | - |
| Debt bonds | National (FUNO 13) | MXN | TIIE + 0.80% | June, 2019 | 6,850,059 | - |
| Debt bonds | National (FUNO 15) | MXN | 6.99% | July, 2025 | 7,500,000 | - |
| Debt bonds | National (FUNO 13U) | UDIS | 5.09% | December, 2028 | 2,368,119 | - |
| Debt bonds | National (FUNO 16U) | UDIS | 4.60% | April, 2027 | 2,547,123 | - |
| Debt bonds | National (FUNO 16) | MXN | TIIE + 0.65% | April, 2019 | 883,750 | - |
| Debt bonds | International | USD | 5.25% | December, 2024 | - | 600,000 |
| Debt bonds | International | USD | 6.95% | January, 2044 | - | 700,000 |
| Debt bonds | International | USD | 5.25% | January, 2026 | - | 500,000 |

December 31, 2016      $ 26,645,665      1,873,330

Exchange rate as of December 31, 2016 (pesos per dollar)      $ 20.6640

     $ 38,710,482

| | |
|---|---|
| Balance as of December 31, 2016, in thousands of Mexican pesos | $ 65,356,147 |
| Current | (633,911) |
| Non-current | 64,722,236 |
| Cost of transaction | (580,043) |
| Fair value adjustment | 30,449 |
| | $ 64,172,642 |

The Trust's loan agreements contain various affirmative and negative covenants, for which Fibra UNO was in compliance as of June 30, 2017 and December 31, 2016. The most significant covenants are described below:

- Fibra UNO is required to pay, on or before on the due date, all property and other related taxes due with respect to its operations.
- Maintain in good standing all properties and assets necessary for the proper operation of the Trust's business, outside of normal use, wear and tear of the properties.
- Maintain insurance on assets, with reputable agents, for amounts to cover risks associated with and sufficient to replace or repair damage to the properties.
- Maintain a debt service ratio (Net Operating Income (NOI) divided by and Debt Service, as those terms are defined in the indenture) of less than 1.20 to 1



**16**

12. **Long-term derivative financial instruments**

In order to minimize the currency risk raised from the bond issued in US dollars maturing in 2026, Fibra UNO has nine foreign currency swaps contracted of US $450 million, of which US $100 million cover principal and US $350 million cover principal and interest.

In order to restrict interest rate due from the mortgage credit engaged with HSBC, Fibra UNO contracted two interest rate swaps known as "Interest Rate SWAP" of $2,942 million.

In addition, Fibra UNO performed a reciprocal transaction of purchase and sale of interest rate options (COLLAR) for hedging purposes for an amount of $1,889.5 million. Fibra UNO would pay the counterpart if the TIIE rate is lower than 4.5% and the counterparty would pay Fibra UNO if the TIIE is higher than 8.5%

As of June 30, 2017, the position of Fibra UNO's derivative financial instruments is composed of nine currency SWAPS and two interest rate SWAPS, which are presented in the unaudited condensed consolidated interim statements of financial position in the financial derivative instruments line of $702.5 million and a Collar that is shown in the item of financial derivative instruments of $368. As of December 31, 2016, the position of Fibra UNO's derivative financial instruments is comprised of six SWAPS and a Collar, which are shown in condensed consolidated financial statements in the financial derivative instruments category in the non-current assets line of $515 million.

Characteristics of the SWAPS used to hedge the aforementioned risks and their fair value as of June 30, 2017 and December 31, 2016 are as follows:

| No. | Notional miles USD | Notional USD (thousands) | Exchange rate | FUNO pays | FUNO receives | Initial date | Final date | Fair value with risk coverage June 30, 2017 (Unaudited) |
|---|---|---|---|---|---|---|---|---|
| 1 | 50,000 | $ 944,750 | $ 18.8950 | TIIE + 3.34% | 5.25% USD | 17/06/2016 | 30/01/2026 | $ (43,251) |
| 2 | 50,000 | 944,750 | 18.8950 | TIIE - 2.77% | - | 17/06/2016 | 30/01/2026 | (51,982) |
| 3 | 50,000 | 958,000 | 19.1600 | TIIE + 3.51% | 5.25% USD | 28/06/2016 | 30/01/2026 | (70,996) |
| 4 | 50,000 | 958,000 | 19.1600 | TIIE - 2.60% | - | 28/06/2016 | 30/01/2026 | (74,308) |
| 5 | 60,000 | 1,113,000 | 18.5500 | TIIE + 3.49% | 5.25% USD | 30/06/2016 | 30/01/2026 | (36,759) |
| 6 | 40,000 | 739,000 | 18.4750 | TIIE + 3.59% | 5.25% USD | 08/07/2016 | 30/01/2026 | (25,608) |
| 7 | 25,000 | - | 20.3465 | TIIE + 3.09% | 5.25% USD | 30/01/2017 | 30/01/2026 | (59,212) |
| 8 | 50,000 | - | 19.6000 | TIIE + 2.80% | 5.25% USD | 30/01/2017 | 30/01/2026 | (56,522) |
| 9 | 75,000 | - | 20.3700 | TIIE + 3.06% | 5.25% USD | 30/01/2017 | 30/01/2026 | (176,892) |
| 10 | | 2,046,207 | - | TIIE a 28 days | 7.73% | 21/02/2017 | 15/09/2023 | (74,388) |
| 11 | - | 896,650 | - | TIIE a 28 days | 7.73% | 21/02/2017 | 15/09/2023 | (32,597) |
| | 450,000 | $ 8,600,357 | | | | | | $ (702,515) |



| No. | Notional miles USD | Notional USD (thousands) | Exchange rate | FUNO pays | FUNO receives | Initial date | Final date | Fair value with risk coverage December 31, 2016 (Audited) |
|---|---|---|---|---|---|---|---|---|
| 1 | 50,000 | $ 944,750 | $ 18.8950 | THE + 3.34% | 5.25% USD | 17/06/2016 | 30/01/2026 | $ 114,703 |
| 2 | 50,000 | 944,750 | 18.8950 | THE - 2.77% | - | 17/06/2016 | 30/01/2026 | 37,849 |
| 3 | 50,000 | 958,000 | 19.6000 | THE + 3.51% | 5.25% USD | 28/06/2016 | 30/01/2026 | 89,111 |
| 4 | 50,000 | 958,000 | 19.6000 | THE - 2.60% | - | 28/06/2016 | 30/01/2026 | 17,267 |
| 5 | 40,000 | 739,000 | 18.5500 | THE + 3.49% | 5.25% USD | 30/06/2016 | 30/01/2026 | 99,999 |
| 6 | 60,000 | 944,750 | 18.4750 | THE + 3.59% | 5.25% USD | 08/07/2016 | 30/01/2026 | 151,548 |
| | 300,000 | $ 5,489,250 | | | | | | $ 510,477 |

Fibra UNO designated swaps covering principal and interest (SWAPS No. 1, 3, 5, 6, 7, 8 and 9 of the table above) as Fair Value Hedges and swaps covering only mainly or solely interest rate (SWAPS No. 2, 4, 10 and 11 of the table above) as Cash Flow Hedges.

Characteristics of the Collar and its fair value as of June 30, 2017 and December 31, 2016 are as follows:

| Notional thousands of Mexican pesos | Floor | Top | Initial date | Final date | Fair value with risk coverage June 30, 2017 (Unaudited) |
|---|---|---|---|---|---|
| 1,889,500 | 4.50% | 8.75% | 01/07/2016 | 30/06/2028 | 368 |

| Notional thousands of Mexican pesos | Floor | Top | Initial date | Final date | Fair value with risk coverage December 31, 2016 (Audited) |
|---|---|---|---|---|---|
| 1,889,500 | 4.50% | 8.75% | 01/07/2016 | 30/06/2028 | 4,758 |

As of June 30, 2017, the primary position covered by all SWAPS amounts is of US $450 million, of which US $350 million covers principal and interest and US $100 million only covers principal, and $2,942.9 million only cover interest rates.

As of June 30, 2017, the fair value of SWAP was determined by an internal model, proving its effectiveness prospectively and retrospectively, which was highly effective between 80% and 125%.



18

13.   **Trade accounts payable and accrued expenses**

| | June 30, 2017 (Unaudited) | | December 31, 2016 (Audited) | |
|---|---|---|---|---|
| Trade accounts payable | $ | 862,476 | $ | 985,461 |
| Accrued expenses | | 283,740 | | 168,834 |
| Interest payable | | 114,080 | | 130,729 |
| | $ | 1,260,296 | $ | 1,285,024 |

14.   **Transactions and balances with related parties**

Balances and transaction between Fibra UNO and its subsidiaries, which are related parties of Fibra UNO, have been eliminated of the consolidation and are not disclosed within this note.

a.   Transactions with related parties were as follows

| | Six months ended | | | |
|---|---|---|---|---|
| | June 30, 2017 (Unaudited) | | June 30, 2016 (Unaudited) | |
| Income: | | | | |
| F1 Administración, S.C. | | | | |
| Administration fees 1.25% (1) | $ | 48,750 | $ | 37,500 |

| | Six months ended | | | |
|---|---|---|---|---|
| | June 30, 2017 (Unaudited) | | June 30, 2016 (Unaudited) | |
| Expenses: | | | | |
| Fibra Uno Administración: | | | | |
| Capitalized acquisition fees 3% (2) | $ | 173,190 | $ | 138,100 |
| Management fees 0.5% (2) | $ | 310,000 | $ | 285,440 |
| Parks Desarrolladora, S. A. de C. V. | | | | |
| Capitalized received services (5) | $ | 179,150 | $ | 1,043,775 |
| Coordinadora de Inmuebles Industriales, S. A. de C. V. (5) | | | | |
| Capitalized received services | $ | 518,069 | $ | 313,158 |
| G-30 La Madre, S. A. P. I. de C. V. | | | | |
| Capitalized received services | $ | 372 | $ | 63,948 |
| Jumbo Administración S. A. P. I. de C.V. | | | | |
| Real Estate management services (4) | $ | 183,204 | $ | 180,218 |
| F2 Services | | | | |
| Received services (3) | $ | 136,470 | $ | 126,897 |
| E- Administración y Construcción, S. A. de C. V. | | | | |
| Received services | $ | - | $ | 15,901 |
| Luxe Administración y Control Inmobiliario, S. A. P. I. de C. V. | | | | |
| Received services (6) | $ | - | $ | 223 |



19

(1)   Fibra UNO pays an administration fee in an amount equal to 1.25% of the maximum amount of investment.

(2)   Fibra UNO pays an annual fee in an amount equal to 0.5% of the trustors' capital and a 3 % of the total value of acquired properties or contributed by other third parties, plus any applicable value-added taxes in exchange for advisory services.

(3)   Fibra UNO pays a monthly fee in an amount equal to 2% of the lease payments received, plus any applicable value-added taxes in exchange for administrative services.

(4)   Fibra UNO pays for real estate management services at an amount equivalent to 3% of monthly revenues collected related to rent, uses of spaces (kiosks or islands), management and maintenance fees, advertising and income from parking from the Morado portfolio.

(5)   Fibra UNO executed a real state oversight services agreement. Fee is payable based on the construction progress.

(6)   Fibra UNO pays to Cabi Inver, S. A. de C. V. and to Luxe Administración y Control Inmobiliario, S. A. P. I. de C. V. the equivalent of 5% of the rental amount under each new lease agreement (not including renewals or extensions of existing lease agreements) that it enters into as a result of their involvement, for a period of five years, beginning on the effective date of the lease agreement.

The contracts with the aforementioned parties have terms of five years, renewable for additional periods.

b.   Balances with related parties are as follows

| | | June 30, 2017 (Unaudited) | | December 31, 2016 (Audited) |
|---|---|---|---|---|
| Due from related parties: | | | | |
| Fundación FUNO, A.C. | $ | 82,005 | $ | 80,293 |
| Parks Operadora Hotelera, S. A. de C. V. | | 37,178 | | - |
| Other | | 28,774 | | - |
| | $ | 147,957 | $ | 80,293 |
| | | | | |
| Due to related parties: | | | | |
| F1 Administración, S. C. | $ | 80,933 | $ | 72,900 |
| Jumbo Administración, S. A. P. I. de C. V. | | 25,517 | | 20,366 |
| Parks Mantenimiento, S. C. | | 4,524 | | - |
| Creatividad en Administración Corporativa, S. A. de C. V. | | 4,461 | | - |
| Coordinadora de Inmuebles Industriales, S. A de C. V. | | 3,480 | | - |
| Parks Desarrolladora, S. A. de C. V. | | 3,372 | | - |
| | $ | 122,287 | $ | 93,266 |



20

15. **Trustors' capital**

a. *Contributions*

  a) Fibra UNO was established by an initial contribution from the trustors of one thousands pesos plus the resources obtained from issuance of CBFIs.

  b) As of June 30, 2017 and December 31 2016 there are the following outstanding CBFIs

| Number de CBFIs | June 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| In circulation | 3,289,543,506 | 3,249,305,750 |
| In treasury | 557,085,830 | 597,323,586 |

b. *Distributions*

Fibra UNO's Technical Committee has approved and paid distributions out of tax revenue accounts to CBFI holders as follows

| Distribution date | Distributions (Unaudited) | |
|---|---|---|
| May 9, 2017 | $ | 1,684,261 |
| February 9, 2017 | | 1,662,539 |
| Total as of June 30, 2017 | $ | 3,346,800 |

| Distribution date | Distributions (Unaudited) | |
|---|---|---|
| May 9, 2016 | $ | 1,607,651 |
| February 10, 2016 | | 1,629,778 |
| Total as of June 30, 2016 | $ | 3,237,429 |

16. **Commitments and contingencies**

Neither Fibra UNO nor its assets are subject to any type of legal action, other than those stemming from its routine operations and activity.

17. **Subsequent events**

On July 19, 2017, the Technical Committee of Fibra UNO approved, with the prior approval of the majority of its independent members, distributions for the advance of fiscal results and reimbursement of capital for $1,701,892. This distribution will be paid by Fibra UNO no later than August 9, 2017 and the number of CBFIs eligible for such distribution will be 3,326,983,408 CBFIs.



**21**

18.   **Approval of the unaudited condensed consolidated interim financial statements**

The accompanying condensed consolidated interim financial statements were authorized for issuance on August 25, 2017 by Lic. Gerardo Vargas Ateca, Finance vice president of Fibra UNO, in accordance with the Committee approval; consequently do not reflect events occurring after that date. These unaudited condensed consolidated interim financial statements are subject to approval at the Trustors' meeting, where they may be modified. Consequently, these financial statements do not reflect events after this date.

* * * * * *



**ISSUER**
**FIBRA UNO**
Antonio Dovalí Jaime # 70, Tower B, 11th Floor
Col. Zedec Santa Fe, C.P. 01210
Mexico City.

**ADVISOR**
**Fibra Uno Administración, S.C.**
Quintana Roo No. 3 int 303
Col. Roma Sur.; C.P. 06760
Mexico City.

**FIBRA TRUSTEE**
**Deutsche Bank México, S.A., Institución de Banca Múltiple, División Fiduciaria**
Blvd. Manuel Ávila Camacho 40 floor 17
Col. Bosques de las Lomas de Chapultepec; C.P. 11000
Mexico City.

**COMMON REPRESENTATIVE**
**CI Banco, S.A., Institución de Banca Múltiple**
Paseo de las Palmas 215, Piso 7
Col. Lomas de Chapultepec
Del. Miguel Hidalgo; C.P. 11000
Mexico City.

**FINANCIAL ADVISOR AND STRUCTURING AGENT**
**Consultoría XFN, S.C. ("ExeFin")**
Paseo de los Tamarindos No. 400B Piso 22
Bosques de las Lomas; C.P. 05120
Mexico City.

**LEGAL ADVISORS**
*To the Issuer*

*As to U.S. Federal and New York Law:*        *As to Mexican Law:*
**Hogan Lovells US LLP**                          **Holland & Knight México, S.C.**
875 Third Avenue                                  Paseo de la Reforma 342
New York, New York 10022                          Col. Juárez, Del. Cuauhtémoc
United States of America                          C.P. 06600, Mexico D.F.

*To the Initial Purchasers*

*As to U.S. Federal and New York Law:*        *As to Mexican Law:*
**Paul Hastings LLP**                             **Mijares Angoitia Cortés y Fuentes**
200 Park Avenue                                   Javier Barros Sierra 540
New York, New York 10166           Santa Fe, Park Plaza I, Delegación Alvaro Obregón
United States of America                          C.P. 01210, Mexico City

**INDEPENDENT AUDITORS**
**Galaz, Yamazaki, Ruiz Urquiza, S.C.**
(Member of Deloitte Touche Tohmatsu Limited)
Paseo de la Reforma 489, 6th Floor
Col. Cuauhtémoc; C.P. 06500, Mexico City.

**365,000,000 CBFIs**

# FIBRA UNO



**Real Estate Trust Certificates**

**OFFERING MEMORANDUM**

Joint Global Coordinators and Joint Book-Runners

**Santander**       **BofA Merrill Lynch**       **HSBC**

*Joint Book-Runners*

**BTG Pactual**       **Credit Suisse**
**Goldman Sachs & Co. LLC**       **UBS Investment Bank**

October 4, 2017