# EXHIBIT 27

## ANNEX "A"

---

RESTATED CONTRACT FOR PURCHASE/SALE OF SHARES

between

TWIBEL 1 SPRL, TWIBEL 2 SPRL, TWIBEL 3 SPRL, TWIBEL 4 SPRL, TWIBEL 5 SPRL, TWIBEL 6 SPRL and TWIBEL 7 SPRL

as Sellers

and

Servicios Funerarios GG, S.A. de C.V.

as Purchaser

and

Banco Actinver, S.A. de C.V., Institución de Banca Múltiple, as Fiduciary in the Trust Identified with Number  F/1401 and known as "Fibra Uno"

as Acquirer of the Real Estate Assets

with the recognition and agreement of

Grupo Gayosso, S.A. de C.V.

December 18, 2020

---

<u>INDEX</u>

| | | |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Purpose and Purchase Price | 12 |
| 3. | Payment of the Purchase Price at Closing | 13 |
| 4. | Closing of the Transaction | 14 |
| 5. | Representations of the Sellers and the Company | 19 |
| | 5.1. | Representations of the Sellers | 19 |
| | 5.2. | Representations of the Company | 20 |
| | 5.3. | No Additional Representations. Ratification, Veracity and Purpose | 34 |
| 6. | Representations of the Purchaser | 35 |
| | 6.1. | Representations of the Purchaser | 35 |
| 7. | Pre-Closing Obligations | 36 |
| 8. | Post-Closing Obligations | 41 |
| 9. | Sellers' Liability and Indemnification Obligations | 45 |
| 10. | Liability of the Purchaser and, where appropriate, of the Acquirer of the Real Estate Assets and Indemnification Obligations | 49 |
| 11. | Termination | 50 |
| 12. | Rights in the Event of a Breach | 50 |
| 13. | Taxes | 51 |
| 14. | Registered Addresses and Notifications | 51 |
| 15. | Full Agreement | 53 |
| 16. | Modifications, Waivers, and Exemptions | 53 |
| 17. | Subsistence of Representations and Provisions | 53 |
| 18. | Divisibility | 53 |
| 19. | Headers | 53 |
| 20. | Annexes and Appendices | 53 |
| 21. | Assignment | 53 |
| 22. | Applicable Law | 54 |
| 23. | Jurisdiction | 54 |
| 24. | Sellers' Representative | 54 |

ANNEXES AND APPENDICES

<u>Annexes</u>

| | |
|---|---|
| Annex A: | Distribution of Gayosso Shares |
| Annex B: | Corporate Structure of Gayosso |
| Annex C: | CPPIB Guarantees |
| Annex D: | Omitted intentionally. |
| Annex E: | Gayosso's Shareholder Meeting Minutes Format |
| Annex F: | Administration Bond |
| Annex G: | Resigning Directors and Officers |
| Annex H: | Required Authorizations |
| Annex I: | Restricted Workers |
| Annex J: | List of Subsidiaries |
| Annex K: | Subsidiary's Shareholder Meeting Minutes Format |
| Annex L: | Copy of the HSBC Credit |
| Annex M: | Allocation of the Purchase Price and Bank Account Information of Each Seller |
| Annex N: | Omitted intentionally. |
| Annex O: | Omitted intentionally. |
| Annex P: | Real Estate Assets |
| Annex Q: | Owner Company's Shareholder Meeting Minutes Format |
| Annex R: | Omitted intentionally. |
| Annex S: | Format of the Adhesion Agreement |
| Annex T: | Format of the Acquisition Contract |
| Annex U: | Omitted intentionally. |
| Annex V: | Format of the Sellers' Guarantee |

<u>Appendices</u>
Appendix of Representations

This contract (the "Contract") dated January 24, 2020, and restated on December 18, 2020 is entered into between TwiBel 1 SPRL, TwiBel 2 SPRL, TwiBel 3 SPRL, TwiBel 4 SPRL, TwiBel 5 SPRL, TwiBel 6 SPRL and TwiBel 7 SPRL (jointly, the "Sellers"), Servicios Funerarios GG, S.A. de C.V. (the "Purchaser"); Banco Actinver, S.A., Institución de Banca Múltiple, as Trustee of the Trust identified with number 1401 and called "Fibra Uno" (the "Acquirer of the Real Estate Assets") and Grupo Gayosso, S.A. de C.V. (the "Company" or "Gayosso", independently and jointly with the Sellers, the Purchaser and the Acquirer of the Real Estate Assets, the "Parties"), in accordance with the following Backgrounds and Clauses:

## BACKGROUND

I.   On January 24, 2020, the Purchaser, in the role of the purchaser, and the Sellers, in the role of the sellers, with the appearance and acceptance of Gayosso, entered into a contract of purchase/sale of the shares representing the capital stock of Gayosso and its Subsidiaries (the "Original Contract").

II.   On January 27, 2020, the Purchaser and the Sellers, with the appearance and acceptance of Gayosso, entered into an agreement amending the Original Contract, under whose terms the Purchaser was expressly empowered to designate, under the terms of the Contract, Banco Actinver, S.A., Institución de Banca Múltiple, Grupo Financiero Actinver, solely and exclusively in its capacity as trustee of the irrevocable trust identified with the number "1401," without the need for the presence, participation or acceptance of the Sellers and Gayosso (the "First Amending Agreement").

III.   On September 30, 2020, the Purchaser and the Sellers, with the appearance and acceptance of Gayosso, entered into a second agreement amending the Original Contract (the "Second Amending Agreement").

IV.   On December 18, 2020, the the Purchaser and the Acquirer of the Real Estate Assets notified the Sellers and the Company, the adhesion of the Acquirer of the Real Estate Assets to the Purchase/Sale Contract whereby, among other things, it assumed, solely and exclusively, the right to purchase the Real Estate Assets and the obligations related to said purchase (the "Letter of Adhesion").

V.   On December 18, 2020, the Purchaser, the Sellers and the Acquirer of the Real Estate Assets, with the appearance and acceptance of Gayosso, entered into a third amending agreement and total restatement of the Original Contract (the "Third Amending Agreement"; the Original Contract, as it was amended by the First Amending Agreement, the Second Amending Agreement and restated by the Third Amending Agreement, the "Contract"), by virtue of which the parties thereto agreed to restate the Original Contract and certain Annexes in their entirety.

VI.   The Sellers are owners, except for five (5) shares owned by Agencia Eusebio Gayosso, S.A. de C.V., of all issued and outstanding shares representing the capital stock of the Company (the "Shares"), which is duly incorporated in accordance with the laws of Mexico in the form and percentages described in Annex A hereto;

VII.   The Company is the owner, directly and indirectly, of 100% (one hundred percent) of the shares of the capital stock of the companies that are listed in Annex J hereto (the "Subsidiaries"), each of which is a limited-liability company with variable capital [sociedad anónima de capital variable], incorporated under the laws of Mexico, except for Gayosso, Inc., (a corporation incorporated in accordance with the laws of the State of California, United States of America). Annex B contains a description of the corporate structure of the Company and of the Subsidiaries.

VIII.   The Company and the Subsidiaries that are listed in <u>Annex P</u> of this Contract (the "<u>Owner Companies</u>") are the sole and legitimate owners of the real estate that is listed and written in said <u>Annex P</u> (the "<u>Real Estate Assets</u>").

IX.   The Company and the Subsidiaries own and operate cemeteries, funeral homes and crematoria in Mexico and provide funeral services, including prepaid plans, to their customers (the "<u>Business</u>"); and

X.   The Company entered into a credit agreement dated August 9, 2013, as it has been amended from time to time, between the Company, in its capacity as a borrower, CPPIB Credit Investments Inc. ("<u>CPPIB</u>"), as creditor, and Banco Nacional de México, S.A., Member of the Banamex Financial Group, Trust Division, as collateral agent and administrative agent, originally for the amount of MXN $1,610,439,750.00 (one billion, six hundred ten million, four hundred thirty- nine thousand, seven hundred fifty pesos and 00/100), which was modified and restated on December 15, 2017, to the amount of MXN $2,940,000,000 (two billion,  nine hundred forty million pesos and 00/100) and with a balance outstanding as of January 24, 2020, of MXN $2,837,100,000 (two billion, eight hundred thirty-seven million, one hundred thousand pesos and 00/100) (the "<u>CPPIB Credit</u>"), guaranteed with the personal and real guarantees (the "<u>CPPIB Guarantees</u>") that are described in <u>Annex C</u> hereto.

XI.   It is the desire of the Acquirer of the Real Estate Assets to acquire ownership of the Real Estate Assets from the Owner Companies; and it is the desire of the Sellers to cause the Owner Companies to dispose of the Real Estate Assets to the Acquirer  of the Real Estate Assets subject to the terms and conditions established in this document.

XII.   It is the desire of the Purchaser to acquire ownership of the Shares from the Sellers; and it is the desire of the Sellers to sell the Shares to the Purchaser subject to the terms and conditions established in this document.

In consideration of the aforementioned Background and the representations, guarantees, commitments and obligations established below, the Parties agree to be bound in accordance with the following:

## SECTIONS

**1.**     **<u>Definitions</u>**.

"<u>Shares</u>" means the entirety of the issued, subscribed, paid and outstanding shares of the capital stock of the Company.

"<u>Gayosso's Shareholder Meeting Minutes</u>" means the unanimous resolutions that will be adopted by Gayosso shareholders, in terms substantially similar to those indicated in <u>Annex E</u> hereto, and in which it authorizes, among other matters: (i) the acceptance of the Purchaser as the new shareholder of the Company; (ii) entering into and consummating the Transaction contemplated under this Contract; (iii) the disposal of the Real Estate Assets directly or indirectly owned by the Company in favor of the Acquirer of the Real Estate Assets; (iv) the issuance of an irrevocable instruction to the Acquirer of the Real Estate Assets so that, with the Purchase Price of the Real Estate Assets, it pays, on behalf and order of the Company, part of the CPPIB Credit, including the CPPIB Termination Commissions and other additional commissions from the CPPIB Credit; (v) the removal of the members of the Board of Directors contemplated under this contract, the ratification of their actions in the performance of their functions, the release from liability and the granting of the widest release under the law regarding the performance of their positions; (vi) the revocation of powers, the

ratification of the acts of the representatives in the exercise of the same, the release from liability and the granting of the widest release under the law for the exercise thereof; (vii) the appointment of members of the board of directors; (viii) the granting of powers; (ix) the granting of a mutuum with interest in favor of the Purchaser.

"Owner Company's Shareholder Meeting Minutes" means the unanimous resolutions adopted by the shareholders of each Owner Company, in a manner substantially similar to Annex Q hereto, and in which it authorizes, among other matters: (i) the disposal of the Real Estate Assets in favor of the Acquirer of the Real Estate Assets; (ii) the decree and payment of dividends and/or loans in favor of the Company; (iii) the granting of loans in favor of the Purchaser; and (iv) the issuance of an irrevocable instruction to the Acquirer of the Real Estate Assets, so that on behalf and order of the Owner Company, it delivers: (a) to the Company or to the Purchaser, as the case may be, the Acquisition Price of the Real Estate Assets in payment of the dividends decreed and/or loans granted in favor of the Company and/or the Purchaser, as the case may be; and (b) the balance of the Acquisition Price of the Real Estate Assets after the payment of the dividends and/or loans in favor of the Company and the Purchaser, as well as the corresponding VAT, paying it by electronic transfer of funds to the account of each Owner Company.

"Subsidiary's Shareholder Meeting Minutes" means the unanimous resolutions adopted by the shareholders of each Subsidiary, in a manner substantially similar to Annex K hereto, and in which it authorizes, among other matters: (i) the removal of the members of the board of directors of each company, the ratification of their acts in the performance of their functions, release from liability and the granting of the widest release under the law in the performance of their functions,
(ii) the revocation of powers, the ratification of the acts of the representatives in the exercise of the same, release from liability and the granting of the widest release under the law in the performance of their functions, (iii) the appointment of members of the board of directors and (iv) the granting of powers.

"Real Estate Assets" means the real estate assets listed and described in Annex P that will be contributed by the Owner Companies to the Acquirer of the Real Estate Assets.

"Material Asset" means any asset owned by the Company or its Subsidiaries whose value is equivalent to or greater than MXN $1,000,000.00 (one million pesos and 00/100).

"IT Assets" has the meaning established in Section 5.2(r)(vi).

"Acquirer of the Real Estate Assets" means Banco Actinver, S.A., Institución de Banca Múltiple, Grupo Financiero Actinver, as Trustee of Trust 1401 called "Fibra Uno," which is attached to this Contract in terms of the document that is attached to this document as Annex S, solely and exclusively to be entitled to purchase the Real Estate Assets and assume the obligations related to said purchase, but without assuming any obligation or liability on behalf of the Purchaser that is not related to the purchase of the Real Estate Assets.

"<u>Affiliate</u>" means (i) with respect to any Person who is not a natural person, another Person who, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under Common Control with, such first Person; and (ii) with respect to any Person who is a natural person, the past, present and future spouse, parents, grandparents, children, siblings and grandchildren of such natural person.

"<u>Appendix of Representations</u>" means the Appendix of Representations delivered by the Sellers to the Purchaser, attached hereto as an integral part of this document.

"<u>Governmental Approval</u>" means any concession, license, permit, consent, approval or other authorization by a Governmental Authority.

"<u>Lease</u>" means any lease, license, sublease, sub-license, franchise, easement or other contract in accordance to which a Person is entitled to use any immovable, movable or intangible property.

"<u>Leases by the Companies</u>" has the meaning established in Section 5.2(o)(i).

"<u>Tax Authority</u>" means any Governmental Authority that exercises regulatory powers or that otherwise has powers to impose or apply Taxes.

"<u>Governmental Authority</u>" means any sovereign government or any political subdivision thereof, whether federal, state or municipal, any legislative or judicial body, and any agency, authority, department, secretary, regulatory body, court, central bank or other entity that is competent and exercises executive, legislative, judicial, fiscal, regulatory or administrative powers or functions with respect to the Person or matter in question.

"<u>Required Authorizations</u>" means the approvals, procedures or authorizations established in <u>Annex H</u> which are required to consummate the Transaction.

"<u>Administration Bond</u>" means the bonds established in <u>Annex F</u> hereto, payable to any relevant director of the Company as a result of the change of control of the Company derived from entering into and the performance of this Contract.

"<u>Cause of Indemnification to the Purchaser</u>" has the meaning established in Section 9(a).

"<u>Cause of Indemnification to the Seller</u>" has the meaning established in Section 10(a).

"<u>CFC</u>" means the Mexican Federal Economic Competition Commission.

"<u>CFDI</u>" means Internet-Based Digital Tax Certificate.

"<u>Closing</u>" means the closing of the Transaction in accordance with the terms established in Clause 4(a).

"CPPIB Credit Termination Commissions" means any commissions and penalties payable by the Company to CPPIB under the CPPIB Credit related to, or for the purposes of, the advance payment and termination of said CPPIB Credit.

"Purchaser" has the meaning established in the preamble to this Contract.

"Adhesion Contract" means the adhesion agreement to this Agreement entered into by the Acquirer of the Real Estate Assets in terms of Annex S hereto.

"Conditions Applicable to the Closing" has the meaning established in Section 4(b).

"Knowledge" means (i) with respect to a natural person, the actual knowledge of such natural person; and (ii) with respect to any Legal Person, the actual knowledge of any board member, Restricted Workers or second- and third-level workers of such Person indicated in Appendix 5.2(w)(i).

"Resigning Directors and Officers" means those directors and officers established in Annex G.

"Contract" means this Purchase/Sale Contract and its annexes and appendices.

"Purchase Contract" means the contract that, in terms of Annex T hereto, is entered into by the Acquirer of the Real Estate Assets and the Company and/or the Owner Subsidiaries in order to carry out the purchase of the Real Estate Assets.

"Material Contract" has the meaning established in Section 5.2(t)(i).

"Control" (including the terms "that controls," "controlled by," and "under common control with") means the ability, directly or indirectly, to direct or cause the direction of the administration and policies of a Person, whether by means of ownership of securities with voting rights, as trustee or executor, as general partner or administrative member, by contract or otherwise, including ownership, directly or indirectly, of securities that have the power to elect a majority of the board of directors or other similar body that regulates the affairs of such Person.

"Transaction Costs" means the fees accrued by the legal, financial and/or any other advisors engaged by the Purchaser and/or, where applicable, the Acquirer of the Real Estate Assets in relation with the Transaction.

"CPPIB Credit" has the meaning established in the Background of this Contract.

"HSBC Credit" means the syndicated credit agreement to be entered into between the Company, as borrower, and HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC, as well as any other creditor that is part of it, as creditors, for the amount of up to ███, whose resources will be used in their entirety to carry out the payment of part of the CPPIB Credit on the Closing Date, and a copy of which is attached hereto as Annex L.

"Ordinary Course of Business" means, with respect to the Company and the Subsidiaries, the usual performance or execution or conclusion of any act necessary and/or convenient for the proper and normal development of its corporate purpose or business activities, consistent with the customs, practices and acts previously observed or performed by the Company and each Subsidiary during the last twelve years, therefore excluding any act that, based on previous practices and activities of the Company and the Subsidiaries, may be qualified as unusual. For clarification purposes, "Ordinary Course of Business" will include the conducting of business in the manner that has been carried out by the Company and its Subsidiaries derived from the SARS CoV-2 "COVID-19" pandemic during the fiscal year ending on December 31, 2020.

"Tax Representations" means all representations, notifications, reports and other documents, including any amendments thereto, which, under Applicable Law, must be filed with or provided to any Tax Authority in relation to Taxes.

"Fundamental Representations" means the representations contained in Section 5.1, with the exception of Sub-Paragraph (g) *Intermediaries*; Section 5.2(a) *Incorporation*, Section 5.2(b) *Representation*, Section 5.2(c) *Capitalization,* Section 5.2(d) *Powers,* Section 5.2(n) Sub-Paragraph (i) *Ownership of Properties* and Section 5.2(r) Sub-Paragraph (i) *Gayosso Trademarks.*

"Business Day" means any day, other than Saturday or Sunday, on which commercial banks in Mexico are not authorized or obligated to close, in accordance with Applicable Law.

"Corporate Documents" means, with respect to any Person, the articles of incorporation, its corporate bylaws in force, the company books and any agreement between any of its shareholders, as the case may be, as each is in force and as has been amended from time to time.

"Adverse Material Effect of the Business" means any events, changes, circumstances or events that jointly or individually result in, or would result in, direct, actual, non-contingent damage to the Business, assets, financial situation or operating results of the Company and its Subsidiaries, exceeding the amount of MXN $5,000,000.00 (five million pesos and 00/100); on the understanding, however, that any such effect that results or arises from, or is related to, any of the matters mentioned below shall not be considered to determine whether an "Adverse Material Effect of the Business" has occurred: (i) any changes in the financial, banking or securities markets in general, including any alteration thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (ii) acts of war, armed hostilities or terrorism, or the escalation or worsening thereof; (iii) any action required or permitted by this Contract or any action taken (or omitted) with the written consent of, or in accordance with the written request of the Purchaser or, where applicable, the Acquirer of the Real Estate Assets; (iv) any changes in the IFRS; or (v) any natural disaster or Act of God.

"Indebtedness" means, with respect to a Person, without duplication; (i) all indebtedness from money obtained by loan (including capital, interest and any commissions or fees and any prepayment charges); (ii) all obligations evidenced by promissory notes, bonds, obligations and other similar instruments (other than performance, guarantee and appeal bonds that may arise in the ordinary course of business in a manner consistent with past practices for which such Person's liability remains contingent); (iii) all obligations under leases that have been or should be, in accordance with IFRS, recorded as capital leases, except for leases that are operational in nature (e.g., office space, computers, automobiles, etc.); (iv) any reimbursement, payment or similar obligations under acceptances, letters of credit or similar lines of credit, in each case, insofar that they have been used; (v) all obligations and commitments with respect to the deferred purchase price of goods, assets or services, net of any applicable liens; (vi) all obligations of such Person pursuant to derivatives, swaps or other hedging contracts; (vii) all obligations of the Company and the Subsidiaries in favor of their respective

shareholders or any of the Related Parties; (viii) any liability from third parties described in Sub-Paragraphs (i) to (vii) above that the Person has guaranteed directly or indirectly; (ix) the CPPIB Credit Termination Commissions and (x) the Administration Bond.

"Financial Statements" means, with respect to a Person, the general balance sheets, income statements, statements of changes in capital and statements of changes in that financial position of that Person, including audited Financial Statements, notes on them and the external auditor's report.

"Closing Date" has the meaning established in Section 4(a).

"Closing Deadline" means March 31, 2021.

"Guarantee by the Sellers" means the guarantee to be granted by certain guarantors of the Sellers in terms substantially similar to those established in Annex V.

"Guarantees by CPPIB" means the guarantees granted in accordance the CPPIB Credit, described in Annex C hereto.

"Lien" means any lien, pledge, mortgage, trust contract, guarantee right, claim, option, right of first refusal, easement, charge, restriction, lease, assignment, sublease, commitment, right-of-way and any other similar restriction of any nature. Notwithstanding the general nature of the above, with respect to Shares and capital instruments in general and Real Estate Assets, "Liens" also includes irrevocable powers of attorney, trusts or voting agreements, rights of first offer, rights of first refusal, preferential rights or restrictive contracts, in each case to the extent that they constitute a restriction on the right of ownership, title, economic and corporate rights (including voting rights), to transfer or exercise any other attributes of ownership or entitlement.

"Permitted Liens" means only any lien, guarantee and limitation on property created, constituted or granted under existing contracts and expressly disclosed in writing to Purchaser and, where applicable, to the Acquirer of the Real Estate Assets, in accordance with this Agreement and the Annexes hereto, including the CPPIB Guarantees and any liens created under the CPPIB Credit, as well as any liens to be constituted under the HSBC Credit.

"Tax" means any and all taxes and contributions, charges, duties, commissions, fees, tariffs, taxes and other charges of any kind (together with any and all interest, penalties, surcharges, updates and additions related to the above), social security contributions imposed by any Governmental Authority (whether in Mexico or in any other jurisdiction to which the Company and Subsidiaries may be subject), including profit sharing, taxes and other charges related to income (income tax), assets, real estate (including property tax and improvement contributions), withholdings, contributions to the Mexican Social Security Institute, contributions and dues to the Retirement Savings System, contributions and dues to INFONAVIT and Value-Added Tax; including in each case any charges, interest, surcharges, updates or penalties imposed by any Governmental Authority in relation to the above.

"<u>Transfer Taxes</u>" means any and all Taxes that are caused in relation to the Closing of the Transaction.

"<u>Confidential Information</u>" has the meaning established in Clause 8(a).

"<u>Personal Information</u>" means any and all information related to, or likely to be related to, a particular Person, including information that identifies, could be used to identify or that otherwise may make identifiable a natural person, including their name, address, phone number, email address, bank account number or government-issued identifier (including social security number or equivalent identifier, National Electoral Institute ID number and driver's license number), medical, health or insurance information, gender, date of birth, educational or employment information, marital status and any other data that may be used or intended to be used to identify, contact or locate a natural person specifically.

"<u>Leased Properties</u>" means the properties leased or subleased by the Company or the Subsidiaries or over which the Company or the Subsidiaries have a right to use, occupy or possess.

"<u>VAT</u>" means value-added tax.

"<u>Environmental Law</u>" means any Applicable Law or binding contract with any Governmental Authority in relation with the pollution (or cleaning thereof) or protection of natural resources, endangered or threatened species, human health or safety or the environment (including air, soil, surface water, groundwater or subsoil layers); in relation with the presence of, exposure to or the administration, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, release, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"<u>Applicable Law</u>" means, with respect to any Person, all present and future statutes, laws, ordinances, rules, orders, regulations, Official Mexican Standards and Mexican Standards issued by any Governmental Authority.

"<u>Privacy Law</u>" means all Applicable Law that regulates the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disclosure or transfer of Personal Information, including all Applicable Law that regulates the notice of breach and the Federal Law on the Protection of Personal Data Held by Individuals.

"<u>Labor Law</u>" means all Applicable Law that regulates or is related to labor relations, unions and collective bargaining agreements, terms and conditions of employment, including the Federal Labor Law, the Social Security Law and the National Workers' Housing Fund Institute Law, as such laws have been amended or supplemented, as well as regulations promulgated in accordance with the same.

"Federal Competition Law" means the Federal Law on Economic Competition published in the Official Gazette of the Federation on May 23, 2014, as well as any amendments or restatements, or law or regulation, that may replace it.

"Release" means any release, threat of release, spillage, emission, leakage, injection, disposal, deposit, discharge or migration to or through the environment (including, without limitation, air (indoor or outdoor), surface water, groundwater, soil, land surface or underground layer or within any building, structure, facility or furniture).

"Limit" has the meaning established in Section 9(c).

"Gayosso Trademarks" has the meaning established in Section 5.2(r)(i).

"Hazardous Materials" means any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, natural or man-made, which is regarded as hazardous, severely hazardous, toxic or words of similar significance or regulatory effect in accordance with Environmental Law.

"Mexico" means the United Mexican States.

"Minimum Indemnification Amount" has the meaning established in Section 9(b).

"Business" has the meaning established in the preamble to this Contract.

"FRS" means Financial Reporting Standards.

"IFRS" means International Financial Reporting Standards.

"Environmental Notice" means any guideline, notification of violation or infringement or notification, in writing, with respect to any Environmental Claim related with actual or alleged breaches of any Environmental Law or any term or condition of any Permit issued under, or in connection with, any Environmental Law.

"Indemnification Notice" has the meaning established in Section 9(d).

"Transaction" means, under the terms and conditions established in this Contract: (i) the acquisition of the Real Estate Assets by the Acquirer of the Real Estate Assets, in terms of the format of the Purchase Contract format, and the subsequent leasing of the Real Estate Assets to the Owner Companies under the terms and for the purposes indicated in Section XII of Article 188 of the Income Tax Law; (ii) simultaneously, the purchase of the Shares from the Sellers by the Purchaser; and (iii) entering into any other act related to or required for the formalization and consummation of the Transaction.

"Other Goods" has the meaning established in Section 5.2(p)(i).

"Parties" means the parties mentioned in the preamble to this Contract.

"Losses" means any damages and injuries suffered by the Party in question, including attorneys' fees and other reasonable and duly documented cash expenses incurred in relation with any claims brought against the Party in question.

"Post-Closing Tax Period" means any tax period (or portion of the Intermediate Period) that starts after the Closing Date.

"Pre-Closing Tax Period" means all tax periods (or the portion of the Intermediate Period) that end on or prior to the Business Day immediately preceding the Closing Date and, with respect to an Intermediate Period, the portion of such Tax Period that ends on the Business Day immediately prior to the Closing Date.

"Intermediate Period" means Fiscal Year 2021, including any monthly tax period within such fiscal year, and which will comprise two stages: (i) the first one that begins on January 1, 2021, and ends on the day immediately prior to the Closing Date; on the understanding that in this first stage, the Sellers will be solely liable for the fulfillment of all tax obligations borne by the Company and the Subsidiaries; and (ii) the second one that begins on the Closing Date and ends on December 31, 2021; on the understanding that in this second stage, the Purchaser will be solely liable for the fulfillment of all tax obligations borne by the Company and the Subsidiaries.

"Permits" means all licenses, permits, franchises, certificates, authorizations, concessions, approvals, clearances, exceptions, classifications, registrations and other similar documents and authorizations issued by any Governmental Authority which may be required for the operation of the Business in its Ordinary Course of Business.

"Person" means any natural person, company, trust, association, joint venture or Governmental Authority with legal capacity in accordance with Applicable Law.

"Related Persons" means (i) any of the Sellers, (ii) any director, officer or employee within the first hierarchical level of the Company or its Subsidiaries, (iii) any director, officer or employee within the first two (2) hierarchical levels of the Company or its Subsidiaries, (iv) any Person with relationship by blood or affinity, up to the third degree, of the Persons referred to in Sub-Paragraphs (i) to (iii) above, or (v) any Person in whom any Person referred to in Paragraphs (i), (ii) and (iii) has a controlling interest as a shareholder, partner or associate, or in whom any Person referred to in Sub-Paragraphs (i), (ii) and (iii) acts as a first-level director or officer (understood as the positions of the CEO, Director of Finance, Director of Operations or similar positions).

"Pesos" or "MXN $" means the legal currency of Mexico.

"Purchase Price of the Real Estate Assets" means the amount of ████████, plus the corresponding VAT, which the Purchaser of the Real Estate Assets will pay to the Owner Companies, in the individual amounts that are indicated in Annex P of this document.

"Acquisition Proposal" means any transaction whose purpose is to: (i) acquire the Real Estate Assets, (ii) acquire practically all or a substantial part of the assets of the Company or any Subsidiary, (iii) acquire part or all of the Shares representing the capital stock of the Company or any Subsidiary, (iv) acquire by any means the Control of the Company and/or any Subsidiary, or (v) split or merge the Company and/or the Subsidiaries and/or the split companies resulting from the split with a third party and transfer the operations of the Company and/or the Subsidiaries and/or the split companies to the merging company or to its subsidiaries.

"Purchase Price at Closing" has the meaning established in Section 2(b).

"Intellectual Property" means: (i) patents, inventions (whether or not patentable and trade secrets), (ii) copyrights and related rights, (iii) trademarks and service marks, (iv) trade names, (v) industrial designs, (vi) industrial secrets, (vii) utility models, (viii) trade notices, (ix) designations of origin, (x) domain names, (xi) database rights, and (xii) integrated circuit layout schemes, including registrations and applications for the same, defined as intellectual or industrial property in accordance with Applicable Law.

"Intellectual Property of the Companies" means any Intellectual Property, whether or not registered, that is owned by or licensed to the Company and/or the Subsidiaries and/or used in the Business as currently carried out by the Company and the Subsidiaries.

"Environmental Claim" means any claim, action, cause of action, governmental order, penalty, requirement, demand, investigation, audit, notification of violation, proceeding, litigation, subpoena or investigation [sic] of any nature, whether civil, criminal, administrative or regulatory, by or before any court, tribunal, arbitrator or other Governmental Authority by or from any Person alleging liability of any kind or nature (including liability for Losses, costs of enforcement proceedings, investigations, cleaning, governmental response, removal or remediation, damage to natural resources, damage to property, personal injury, medical monitoring, penalties, contributions, compensation and injunctive relief) that may arise from, or be based on, or that may result from: (i) the presence, Release of or exposure to any Hazardous Materials; or (ii) any breach, alleged or actual, of any Environmental Law or term or condition of any Permit issued under, or in relation with, any Environmental Law.

"Corporate Records" means, with respect to the Company and Subsidiaries, the original corporate books of each of those companies, duly requisitioned and signed by the representatives of such Persons in accordance with the requirements of Applicable Law, including the Meeting Minutes Book, the Share Registry Book, the Changes in Capital Book and the Board of Directors Meeting Minutes Book, as the case may be.

"Vendor Representative" has the meaning established in Section 24.

"Judgments" means, with respect to any Person, any judgment, order, award or decree from any Governmental Authority or arbitral tribunal applicable to said Person or to any of the Subsidiaries or any of their respective goods or assets.

"Company" has the meaning established in the preamble to this Contract.

"Owner Companies" has the meaning established in Background VIII to this Contract.

"Licensed Company Software" means all computer software and operating systems that are used in the Business as currently conducted by the Company and Subsidiaries.

"Subsidiaries" has the meaning established in Background VII to this Contract.

"Relevant Subsidiaries" means Jardines del Tiempo, S.A. de C.V., Servicios Auxiliares a Cementerios, S.A. de C.V., Gayosso Servicios Corporativos, S.A. de C.V., Mausoleos del Ángel, S.A. de C.V. and Agencia Funeraria Gayosso, S.A. de C.V.

"Restricted Workers" means the CEO of the Company and any other executive of the Company who reports directly to said CEO who currently provide services to the Company and/or its Subsidiaries, as described in the organizational chart established in Annex I.

"Sellers" has the meaning established in the preamble to this Contract.

Unless specifically stated otherwise, the following rules of interpretation will apply for the purposes of this Contract:

(a)    All references to Section numbers refer to Sections of this Agreement, and all references to Annexes or Appendices refer to Annexes or Appendices attached hereto and incorporated herein.

(b)    The words "hereto," "hereof," "hereunder," "hereinafter" and words of similar meaning refer to this Contract as a whole and not to a particular Section.

(c)    The words "includes" and "including" will be deemed to be followed by the phrase "without limitation."

(d)    The definitions in this Contract will be applicable to both the singular and plural of the terms defined. Where context so requires, any pronoun shall include the masculine, feminine and neutral gender.

(e)    A reference to any period of days will be deemed to be the number of calendar days unless specified otherwise.

Any references to any statute, law, regulation, treaty or protocol will be considered to include amendments thereto from time to time or any successor statute, law, regulation, treaty or protocol thereto.

## 2.    **Purpose and Purchase Price**.

(a)    Purpose. Subject to the terms and conditions agreed to in this Contract, the Parties undertake to carry out and cause to be carried out, formalize and consummate the Transaction, and to that effect they agree that: (i) the Acquirer of the Real Estate Assets undertakes to purchase, and the Owner Companies undertake to dispose of, the Real Estate Assets; (ii) simultaneously the Purchaser agrees to purchase from the Sellers, and the Sellers agree to sell to the Purchaser, the number of Shares established against the name of said Sellers in Annex A, which, except for five (5) shares owned by Agencia Eusebio Gayosso, S.A. de C.V., represent all of the Shares issued and outstanding that cover the capital stock of the Company, for the Purchase Price at Closing, in accordance with the provisions of Section 2(b) below; and (iii) jointly, they will enter into any other act related thereto or required for

the formalization and consummation of the Transaction. The transfer of ownership of the Real Estate Assets and Shares will be done simultaneously, free of any Lien, except for Permitted Liens.

(b) <u>Purchase Price at Closing</u>. The Purchaser and the Sellers agree that the purchase price of the Shares is  (the "<u>Purchase Price at Closing</u>"), which the Purchaser and the Sellers determined in the following manner:

i) the amount of ███████████████████████████ █████████████;

ii) minus the Company Indebtedness as of October 31, 2020, to the tune of ████████████████████;

iii) minus the Working Capital as of October 31, 2020, to the tune of ███████ ███████████████████████████████████;

(c) <u>Allocation of the Purchase Price</u>: The Closing Purchase Price will be paid by the Purchaser to the Sellers in accordance with the allocation percentage set out against the name of the Sellers in <u>Annex M</u>.

(d) <u>Purchase Price of the Real Estate Assets</u>. The Purchaser and the Sellers agree that the Purchase Price of the Real Estate Assets will be paid on the Closing Date in favor of each of the Owner Companies. To receive the Purchase Price of the Real Estate Assets, the Sellers undertake to ensure that no later than on the Closing Date: (i) the Owner Companies adopt resolutions under the terms stated in the Owner Company's Shareholder Meeting Minutes; and (ii) the Company adopts resolutions under the terms stated in Gayosso's Shareholder Meeting Minutes.

**3.** **Payment of the Purchase Price at Closing.**

(a) <u>Date of Payment of the Purchase Price at Closing</u>. On the Closing Date, subject to compliance with the Conditions Applicable to the Closing and once the transfer of the Shares in favor of the Purchaser has been made and the payment of dividends and/or loans in favor of the Purchaser has been decreed in terms of Gayosso's Shareholder Meeting Minutes and the Owner Company's Shareholder Meeting Minutes, the Purchaser must make the payment in Pesos on the Closing Date by means of electronic transfer of immediately available funds, without any deduction, compensation or claim (except as expressly established in this Contract) of the Closing Purchase Price to the accounts of the Sellers established in <u>Annex M</u> in accordance with the percentage of allocation established against the name of the Sellers in <u>Annex M.</u> The cost and foreign exchange risk of converting the Purchase Price at Closing into US dollars will be borne by and at the sole expense of the Sellers.

(b) <u>Date of Payment of the Purchase Price of the Real Estate Assets</u>. On the Closing Date, the Acquirer of the Real Estate Assets, simultaneously with the signing of the writs in which it states the release of the CPPIB Guarantees and those writs in which the transfer of ownership of the Real Estate Assets is made by the Owner Companies in favor of the Acquirer of the Real Estate Assets; and against the receipt of (i) the corresponding CFDIs; and (ii) the certified copy of each Owner Company's Shareholder Meeting Minutes and Gayosso's Shareholder Meeting Minutes, will pay the Purchase Price of the Real Estate Assets, delivering its amount in accordance with the irrevocable instructions issued by the Owners Companies and by the Company and will obtain the release of the CPPIB Guarantees; <u>on the understanding that</u> the aforementioned deeds will be safeguarded by the notary public before whom they have been granted and that the notary public will allow the Acquirer of the Real Estate Assets, as appropriate, to sign the writs until such time as it proves to have delivered the Purchase Price of the Real Estate Assets in accordance with the irrevocable instructions of the Owner Companies and the Company. The Acquirer of the Real Estate Assets will make the payment of the Purchase Price of the Real Estate Assets in Pesos by means of electronic transfer of immediately available funds, without any deduction, compensation or claim under the terms indicated in Section 2(b) above. Any VAT that may be caused will be paid directly to each Owning Company against the delivery of the corresponding CFDI.

(c) <u>Transfer Taxes</u>. Any Transfer Taxes that are caused on the occasion of the consummation of the Transaction shall be borne exclusively by the Party that is obliged to pay said Taxes in accordance with Applicable Law. The Party obliged by Applicable Law must file all necessary Declarations of Taxes required and other documentation in respect of all Transfer Taxes, and, if required by Applicable Law, the other Parties shall unite, and shall cause their Affiliates to unite, in the preparation of any Declarations of Taxes and other documentation. All documentation arising out of or in connection with the proceedings described herein will be sent to the Purchaser immediately upon filing and no later than five (5) Business Days after such filing.

**4.** **<u>Closing of the Transaction</u>**.

(a) <u>Conditions Applicable to the Closing</u>. The Closing will be subject to compliance with the obligations and conditions established below (the "<u>Conditions Applicable Conditions to the Closing</u>"):

(i) <u>Conditions for the Benefit of All Parties</u>. To consummate the Transaction, the respective obligations of each of the Sellers, the Purchaser and the Acquirer of the Real Estate Assets are subject to the satisfaction of the following suspensive conditions, each of which is for the benefit of the Sellers, the Purchaser and the Acquirer of the Real Estate Assets, and which can be waived only by the mutual written consent of the Representative of the Sellers, of the Purchaser and of the Acquirer of the Real Estate Assets; <u>on the understanding, however,</u> that unless there is an amendment or extension to this Contract agreed upon between the Parties, for all purposes the consummation of the Closing will constitute an express waiver of any Condition Applicable for the Closing that has not been satisfied no later than during the Closing:

(1) All Required Authorizations necessary to carry out the Transaction must have been obtained from the competent Governmental Authorities, and there must be no judicial or administrative procedure that seeks to revoke or alter the validity of any Required Authorizations as of the Closing Date;

(2)     All preventive notices in the corresponding Public Property Registries regarding the following properties must have been obtained:

i)     " Funeraria Gayosso Aguascalientes" located in Building built on (sic) a section of the lot located in Sillero or Casa Blanca de Aguascalientes;

ii)     "Funeraria Capillas del Carmen" located in a property marked with number 2670 on Avenida México, formerly calle Juan Manuel, built on lots 3 and 4 of block 27 of the 3rd section of the Ladrón de Guevara subdivision or colonia del Parque;

iii)     "Funeraria Capillas Vallarta" located in a property marked with number 2460 on Avenida Vallarta of the city of Guadalajara, Jalisco, and the lot of land on which it is built;

iv)     "Funeraria Gayosso López Mateos" located in a lot resulting from the merger of 8 lots of Malecón del Río de los Gómez, city of León, state of Guanajuato;

v)     "Funeraria Funerarias del Río" located in Lots of land number 3, 4, 19 and 20 of Block 19 of the Río Tijuana subdivision and Zona Río development, located in the municipality of Tijuana, Baja California;

vi)     "Funeraria Capillas de Santa Gema" located in Lots 9 of Block 5 of Colonia Juárez, in the city of Tijuana, Baja California, currently identified with number 2618 of Boulevard Fundadores; and

vii)     "Funeraria Gayosso Allende" located in half of Block number 16 of the second subdivision of land to the east of the city of Torreón.

(3)     The conditions for carrying out the HSBC Credit provision must have been met or waived; and

(4)     (i) There must have been no Applicable Law, injunctive, written or preliminary restraining order or any order of any nature issued by any Governmental Authority which remains in force and which results in the Transaction not being able to be consummated in accordance with the provisions of this Contract; (ii) there must have been no proceeding or demand commenced by any Governmental Authority for the purpose of obtaining such injunctive, written or preliminary restraining order; and (iii) there must have been no written or other notice received from any Governmental Authority that indicates the intention to restrict, impede, materially delay or restructure the Transaction.

(ii)     <u>Obligations for the Benefit of the Purchaser and the Acquirer of the Real Estate Assets</u>. To consummate the Transaction, the Purchaser and the Acquirer of the Real Estate Assets are subject to the satisfaction of the following obligations, each of which will be for the benefit of the Purchaser and the Acquirer of the Real Estate Assets, and they can be waived only by the prior written consent of the Purchaser and the Acquirer of the Real Estate Assets; <u>on the understanding, however,</u> that unless there is an amendment or extension to this Contract agreed upon between the Parties, for all purposes the consummation of the Closing will constitute an express waiver of any Condition Applicable for the Closing that has not been satisfied no later than during the Closing:

(1)     Except for Required Authorizations, Sellers must have obtained any consent forms, orders or authorizations from any Person required in relation with the execution or performance of this Contract, which will be in full force and effect on the Closing Date;

(2)     The representations of the Sellers, the Company and its Subsidiaries contained in Clause 5 of this Contract must be true, complete and correct in all material respects as of the date hereof and shall continue to be true, complete and correct in all material respects as of the Closing Date;

(3)     The Sellers must have entered into, or caused to be entered into, the Sellers' Guarantee in terms of <u>Annex V</u> hereto;

(4)     The Sellers, the Company and its Subsidiaries must have performed or fulfilled all of their obligations and commitments which, in accordance with this Contract, must be performed or fulfilled by each of them at the time of the Closing.

(5)     The Seller's Representative must have delivered, or caused to be delivered to the satisfaction of the Purchaser or, as the case may be, to the satisfaction of the Purchase of the Real Estate Assets, the deliverables for the Closing established in Section 4(b), respectively; and

(6)     The Company must have made the payment of the Transaction Costs in an amount that will not exceed, as a whole, MXN $30,000,000.00 (thirty million pesos and 00/100);

(iii)     <u>Obligations for the Benefit of Sellers</u>. The obligations of the Sellers to consummate the Transaction are subject to the satisfaction of the following obligations, each of which will be for the benefit of the Sellers, and they can be waived only by the prior written consent of the Sellers; <u>on the understanding, however,</u> that unless there is an amendment or extension to this Contract agreed upon between the Parties, for all purposes the consummation of the Closing will constitute an express waiver of any Condition Applicable for the Closing that has not been satisfied no later than during the Closing:

(1)     The representations of the Purchaser contained in Clause 6 of this Contract must be true, complete and correct in all material respects as of the date hereof and shall continue to be true, complete and correct in all material respects as of the Closing Date;

(2)     The Purchaser and the Acquirer of the Real Estate Assets must have performed or fulfilled all of their obligations and commitments which, in accordance with this Contract and, in accordance with the Adhesion Agreement, as the case may be, must be performed or fulfilled by each of them at the time of the Closing.

(3)     The Acquirer of the Real Estate Assets must have entered into leasing contracts with the Owner Companies on the Real Estate Assets; and

(4)     The Purchaser and the Acquirer of the Real Estate Assets must have delivered, or caused to be delivered to the satisfaction of the Representative of the Sellers, the deliverables for the Closing established in Section 4(b).

(b)       Closing. The Closing of the Transaction will be carried out on or before the Closing Deadline, as long as all Applicable Conditions for the Closing have occurred or have been waived, or on any other date previously agreed upon in writing between the Parties (the "Closing Date"). The Closing will be held at the offices of Fibra Uno, located at Antonio Dovalí Jaime, Torre B, piso 11, Colonia Santa Fe, 01210, Ciudad de México, México, or at any other place previously agreed upon in writing between the Parties. If the Closing has not been formalized before the Closing Deadline due to the breach of one or more of the Applicable Conditions for the Closing, this Contract will be considered terminated immediately as of the Closing Deadline without prejudice to the rights of the Parties to file the applicable remedies under the law if any breach should occur.

The fulfillment of all acts mentioned below will constitute the closing of the Transaction (the "Closing") and must occur on or before the Closing Deadline. Each Party will be obliged to carry out all acts required of it for the purpose of satisfying the Conditions Applicable to the Closing in accordance with the provisions established below. The failure by any Party to comply with any of its required acts in relation with the Closing will constitute a breach by such Party. The Closing will be considered to have occurred only when the corresponding Party has carried out all of the following acts.

(i)       The Representative of the Sellers must enter into and deliver to the Purchaser and the Acquirer of the Real Estate Assets, or cause to be entered into and delivered to the Purchaser and the Acquirer of the Real Estate Assets, as applicable, the following:

(1)       To the Purchaser, the titles of Shares in accordance with Annex "H," the ownership of and entitlement to must be duly endorsed in favor of the Purchaser, and with this, the transfer of ownership of and entitlement to the Shares to the Purchaser will be formalized;

(2)       To the Purchaser, a certified copy, issued by the secretary of the board of directors of the Company, of the corresponding entry made in the Company's share registry book, which reflects the transfer of the Shares in favor of the Purchaser in accordance with this Contract;

(3)       To the Purchaser, the updated Corporate Documents of the Company and of each Subsidiary and the first testimonies of the writs that contain the protocolization of: (A) each of the Subsidiary's Shareholder Meeting Minutes; (B) each of the Owner Company's Shareholder Meeting Minutes; and (C) Gayosso's Shareholder Meeting Minutes;

(4)       To the Purchaser and the Acquirer of the Real Estate Assets, copies of the public writs (or relevant extracts thereof) that demonstrate that the representative of each Seller has all of the necessary powers to sign this Contract on its behalf and to bind it in accordance with its terms;

(5)       To the Purchaser, the Corporate Records of the Company and of each Subsidiary, duly updated as of the Closing Date;

(6)       To the Purchaser, a certificate signed by the secretary of the board of directors of the Company and each Subsidiary regarding the shareholding structure thereof as of the Closing Date;

(7)     To the Purchaser, letters of resignation, in form and substance reasonably satisfactory to the Purchaser, signed by each Resigning Director and Officer (which must be confirmed by the Subsidiary's Shareholder Meeting Minutes and Gayosso's Shareholder Meeting Minutes), which must include a settlement issued to each Resigning Director and Officer on behalf of the Company and its Subsidiaries, as applicable, to the satisfaction of the Purchaser;

(8)     To the Acquirer of the Real Estate Assets, the first testimony of the public writs in which the transfer of ownership of the Real Estate Assets in favor of the Acquirer of the Real Estate Assets is recorded in the terms of this Contract and in terms of the Acquisition Contract format, once the Acquirer has paid the CPPIB Credit and the writs of release of the CPPIB Guarantees have been signed.

(9)     To the Acquirer of the Real Estate Assets, the CFDI of the Purchase Price of the Real Estate Assets issued by each of the Owning Companies;

(10)    To the Purchaser, copies of the Company's audited Financial Statements as of December 31, 2018, and as of December 31, 2019, and, in the event that the Closing occurs after January 31, 2021, the Company's internal Financial Statements as of December 31, 2020;

(11)    To the Purchaser, monthly financial statements after December 31, 2020, for each month that has expired after 20 (twenty) Business Days, duly subscribed by the legal representatives of the Company and the Subsidiaries.

(12)    To the Purchaser and to the Acquirer of the Real Estate Assets, copy of all of the Required Authorizations and any other consent forms, approvals, orders or authorizations of any Person required in relation with entering into or the fulfillment of this Contract.

(13)    To the Acquirer of the Real Estate Assets, certificates of release from liens of each of the Real Estate Assets and plans, licenses, permits, proof of payment of taxes and duties and other documents related to the Real Estate Assets.

(14)    To the Purchaser and to the Acquirer of the Real Estate Assets, copy of the CPPIB Credit termination agreement and release of the CPPIB Guarantees; and

(ii)    The Purchaser and the Acquirer of the Real Estate Assets, as applicable, must carry out, enter into and deliver, or cause to be carried out, entered into and delivered, the following:

(1)     The Purchaser to the Sellers, the Purchase Price at Closing, in funds immediately available in accordance with the provisions of Section 3 above;

(2)     The Acquirer of the Real Estate Assets to the Company, with a copy to the Sellers, a copy of the proof of payment of the Purchase Price of the Real Estate Assets by means of a copy of the proof of the transfer of funds immediately available, made by order and account of the Company and the Owner Companies, to pay part of the CPPIB Credit and its accessories, including the CPPIB Credit Termination Commissions;

(3)    The Purchaser to the Sellers, copy of the Purchaser's bylaws and instruments (or corresponding extracts thereof) demonstrating that the Purchaser has the necessary authorizations to enter into this Contract and to be bound in accordance with its terms; and

(4)    The Purchaser and the Acquirer of the Real Estate Assets to the Sellers, copies of the instruments (or corresponding extracts thereof) that demonstrate that the representative of the Purchaser and of the Acquirer of the Real Estate Assets has all of the necessary powers to sign this Contract on its behalf and to bind it in accordance with its terms;

## 5.    **Representations of the Sellers and the Company**.

5.1.                    Representations by the Sellers. Each Seller declares, only with respect to itself, through its respective representatives or proxies, the following:

(a)    *Incorporation*. (i) TwiBel 1 SPRL, TwiBel 2 SPRL and TwiBel 3 SPRL are legal and currently existing companies, duly incorporated in the Kingdom of Belgium, and (ii) TwiBel 4 SPRL, TwiBel 5 SPRL, TwiBel 6 SPRL and TwiBel 7 SPRL are legal and currently existing companies, duly incorporated in the Kingdom of Belgium, resident, for tax purposes, in the Netherlands. Each of the Sellers has the power to own and dispose of its assets and comply with its obligations and consummate the Transaction considered in this Contract.

(b)    *Representation*. Each of the representatives or proxies of the Sellers has all of the powers necessary to bind them in accordance with the terms of this Contract, and said powers have not been revoked or modified in any way.

(c)    *Ownership of the Shares*. Each of the Sellers is the sole and legitimate owner or beneficiary of the Shares indicated against the name of said Seller in Annex A. Each of the Shares has been duly issued, subscribed and fully paid, and except for the Permitted Liens is free of any Lien, contingency, liability, debt and controversies. The Shares, except for five (5) shares owned by Agencia Eusebio Gayosso, S.A. de C.V., represent 100% (one hundred percent) of the capital stock of the Company outstanding, and there are no shares pending subscription and/or payment in the treasury of the Company. There are no options for purchasing, subscription, optional securities, purchase rights, conversion rights or other contracts or commitments in force that may oblige the Company to issue, sell or put into circulation shares representative of its capital stock; and the Sellers are not party to any contract related to options, optional instruments, purchase rights or other similar agreement or commitment (other than this Contract) that obliges the Sellers to sell or transfer, in any way, a part of the capital stock of the Company. The Sellers are not party to any voting trust, power of attorney or other similar contract or agreement regarding the voting of the capital stock of the Company. The Sellers acquired the Shares by means of valid acts enforceable against third parties and with remedies of lawful origin.

(d)    *Powers*. Each of the Sellers has full corporate power and faculties to enter into this Contract, fulfill and cause to be fulfilled its obligations derived from this contract and to consummate the Transaction, including, without limitation, causing the Owner Companies to dispose of the Real Estate Assets in the amounts, terms and conditions established in this Contract. The entering into and the fulfillment by the Sellers of this Contract, the fulfillment by the Sellers of their obligations hereunder and the consummation of the Transaction have been duly and validly authorized by all necessary corporate and contractual actions. This Contract has been entered into correctly and validly by the Sellers. This Contract constitutes legal, valid and binding obligations on the Sellers that are enforceable against them in accordance with its terms, subject to the applicable bankruptcy, receivership and other similar laws that may affect the enforceability of the rights of creditors in general, on the understanding that the consummation of the Transaction is subject to the obtaining of

the Required Authorizations, among other Conditions Applicable to the Closing.

(e) *Authorizations*. Except for Required Authorizations, it is not necessary to obtain or grant any consent, approval, notification, authorization or order from, or declaration, presentation or registration with, any Governmental Authority or other third party regarding entering into, delivering and fulfilling this Contract or the consummation of the Transaction.

(f) *Breach*. Entering into and fulfilling this Contract by the Sellers, the consummation of the Transaction and the performance and fulfillment of the terms and conditions hereof by the Sellers, as applicable: (i) do not conflict with or violate any provision of the Sellers' bylaws; (ii) do not constitute or result in a violation of, or involve a breach (or an event which, by notification or the passage of time, or both, would become a breach), grant to others any right of termination, modification, acceleration or cancellation of, trigger any payment or other obligations in accordance with or under any contract, confidentiality agreement, exclusive affairs or similar agreements, or other instrument or obligation to which a Seller is a party or by which any of the Seller's goods or assets are linked or affected; or (iii) does not violate or conflict with, constitutes a violation or breach of any Judgment to which a Seller is a party or by which a Seller or any of its goods is linked, or any Applicable Law and which, in the case of each of sections (i), (ii) and (iii) above, could prevent, impair or affect the existence, validity or enforceability of this Contract, or the fulfillment by the Sellers of any of their obligations under this Contract or the consummation of the Transaction.

(g) *Intermediaries.* Except as indicated in Appendix 5.1(g), Sellers have not paid or are obligated to pay any commission, investment banking fees, financial advisory fees, brokerage fees or intermediary fees in relation with this Contract and the consummation of the Transaction; on the understanding that, with respect to the commission, investment banking fees, financial advisory fees, brokerage fees or intermediary fees established in Appendix 5.1(g), the Sellers will be solely liable for their respective payments.

(h) *Ratification, Accuracy and Purpose.* Each of the representations that the Sellers make and grant in this Contract and the documentation presented to the other Parties to this Contract, which is attached thereto, is true and complete and does not contain false or incorrect data.

5.2. Representations of the Company. The Company declares, through its representatives, that:

(a) *Incorporation*. Except as established in Appendix 5.2(a), the Company and each of the Subsidiaries are limited-liability, variable capital companies incorporated in accordance with the laws of Mexico. The Company and the Subsidiaries have full powers and faculties to own and dispose of their respective assets, lease and operate them and conduct the Business as they have been to date.

(b)     *Representation*. The representatives or proxies of the Company have all of the powers necessary to bind them in accordance with the terms of this Contract, and said powers have not been revoked or modified in any way.

(c)                      *Capitalization*

(i)     Appendix 5.2(c)(i) contains a description of the capital stock and the shareholder structure of the Company and of the Subsidiaries. All shares of the capital stock of the Company and of each Subsidiary are duly authorized, have been validly issued, fully paid and, except for Permitted Liens, are free of any Liens, contingencies, liabilities, debts and controversies and qualify as shares released in accordance with Applicable Law.

(ii)     Except as established in Appendix 5.2(c)(ii), the Company is directly and indirectly the legal owner of all outstanding shares of the Subsidiaries in the proportions indicated in Appendix 5.2(c)(i) and has sufficient powers to cause the Owner Companies to perform the necessary acts required to dispose of the Real Estate Assets in the amounts, terms and conditions established in this Contract.

(iii)     Except for this Contract, there are no options, warrants, convertible securities, treasury securities, subscription rights, capital appreciation rights, phantom stock plans, employee share ownership or capital equivalents or other rights based on capital, contracts, arrangements or commitments (contingent or otherwise) of any nature issued or authorized in relation to the issued or non-issued capital stock or shares owned by the Company or the Subsidiaries. There are no contractual obligations pending repurchase, amortization or acquisition by other means of any shares of the capital stock in the Company or the Subsidiaries or for paying any dividend or making any other distribution with respect to the above or for providing funds to, or make any investment (in the form of a credit, capital contribution or any other form) in, any Person. There are no contributions for future capital increases pending capitalization by the Company or its Subsidiaries.

(iv)     The Company and the Subsidiaries do not own, directly or indirectly, shares in the capital stock of any other company or any rights, stock or any other interests in any other company, association, joint venture, trust or other non-profit entity other than those listed in Appendix 5.2(c)(i).

(d)     *Powers*. The Company has full powers and faculties to enter into this Contract, to carry out and fulfill its obligations hereunder and to consummate and cause to be consummated the Transaction. The entering into and the fulfillment by the Company of this Contract, the fulfillment of their obligations hereunder and the consummation of the Transaction have been duly and validly authorized by all necessary corporate and contractual actions. This Contract has been duly and validly entered into by the Company.

(e)     *Mandatory Nature*. This Contract constitutes legal, valid and binding obligations on the Company, enforceable against it in accordance with its terms, subject to the applicable bankruptcy, receivership and other similar applicable laws that may affect the enforceability of the rights of creditors in general, on the understanding that the consummation of the Transaction is subject to the obtaining of the Required Authorizations, among other Conditions Applicable to the Closing.

(f)     Breach. The entering by the Company into this Contract and the fulfillment of this Contract by the Company and the consummation of the Transaction (i) do not conflict with or violate any provision of the Company's or the Subsidiaries' bylaws; (ii) do not result in a breach or constitute a breach (or an event which, by notification or the passage of time, or both, would become a breach), or would give others any right to rescind, terminate, modify, finish early, accelerate or cancel, or permit the imposition of any commissions or penalties, require the offering or making of any payment, or result in the creation of any Lien on any property or asset owned or used by the Company or any of the Subsidiaries in accordance with, or under, any promissory note, bond, mortgage, obligation, contract, agreement, exclusive affairs or similar contract, lease, license, permit, franchise or other instrument or obligation, instrument [sic] or other agreement, in which the Company or any of the Subsidiaries are part or by which the goods or assets of the Company or any of the Subsidiaries are linked to or affected by; (iii) do not violate or conflict with, constitute a breach of, any Judgment applicable to the Company or any of the Subsidiaries or any of their assets (iv) will not entitle third parties to exercise the option to purchase or subscribe shares representative of the Company's capital stock or (v) do not violate or conflict with, constitute a breach of, any act of Government Authority applicable to the Company or any of the Subsidiaries or any of its assets and that, in the cases of Sections 5.2(f)(ii) and (v) above, could constitute an Adverse Material Effect of the Business.

(g)     *Compliance with Applicable Law* The Company and each of its Subsidiaries and its Real Estate Assets are in compliance with Applicable Law and Environmental Law in all material respects.

(h)               *Dissolution, Liquidation, Receivership or Bankruptcy.* Neither the Company nor any of its Subsidiaries: (i) has incurred any cause of dissolution, liquidation, receivership, commercial insolvency or bankruptcy, or is subject to any proceeding to such effect, or (ii) has knowledge that any of its creditors has commenced any proceeding for dissolution, liquidation, receivership, bankruptcy or commercial insolvency, or (iii) has filed or intends to file a voluntary declaration of dissolution, liquidation, receivership, bankruptcy or commercial insolvency.

(i)     *Financial Reporting*.

(i)     Appendix 5.2(i)(i) contains copies of (x) the audited Financial Statements of the Company and its Relevant Subsidiaries as of December 31, 2016, 2017, and 2018, (y) the non-audited internal financial statements of the Company and its Subsidiaries as of October 31, 2019, and (z) the internal income statement and financial position statement of each of Servicios Integrales San Pedro, S.A. de C.V., and Agencia Eusebio Gayosso, S.A. de C.V. as of December 31, 2016, 2017, and 2018, and as of October 31, 2019 (collectively those established in Sub-Paragraphs x, y and z, the "Financial Statements").

(ii)     The Financial Statements were prepared in accordance with the IFRS in force on the relevant issue date, applied consistently, and in accordance with all Applicable Law. The Financial Statements (including the notes and appendices related thereto, where applicable) fairly present the financial position, operating results, capital and cash flows of the Company and of its Subsidiaries. Since December 31, 2017, there has been no change in any accounting (and tax accounting) policies, practices or procedures within the Company, except for any changes required in accordance with IFRS or Applicable Law.

(iii)  Appendix 5.2(i)(iii) contains the integration of the working capital accounts of the Company, consolidated with the working capital accounts of the Subsidiaries, as of the date this Contract is entered into.

(iv)  Each of the Company and the Subsidiaries has a valid title in relation to all of its accounts receivable reflected in the balance sheet of the Company and each of the Subsidiaries, free of any Lien. All accounts receivable from the Company and from the Subsidiaries as of October 31, 2019, are valid and enforceable claims and were generated in the Ordinary Course of Business.

(j)  *No Adverse Changes*. As of October 31, 2019, and until the date of this Contract, there has been no Adverse Material Effects of the Business on the activities, financial situation or results of the Company or its Subsidiaries. Without limiting the general nature of the above, as of such date:

(i)  neither the Company nor any Subsidiary has sold, leased, transferred or assigned any Material Assets, whether tangible or intangible, outside of the Ordinary Course of Business;

(ii)  neither the Company nor any Subsidiary has created any security interest on its assets, whether tangible or intangible, nor has it recorded any Lien or claim on such assets other than Permitted Liens;

(iii)  neither the Company nor any Subsidiary has invested in Material Assets or incurred material capital expenditures outside of the Ordinary Course of Business;

(iv)  neither the Company nor any Subsidiary has made any investment of material capital in another Person or has granted any material credits to another Person outside of the Ordinary Course of Business;

(v)  neither the Company nor any Subsidiary has granted any license or sub-license with respect to any material rights related to any Industrial Property rights;

(vi)  neither the Company nor any Subsidiary has made or authorized any amendment to its bylaws;

(vii)  neither the Company nor any Subsidiary has granted any credit or entered into any transaction with its shareholders, directors, officers and employees outside of the Ordinary Course of Business;

(viii)  neither the Company nor any Subsidiary has entered into any individual or collective bargaining contract in writing, nor has it modified the terms of any contract in force other than those described in this Contract or as required by Applicable Law;

(ix)    neither the Company nor any Subsidiary has increased the base salary of its directors, officers and employees outside of the Ordinary Course of Business;

(x)    neither the Company nor any Subsidiary has adopted, amended, modified or rescinded any plan, contract or commitment related to the payment of bonuses, profit sharing, incentives or payment of settlements to its directors, officers and employees (or entered into any such acts in relation with any other employee benefit plan) outside of the Ordinary Course of Business;

(xi)    except for the Administration Bond, neither the Company nor any Subsidiary has adopted, amended, modified or rescinded any plan, contract or commitment related to the payment of bonuses, profit sharing, incentives or payment of settlements to its directors, officers and employees outside of the Ordinary Course of Business;

(xii)    neither the Company nor any Subsidiary has recorded its inventory, accounts receivable or accounts payable in a manner inconsistent with, or contrary to, IFRS or with the historical, business and operating accounting practices of the Company or the Subsidiaries, as the case may be.

(k)    *Significant Liabilities and Non-disclosed Liabilities.*

(i)    Appendix 5.2(k)(i) contains a list of liabilities pending payment by the Company and the Subsidiaries derived from banking and financial transactions, indicating, with respect to each liability, the identity of the debtor and creditor and the original and unpaid amount thereof.

(ii)    Appendix 5.2(k)(ii) contains a list of liabilities pending payment by the Company and the Subsidiaries with its service providers and other providers as of October 31, 2019, indicating, with respect to each liability, the identity of the debtor and creditor and the amount pending payment thereof.

(iii)    Neither the Company nor any Subsidiary has liabilities (whether direct or contingent, matured or not) which must be reflected in the Financial Statements in accordance with Applicable Law and IFRS, but which are not properly reflected or established in the Financial Statements, except for liabilities resulting from this Contract.

(l)    *Taxes*

(i)    The Company and each of the Subsidiaries has duly prepared and filed in due time, or has caused to be duly prepared and filed in due time (within any applicable extension periods), all Declarations of Taxes to be filed on or before the Closing by the Company and the Subsidiaries in accordance with Applicable Law. Such Declarations of Taxes are true, complete and accurate in all material respects. All of the Taxes that are shown as owed on such Declarations of Taxes, and all other Taxes for which the Company and any Subsidiaries are, or may otherwise be, liable (whether or not shown as due on such Declarations of Taxes), have been due, paid in a timely and full manner or will be due, paid in a timely and full manner on the due date thereof. Insofar as is required under Applicable Law or IFRS, the most recent Financial Statements of the Company and Subsidiaries reflect an adequate reserve for all Taxes contingent or payable by the Company and Subsidiaries for all tax periods and portions thereof as of the date of such Financial Statements. No Tax Lien has been filed against the Company and the Subsidiaries and no Tax Authority has filed any claims or impositions with respect to the Company and the Subsidiaries.

(ii)     No Declaration of Taxes of any of the Company and Subsidiaries is under audit or examination by any Tax Authority, nor has it received any home visit, office review or electronic review, audit or examination by any Tax Authority during the last 5 (five) fiscal years, and the Company and Subsidiaries have not received any written or verbal notice of such audit. Neither the Company nor any Subsidiary is a party to, or otherwise subject to, a proceeding in which Taxes are being challenged.

(iii)     Neither the Company nor any of the Subsidiaries is a party to, or is subject to, Judgment, transaction agreement or similar contract with any Governmental Authority in relation to Taxes for any periods for which the statute of limitations has not yet expired.

(iv)     The Company and the Subsidiaries withheld and paid all Taxes in full and in a timely manner and made the accounting and corporate records required by Applicable Law to support any tax or accounting situation, filing or claim they may have made with respect to Taxes for periods within the statute of limitations.

(v)     The Company and the Subsidiaries have duly and fully complied with all applicable transfer pricing provisions in accordance with Applicable Law.

(vi)     Notwithstanding any provision to the contrary expressed or implied herein, the representations in this Contract are the sole and exclusive representations of the Sellers or with respect to the Company and the Subsidiaries related to Taxes, tax attributes or any matters relating to Taxes. No statement is made with respect to Taxes, tax attributes or any matters related to tax corresponding to any Tax Period After the Closing.

(m)     *Corporate Books and Records*. The Corporate Records of the Company and each of the Subsidiaries are complete, correct and have been maintained in accordance with sound business practices and the requirements of Applicable Law.

(n)     *Ownership of Property.*

(i)     Appendix 5.2(n)(i) contains a list of each and each and every one of the Real Estate Assets owned by the Company and the Subsidiaries. The Company and the Subsidiaries, as applicable, are the sole and legal owners of the goods described in Appendix 5.2(n)(i).

(ii)     The Company and the Owner Companies have full ownership, possession and dominion over their respective Real Estate Assets, which have been legally acquired and, except as mentioned in Appendix 5.2(n)(ii), are free of Liens; current in the payment of their taxes, duties and contributions; free of debts or liabilities of any kind; and free of invaders or possessors of any kind.

(iii)     Neither the Company nor the Subsidiaries have entered into or are bound by any lease (including free or loan leases), sublease, license, option, right, use grant or other contract or agreement granting any Person the right to use or occupy the Real Estate Assets or any part thereof.

(iv)  Neither the Company nor the Subsidiaries are party to or are obligated under any option, right of preference, right of first refusal and other contractual right to sell, dispose of, grant the use or lease any part of the Real Estate Assets.

(v)  The Company and the Subsidiaries are in compliance with the payment of any Tax related to the Real Estate Assets, including the property tax and rights for water and drainage service.

(vi)  There are no convictions or similar proceedings pending against any of the Real Estate Assets.

(o)  *Leases*.

(i)  Appendix 5.2(o)(i) contains a list of (i) any and all Leased properties, and (ii) any and all lease contracts whose consideration exceeds MXN $50,000.00 (fifty thousand pesos and 00/100) monthly, under which the Company or the Subsidiaries are lessors, owners or operators of any property owned by third parties, in both cases as of the date of this Contract, specifying, with respect to each lease, the location of the property, the parties to the lease, the validity, use, current monthly rent, date of entering into and expiration date of the contract (the "Companies' Leases").

(ii)  With respect to each of the Companies' Leases:

(1)  said Company Lease is legal, valid, binding, enforceable against the Company and the corresponding Subsidiaries and against the counterparty (unless said enforceability may be affected by receivership, bankruptcy, insolvency or similar procedures) and third parties, and is in full force and effect;

(2)  neither the Company nor any of the Subsidiaries are in breach under any Company Lease outside of any corresponding notice and curing period and, insofar as the Sellers and the Company are aware, no event has occurred nor is there any circumstance which, upon the delivery of notice, the passage of time, or both, would constitute a breach or would permit the termination, modification or acceleration of the rent under any of the Companies' Leases.

(3)  the peaceful possession, use and enjoyment by the Company and the Subsidiaries of the Leased Properties under each of the Companies' Leases has not been interrupted and there are no controversies regarding any of the Companies' Leases;

(4)  there are no convictions, expropriations or similar proceedings pending against any of the Leased Properties or the Improvements thereto; and

(5)  they have not been notified in writing of the occurrence of any event or the existence of any circumstance that would prevent the renewal of any of the Companies' Leases under the same terms and conditions in force.

(p)    *Other Assets.*

(i)    Appendix 5.2(p)(i) contains a list of the main assets owned by the Company and its Subsidiaries whose net book value on the date of execution of this Contract exceeds the amount of MXN $100,000.00 (one hundred thousand Mexican pesos) ("Other Assets"), consisting of machinery and equipment (including computing equipment, transportation equipment, and the machinery/equipment used in the provision of funeral services) used by the Company and the Subsidiaries during the Ordinary Course of Business, while any Other Assets of a lesser value are duly reflected, included, and recognized in the Financial Statements. Without prejudice to the foregoing, the Company makes no representation with respect to the commercial value of the Other Assets, and this declaration does not imply any representation or warranty with respect to the continued operation of said Other Assets or their suitability in the future.

(ii)    The Company and the Subsidiaries hold sufficient and valid title for all their respective Other Assets, which are in good working order, have been preserved in good condition by maintenance and repair save normal wear and tear from use, and are, with the exception of the Permitted Liens and the terms established herein, free of any Liens, contingencies, debts, liabilities, and disputes.

(q)    *Permits.*

(i)    Appendix 5.2(q)(i) contains a list of the Permits held by the Company and the Subsidiaries, which include all of the Permits required to own, hold concession for, benefit from, or operate all of their cemeteries, mausoleums, columbaria, crematoria and for the provision of cremation and funeral services in the Ordinary Course of Business;

(ii)    Except as described in Appendix 5.2(q)(i), the Company and each Subsidiary owns or possesses the Permits and is compliant in all formal and material respects with all obligations and liabilities deriving therefrom, including those required by the Environmental Law, as necessary in order for them to carry out the Business in adherence with the Applicable Law, and in the manner they have so done to date, as well as to own, lease, use or operate their assets and property in precisely the manner in which such assets and property have been owned, leased, used or operated to date in connection with the Business, these assets being in each case free and clear of any Liens and in compliance with the Applicable Law. All these Permits are valid, binding, and fully in effect;

(iii)    Neither the Company nor any of the Subsidiaries has received any notification or claim from any Government Authority or any Person alleging or establishing their intent to allege a breach on behalf of the Company or any of the Subsidiaries of any of the Permits, and there is no legal or factual basis for any such allegation to reasonably be made; and

(iv)    The Company owes no fees, levies, or Taxes in relation to the Permits or arising from the interment, creation, disinterment, re-interment, and disposal of ashes, with the exception of debts which individually or in the aggregate fail to constitute a Material Adverse Effect on the Business.

(r)    *Intellectual Property and IT Assets.*

(i)     Appendix 5.2(r)(i) contains a list of: (i) all of the Intellectual Property of the Company or of the Subsidiaries which is not registered and is significant to the Ordinary Course of Business as it is conducted at present; and (ii) all the Intellectual Property of the Company and of the Subsidiaries that has been registered and for which registration requests have been submitted by or on behalf of the Company or the Subsidiaries, or by or on behalf of a predecessor of the Company or the Subsidiaries, in any jurisdiction (the (las "Registered Trademarks of Gayosso").

(ii)     The Registered Trademarks of Gayosso can be used by the Company and/or the Subsidiaries free of any royalties, and with the exception of the Permitted Liens and the terms established herein, they are free of any Lien, debt, contingency, liability, or dispute, and they constitute the only Intellectual Property rights used by the Company and the Subsidiaries in the Ordinary Course of Business.

(iii)     Excepting the CPPIB Warranties, neither the Company nor any Subsidiary has used (except in relation to their activities), transferred, or encumbered their Intellectual Property.

(iv)     Excepting the terms established in Appendix 5.2(r)(iv), (x) there is no claim whatsoever contesting the right of the Company or of any Subsidiary to use the Registered Trademarks of Gayosso, and to the best of the Knowledge of the Sellers and of the Company, there is no reasonable basis for such claim to be brought in good faith, (y) neither the Company nor any Subsidiary is in violation or infringement of any Intellectual Property, nor have they misappropriated any Intellectual Property or created any conflict with the foregoing, and the future performance of the activities of the Company and of the Subsidiaries, in the manner they are conducted at present, will not result in any violation, infringement, misappropriation, or conflict with any Intellectual Property, and (z) no Person has brought any claim, suit, complaint, or notification in such regard which Material Adverse Effect on the Business, and the Company has no reasonable Knowledge of the filing of any such claim.

(v)     Neither the Company nor any Subsidiary has granted any license or right to any other Person or person with respect to the Registered Trademarks of Gayosso.

(vi)     The Company and each Subsidiary state that (y) they have computing equipment, software, databases, computing programs and applications, systems to create backups, and any other equipment or information technology necessary to carry out their operations in the Ordinary Course of Business (the "IT Assets"), and (z) the Company has no Knowledge of any material noncompliance or limitation on such IT Assets that may impede their continued operation in the Ordinary Course of Business. The foregoing does not imply any representation or warranty in regard to the continued operation of said IT Assets or their suitability in the future.

(vii)     Appendix 5.2(r)(vii) establishes a list of the Licensed Software of the Companies necessary to continue their operations in the Ordinary Course of Business. The Company and each of the Subsidiaries are in compliance with the terms and conditions of all license contracts relating to the Licensed Software of the Companies, excepting breaches that either individually or in the aggregate do not cause a Material Adverse Effect to the Business.

(s)     *No Breach of Contract*. Neither the Company nor any Subsidiary has incurred in any violation or breach, and no event has occurred that, given prior notice of the same or by the mere passage of time, that

(i)    would constitute a violation or breach of any contract with service providers, vendors, or lessors to which the Company or any Subsidiary are party, or that would result in the amendment or early termination of said contract, excepting violations or breaches that either individually or in the aggregate do not cause a Material Adverse Effect to the Business; and

(ii)    that would result in the imposition of any material Lien, claim, or lien on the assets of the Company or any Subsidiary under any contract or instrument to which they are party.

(t)    *Contracts.*

(i)    Appendix 5.2(t)(i) establishes a list of the following contracts, to which the Company and each of the Subsidiaries are party (including any amendments, waivers, modifications, or addenda thereto), and which remain fully in effect (collectively, the "Material Contracts"):

(1)    any contracts for issuance of credit obligations, guarantee contracts, guarantees, factoring and leasing contracts, and other contracts related to any Indebtedness of the Company and the Subsidiaries;

(2)    any guarantees pledged by the Sellers or their Affiliates to guarantee obligations of the Company and any of the Subsidiaries;

(3)    all contracts that limit or restrict the capacity of the Company and of any of the Subsidiaries to carry out any business or to own, operate, or otherwise participate in any business (in any capacity), in any jurisdiction;

(4)    any contract whereby the Company and any of the Subsidiaries have made any capital contribution or other investment in, or have assumed any liability or obligation of any Person, in an amount greater than MXN $500,000.00 (five hundred thousand Mexican pesos and 00/100);

(5)    any contract providing for settlement, severance, or similar payment to any directors, officers, employees, or consultants or other independent contracts past or present of the Company and any of the Subsidiaries;

(6)    any contract entered into by the Company and any of the Subsidiaries containing a change of control provision or other similar provisions restricting any changes in the capital stock of the Company and the Subsidiaries;

(7)    all existing contracts (other than those described in paragraph (1) above) that involve an annual commitment or annual payment to or from the Company and any of the Subsidiaries in an amount greater than $500,000.00 (five hundred thousand Mexican pesos); or (2) under which the consequences of breach or termination would have a Material Adverse Effect on the Business.

(ii)    Copies of each Material Contract have been provided to the Purchaser. Each Material Contract is legal, valid, binding, and enforceable in accordance with their respective terms either in favor of or against the Company and the Subsidiaries, and to the best of the Knowledge of the Sellers and of the Company, each counterpart in said contracts is also in compliance therewith (unless such enforceability is impacted by bankruptcy, insolvency, or similar proceedings). Neither the Company nor the Subsidiaries have incurred in any material violation or breach of the Material Contracts and (ii) to the best of the Knowledge of the Sellers, of the Company, and of the Subsidiaries,

no event has occurred that, with prior notification of the same or without the need for any such notification, or by the mere passage of time, would constitute a material violation or breach, or would result in the rescission, modification, or early termination of the Material Contracts.

(u)     *Related Party Transactions.* Except as described in Appendix 5.2(u), there is no contract, agreement, commitment, obligation, or legal or business relationship or any kind, whether direct or contingent, verbal or written, between the Company and/or any Subsidiary on the one hand and a Related Party on the other. All transactions between related parties comply with the rules on transfer pricing under the Applicable Law and have been carried out at prevailing market prices, under prevailing market conditions, and on arm's length basis. The Business is carried out, conducted, and operated solely and exclusively by the Company and the Subsidiaries.

(v)     *Litigation and Claims.* Appendix 5.2(v) contains a list of lawsuits and claims or agrarian, civil, labor, criminal, or administrative proceedings in which the Company and the Subsidiaries are currently involved. Except as described in said Appendix 5.2(v), neither the Company nor any Subsidiary is party to any action, suit, proceeding, hearing or investigation before any court of law or quasi-judicial or administrative body in any jurisdiction, or with any arbitrator, which, if decided on terms unfavorable to the Company or the Subsidiaries would, individually or in the aggregate, have a Material Adverse Effect on the Business.

(w)     *Personnel.*

(i)     Appendix 5.2(w)(i) contains a list of the employees of the Company and the Subsidiaries whose position is at a level between Senior Officer and Junior Manager, inclusive, indicating their age, position, and current annual compensation (including any rights to bonuses, benefits in kind, profit sharing, and payment of severance or retirement benefits).

(ii)     (y) Except as established in Appendix 5.2(w)(ii), there are no complaints, actions, claims, arbitration proceedings, investigations, audits, or proceedings of any kind pending against or affecting the Company and the Subsidiaries in connection with an alleged violation by the Company and the Subsidiaries (or any of their respective directors or officers) of any Labor Laws with respect to the Business, (z) neither the Sellers nor the Company or Subsidiaries, in connection with the Business, have committed any unfair labor practice, nor has any charge or claim of unfair labor practice been filed, as of the date hereof, against the Company or the Subsidiaries in connection with the Business, with any Governmental Authority, except for any suits, actions, claims, arbitration proceedings, investigations, audits, proceedings of any kind, breaches, unfair labor practices or complaints which, individually or in the aggregate (for breach, unfair labor practice, or complaint of the same kind) do not cause a Material Adverse Effect on the Business.

(iii)     The Company and each of the Subsidiaries is in compliance with the Labor Laws relating to profit sharing (including Employee Profit Sharing) and have paid all amounts payable under these systems to their employees.

(iv)    Appendix 5.2(w)(iv) contains a list of the outsourcing contracts entered into by the Company and the Subsidiaries with respect to the sales force and commission-based agents of the Company and of the Subsidiaries.

(v)    The Company and each of the Subsidiaries is in compliance with the Labor Law in connection with the outsourcing contracts enumerated in Appendix 5.2(w)(iv), excepting any infringement that either individually or in the aggregate would not have a Material Adverse Effect on the Business.

(vi)    A list is included in Appendix 5.2(w)(vi) of any and all plans, contracts, or commitments relating to the payment of bonuses, profit sharing, incentives or payment of severance to directors, officers, and employees of the Company and of the Subsidiaries (including any other employee benefit plans).

(x)    *Unions*. Appendix 5.2(x) contains a list of all the collective bargaining contracts applicable to the Company and the Subsidiaries, and their respective operations, and there is no other union, labor organization, labor council, or group of employee representatives that is legally certified or recognized or that is negotiating a contract with the Company or its Subsidiaries. There is no strike or work stoppage that is pending resolution.

(y)    *Insurance*.

(i)    Appendix 5.2(y)(i) contains a list of all insurance policies and bonds contracted by or for the benefit of the Company and each of the Subsidiaries, specifying the insurer, the amount and nature of the coverage, the insured risk, the amount of the deductible (if any), the annual premium, and the date through which coverage will continue by virtue of premiums that are already paid. Said insurance policies are in effect and the respective premiums have been paid.

(ii)    There are no pending claims under any of the policies involving an amount in excess of $500,000.00 (five hundred thousand Mexican pesos and 00/100).

(z)    *Necessary Authorizations and Approvals*. Excepting the Required Authorizations which will be obtained before the Closing Date, the formalization and execution of this Contract and all other contracts executed or to be executed hereunder, as well as the consummation of the Transaction by the Sellers, do not require any Permit and require no notice, registration, or submission with any Person or Government Authority.

(aa)    *Powers of Attorney and Guarantees*. Appendix 5.2 (aa) contains a list of all the physical or legal persons to whom the Company and the Subsidiaries have granted powers of attorney (whether general, special, or any other type of power of attorney) effective as of the date of this Contract, indicating for each such powers of attorney (w) the date it was given, (x) the powers granted (e.g., for litigation and collection, for administrative acts, etc.), (y) the name and number of the notary public that notarized the public document containing the power of attorney, and (z) where applicable, information on the registration of said public document with the public commercial registry.

(bb) *Bank Accounts.* Appendix 5.2(bb) contains a list of all the deposit and bank accounts of the Company and each Subsidiary, with the authorized signatories (including signatories to carry out electronic transactions) for each deposit and bank account.

(cc) *Environment*.

(i)     The Company, the Subsidiaries, the Real Estate Assets, and the operation of the Business are and have been compliant with the Environmental Law, excepting any noncompliance which individually or in the aggregate does not cause a Material Adverse Effect to the Business.

(ii)     The Company and the Subsidiaries have operated the Business at all times and have generated, received, handled, used, treated, delivered, and disposed of all Hazardous Materials in compliance with the Environmental Law in all material aspects.

(iii)     There has been no Release of Hazardous Materials in violation of the Environmental Laws with respect to the Business or the Real Estate Assets owned, used, or operated by the Company and the Subsidiaries (including any Leased Properties or any off-site location to which the Company and any of the Subsidiaries may have transported or agreed to transport materials subject to regulation under the Environmental Laws) that could have a Material Adverse Effect on the Business, and neither the Company nor the Subsidiaries have received an Environmental Notification indicating that any Real Estate Asset or Leased Property, or any other facilities previously owned or operated by or leased in connection with the Business, including any off-site locations to which the Company and any of the Subsidiaries may have transported or arranged for the transport of materials subject to regulation under the Environmental Law (including soil, subsoil, groundwater, surface water, buildings and other structures located on any of the Real Estate Assets or Leased Properties or previously used facilities) has been contaminated with any Hazardous Material that could reasonably be expected to result in an Environmental Claim against, or a violation on the part of the Company and the Subsidiaries, of the Environmental Law or any term or condition of any Permit issued pursuant to any Environmental Law in connection with the Business that could have a Material Adverse Effect on the Business, and to the best of the Knowledge of the Sellers and the Company, none of the locations has at any time been deemed with its obligations under Applicable Law to be a contaminated site, environmental emergency, or environmental liability, to the extent that such a declaration could have a Material Adverse Effect on the Business.

(iv)     No remedial or corrective action necessary to guarantee the continuation of the Ordinary Course of Business of the Company and of the Subsidiaries pursuant to the Environmental Law is required or being carried out by the Company and the Subsidiaries, excepting any remedial or corrective action necessary to correct a non-compliance that would not have a Material Adverse Effect on the Business.

(v)     Except as established in Appendix 5.2(cc)(v), no written notice, order or summons has been issued and served on the Company and the Subsidiaries, and to the Knowledge of the Sellers and the Company, no written complaint has been filed, and no written penalty has been imposed by any Government Authority with respect to any failure to comply with the Environmental Law in connection with the Business conducted by the Company and the Subsidiaries; and (ii) to the Knowledge of the Sellers and the Company, there is no environmental investigation or review underway by any Government Authority with respect to any failure to comply with Environmental Law in connection with the Real Estate Assets and the Business carried out by the Company and the Subsidiaries, including actions alleging the existence of environmental damage caused by the Company and the Subsidiaries or the operation of the Business.

(dd) *Health and Sanitary Regulations*. The Company and the Subsidiaries have operated the Business, including the provision of cremation, interment, disinterment, re-interment, and ash storage services, in compliance with all health and sanitary requirements and guidelines established in the Applicable Laws, including the General Health Law, the Regulations to the General Health Law on Sanitary Control of the Disposal of Human Organs, Tissues, and Cadavers, and Official Mexican Standards NOM-087-ECOL-SSA1-2002, Environmental Protection, Environmental Health, Biological/Infectious Hazardous Waste, classification and handling specifications, and NOM 036-SCFI-2016, Commercial Practices, information requirements, and general provisions on funeral services, published on January 5, 2017 in the Official Gazette of the Federation.

(ee) *Privacy and Data Protection*.

(i) The Company and the Subsidiaries (y) are and have been in compliance with the Privacy Law, including all privacy policies and similar disclosures posted on the applicable websites of the Company and the Subsidiaries or otherwise communicated to third parties; and (z) have implemented and maintained sufficient measures to provide sufficient assurances that the Company and the Subsidiaries are in compliance with the Privacy Law and that the Company and any of the Subsidiaries will acquire, cease to obtain, share, or use Personal Information in a manner not consistent with (1) the Privacy Law, (2) any notice to or consent of the provider of the Personal Information, (3) any policy adopted by the Company and the Subsidiaries, (4) any contract to which the Company and the Subsidiaries are party and which is applicable to such Personal Information, and (5) any privacy policy or privacy statement published from time to time or otherwise made available by the Company and the Subsidiaries to Persons from whom Personal Information is collected.

(ii) With respect to all Personal Information in the possession or control of the Company and the Subsidiaries, the Company and the Subsidiaries have at all times taken the steps required and/or reasonably necessary to protect such Personal Information against loss and against unauthorized access, use, modification, disclosure, or any other misuse, including the implementation and monitoring of compliance with reasonable measures regarding the technical and physical security of such Personal Information. There has been no unauthorized access to, disclosure of, or other misuse of any Personal Information in the possession or under the control of the Company and any of the Subsidiaries.

(ff) *Compliance with anti-corruption laws*. There has been no action on the part of the Company and the Subsidiaries or any person on behalf of the Company and the Subsidiaries that could cause the Company and any of the Subsidiaries or said persons to be in noncompliance with the Foreign Corrupt Practices Act of 1977 (United States), as amended, the Federal Criminal Code (Mexico), as amended, the Federal Law on Administrative Responsibilities of Public Servants (Mexico), as amended, the Law on Anti-corruption in Public Procurement (Mexico), as amended, the General Law on the National Anti-corruption System of 2016 (Mexico), as amended, or any other similar legislation prohibiting corruption, bribery, or money laundering in any jurisdiction in which the Company and the Subsidiaries conduct their business and to which the Company and the Subsidiaries may be subject. Neither the Company nor the Subsidiaries (nor any Person acting on any of their behalf), directly or indirectly through a third party intermediary, have paid, offered, given, promised to pay, or authorized the payment of money or anything of value (including any gift, token, travel, food and lodging expenses, entertainment, service, equipment, debt forgiveness, donation or other thing of value, however characterized) to (i) any officer or employee of a Government Authority or entity owned or controlled by the government; (ii) any Person acting for or on behalf of any Government Authority or entity owned or controlled by the government; (iii) any political party or official thereof, (iv) any candidate for political office; or (v) any other Person at the suggestion, request, direction or for the benefit of any of the Persons described above for any of the following purposes: (A) (1) to influence any act or decision of such individual or entity in their official capacity;

or (2) to induce such individual or entity to perform or omit to perform any act in violation of the lawful duty of such individual or entity; or (3) to secure any improper business advantage; or (B) to induce such natural person or entity to use its influence with any Government Authority or entity owned or controlled by the Government to affect or influence any act or decision of such Government Authority or entity owned or controlled by the Government to assist such individual or entity in obtaining or retaining business for or with, or to direct business to any individual or entity.

(gg) None of the Shares, Real Estate Assets, or assets owned by the Company or the Subsidiaries has originated in or is related to any activity considered a crime under the laws of Mexico, Belgium, the Netherlands, or any other jurisdiction to which such assets are subject. The Sellers will immediately notify the Purchaser if they discover that any of the preceding statements are no longer true.

(hh) Pursuant to the Foreign Account Tax Compliance Act ("FATCA"), the Sellers acknowledge that in the future they may be required to disclose information relating to this Contract in a confidential manner under the terms of FATCA.

(ii) The Sellers are the ultimate beneficial owners of the Shares and of the Real Estate Assets, as this term is defined in the Federal Law for the Prevention and Identification of Transactions with Illicit Proceeds.

5.3.        <u>No Additional Representations. Ratification, Veracity and Purpose</u>. (i) Each of the representations made and given by the Company in this Contract and the documentation submitted to the other Parties to this Contract and attached hereto is true and complete and contains no untrue or incorrect information; and (ii) except for the representations contained in Sections 5.1 and 5.2 hereof (including the related parts of the Representations Appendices), the Sellers and the Company make no other express or implicit representations, including but not limited to, and without prejudice to the generality of the foregoing, in regard to the technical, commercial, financial or legal viability of the Company and the Subsidiaries, including (1) the collectability of their accounts receivable or the solvency of their debtors, and (2) in regard to the profitability or success of the Company; accordingly, the Parties acknowledge that the Company and/or the Subsidiaries, as the case may be, shall not be liable in connection with any other information that does not form part of this Contract.

**6.**     **Representations of the Purchaser**.

6.1.     Representations of the Purchaser. The Purchaser represents to the Sellers as follows:

(a)     *Incorporation*. The Purchaser is duly incorporated in Mexico, validly existing, and is in compliance with its obligations under Applicable Law.

(b)     *Representation*. The Purchaser's representatives or attorneys-in-fact have all the necessary powers to bind the Purchaser under the terms of this Contract, and such powers have not been revoked or modified in any way.

(c)     *Powers*. The Purchaser has full corporate power and authority to enter into this Contract, perform its obligations hereunder, and consummate the Transaction. The Purchaser's execution and performance of this Contract, its performance of its obligations hereunder, and the consummation of the Transaction have been duly and validly authorized through all necessary corporate and contractual actions. This Contract has been properly and validly executed by the Purchaser. This Contract establishes legal, valid and binding obligations for the Purchaser, which are enforceable against it in accordance with the terms herein, subject to the applicable bankruptcy, receivership, and other similar laws affecting the enforceability of creditors' rights in general; with the understanding that the consummation of the Transaction is subject to the obtaining of the Required Authorizations, among other Applicable Conditions for Closing.

(d)     *Authorizations*. With the exception of the Required Authorizations, no consent, approval, notice, authorization, order, declaration, submission, or registration with any Government Authority or other third party is required to be obtained or given with respect to the execution, delivery, and performance of this Contract or the consummation of the Transaction.

(e)     *Non-infringement*. The execution and performance by the Purchaser of this Contract, and the consummation of the Transaction and the performance and satisfaction by the Purchaser of the terms and conditions hereof, as applicable, (i) do not conflict with or violate any provision of the Purchaser's bylaws; (ii) do not constitute or result in any breach or default of (or an event which by notification, lapse of time, or both would become a default); grant to others any right of termination, amendment, acceleration, or cancellation of; or trigger any payment or other obligations pursuant to or under any contract, confidentiality agreement, exclusive dealings, or similar agreements, or any other instrument or obligation to which the Purchaser is party or whereby any of the Purchaser's goods or assets are bound or affected; and (iii) do not violate or conflict with or constitute a breach or default of any Judgment to which the Purchaser is party or whereby the Purchaser or any of its assets are bound, or any Applicable Law, and which could, in the case of each of the preceding numbers (i), (ii), and (iii), impede, impair, or affect the existence, validity, or enforceability of this Contract, or the Purchaser's performance of any of its obligations hereunder or the consummation of the Transaction.

(f)     *Intermediaries*. The Purchaser has not paid and is not obligated to pay any commission, investment banking fees, financial advisory fees, brokerage fees, or fees to other intermediaries in connection to this Contract and the Transaction.

(g) *Resources*. The Purchaser and the Acquirer of the Real Estate Assets must have, on the Closing Date, liquid resources available from legal sources in an amount equal to the Acquisition Price of the Real Estate Assets and the Closing Purchase Price.

(h) *Purchaser's Audit (Due Diligence)*. The Purchaser has conducted and continues to conduct in good faith an audit process (due diligence) of the legal, contractual, environmental, labor, accounting, operational, fiscal, and financial affairs and details of the Company and its Subsidiaries based on the information and documentation that has been provided to it by the Sellers and the Company, trusting the veracity and sufficiency of all such information and documentation, and acknowledging that it has been given appropriate access to the personnel, facilities, books, records, and other Company documents and information for this purpose. However, the Parties expressly agree that the due diligence conducted by the Purchaser does not release the Sellers and the Company from any obligation or liability hereunder.

(i) *Ratification, Veracity and Purpose*. Each of the representations made and given by the Purchaser herein and in the documentation submitted to the other Parties to this Contract and attached hereto is true and complete and contains no untrue or incorrect information.

## 7.     Pre-Closing Obligations.

(a)     Sellers' Pre-Closing Obligations. The Sellers agree and undertake for the benefit of the Purchaser and the Acquirer of the Real Estate Assets to perform or refrain from performing the following acts, from the date of execution of this Contract until the Closing Date or the date on which this Contract is terminated in accordance with its terms:

(i)     Amendment to the Company Bylaws. Unless given prior written consent by the Purchaser, the Sellers must refrain from adopting any resolution, whether at a shareholders meeting or by unanimous consent in lieu of a meeting, that would result in amendment to the bylaws of the Company and its Subsidiaries.

(ii)     Distributions. Unless recorded in the Owning Company's Shareholder Meeting Minutes or with the prior written consent of the Purchaser, the Sellers shall refrain from (i) adopting any resolution, whether at a shareholders' meeting or by unanimous consent in lieu of a meeting, that would result in the declaration or payment of dividends, capital reductions, or other distributions in favor of the Company or the Sellers, or (ii) reimbursing any fees, loans and/or expenses to the Sellers.

(iii)     Corporate Restructuring. Unless given prior written consent by the Purchaser, the Sellers must refrain from adopting any resolution, whether at a shareholders meeting or by unanimous consent in lieu of a meeting, that would result in the merger of the Company and/or its Subsidiaries with any third party.

(iv)     Sale or Transfer of Stock or Assets. Except for Permitted Liens and transactions carried out in the Ordinary Course of Business, the Sellers will refrain from selling, transferring, disposing of, encumbering, or pledging the Stock or assets of the Company and the Subsidiaries; granting or creating rights to purchase or sell, options, ownership restrictions, voting restrictions, or other rights in favor of third parties with respect to the Stock or the assets of the Company and the Subsidiaries; and imposing any restrictions or limitations on the rights associated with the Stock or the assets of the Company and the Subsidiaries. The Owning Companies will refrain from selling, transferring, disposing of, or encumbering the Real Estate Assets.

(v)    Exclusivity. The Sellers will refrain from directly or indirectly (i) requesting, commencing, or performing any act intended to facilitate any Acquisition Proposal; (ii) commencing or participating in conversations, discussions, or negotiations with any Person (excluding the Purchaser) in connection with any Person's Acquisition Proposal; (iii) supporting, cooperating with, facilitating, or encouraging the efforts of any Person in connection with an Acquisition Proposal; and (iv) providing information on the activities, assets and liabilities, financial or operational position, or operating results of the Company or the Subsidiaries to any Person in the context of an Acquisition Proposal.

(b)    The Company's Pre-Closing Obligations. The Company agrees and undertakes for the benefit of the Purchaser to perform or refrain from performing the following acts, from the date of execution of this Contract until the Closing Date or the date on which this Contract is terminated in accordance with its terms:

(i)    Performance of Activities. The Company and the Subsidiaries will carry out all necessary actions in order to enable the Company and the Subsidiaries to: (i) continue to conduct their activities and operations in the Ordinary Course of Business, in accordance with their past practices, seeking to preserve their activities, assets, and relationships with customers and suppliers (including the sources of their financing), (ii) continue to repair and provide maintenance to their assets in the Ordinary Course of Business, (iii) refrain from creating a Lien on any of their assets, except those created in the Ordinary Course of Business, (iv) keep their Real Estate, including all improvements made thereto, in substantially the same condition as they are in on the date hereof, (v) refrain from incurring additional liabilities or indebtedness, except for that which is incurred in the Ordinary Course of Business, and (vi) refrain from entering into any written or oral contract or entering into any transaction with any Related Party, (vii) refrain from making any changes in its accounting procedures and records, (viii) continue to pay all of its Taxes as required by the Applicable Law, and (ix) comply with its obligations to customers, except for those defaults that do not have a Material Adverse Effect on the Business.

(ii)    Other Restrictions. Except (i) as otherwise expressly established in this Contract, or (ii) as previously consented to in writing by the Purchaser (such consent which will not be unreasonably withheld, delayed or conditioned), or (iii) as required by the Applicable Law, or (iv) as disclosed in the Representations Appendices, or (v) consistent with the Ordinary Course of Business, from the date of this Contract and until Closing, the Company must, and the Sellers and the Company must cause the Subsidiaries to refrain from:

(1)    amending their Corporate Documents;

(2)    issuing shares or other instruments that represent their capital, redeeming the Stock or entering into any contract with respect to the subscription, conversion, redemption or issuance of optional securities (or other similar instruments) or options with respect to the Stock or the shares of capital stock of the Subsidiaries, or that involves the granting to third parties of any rights over such stock or the right to require issuance of additional shares of its capital stock or the capital stock of the Subsidiaries, or that imposes on the Company any obligation (whether direct or contingent) to acquire, issue, or authorize the subscription or transfer of shares of its capital stock or the capital stock of the Subsidiaries;

(3)    transferring, selling, leasing, licensing, mortgaging, pledging, or otherwise disposing of the Real Estate Assets; delivering, divesting, canceling, abandoning, or ceasing to exercise rights available to prevent lapse or expiration or other disposal of any asset or any of its operations, rights, businesses, or interests, except in the Ordinary Course of Business;

(4)    making any changes to hiring and compensation policies outside the Ordinary Course of Business;

(5)    incurring in additional Indebtedness or liability, except for additional inter-company Indebtedness or liabilities incurred in the Ordinary Course of Business, never to exceed the amount of MXN $1,000,000.00 (one million Mexican pesos and 00/100) without the prior written consent of the Purchaser;

(6)    constituting any Lien on its assets;

(7)    acquiring real estate;

(8)    paying dividends or making other outlays to the Company, the Subsidiaries, or the Sellers;

(9)    submitting any request for voluntary restructuring with respect to themselves or the Subsidiaries under the Bankruptcy Law;

(10)   amending in any material aspect or terminating any Material Contract inconsistent with the Ordinary Course of Business;

(11)   unless required by the NIIF or the Applicable Law, making any significant change to their fiscal and accounting policies;

(12)   waiving, releasing, surrendering, terminating, granting, or transferring any right of low value, or failing to take any action where such failure may result in the revocation, cancellation, suspension or termination of any Permit;

(13)   except as required by the Applicable Law or payable in the Ordinary Course of Business, making or changing any option for the payment of Taxes, changing the annual Tax accounting periods, adopting or changing any method of accounting for Taxes, settling any claim or dispute relating to Taxes or amending any Tax Return; and

(14)   authorizing their spin-off or merger or the merger of any Subsidiary with a third party.

(iii)    <u>Documents of the Real Estate Assets</u>. The Company agrees to deliver and to cause the Owning Subsidiaries to deliver to the Acquirer of the Real Estate Assets the documents and information necessary for the notarization of the deeds of sale for the Real Estate Assets with the notary designated by the Acquirer of the Real Estate Assets no later than 15 (fifteen) Business Days before the Closing Date.

(iv) <u>HSBC Loan</u>. The Purchaser hereby acknowledges and instructs the Company to carry out all actions necessary or convenient to the execution and disbursement of the HSBC Loan on the Closing Date. The Parties agree that the HSBC Loan will be subject to the condition precedent consisting of the completion of the Closing. Given that the HSBC Loan will be drawn down on the Closing Date at the request and to the benefit of the Purchaser, the Parties acknowledge that the Purchaser will conduct the negotiations on all the terms and conditions of the HSBC Loan. The foregoing is with the understanding that neither the Purchaser nor the Company can make any modification to the HSBC Loan without the prior written consent of the Representative of the Sellers.

(c) <u>Reasonable Access</u>. The Company and the Subsidiaries will grant to the Purchaser's representatives, officers, and advisors full access during Business Days and reasonable hours interfering as little as possible with the normal activities of the Company and the Subsidiaries, to all facilities, properties, personnel, accounts, books, records (including records relating to Taxes), contracts, and documents of the Company and the Subsidiaries, to the extent necessary in order for the Purchaser to verify the continued veracity and accuracy of the Representations Appendix and the representations given herein, and to verify compliance with the Applicable Conditions for Closing. Likewise, the Company and the Subsidiaries will allow the Purchaser to attend as observer the meetings of their Board of Directors and Finance Committee. The Purchaser must maintain the confidentiality of all the Confidential Information received from the Sellers. The Purchaser will not use any part of the Confidential Information unrelated to the purposes of this Contract.

(d) <u>Termination of Certain Contracts</u>. All contracts or agreements between the Company and any of the Subsidiaries, on the one hand, and any of the Sellers or any of their Affiliates (other than the Company and the Subsidiaries), on the other hand, will terminate no later than the day immediately preceding the Closing Date, and there will be no accounts receivable and no accounts payable as of such termination.

(e) <u>Consents</u>. The Parties will cooperate in good faith: (i) to determine whether any action is required by or in regard to, or any proceeding is required before any Government Authority, or whether it is necessary to obtain any actions, consents, approvals, or waivers from the Parties for any contract, agreement, instrument, covenant, or understanding to which the Company or any of the Subsidiaries is party, or under which any of their assets or property are bound in connection with the consummation of the Transaction; and (ii) to take any actions or perform any steps or perform any filings, submit any information, required in connection with the foregoing and in seeking to obtain any actions, consents, approvals, or waivers in a timely manner, including to make commercially reasonable efforts to cooperate in connection with any such steps, filings, or other communication relating thereto or in connection with any claim brought by a third party. Each Party must promptly notify the other Parties (and provide written copies) of any communication from or with any Government Authority or any third-party Claims in connection with the transactions contemplated hereby.

(f) <u>Antitrust</u>. The Parties shall fully comply with all notices, reports, and other applicable requirements from the Applicable Law in connection with the Transaction. The Parties have already obtained CFC authorization for the Transaction in accordance with the Federal Antitrust Law (Ley Federal de Competencia Económica). The Parties will provide the CFC with any additional information and documentary material it might request in accordance with the Federal Antitrust Law as soon as possible. Payment of the fees for the filing of the notification of the Transaction was at the sole account and expense of the Company.

(g) <u>Public Announcement</u>. The Parties agree not to make any public announcement regarding the Closing or any other transaction contemplated hereby unless the Applicable Law requires such public announcement.

(h) <u>Supplemental Disclosure</u>.

(i) The Sellers, the Company and the Subsidiaries will be under a continuing obligation from the date of execution of this Contract and the Closing Date to promptly supplement or amend the Appendices with respect to any matter which, in the event it had existed or if there was Knowledge of the matter on the date hereof, should have been established or described in the Appendices listed in Section 5, and they shall promptly advise the Purchaser in writing of the particulars of such supplement or amendment to the relevant Appendix. The Parties agree that, to the extent that any representation contained in Section 5 above does not refer to an Appendix, but results from circumstances arising after the date hereof, the inclusion of exceptions in an Appendix to such representation shall be necessary to make such representations complete and correct. The Sellers will have the right to create the respective Appendix prior to the Closing and will be obligated to promptly disclose the same in writing to the Purchaser.

(ii) The Sellers, the Company, and the Subsidiaries will promptly notify the Purchaser and the Acquirer of the Real Estate Assets of the occurrence of any event or condition or the existence of any fact which, to the Knowledge of the Sellers, the Company, or the Subsidiaries, would cause any of the Applicable Conditions for Closing benefiting the Parties and/or the Purchaser and/or, as the case may be, the Acquirer of the Real Estate Assets, not to be satisfied.

(iii) The Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, will promptly notify the Sellers' Representative of the occurrence of any event or condition or the existence of any fact that would cause any of the Applicable Conditions for Closing benefiting the Sellers not to be satisfied.

(i) <u>Resignation of Directors</u>.

(i) The Sellers shall cause the Company and each of the Subsidiaries, on the Closing Date, to adopt unanimous resolutions to: (1) approve the resignations of each of the Resigning Directors and Officers pursuant to their respective letters of resignation (and effective as of the Closing), (2) revoke any powers of attorney granted to such Resigning Directors and Officers in a form satisfactory to the Purchaser, and (3) appoint and grant powers of attorney to new directors and officers to replace the Resigning Directors and Officers, in accordance with the instructions of the Purchaser no later than five (5) Business Days prior to the Closing and with evidence of the foregoing duly executed before a Mexican notary public at the Closing, as well as their registration with the appropriate public registries. To the extent that any such action or notice is required under Applicable Law in connection with the foregoing resignations, the Sellers and the Purchaser, as applicable, shall cause the Company and the Subsidiaries to promptly take such action or send such notices in accordance with such Applicable Law (provided that drafts thereof shall have been approved by the Sellers or the Purchaser, as the case may be, prior to such action or notice).

(ii) Effective as of the Closing, the Purchaser agrees, and shall cause the Company and the Subsidiaries, to release each of the Resigning Directors and the Resigning Officers from any claims that the Purchaser, the Company, the Subsidiaries or any of their respective Affiliates may have against them for the performance of their respective duties as a director, officer, representative or employee of the Company, the Subsidiaries or any of their respective Affiliates, as applicable, or otherwise had or may hereafter have by reason of, or in any way arising out of, any

-40-

cause, matter or thing whatsoever existing up to the Closing, except in the case of fraud, willful misconduct or negligence.

8.      **Post-Closing Obligations**.

        (a)     Confidentiality.

                (i)     For a period of three (3) years from the Closing Date, the Sellers and each of their respective Affiliates agree: (y) to treat as confidential and safeguard any confidential and proprietary information, knowledge and data about the Company, the Subsidiaries and the Business (the "Confidential Information") using the same degree of care, but not less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of the Confidential Information that the Sellers or their respective Affiliates exercised with respect thereto prior to the execution of this Contract; and (z) not to disclose or use the Confidential Information directly or indirectly without the prior written consent of the Purchaser and/or the Acquirer of the Real Estate Assets.

                (ii)    For a period of three (3) years from the date hereof, each Party agrees that it shall treat as confidential and safeguard, and shall cause (or, with respect to representatives of third parties, use commercially reasonable efforts to cause) its Affiliates and representatives to treat as confidential and safeguard, (1) the entire Contract and the terms and conditions hereof, (2) other documents, materials and other information it has obtained with respect to the other Parties during the course of: (A) the negotiations leading to the conclusion of the Transaction (whether obtained before or after the date of this Contract); (B) the "*due diligence*" performed; and (C) the preparation of this Contract and other related documents, in each case, using the same degree of care, but not less than a reasonable standard of care, to prevent unauthorized use, dissemination or disclosure of the Confidential Information. Such documents, materials and information shall not be communicated to any third party (other than their respective officers, hired advisors, agents, attorneys, accountants, financial advisors or other representative; provided that, in the event of disclosure to such persons, the Parties and their respective Affiliates shall use commercially reasonable efforts to preserve the confidentiality of the information disclosed).

                (iii)   The obligation of each Party to treat documents, materials and other information as confidential pursuant to Sections 8(a)(i) and 8(a)(ii) shall not apply to any information that (1) is previously known to such Party on a non-confidential basis, (2) is in the public domain through no fault of such Party, (3) is lawfully acquired after the Closing by such Party from sources other than the Parties, or (4) is required to be disclosed pursuant to Applicable Law or judicial process, or upon the request of any competent Governmental Authority having regulatory authority over such Party or its Affiliates, but only to the extent required to be disclosed and provided that, to the extent practicable, reasonable prior notice of such disclosure is sent to the other Parties and a reasonable opportunity to contest such disclosure is provided.

        (b)     ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



      (c)    <u>Non-solicitation</u>. For a period of 3 (three) years from the Closing Date, the Sellers agree that neither they nor any of their respective Affiliates shall, directly or indirectly (i) induce, encourage or entice any Restricted Employee to leave their employment or to accept any other position or employment with any other Person or (ii) hire or assist any other Person to hire any Restricted Employee for any reason; provided, however, that (i) and (ii) above shall not (x) prohibit Sellers or their respective Affiliates from hiring or assisting a Restricted Employee who is no longer engaged in the operation of the Company and the Subsidiaries at the time of their initial contact with such Restricted Employee with respect to such employment and six months have elapsed since such Restricted Employee ceased to be engaged in the operation of the Company and the Subsidiaries, or (y) prohibit general solicitation of employment through advertisements or other means not directed toward Restricted Employees, and the hiring of Restricted Employees who respond to such advertisements. Notwithstanding the foregoing, the Sellers shall have 1 (one) month to remedy such breach from the date the Purchaser notifies the Sellers of such breach by terminating any contract or relationship with any Restricted Employee whereby such Restricted Employee became an employee or service provider of the Sellers.

      (d)    <u>Tax Matters</u>.

      (i)    Preparation and Filing of Tax Returns. Payment of Taxes.

      (1)  The Sellers shall be solely liable for the payment of the Taxes for the Pre-Closing Tax Periods and for such purpose shall timely prepare and file, or cause to be timely prepared and filed, all Tax Returns for the Partnership and the Subsidiaries for all Pre-Closing Tax Periods due prior to the Closing (taking into account any applicable extensions). The Sellers shall also prepare and file all Tax Returns for the Partnership and the Subsidiaries required to be included in (or filed with) a Tax Return of an affiliated, consolidated, combined, unitary or aggregate group of which the Sellers or any of their Affiliates are a part for Pre-Closing Tax Periods. The Sellers shall pay, or cause to be paid, all Taxes shown as due and owing on all Tax Returns for, or including, a Pre- Closing Tax Period or the respective portion of the Interim Period filed pursuant to this Section. Notwithstanding the foregoing, The Sellers shall not be liable for the payment of any Taxes arising out of the acquisition of the Real Estate Assets by the Acquirer of the Real Estate Assets.

(2) The Purchaser shall timely prepare and file, or cause to be timely prepared and filed, all Tax Returns required to be filed by the Company and the Subsidiaries after the Closing. Any Tax Returns filed by the Purchaser and relating to a Pre-Closing Tax Period shall be prepared in accordance with the past practices of the Company and the Subsidiaries, deviating from such practices only as required by Applicable Law. With respect to any Tax Return to be filed by the Purchaser including a Pre-Closing Tax Period, the Purchaser shall deliver it to the Sellers' Representative for approval at least 20 (twenty) Business Days prior to the due date for the filing of the annual Tax Return and at least 7 (seven) Business Days prior to the due date for the filing of any other Tax Return, especially, monthly interim payments (taking into account any applicable extensions), a draft of such Tax Return, together with any additional information relating to such Tax Return and in the Purchaser's possession, as the Sellers may reasonably request. The Purchaser shall reflect in such Tax Return any reasonable comments submitted by the Sellers' Representative at least 3 (three) Business Days prior to the due date of such Tax Return; provided that, in the event the Sellers' Representative fails to provide comments in a timely manner, the Purchaser shall have the right to file such Tax Return without incorporating the Sellers' comments in order to avoid a late filing of such Tax Return. Prior to the due date of a Tax Return filed by the Purchaser pursuant to this Section with respect to a Pre-Closing Tax Period, but no later than 2 (two) Business Days prior to the due date for the filing of such Tax Return, the Sellers shall pay to the Purchaser, by wire transfer of immediately available funds to an account designated by the Purchaser, the amount of Taxes shown as due and owing on such Tax Return for a Pre-Closing Tax Period, taking into account any interim payments and accounting provisions that the Company and the Subsidiaries may have made. Once the net amount of Taxes is determined, in the event of a positive balance, it shall be paid by wire transfer of immediately available funds to the bank account designated by the Sellers in writing for such purposes, within 2 (two) Business Days following the date on which such bank account information is received by the Purchaser. Neither the Purchaser nor any of its Affiliates (including the Company or any of the Subsidiaries) may file an amended Tax Return, or agree to any waiver or extension of the statute of limitations relating to Taxes with respect to the Company or any of the Subsidiaries with respect to a Pre-Closing Tax Period or the Interim Period without the prior written consent of the Sellers' Representative (such consent not to be unreasonably withheld, conditioned or delayed), provided that, if the Law requires any amendment, modification or change to a Tax Return for a Pre-Closing Tax Period or for the Interim Period, the Purchaser shall, prior to making such amendment, modification or change, provide to the Sellers' Representative a draft of the amended Tax Return for review by the Sellers' Representative or make or change any Tax election or accounting method that has a retroactive effect to any Pre-Closing Tax Period or portion thereof (including any corresponding provision of any applicable Tax law with respect to the Transaction referred to herein).

(3) For the purposes of this Contract, whenever it is necessary to determine a liability corresponding to Taxes owned by Company and the Subsidiaries (or the right of any of the Parties to receive a Tax reimbursement or compensation regarding the Taxes of the Company and the Subsidiaries) for the Intermediate Period, the Parties will determine the Taxes of the Company and the Subsidiaries generated during the part of the Intermediate Period that ends the day immediately prior to the Closing Date, and the Taxes generated during part of the Intermediate Period that begins on the Closing Date and ends on December 31 of the year in which the Closing Date occurs, assuming that the Intermediate Period consisted of two tax periods, and the items of income, gains, deductions, losses or credits of the Company and the Subsidiaries for the Intermediate Period will be allocated between said two tax periods based on the "closing of the books," and assuming that the books of the Company and the Subsidiaries were closed on the day immediately prior to the Closing Date and were opened on the Closing Date and closed on December 31 of the year in which the Closing Date occurs; provided, however, that (i) the operations that the Company and the Subsidiaries carry out in the Ordinary Course of Business on the Closing Date, are operations that correspond to the Purchaser, (ii) the exemptions, bonuses or deductions that are calculated on an annual basis, as the deduction for depreciation, and the Taxes on real estate, personal property and intangibles, will be distributed between the part prior to the Closing of the Intermediate Period and the part after the Closing of the Intermediate Period on a daily basis, (iii) all the Tax effects derived from the sale of the Real Estate Assets and the payment of the distributions made by the Owner Companies to the Company correspond to the Purchaser, and (iv) all the Tax effects derived from the payment of the distributions that make the Company to the Sellers correspond to the Sellers.

(4) The Sellers will be entitled to any Tax refunds for the Company and the Subsidiaries that originated in the part of the Intermediate Period for which the Sellers are liable (including any interest paid in respect of said refund) that is actually received by the Company or Subsidiaries (including by way of credit, but only to the extent that such credit actually reduces any amount of Taxes of the Company or of the Subsidiaries in a Post-Closing Fiscal Period), discounting any costs and expenses related thereto (including any additional Tax charged in relation thereto and not including in the refund, (i) the payment of taxes of the Company and the Subsidiaries with respect to the annual declaration of Income Tax referring to the fiscal year of 2020, which must be to present no later than March 2021 and (ii) the taxes generated from the distribution of dividends p or part of the Company or the Subsidiaries in a period prior to the Closing Date or on the Closing Date). The Purchaser will ask the Company and the Subsidiaries or other relevant Affiliates to present, in a timely manner, the CFDI of any reimbursement to which the Sellers are entitled hereunder and to which the Company and the Subsidiaries are entitled in accordance with Applicable Law. Within 10 (ten) Business Days following the receipt or effective use by the Company and any of its Subsidiaries of any Tax refund or credit with respect to a Pre-Closing Tax Period, the Purchaser or the Company or Subsidiaries shall deliver and pay the amount of such Tax refund or credit to the Sellers, net of any costs and expenses related thereto (including any additional Tax charged in connection therewith), by bank wire transfer of immediately available funds to the bank account designated by each Seller in writing for such purpose. Purchaser shall, and will cause Company and Subsidiaries and their Affiliates thereto, to execute the documents, take reasonable additional steps and otherwise reasonably cooperate as necessary for Purchaser, Company and Subsidiaries and their Affiliates to perfect their rights in, and obtain all refunds of Taxes to which such Person is eligible under Applicable Law and to which Sellers or the Company and Subsidiaries are entitled hereunder. Neither the Purchaser nor the Company and its Subsidiaries shall, or shall allow any of the respective Affiliates, to lose, stop collecting or minimize any Tax refund, Tax credit or Tax benefit to which the Sellers would be entitled pursuant to this Section. Refunds paid to Sellers pursuant to this paragraph (4) will be treated as adjustments to the Closing Purchase Price for all purposes, unless otherwise required under Applicable Law.

(ii)   The Purchaser must notify the Sellers' Representative, within 10 (ten) Business Days after the date on which the Purchaser, any of its Affiliates, the Company or the Subsidiaries have received a notification regarding any audits, examinations, reviews, requests for information or evaluations from the Government Authority related to a Fiscal Period Prior to Closing or the part of the Interim Period that does not correspond to the Purchaser according to the previous paragraph. In the event the Purchaser fails to give such notice to the Sellers' Representative, Purchaser shall not be deemed to have waived its right to indemnification pursuant to Section 9. The Purchaser will assume and control the defense of said Fiscal audit. Purchaser shall not enter into any transaction of, or otherwise compromise or waive such tax audit without the prior written consent of the Sellers' Representative, which shall not be unreasonably withheld, conditioned, or delayed. The Purchaser will provide the Sellers' Representative with access to information regarding the commencement, status, and nature of such Tax audit.

(iii)   Subsequent to the Closing Date, each of the Sellers and the Purchaser shall (and shall ask their respective Affiliates) to:

(1)   grant the other Party access, at any reasonable time, to all books and records related to the Company and the Subsidiaries that are in its possession (including, without limitation, all types of Tax Returns, accounting records, fiscal documents and correspondence with tax authorities), and shall grant the other Party the right (at the other Party's expense) to take extracts therefrom and make copies thereof, to the extent reasonably necessary to enable the other Party to prepare Tax Returns, carry out negotiations with the Tax Authorities, defend against any tax contingency or implement the provisions thereof, or investigate or defend any claim between the Parties arising from this Contract; and

(2)   make available to the other Party and any authorized Tax Authority, as reasonably requested, all information, all records and documents related to the Taxes of the Company and Subsidiaries.

9.        **Seller Liability and Indemnification Obligations**.

(a)   <u>Causes of Indemnification to the Purchaser and the Acquirer of the Real Estate Assets.</u> Subject to the limitations established in this Section, the Sellers, jointly and severally, must indemnify and hold harmless the Purchaser exclusively from the Losses suffered by the Purchaser for the purchase of the Shares or the Acquirer of the Real Estate Assets, exclusively from the Losses suffered by the Acquirer of the Real Estate Assets, due to the acquisition of the Real Estate Assets, arising from, or related to, or in any other way with respect to (i) any breach of their respective obligations assumed herein, and (ii) the lack of veracity in the statements of the Sellers and the Company in this Contract (any of the cases described in paragraphs (i) and (ii) above, a "<u>Cause of Indemnification to the Purchaser</u>").

The Sellers will not be liable for any Loss suffered by the Purchaser or the Acquirer of the Real Estate Assets, as a result of (i) an act of God, force majeure or fraud or negligence or intent of the Purchaser or the Acquirer of the Real Estate Assets, (ii) a cause or an event that is not a Cause of Indemnification to the Purchaser, (iii) breach of the obligations of the Purchaser or the Acquirer of the Real Estate Assets, established in this Contract, as the case may be, or (iv) non-collectability of the accounts receivable in favor of the Company and the Subsidiaries or the solvency of its debtors.

The Purchaser and the Acquirer of the Real Estate Assets acknowledge that the indemnification derived from this Section will be their only recourse against the Sellers to claim payment of the Losses arising from the Transaction object of this Contract.

(b)     Minimum Indemnification Amount and Indemnification Limit. The Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, will only be entitled to indemnification in accordance with this Contract for the Losses suffered within the period mentioned in subsection (f) below, provided that the total amount of the same, whether jointly or separately, exceeds the amount of MXN $60,000,000.00 (sixty million pesos 00/100) (the "Minimum Indemnification Amount"). At such point that the Losses exceed the Minimum Indemnification Amount, the Sellers shall immediately pay the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets only any amount in excess of the Minimum Indemnification Amount; on the understanding that the Minimum Indemnification Amount established in this Section will not be applicable to any claim for Losses derived from fraud or bad faith by the Sellers. By virtue of the foregoing, both the Purchaser and the Acquirer of the Real Estate Assets acknowledge and accept that in the event that the Losses do not exceed the Minimum Indemnification Amount, the Sellers will not have any obligation of indemnification.

(c)     Limit. The Sellers shall not be liable, either jointly or severally, for Losses that exceed the amount of MXN $300,000,000.00 (three hundred million pesos 00/100), and once the Minimum Indemnification Amount has been subtracted (the "Limit"), that is, the Sellers They will be solely and exclusively liable, jointly and severally, for Losses that exceed the Minimum Indemnification Amount but, in any case, up to the Limit, while subtracting the Minimum Indemnification Amount from the Limit; on the understanding that the Limit will not be applicable in case of lack of veracity of the Fundamental Statements of the Sellers or the Company contained in Section 5.1 and 5.2 of this Contract, in which case, the total liability of the Sellers for the Losses payable under this Contract it will be up to the amount of $4,076,040,000.00 (four thousand seventy-six million forty thousand pesos 00/100). In addition, the Limit established in this Section will not be applicable to any claim for Losses arising from fraud or bad faith by the Sellers.

(d)     Right to Challenge the Causes of Indemnification to the Purchaser.

The Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, must notify the Sellers' Representative of the existence of a Cause of Indemnification to the Purchaser, in the manner established in Section 14 hereof, within the term that is less between within 30 (thirty) Business Days following the date on which you become aware of said cause, or within 1/3 (one third) of the term provided for responding to third-party claims (the "Indemnification Notification"), indicating the nature of the claim, attaching any document in the possession of the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, evidencing the date on which the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, became aware of the Cause of Indemnification to the Purchaser and that are necessary to analyze the Cause of Indemnification to the Purchaser, so that the Sellers' Representative may make a decision regarding the exercise of any legal or administrative lawsuit to which they may be entitled in order to challenge said Cause of Indemnification to the Purchaser. Within either 10 (ten) days after the date on which the Sellers' Representative received the Indemnification Notification or the date on which he became aware of the existence of the Cause of Indemnification to the Purchaser for any other medium (the "Knowledge of the Obligation to

Indemnify"), or 2/3 (two thirds) of the term established to respond to the claim, whichever is shorter, the Sellers' Representative will notify the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, in writing if they decide or not, to challenge the Cause of Indemnification to the Purchaser on their own account. In the event that Sellers' Representative (i) does not respond within said term, or (ii) in the event that it responds that it has decided not to contest the Cause of Indemnification to the Purchaser, the Sellers' Representative must pay the Purchaser or, if applicable, the Acquirer of the Real Estate Assets, the amount corresponding to said Cause of Indemnification to the Purchaser within the following 10 (ten) Business Days, and subject to the provisions of this Section

9. It is established that, In the event that Purchaser and/or, where appropriate, the Acquirer of the Real Estate Assets, and/or the Company, as appropriate, do not comply with the procedure established in this subsection (d), that is, if they do not send the Notification of Indemnification in the form and term established in this subsection (d), the Sellers will be released from their obligation to indemnify the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets.

In the event that the Sellers' Representative decides to challenge the Cause of Indemnification to the Purchaser, the Company or the corresponding Subsidiary will be required to grant to the Persons designated by the Sellers' Representative, at the expense of the Sellers' Representative, any powers to lawsuits and collections for that purpose. All expenses related to the challenge of the Cause of Indemnification to the Purchaser that originates from a third party will be borne exclusively by the Sellers' Representative. The expenses related to the challenge of the Cause of Indemnification to the Purchaser that comes from the Purchaser and/or the Acquirer of the Real Estate Assets, as appropriate, will be borne exclusively by the Sellers' Representative, provided that the final result of the Cause of Indemnification to the Purchaser is a Loss. The Company and/or the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, will also have the right to designate, at their expense, a proxy to participate in the challenge of the Cause of Indemnification to the Purchaser.

In the event that the Sellers' Representative decides to contest the Cause of Indemnification for to the Purchaser, indemnification payments in respect of said Cause of Indemnification to the Purchaser will be made within 5 (five) Business Days following the earlier of: (i) the effects of a final, unappealable arbitration or judicial resolution related to the determination of the respective Losses and the liability of the Sellers to indemnify them, (ii) the execution of a transaction by the Company, the Subsidiaries or the Sellers with the prior written consent of the Sellers' Representative in respect of such Losses, or (iii) the written acknowledgment of the Sellers' Representative of its obligation to pay and indemnify the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, for said Losses. Any Indemnification payment under this Section shall be made in cash in immediately available funds.

The Parties agree that any grounds to bring a claim regarding any conflict, controversy or disagreement between the Parties arising from this Section or in relation to it, will be inadmissible without first exhausting the procedure and the terms established in this subsection (d).

(e)  <u>Deductions</u>. The Losses that the Sellers must pay to the Purchaser or, as the case may be, to the Acquirer of the Real Estate Assets, shall be the Losses actually suffered and/or paid by the Purchaser or, as the case may be, the Acquirer of the Real Estate Assets, as applicable, provided that it does not exceed the limitations established in Section 9(c), deducting the total amount of the following items: (i) the net present value of said benefit with regard to income tax savings if any tax expense benefit, depreciation or of any other nature is used directly by reason of the payment of said Losses, and (ii) the amount received from national or foreign insurance companies for the same purpose, as appropriate.

(f)  <u>Liability Period</u>.

(i)  The liability of the Sellers to indemnify the Purchaser or, when appropriate, the Acquirer of the Real Estate Assets, in terms of this Section will continue for a period from the Closing Date and until the date that is 36 (thirty-six) months after the Closing Date, except for (i) any lack of veracity in the Fundamental Representations that will survive indefinitely and (ii) Fiscal and Labor Matters, which will survive until the expiration of their respective prescription term in accordance with the Applicable Law.

(ii)  The obligations, agreements and commitments contained in this Contract will continue in force after the Closing Date, without limitation.

(g)  Indemnification. The Purchaser acknowledges and agrees that neither Party hereto shall be entitled to set off, withhold, deduct any sum due or due to the Purchaser as a result of a Cause of Indemnification to the Purchaser under this Section 9 from any amount payable by Purchaser to the sellers.

(h)  Any payment made in favor of the Purchaser by the Sellers in terms of this Section or, where appropriate, the Acquirer of the Real Estate Assets, shall be understood as part of the Closing Purchase Price.

(i)  <u>Release regarding acquisition contracts</u>. The Purchaser and, if applicable, the Acquirer of the Real Estate Assets acknowledge and accept that the only representations and indemnities that the Sellers grant with respect to the Real Estate Assets contained in this Contract. By virtue of the foregoing, the Purchaser and, where appropriate, the Acquirer of the Real Estate Assets, acknowledge and accept that: (i) regardless of the representations and/or indemnification obligations contained under the Procurement Contracts, said representations and/or indemnification obligations will not affect the Sellers nor will they prevail over the representations and indemnities contained in this Contract; and (ii) therefore release the Sellers from any liability solely and exclusively for any claim for any Loss that may arise from any representations and/or obligations contained in the Acquisition Contracts.

(j)  <u>Release in respect of the HSBC Credit</u>. The Purchaser and the Acquirer of the Real Estate Assets acknowledge and accept that the Sellers will have no liability related to or derived from the HSBC Credit, therefore they release the Sellers from any liability for any claim of any Loss that may arise from or related to the HSBC Credit.

(k)  ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**10.  Liability of the Purchaser and, where appropriate, of the Acquirer of the Real Estate Assets and Indemnification Obligations**.

(a)  Causes of Indemnification to the Seller. The Purchaser and, as the case may be, the Acquirer of the Real Estate Assets, will each be liable individually, in a non-joint and joint manner, towards the Sellers, in relation to the Losses that they may suffer as a result of (i) any non- compliance of their respective obligations assumed herein and (ii) the lack of veracity in the statements contained in Section 6 of this Contract or, where appropriate, the Adhesion Agreement, respectively, according to the provisions of the following paragraph (any of the events described in subsections (i) and (ii) the " Cause of Indemnification to the Seller"). Likewise, the Purchaser undertakes to indemnify the Sellers for any Loss they may suffer as a result of any act related to or derived from the execution of the HSBC Credit.

In this act, the Purchaser with respect to the Shares and, where appropriate, the Acquirer of the Real Estate Assets with respect to the Real Estate Assets, expressly accepts and acknowledges that the Sellers will not be liable in any way for the Company's operations, from of the Closing Date, or the consequences derived from said operations and the resulting obligations of the Company. Therefore, as of the Closing Date, the Purchaser with respect to the Shares and, where appropriate, the Acquirer of the Real Estate Assets with respect to the Real Estate Assets, expressly release the Sellers from any claim that may arise from them. and agrees to indemnify the Sellers as provided in this Section for the Losses they may suffer for said purpose.

The Sellers acknowledge that the Indemnification derived from this Section will be their only recourse against the Purchaser and, where appropriate, the Acquirer of the Real Estate Assets, to claim payment of any Losses arising from the Transaction that is the object of this Contract.

(b)  Indemnification Limit. The total amount of the obligation of the Purchaser and, as the case may be, of the Acquirer of the Real Estate Assets, to indemnify the Sellers for any Cause of Indemnification to the Seller under their charge in accordance with this Contract will be subject to a joint limit of MXN $50,000,000.00 (fifty million pesos 00/100).

(c)  Right to Challenge the Cause of Indemnification to the Seller. The Parties agree that the challenge of any Cause for Indemnification to the Seller will be subject to the provisions of Section 9(d) hereof, applying it *mutatis mutandis* to the obligations of the Purchaser or, as the case may be, of the Acquirer of the Real Estate Assets, of indemnify Sellers for any Cause for Indemnification to Seller.

(d)  Validity of the Obligation. The obligation of the Purchaser and, if applicable, of the Acquirer of the Real Estate Assets, towards the Sellers by virtue of this Section will remain in force for 36 (thirty-six) months from the Closing Date, except for (i) the Representations of the Purchaser contained in Section 6.1, subsections (a) (*Incorporation*), (b) (*Representation*) and (c) (*Powers*) and (ii) the representations of the Acquirer of the Real Estate Assets contained in the Adhesion Agreement in relationship, exclusively, with its Constitution, Representation and Powers, which will survive indefinitely.

**11.**      <u>Termination</u>.

     (a)     Notwithstanding any provision contained in this Contract, this Contract and the Transaction provided herein may be terminated:

     (i)     By mutual agreement of the parties;

     (ii)     by the Sellers, in the event of breach by the Purchaser or, as the case may be, by the Acquirer of the Real Estate Assets, of their obligations hereunder and if said breach is not remedied and results in the Applicable Conditions for Closing are not met before the Closing Deadline;

     (iii)     by the Purchaser and the Acquirer of the Real Estate Assets, in the event of a breach by the Sellers of their obligations hereunder and if said breach is not cured and results in the Applicable Closing Conditions not being met before the Closing Deadline;

     (iv)     if any law, regulation, norm or disposition is promulgated, or if any Government Authority issues a final order or sentence, or if a lawsuit is filed or a judicial proceeding is initiated that prevents the consummation of the Transaction; or

     (v)     by the Sellers or the Purchaser, in the event that Purchaser or Sellers have not waived the Applicable Closing Conditions, respectively, or have not complied with them by the Closing Deadline; provided that the terminating party does not breach its obligations under this Contract.

     (b)     In the event that this Contract is terminated in accordance with the provisions of this Section, the Party that decides such termination will send a written notification of said circumstance to the other Parties, and the Transaction object of this Contract will terminate without the need of subsequent act of the Parties.

     (c)     In the event that this Contract is terminated,

     (i)     each Party shall return to the other Party all documents and information provided by such Party;

     (ii)     this Contract shall cease to remain in force and effect, except for the provisions of Section 8(a); and

     (iii)     the right of Exclusivity established in Section 7(a)(v) will expire on that same date.

**12.**      <u>Rights in the Event of a Breach</u>.

     Either Party shall have the power to opt for the termination of the Contract in terms of Section 11, or to demand enforceable compliance with this Contract and the payment of any Loss in the event that the Applicable Conditions for Closing and another Party does not comply with its obligations in accordance with the provisions established in this Section.

**13.**     **Taxes**.

(a)     Each Part hereof will be liable in accordance with the Applicable Law for any Taxes that are generated as a result of the execution and fulfillment of this Contract, on the understanding that, subject to performance by each of the Sellers, of the requirements established in this Section, the Purchaser will not make any deduction and/or withholding from the Closing Purchase Price to the Sellers. Otherwise, In the event that Seller decides to use a preferential withholding rate through a treaty to avoid double taxation; which in turn must be carried out by the Purchaser, the Seller must notify 15 (fifteen) Business Days before the execution of this Contract and must share the legal basis with the Seller so that the tax treatment of the transaction as joint and severally liable can be confirmed.

(b)     Each Seller will apply the option granted by the Mexican tax provisions to calculate and pay the tax, at an income tax rate of 35% to the profit obtained in the purchase and sale of the Shares, in accordance with Article 161 of the Income Tax Law. Therefore, the Seller is obliged to calculate the tax and pay it to the tax authorities, in addition to presenting and complying with the corresponding tax obligations.

In this sense, each Seller must submit to the Mexican tax authorities a tax opinion issued by a registered public accountant in accordance with the provisions of article 161 of the Income Tax Law. For these purposes, each Seller must deliver to the Purchaser and to the Company: (i) no later than 15 (fifteen) Business Days after the Closing Date, a copy of the corresponding tax declaration presented by each Seller (or by its designated legal representative in Mexico); (ii) no later than 15 (fifteen) Business Days after the date on which the corresponding tax return was filed, a copy of the notification filed by each Seller before the tax authorities as provided by the Income Tax Law and its Regulation, which corresponds to the "*Notice to present a tax report on the sale of shares*," Official Format 39 issued by the Mexican tax authorities, and (iii) no later than 15 (fifteen) Business Days after the date on which the submitted the corresponding tax report on the sale of shares, a copy of the corresponding tax report submitted by a registered public accountant before the Mexican tax authorities (to avoid any doubt, consult the "Letter of presentation of the share sale report," Official Format 40 issued by Mexican tax authorities).

(c)     Invoice: Each Seller agrees to deliver to each Purchaser the corresponding invoice as of the date of this document, which will be issued in accordance with rule 2.7.1.16 of the current Miscellaneous Tax Resolution of 2020 (or any successor provision issued by the Mexican Tax Authorities) where the purchase and sale of the Shares will be supported.

**14.**     **Registered Addresses and Notifications**.

All notifications and other communications established in this Contract will be made in writing and will be considered duly delivered and will take effect on the Business Day following their receipt by the Party to which they are addressed. The notifications delivered in accordance with this Section will be provided (i) reliably to the other Party in person or (ii) in the case of information that must be delivered in terms of this Contract, by courier service or certified mail, in either case with acknowledgment of receipt, at the address specified below or at any other address subsequently designated in writing by such Party:

Seller's Representatives:

TwiBel 1 SPRL

Advent International PE Advisors, S.C.
Edificio Omega, Campos Elíseos 345 - 14 Piso,
Col. Polanco, 11560, Mexico City, México
Attn: Enrique Pani Bano

with copy to Mijares, Angoitia, Cortes y Fuentes, S.C.
Javier Barros Sierra 540, 4to piso,
Colonia Santa Fe, Del. Álvaro Obregón,
CP 01210, Mexico City
Attn: Patricio Trad Cepeda

To the Company:

Grupo Gayosso, S.A. de C.V.
Sullivan 71. Col. San Rafael.
Alcaldía Cuauhtémoc,
C.P. 06470, Mexico City, México
Attn: Octavio Trejo García

with copy to Mijares, Angoitia, Cortes y Fuentes, S.C.
Javier Barros Sierra 540, 4to piso,
Colonia Santa Fe, Del. Álvaro Obregón,
CP 01210 Mexico City
Attn: Patricio Trad Cepeda

To the Purchaser:

Servicios Funerarios GG, S.A. de C.V.
Paseo de los Tamarindos No. 400-B, Piso 22
Bosques de las Lomas, 05120
Mexico City
Attn: Pablo Peña Vázquez

with copy to Sarur Servicios Integrales S.C.
Paseo de la Reforma 2345-101, Colonia Lomas de Reforma,
Miguel Hidalgo, CP. 11930, Mexico City.
Attn: Mr. Raúl Sánchez Rucobo

The foregoing on the understanding that any notification or communication that must be delivered to the Sellers in accordance with this Contract will be delivered to any of the Sellers' Representatives, and the Sellers hereby agree that any notification to any of the Sellers' Representatives in accordance with the terms of this Section will be considered as a personal notification to each and every one of the Sellers and will be enforceable against them for all legal effects that may apply.

15.     **Full Agreement**.

        This Contract, together with its Annexes and Appendices, constitutes the entire agreement between the Parties regarding the matters provided for herein and supersedes any prior written or verbal agreement entered into by the Parties, including, without limitation, any letter of intent or contract in principle.

16.     **Modifications, Waivers, and Exemptions**.

        (a)     No provision of this Contract may be modified except by unanimous written consent of the Parties.

        (b)     Either Party may waive the rights granted to such Party hereunder by providing written notice thereof to the other Party; and the Parties may waive the rights established herein for the benefit of both Parties, with the written consent of all Parties.

        (c)     The omission or delay in the exercise of any right granted to a Party hereunder shall not be construed as a waiver of such right by such Party; and the exercise of any particular right by a Party under this Contract shall not be construed as a waiver of the exercise of any other right granted to such Party hereunder.

17.     **Subsistence of Representations and Provisions**.

        The Parties agree that the representations granted by the Parties hereunder will survive the termination of the Contract during the periods established in each Section.

18.     **Divisibility**.

        If any provision of this Contract is prohibited by any applicable law or declared null and void or unenforceable in any jurisdiction, that provision shall be deemed null and void to the extent prohibited or unenforceable, but shall not affect, modify, or will void the remaining provisions of this Contract or the enforceability of this Contract.

19.     **Headers**.

        The Parties agree that all titles of the Sections of this Contract are included for informational purposes only and will not affect the meaning or interpretation thereof.

20.     **Annexes and Appendices**.

        The Parties agree that the Annexes and Appendices to this Contract form an integral part of it as if they were literally inserted herein, and that the content of said Annexes and Appendices will be taken into consideration for the purposes of interpreting this Contract.

21.     **Assignment**.

        Neither Party may assign this Contract without the prior written consent of the other Party. Notwithstanding the foregoing, this Contract may be assigned: (i) by the Purchaser and/or the Acquirer of the Real Estate Assets, without the consent of the Sellers to one or more wholly owned direct or indirect subsidiaries of the Purchaser or the Acquirer of the Real Estate Assets, as applicable; as long as: (a) said Affiliate or Affiliates enter into a written Contract with the Sellers to be bound by the provisions of this Contract in all its terms and to the same extent that the Purchaser and/or the

Acquirer of the Real Estate Assets are bound; and (b) the Purchaser and/or the Acquirer of the Real Estate Assets, as applicable, shall continue to be bound by all the obligations hereunder, as if said assignment had not occurred and shall comply with the obligations to the extent that said Affiliate or Affiliates do not; and (ii) by the Seller without the consent of the Purchaser and the Acquirer of the Real Estate Assets to Advent Twilight Luxembourg 1 S.a rl, and/or Advent Twilight Luxembourg 2 S.a rl, and/or Advent Twilight Luxembourg 3 S.a rl, and or Advent Twilight Luxembourg 4 S.a rl, and/or Advent Twilight Luxembourg 5 S.a rl, and/or Advent Twilight Luxembourg 6 S.a rl, and/or Advent Twilight Luxembourg 7 S.a rl, and/or any Controlling Person, other than an individual; with the understanding that: (a) said Affiliate or Affiliates of the Seller must enter into a written contract with the Purchaser and with the Acquirer of the Real Estate Assets to be subject to the provisions of this Contract in all its terms and to the same extent that the Sellers are bound and (b) Sellers shall continue to be bound by all obligations hereunder as if such assignment had not occurred and shall perform the obligations to the extent such Assignees fail to do so.

**22.     Applicable Law**.

This Contract will be governed by the Applicable Law in Mexico and will be interpreted in accordance with it. The Parties hereto expressly waive any right they may have, now or in the future, to demand or request the application of any applicable law other than the Applicable Law of Mexico.

**23.     Jurisdiction**.

The Parties to this Contract irrevocably and unconditionally submit to the jurisdiction of the federal courts located in Mexico City, Mexico with respect to any conflict, controversy or dispute between the Parties arising out of or in connection with this Contract and waive any other jurisdiction to which they may be entitled by reason of their present or future domiciles or for any other reason.

**24.     Sellers' Representative**.

Each of the Sellers appoints TwiBel 1 SPRL (the "Sellers' Representative") with all legal powers and faculties to act as common representative of the Sellers, to carry out all acts and to sign any and all documents (including to receive and deliver any notices hereunder), on behalf of the Sellers, in connection with this Contract and the Transaction contemplated hereunder. Any action of the Sellers against the Purchaser, and any action of the Purchaser against the Sellers, will only be carried out, or will be directed through the Representative of the Sellers who appears at this act to accept the position conferred and designates the address indicated in Section 14 as the one to use for all notifications and other communications established in this Contract. The Parties agree that any document or other communication signed by the Sellers' Representative is binding on all Sellers. The Sellers' Representative may only be replaced after delivery to the Purchaser and the Acquirer of the Real Estate Assets of a document duly signed by all the Sellers indicating (i) the revocation of the corresponding power of attorney, (ii) the appointment and acceptance of another Representative of the Sellers with the powers described in this Section and (iii) the designation of the registered address within Mexico City, of the new Representative of the Sellers.

*[The rest of this page is intentionally left blank]*



# TRANSLATOR CERTIFICATION

Date: March 9, 2023

To whom it may concern:

I, Daniel Feather , a translator fluent in the Spanish and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- DOCS1-#472557-v30-Lima __ Contrato_de_compraventa_de_acciones pages 1-29

_____
Signature

Daniel Feather

_____
Print



# TRANSLATOR CERTIFICATION

Date: 3/9/2023

To whom it may concern:

I, Michael Reimer, a translator fluent in the Spanish and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:
- DOCS1-#472557-v30-Lima_Contrato_de_compraventa_de_acciones **pages** 30-43

_____
Signature

Michael Reimer
_____
Print

_ _ _ _ _ _ _ _ _ _ _ The Leaaer Glo P Sotutit,n



IP

# TRANSLATOR CERTIFICATION

Date: March 9, 2023

To whom it may concern:

I, Douglas Mesnier, a translator fluent in the Spanish and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:
  • DOCS1-#472557-v30-Lima_Contrato_de_compraventa_de_acciones  pages  43-47

Smature

Douglas Mesnier

_____
Print



# TRANSLATOR CERTIFICATION

Date: March 9, 2023

To whom it may concern:

I, Robert James , a translator fluent in the Spanish and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- DOCS1-#472557-v30-Lima __ Contrato_de_compraventa_de_acciones  pages  47-58

_____

Signature

Robert James

_____

Print

**The Leader in Global IP Solutions**



# TRANSLATION CERTIFICATION

Date: June 21, 2023

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:
- SPA.pdf

Oscar Ojeda, Project Coordinator in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____

Signature of Oscar Ojeda