# EXHIBIT 28

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

### Case No. 23-cv-10684

SERVICIOS FUNERARIOS GG, S.A. DE C.V.,

    Plaintiff,

    v.

ADVENT INTERNATIONAL CORPORATION,

    Defendant.

_____/

### COMPLAINT

Plaintiff Servicios Funerarios GG, S.A. de C.V. ("Servicios Funerarios") sues defendant Advent International Corporation ("Advent") and alleges, upon personal knowledge as to its own acts and status and upon information and belief as to all other matters, as follows:

### Introduction

1.    Desperate to get its investment in its unprofitable portfolio company Grupo Gayosso, S.A. de C.V. ("Gayosso") off its books after having held the investment for over thirteen years, Advent, a large private equity fund manager and investor, perpetrated a fraudulent scheme to falsely pump-up Gayosso's value so that it could sell the portfolio company without taking a massive loss. Advent's scheme worked. It succeeded in selling the shares in Gayosso to Servicios Funerarios – but only after it repeatedly misrepresented the true condition of the financially strapped company. It did so in myriad ways, but principally by deleting liabilities from the company's financial statements, manipulating invoices for accounts payable, understating the cost of sales, concealing transferred assets, and omitting altogether other

1

contractual and regulatory liabilities from the financial statements.  When all was said and done, Advent fraudulently understated Gayosso's liabilities to the tune of hundreds of millions of dollars, leaving Servicios Funerarios owning a company worth far less than what Advent had represented by way of Gayosso's financial statements.  This action seeks to recover Servicios Funerarios's losses in an amount to be determined at trial but in excess of $224.7 million, before trebling, resulting from Advent's fraudulent scheme and unfair and deceptive practices.

### Parties, Jurisdiction, and Venue

2.      Servicios Funerarios is a corporation organized and doing business under the laws of Mexico.  As a result of the fraud perpetrated by Advent, it is the owner of 99.9% of the shares of Gayosso.

3.      Advent is a Delaware corporation.  Its principal place of business is in Boston, Massachusetts, from where it makes equity investments, manages investment funds, and buys and sells companies – as it did with Gayosso – throughout the world.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between a citizen of a State and a citizen or subject of a foreign state for legal and equitable relief, and the matter in controversy exceeds the sum of $224.7 million, exclusive of interest and costs.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Advent resides in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## Factual Allegations

**I.      Gayosso's Funeral Services Business**

6.      Gayosso is Mexico's oldest, active funeral-services company, having been founded in Mexico City in 1875.  It is the largest funeral services company in Mexico.  It owns and operates 23 funeral homes and 22 cemeteries in 13 states in Mexico.  Gayosso provides integrated funeral services – starting with collection of the body of the deceased to its burial or cremation and including everything in between, such as embalming services, flowers, sale of coffins, graves and mausoleums, bereavement counseling, and the performance of the actual funeral service.

**II.     The Fraudulent Sale of Gayosso**

  **A.      The Stock Purchase and Sale Agreement**

7.      On January 24, 2020,  at the direction of Advent, seven business entities it controlled and administered, TwiBel 1 SPRL, TwiBel 2 SPRL, TwiBel 3 SPRL, TwiBel 4 SPRL, TwiBel 5 SPRL, TwiBel 6 SPRL, TwiBel 7 SPRL (collectively, the "Twibel entities"), entered into a Stock Purchase and Sale Agreement with Servicios Funerarios that was amended four times, on January 27, 2020, September 30, 2020, December 18, 2020, and January 27, 2021 (the Stock Purchase and Sale Agreement, as amended, the "SPA").

8.      At the time of the SPA, the Twibel entities were the nominal owners of 99.9% of the shares of Gayosso.  However, the Twibel entities were special-purpose entities incorporated in Belgium with no business other than to own Gayosso's shares.

9.      In turn, the Twibel entities were owned by seven special-purpose entities incorporated in Luxembourg, also controlled and administered by Advent, and named Advent Twilight Luxembourg 1 S.à r.l., Advent Twilight Luxembourg 2 S.à r.l., Advent Twilight

Luxembourg 3 S.à r.l., Advent Twilight Luxembourg 4 S.à r.l., Advent Twilight Luxembourg 5 S.à r.l., Advent Twilight Luxembourg 6 S.à r.l., and Advent Twilight Luxembourg 7 S.à r.l. (collectively, the "Twilux entities"). The Twilux entities' only business was to own the Twibel entities.

10.     The purpose of the SPA was the sale and purchase of Gayosso's capital stock, including the real estate assets owned by the company. The purchase price was $224.7 million. The transaction closed in January 2021, with Servicios Funerarios paying the purchase price and obtaining the shares of Gayosso. Due to the persistent high rate of inflation in Mexico, the damages suffered by Servicios Funerarios may exceed the purchase price paid by Servicios Funerarios.

### B.     The Representations About Gayosso's Financial Condition

11.     Section 5.1(h) of the SPA, entitled "Declarations of the Sellers," represented that: "Each of the statements that Sellers make and give in this Agreement and the documentation submitted to the other Parties to this Agreement, which is attached hereto, is true and complete and does not contain false or incorrect data." (SPA at § 5.1(h).)

12.     In addition to being referenced in section 5.1(h) of the SPA, Gayosso's audited financial statement for the year 2019 and the unaudited financial statement for the year 2020 were among the documents attached to the SPA executed in January 2021. The audited financial statements for the years 2016, 2017, and 2018, and the unaudited financial statement for the year 2019, were attached to the SPAs executed before January 2021. The representations as to Gayosso's financial condition as disclosed in those financial statements were restated in the Fourth Amendment to the SPA. (Fourth Amended SPA at Representations § a.). All of those financial statements (the "Financial Statements") were provided, by Advent or at the direction of

Advent, to Servicios Funerarios during negotiations leading up to the signing of the SPA in order to induce Servicios Funerarios to enter into the SPA.

13.    In Section 5.2 of the SPA, entitled "Declarations of the Company" (referring to Gayosso), it was represented by Advent, or at the direction of Advent, that:

a.    Gayosso is "in compliance with the Applicable Legislation and Environmental Legislation in all material aspects," (SPA at § 5.2(g));

b.    The Financial Statements of Gayosso attached as Appendix 5.2(i)(i) to the SPA "were prepared in accordance with IFRS on the corresponding issue date, applied consistently and in accordance with Applicable Law," (SPA at § 5.2(i)(i));

c.    Appendix 5.2(k)(ii) to the SPA contained "a list of outstanding liabilities of" Gayosso as of October 31, 2019, (SPA at § 5.2(k)(ii)), subject to those excluded in Appendix 5.2(u);

d.    Gayosso had no liabilities "that should be reflected in the Financial Statements in accordance with Applicable Law and IFRS, but that are not adequately reflected or established in the Financial Statements," (SPA at § 5.2k(iii));

e.    Gayosso's "Tax Returns are true, complete and accurate in all material respects" and all taxes for which Gayosso is or may be responsible had been or would be timely paid and Gayosso's "most recent Financial Statements … reflect an adequate reserve" for the Taxes payable "up to the date of said Financial Statements," (SPA at §5.2(l)(i));

f.    "Appendix 5.2(n)(i) contains a list of each and every one of the Real Estate Assets owned by" Gayosso, (SPA at § 5.2(n)(i));

g.    Gayosso had not "entered into or [is] bound by a lease (including free leases or loan), sublease, option, right, concession of use or other contract or agreement that grants any Person [the] right to use or occupy the Real Estate Assets or any party thereof" and Gayosso is not "a party to or [is] bound by any option, right of first refusal, right of preemption and other contractual right to sell, dispose of, grant the use of or lease any part of the Real Estate Assets," (SPA at §§ 5.2(n)(iii) and (iv));

h.    "Appendix 5.2(q)(i) contains a list of the Permits maintained by [Gayosso and its subsidiaries] and which are all the Permits required to be the owner, concessionaire or beneficiary of, and to operate, all its cemeteries, mausoleums, columbariums, crematoria, for the provision of cremation

5

and funeral services in the Ordinary Course of Business," (SPA at § 5.2(q)(i));

i.     Appendix 5.2(t)(i)(7) lists agreements that "imply an annual commitment" by Gayosso in excess of $500,000 Mexican Pesos and that copies of any such agreement "have been made available to" Servicios Funerarios, (SPA at §§ 5.2(t)(i)(7) and (ii));

j.     Gayosso has "operated the Business, including the provision of cremation, burial, exhumation, re-burial and ashes deposit services in compliance with each and every sanitary requirement and guideline established in the Applicable Legislation," (SPA at § 5.2(dd));

k.     The Twibel entities did not "intend to file a voluntary declaration of dissolution, liquidation … or commercial insolvency," (SPA at § 5.2(h));

l.     "Each of the statements that [Gayosso] makes and grants in this Agreement and the documentation presented to the other Parties of this Agreement that is attached to it, is true and complete and [does] not [contain data that is false] or incorrect," (SPA at § 5.3).

**C.**     **The Falsity of the Representations**

14.     Each of the representations referenced in paragraphs 11 through 13, above (the "Representations") was false at the time it was knowingly made by, or at the direction of, Advent. With respect to the representation concerning dissolution, liquidation, or insolvency (paragraph 13(k), above), the representation was false because, at the time it was made, Advent had an intent to dissolve or liquidate the Twibel entities shortly after the closing of the transaction.

15.     Advent made, or caused to be made, these false representations to Servicios Funerarios not only at the time of the execution of the SPA, but prior to the execution of the SPA, beginning on May 6, 2019, when Advent, through at least its agent, representative, or employee named Veronica Stenner, directed or caused the Financial Statements and other documentation concerning Gayosso's financial condition to be placed in a virtual data room, which was thereafter updated with the later Financial Statements to be provided to Servicios

Funerarios, including on July 5, 2019, with the intent that they be reviewed and relied upon by Servicios Funerarios in making its decision to enter into the SPA. Servicios Funerarios accessed and reviewed this documentation during negotiations with Advent concerning the purchase of Gayosso and relied upon it in making its decision to enter into the SPA.

16. The Financial Statements provided to Servicios Funerarios were rife with falsehoods and were intended by Advent to fraudulently make Gayosso appear to be a healthy, profitable company when it was actually a company with a ***negative*** valuation. To help paint that false picture of Gayosso's financial condition, Gayosso's financial statements and financial reporting flatly ignored the International Financial Reporting Standards (commonly referred to as "IFRS"), which the SPA represented that Gayosso followed in preparing its Financial Statements.

17. Advent, through investment funds it manages and operates (the "Funds"), invested in Gayosso in 2007. As early as 2015, by which time Advent had held the investment in Gayosso for eight years – longer than an equity investment of this type is typically held – Advent knew it had to sell Gayosso. But it had not been successful in doing so. By 2017, Advent held the investment for a decade, and had become desperate to sell Gayosso. However, Advent knew its investors would not accept the sale of Gayosso at a loss. And it knew that it could sell Gayosso at a profit only if it made the company appear financially sound and profitable.

18. Thus, in 2017, Advent took the first step towards fraudulently inflating Gayosso's value in the hope of attracting a buyer and turning a profit for itself and its investors. It laid the groundwork for a fraudulent sale by having Gayosso declare a massive $85 million dividend. The dividend accomplished two things. It placated investors who had not seen a return on their decade-long investment in Gayosso. And it gave the appearance (albeit a false one) that Gayosso

was in sound financial shape and an attractive target to potential buyers.  The dividend, however, was simply not justified by Gayosso's actual financial condition.  Gayosso did not have a basis, let alone the cash, to declare such a large dividend.  It dealt with that hurdle by borrowing the money from a pension plan, the Canada Pension Plan Investment Board, a Canadian Crown corporation that manages funds held in the Canada Pension Plan.  In doing so, Advent engaged in a disfavored practice that harms a company but provides a benefit to its private-equity investors.

19.     Having falsely positioned Gayosso as being on sound financial footing, Advent set about hunting for a buyer.  By 2019, it captured one in Servicios Funerarios, and the execution of the original SPA followed in January 2020.  To induce Servicios Funerarios to purchase the shares of Gayosso, Advent further orchestrated and carried out a fraudulent scheme to misrepresent Gayosso's financial condition to Servicios Funerarios.

20.     The scheme orchestrated and carried out by Advent through its control of Gayosso consisted of four types of fraudulent acts, ranging from removing accounts payable from Gayosso's accounting program to grossly understating the cost of the funeral services and goods provided by Gayosso, all of which resulted in Financial Statements that misrepresented not only Gayosso's then-current financial status, but also the future profitability of the business, after which the Twibel and Twilux entities would be dissolved, but only after sending the hundreds of millions of dollars of sale proceeds upstream to Advent and its Funds while leaving Servicios Funerarios with a company in the red.  Advent did not disclose these fraudulent acts to Servicios Funerarios and, on the contrary, it concealed these acts from Servicios Funerarios.

### 1.     <u>The Deletion and Concealment of Invoices</u>

21.     Gayosso concealed liabilities related to its purchase of products or services.  It did so by (i) removing amounts payable from its financial-information system (referred to as "SAP")

prior to the execution of the SPA, some of which were reintroduced into the SAP system after

the execution of the SPA, and (ii) intentionally failing to enter other invoices into SAP in the first

place. The effect of removing these obligations from, and failing to record them in, the SAP

system was to understate Gayosso's liabilities, rendering false the Representations made in

sections 5.1(h), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), 5.2(u), and 5.3 of the SPA, and the

Representations made in the Financial Statements provided by Advent to Servicios Funerarios

during negotiations.

## 2.    The Split Invoicing

22.    Generally, Gayosso contracts for the provision of its funeral services under one of

two scenarios: "At-Need" and "Pre-Need." At-Need services are contracted for at the time of

death, usually by surviving family members. On the other hand, Pre-Need services are

contracted for prior to the time of death and are typically contracted for by the individual for

whom the services will later be provided.

23.    Pre-Need contracts present accounting considerations that are different than those

implicated by At-Need contracts. While a Pre-Need purchaser pays in full either at the time of

contracting or in installments beginning at that time, Gayosso would not actually have to provide

the contracted-for services until sometime in the future, most often years later (and sometimes

never, since not all purchasers claim the services and products). This means that in a Pre-Need

transaction Gayosso had to determine when it would account for – or, in accounting parlance,

"recognize" – the revenue it received for the services and goods it had not yet provided. If

Gayosso recognized all or most of the revenue at the time of entering into the Pre-Need contract,

it would also have to account for the future costs associated with providing those services and

goods at the same time in order to comply with IFRS and otherwise make the Financial Statements true and accurate.

24. To increase its revenue, Gayosso, at the time of contracting, credited 100% of the revenue it received in connection with Pre-Need contracts as income. But, in order to minimize the costs associated with that revenue, Gayosso fraudulently failed to properly account for the full extent of the costs associated with that revenue. By crediting the full income from these contracts, while omitting the known costs associated with these contracts, Advent overstated Gayosso's revenue and understated costs, resulting in an overstated profit margin attributable to Pre-Need Contracts.

25. A Pre-Need contract obligated Gayosso to construct a grave. The costs to do so would include not only the costs of digging of the grave, but also the costs of construction of the vault, including concrete walls, lower lid, upper lid, burial seal, and capstone, sodding, and headstone. Advent fraudulently depressed the costs associated with Pre-Need contracts by presenting Financial Statements that reported only a portion of the true costs of sale associated with the contract. Although the costs for these products and services would not be incurred until the death of the customer, Advent was required by IFRS to properly recognize them at the time of contracting in order to fairly represent the value of the company.

26. Instead, at the time of the Pre-Need contract's execution, Gayosso would account for only a fraction – usually less than 30% – of the true costs associated with the contract. In so doing, Gayosso falsely increased the margin between the revenue from a Pre-Need contract and the cost associated with that contract, making the Pre-Need contracts, which constitute most of the contracts entered into by Gayosso, appear to be far more profitable than they actually were.

10

27.     To enable the fraud, at the time the graves were actually constructed (typically years after the contract was signed), Gayosso illicitly instructed its vendors and suppliers to submit two different invoices: one for constructing the grave and a different one purportedly for "infrastructure" work.  The invoice for the grave construction matched the false, depressed cost of the grave fraudulently recognized in Gayosso's financial statements at the time of the Pre-Need contract's execution.  The balance of the actual, real cost of the grave was, in turn, made the subject of the fraudulent "infrastructure" invoice, although it was for work performed or goods sold in connection with constructing the grave pursuant to the Pre-Need contract.

28.     The "infrastructure" that was the subject of the fraudulent invoice was recognized as an asset of Gayosso.  But, in reality, no such "infrastructure" asset existed.  In this way, Gayosso's Financial Statements, which Advent caused Servicios Funerarios to rely upon in executing the SPA, grossly overstated Gayosso's assets while grossly understating Gayosso's liabilities, resulting in the flagrant exaggeration of the profit margin of Pre-Need contracts, rendering false the Representations made in sections 5.1(h), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), and 5.3 of the SPA, and the Representations made in the Financial Statements provided by Advent to Servicios Funerarios during negotiations.

### 3.     False Cost of Caskets

29.     Gayosso acquired caskets from third-party vendors and from one of its subsidiaries.  These caskets varied in price.  But in its financial statements, Gayosso falsely represented the value of these caskets in two different ways.  For caskets purchased from its subsidiary, Gayosso attributed a cost to the casket that was actually below the manufacturing cost of the casket and far less than the actual cost of the casket.  And for caskets acquired from third-party vendors, Gayosso uniformly used the lowest cost casket rather than the cost of the

11

casket purchased by the customer.  Most of the actual caskets sold were far more expensive than the lowest cost casket reflected in the Financial Statements.  In this way, Gayosso also misrepresented its financial condition by understating the costs associated with the sale of caskets, resulting in an inflated profit margin, rendering false the Representations made in sections 5.1(h), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), and 5.3 of the SPA, and the Representations made in the Financial Statements provided by Advent to Servicios Funerarios during negotiations.

### 4.     Failure to Disclose Liabilities for Construction of Graves

30.     In addition to fraudulently assigning as "infrastructure" most costs associated with the construction of graves, Gayosso also failed to disclose liabilities incident to the construction of graves.  For example, Gayosso failed to include in the cost of graves such direct costs as excavation, loading and hauling soil resulting from the excavation site, the top and bottom covers for the "drawers," and grass.  These expenses were liabilities incurred by Gayosso with respect to Pre-Need contracts.  These omissions from Gayosso's Financial Statements served to understate the company's liabilities and overstate its profit, rendering false the Representations made in sections 5.1(h), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), and 5.3 of the SPA, and the Representations made in the Financial Statements provided by Advent to Servicios Funerarios during negotiations.

### 5.     Undisclosed Contract

31.     At the time of the SPA, Gayosso had an existing contract, dated January 8, 1982, with the Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado (the "Institute"), which is a Mexican government agency that administers health and social-security programs and helps federal workers with, among other things, funeral services.  The contract conveys to the Institute in perpetuity for mortuary use 400,000 square meters for burial plots.  In

12

addition, the contract required Gayosso to provide the actual burial services. The Institute paid

for the use of the land and the services at the time of contracting in 1982. However, Advent

failed to disclose Gayosso's obligations under the contract which not only deprived Servicios

Funerarios of the use of the land, meaning funeral plots on the land could not be sold, but also

obligated it to perform the related burial services without any additional compensation, rendering

false the Representations made in sections 5.1(h), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), 5.2(n)(iii) and

(iv), 5.2(t)(i)(7) and (ii), and 5.3 of the SPA, and the Representations made in the Financial

Statements provided by Advent to Servicios Funerarios during negotiations.

### 6.    Omission of Other Liabilities

32.    Pursuant to the applicable accounting rules, Gayosso was required to disclose as

liabilities indirect costs of sales, such as the cost of building mausoleum areas, sidewalks, roads,

and offices. Gayosso failed to disclose these liabilities in its Financial Statements (and none of

which liabilities were on the exempted list of obligations set out in Appendix 5.2(u)). As a

result, the Financial Statements Advent provided to Servicios Funerarios understated Gayosso's

liabilities as of the date of the SPA, rendering false the Representations made in sections 5.1(h),

5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), and 5.3 of the SPA, and the Representations made in the Financial

Statements provided by Advent to Servicios Funerarios during negotiations.

33.    In addition, the laws and regulations of the municipalities where Gayosso's

cemeteries are located require the construction of perimeter fences for cemeteries. The failure to

comply with these laws and regulations risks loss of Gayosso's concession to operate the

cemeteries. The cost of building the fences was thus a liability of Gayosso at the time of the

execution of the SPA, but it was not disclosed in the Financial Statements, rendering false the

Representations made in sections 5.1(h), 5(2)(dd), 5.2(i)(i), 5.2(k)(ii), 5.2(k)(iii), and 5.3 of the

SPA, and the Representations made in the Financial Statements provided by Advent to Servicios
Funerarios during negotiations.

      C.    **Advent's Control of Gayosso, the Twibel Entities, the Twilux Entities, and the Sale**

34.    Although Advent is not a named party to the SPA, throughout the negotiation and
execution of the SPA, Advent controlled the Twibel entities, the Twilux entities, and Gayosso
itself.  Advent exercised that control to make the false Representations that are the subject of this
action, each of which was made by or at the direction of Advent.

35.    Advent is a large private equity firm that invests in companies throughout the
world.  In its website, Advent states that its objective is to manage temporary investments of
capital in these companies, while looking for a sale of, and "exit" from, the company in a way
that "maximizes the return on the investment."  Put simply, Advent invests in companies for a
limited time and then sells them for as high a return on its investment as it can achieve.

36.    Advent is not a passive investor in these companies.  Rather, as it states in its
website, its admitted "focus" is to gain "positions of control" in the companies.  Through that
control, it becomes involved in the operation of the companies.  It touts that its business model is
successful inasmuch as it takes a "hands-on approach" with the portfolio companies in which it
invests, assumes an "active role" with those companies, and builds "partnerships" with their
management teams, providing them with "significant support."

37.    To assure its control, Advent embeds its senior management in the portfolio
companies, so that there will be no daylight between Advent and the company's operations.  In
Advent's own words on its website, "[m]embers of Advent's senior management oversee, and
are ultimately responsible for, ensuring Advent's approach to Responsible Investment is

implemented." For example, in this case, the Chairman of Gayosso's Board was Enrique Pani Bano, an Advent Managing Director.

38. Advent's control over the Twibel and Twilux entities is such that, when Advent made its investment in Gayosso, the Mexican competition commission determined that Advent, the Twibel entities, and the Twilux entities constituted a single economic interest and authorized Advent to acquire Gayosso "by means" of the Twibel entities. More recently, in its own submission to the Mexican competition authorities in connection with the sale of Gayosso's shares to Servicios Funerarios, Advent presented the "ownership" structure of Gayosso as follows:



**Ilustración 2.** Relación entre las Sociedades TwiLux, las Sociedades TwiBel y Grupo Gayosso

Fuente: Elaboración propia con información de la Primera Sección, apartado I.2.

In this filing, Advent admitted under oath that it "controls" and "manages" both the Twibel entities and the Twilux entities.

39. The Twibel entities had no operative management structure and took no independent action during the negotiations and execution of the SPA. Twibel entities 2 through 7 were represented by Twibel entity 1. Twibel entity 1, in turn, was represented by a lawyer selected by, or at the direction of, Advent.

40.     Advent caused the Twibel entities to be dissolved shortly after the closing of the transaction and after sending the proceeds of the sale upstream to investment funds managed by Advent and to Advent itself.  Advent also caused the Twilux entities to be dissolved after the execution of the SPA and the movement upstream of the proceeds of the sale.

41.     It was Advent that made the decision to sell Gayosso.  And, through its partners and employees, including those in Boston and embedded in Gayosso, Advent controlled the "sell side" of the fraudulent sale of Gayosso to Servicios Funerarios.  Each misrepresentation made to Servicios Funerarios, and specifically each false Representation listed in paragraphs 11 through 13, above, was made by, or at the direction of, Advent.

42.     Gayosso itself was controlled by Advent, consistent with Advent's business practices for its portfolio companies.  As noted above, Enrique Pani Bano was an Advent Managing Director at the time of the negotiation and execution of the SPA.  At the same time, he was also the Chairman of the Board of Gayosso and, consequently, was intimately familiar with the financial condition of Gayosso and the false statements made in the Financial Statements and the SPA.

43.     Mr. Pani Bano and Carlos Alfredo Paz Perez, a Senior Director and co-head of Portfolio Support Group, Latin America, for Advent International PE Advisors S.C. ("Advent Advisors"), which is an agent of Advent, led the negotiation of the sale of Gayosso on behalf of, and at the direction of, Advent.  It was during those negotiations, culminating in the SPA, that the Representations were made by Advent.  At the direction of Advent, Messrs. Pani Bano and Paz executed the SPA on behalf of Gayosso.

44. The sale of the Gayosso shares was overseen by James Westra, who at the time of the negotiation and execution of the SPA was based in Advent's Boston office as General Counsel and Managing Partner of Advent.

45. In addition, a committee created by Advent and comprised of Advent representatives based in Massachusetts was tasked with overseeing the sale of Gayosso and approved the representations made to Servicios Funerarios, including those made in the SPA.

46. Advent thus perpetrated the fraud from its headquarters in Massachusetts through its control of the Twibels and Twilux entities and of Gayosso itself. Every decision made on the sell-side was made by, or at the direction of, Advent. Every Representation made to Servicios Funerarios was made by, or at the direction of, Advent. It was Advent that made the decision to sell Gayosso's shares; made, directed, or approved the false Representations made to Servicios Funerarios; and then led the negotiation of the transaction. Simply put, Advent defrauded Servicios Funerarios. Advent is thus liable for its unfair and deceptive acts and the misrepresentations that induced Servicios Funerarios to take the failing Gayosso off its hands.

47. Advent's deceptive, unfair, and fraudulent actions occurred primarily and substantially within Massachusetts, from which Advent created, orchestrated, and perpetrated the fraudulent scheme, including by making, or directing others to make, the Representations.

## Count I
## Fraud in the Inducement

48. Servicios Funerarios realleges paragraphs 6 through 47.

49. Each of the Representations made by Advent was knowingly false.

50. Advent made the Representations with the intent to deceive Servicios Funerarios.

51. The Representations were material to Servicios Funerarios's decision to enter into the SPA.

52.     Servicios Funerarios reasonably relied on the Representations.

53.     Servicios Funerarios was injured as a result of its reliance on the Representations.

**Count II**
**Violation of Massachusetts General Law Chapter 93A**

54.     Servicios Funerarios realleges paragraphs 6 through 47.

55.     Advent engages in the conduct of trade or commerce.  As part of that conduct and, more specifically, with respect to the sale of the shares of Gayosso, which was motivated by business reasons, Advent engaged in unfair or deceptive acts or practices in controlling and operating Gayosso and by committing the fraudulent acts described herein and by making or directing the fraudulent misrepresentations regarding the financial condition of Gayosso in connection with the sale of the shares in Gayosso to Servicios Funerarios.  This unfair and deceptive conduct occurred primarily and substantially within the Commonwealth.  In fact, Massachusetts was its center of gravity.

56.     Servicios Funerarios, which engages in trade or commerce, suffered a loss of property or money as a result of Advent's deceptive trade practices described above.

57.     Advent's unfair or deceptive acts or practices caused the loss suffered by Servicios Funerarios.

**Count III**
**Negligent Misrepresentation**

58.     Servicios Funerarios realleges paragraphs 6 through 47.

59.     Advent in the course of its business negligently supplied false information relating to the value of Gayosso to Servicios Funerarios, which Advent knew Servicios Funerarios would rely on when considering the purchase and value of the shares of Gayosso.

60.     Advent's supplying of the false information caused and resulted in pecuniary loss to Servicios Funerarios by Servicios Funerarios's justifiable reliance on the false information.

61.     Advent failed to exercise reasonable care or competence in obtaining or communicating the information.

**Count IV**
**Unjust Enrichment**

62.     Servicios Funerarios realleges paragraphs 6 through 47.

63.     Servicios Funerarios's purchase of the shares of Gayosso conferred a benefit, money, or other consideration paid by Servicios Funerarios, upon Advent by reason of Advent's investment, direct or indirect, in the investment funds that sold the shares in Gayosso and by reason of its service as a manager of those funds.

64.     Advent has and at all material times had an appreciation or knowledge of the benefit it received.

65.     Acceptance and retention by Advent of the benefit under the circumstances – the fact that the sale was induced by fraud and/or negligent misrepresentation – would violate the principles of justice or equity and good conscience without payment for its value.

66.     Servicios Funerarios is without an adequate remedy at law.

**Count V**
**Violation of Uniform Fraudulent Transfer Act**

67.     Servicios Funerarios realleges paragraphs 6 through 47.

68.     Upon the fraudulent sale of the shares of Gayosso, the Twibel entities received the amount paid (directly or indirectly) by Servicios Funerarios.

19

69.     The Twibel entities thereupon transferred these proceeds from the fraudulent sale upstream through other investment vehicles and, ultimately, to Advent, which did not receive these proceeds in good faith or for a reasonably equivalent value.

70.     The proceeds of the sale of the shares in Gayosso constitute property under the Uniform Fraudulent Transfer Act (the "Act").

71.     The upstreaming of the proceeds of the sale of the shares in Gayosso constituted a transfer under the Act.

72.     Servicios Funerarios is a creditor of the Twibel entities (and Affiliates), the debtor, under the Act.

73.     The liability of the Twibel entities (and Affiliates) for the fraud in relation to the sale of the shares in Gayosso constitutes a debt under the Act.

74.     The transfer of the proceeds of the fraudulent sale of the shares in Gayosso was intended to hinder, delay, or defraud Servicios Funerarios including because the transfer was to an insider, the transfer was of substantially all of the debtor's assets, and the Twibel entities became insolvent before or after a substantial debt was incurred.

## PRAYER FOR RELIEF

WHEREFORE, Servicios Funerarios demands judgment against Advent for:

a.     Compensatory damages;

b.     Punitive damages;

c.     Treble damages;

d.     Imposition of a constructive trust over benefits received;

e.     Restitution of all amounts paid in connection with the fraudulent sale;

f.     Its costs of this action;

g.    Its attorney's fees; and

h.    All other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Servicios Funerarios demands a trial by jury of all issues so triable.

Dated:  March 29, 2023                    Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**          **LESSER, NEWMAN, ALEO & NASSER LLP**

David Boies (*pro hac vice forthcoming*)    /s/ Michael Aleo
333 Main Street                             Michael Aleo
Armonk, NY 10504                            Thomas Lesser
Telephone: (914) 749-8200                   39 Main Street, Suite 1
Facsimile: (914) 749-8300                   Northampton, MA  01060
dboies@bsfllp.com                           Telephone:  (413) 584-7331
                                            Facsimile:   (413) 586-7076
Carlos M. Sires (*pro hac vice forthcoming*)  aleo@LNN-law.com
Jason Hilborn (*pro hac vice forthcoming*)    lesser@LNN-law.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida  33301             *Attorneys for Plaintiff Servicios Funerarios*
Telephone:  (954) 356-0011                  *GG, S.A. de C.V.*
Facsimile:   (954) 356-0022
csires@bsfllp.com
jhilborn@bsfllp.com

*Attorneys for Plaintiff Servicios Funerarios*
*GG, S.A. de C.V.*